quinn emanuel  trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S EMAIL ADDRESS
alexspiro@quinnemanuel.com

September 25, 2023

**VIA ECF**
Hon. Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     U.S. v. Charlie Javice (No. 23-cr-00251)

Dear Judge Hellerstein:

We write on behalf of Defendant Charlie Javice and in response to letters from the Government and JPMC dated September 22, 2023, the former filed with the Court, the latter addressed to the Government and enclosed as an exhibit to the Government's filing (the "Government Letter" and "JPMC Letter," respectively). The Government Letter advances positions antithetical to fundamental principles of fairness, compounding the prejudice already caused by inexplicable delay with affirmative waste of the Defendants' (and Court's) time and resources. Ms. Javice respectfully requests that the Court exercise its inherent authority to compel compliance with its previous discovery orders.

**I.      Introduction**

Half a year after Ms. Javice's arrest and a year after the Government first subpoenaed records from JPMC, Ms. Javice still awaits the production of basic discovery materials, including materials essential to the preparation of her defense. In the more than three months since the first status conference in this case, the Government has repeatedly assured Ms. Javice and the Court that the Government and JPMC were working "diligently" to produce relevant materials responsive to the Government's subpoena, including materials requested by Ms. Javice. More than a month ago, at the status conference held on August 23, 2023 (the "August Conference"), the Government raised no objection to the process directed by the Court to ensure the Defendants' access to relevant materials and for adjudication of challenges to JPMC's assertions of privilege—indeed, in subsequent conferrals, the Government affirmatively agreed to the Defendants' proposal for addressing JPMC's assertions of privilege. The Government now says

quinn emanuel urquhart & sullivan, llp
ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

never mind. It has, finally, made its position plain: Although the Government is fully aware that JPMC holds relevant materials that are responsive to its subpoena and necessary to Ms. Javice's defense, it intends to fight at every turn to ensure that Ms. Javice never sees those materials and is thereby deprived of her right to a fair trial. The Court must not countenance this abuse of fair and due process.

## II.     Background

Since the start of this case, the Government has offered shifting and inconsistent representations about the scope and timing of the productions the Defendants might expect to receive and about the Government's persistent delays in securing compliance with its own Grand Jury subpoena to JPMC— █████████████████████████████████████████ ██████████████████████████████████████████████████████████████████.[1]

On June 6, 2023, at the first status conference in this case, the Government represented that it had produced "if not all, the vast majority of the Rule 16 discovery in our possession." Status Conf. June 6, 2023, Tr. ("Jun. 6 Tr.") at 4:17–19. The Government also stated that its investigation was ongoing, prompting the court to inquire, "By when do you believe you will have produced everything you are going to produce?" Jun. 6 Tr. at 6:25–7:2. The Government responded that, in terms of volume, any additional productions would not be "anything comparable to the size of the [initial] production" and that it expected to produce "any additional subpoena returns" within approximately 45 days, that is, by the third week of July, or more than two months ago. Jun. 6 Tr. at 7:6–18. During the course of recent conferrals with the Government, the Defendants have now learned that they should expect to receive potentially **double** the amount of discovery produced to date, and they should expect that production to come in one dump close to the October 13, 2023 deadline set by the Court.

At the second status conference, held on July 13, 2023, the Court again inquired, "Have you made your discovery?" The Government stated that it had "produced the Rule 16 in [its] possession" as of that date. Status Conf. July 13, 2023, Tr. ("July 13 Tr.") at 8:10–12. Counsel for Ms. Javice noted that the Government had yet to produce "the internal communications of the JPMorgan side of this . . . They haven't provided them to us. And we believe that they will be exculpatory." *Id.* at 9:17–14. The Court turned to the Government and asked, "Are you intending to produce that information?" Mr. Fergenson replied, "Yes, your Honor." The following colloquy ensued:

> THE COURT: I understand what you want. Let me ask this: Can you, under the Rules, issue a trial subpoena to JPMorgan to produce, well, the things you say you want to have?
>
> MR. SPIRO: We can prepare one immediately for your Honor, yes.

---

[1]   The Government designated the text of the subpoenas as Attorney Possession Only under the governing protective order. The corresponding redaction is made out of an abundance of caution.

