# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.                                          CRIMINAL NO.   3:20-cr-00175 - RNC

JPMORGAN CHASE & CO.

## **DEFERRED PROSECUTION AGREEMENT**

Defendant JPMorgan Chase & Co. (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office"), enter into this deferred prosecution agreement (the "Agreement"). The Company's subsidiaries, JPMorgan Chase Bank, N.A. ("JPMC"), and J.P. Morgan Securities LLC ("JPMS") (together, the "Related Entities"), also agree, pursuant to the authority granted by their respective Boards of Directors, also reflected in Attachment B, to certain terms and obligations of the Agreement as described below. The terms and conditions of this Agreement are as follows:

## **Criminal Information and Acceptance of Responsibility**

1.      The Company acknowledges and agrees that the Fraud Section and the Office will file the attached two-count criminal Information in the United States District Court for the District of Connecticut charging the Company with two counts of wire fraud, in violation of Title 18, United States Code, Section 1343. In so doing, the Company: (a) knowingly waives any right it may have to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect

to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Connecticut. The Fraud Section and the Office agree to defer prosecution of the Company pursuant to the terms and conditions described below.

2.     The Company and the Related Entities admit, accept, and acknowledge that they are responsible under United States law for the acts of their officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. The Company and the Related Entities agree that, effective as of the date they sign this Agreement, in any prosecution that is deferred by this Agreement, they will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, in connection therewith, the Company and the Related Entities agree not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines"), or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

### Term of the Agreement

3.     This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term"). The Company and the

Related Entities agree, however, that, in the event the Fraud Section and the Office determine, in their sole discretion, that the Company or the Related Entities have knowingly violated any provision of this Agreement or have failed to completely perform or fulfill each of their obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section and the Office, in their sole discretion, for up to a total additional time period of one year, without prejudice to the right of the Fraud Section and the Office to proceed as provided in Paragraphs 24-27 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section and the Office find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early. If the court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), the Term shall be deemed to have not begun, and all the provisions of this Agreement shall be deemed null and void, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

### Relevant Considerations

4.      The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case and by the Company and the Related Entities, including:

a.      The nature and seriousness of the offense conduct, which involved tens of thousands of instances of unlawful trading in gold, silver, platinum, and palladium

("precious metals") futures contracts by ten former traders on the precious metals desk of the Company and the Related Entities resulting in at least $205,992,102 of loss to other precious metals futures market participants between March 2008 and August 2016, as well as thousands of instances of unlawful trading in U.S. Treasury futures contracts and in U.S. Treasury notes and bonds in the secondary ("cash") market by five former traders on the U.S. Treasuries desk of the Company and the Related Entities resulting in at least $105,744,906 of loss to other U.S. Treasury futures and cash market participants between April 2008 and January 2016, all resulting in significant harm to the integrity of core United States commodities and securities markets;

b.       The Company did not receive voluntary disclosure credit because it did not voluntarily and timely disclose to the Fraud Section and the Office the conduct described in the Statement of Facts;

c.       The Company received credit for its cooperation with the Fraud Section's and the Office's investigation into both the precious metals and U.S. Treasuries conduct, including conducting a thorough internal investigation, making factual presentations to the Fraud Section and the Office, voluntarily making foreign-based employees available for interviews in the United States, producing documents to the Fraud Section and the Office from foreign countries in ways that did not implicate foreign data privacy laws, and proactively identifying for the Fraud Section and the Office important documents and information even when those documents and information were not favorable to the Company, notwithstanding the fact that earlier in the Fraud Section's and the Office's investigation of the precious metals conduct the Company was unable to provide a complete list of trader IDs;

-4-

d. The Company and the Related Entities engaged in remedial measures, including suspending (and ultimately terminating) any employees still working at the Company, the Related Entities, and their affiliates that were involved in the conduct described in the Statement of Facts, although the suspensions of employees on the precious metals desk occurred several months after the Fraud Section and the Office notified the Company of their investigation and only after a second individual involved in the precious metals conduct had pleaded guilty;

e. The Company provided to the Fraud Section and the Office all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Statement of Facts and conduct disclosed to the Fraud Section and the Office prior to the Agreement;

f. The Company's prior criminal history includes a guilty plea on May 20, 2015, for similar misconduct involving manipulative and deceptive trading practices in the foreign currency exchange spot market (the "FX Guilty Plea");

g. The Company and the Related Entities have enhanced and have committed to continuing to enhance their compliance program and internal controls, including ensuring that their compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program). In particular, following the FX Guilty Plea, the Company and the Related Entities engaged in a systematic effort to reassess and enhance their market conduct compliance program and internal controls, including by:

-5-

(i)      hiring hundreds of new compliance officers, spending over $335 million on personnel and other compliance-related costs, and increasing Internal Audit's budget by almost $100 million and its headcount by approximately 400;

(ii)     improving their anti-fraud and manipulation training and policies, for example, the Company's 2019 Business Conduct Training included specific scenarios covering different products and dedicated spoofing sections that highlighted regulators' concerns, key definitions, and a discussion of "Dos" and "Don'ts" and the Company has continued to issue compliance bulletins highlighting lessons learned from cases brought against traders and firms that were found to have engaged in spoofing;

(iii)    revising their trade and electronic communications surveillance programs, for example, the Company's systems now surveil trades on over 80 equities exchanges and over 40 futures and options exchanges. The Company also continues to refine its spoofing surveillance, modifying its spoofing parameters in response to lessons learned in the instant case and related interactions with exchanges and regulators, and currently uses three primary alert types within SMARTS to detect potential spoofing, including spoofing by layering orders;

(iv)    increasing their electronic communications surveillance program by, on a monthly basis, the Company's communications surveillance platforms automatically ingesting and processing approximately 100 million messages, and analysts review 100% of the alerts generated from these surveillances. The Company continues to update the universe of monitored employees and revise its

-6-

lexicons on a regular basis to address evolving risks as well as utilize technology that allows for lexicon-based surveillance of voice recordings;

(v)     implementing tools and processes to facilitate closer supervision of traders, for example, by implementing the Supervisory Portal which is a web-based, centralized tool that helps supervisors meet their oversight responsibilities. The Supervisory Portal presents supervisors with a consolidated view of metrics ranging from an employee's attendance at trainings to the number and type of trading-related alerts an employee has triggered. This allows a supervisor to make assessments about an employee's risk profile by considering diverse metrics that might be meaningful in combination but not in isolation. Supervisors are also required to review and affirm employees' conduct on a monthly basis, which incentivizes closer supervision. With regard to precious metals traders, Supervisory Portal reports contain granular information including, but not limited to, whether any trading was above applicable thresholds or required additional action and/or escalation;

(vi)     taking into account employees' commitment to compliance in promotion and compensation decisions by, among other things, soliciting direct feedback from risk and control professionals when reviewing employees who individually or collectively are responsible for risk-taking or risk management at the Company; and

(vii)     implementing independent quality assurance testing of non-escalated and escalated surveillance alerts, which identifies potential defects in alert documentation and promotes consistency in the dispositioning of alerts, and now

issues monthly spoofing alert reports that provide metrics on alerts by trader, desk, supervisor, and region.

h.      Accordingly, after considering (a) through (g) above, the Company received an aggregate discount of twelve-and-one-half percent off of the bottom of the otherwise-applicable Sentencing Guidelines fine range;

i.      Substantially all of the conduct described in the Statement of Facts occurred prior to the Company's FX Guilty Plea and to the significant changes to the Company's and the Related Entities' compliance program described in Paragraph 4(g) above;

j.      Based on the Company's and the Related Entities' remediation, the state of their compliance program, and the Company's and the Related Entities' agreement to report to the Fraud Section and the Office as set forth in Attachment D to this Agreement (Corporate Compliance Reporting), the Fraud Section and the Office determined that an independent compliance monitor was unnecessary;

k.      The Company and the Related Entities have agreed to continue to cooperate with the Fraud Section and the Office as described in Paragraph 5, below;

l.      The Company and the Related Entities have agreed to enter into a separate resolution with the U.S. Commodity Futures Trading Commission ("CFTC") relating to the conduct described in the Statement of Facts; and

m.      JPMS has agreed to enter into a separate resolution with the U.S. Securities and Exchange Commission ("SEC") relating to the conduct described in the Statement of Facts regarding the trading of U.S. Treasury notes and bonds in the secondary cash market.

## Future Cooperation and Disclosure Requirements

5.     The Company, the Related Entities, and their subsidiaries and affiliates shall cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Fraud Section and the Office until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Fraud Section and the Office, the Company, the Related Entities and their subsidiaries and affiliates shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company, the Related Entities, their subsidiaries and affiliates, or any of their present or former officers, directors, employees, and agents in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct.  The Company's, the Related Entities', and their subsidiaries' and affiliates' cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company, the Related Entities, and their subsidiaries and affiliates must provide to the Fraud Section and the Office a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company, the Related Entities, and their subsidiaries and affiliates bear the burden of establishing the validity of any such assertion.  The Company, the Related Entities, and their subsidiaries and affiliates agree that their cooperation pursuant to this paragraph shall include, but not be limited to, the following:

a.     The Company, the Related Entities, and their subsidiaries and affiliates shall truthfully disclose all factual information with respect to their activities and those of their present and former directors, officers, employees, agents, and consultants, including any

-9-

evidence or allegations and internal or external investigations, about which the Company, the Related Entities, and their subsidiaries and affiliates have any knowledge or about which the Fraud Section and the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company, the Related Entities, and their subsidiaries and affiliates to provide to the Fraud Section and the Office, upon request, any document, record or other tangible evidence about which the Fraud Section and the Office may inquire of the Company, the Related Entities, and their subsidiaries and affiliates.

b.      Upon request of the Fraud Section and the Office, the Company, the Related Entities, and their subsidiaries and affiliates shall designate knowledgeable employees, agents, or attorneys to provide to the Fraud Section and the Office the information and materials described in Paragraph 5(a) above on behalf of the Company, the Related Entities, and their subsidiaries and affiliates. It is further understood that the Company, the Related Entities, and their subsidiaries and affiliates must at all times provide complete, truthful, and accurate information.

c.      The Company, the Related Entities, and their subsidiaries and affiliates shall use their best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, directors, employees, agents, and consultants of the Company, the Related Entities, and their subsidiaries and affiliates. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, the Related Entities, and their

subsidiaries and affiliates, may have material information regarding the matters under investigation.

       d.     With respect to any information, testimony, documents, records, or other tangible evidence provided to the Fraud Section and the Office pursuant to this Agreement, the Company, the Related Entities, and their subsidiaries and affiliates consent to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Fraud Section and the Office, in their sole discretion, shall deem appropriate.

      6.     In addition to the obligations in Paragraph 5, during the Term, should the Company or the Related Entities learn of any evidence or allegation of (A) conduct which may constitute a violation of the wire fraud statute, Title 18, United States Code, Section 1343; or (B) conduct in the Global Markets, Global Rates & Rates Exotics, or Global Commodities lines of business in the Corporate and Investment Bank which may constitute a violation of (i) the anti-fraud, anti-spoofing, and/or anti-manipulation provisions of the Commodity Exchange Act, Title 7, United States Code, Section 1, *et seq*.; (ii) the securities and commodities fraud statute, Title 18, United States Code, Section 1348; or (iii) the federal securities laws prohibiting manipulative and deceptive devices, Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively, (A) and (B), the "Securities and Commodities Laws"), the Company and the Related Entities shall promptly report such evidence or allegation to the Fraud Section and the Office.

### Total Criminal Monetary Amount

      7.     The Company and the Fraud Section and the Office agree that the Total Criminal Monetary Amount to be paid by the Company pursuant to this Agreement is $920,203,609, which

is comprised of the following components set forth below: (i) a Criminal Monetary Penalty of $436,431,811; (ii) a Criminal Disgorgement Amount of $172,034,790; and (iii) a Victim Compensation Payment Amount of $311,737,008.