> THE COURT: Would there be any objection to doing that, Mr. Fergenson?
>
> MR. FERGENSON: Your Honor, I think we would have to assess whether it would comply with the requirements of Rule 17, but I think maybe just one further –
>
> THE COURT: It would be ahead of the trial, but for purposes of use in a trial. I can see the relevance of that information. Did JPMorgan rely on this information, from your point – from your account, reliance is suggested, but there may be items in the correspondence that show differently. I think it would be a good idea, but – unless you issue the subpoena –
>
> MR. FERGENSON: Well, your Honor, so when I mentioned the rolling productions we're expecting to receive, we expect those to also include additional internal JPMC communications.
>
> THE COURT: Do they have a compulsion to deliver – is there a grand jury subpoena –
>
> MR. FERGENSON: Yes. Yes, your Honor.
>
> THE COURT: So in complying with a subpoena.
>
> MR. FERGENSON: Correct.
>
> THE COURT: All right. It doesn't seem to me a third-party subpoena is necessary, Mr. Spiro, but this is information obtained by the government to the extent it exists in the files of Chase Manhattan, Morgan Chase, and produced to you.

*Id.* at 10:24–12:4. The Court then directed the Government to "give a terminal date to Chase" to complete the bank's productions and to inform the Defendants and Court of that date. *Id.* at 12:9–25.

At the August Conference, the third in this case, the Government stated that JPMC anticipated completing its productions, including privilege logs, in November. Status Conf., Aug. 23, 2023, Tr. ("Aug. 23 Tr.") at 3:8. The Court stated that it was "not very pleased with the slow procedures being used by JP Morgan" and directed completion of JPMC's productions to the Government by October 13. *Id.* at 7:9–14; 9:1–6. Counsel for Ms. Javice again noted the importance to her defense of relevant internal communications among key bank personnel involved in vetting, appraising, and implementing the merger at the heart of this case—internal communications missing then **and now** from the materials produced by the Government. Ms. Javice's counsel indicated that certain key custodians were missing from the list provided by JPMC and that, in order for the Defendants to obtain necessary discovery, those individuals' accounts would need to be searched. *Id.* at 9:15– 10:19. The Court sought the Government's view:

3

> THE COURT: Ms. McLeod?
>
> MS. MCLEOD: Your Honor, as you know, defendants are not entitled to tell a responding third-party how to respond to a subpoena. If they have their own subpoena that might be a different question if they want to work something out.
>
> THE COURT: Don't invite them to have their own subpoena because it is going to take more time.
>
> MS. MCLEOD: That's fair, your Honor.

*Id.* at 10:20–11:2. AUSA McLeod went on to discuss limitations on the defense's ability to shape the scope of the Government's requests but did not suggest that the Government would refuse to carry out the Court's directions. Indeed, when the Court stated that, with respect to the ongoing discovery disputes, it would be "driving the bus," Ms. McLeod responded, "That is absolutely correct, your Honor." *Id.* at 11:16–17. The Court directed that the parties exchange lists of custodians so that the Government would have a list "of those potential custodians of Chase who should be asked to search their files." *Id.* at 17:11–14; *see also* Joint Letter, ECF Dkt. No. 48 ("Joint Letter"). Defense counsel confirmed on the record "the Court's directive [that] we will provide, by the end of next week, a list of custodians which we assume, based on the Court's comments today, [they] will add to the custodian list of the government's and JP Morgan's and at that time, if there is any issue, we will bring it to the Court's attention. But so long as they're going to eventually comply with this very old subpoena and search the relevant parties' names, that's going to be sufficient for the defense at this stage." *Id.* at 17:1–9. **The Government did not oppose the procedure directed by the Court and summarized by counsel for Ms. Javice.**

As detailed in the Joint Letter, the Defendants complied with the Court's direction that they provide a proposed list of supplemental custodians to the Government by September 1, 2023. The Government said nothing to the Defendants on the subject until a conferral call on September 7, 2023, when, for the first time, the Government stated that it would not follow the Court's direction. The Government not only declined to confirm whether the Defendants' supplemental list of custodians had been provided to JPMC but refused to engage in **any** discussion regarding the scope of the list. The Government advised the Defendants to "file something" with the Court if they wanted relief.

With respect to privilege, the Government expressly agreed during the September 7, 2023 conferral call to the following proposal, sent by the Defendants the day before, in writing (*see* Ex. A, attached hereto):

> To the extent we wish to challenge the withholding of documents identified on JPMC's privilege logs or to seek clarification regarding an assertion of privilege, we think it would be most efficient for us to send our list(s) of challenged documents along with a basis for our challenge (or our request for clarification) to a representative of the bank, copying you, to give the bank an

4

opportunity to revisit or clarify the claim of privilege and potentially avoid the need for Court intervention. We would propose that to the extent you wish to challenge the assertion of privilege as to any documents, you do the same, copying us. If, after this process, disagreements remain as to assertions of privilege, the parties can decide which documents they wish to present for review by the Court at the hearing on the 26th. Do you agree to this proposed framework?