8.    The Fraud Section and the Office agree that: (i) the Criminal Monetary Penalty may be offset by the amount of any payment made by the Company pursuant to the September 29, 2020 order and settlement between the Company and the CFTC; and (ii) that the Criminal Disgorgement Amount may be offset by the $10 million disgorgement payment made by JPMS pursuant to the September 29, 2020 order and settlement between JPMS and the SEC, both the CFTC and SEC resolution relating to the conduct described in the attached Statement of Facts.

9.    The Company acknowledges that no tax deduction may be sought in connection with the payment of any of the components of the Total Criminal Monetary Amount. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Total Criminal Monetary Amount or any other agreement entered into with an enforcement authority or a regulator, including the CFTC and SEC, concerning the facts set forth in the Statement of Facts.

## **Payment of Criminal Monetary Penalty**

10.    The Fraud Section and the Office and the Company agree that application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

a.    The 2018 USSG are applicable to this matter.

b.    <u>Offense Level</u>. Based upon USSG § 2B1.1, the total offense level is 39, calculated as follows:

| (a)(1) | Base Offense Level | 7 |
| (b)(1)(O) | Loss of More Than $250,000,000 | +28 |

-12-

| (b)(2)(A)(i) | More Than 10 Victims | +2 |
| (b)(10) | Sophisticated Means | +2 |
| **TOTAL** | | 39 |

c.     <u>Base Fine</u>. Based upon USSG § 8C2.4(a)(3), the base fine is $311,737,008 (the loss from the offense, which is greater than the amount indicated in the Offense Level Fine Table)

d.     <u>Culpability Score</u>. Based upon USSG § 8C2.5, the culpability score is 8, calculated as follows:

| (a) | Base Culpability Score | 5 |
| (b)(3) | The relevant unit of the organization had 200 or more employees and one or more individuals within high-level personnel of the unit participated in, condoned, or was willfully ignorant of the offense | +3 |
| (c)(2) | The organization committed any part of the instant offense less than 5 years after a criminal adjudication based on similar misconduct | +2 |
| (g)(2) | The organization cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |
| **TOTAL** | | 8 |

<u>Calculation of Fine Range</u>:

| Base Fine | $311,737,008 |
| Multipliers | 1.6 (min) / 3.2 (max) |
| Fine Range | $498,779,213 / $997,558,426 |

11.     The Company agrees to pay a criminal monetary penalty in the amount of $436,431,811 (the "Criminal Monetary Penalty") to the United States Treasury no later than ten (10) business days after the Agreement is fully executed pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion. The Fraud Section and the Office and

-13-

the Company agree that this Criminal Monetary Penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4.

12.     The Criminal Monetary Penalty is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section and the Office that $436,431,811 is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section and the Office are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section and the Office agree that under those circumstances, they will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.

### Payment of Criminal Disgorgement Amount

13.     The Company hereby agrees to disgorge to the United States the sum of $172,034,790 (the "Criminal Disgorgement Amount").  The Company shall pay the Criminal Disgorgement Amount plus any associated transfer fees no later than ten (10) business days after the Agreement is fully executed, pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.

14.     The Criminal Disgorgement Amount paid is final and shall not be refunded should the Fraud Section and the Office later determine that the Company has breached this Agreement and commence a prosecution against the Company.  In the event of a breach of this Agreement and subsequent prosecution, the Fraud Section and the Office may pursue additional civil and criminal forfeiture in excess of the Criminal Disgorgement Amount.  The Fraud Section and the Office agree that in the event of a subsequent breach and prosecution, they will recommend to the Court that the amounts paid pursuant to this Agreement be offset against whatever forfeiture the

Court shall impose as part of its judgment. The Company understands that such a recommendation will not be binding on the Court.

### Payment of Victim Compensation Amount

15.     The Company agrees to pay the amount of $311,737,008 in order to compensate victims for their losses as set forth in Paragraph 4(a) above (the "Victim Compensation Amount"). The Company shall pay the full Victim Compensation Amount to the United States no later than ten (10) business days after the Agreement is signed pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.

16.     The Fraud Section and the Office shall have sole discretion to determine how the Victim Compensation Amount will be disbursed. The Company shall retain and pay the costs of a claims administrator for making victim compensation payments according to calculations and instructions provided by the Fraud Section and the Office in their sole discretion.

17.     The Company agrees that any part of the Victim Compensation Amount that remains unclaimed at the end of the Term shall revert to the United States in the form of an additional Criminal Monetary Penalty.

### Conditional Release from Liability

18.     Subject to Paragraphs 24-27, the Fraud Section and the Office agree, except as provided in this Agreement, that they will not bring any criminal or civil case against the Company or the Related Entities relating to any of the conduct described in the attached Statement of Facts, the criminal Information filed pursuant to this Agreement, or in the Superseding Indictment filed in *United States v. Smith*, 19-cr-669, ECF No. 52 (N.D. Ill. Nov. 14, 2019); or any conduct on the Company's and Related Entities' precious metals desk or U.S. government bonds desk relating to manipulative trading in connection with triggering or defending precious metals barrier options

and to placing orders with no intent to execute in connection with the trading of precious metals futures contracts, U.S. Treasury futures contracts, and U.S. Treasury bonds and notes in the secondary ("cash") market during the relevant periods as defined in the Statement of Facts. The Fraud Section and the Office, however, may use any information related to the conduct described in the attached Statement of Facts against the Company or the Related Entities: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

     a.     This Agreement does not provide any protection against prosecution for any future conduct by the Company or the Related Entities.

     b.     In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company or the Related Entities.

### Corporate Compliance Program

19.     The Company and the Related Entities represent that they have implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the Securities and Commodities Laws throughout their operations, including those of their affiliates, agents, and joint ventures (to the extent the Company or the Related Entities manage or control such joint ventures) and those of their contractors and subcontractors whose responsibilities relate to securities and commodities trading or supervision of securities and commodities trading, including, but not limited to, the minimum elements set forth in Attachment C.

20.     In order to address any deficiencies in their internal controls, policies, and procedures, the Company and the Related Entities represent that they have undertaken, and will continue to undertake in the future, in a manner consistent with all of their obligations under this Agreement, a review of their existing internal controls (including their trade surveillance tools), policies, and procedures regarding compliance with the Securities and Commodities Laws. Where necessary and appropriate, the Company and the Related Entities agree to adopt a new compliance program, or to modify their existing ones, including internal controls, compliance policies, and procedures in order to ensure that they maintain an effective compliance program, including a system of internal controls, designed to effectively detect and deter violations of the Securities and Commodities Laws. The compliance program, including the internal controls system, will include, but not be limited to, the minimum elements set forth in Attachment C.

## Corporate Compliance Reporting

21.     The Company and the Related Entities agree that they will report to the Fraud Section and the Office annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C. These reports will be prepared in accordance with Attachment D.

## Deferred Prosecution

22.     In consideration of the undertakings agreed to by the Company and the Related Entities herein, the Fraud Section and the Office agree that any prosecution of the Company for the conduct set forth in the attached Statement of Facts be and hereby is deferred for the Term. To the extent there is conduct disclosed by the Company or the Related Entities that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

23.     The Fraud Section and the Office further agree that if the Company and the Related Entities fully comply with all of their obligations under this Agreement, the Fraud Section and the Office will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Six months after the Agreement's expiration, the Fraud Section and the Office shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts.  If, however, the Fraud Section and the Office determine during this six-month period that the Company or the Related Entities breached the Agreement during the Term, as described in Paragraph 24, the Fraud Section's and the Office's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 24-27, remains in full effect.

### Breach of the Agreement

24.     If, during the Term, (a) the Company or the Related Entities commit any felony under U.S. federal law; (b) the Company or the Related Entities provide in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with their disclosure of information about individual culpability; (c) the Company, the Related Entities, or their subsidiaries and affiliates fail to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) the Company and the Related Entities fail to implement a compliance program as set forth in Paragraphs 19-20 of this Agreement and Attachment C; or (e) the Company or the Related Entities otherwise fail to completely perform or fulfill each of their obligations under the Agreement, regardless of whether the Fraud Section and the Office become aware of such a breach after the Term is complete, the Company, the Related Entities, and their subsidiaries and affiliates

-18-

shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section and the Office in the United States District Court for the District of Connecticut or any other appropriate venue. Determination of whether the Company or the Related Entities have breached the Agreement and whether to pursue prosecution of the Company, the Related Entities, or their subsidiaries or affiliates shall be in the sole discretion of the Fraud Section and the Office. Any such prosecution may be premised on information provided by the Company, the Related Entities, their subsidiaries and affiliates, or their personnel. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, the Related Entities, or their subsidiaries and affiliates, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company and the Related Entities agree that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company and the Related Entities agree that the statute of limitations as to any violation of the Securities and Commodities Laws that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

-19-

25.    In the event the Fraud Section and the Office determine that the Company or the Related Entities have breached this Agreement, the Fraud Section and the Office agree to provide the Company and the Related Entities with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company and the Related Entities shall have the opportunity to respond to the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company and the Related Entities have taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Company or the Related Entities.

26.    In the event that the Fraud Section and the Office determine that the Company or the Related Entities have breached this Agreement: (a) all statements made by or on behalf of the Company, the Related Entities, or their subsidiaries and affiliates to the Fraud Section and the Office or to the Court, including the attached Statement of Facts, and any testimony given by the Company, the Related Entities, or their subsidiaries and affiliates before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section and the Office against the Company, the Related Entities, or their subsidiaries and affiliates; and (b) the Company, the Related Entities, or their subsidiaries and affiliates shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, Section 1B1.1(a) of the United States Sentencing Guidelines, or any other federal rule that any such statements or testimony made by or on behalf of the Company, the Related Entities, or their subsidiaries and affiliates prior or subsequent to this Agreement, or any leads derived therefrom,

should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer, or employee, or any person acting on behalf of, or at the direction of, the Company, the Related Entities, or their subsidiaries and affiliates will be imputed to the Company or the Related Entities for the purpose of determining whether the Company or the Related Entities have violated any provision of this Agreement shall be in the sole discretion of the Fraud Section and the Office.

27.     The Company and the Related Entities acknowledge that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company or the Related Entities breach this Agreement and this matter proceeds to judgment. The Company and the Related Entities further acknowledge that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

28.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, on behalf of itself and the Related Entities, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will submit the certification set forth in Attachment E and certify to the Fraud Section and the Office that the Company and the Related Entities have met their disclosure obligations pursuant to Paragraph 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Sale, Merger, or Other Change in Corporate Form of Company and the Related Entities

29.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company and the Related Entities agree that in the event that, during the Term, they undertake any change in corporate form, including if they sell, merge, or transfer business operations that are material to the Company's or the Related Entities' consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the ability of the Fraud Section and the Office to breach under this Agreement is applicable in full force to that entity. The Company and the Related Entities agree that the failure to include these provisions in the transaction will make any such transaction null and void. The Company and the Related Entities shall provide notice to the Fraud Section and the Office at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Fraud Section and the Office shall notify the Company and the Related Entities prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term the Company or the Related Entities engage in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section and the Office may deem it a breach of this Agreement pursuant to Paragraphs 24-27 of this Agreement. Nothing herein shall restrict the Company or the Related Entities from indemnifying (or otherwise holding

-22-

harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section and the Office.

## Public Statements by Company and the Related Entities

30.     The Company and Related Entities expressly agree that they shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company or the Related Entities make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company and the Related Entities set forth above or the facts described in the attached Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company and the Related Entities described below, constitute a breach of this Agreement, and the Company and/or the Related Entities thereafter shall be subject to prosecution as set forth in Paragraphs 24-27 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company and/or the Related Entities for the purpose of determining whether they have breached this Agreement shall be at the sole discretion of the Fraud Section and the Office. If the Fraud Section and the Office determine that a public statement by any such person contradicts in whole or in part a statement contained in the attached Statement of Facts, the Fraud Section and the Office shall so notify the Company and the Related Entities, and the Company and the Related Entities may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company and the Related Entities shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and

claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company or the Related Entities in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company or the Related Entities.

31. The Company and the Related Entities agree that if they, or any of their direct or indirect subsidiaries or affiliates, issue a press release or hold any press conference in connection with this Agreement, the Company and the Related Entities shall first consult with the Fraud Section and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Office, the Company, and the Related Entities; and (b) whether the Fraud Section and the Office have any objection to the release.