At the conferral, after agreeing to Defendants' proposal, the Government identified Kristy Greenberg of Hogan Lovells, counsel for JPMC, as the person to whom Defendants should direct their privilege challenges. With the parties in apparent agreement on process, the Defendants spent many hours analyzing voluminous privilege logs produced by JPMC, including logs produced in the days just before the Joint Letter was due to the Court, and prepared and sent a letter to JPMC, copying the Government and noting the Government's consent to the process, in which the Defendants raised certain objections to the bank's claims of privilege. (*See* Ex. B, attached hereto).

The Defendants prepared their portion of the Joint Letter based on the understanding, confirmed by the Government, that they should expect to receive tens of thousands of additional privilege log entries and that the agreed process for challenging privilege would, of necessity, continue well past the September 26 hearing. When the parties conferred on the Joint Letter the evening before it was due—in a meeting the Government requested—the Government said nothing to indicate that it wished to revisit the parties' agreement. Indeed, in its portion of the Joint Letter, the Government noted that it did "not expect to raise any challenges to JPMC's claims of privilege" and nowhere suggested that the Defendants should be barred from raising such challenges.

### III.     The Government's Letter Reveals Conduct Inconsistent with Good Faith and Undertaken in Concert with JPMC

The Government Letter makes clear that (1) the Government has no intention of making a good faith effort to ensure that the Defendants have access to the materials essential to the preparation of their defenses in accordance with this Court's instructions and basic principles of fairness; and (2) by withholding until now objections it easily could have raised months ago, the Government has forced the Defendants into a choice between proceeding to trial on a distorted record cherry-picked by JPMC—a bank maximally incentivized to withhold information helpful to the Defendants—or further delaying their day in court in order to gain access to materials essential to the preparation of their defenses. Needless to say, Ms. Javice must choose the latter course.

#### A. Rule 16 Discovery

The Government suggests in its Letter that the Defendants failed to adequately confer before notifying the Court of their concerns relating to the list of custodians selected by JPMC. Gov. Ltr. at 2. This is nonsense, and obviously so.

The Defendants addressed the inadequacy of JPMC's list of custodians in open court at the August Conference—indeed, the Defendants' concerns on this point gave rise to the Court's direction that the Government provide a supplemental list to JPMC. The Government raised no objection to this procedure at the hearing, leaving the Defendants to spend hours generating the list of custodians contemplated by the Court's order, which the Defendants provided to the Government on September 1, 2023, under cover of a letter that referred to the Court's instructions. Upon receipt of this letter, the Government said nothing. It did not inform the Defendants that it had reconsidered its position, for example, or reference the cases and principles it now cites regarding its control over the grand jury process. Rather, the Government waited until a conferral call a week later to tell the Defendants that it was not going to provide the list to JPMC. The Defendants naturally asked to understand the Government's position—had the Government understood the Court differently? Was the Government taking the position that the Court was not empowered to order the Government to obtain additional materials? The Government refused to say, directing the Defendants to file an application with the Court if they wanted relief. On this record, the Government's accusations of sandbagging smack of projection.

The Government now seeks to justify its refusal to consider the names provided by the Defendants by reference to the role of the grand jury. The Government faults the Defendants for "interject[ing] themselves into the Government's grand jury subpoenas," Gov. Ltr. at 5, but fails to acknowledge that the Defendants have done no more than comply with the Court's instructions. Moreover, it was the *Government* that told the Court it intended to obtain the information sought by the Defendants under power of its broad subpoena. July 13 Tr. at 10:1–2 ("Court: Are you intending to produce that information? Mr. Fergenson: Yes, your Honor"). While the Defendants do not challenge the proposition that the grand jury is, as the Government puts it, "under the (almost) complete control of the prosecutor" (Gov. Ltr. at 3, quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 189 (2d Cir. 2000)), here the prosecution is abusing its role in the investigative process, allowing JPMC, a highly interested party, to avoid searching sources of data certain to contain highly relevant information.