32. The Fraud Section and the Office agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's and the Related Entities' cooperation and remediation. By agreeing to provide this information to such authorities, the Fraud Section and the Office are not agreeing to advocate on behalf of the Company or the Related Entities, but rather are agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

33. This Agreement is binding on the Company, the Related Entities, and the Fraud Section and the Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory

agencies, or any other authorities, although the Fraud Section and the Office will bring the cooperation of the Company and the Related Entities and their compliance with their other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company or the Related Entities.

## Notice

34. Any notice to the Fraud Section and the Office under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Brian Kidd, Deputy Chief, Fraud Section, Criminal Division, United States Department of Justice, 1400 New York Avenue NW, Washington, DC, 20005 and to Jonathan Francis, Assistant United States Attorney, U.S. Attorney's Office for the District of Connecticut, Connecticut Financial Center, 157 Church Street, 25th Floor, New Haven, CT 06510. Any notice to the Company and the Related Entities under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Stacey R. Friedman, General Counsel, c/o Office of the General Counsel, JPMorgan Chase & Co., 383 Madison Avenue, New York, New York 10017. Notice shall be effective upon actual receipt by the Fraud Section and the Office or the Company and the Related Entities.

## Complete Agreement

35. This Agreement, including its attachments, sets forth all the terms of the agreement between the Company, the Related Entities, and the Fraud Section and the Office. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section and the Office, the attorneys for the Company and for the Related Entities, and duly authorized representatives of the Company and the Related Entities.

-25-

AGREED:

FOR JPMORGAN CHASE & CO.:

Date: 9/25/20        By: _____
                                  Stacey R. Friedman
                                  JPMorgan Chase & Co.

Date: 9/25/20        By: _____
                                  Alexander J. Willscher
                                  Tracy Richelle High
                                  SULLIVAN & CROMWELL LLP

Date: 9/25/20        By: _____
                                  Mark Filip
                                  Zachary S. Brez
                                  Robert W. Allen
                                  KIRKLAND & ELLIS LLP

FOR JPMORGAN CHASE BANK N.A.:

Date:             By: _____
                                  Stacey R. Friedman
                                  JPMorgan Chase & Co.

Date: 9/25/20        By: _____
                                  Alexander J. Willscher
                                  Tracy Richelle High
                                  SULLIVAN & CROMWELL LLP

Date: 9/25/20        By: _____
                                  Mark Filip
                                  Zachary S. Brez
                                  Robert W. Allen
                                  KIRKLAND & ELLIS LLP

**FOR J.P. MORGAN SECURITIES LLC:**

Date: 9/25/20

By: _____
Stacey R. Friedman
JPMorgan Chase & Co.

Date: 9/25/20

By: _____
Alexander J. Willscher
Tracy Richelle High
SULLIVAN & CROMWELL LLP

Date: 9/25/20

By: _____
Mark Filip
Zachary S. Brez
Robert W. Allen
KIRKLAND & ELLIS LLP

**FOR THE DEPARTMENT OF JUSTICE:**

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: 9/28/2020          By: _____
                              Avi Perry, Assistant Chief

Date: 9/28/2020          By: _____
                              Matthew F. Sullivan, Trial Attorney

JOHN H. DURHAM
United States Attorney
District of Connecticut

Date: 9/28/20           By: _____
                              Jonathan Francis
                              Assistant United States Attorney

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for JPMorgan Chase & Co. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the General Counsel for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: 9/25/20

By: _____
Stacey R. Friedman
General Counsel
JPMORGAN CHASE & CO.

**CERTIFICATE OF COUNSEL FOR JPMORGAN CHASE & CO.**

I am counsel for JPMorgan Chase & Co. (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the General Counsel of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 9/25/20          By: _____
                            Alexander J. Willscher
                            SULLIVAN & CROMWELL LLP
                            Counsel for JPMorgan Chase & Co.

Date: 9/25/20          By: _____
                            Mark Filip
                            KIRKLAND & ELLIS LLP
                            Counsel for JPMorgan Chase & Co.

## JPMORGAN CHASE BANK, N.A. OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for JPMorgan Chase Bank, N.A. ("JPMC"). I understand the terms of this Agreement and voluntarily agree, on behalf of JPMC, to each of its terms. Before signing this Agreement, I consulted outside counsel for JPMC. Counsel fully advised me of the rights of JPMC, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of JPMC. I have advised and caused outside counsel for JPMC to advise the Board of Directors fully of the rights of JPMC, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of JPMC, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the General Counsel for JPMorgan Chase & Co. and that I have been duly authorized by JPMC to execute this Agreement on behalf of JPMC.

Date: 9/25/20

JPMORGAN CHASE BANK, N.A.

By: _____

Stacey R. Friedman
General Counsel
JPMorgan Chase & Co.

**CERTIFICATE OF COUNSEL FOR JPMORGAN CHASE BANK, N.A.**

I am counsel for JPMorgan Chase Bank. N.A. ("JPMC") in the matter covered by this Agreement. In connection with such representation. I have examined relevant JPMC documents and have discussed the terms of this Agreement with JPMC's Board of Directors. Based on our review of the foregoing materials and discussions. I am of the opinion that the representative of JPMC has been duly authorized to enter into this Agreement on behalf of JPMC and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of JPMC and is a valid and binding obligation of JPMC. Further. I have carefully reviewed the terms of this Agreement with the Board of Directors and the General Counsel of JPMC. I have fully advised them of the rights of JPMC, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the JPMC to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 9/25/20

By: _____

Alexander J. Willscher
SULLIVAN & CROMWELL LLP
Counsel for JPMorgan Chase Bank, N.A.

Date: 9/25/20

By: _____

Mark Filip
KIRKLAND & ELLIS LLP
Counsel for JPMorgan Chase Bank, N.A.

## J.P. MORGAN SECURITIES LLC OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for J.P. Morgan Securities LLC ("JPMS"). I understand the terms of this Agreement and voluntarily agree, on behalf of JPMS, to each of its terms. Before signing this Agreement, I consulted outside counsel for JPMS. Counsel fully advised me of the rights of JPMS, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Managers of JPMS. I have advised and caused outside counsel for JPMS to advise the Board of Managers fully of the rights of JPMS, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of JPMS, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the General Counsel for JPMorgan Chase & Co. and that I have been duly authorized by JPMS to execute this Agreement on behalf of JPMS.

Date: 9/25/26

J.P. MORGAN SECURITIES LLC

By: _____
Stacey R. Friedman
General Counsel
JPMorgan Chase & Co.

## CERTIFICATE OF COUNSEL FOR J.P. MORGAN SECURITIES LLC

I am counsel for J.P. Morgan Securities LLC ("JPMS") in the matter covered by this Agreement.  In connection with such representation, I have examined relevant JPMS documents and have discussed the terms of this Agreement with JPMS' Board of Managers.  Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of JPMS has been duly authorized to enter into this Agreement on behalf of JPMS and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of JPMS and is a valid and binding obligation of JPMS.  Further, I have carefully reviewed the terms of this Agreement with the Board of Managers and the General Counsel of JPMorgan Chase & Co.  I have fully advised them of the rights of JPMS, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement.  To my knowledge, the decision of JPMS to enter into this Agreement, based on the authorization of the Board of Managers, is an informed and voluntary one.

Date:  9/25/20

By: _____
Alexander J. Willscher
SULLIVAN & CROMWELL LLP
Counsel for JPMorgan Securities LLC

**ATTACHMENT A**

**STATEMENT OF FACTS**

1.      The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") and JPMorgan Chase & Co. (the "Company"). The Company, together with JPMorgan Chase Bank, N.A. ("JPMC") and J.P. Morgan Securities LLC ("JPMS"), hereby agree and stipulate that the following information is true and accurate. The Company, JPMC, and JPMS admit, accept, and acknowledge that they are responsible for the acts of their officers, directors, employees, and agents as set forth below. Should the Fraud Section and the Office pursue the prosecution that is deferred by this Agreement, the Company, JPMC, and JPMS agree that they will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

**PRECIOUS METALS CONDUCT**

***Relevant Entities***

2.      At all times relevant to this Statement of Facts, the Company, together with its subsidiaries and affiliates, was a global banking and financial services company that was headquartered in New York, New York. The Company was a financial institution within the definition of Title 18, United States Code, Section 20.

3.      At all times relevant to this Statement of Facts, JPMC was a wholly-owned subsidiary of the Company. JPMC had operations in the United States and abroad, and operated a global commodities trading business that included the trading of gold, silver, platinum, and

A-1

palladium ("precious metals") futures contracts and options. JPMC was a financial institution within the definition of Title 18, United States Code, Section 20.

4.      Bear Stearns, together with its subsidiaries and affiliates, was a global banking and financial services company that was headquartered in New York, New York. Bear Stearns operated a global commodities trading business that included the trading of precious metals futures contracts. In March 2008, the Company announced a merger agreement to acquire Bear Stearns, and the acquisition was completed in May 2008. In connection with the acquisition, certain precious metals traders from Bear Stearns joined JPMC.

5.      At all times relevant to this Statement of Facts, the CME Group, Inc. ("CME Group") was a commodities marketplace made up of several exchanges, including the Commodity Exchange, Inc. ("COMEX") and New York Mercantile Exchange, Inc. ("NYMEX"), each of which was a "registered entity" with the U.S. Commodity Futures Trading Commission ("CFTC"). Gold and silver futures contracts were traded on COMEX, and platinum and palladium futures contracts were traded on NYMEX. COMEX and NYMEX utilized the "Globex" electronic trading system, which allowed market participants to trade futures contracts on those exchanges from anywhere in the world. The CME Group operated Globex using computer servers located in and around Chicago and Aurora, Illinois.

### *The Precious Metals Desk*

6.      During the period from at least March 2008 until August 2016 (the "Precious Metals Relevant Period"), the Company, together with its subsidiaries including JPMC and its affiliates, ran one of the world's largest precious metals businesses through its Global Commodities Group with precious metals traders that worked in offices in New York, Singapore,

and London, England, and that operated as part of a single, cohesive global unit or "desk" (the "Precious Metals Desk").

7.     Gregg Smith was employed as a precious metals trader at Bear Stearns from May 2007 until its acquisition by the Company in May 2008.  For the remainder of the Precious Metals Relevant Period, Smith was employed as an Executive Director and trader on the Precious Metals Desk in New York.

8.     Michael Nowak began working at JPMC in July 1996.  Nowak was employed as a Managing Director and trader on the Precious Metals Desk, and was the head of the desk supervising other traders, for the entirety of the Precious Metals Relevant Period.  During the Precious Metals Relevant Period, Nowak worked in New York and London.

9.     Jeffrey Ruffo was employed as a salesperson at Bear Stearns from May 2007 until its acquisition by the Company in May 2008.  For the remainder of the Precious Metals Relevant Period, Ruffo was employed as an Executive Director and salesperson on the Precious Metals Desk in New York, specializing in hedge fund sales.  Ruffo left JPMC in August 2017.

10.     Christopher Jordan began working at JPMC in March 2006.  He was employed as a trader on the Precious Metals Desk from the beginning of the Precious Metals Relevant Period until leaving JPMC in December 2009.  Jordan worked at JPMC's offices in New York and was an Executive Director at the time of his departure.

11.     John Edmonds began working at JPMC in July 2004.  He was employed as a clerk and in a back-office operations role supporting JPMC's precious metals traders from the beginning of the Precious Metals Relevant Period until May 2009.  After that, Edmonds was employed as a trader on the Precious Metals Desk until leaving JPMC in August 2017.  He was a Vice President at the time of his departure.

A-3

12. Christian Trunz was employed as a precious metals trader at Bear Stearns from July 2007 until its acquisition by the Company in May 2008. For the remainder of the Precious Metals Relevant Period, Trunz was employed as a trader on the Precious Metals Desk. Trunz worked at JPMC's offices in New York until June 2013. He transferred to JPMC's offices in Singapore, and remained there until he transferred to JPMC's offices in London in August 2014. Trunz left JPMC in August 2019 and was an Executive Director at the time of his departure.