In any event, had the Government wished to resist efforts to ensure that JPMC's productions included all materials necessary to the defense, it could and should have relied on the authorities cited in the Government Letter months ago instead of repeatedly suggesting to the Court and to the Defendants that it expected to receive many of the same requested materials under the authority of its subpoena, *see, e.g.*, July 13 Tr. at 11:17–24, or that it would comply with this Court's order on August 23, *see* Aug. 23 Tr. at 11:11–17; *accord id.* at 20:20–22:22.

### B. Rule 17

The Government's suggestion that the Defendants are attempting to avoid the Rule 17 process relies on a gross distortion of the record. It is the Government that has misled the Court and the Defense regarding its true intentions on this score. The Court has (at least) twice considered the possibility of authorizing Rule 17 subpoenas, but in both instances declined to do so based on representations **by the Government** clearly intended to suggest that defense subpoenas would be unnecessary because the Government intended to compel production of the materials sought by the Defendants.

The Government Letter includes the following characterization of the record:

> Indeed, at the July 13, 2023 status conference before this Court, Your Honor asked defense counsel: "Let me ask this: Can you, under the Rules, issue a trial subpoena to JPMorgan to produce, well, the things you say you want to have?" (July 13, 2023 Tr. at 10-11 (emphasis added)). Counsel for Javice responded, "We can prepare one immediately for your Honor, yes." (*Id.* at 11). Over two months have passed since that conference and, to the Government's knowledge, neither defendant has applied to the court for an issuance of a Rule 17 subpoena.

This paragraph leaves out the exchange that followed, quoted *supra* at 2–3, during which the Government indicated to the Court that it would obtain the necessary materials pursuant to its subpoena, leading the Court to conclude: "All right. It doesn't seem to me a third-party subpoena is necessary, Mr. Spiro, but this is information obtained by the Government to the extent it exists in the files of Chase Manhattan, Morgan Chase, and produced to you." Of course, the Defendants did not apply for Rule 17 subpoenas after the Government gave assurances that the information the Defendants sought would be obtained through other means.

A month later, at the August Conference, when the Government suggested the Defendants could pursue relevant materials through Rule 17 subpoenas, the Court stated, "Don't invite them to have their own subpoena because it is going to take more time." Aug. 23 Tr. at 10:25–11:1. Ms. McLeod responded, "That's fair," *id.* at 11:2, and, later, to the Court's statement that it would be "driving the bus" on discovery, "That's absolutely correct, your Honor," *id.* at 11:16–17. Surely every person in the courtroom understood both that the Court was proposing a practical solution in the interest of efficiency and also that the Government had consented to that proposal. It is hard to think that the same prosecutors who said, "That's fair" and then affirmatively endorsed the Defendants' proposal for painstaking review of privilege logs have now, a month later, filed a letter retreating to legal formalism and complaining that the Defendants are trying to avoid Rule 17 process. Ms. Javice cannot know whether the Government's conduct was cavalier or in bad faith, but the prejudice to her defense and her right to a fair process is the same.

### C. Privilege

The Government's conduct with respect to procedures set by the Court for resolving privilege issues is particularly troublesome and revealing as to the relationship between the Government and JPMC in this matter. At the August Conference, the Court proposed a process by which the Government **and the Defendants** would have an opportunity to challenge privilege assertions by JPMC in connection with its response to the Government's grand jury subpoena—a subpoena, as discussed above, that the Defendants understood would capture the materials necessary to preparation of their defense. The Government raised no objection to that process, participated in two subsequent conferences with the Defendants regarding these privilege challenges, **agreed** to the Defendants' methodology for challenging JPMC's privilege assertions, and **facilitated the** Defendants' outreach to counsel for JPMC to communicate such challenges. The Defendants have spent many hours analyzing privilege logs produced by JPMC, drafting

7

correspondence with JPMC, and conferring with the Government only to learn three days ago, for the very first time, that the Government now takes the position (following discussions between the Government and JPMC) that the Defendants have no right to submit privilege objections to JPMC and that the Government will not advance those objections on behalf of the Defendants. It would be hard to invent a more egregious example of sandbagging.

As discussed below, the source of the Government's abrupt change of heart is hardly a mystery. They consulted with counsel for JPMC and changed their position to match the bank's. It bears noting that the bank presumably was well aware of the process set by the Court last month but, like the Government, waited until now to raise their objection to the Court's proposal.