13. Trader 1 was employed as a precious metals trader at Bear Stearns from May 2007 until its acquisition by the Company in May 2008. Trader 1 was employed as a Managing Director and trader on the Precious Metals Desk in New York until he left JPMC in July 2014.

14. Trader 2 joined JPMC in 2003. He was employed as a trader on the Precious Metals Desk in London as an Executive Director at the beginning of the Precious Metals Relevant Period. Trader 2 became a Managing Director in May 2014 and ultimately supervised the precious metals traders in London until he left JPMC in July 2017.

15. Trader 3 joined JPMC in July 2005. He was employed as a trader on the Precious Metals Desk as an Associate from the beginning of the Precious Metals Relevant Period until February 2010, when he was promoted to Vice President. Trader 3 became an Executive Director in November 2014 and remained in that position through the end of the Precious Metals Relevant Period. During the Precious Metals Relevant Period, he worked in New York and London. Trader 3 left JPMC in October 2019 and was a Managing Director and the Global Head of Precious Metals Trading at the time of his departure.

16. Trader 4 joined JPMC in 2004. He was employed as a trader on the Precious Metals Desk in London as an Associate at the beginning of the Precious Metals Relevant Period. Trader 4

became a Vice President in 2010 and an Executive Director in February 2014.  Trader 4 was terminated from JPMC in June 2014 in connection with an inquiry into his trading activity.

17.     JPMC also employed other supervisors, salespeople, and traders on the Precious Metals Desk in New York, London, and Singapore.

### *Unlawful Precious Metals Trading*

18.     During the Precious Metals Relevant Period, Smith, Nowak, Jordan, Trunz, Edmonds, Traders 1 through 4, and one or more other traders on the Precious Metals Desk (collectively, the "Subject PM Traders") and Ruffo and one or more other salespeople on the Precious Metals Desk (together with the Subject PM Traders, the "Subject PM Desk Members") engaged in a scheme to defraud in connection with the purchase and sale of precious metals futures contracts on and subject to the rules of a registered entity, specifically NYMEX and COMEX.

19.     In furtherance of the scheme, the Subject PM Traders knowingly and intentionally placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution ("Deceptive PM Orders"), including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for precious metals futures contracts.

20.     In tens of thousands of trading sequences, the Subject PM Traders placed one or more orders for precious metals futures contracts that they intended to execute ("Genuine PM Orders").  Sometimes, but not always, the Genuine PM Orders were iceberg orders, so that other market participants could see only a portion of the order's full size at any given time.  An "iceberg" order was a type of order that a trader could place on COMEX and NYMEX that did not display the order's full size to other market participants.  Only a pre-set portion of an iceberg order was

A-5

visible at any given time. When the visible portion was filled, the next pre-set portion of the order became visible, and so forth.

21.     During the same trading sequences, the Subject PM Traders also placed one or more Deceptive PM Orders on the opposite side of the market from the Genuine PM Orders. The Deceptive PM Orders were not iceberg orders, and so the full order size was visible to other market participants.

22.     For the most part, the Subject PM Traders placed Deceptive PM Orders electronically using Globex. At times, however, certain of Subject PM Traders (and, in particular, Jordan) placed Deceptive PM Orders through telephone calls to floor brokers in trading pits.

23.     Even prior to May 2008, certain precious metals traders at JPMC, including Jordan, were trading in this unlawful manner, typically using a single, large Deceptive PM Order that was many times bigger than the visible portion of the opposite-side Genuine PM Order.

24.     But when the Company acquired Bear Stearns in May 2008, Smith and Trunz brought to JPMC a new style of unlawful trading which involved layering multiple Deceptive PM Orders at different prices in rapid succession that in the aggregate, if not individually, were substantially larger than the visible portion of the opposite-side Genuine PM Order. This new style of "layering," which was more difficult both to execute and to detect than placing a single, large Deceptive PM Order, took hold on the Precious Metals Desk and was adopted by, among others, Nowak, Edmonds, Trader 2, Trader 3, and Trader 4.

25.     By placing Deceptive PM Orders, the Subject PM Traders intended to inject false and misleading information about the genuine supply and demand for precious metals futures contracts into the markets, and to deceive other participants in those markets into believing

something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.

26.     This false and misleading information was intended to, and at times did, trick other market participants, including competitor financial institutions and proprietary traders, into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices, and times that they otherwise likely would not have traded.

27.     By placing Deceptive PM Orders to *buy* precious metals futures contracts, the Subject PM Traders intended to create the false impression in the market of increased demand in an effort to drive *up* the prices of those futures contracts.

28.     By placing Deceptive PM Orders to *sell* precious metals futures contracts, the Subject PM Traders intended to create the false impression in the market of increased supply in an effort to drive *down* the prices of those futures contracts.

29.     In either situation, the Subject PM Traders placed Deceptive PM Orders with the intent to fraudulently and artificially move the price of a given precious metals futures contract in a manner that would increase the likelihood that one or more of their own opposite-side Genuine PM Orders would be filled by other market participants, allowing the Subject PM Traders to generate trading profits and avoid losses for themselves and other members of the Precious Metals Desk, the Precious Metals Desk itself, and ultimately, JPMC and the Company.

30.     Once the Subject PM Traders successfully used their Deceptive PM Orders to get their Genuine PM Orders filled (either in whole or in part), they attempted to, and generally did, quickly cancel their Deceptive PM Orders before they could be executed. Sometimes, however,

they were unable to cancel quickly enough, and had to accept unintended (and unwanted) executions of their Deceptive PM Orders.

31.     One of the reasons the Subject PM Traders used Deceptive PM Orders in their trading was to service and benefit key clients, including hedge funds, which were important sources of revenue and market intelligence for the Precious Metals Desk.  For example, if a hedge fund wished to purchase gold, Ruffo would receive the order and communicate it to Smith, who, with Ruffo's knowledge and encouragement, would then place Deceptive PM Orders to sell gold futures contracts in order to artificially lower the price at which the hedge fund could buy (or one of the Subject PM Traders could buy on the hedge fund's behalf).  By passing along the lower price, the Subject PM Desk Members hoped to retain the hedge fund's business for the Precious Metals Desk.

32.     In total, during the Precious Metals Relevant Period, the Subject PM Desk Members' fraudulent and manipulative trading activity involving the placement of Deceptive PM Orders resulted in at least $200,847,102 in losses to other participants in the markets for precious metals futures contracts.

33.     The Deceptive PM Orders placed by the Subject PM Traders were transmitted electronically via international and interstate wire communications from New York, London, and Singapore to computer servers operated by the CME Group in and around Chicago and Aurora, Illinois.

34.     In executing the scheme to defraud in connection with the purchase and sale of precious metals futures contracts and the placement of Deceptive PM Orders, the Subject PM Desk Members were acting within the scope of their employment as employees of JPMC and its

affiliates, and as agents of the Company, and with the intent, at least in part, to benefit the Company.

### *Electronic Communications Regarding Unlawful Trading*

35.     At times, the Subject PM Desk Members discussed their unlawful activity with each other using electronic communications such as "chats" and emails.  On May 27, 2008, at 9:41:21 a.m.[1], Trader 1 informed Nowak that Smith "just bid it up to [. . .] sell."  Approximately contemporaneous with Trader 1's comment, Smith was engaged in trading activity that involved placing multiple Deceptive PM Orders to buy (*i.e.*, "bids") on the opposite side of the market from his Genuine PM Orders to sell.  For example, at 9:39:56.313 a.m., Smith placed a Genuine PM Order to sell seven silver futures contracts at $17.575.  Next, 11.677 seconds later, beginning at 9:40:06.041 a.m., Smith placed 13 layered Deceptive PM Orders to buy seven contracts each (91 contracts total) from $17.555 to $17.565 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher.  Beginning at 9:40:08.266 a.m., all seven contracts in Smith's Genuine PM Order were filled.  Then, 267 milliseconds after the last contract was filled, beginning at 9:40:09.935 a.m., Smith canceled his Deceptive PM Orders in their entirety.

---

[1] All dates, times, and numbers in this Statement of Facts are approximate.  All times are in Eastern Standard Time or Eastern Daylight Time.

36.     On February 24, 2009, at 8:39:24 a.m., Trunz alerted a salesperson on the Precious Metals Desk in London via chat to the fact that Smith was placing Deceptive PM Orders:

| Trunz: | so you know its gregg bidding up on the futures trying to get some off |
| Salesperson 1: | sweet mate |
| Trunz: | incase you were watching some large bids come into market |
| Salesperson 1: | appreesh  //  that worked ! |
| Trunz: | haha |

Approximately contemporaneous with this conversation, Smith was engaged in trading activity that involved placing multiple Deceptive PM Orders to buy (*i.e.*, "bidding up"). For example, at 8:35:35.110 a.m., Smith placed a Genuine PM Order to sell seven gold futures contracts at $988.90. Next, 47.195 seconds later, beginning at 8:36:22.305 a.m., Smith placed 11 layered Deceptive PM Orders to buy seven contracts each (77 contracts total) from $988.60 to $988.80 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Then, 1.203 seconds later, beginning at 8:36:23.508 a.m., three of the seven contracts in Smith's Genuine PM Order were filled. Last, 957 milliseconds later, beginning at 8:36:24.465 a.m., Smith canceled his Deceptive PM Orders in their entirety.

37.     On April 1, 2009, at 2:57:54 p.m., Jordan commented to a precious metals trader at another financial services firm that "every order i do is iceberged it funny actualy i show 1 lot then when i need to get filled i will bid or offer size in front of it then boom." Earlier that same day, Jordan engaged in trading activity using Deceptive PM Orders in the same manner as he described. Specifically, at 9:29:20.263 a.m., Jordan placed an iceberg Genuine PM Order to buy 17 silver futures contracts at $13.065. Jordan was subsequently able to fill three of those contracts. At 9:29:24.529 a.m., Jordan placed a Deceptive PM Order to sell 278 contracts at $13.070 with the

A-10

intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Next, beginning 18 milliseconds later, the remaining 14 contracts in Jordan's Genuine PM Order to buy were filled. Last, 1.840 seconds after the last contract was filled, Jordan canceled his Deceptive PM Order in its entirety.

38. On September 24, 2009, Trader 1 had the following chat communication with a trader on the Precious Metals Desk in London about deceiving a particular floor trader:

Trader 1:    I offered a lot of sil switches 100 to 200 a switch. Spoofed locals aftewr number and hopefully mr s h a q

Trader 5:    good man

39. On October 15, 2009, Jordan sent several electronic communications in which he described his unlawful trading activity which occurred that day. At 7:41 a.m., Jordan sent an email to an individual with the subject, "hey buddy," and stated, "hold on to your hat today, I have my lead pipe out in silver. last night has the feel of capitulation in everything but ive been wrong before." As the trading day ensued, Jordan engaged in multiple trading sequences involving Deceptive PM Orders. For example, at 10:32:33.976 a.m., Jordan placed an iceberg Genuine PM Order to buy 14 silver futures contracts at $17.615. Next, 2.248 seconds later, at 10:32:36.224 a.m., Jordan placed a Deceptive PM Order to sell 105 contracts at $17.620 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Then, 24 milliseconds later, beginning at 10:32:36.248 a.m., all 14 contracts in Jordan's Genuine PM Order were filled. Next, 772 milliseconds after the last contract was filled, Jordan canceled his Deceptive PM Order in its entirety. Later that afternoon, at 1:13:11 p.m., Jordan wrote to a different individual and commented, "ive taken my leadpipe/ your olsd mini basebsall bat out of my bottom drawer ahah, i am whacking this thing."

A-11

40.     On November 18, 2009, at 11:34:20 a.m., Trader 2 informed Nowak via chat that Trader 2 was "going to sell some gold up here no massive need to be long 50k." To accomplish the objective of selling gold, Trader 2 placed a Genuine PM Order to sell gold futures contracts, but then also placed several, large Deceptive PM Orders to buy gold futures contracts which resulted in a large portion of Trader 2's Genuine PM Order being filled. More specifically, at 11:34:48.576 a.m., Trader 2 placed an iceberg Genuine PM Order to sell 50 gold futures contracts at $1,147.60. Trader 2 subsequently was able to fill 15 of those 50 contracts. Beginning at 11:39:05.823 a.m., Trader 2 placed 12 layered Deceptive PM Orders to buy 50 contracts each (600 contracts total) from $1,146.80 to $1,147.30 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Next, 3.976 seconds later, beginning at 11:39:09.799 a.m., 34 of the remaining 35 contracts in Trader 2's Genuine PM Order were filled. Then, 2.104 seconds later, beginning at 11:39:13.807 a.m., Trader 2 canceled all of his Deceptive PM Orders in their entirety.