### D. The Government and JPMC Are Working Together

The Government's delegation of authority to JPMC in the context of the bank's selection of custodians and assertions of privilege are only the latest indicators of the unusually close relationship between the Government and the bank in connection with this case, starting with the fact that the pending criminal charges are based almost entirely on information carefully curated by JPMC, and the allegations in the criminal complaint and subsequent indictment closely mirror those leveled by the bank against the Defendants in a civil suit filed in Delaware. The relationship suggests that the bank is acting, in effect, as an arm of the prosecution. Ms. Javice does not here seek a finding to that effect (she reserves the right to do so in the future) but urges the Court to take the unusual nature of the relationship into consideration as it exercises its discretion to protect Ms. Javice's right to a fair trial. To give just one example, the JPMC Letter includes the following statement:

> Importantly, the SDNY has informed JPMC that the SDNY: a) has no challenges to the Privilege Logs; and b) has no requested changes to the Custodian List. Simply put, there is no dispute between the SDNY and JPMC about JPMC's compliance with the Subpoenas issued by the SDNY to JPMC.

JPMC Ltr. at 3. How could the Government have decided it has no challenges to the Privilege Logs when (1) the Defendants have identified several aspects of the logs that suggest substantially overbroad assertions of privilege, and (2) the Government was only recently supplied with thousands of additional entries on the cumulative log and thousands of documents with portions redacted based on asserted privilege. Since the Government cannot have conducted a thorough review of those assertions, it seems the Government's position is that it does not care whether JPMC has withheld discoverable, non-privileged materials. The same might be said of the Government's lack of interest in providing JPMC with additional custodians—such as Ms. Javice's direct supervisor, who was intimately involved in aspects of the integration of Frank following the merger, individuals identified in **JPMC's own civil complaint against Ms. Javice**, and the executives who ultimately approved the merger and its price, *see* Joint Ltr. at 5—individuals whose data should be searched for relevant materials. The Government states that "149 different individuals or administrative inboxes who have been included as custodians," Gov. Ltr. at 1, but fails to mention self-serving aspects of the list, such as the inclusion of former Frank employees who had little to nothing to do with the merger and the absence of key JPMC personnel who were

8

intimately involved in diligence, integration, and other aspects of the merger.[2] The Government insists that the grand jury's investigation is ongoing, Gov. Ltr. at 1, but it is a strange sort of investigation in which the Government is closing its eyes to obvious sources of relevant material.

### IV. Requested Relief in the Interest of Due Process and Fundamental Fairness

The Court should exercise its authority to ensure that the Defendants receive the materials they require to prepare their defenses in this case by enforcing its prior orders. Fundamental principles of fairness, particularly in the context of a criminal case in which Ms. Javice's liberty interest is at stake, require no less. *Cf., e.g., California v. Trombetta*, 467 U.S. 479, 485 (1984) ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense.").

This Court has both statutory and inherent authority over the discovery process in criminal prosecutions to further the ends of justice. *See, e.g.*, Fed. R. Crim. P. 16(d)(2)(A) & (d)(2)(D) (providing that, when the government fails to satisfy its obligations hereunder, the Court may order the government to provide the requested discovery or "***enter any other order that is just*** under the circumstances" (emphasis added)); *United States v. Jackson*, 508 F.2d 1001, 1006 (7th Cir. 1975) ("[T]he district court possesses, in the exercise of its inherent power to promote the proper administration of criminal justice, the authority to" order discovery beyond that provided by the federal rules or statute); *Cordius Tr. v. Kummerfeld Assocs., Inc.*, 658 F. Supp. 2d 512, 524 (S.D.N.Y. 2009) ("Federal courts have broad discretion to fashion remedies as equity requires, to ensure compliance with their orders.").

The positions taken by the Government—indicating that it intended to require compliance with its broad Grand Jury subpoena in a manner sufficient to secure the materials requested and needed by the Defendants; agreeing to practical, compromise procedures set by the Court; agreeing to the Defendants' proposed procedures for addressing challenges to JPMC's assertions of privilege, only to abruptly change course—violate the Court's instructions and offends the interests of justice. *See, e.g.*, Fed. R. Crim. P. 2 ("These rules are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay.").

---

[2] It remains unclear to the defense what sources of information JPMC is searching or querying—i.e., whether it is searching phones, emails, messaging applications, central repositories, etc. The Defendants have repeatedly asked for this information, along with information about search parameters used by the bank—not investigative techniques, but merely information regarding the process for determining relevance. The Defendants reserve the right to move to compel disclosure of this information.

## V.     Conclusion

In light of the foregoing, the Defendants respectfully request that the Court direct the Government's immediate compliance with its previous orders that relevant materials be gathered from JPMC and produced forthwith.

Respectfully Submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Alex Spiro