41.     On January 18, 2012, between 8:54:53 a.m. and 9:41:57 a.m., Ruffo had a chat communication with Hedge Fund Client 3 who worked at a large hedge fund that was one of Ruffo's major clients, regarding the progress of the client's order to sell 93,200 ounces of gold that the hedge fund had given JPMC to execute. Smith worked to execute the client's order while Ruffo provided updates to the client in the chat regarding the progress of the order (*e.g.*, "47k" to mean that 47,000 ounces had been executed) and how the market was reacting. For example:

| | |
|---|---|
| (8:56:31 a.m.) Ruffo: | 47 k |
| (8:56:40 a.m.) Ruffo: | Getting lifted small stuff now |
| (8:56:48 a.m.) Hedge Fund Client 3: | ok |
| (8:57:07 a.m.) Ruffo: | 50k |
| (8:57:41 a.m.) Ruffo: | 55 k |

A-12

| (8:57:52 a.m.) Ruffo: | offering small pieces |
| (8:57:52 a.m.) Hedge Fund Client 3: | ok |

After a few more minutes, the price for gold futures contracts began to fall and Smith had difficulty filling the order.  Ruffo provided an update to Hedge Fund Client 3:

| (9:00:40 a.m.) Ruffo: | 65 k was done |
| (9:03:11 a.m.) Ruffo: | everything moving together |
| (9:07:31 a.m.) Hedge Fund Client 3: | filled ? |
| (9:07:42 a.m.) Ruffo: | not yet we are offering |
| (9:08:00 a.m.) Hedge Fund Client 3: | looked like it went bid ther |
| (9:08:24 a.m.) Ruffo: | there was only 1 and 2 lots on the machine that tradind above 8 |
| (9:08:58 a.m.) Ruffo: | - we are trying |
| (9:09:01 a.m.) Hedge Fund Client 3: | tell GReg to wake up |
| (9:09:59 a.m.) Ruffo: | we are - it really went ugly - we lost gold on the offer and we filled some order - so it was a mix that filled us in on the 65 k |

Shortly after Hedge Fund Client 3 advised Ruffo to "tell GReg to wake up," Smith began to place numerous, layered Deceptive PM Orders to buy 10 gold futures contracts each with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher.  In fact, during the time period from 8:50:30 a.m. through 9:40:38 a.m., Smith placed 246 orders to buy, totaling 2,661 contracts, of which only 3% were iceberg orders and only 74 contracts were filled.  By contrast, during the same period, Smith placed 71 orders to sell, totaling 6,586 contracts, of which 94% were iceberg orders and 1,028 contracts were filled.

42.     On January 30, 2012, beginning at 3:35:52 p.m., Nowak recounted to a precious metals trader at a competitor financial institution a conversation that Nowak recently had with another former precious metals trader, saying "he did talk about the silver market //  and how he used to spoof it //  by showing huge huge bids and cancelling //  ie--what's totally not allowed to

do these days." After the date of this electronic communication, the Subject PM Traders continued to engage in their unlawful trading activity, including thousands of trading sequences involving Deceptive PM Orders, with hundreds of those trading sequences involving Nowak, himself, placing the Deceptive PM Orders. As one example, on February 6, 2012, at 8:47:41.128 a.m., Nowak placed an iceberg Genuine PM Order to sell five gold futures contracts at $1,717.80. Then, 2.281 seconds later, beginning at 8:47:43.409 a.m., Nowak placed 11 layered Deceptive PM Orders to buy five contracts each (55 contracts total) from $1,716.90 to $1,717.60 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Next, 1.940 seconds later, beginning at 8:47:45.349 a.m., all five contracts in Nowak's Genuine PM Order were filled. Last, 866 milliseconds after the last contract was filled, beginning at 8:47:46.223 a.m., Nowak canceled his Deceptive PM Orders in their entirety.

43.     On September 12, 2013, beginning at 6:28:47 a.m., Trader 3 had the following discussion in a chat communication with a former JPMC precious metals trader:

| | |
|---|---|
| Former Trader 1: | wow - what is up with pd - 694/695.5 50/100 lots!  //  when has it ever had that sort of liquidity |
| Trader 3: | yowsers!!  //  Think fast quick what do you want to do?! |
| Former Trader 1: | not take a 5k OR a 10k posi |
| Trader 3: | prob same guy both sides  //  wants to buy 5k  //  so he's offering 10  //  hahaha |
| Former Trader 1: | recipe for tears |
| Trader 3: | yup!! |
| Former Trader 1: | sounds like gregg smith  //  :-)  //  i shouldnt say that  //  hahaha  //  is he still there  //  ? |
| Trader 3: | Yuppers still clicking away in NY |

Trader 3 also engaged in unlawful trading activity involving Deceptive PM Orders. For example, on August 14, 2013, at 1:16:15.341 p.m., Trader 3 placed a Genuine PM Order to sell one

palladium futures contract at $739.00. Then, 55.860 seconds later, at 1:17:11.201 p.m., Trader 3 placed a Deceptive PM Order to buy 50 contracts at $738.75 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Two milliseconds later, Trader 3's Genuine PM Order was filled. Next, 2.686 seconds later, at 1:17:13.889 p.m., Trader 3 canceled his Deceptive PM Order in its entirety.

44. As one example of Trader 4's unlawful trading activity, on January 14, 2014, at 10:05:57.063 a.m., Trader 4 placed an iceberg Genuine PM Order to buy 20 silver futures contracts at $20.415. Trader 4 subsequently was able to fill 10 of those 20 contracts. Then, 55.064 seconds later, at 10:06:52.127 a.m., Trader 4 placed a Deceptive PM Order to sell 100 contracts at $20.425 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Next, 98 milliseconds later, beginning at 10:06:52.225 a.m., the remaining 10 contracts in Trader 4's Genuine PM Order were filled. Last, 541 milliseconds after the last contract was filled, Trader 4 canceled his Deceptive PM Order in its entirety.

45. As an example of Trunz's unlawful trading activity, on June 22, 2016, at 3:14:33.935 a.m., Trunz placed an iceberg Genuine PM Order to sell 20 platinum futures contracts at $981.80. Trunz subsequently was able to fill nine of those 20 contracts. Then, 1.991 seconds later, beginning at 3:14:35.926 a.m., Trunz placed a series of eight Deceptive PM Orders to buy five contracts each (40 contracts total) at prices from $981.20 to $981.60 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Next, 594 milliseconds later, beginning at 3:14:36.520 a.m., four of the twenty contracts in his Genuine PM Order to sell were filled. Last, 886 milliseconds after the last contract was filled, beginning at 3:14:37.407 a.m., Trunz canceled his Deceptive PM Orders in their entirety.

A-15

*Unlawful Trading in Connection with Precious Metals Barrier Options*

46.     On certain occasions, the Subject PM Traders engaged in trading activity involving precious metals futures contracts that was intended to deliberately trigger or defend barrier options held by JPMC and the Company, and thereby avoid losses of at least $5,145,000.

47.     An "option" was a derivative financial product whose value was tied to the value of an underlying asset (such as a physical commodity).  An option contract offered the purchaser of the option the right (but not the obligation) to buy or sell the underlying asset at an agreed-upon price during a certain period of time or on a specific date.  A "barrier" option was a type of option whose value depended on whether or not the underlying asset reached or exceeded a predetermined price during the lifetime of the option.

*$5mm Barrier Option*

48.     As one example, JPMC had entered into a barrier option with Counterparty 1 that would expire on November 19, 2008, and JPMC would have to pay out $5,000,000 on the option if, at expiration, the price of gold had not exceeded $760 per ounce as determined by the London Bullion Market Association's ("LBMA") afternoon (3 p.m. London; 10 a.m. New York) gold fixing.  The day before the barrier option's expiration, on November 18, 2008, beginning at 5:29:26 a.m., Trader 2 discussed this barrier option with a JPMC salesperson, Salesperson 2 who had the client relationship with Counterparty 1 and specifically whether Counterparty 1 would agree to unwind the trade:

| | |
|---|---|
| Trader 2: | no good? |
| Salesperson 2: | :-( |
| Trader 2: | we really must close this out today or else this will cost us a huge amount of money - is there absolutely no way they close this? |

| Salesperson 2: | i am talking to [Counterparty 1] |
| Trader 2: | cool |
| Salesperson 2: | [Trader 2]..she does not want to touch it |
| Trader 2: | oh dear |

[…]

| Trader 2: | if nthg change this single trade will lose me $1mio overnight // urgh |
| Salesperson 2: | oh my god |
| Trader 2: | it will go from 80pct value to 100pct // so 20pct of $5mio // of course if we trade to 760 by expiration time I will make $5mio |

49.     Later on November 18, 2008, at 4:50:16 pm., Nowak sent an email to the Precious Metals Desk with a daily recap and discussion of what to expect the following day.  Regarding Counterparty 1's barrier option that expired the next day, Nowak wrote:

> OK time to line up at the roulette table..... [Counterparty 1] refused to unwind their at - expiry digital, so we are faced with a 900k theta bill, but with the potential of a $5mm windfall if spot fixes above 760 tomorrow.  Our underlying gamma is pretty neglible and we remain short about 35-40k at all spot levels for $25 in either direction.
>
> To win tomorrow we're going to need a $25 move before 10am, which isn't really that likely given how the market has been trading, but we will see how it goes. There's not really anything to do until later in the morning, so its probably best to just chill out, focus on other things and see where we stand around 9am tomorrow.

50.     On November 19, 2008, the price of gold was close to, but below, the level (*i.e.*, $760) that would trigger Counterparty 1's barrier option and lead to the "$5mm windfall" that Nowak described in his email.  In the period of time leading up to the LBMA fixing window (*i.e.*, 10 a.m. New York), during which the price of gold was determined for that fixing, Smith placed multiple orders to buy gold futures contracts, including Deceptive PM Orders, in a manner to push the price of gold up and through the $760 level.  In the LBMA's afternoon fix, gold fixed

at $762, which was above the trigger price for Counterparty 1's barrier option, meaning that the option had been triggered and JPMC avoided having to pay $5,000,000 to Counterparty 1.

### *$145,000 Barrier Option*

51.     As a second example, JPMC entered into a barrier option with Counterparty 2 that would expire on March 11, 2013, and JPMC would lose $145,000 if the price of gold was below $1,580 per ounce as determined by the LBMA's afternoon gold fixing.

52.     On Friday, March 8, 2013, the last business day before the barrier option's expiration, Nowak sent an email to the Precious Metals Desk with a daily recap and discussion of what to expect the following business day, saying:

> We bled a bit longer delta which initially surprised me until I realized we have an at exp barrier at 1580 on Monday.  We sold a 1725p with at-exp ko at 1580, so if we fix above 1580 we'll lose 145k.

53.     On March 11, 2013, the price of gold was close to, but above, the level (*i.e.*, $1,580) that would trigger Counterparty 2's barrier option and cause the Precious Metals Desk to "lose 145k" as Nowak described in his email.  In the period of time leading up to the LBMA fixing window, Smith placed multiple orders to sell gold futures contracts, including Deceptive PM Orders, in a manner to push the price of gold down and through the $1,580 level.  In the LBMA's afternoon fix, gold fixed at $1,579, which was below the trigger price for Counterparty 2's barrier option, meaning that the option had been triggered and JPMC avoided losing $145,000.

*        *        *

## U.S. TREASURIES CONDUCT

### *Relevant Entities*

54.     At all times relevant to this Statement of Facts, JPMS was a wholly-owned subsidiary of the Company.  JPMS had operations in the United States, and conducted a global rates business that included the trading of U.S. Treasury notes, bonds, and futures.

### *U.S. Treasuries Market Background*

55.     At all times relevant to this Statement of Facts, to raise capital to operate the federal government and finance the national debt, the U.S. Department of the Treasury issued and sold marketable securities in the form of bills, notes, bonds, and certain related instruments at public auction (collectively, "U.S. Treasuries").  U.S. Treasuries were subject to fixed terms at fixed interest rates determined by the prevailing rates in the marketplace at the time of issuance.  After U.S. Treasuries were auctioned, institutional and individual investors could buy and sell these securities in the secondary (or "cash") market.

56.     Investors also could trade derivatives that tracked the prices of U.S. Treasuries securities.  These derivatives consisted of futures contracts that were standardized agreements for the purchase and sale of U.S. Treasuries for future delivery, including futures contracts for the five-year U.S. Treasury note, ten-year U.S. Treasury note, and 30-year U.S. Treasury bond, as well as the Ultra U.S. Treasury bond futures contract (the "Ultrabond") (all four products, collectively, "U.S. Treasury futures contracts").  U.S. Treasury futures contracts were commodities that traded on markets designated and regulated by the CFTC.

57.     The CME Group included the Chicago Board of Trade ("CBOT"), which was a "registered entity" with the CFTC.  U.S. Treasury futures contracts were traded on CBOT, which utilized the "Globex" electronic trading system that allowed market participants to trade U.S.

Treasury futures contracts on the CBOT from anywhere in the world. The CME Group operated Globex using computer servers located in and around Chicago and Aurora, Illinois.

### The U.S. Treasuries Desk

58. During the period from at least April 2008 until January 2016 (the "U.S. Treasuries Relevant Period"), the Company, together with its subsidiaries including JPMS and its affiliates, ran its U.S. Treasuries business through its Global Rates and Rates Exotics group with traders that worked in New York, London, and Tokyo, and that operated as a part of a single, cohesive global unit or "desk" (the "U.S. Treasuries Desk").

59. Trader A began working at JPMS in 2005. Trader A was employed as a Managing Director and trader on the U.S. Treasuries Desk in New York, and was the head of the desk supervising other traders, for the entirety of the U.S. Treasuries Relevant Period.

60. Trader B began working at JPMS in 2006. Trader B was employed as an Executive Director and trader on the U.S. Treasuries Desk in New York for the entirety of the U.S. Treasuries Relevant Period.

61. Trader C began working at JPMS in 2005. Trader C was employed as an Executive Director and trader on the U.S. Treasuries Desk in New York for the entirety of the U.S. Treasuries Relevant Period.

62. Trader D began working at JPMS in 2009. Trader D was employed as a Managing Director and trader on the U.S. Treasuries Desk in New York for the entirety of the U.S. Treasuries Relevant Period.

63. Trader E began working at the Company, together with its subsidiaries including JPMS and its affiliates, in 1996. Trader E was employed as an Executive Director and trader on the U.S. Treasuries Desk in London for the entirety of the U.S. Treasuries Relevant Period.

64.     The Company, together with its subsidiaries including JPMS and its affiliates, also employed other supervisors, salespeople, and traders on the U.S. Treasuries Desk at its offices in New York, London, and Tokyo.

### *Unlawful U.S. Treasuries Trading Practices*

65.     During the U.S. Treasuries Relevant Period, Traders A through E and one or more other members of the U.S. Treasuries Desk employed by the Company (collectively, the "Subject UST Traders") engaged in a scheme to defraud in connection with the purchase and sale of (i) U.S. Treasury futures contracts, on and subject to the rules of a registered entity, specifically CBOT, and/or (ii) U.S. Treasury notes and bonds in the secondary cash market (collectively (i) and (ii), "U.S. Treasury Products").

66.     In furtherance of the scheme, the Subject UST Traders knowingly and intentionally placed orders to buy and sell U.S. Treasury Products with the intent to cancel those orders before execution (the "Deceptive UST Orders"), including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for U.S. Treasury Products.

67.     In thousands of trading sequences, certain of the Subject UST Traders placed one or more orders for U.S. Treasury Products that they intended to execute ("Genuine UST Orders"). Sometimes, but not always, the Genuine UST Orders were iceberg orders, so that other market participants could see only a portion of the order's full size at any given time. An "iceberg" order was a type of order that a trader could place on CBOT that did not display the order's full size to other market participants. Only a pre-set portion of an iceberg order was visible at any given time. When the visible portion was filled, the next pre-set portion of the order became visible, and so forth.

68.     During the same trading sequences, certain of the Subject UST Traders also placed one or more Deceptive UST Orders on the opposite side of the market from the Genuine UST Orders. The Deceptive UST Orders were not iceberg orders, and so the full order size was visible to other market participants. Further, at times when trading U.S. Treasury notes and bonds in the secondary cash market on various cash trading platforms (*e.g.*, BrokerTec, eSpeed), Subject UST Traders would place their Genuine UST Orders on one cash trading platform, but place their Deceptive UST Orders on a different cash trading platform.

69.     By placing the Deceptive UST Orders, the Subject UST Traders intended to inject false and misleading information about the genuine supply and demand for U.S. Treasury Products into the respective markets, and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.

70.     This false and misleading information was intended to, and at times did, trick other market participants, including competitor financial institutions and proprietary traders, into reacting to the apparent change and imbalance in supply and demand by buying and selling U.S. Treasury Products at quantities, prices, and times that they otherwise likely would not have traded.

71.     By placing Deceptive UST Orders to *buy* U.S. Treasury Products, the Subject UST Traders intended to create the false impression in the market of increased demand in an effort to drive *up* the prices of those products.

72.     By placing Deceptive UST Orders to *sell* U.S. Treasury Products, the Subject UST Traders intended to create the false impression in the market of increased supply in an effort to drive *down* the prices of those products.

A-22

73. In either situation, the Subject UST Traders placed Deceptive UST Orders with the intent to fraudulently and artificially move the price of a given U.S. Treasuries Product in a manner that would increase the likelihood that one or more of their own opposite side Genuine UST Orders would be filled by other market participants, allowing the Subject UST Traders to generate trading profits and avoid losses for themselves and other members of the U.S. Treasuries Desk, the U.S. Treasuries Desk itself, and ultimately, JPMS and the Company.

74. Once the Subject UST Traders successfully used their Deceptive UST Orders to get their Genuine UST Orders filled (either in whole or in part), they attempted to, and generally did, quickly cancel their Deceptive UST Orders before they could be executed. Sometimes, however, they were unable to cancel quickly enough, and had to accept unintended (and unwanted) executions of their Deceptive UST Orders.

75. In total, during the U.S. Treasuries Relevant Period, the Subject UST Traders' fraudulent and manipulative trading activity involving the placement of Deceptive UST Orders resulted in at least $105,744,906 in losses to other participants in the markets for U.S. Treasury Products, specifically, $33,584,906 in losses to participants in the U.S. Treasury futures market and $72,160,000 in losses to participants in the secondary cash market for U.S. Treasury notes and bonds.

76. The Deceptive UST Orders for U.S. Treasury futures contracts placed by the Subject UST Traders were transmitted electronically via international and interstate wire communications to computer servers operated by the CME Group in and around Chicago and Aurora, Illinois.

77. The Deceptive UST Orders for U.S. Treasury notes and bonds placed by the Subject UST Traders were transmitted electronically via international and interstate wire communications

to computer servers operated by trading platforms, including certain platforms with servers located in New York and New Jersey.

78.     In executing the scheme to defraud in connection with the purchase and sale of U.S. Treasury Products and the placement of Deceptive UST Orders, the Subject UST Traders were acting within the scope of their employment as employees of JPMS and its affiliates, and as agents of the Company, and with the intent, at least in part, to benefit the Company.

### *Examples of Trader A's Unlawful Trading*

79.     One example of Trader A's unlawful trading activity occurred on June 3, 2010, at 2:05:55.480 p.m., when Trader A placed a Genuine UST Order to sell 20 U.S. Treasury bond futures contracts at $122.25000. Next, 2.043 seconds later, Trader A placed a Deceptive UST Order to buy 2,000 U.S. Treasury bond futures contracts at $122.21875 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Then, 59 milliseconds later, Trader A's Genuine UST Order to sell was filled in its entirety. Last, 848 milliseconds later, Trader A cancelled his Deceptive UST Order in its entirety.

80.     A second example of Trader A's unlawful trading activity occurred on January 26, 2011, at 11:02:30.174 a.m., when Trader A placed an iceberg Genuine UST Order to buy 200 ten-year U.S. Treasury note futures contracts at $120.40625. Next, 4.286 seconds later, after 10 of the 200 contracts had been filled, Trader A placed a Deceptive UST Order to sell 2,000 ten-year U.S. Treasury note futures contracts at $120.421875 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Then, 11 milliseconds later, the remaining 190 contracts on Trader A's Genuine UST Order to buy were filled. Last, 927 milliseconds later, Trader A cancelled his Deceptive UST Order in its entirety.

A-24

81. A third example of Trader A's unlawful trading activity occurred on June 19, 2013, at 9:54:28.280 a.m., when Trader A placed an iceberg Genuine UST Order to buy 200 U.S. Treasury bond futures contracts at $139.53125. Next, 85.384 seconds later, Trader A placed a Deceptive UST Order to sell 500 U.S. Treasury bond futures contracts at $139.56250 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Beginning five milliseconds later, Trader A's Genuine UST Order to buy was filled in its entirety. Next, 862 milliseconds after the last contract in the Genuine UST Order was filled, Trader A cancelled his Deceptive UST Order in its entirety.

82. A fourth example of Trader A's unlawful trading activity occurred on December 3, 2015, at 11:42:18.223 a.m., when Trader A placed an iceberg Genuine UST Order to buy 30 Ultrabond futures contracts at $157.09375. Next, 30.980 seconds later, Trader A placed a Deceptive UST Order to sell 100 Ultrabond futures contracts at $157.12500 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Beginning nine milliseconds later, Trader A's Genuine UST Order to buy was filled in its entirety. Then, 6.070 seconds after the last contract in the Genuine UST Order was filled, Trader A cancelled his Deceptive UST Order in its entirety.

83. A fifth example of Trader A's unlawful trading activity occurred on January 6, 2016, at 10:18:45.456 a.m., when Trader A placed an iceberg Genuine UST Order to sell 200 U.S. Treasury bond futures contracts at $155.31250. Next, 4.060 seconds later, Trader A placed a Deceptive UST Order to buy 200 U.S. Treasury bond futures contracts at $155.28125 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Then, 1.757 seconds later, Trader A's Genuine UST Order to sell was filled

in its entirety. Last, 1.039 seconds later, Trader A cancelled his Deceptive UST Order in its entirety.

### *Examples of Trader B's Unlawful Trading*

84. An example of Trader B's unlawful trading activity occurred on December 9, 2009, at 9:14:42.300 a.m., when Trader B placed a Genuine UST Order to buy 25 U.S. Treasury bond futures contracts at $119.5625. Next, 10.106 seconds later, Trader B placed a Deceptive UST Order to sell 5,000 U.S. Treasury bond futures contracts at $119.59375 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Then, 114 milliseconds later, Trader B's Genuine UST Order to buy was filled in its entirety. Last, 549 milliseconds later, Trader B cancelled his Deceptive UST Order in its entirety.

85. A second example of Trader B's unlawful trading activity occurred on April 2, 2012, at 7:47:42.915 a.m., when Trader B placed an iceberg Genuine UST Order to buy 25 Ultrabond futures contracts at $151.46875. Next, 3.340 seconds later, Trader B placed a Deceptive UST Order to sell 250 Ultrabond futures contracts at $151.50000 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Beginning four milliseconds later, Trader B's Genuine UST Order to buy was filled in its entirety. Then, 959 milliseconds after the last contract in the Genuine UST Order was filled, Trader B cancelled his Deceptive UST Order in its entirety.

86. A third example of Trader B's unlawful trading activity occurred on February 13, 2013, at 8:44:33.691 a.m., when Trader B placed a Genuine UST Order to sell 30 U.S. Treasury bond futures contracts at $142.90625. Then, 17.276 seconds later, Trader B modified the Genuine UST Order to increase its total quantity to 50 contracts and to make it an iceberg order that displayed 30 contracts. Then, 12.501 seconds later, Trader B placed a Deceptive UST Order to

A-26

buy 1,100 U.S. Treasury bond futures contracts at $142.87500 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Next, 544 milliseconds later, Trader B's Genuine UST Order to sell was filled in its entirety. Last, 265 milliseconds later, Trader B cancelled his Deceptive UST Order in its entirety.

### Examples of Trader C's Unlawful Trading

87.     An example of Trader C's unlawful trading activity occurred on June 28, 2011, at 9:16:10.179 a.m., when Trader C placed a Genuine UST Order to buy 100 ten-year U.S. Treasury note futures contracts at $124.21875. Then, 3.472 seconds later, Trader C placed a Deceptive UST Order to sell 4,000 ten-year U.S. Treasury note futures contracts at $124.234375 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Next, 46 milliseconds later, Trader C's Genuine UST Order to buy was filled in its entirety. Last, 432 milliseconds later, Trader C cancelled his Deceptive UST Order in its entirety.

88.     A second example of Trader C's unlawful trading activity occurred on October 4, 2011, at 1:59:58.167 p.m., when Trader C placed a Genuine UST Order to buy 100 ten-year U.S. Treasury note futures contracts at $130.87500. Next, 76.874 seconds later, Trader C placed a Deceptive UST Order to sell 3,000 ten-year U.S. Treasury note futures contracts at $130.890625 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Then, 251 milliseconds later, Trader C's Genuine UST Order to buy was filled in its entirety. Last, 381 milliseconds later, Trader C cancelled his Deceptive UST Order in its entirety.

89.     A third example of Trader C's unlawful trading activity occurred on January 25, 2012, at 9:18:31.884 a.m., when Trader C placed a Genuine UST Order to buy 50 ten-year U.S. Treasury note futures contracts at $130.15625. Next, 52.708 seconds later, Trader C placed

a Deceptive UST Order to sell 4,000 ten-year U.S. Treasury note futures contracts at $130.171875 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Then, 98 milliseconds later, Trader C's Genuine UST Order to buy was filled in its entirety. Last, 674 milliseconds later, Trader C cancelled his Deceptive UST Order in its entirety.

### *Examples of Trader D's Unlawful Trading*

90.    An example of Trader D's unlawful trading activity occurred on February 4, 2010, at 2:27:27.279 p.m., when Trader D placed a Genuine UST Order to buy 10 ten-year U.S. Treasury note futures contracts at $118.265625. Next, 153.26 seconds later, Trader D placed a Deceptive UST Order to sell 1,000 ten-year U.S. Treasury note futures contracts at $118.281250 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Then, 138 milliseconds later, Trader D's Genuine UST Order to buy was filled in its entirety. Last, 790 milliseconds later, Trader D cancelled his Deceptive UST Order in its entirety.

91.    A second example of Trader D's unlawful trading activity occurred on July 20, 2010, at 1:55:35.574 p.m., when Trader D placed a Genuine UST Order to buy five ten-year U.S. Treasury note futures contracts at $123.078125. Next, 34.011 seconds later, Trader D placed a Deceptive UST Order to sell 1,000 ten-year U.S. Treasury note futures contracts at $123.093750 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Then, 58 milliseconds later, Trader D's Genuine UST Order to buy was filled in its entirety. Last, 1.267 seconds later, Trader D cancelled his Deceptive UST Order in its entirety.

92.     A third example of Trader D's unlawful trading activity occurred on March 16, 2012, at 12:34:05.508 p.m., when Trader D placed a Genuine UST Order to sell 100 five-year U.S. Treasury note futures contracts at $121.921875.  Next, 49.115 seconds later, Trader D placed a Deceptive UST Order to buy 1,000 five-year U.S. Treasury note futures contracts at $121.9140625 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher.  Then, 2.248 seconds later, Trader D's Genuine UST Order to buy was filled in its entirety.  Three milliseconds later, Trader D cancelled his Deceptive UST Order in its entirety.

### *Electronic Communications Regarding Unlawful Trading*

93.     At times, the Subject UST Traders discussed their unlawful trading activity with each other using electronic chat communications such as "chats" and emails.  For example, on November 2, 2010, beginning at 1:30:47 p.m., Trader E discussed with Trader C a Deceptive UST Order that Trader E had placed:

| | |
|---|---|
| Trader E: | got a sec?  //  im leaving a spoof offer up on the 4⅝ feb 17 |
| Trader C: | gotcha..  //  makes sense |
| Trader E: | if it gets hit can u buy for me? |
| Trader C: | no one is going to lift so |
| Trader E: | 50mm? |
| Trader C: | yes |

94.     On November 30, 2010, beginning at 11:50:03 a.m., Trader A explained to Trader C how to place Deceptive UST Orders in the U.S. Treasury cash market on one trading platform (*e.g.*, eSpeed) to facilitate the execution of Genuine UST Orders placed on a different cash trading platform (*e.g.*, BrokerTec):

| | |
|---|---|
| Trader A: | Hey  //  Putting on a clinic here banging around 10's  //  fyi |

| | |
|---|---|
| Trader C: | what's the strategy? |
| Trader A: | You have to see this // show 10mm on bid and offer on BTEC...w/ hidden size for 100 on each // for example...22/22+...hidden size for 100mm on each // ARE YOU PAYING ATTENTION??? // has to be a slow mkt // then in espd...offer 150 at 22+ // 22 bid at espd automatically drops or lowers.. // then offer 150 at 22 at espd // IMMEDIATELY the computers slash and burn your bid at BTEC // OFFER OUT AT ESPEED! // 22 150 at ESPD...22+ offer disappears! // Bid 22+ for 150 at espd // THE computers scramble and lift your 22+'s at BTEC // 15k // automatic |
| Trader C: | show me |

95.    On December 14, 2010, beginning at 1:06:08 p.m., Trader A again explained to

Trader C how to place Deceptive UST Orders in one cash U.S. Treasuries trading platform to

facilitate the execution of Genuine UST Orders on another trading platform:

| | |
|---|---|
| Trader A: | here's what's // amazing // LISTEN! // by showing bids/offers...lifts/hits..then CXL at ESPD // w/in a + mkt... // I got lifted and hit on // 380mm 10's at BTEC // yet // only traded 13mm 10's at ESPEED // Amazing // i'm really onto something // here // Are you paying attention?!?!?! // There is a pure and simple FRONTRUNNING algo program out there that crushes the street and crushes liquidity // I am taking it square on.... // Head to Head |

96.    On November 15, 2012, beginning at 11:36:32 a.m., Trader A described to Trader E

how he traded in a manner to deceive other market participants that traded using automated trading

systems or computer algorithms ("algos"):

| | |
|---|---|
| Trader E: | + for the good guy there? |
| Trader A: | you like that one? |
| Trader E: | u even do the 100lots? |
| Trader A: | a little razzle dazzle to juke the algos… |
| Trader E: | skills |
| Trader A: | sometimes. depends on the bid. |
| Trader E: | wow nice to have someone like us to lean on. |
| Trader A: | i've been way overtrading git today…chi would not be happy. was long 400 10's at one point after phil fed. // usually it works…just as long as you |

dont get caught in a buzzsaw real 'buyer'/'seller'. otherwise..these algos are just trying to sniff out 'weakness'…so have to show strength.

Trader E:     jpm thats right…

97.     In addition, at various times, Trader E would remark to other traders on the U.S. Treasuries Desk that he was going to place Deceptive UST Orders on certain cash U.S. Treasury trading platforms:

| Date | Trader E's Statement |
|---|---|
| January 17, 2008 | i spoof brokertec 2's |
| February 11, 2009 | OKAY im offering 13's garban but its spoof. |
| July 1, 2009 | i'm going to spoof down aug 14's garban |
| December 3, 2009 | im bidding sep 14s up at 16¾ in box as spoof do us want 50 at 16+? there is 16+ bid liberty… |
| November 3, 2010 | im just spoofing down jan feb 17 garban |
| July 6, 2011 | just spoofing down the jan 15's -185m still |

*      *      *

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE RESOLUTIONS FOR**

**JPMORGAN CHASE & CO.**

WHEREAS, JPMorgan Chase & Co. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") regarding issues arising in relation to unlawful securities and commodities trading activity by the Company's agents and employees; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a deferred prosecution agreement with the Fraud Section and the Office (the "Agreement"); and

WHEREAS, the Company's General Counsel of the Company, Stacey R. Friedman, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section and the Office;

Therefore, the Board of Directors has RESOLVED that:

1.     The Company (a) acknowledges the filing of the two-count Information (as such term is described/defined in the Agreement) charging the Company with two counts of wire fraud, in violation of Title 18, United States Code, Section 1343; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section and the Office; and (c) agrees to pay a Total Criminal Monetary Amount of $920,203,609 under the Agreement with respect to the conduct described in the Information;

2.      The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Connecticut; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts attached to the Agreement or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The General Counsel of the Company, Stacey R. Friedman, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Lead Director of Company, Lee Raymond may approve;

4.      The General Counsel of the Company, Stacey R. Friedman, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the General Counsel of the Company, Stacey R. Friedman, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: ___9/23/20___

By: _____
    Corporate Secretary
    JPMorgan Chase & Co.

**CERTIFICATE OF CORPORATE RESOLUTIONS FOR**

**JPMORGAN CHASE BANK, N.A.**

WHEREAS, JPMorgan Chase Bank, N.A. ("JPMC") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") regarding issues arising in relation to unlawful securities and commodities trading activity by JPMorgan Chase & Co. ("JPMorgan") agents and employees; and

WHEREAS, in order to resolve such discussions, it is proposed that JPMC agree to certain terms and obligations of a deferred prosecution agreement among JPMorgan and the Fraud Section and the Office (the "Agreement"); and

WHEREAS, the General Counsel of JPMorgan, Stacey R. Friedman, together with outside counsel for JPMC, have advised the Board of Directors of JPMC of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of agreeing to such terms and obligations of the Agreement with the Fraud Section and the Office;

Therefore, the Board of Directors has RESOLVED that:

1.      JPMC (a) acknowledges the filing of the two-count Information (as such term is described/defined in the Agreement) charging JPMorgan with two counts of wire fraud, in violation of Title 18, United States Code, Section 1343; and (b) undertakes certain obligations under the Agreement among JPMorgan, the Fraud Section and the Office;

2.      JPMC accepts the terms and conditions of this Agreement, including, but not limited to: (a) a knowing waiver of JPMorgan's rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this

B-4

Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue and consents to the filing of the Information against JPMorgan, as provided under the terms of this Agreement, in the United States District Court for the District of Connecticut; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts attached to the Agreement or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The General Counsel of JPMorgan, Stacey R. Friedman, is hereby authorized, empowered and directed, on behalf of JPMC, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the General Counsel of JPMorgan, Stacey R. Friedman, may approve;

4.      The General Counsel of JPMorgan, Stacey R. Friedman, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.    All of the actions of the General Counsel of JPMorgan, Stacey R. Friedman, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of JPMC.

Date: 9/23/20

By: _____
Corporate Secretary
JPMorgan Chase Bank, N.A.

## CERTIFICATE OF CORPORATE RESOLUTIONS FOR

## J.P. MORGAN SECURITIES LLC

WHEREAS, J.P. Morgan Securities LLC ("JPMS") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") regarding issues arising in relation to unlawful securities and commodities trading activity by JPMorgan Chase & Co. ("JPMorgan") agents and employees; and

WHEREAS, in order to resolve such discussions, it is proposed that JPMS agree to certain terms and obligations of a deferred prosecution agreement among JPMorgan and the Fraud Section and the Office (the "Agreement"); and

WHEREAS, the General Counsel of JPMorgan, Stacey R. Friedman, together with outside counsel for JPMS, have advised the Board of Managers of JPMS of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of agreeing to such terms and obligations of the Agreement with the Fraud Section and the Office;

Therefore, the Board of Managers has RESOLVED that:

1.     JPMS (a) acknowledges the filing of the two-count Information (as such term is described/defined in the Agreement) charging JPMorgan with two counts of wire fraud, in violation of Title 18, United States Code, Section 1343; (b) undertakes certain obligations under the Agreement among JPMorgan; the Fraud Section, and the Office; and (c) agrees to accept a monetary penalty against JPMorgan totaling $920,203,609, and to pay such penalty to the United States Treasury with respect to the conduct described in the Information if JPMorgan does not pay such monetary penalty within the time period specified in the Agreement;

2.      JPMS accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of JPMorgan's rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue and consents to the filing of the Information against JPMorgan, as provided under the terms of this Agreement, in the United States District Court for the District of Connecticut; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts attached to the Agreement or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The General Counsel of JPMorgan, Stacey R. Friedman, is hereby authorized, empowered and directed, on behalf of JPMS, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Managers at this meeting with such changes as the General Counsel of JPMorgan, Stacey R. Friedman, may approve;

4.      The General Counsel of JPMorgan, Stacey R. Friedman, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.    All of the actions of the General Counsel of JPMorgan, Stacey R. Friedman, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of JPMS.

Date: _23 September 2020_

By: _____

Corporate Secretary
J.P. Morgan Securities LLC

**ATTACHMENT C**

**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures relating to conduct in the Global Markets, Global Rates & Rates Exotics, or Global Commodities lines of business in the Corporate and Investment Bank in violation of (i) the anti-fraud, anti-spoofing, and/or anti-manipulation provisions of the Commodity Exchange Act, Title 7, United States Code, Sections 1, *et seq.*; (ii) as it applies to securities and commodities trading, the wire fraud statute, Title 18, United States Code, Section 1343; (iii) the securities and commodities fraud statute, Title 18, United States Code, Section 1348; and (iv) the federal securities laws prohibiting manipulative and deceptive devices, Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively (i) through (iv), the "Securities and Commodities Laws"), JPMorgan Chase & Co. (the "Company"), and its subsidiaries JPMorgan Chase Bank, N.A., and J.P. Morgan Securities LLC (the two subsidiaries, collectively, the "Related Entities") agree to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company and the Related Entities agree to adopt new, or to modify their existing compliance program, including internal controls, compliance policies, and procedures in order to ensure that they maintain an effective compliance program that is designed to effectively deter and detect violations of the Securities and Commodities Laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's and the Related Entities' existing internal controls, compliance code, policies, and procedures:

C-1

*Commitment to Compliance*

1.    The Company and the Related Entities will ensure that their directors and senior management provide strong, explicit, and visible support and commitment to their corporate policy against violations of the Securities and Commodities Laws and their compliance codes, and demonstrate rigorous adherence by example.  The Company and the Related Entities will also ensure that middle management, in turn, reinforce those standards and encourage employees to abide by them.  The Company and the Related Entities will create and foster a culture of ethics and compliance with the law in their day-to-day operations at all levels of the companies.

*Policies and Procedures*

2.    The Company and the Related Entities will develop and promulgate clearly articulated and visible corporate policies against violations of the Securities and Commodities Laws, which policies shall be memorialized in a written compliance code.

3.    The Company and the Related Entities will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the Securities and Commodities Laws and the Company's and the Related Entities' compliance code, and the Company and the Related Entities will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the Securities and Commodities Laws by personnel at all levels of the Company and the Related Entities.  These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the company, including, but not limited to, agents, consultants, and joint venture partners (collectively, "agents and business partners").  The Company and the Related Entities shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company and the Related Entities.

C-2

*Periodic Risk-Based Review*

4.    The Company and the Related Entities will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company and the Related Entities.

5.    The Company and the Related Entities shall review their compliance policies and procedures regarding the Securities and Commodities Laws no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving industry standards.

*Proper Oversight and Independence*

6.    The Company and the Related Entities will assign responsibility to one or more senior corporate executives of the Company and the Related Entities for the implementation and oversight of the Company's and the Related Entities' compliance code, policies, and procedures regarding the Securities and Commodities Laws.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's and the Related Entities' Boards of Directors, or any appropriate committee of the Boards of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

7.    The Company and the Related Entities will implement mechanisms designed to ensure that its compliance code, policies, and procedures regarding the Securities and Commodities Laws are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust,

C-3

all commodities traders, any positions that require such training (*e.g.*, internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, commodities traders, agents and business partners, certifying compliance with the training requirements. The Company and the Related Entities will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

8.      The Company and the Related Entities will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, commodities traders, securities traders, and, where necessary and appropriate, agents and business partners, on complying with the Company's and the Related Entities' compliance code, policies, and procedures regarding the Securities and Commodities Laws, including when they need advice on an urgent basis.

*Internal Reporting and Investigation*

9.      The Company and the Related Entities will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the Securities and Commodities Laws or the Company's and the Related Entities' compliance code, policies, and procedures regarding the Securities and Commodities Laws.

10.     The Company and the Related Entities will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the Securities and Commodities Laws or the Company's and the Related Entities' compliance code, policies, and procedures regarding the Securities and

Commodities Laws. The Company and the Related Entities will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

*Enforcement and Discipline*

11.    The Company and the Related Entities will implement mechanisms designed to effectively enforce their compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

12.    The Company and the Related Entities will institute appropriate disciplinary procedures to address, among other things, violations of the Securities and Commodities Laws and the Company's and the Related Entities' compliance code, policies, and procedures regarding the Securities and Commodities Laws by the Company's and the Related Entities' directors, officers, and employees. Such procedures should be applied consistently and fairly, and in a manner consistent with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company and the Related Entities shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program regarding the Securities and Commodities Laws is effective.

*Mergers and Acquisitions*

13.    The Company and the Related Entities will develop and implement policies and procedures for mergers and acquisitions requiring that the Company and the Related Entities

conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding the Securities and Commodities Laws by legal, accounting, and compliance personnel.

14. The Company and the Related Entities will ensure their compliance code, policies, and procedures regarding the Securities and Commodities Laws apply as quickly as is practicable to newly-acquired businesses or entities merged with the Company and the Related Entities and will promptly (a) train the directors, officers, employees, commodities traders, agents, and business partners consistent with Paragraphs 7-8; and (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with the Securities and Commodities Laws.

*Monitoring, Testing, and Remediation*

15. In order to ensure that its compliance program does not become stale, the Company and the Related Entities will conduct periodic reviews and testing of their compliance code, policies, and procedures regarding the Securities and Commodities Laws designed to evaluate and improve their effectiveness in preventing and detecting violations of Commodities Laws and the Company's and the Related Entities' code, policies, and procedures regarding the Securities and Commodities Laws, taking into account relevant developments in the field and evolving industry standards. The Company and the Related Entities will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing. Based on such review and testing and its analysis of any prior misconduct, the Company and the Related Entities will conduct a thoughtful root cause analysis and timely and appropriately remediate to address the root causes.

C-6

16.   The Company and the Related Entities will maintain, or where necessary establish, effective trade surveillance programs capable of detecting trading activity that has indicia of fraudulent, manipulative, or otherwise unlawful conduct.

**ATTACHMENT D**

**REPORTING REQUIREMENTS**

JPMorgan Chase & Co. (the "Company"), and its subsidiaries JPMorgan Chase Bank, N.A., and J.P. Morgan Securities LLC (the two subsidiaries, collectively, the "Related Entities"), agree that they will report to the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") periodically, at no less than twelve-month intervals during a three-year term, regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Attachment C. During this three-year period, the Company and the Related Entities shall: (i) conduct an initial review and submit an initial report, and (ii) conduct and prepare at least two (2) follow-up reviews and reports, as described below:

1.      By no later than one year from the date this Agreement is executed, the Company and the Related Entities shall submit to the Fraud Section and the Office a written report setting forth a complete description of their remediation efforts to date, their proposals reasonably designed to improve the Company's and the Related Entities' internal controls, policies, and procedures for ensuring compliance in the Global Markets, Global Rates & Rates Exotics, or Global Commodities lines of business in the Corporate and Investment Bank with (i) the anti-fraud, anti-spoofing, and/or anti-manipulation provisions of the Commodity Exchange Act, Title 7, United States Code, Sections 1, *et seq.*; (ii) as it applies to securities and commodities trading, the wire fraud statute, Title 18, United States Code, Section 1343; (iii) the securities and commodities fraud statute, Title 18, United States Code, Section 1348; and (iv) the federal securities laws prohibiting manipulative and deceptive devices, Title 15, United States Code, Sections 78j(b) and

78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively (i) through (iv), the "Securities and Commodities Laws"), and the proposed scope of the subsequent reviews. The report shall be transmitted to:

> Sally Molloy
> Deputy Chief, Fraud Section
> Criminal Division, U.S. Department of Justice
> 1400 New York Avenue NW
> Washington, DC 20005
> and
>
> Jonathan Francis
> Assistant United States Attorney
> U.S. Attorney's Office for the District of Connecticut
> Connecticut Financial Center
> 157 Church Street, 25th Floor
> New Haven, CT 06510

The Company and the Related Entities may extend the time period for issuance of the report with prior written approval of the Fraud Section and the Office.

2. The Company and the Related Entities shall undertake at least two follow-up reviews and reports, incorporating the views of the Fraud Section and the Office on the Company's and the Related Entities' prior reviews and reports, to further monitor and assess whether the Company's and the Related Entities' policies and procedures are reasonably designed to detect and prevent violations of the Securities and Commodities Laws.

3. The first follow-up review and report shall be completed by no later than one year after the initial report is submitted to the Fraud Section and the Office. The second follow-up review and report shall be completed and delivered to the Fraud Section and the Office no later than thirty days before the end of the Term.

4. The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation,

impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section and the Office determine in their sole discretion that disclosure would be in furtherance of the Fraud Section's and the Office's discharge of their duties and responsibilities or is otherwise required by law.

5.    The Company and the Related Entities may extend the time period for submission of any of the follow-up reports with prior written approval of the Fraud Section and the Office.

D-3

# ATTACHMENT E

# CERTIFICATION

To:  United States Department of Justice          United States Attorney's Office
     Criminal Division, Fraud Section              District of Connecticut
     Attention: Daniel S. Kahn, Acting Chief       Attention: John H. Durham, U.S. Attorney

Re:  Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 28 of the Deferred Prosecution Agreement ("DPA") filed on September 29, 2020 in the U.S. District Court for the District of Connecticut, by and between the United States and JPMorgan Chase & Co. (the "Company"), that undersigned are aware of the Company's disclosure obligations, and the disclosure obligations of JPMorgan Chase Bank, N.A., and J.P. Morgan Securities LLC (together, the "Related Entities"), under Paragraph 6 of the DPA, and that the Company and the Related Entities have disclosed to the United States Department of Justice, Criminal Division, Fraud Section and to the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") any and all evidence or allegations of conduct required pursuant to Paragraph 6 of the DPA, which includes evidence or allegations of (A) conduct which may constitute a violation of the wire fraud statute, Title 18, United States Code, Section 1343; or (B) conduct in the Global Markets, Global Rates & Rates Exotics, or Global Commodities lines of business in the Corporate and Investment Bank that may constitute a violation of (i) the anti-fraud, anti-spoofing, and/or anti-manipulation provisions of the Commodity Exchange Act, Title 7, United States Code, Section 1, *et seq.*; (ii) the securities and commodities fraud statute, Title 18, United States Code, Section 1348; or (iii) Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively, (A) and (B), "Disclosable Information"). This obligation to disclose

E-1

information extends to any and all Disclosable Information that has been identified through the Company's and the Related Entities' compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes. The undersigned further acknowledge and agree that the reporting requirements contained in Paragraph 6 and the representations contained in this certification constitute a significant and important component of the DPA and of the Fraud Section's and the Office's determination whether the Company and the Related Entities has satisfied their obligations under the DPA.

The undersigned hereby certify respectively that [he/she] is the Chief Executive Officer of the Company and that [he/she] is the Chief Financial Officer of the Company and that each has been duly authorized by the Company and the Related Entities to sign this Certification on behalf of the Company and the Related Entities.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company and the Related Entities to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the District of Connecticut. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18

U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made

in the District of Connecticut.

By: _____     Dated: _____

    [NAME]
    Chief Executive Officer
    JPMorgan Chase & Co.

By: _____     Dated: _____

    [NAME]
    Chief Financial Officer
    JPMorgan Chase & Co.