**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    v.

CHARLIE JAVICE and OLIVIER AMAR,

        Defendants.

23-cr-00251-AKH

**DEFENDANT AMAR'S MEMORANDUM IN OPPOSITION TO**
**<u>JPMORGAN CHASE BANK, N.A.'S MOTION TO QUASH RULE 17(C) SUBPOENAS</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ iii

BACKGROUND ................................................................................................................3

LEGAL STANDARD.........................................................................................................7

ARGUMENT .....................................................................................................................9

I.      The Subpoena Is Reasonable and Not Unduly Oppressive ..................................9

II.     The Subpoena Satisfies Rule 17(c) and the *Nixon* Standard.............................10

        A.      The Subpoena Seeks Documents that Have Not Been Produced ...............10

        B.      The Subpoena Seeks Specific, Identifiable Information Believed to Be
                Contained in the Documents Sought .........................................................14

        C.      The Subpoena Seeks Evidence That Is Squarely Relevant to the Charges in the
                Indictment .................................................................................................16

        D.      The Subpoena Seeks Admissible Documents.............................................18

III.    The Subpoena's Definitions and Instructions Do Not Violate Rule 17(c) ........20

        A.      Instruction 9 Is Proper..............................................................................20

        B.      Instruction 14 Is Proper.............................................................................21

        C.      Instruction 19 Is Proper.............................................................................21

IV.     Mr. Amar's Requests Satisfy Rule 17(c) ...........................................................23

        A.      Requests 1 and 2 Seek Specific Documents That Have Not Been Produced
                and Should Not Be Quashed .....................................................................23

        B.      Requests 3, 4, 6, 7, 8, 9, and 10 Seek Specific Documents That Have Not
                Been Produced and Should Not Be Quashed.............................................26

                i.      JPMC's Approach to Requests 3, 4, 6, 7, 8, 9, and 10 Falls Short, and
                        These Requests Seek Documents That Have Not Been Produced .................27

                ii.     Requests 3, 8, 9, and 10 Are Sufficiently Specific .........................29

                iii.    Requests 4, 6, and 7 are Sufficiently Specific ................................31

        C.      Mr. Amar Agrees to Withdraw Request 5 ................................................32

D.      Requests 11 and Request 12 Seek Specific Documents That Have Not Been Produced and the Requests Should Not Be Quashed.....................................................32

E.      Requests 13 and 14 Seek Specific Documents That Have Not Been Produced and Should Not Be Quashed ...................................................................................34

F.      Request 15 Seeks Specific Documents That Have Not Been Produced and Should Not Be Quashed ...............................................................................................34

G.      Request 16 Seeks Specific, Relevant Documents and Should Not Be Quashed .........38

H.      Requests 17, 18, and 19 Seeks Specific Documents That Have Not Been Produced and Should Not Be Quashed .....................................................................40

I.      Request 20 Seeks Specific Documents and Should Not Be Quashed ........................43

J.      Request 21 Seeks Specific, Relevant Documents That Have Not Been Produced and Should Not Be Quashed .....................................................................43

K.      Requests 22 and 24 Seek Specific Documents That Have Not Been Produced, Are Admissible, and Should Not Be Quashed..............................................................45

L.      Request 23 Seeks Specific, Relevant, and Admissible Documents and Should Not Be Quashed ....................................................................................................47

M.      Request 25 Seeks Specific Documents That Have Not Been Produced and Should Not Be Quashed ...............................................................................................48

N.      Mr. Amar Agrees to Withdraw Requests 26 and 27 ....................................................49

O.      Request 28 Seeks Specific, Admissible Documents That Have Not Been Produced and Should Not Be Quashed .....................................................................50

P.      Requests 29 and 30 Seek Relevant, Admissible Documents and Should Not Be Quashed ...............................................................................................................51

Q.      Request 31 Seeks Admissible Documents and Should Not Be Quashed ...................53

CONCLUSION.........................................................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fisher v. United States*,
    425 U.S. 391 (1976) ................................................................ 57

*Gannett Co. v. DePasquale*,
    443 U.S. 368 (1979) ................................................................ 60

*In re Bonanno*,
    344 F.2d 830 (2d Cir. 1965) ................................................... 58

*In re Grand Jury Subpoena Dated Jan. 4, 1984*,
    750 F.2d 223 (2d Cir. 1984) ................................................... 57

*In re Grand Jury Subpoenas Dated Jan. 20, 1998*
    995 F. Supp. 332 (E.D.N.Y. 1998) ......................................... 58

*In re Horowitz*,
    482 F.2d 72 (2d Cir. 1973) ..................................................... 57

*In re Irving*,
    600 F.2d 1027 (2d Cir.1979) .................................................. 17

*Markus v. Rozhkov*,
    615 B.R. 679 (S.D.N.Y. 2020) ............................................... 24

*Nikkal Indus., Ltd. v. Salton, Inc.*,
    689 F. Supp. 187 (S.D.N.Y. 1988) .................................... 58, 59

*United States v. Adlman*,
    68 F.3d 1495 (2d Cir. 1995) ................................................... 57

*United States v. Avenatti*,
    2020 WL 508682 (S.D.N.Y. Jan. 31, 2020) .......................... 18

*United States v. Barnes*,
    2008 WL 9359654 (S.D.N.Y. Apr. 2, 2008) ......................... 18

*United States v. Bergstein*,
    2017 WL 6887596 (S.D.N.Y. Dec. 28, 2017) ....................... 14

*United States v. Christy*,
    739 F.3d 534 (10th Cir. 2014) ............................................... 23

*United States v. CITGO Petroleum Corp.,*
    908 F. Supp. 2d 812 (S.D. Tex. 2012) ............................................................... 23

*United States v. Clarke,*
    979 F.3d 82 (2d Cir. 2020) ............................................................................... 19

*United States v. Cole,*
    2021 WL 912425 (S.D.N.Y. Mar. 10, 2021) ...................................................... 18

*United States v. Construction Products Research, Inc.,*
    73 F.3d 464 (2d Cir. 1996) ............................................................................... 57

*United States v. Goldstein,*
    2023 WL 3662971 (E.D.N.Y. May 25, 2023) ............................................... 10, 11

*United States v. Hatfield,*
    2009 WL 3806300 (E.D.N.Y. Nov. 13, 2009) ............................................. 58, 59

*United States v. Healy,*
    376 U.S. 75 (1964) ........................................................................................... 23

*United States v. Huff,*
    782 F.3d 1221 (10th Cir. 2015) ........................................................................ 23

*United States v. Lewis,*
    432 F. Supp. 3d 1237 (D.N.M. 2020) ............................................................... 23

*United States v. Louis,*
    2005 WL 180885 (S.D.N.Y. Jan. 27, 2005) ...................................................... 55

*United States v. Lucas,*
    841 F.3d 796 (9th Cir. 2016) ............................................................................ 20

*United States v. Maxwell,*
    2021 WL 1625392 (S.D.N.Y. Apr. 27, 2021) .................................................... 55

*United States v. Nachamie,*
    91 F. Supp. 2d 552 (S.D.N.Y. 2000) ........................................................... 11, 12

*United States v. Nixon,*
    418 U.S. 683 (1974) ................................................................................. *passim*

*United States v. Rajaratnam,*
    2011 WL 507086 (S.D.N.Y. Feb. 15, 2011) .......................................... 17, 19, 21

*United States v. Renzi,*
    2010 WL 582100 (D. Ariz. Feb. 18, 2010) ....................................................... 60

*United States v. Rezaq,*
   156 F.R.D. 514 (D.D.C. 1994) .......................................................................... 19

*United States v. Rollins,*
   607 F.3d 500 (7th Cir. 2010) .......................................................................... 23

*United States v. RW Pro. Leasing Servs. Corp.,*
   228 F.R.D. 158 (E.D.N.Y. 2005) ...................................................................... 17

*United States v.* Sattar,
   2003 WL 22137012 (S.D.N.Y. Sept. 15, 2003) ................................................ 60

*United States v. Seabrook,*
   2017 WL 4838311 (S.D.N.Y. Oct. 23, 2017) .................................................... 13

*United States v. Shea,*
   2022 WL 13847351 (S.D.N.Y. Oct. 24, 2022), ................................................ 19

*United States v. Smith,*
   2020 WL 4934990 (N.D. Ill. Aug. 23, 2020) .................................................... 55

*United States v. Soliman,*
   2009 WL 1531569 (W.D.N.Y. May 29, 2009) ................................................... 12

*United States v. Stein,*
   2006 WL 1063298 (S.D.N.Y. Apr. 12, 2006) ................................................... 55

*United States v. Stevens,*
   985 F.2d 1175 (2d Cir. 1993) .......................................................................... 19

*United States v. Tagliaferro,*
   2021 WL 980004 (S.D.N.Y. Mar. 16, 2021) .................................................... 26

*United States v. Tucker,*
   249 F.R.D. 58 (S.D.N.Y. 2008), *as amended* ........................................... 11, 19

*United States v. Ulbricht,*
   858 F.3d 71 (2d Cir. 2017) ........................................................................ 11, 19

*United States v. W.R. Grace,*
   439 F. Supp. 2d 1125 (D. Mont. 2006) ............................................................ 60

*United States v. Weigand,*
   520 F. Supp. 3d 609 (S.D.N.Y. 2021) ....................................... 10, 19, 21, 55

*United States v. Weisberg,*
   2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011) ................................................Passim

*United States v. Williams*,
    951 F.2d 1287 (D.C. Cir. 1991)...................................................................... 23

*United States v. Xiaoquing Zheng*,
    2020 WL 6287481 (N.D.N.Y. Oct. 27, 2020)...................................... 14, 15

*United States v. Yudong Zhu*,
    2014 WL 5366107 (S.D.N.Y. Oct. 14, 2014)...................................... 12, 21

## **Rules**

Fed. R. Crim. P. 17 ...............................................................................passim

Fed. R. Evid. 501 ........................................................................................ 61

Fed. R. Evid. 803(6)............................................................................... 22, 60

## PRELIMINARY STATEMENT

If JPMC had its way, defendant Olivier Amar would be forced to defend against criminal charges without critical internal communications that are squarely relevant to the allegations against him. He would not have communications of JPMC employees discussing the very documents referenced and quoted in the Criminal Complaint that allegedly contain the misrepresentations at the heart of this case. He would not have communications of key JPMC personnel involved in the Frank acquisition—the executives who aggressively spearheaded the acquisition, the employees who attended meetings where the alleged misrepresentations were made, and the individuals who orchestrated the valuation and diligence of Frank where the materiality of the alleged misrepresentations was assessed. And crucially, he would not have internal JPMC communications regarding the post-Merger[1] data transfer at the center of the charges against him. Mr. Amar has issued a proper Rule 17(c) subpoena (the "Subpoena") seeking a targeted set of these specific, relevant, and admissible documents, which are essential for him to receive a fair trial, but JPMC has refused to comply. JPMC does not argue that the Subpoena fails to satisfy Rule 17(c)'s requirements—which demand only that the subpoena be "reasonable" and not "oppressive"—but instead takes pains to heighten the hurdle. But even under the more stringent standard that JPMC asks this Court to apply, the Subpoena withstands scrutiny.

After describing Mr. Amar's requests as "detailed" to this Court, JPMC's main challenge to the Subpoena is that it lacks specificity. JPMC repeatedly points to the three-year period nominally covered by the default, general instructions accompanying the Subpoena, and pays no mind to the fact that nearly all of Mr. Amar's requests are tethered to a specific document, event,

---

[1] "Merger" refers to the merger of Finland Merger Sub, Inc., with and into Frank, which occurred on September 14, 2021, when Frank became a subsidiary of JPMC.

or conversation (and thus are temporally limited by context). JPMC otherwise feigns ignorance as to which custodians may have documents responsive to the requests—even in instances where the requests are tied to specific communications referenced in the Criminal Complaint, which itself merely parrots JPMC's civil complaint against Mr. Amar. Even if such objections had merit—which they do not given the context of the specific requests—Mr. Amar clarifies and narrows both the time frames and specific custodians as set forth below.

JPMC otherwise argues that the Subpoena seeks documents that it has produced, but this argument, too, fails. Mr. Amar's requests seek documents from individuals whose files have not been searched at all or were not searched during the relevant time periods. On numerous occasions, JPMC points to parts of its existing productions that do not satisfy Mr. Amar's requests or makes empty gestures to produce documents that only partially get there. Where Mr. Amar seeks discussions concerning emails, presentations, and spreadsheets cited specifically in the Criminal Complaint, JPMC offers only to produce all documents "containing" the email or "attaching" the presentation or spreadsheet. JPMC's suggested approach defies common sense and falls woefully short of satisfying the requests. JPMC's remaining arguments—for example, that no post-Merger communications are relevant (despite the fact that the Indictment defines the conspiracy period through November 22, 2022, more than a year after the Merger closed, and despite JPMC agreeing in various instances to produce post-Merger communications) or that all documents withheld for privilege are immune from production (despite JPMC's own case law finding otherwise)—are just as specious and overbroad. JPMC's position ignores that the central allegations against Mr. Amar in particular hinge on purported post-Merger conduct. *See* Crim. Compl. ¶¶ 32-33 (containing section entitled, "The Fraud Continues Post-Acquisition").

Ultimately, JPMC's motion makes one thing clear: JPMC should have engaged in a good faith conferral with Mr. Amar before moving to quash the Subpoena (nearly in its entirety). Instead, JPMC made no outreach to Mr. Amar for the three weeks following service of the Subpoena and then requested a conferral on the day its motion was due. Evidently, JPMC misapprehends the purpose behind this Court's individual rule and was content to check a box rather than engage in meaningful discussions aimed at narrowing or obviating disputes. As a result, JPMC's motion reads more like objections and responses to a subpoena than a bona fide motion to quash. Mr. Amar has been and remains willing to meet and confer to answer any questions or discuss any issues—an offer that has been conveyed to JPMC repeatedly—but in the meantime is left to clarify and narrow his requests through an opposition brief.

For the reasons set forth below, JPMC's motion is without merit. The Subpoena specifically identifies relevant and admissible categories of documents that have not already been produced. The documents it seeks are crucial to the defense, and they are precisely the types of documents that criminal defendants are entitled to subpoena from third parties. The Court should therefore deny the motion and order JPMC to comply with the Subpoena.

## BACKGROUND[2]

On July 12, 2023, the Government filed a superseding indictment naming Mr. Amar as a defendant in this action. *See* ECF. No. 27. Since then, Mr. Amar has fought to access documents foundational to his defense, including those from his direct supervisors at JPMC and internal

---

[2] The limited redactions in this filing correspond to materials the Government has designated under the protective order in this case and to the names of certain non-party JPMC personnel that were redacted from JPMC's motion. Defendants have no objection to the publication of any of this information and are available to confer with the Government and JPMC regarding the confidentiality of this information. In an abundance of caution, this information is currently redacted from this public filing.

communications of individuals who approved the Frank acquisition, among others. This Court has recognized the materiality of these internal communications, both in this case and in the parallel SEC matter that has since been stayed. *See* July 13, 2023 Hr'g Tr. at 11:10-16, ECF No. 35 (this Court noting that it "can see the relevance of that information" and that internal communications are material evidence for assessing "[d]id JPMorgan rely on this information, from your point— from your account, reliance is suggested, but there may be items in the correspondence that show differently"); *see also* June 15, 2023 Hr'g Tr. at 24:13-24, *SEC v. Javice*, No. 23-cv-02795, (S.D.N.Y. Apr. 4, 2023) (Liman, J.) ("There might be a smoking gun. There might be an email where Ms. Javice said to J.P. Morgan, these customers are not yet real customers where we have information, identifying information.").

For months, Mr. Amar has pursued these communications, first through attempted negotiations with the Government to enforce the grand jury subpoenas to JPMC and collect material communications from all critical custodians. When the Government refused to collect those communications from JPMC, Defendants moved to compel the Government to do so under Rule 16, *Brady*, and *Giglio*. *See* Motion to Compel Production of Rule 16 Discovery and Brady/Giglio Material at 5-12, ECF No. 58 (Oct. 13, 2023) (the "Motion to Compel"). The Court granted the Defendants' motion, in part, and ordered that the Government require JPMC to produce documents from individuals named in the Complaint. *See* Order Regulating Proceedings at 2-3, ECF No. 61 (Nov. 7, 2023) (the "November 7 Order") ("Goldstein and Shpiro were identified in the Government's Complaint as recipients of Defendants' alleged fraudulent conduct, and they may possess relevant and material documents. The Government should require JPMC to search for, and produce, under the existing subpoenas, responsive documents in the files and emails of these two custodians. This ruling extends, as well, to all other JPMC officers or employees

referenced in the Complaint."). Mr. Amar now seeks the remaining documents that are critical to his defense.

  Mr. Amar does not seek documents for the sake of documents. His pursuit of additional communications is specifically targeted at evidence that he knows exists and that is material to his defense—particularly given the exculpatory evidence unearthed so far. As just one example, on October 12, 2023, the Government produced from JPMC an internal communication from February 2022 (five months after the acquisition) between senior officers involved in Merger diligence, a senior managing director deeply involved in Frank's integration, as well as Defendants' direct manager about why Frank's marketable user base was lower than expected. After discussing various possibilities for lower-than-expected numbers, the chain is forwarded to ███████████ ("Executive-1" in the Criminal Complaint), who states, "I don't think this is a misrepresentation issue." In a case premised on alleged misrepresentations to JPMC, Mr. Amar is entitled to JPMC's internal communications about what was represented (or not).  But JPMC has, so far, declined to produce specific, relevant, and admissible documents from key individuals about those alleged misrepresentations. Indeed, Ms. ██████████ email exchange originates in a discussion with other JPMC employees, including (among others) ███████████ ███████████—none of whom are custodians whose documents have been searched and produced in this matter—wherein ███████████ attribute the drop in marketable users to flaws in integrating Frank into JPMC post-Merger. *See* Ex. B (USAO_Rel_001735542); *see also* Ex. C (USAO_Rel_001730711) (███████████ ███████████ ███████████

██████████████████████████████████████████████

████████████████████████████████).[3]

Mr. Amar now seeks additional documents pursuant to Rule 17—an avenue this Court contemplated and deemed appropriate at this juncture "[i]n light of the complexity of this case," rather than having to wait until "the eve of trial." *See* Nov. 7 Order at 3. On November 9, 2023, Mr. Amar therefore issued a subpoena with specific requests for relevant and admissible evidence. JPMC moves to quash on the following grounds: the Subpoena (1) seeks documents previously produced; (2) lacks specificity; (3) seeks irrelevant information; and (4) seeks documents that are inadmissible because they are privileged. *See, e.g.*, Memorandum of Law in Support of Non-Party JPMorgan Chase Bank, N.A.'s Motion to Quash Defendants' Rule 17(c) Subpoenas ("Mot.") at 7-11, ECF No. 75. JPMC's grounds to quash are meritless, and its motion should be denied.

Before filing the instant opposition, Mr. Amar made good faith efforts to meet and confer with JPMC. JPMC asked Mr. Amar and Ms. Javice to schedule a meet and confer on the day its motion was due. Counsel for Defendants and JPMC met and conferred on December 4, 2023, just one business day after JPMC filed its motion. On December 7, Mr. Amar provided JPMC with a written proposal—with specific custodians, time periods, and suggested search terms—in an effort to narrow the disputes JPMC raised in its Motion and sought JPMC's availability to discuss the same. Counsel for JPMC responded to Mr. Amar's proposal the following Monday, December 11, only to note they had received, were reviewing, and would be in touch. Counsel for Mr. Amar reached out again on December 13. On the night of December 14, the eve that the instant opposition was due, counsel for JPMC responded by letter, addressing only a handful of

---

[3] JPMC continues to produce responsive materials. Indeed, only one week ago, JPMC produced an additional 14,244 documents in response to the Court's November 7 Order.

confirmatory questions and otherwise declining to respond to most of Mr. Amar's proposal because of its view that, "as currently presented," those requests do not "meet[] the requirement of [Rule] 17(c)." JPMC offered no further explanation as to how Mr. Amar might address his requests to "present" them in a manner that, in JPMC's view, would satisfy Rule 17(c). And so, this opposition follows.

## **LEGAL STANDARD**

Rule 17(c) of the Federal Rules of Criminal Procedure governs the issuance of subpoenas *duces tecum*. Rule 17(c) states, in part, that a witness may be ordered to "produce any . . . papers, documents, data, or other objects . . . in court before trial or before they are to be offered in evidence." Fed. R. Crim. P. 17(c)(1). To survive a motion to quash, the subpoenaed materials must be "reasonable" so that compliance with the subpoena is not "oppressive." *See* Fed. R. Crim. P. 17(c)(2).

JPMC assumes that the Court must apply the factors set forth in *United States v. Nixon*, 418 U.S. 683, 700 (1974)— (1) relevancy; (2) admissibility; and (3) specificity—should apply to assess the propriety of the Subpoena. *See* Mot. at 7. But "no binding authority requires" as much, particularly here, where a criminal defendant seeks documents from a third party (rather than from the government). *United States v. Weigand*, 520 F. Supp. 3d 609, 612 (S.D.N.Y. 2021) ("*Nixon* did not consider whether, and under what circumstances, Rule 17(c) might be appropriately used by the *defendant* to seek discovery against a *third party*." (emphasis added)); *United States v. Goldstein*, No. 21-cr-550 (DC), 2023 WL 3662971, at *2 (E.D.N.Y. May 25, 2023) (opining a "standard less stringent than *Nixon* is appropriate" for subpoenas issued by defendants to non-parties; *United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008), *as amended* (Feb. 20, 2008); ("Rule 17(c) states only that a court may quash a subpoena 'if compliance would be unreasonable or oppressive.' The judicial gloss that the material sought must be relevant, admissible, and

specific applies where the government issues a subpoena or where a defendant issues a subpoena to the government.").[4]

When issued by the defense, "the only test for obtaining the documents [should] be whether the subpoena was: (1) reasonable, construed using the general discovery notion of 'material to the defense;' and (2) not unduly oppressive for the producing party to respond." *United States v. Nachamie*, 91 F. Supp. 2d 552, 563 (S.D.N.Y. 2000). This test is consistent with the literal text of Rule 17(c)(2), and has been applied by several courts that have considered this specific issue. *See id; Goldstein*, 2023 WL 3662971, at *2 (subpoena must be "(1) reasonable, construed as 'material to the defense' and (2) not unduly oppressive for the producing party to respond." (citing *Tucker*, 249 F.R.D. at 66)); *see also United States v. Soliman*, No. 06-cr-236A (RJA) (HBS), 2009 WL 1531569, at *3 (W.D.N.Y. May 29, 2009). Indeed, this less stringent standard is appropriate for a defendant's Rule 17(c) subpoena because, unlike the government, the defendant does not have access to vast investigatory powers. *See, e.g.*, *Nachamie*, 91 F. Supp. 2d at 562 ("That high standard [of *Nixon*] . . . made sense in the context of a Government subpoena, especially one seeking evidence from the President. It must be recalled that the Government's use of a subpoena occurs after the completion of a grand jury investigation."); *Soliman*, 2009 WL 1531569, at *3 (discussing the "inherent asymmetry of investigative resources the defense has as compared with the Government").

---

[4] The Second Circuit applied the *Nixon* factors in *United States v. Ulbricht*, 858 F.3d 71, 109 (2d Cir. 2017), but that case involved a subpoena issued to the government—not to a third party.

**ARGUMENT**

**I.    The Subpoena Is Reasonable and Not Unduly Oppressive**

The Supboena satisfies the standard contained in the text of Rule 17(c) itself. JPMC does not argue that the Subpoena is unreasonable or unduly oppressive because it cannot. The requests are reasonable because they seek squarely relevant evidence—in most instances, pertaining directly to documents cited in the Criminal Complaint and discussions regarding the same—that bears directly on Mr. Amar's defenses, including as to scienter, falsity, and materiality. JPMC cries burden under the guise of lack of specificity, repeatedly attacking the three-year time period provided in the Subpoena's general instructions, but under any rubric—Rule 17(c) or *Nixon*—this argument fails. *See United States v. Yudong Zhu*, No. 13 CR. 761, 2014 WL 5366107, at *6 (S.D.N.Y. Oct. 14, 2014) (finding specificity requirement under *Nixon* established for a nearly three-year time period); *United States v. Nachamie*, 91 F. Supp. 2d 552, 563-64 (S.D.N.Y. 2000) (finding subpoena seeking documents from five-year time period to be reasonable and not unduly oppressive). In any event, as described below, that three-year time period is a default time period that rarely applies because the context of the specific requests obviously requires JPMC to search for documents from much narrower time periods. To avoid any confusion notwithstanding Mr. Amar's specificity, he clarifies the narrow time frames below.

JPMC is one of the world's largest, wealthiest, and most sophisticated financial institutions in the world. The Bank is also a litigant in a civil securities fraud claim against Mr. Amar pending in the District of Delaware, and has imposed litigation holds (albeit, potentially belated ones) on numerous custodians. In fact, the Bank already has done a significant portion of the legwork collecting potentially relevant materials. JPMC represents that it has already collected the custodial

files of 39 individuals,[5] though not reviewed these documents in full. Reviewing the custodial files of a few additional, critical individuals, and applying additional search terms to existing custodians, is not a heavy feat for JPMC at this juncture.

Given the reasonableness of the requests, and the lack of burden on JPMC, the Subpoena survives Rule 17(c) scrutiny.

## II.    The Subpoena Satisfies Rule 17(c) and the *Nixon* Standard

JPMC's opposition presupposes that the *Nixon* standard governs the Subpoena. It does not. *See supra* at 6-8 (Legal Standard). But even if *Nixon* applies, the Subpoena readily satisfies its requirements. Under *Nixon*, Mr. Amar must only "make a preponderance showing that the materials requested are relevant, specifically identified, admissible, and not otherwise procurable by the exercise of due diligence." *United States v. Seabrook*, No. 16-cr-467 (ALC), 2017 WL 4838311, at *1 (S.D.N.Y. Oct. 23, 2017) (citation omitted). Mr. Amar has done so here. Far from a "fishing expedition," Mot. to Quash at 3, 17, 29, 35, the Subpoena seeks targeted documents over narrow time periods that bear directly on Mr. Amar's defenses. JPMC's motion should be denied.

### A.  The Subpoena Seeks Documents that Have Not Been Produced

JPMC contends that the Subpoena seeks documents that JPMC has already produced to the Government. Mot. at 7-8. JPMC is wrong. To begin, Mr. Amar's instructions specifically provide:

> You are not required to produce non-privileged Documents that You have previously produced to the Government as part of Your Bates-stamped formal responses to the Government Subpoenas.

---

[5] Based on conferrals with the Government regarding JPMC's custodians, Mr. Amar understands that JPMC has collected but not searched various individuals' custodial files. Based on the metadata in JPMC's productions, Mr. Amar understands these to be the following 10 individuals:

Instruction No. 3. Moreover, as set forth in detail below, Mr. Amar's requests specifically seek documents that JPMC has not yet produced—from custodians whose files have not been searched; from time periods in which documents have not been pulled; and using search terms that have not yet been applied. *See infra* (Request Nos. 3-15, 17, 18, 19, 21, 22-28).

In this regard, JPMC's reliance on *United States v. Bergstein*, No. 16-cr-746 (PKC), 2017 WL 6887596 (S.D.N.Y. Dec. 28, 2017), and *United States v. Xiaoquing Zheng*, No. 19-cr-156 (MAD), 2020 WL 6287481 (N.D.N.Y. Oct. 27, 2020), is misplaced. *See* Mot. at 8. In *Bergstein*, Judge Castel assessed the propriety of subpoenas seeking broad categories of documents—nearly all of which requested "all documents" pertaining to a topic or person. 2017 WL 6887596, at *2 (describing subpoena seeking, among other things, "All COMMUNICATIONS with BERGSTEIN," and "All COMMUNICATIONS regarding ARIUS, PINEBOARD, MD TABLET, PARMAR, or BERGSTEIN"). In *Xiaoquing Zheng*, Judge D'Agostino likewise assessed the propriety of subpoenas seeking broad categories of documents—nearly all of which requested "all documents" pertaining to a topic or person. 2020 WL 6287481, at *1 (describing a subpoena seeking, among other things, "All GE documents including the alleged trade secrets at issue in the indictment"). The Subpoena here, by contrast, seeks specific categories of documents tailored to narrow time periods and often connected to specific discussions or even the substance of specific documents.

Further, in both *Bergstein* and *Xiaoquing Zheng*, the courts emphasized that the defendants made no distinction between the materials that the Government already produced and those that the respective defendants sought via subpoena. This failure, among other things, was fatal to their subpoenas. *Bergstein*, 2017 WL 6887596 at *5; *Xiaoquing Zheng*, 2020 WL 6287481, at *5. That is not the case here, where Mr. Amar has explicitly carved out documents that JPMC has already

produced to the Government and identified custodians whose documents have not been searched and produced.

Further, in *Xiaoquing Zheng*, the defendant did not indicate that he had "reviewed the hard drives in his possession and that they [did] not contain the information he [sought]." 2020 WL 6287481, at *13. The opposite is true here. Mr. Amar has made a good-faith attempt to analyze JPMC's ongoing productions and its search criteria and has identified significant holes in the materials produced to the Government. For instance, the materials this Court ordered to be produced on December 8, 2023, fill some, but certainly not all, of those critical gaps. *See* Nov. 7 Order at 2 (granting Defendants' Motion to Compel as to Adam Shpiro and Mark Goldstein, as well as "all other JPMC officers or employees referenced in the Complaint").

JPMC contends that the Government has already corrected the record and proven that JPMC has produced the "missing materials" Mr. Amar seeks. *See* Mot. at 8 (citing the Government's Memorandum of Law in Opposition to Motion to Compel at 7-8, ECF No. 60 (Oct. 27, 2023)). But JPMC misstates the record. JPMC has not produced the documents Mr. Amar seeks. First, Request 15 seeks "Documents and Communications related to JPMC's decision to offer $175 million to acquire Frank and how JPMC arrived at that valuation." JPMC has produced *some* documents responsive to this Request. However, it has not searched the custodial files of certain critical JPMC executives—like ███████████████████████████—at all, let alone for documents responsive to this request. Documents produced by JPMC to date show these individuals were key decisionmakers in connection with JPMC's hurried purchase of Frank at a premium:

- ███████ facilitated the initial outreach about the potential acquisition of Frank. *See* USAO_Rel_000113533 (███████████████████████████████████████████████████████).

12

- ███ was directly involved in Frank's initial conversations with JPMC in March and April 2021. *See* USAO_Rel_000114945 (████████████████████████████████. He was also involved in JPMC's diligence progress in Summer 2021. For instance, on July 2, 2023, Ms. Javice emailed ███ about the acquisition, wherein she allegedly made misrepresentations. *See* Crim. Compl. ¶ 19(b); *see also* USAO_Rel_000724361 ████████████████████████████████).

- Dimon personally pursued the acquisition of Frank on behalf of JPMC, meeting with Ms. Javice multiple times, and expressing unbridled enthusiasm such that the deal was fast-tracked. *See e.g.*, USAO_Rel_001713238 (████████████████████████████████). After JPMC soured on the deal, Jamie Dimon personally noted that the Bank had made a "huge mistake" in purchasing the startup. *See* Tr. at 13, JPMorgan Chase & Co. Q4 2022 Earnings Call (Jan. 13, 2023).

Second, Request 28 seeks "Documents and Communications related to internal discussions of the content and subject matter of JPMC's Internal Investigation into Frank that precipitated the termination of Ms. Javice and Mr. Amar for cause[.]" Again, JPMC has produced *some* documents responsive to this Request. JPMC, however, did not search the custodial files of critical custodians—like ███ and ███—at all, let alone for documents responsive to this request ███ was the principal investigator and relied heavily on materials and statements from ███—Ms. Javice's and Mr. Amar's direct supervisor who was intimately involved in JPMC's investigation of Ms. Javice and Mr. Amar. *See* USAO_Rel_000109715 (██████████████████████████████████████████████████████); USAO_Rel_000109697 (██████████████████████████████████████████████████████); USAO_Rel_000109715 ██████████████████████████████████████████████████████; USAO_Rel_000109918 (██████████████); USAO_Rel_000109561 (██████████████████████████. ███ and ███

documents are unquestionably critical to Mr. Amar's defense, and JPMC should search their files for documents responsive to this request.

In sum, the documents sought by the Subpoena and JPMC's productions to date do not significantly overlap, and Mr. Amar has distinguished the materials that JPMC already produced from the materials to which he is entitled by subpoena. For these reasons, the Motion to Quash should be denied.

### B. The Subpoena Seeks Specific, Identifiable Information Believed to Be Contained in the Documents Sought

JPMC incorrectly contends that the Subpoena does not "seek specific, identifiable information contained or believed to be contained in the documents sought." Mot. at 8. "A request is generally sufficiently specific where it limits documents to a reasonable period of time and states with reasonable particularity the subjects to which the documents relate," *United States v. RW Pro. Leasing Servs. Corp.*, 228 F.R.D. 158, 162 (E.D.N.Y. 2005), or where it is "focused on a group of records likely to contain helpful documents," *United States v. Weisberg*, No. 08-cr-347 (NGG) (RML), 2011 WL 1327689, at *7 (E.D.N.Y. Apr. 5, 2011) (citing *In re Irving*, 600 F.2d 1027, 1034 (2d Cir.1979)); *United States v. Rajaratnam*, No. 09-cr-1184 (RJH), 2011 WL 507086, at *1 n.1 (S.D.N.Y. Feb. 15, 2011) (holding that a request for "all documents" between several named parties and reflecting certain payments was sufficiently specific). Rule 17 does not require a defendant to "have prior knowledge of specific documents to meet the specificity requirement of Rule 17(c)." *Weisberg*, 2011 WL 1327689, at *7; *see Rajaratnam*, 2011 WL 507086, at *1 n.1 (explaining that "requiring the defendant to specify precisely the documents he wants without knowing what they are borders on rendering Rule 17 a nullity"); *Weisberg*, 2011 WL 1327689, at *7 (Rule 17(c) subpoena should be issued "where the movant knows that the material sought exists and can identify it with specificity, *even if he is ignorant of the exact content of the material*"

(emphasis added)). As discussed below, Mr. Amar has made a preponderance showing that the materials requested are specific. He has identified specific categories of documents (in some cases, referencing particular communications with *exact* precision), in narrow time frames, and a targeted list of custodians from whom he seeks those documents. Rule 17(c) requires nothing more.

On this point, JPMC's reliance on *United States v. Barnes*, No. S9 04-cr-186 (SCR), 2008 WL 9359654 (S.D.N.Y. Apr. 2, 2008), is misplaced. There, the defendant sought "all" documents that fell into several categories for a two-year period, including, for example, "all disciplinary records" for an MDC employee that had none (a fact of which the defendant was aware). *Id.* at *4. For other categories, the defendant "apparently [did] not know whether or not the some of the documents requested even exist[ed]." *Id.* Taken together, the court found that the requests evinced that the defendant was trying to obtain "voluminous materials in the hope that a review of them will uncover some evidence that will be helpful to his defense." *Id.* Here, by contrast, Mr. Amar knows that the requested materials exist—or has good reason to believe so—and has articulated beyond mere speculation that these materials are likely to contain information material to the defense if not outright exculpatory.

JPMC's reliance on *United States v. Shea*, 2022 WL 13847351, No. 20-cr-412-4 (AT) (S.D.N.Y. Oct. 24, 2022), *United States v. Cole*, No. 19-cr-869 (ER), 2021 WL 912425 (S.D.N.Y. Mar. 10, 2021), and *United States v. Avenatti*, No. (S1) 19-cr-373 (PGG), 2020 WL 508682 (S.D.N.Y. Jan. 31, 2020), is likewise misplaced. *See* Mot. at 9-10. Mr. Amar is not speculating or hoping that the sought-after materials exist or contain relevant information. To satisfy the specificity requirement of *Nixon*, the party seeking production of the materials must "reasonably specify the information contained or believed to be contained in the documents sought" rather than merely hope that something useful will turn up. *Tucker*, 249 F.R.D. at 62-63 (citation omitted). A

subpoena meets the specificity requirement if the defendant is able to specify what he believes to be contained in the documents he seeks. *Id*. Mr. Amar has done so here, and so JPMC's Motion fails.

### C.  The Subpoena Seeks Evidence That Is Squarely Relevant to the Charges in the Indictment

JPMC argues, without substantiation, that that the Subpoena seeks "information that is irrelevant to the charges in the Indictment." Mot. at 10. While "Rule 17(c) subpoenas are not to be used as broad discovery devices," they need only be "reasonably targeted to ensure the production of material evidence." *Tucker*, 249 F.R.D. at 66. A document is material if "it could be used to counter the government's case or to bolster a defense." *United States v. Clarke*, 979 F.3d 82, 97 (2d Cir. 2020) (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)); *Weigand*, 482 F. Supp. 3d, at 243 (quoting *United States v. Ulbricht*, 858 F.3d 71, 109 (2d Cir. 2017)). "[T]he documents need not directly relate to the defendant's guilt or innocence. Rather, they simply must 'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony or assisting impeachment or rebuttal.'" *United States v. Rezaq*, 156 F.R.D. 514, 519 (D.D.C. 1994), *vacated in part*, 899 F. Supp. 697 (D.D.C. 1995) (citations omitted). "This 'low threshold' is satisfied if the information requested would have 'helped' [the Defendant] prepare a defense." *United States v. Lucas*, 841 F.3d 796, 804 (9th Cir. 2016) (internal citations omitted).

Despite broadly disputing relevance, JPMC does not specifically contest relevance for most of the requests—Requests 1-15, 17-20, 22, 24-27, 31—because it cannot.[6] That is because these requests seek evidence that is unquestionably relevant to allegations in the Criminal Complaint.

---

[6] The relevance of the remaining requests is addressed in turn below. *See infra* (Requests 16, 21, 23, 28, 29, 30).

*See, e.g.*, Crim. Compl. ¶¶ 13, 19, 21, 25-26, and 32. On their face, these requests seek evidence that bears directly on Mr. Amar's defenses, including as to scienter, falsity, and materiality, and JPMC does not contend otherwise.

JPMC argues in conclusory fashion that "many" of Mr. Amar's requests "seek information as to post-Merger business dealings that are wholly irrelevant to whether Defendants engaged in fraud when they sold Frank to JPMC." Mot. at 10. JPMC never specifically identifies the "many" requests at issue. Regardless, JPMC's unsupported contention that post-Merger conduct is irrelevant to the charges against Mr. Amar lacks merit and contradicts the allegations in the Indictment and the Criminal Complaint. To begin, the Superseding Indictment specifically defines the conspiracy period as "in or about June 2021 through at least in or about November 2022." ECF No. 27 ¶ 1. Further, the Criminal Complaint includes allegations, particularly against Mr. Amar, that took place post-acquisition, even consolidating those allegations in a section titled, "The Fraud Continues Post-Acquisition."[7] Crim. Compl. ¶¶ 32-33*; id*. ¶ 32(a)(ii) (quoting emails from Mr. Amar). JPMC's position that post-Merger documents are irrelevant is all the more confusing, given it elsewhere agrees to produce certain post-Merger communications. *See infra* (Requests 13, 14, 22, 24, 25, 28).

Putting aside the allegations pertaining to post-Merger conduct, documents from after the Merger also contain critical information casting doubt on the materiality of the alleged misrepresentations in JPMC's decision to buy Frank and in the valuation of the startup. *See* USAO_Rel_001735542; USAO_Rel_001730711. These documents are not only directly relevant to an element of the charges against Mr. Amar, but they demonstrably contain exculpatory information.

---

[7] Mr. Amar remained an employee of JPMC until October 26, 2022.

### D. The Subpoena Seeks Admissible Documents

Finally, JPMC broadly contends that the Subpoena seeks "documents and communications that would be inadmissible," but points only to Mr. Amar's request for the production of certain documents on JPMC's privilege log. Mot. at 10-11. Indeed, JPMC does not specifically dispute admissibility for most of the requests—Requests 1-15, 17-18, 20, 22, and 25-27—because it cannot.

To begin, the Subpoena seeks admissible evidence, including relevant business records kept in the ordinary course by JPMC.[8] A presumption of admissibility may apply in cases, like this one, where the defendant has shown the potential relevance of documents. *Rajaratnam*, 753 F. Supp. 2d 317, 320 n.1 (noting that Rule 17 may be a "way for a defendant to examine documents he believes to exist that would be *relevant to, and therefore presumptively admissible in*, his defense" (emphasis added)). This determination can be preliminary, since the trial itself will involve separate rulings on admissibility. *See Bergstein*, 2018 WL 9539846, at *2 (finding *Nixon*'s admissibility prong met for requests given that defendant's showing "permits a rational inference as to the relevance of these materials, and *sufficiently preliminarily demonstrates admissibility*" (emphasis added)). As demonstrated above, the evidence requested by the Subpoena bears directly on Mr. Amar's defenses, namely as to scienter, materiality, and falsity, thus establishing relevance and preliminarily demonstrating admissibility. *See id.*; *see also Weigand*, 520 F. Supp. at 614 (finding, in a bank fraud prosecution, that a Rule 17(c) subpoena sought relevant materials in part

---

[8] *See, e.g.*, *Zhu*, 2014 WL 5366107, at *3 (denying motion to quash and noting that "documents would likely qualify as business records under Federal Rules of Evidence 803(6), if they were created in the course of a business's regularly-conducted activities"); *Weisberg*, 2011 WL 1327689, at *7 (finding that "requested material is also likely admissible as business records").

because a juror may "find that the alleged misstatements did not have a natural tendency to influence or a reasonable likelihood of influencing a bank's decision").

As discussed in further detail below, *see infra* (Request 31), many of the requested documents may in fact not be privileged, and in any event, documents withheld on the basis of privilege are not *per se* inadmissible. JPMC does not argue—and offers no case law demonstrating—otherwise.[9] In fact, JPMC relies on inapposite case law to insinuate that privilege claims, without more, are sufficient grounds to withhold documents in the face of a Rule 17(c) subpoena. Indeed, JPMC's citation to *United States v. Weisberg*, No. 08-cr-347 (NGG) (RML), 2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011), is misleading. *See* Mot. at 10. This case supports Mr. Amar's position. There, the court quashed certain subpoena requests for failing to meet any of the *Nixon* factors (none on the basis of privilege claims alone), but otherwise held, with respect to certain supposedly privileged records: "If [the subpoena recipients] believe that any responsive records are in fact privileged, they should submit such records for the court to review *in camera*, along with a detailed explanation as to why they believe the records are privileged. A mere privilege log will not suffice." *Id.* at *7. Here, too, JPMC's bald assertions of privilege and wholesale reliance on its privilege log are not enough.

Because the Subpoena seeks specific, relevant, and admissible documents that have not otherwise been produced, this Court should deny JPMC's Motion to Quash.

---

[9] JPMC raises a banking privilege, arguing that it is "bound by strict federal law to maintain confidentiality over [its] reporting of suspicious activity." Mot. at 11 n.4. To the extent that this privilege is implicated by Request 31, and as addressed below in further detail, Mr. Amar's "constitutional right to present a defense" may "outweigh" JPMC's right to assert privilege. *See Weisberg* 2011 WL 1327689, at *4 (citing Fed. R. Evid. 501).

**III.    The Subpoena's Definitions and Instructions Do Not Violate Rule 17(c)**

JPMC argues that the Subpoena's definitions and instructions are "so broad that they render even a potentially proper request inappropriate under the strictures of Rule 17." Mot. at 11. But JPMC's only challenge to Mr. Amar's definitions is his reliance on the Local Civil Rules in the absence of any Local Criminal Rules. *See* Mot. at 11-12. Courts have routinely "imported" civil rules to criminal cases where the criminal rules are silent. *See, e.g.*, *United States v. Williams*, 951 F.2d 1287, 1289 (D.C. Cir. 1991) ("[W]e imported [the standard] from the civil rules for cases tried to the court . . . because the rules of criminal procedure were silent on the matter."); *United States v. CITGO Petroleum Corp.*, 908 F. Supp. 2d 812, 820 (S.D. Tex. 2012) ("Absent specific guidance from the Federal Rules of Criminal Procedure, courts should apply the standards set forth in the Federal Rules of Civil Procedure . . . ." (citing *United States v. Healy*, 376 U.S. 75, 84 S. Ct. 553 (1964))); *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010))). Because the Local Criminal Rules are silent, Mr. Amar aligned his general definitions and instructions with S.D.N.Y. Local Rule 26.3. "While the civil rules are not expressly applicable to criminal cases, the courts have used the principles somewhat interchangeably." *United States v. Lewis*, 432 F. Supp. 3d 1237, 1269 (D.N.M. 2020) (citing *United States v. Christy*, 739 F.3d 534, 539-40 (10th Cir. 2014); *United States v. Huff*, 782 F.3d 1221, 1223-24 (10th Cir. 2015)).

JPMC challenges three additional instructions: 9, 14, and 19. Each of these challenges fail.

**A.    Instruction 9 Is Proper**

> Instruction 9: This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below, such as, for example, Documents maintained by your counsel.

JPMC says that Instruction 9 "purports to force JPMC to somehow search for documents JPMC does not possess." Mot. at 13. This instruction by no means "force[s] JPMC to somehow

search" for documents outside its possession. To the contrary, the instruction expressly requests documents *within* JPMC's "possession, custody or control." The term "control" has been "construed broadly by the courts as the legal right, authority, or practical ability to obtain the materials sought upon demand." *Markus v. Rozhkov*, 615 B.R. 679, 705–06 (S.D.N.Y. 2020) (citation omitted). Indeed, "[d]ocuments in the possession of a party's attorney may be considered to be within the control of the party." *Id.* (citation omitted). JPMC documents that are held by JPMC's counsel are certainly within JPMC's possession. In any event, only one of Mr. Amar's requests—Request 28, which seeks "Documents and Communications related to internal discussions of the content and subject matter of JPMC's Internal Investigation into Frank that precipitated the termination of . . . [Mr. Amar]"—may implicate documents in the possession of JPMC's outside counsel, Hogan Lovells.

## B. Instruction 14 Is Proper

> Instruction 14: These Requests require the production of original tangible things in the same form and in the same order as they are kept in the usual course of business. The titles or other descriptions on the boxes, file holders, bindings, or other container in which tangible things are kept are to be left intact. Alternatively, all documents are to be produced, organized, and labeled to correspond with the categories in this Request.

JPMC argues that Instruction 14 "amounts to nothing more than an attempt to compel JPMC to do Defendants' job in reviewing the documents in their possession and provide a summary to Defendants." Mot. at 13. This exaggeration is as specious as it is untrue. This instruction requires only that JPMC produce things "in the same form and in the same order as they are kept in the usual course of business." If anything, this instruction requires JPMC to do less. JPMC's misconstruction of this instruction therefore should be disregarded, if not outright rejected.

### C. Instruction 19 Is Proper

> <u>Instruction 19</u>: Documents not otherwise responsive to these Requests shall be produced if such documents concern, relate to, mention, discuss, refer to, describe, or explain the documents which are called for by these Requests.

Finally, JPMC contends that Instruction 19 is "absurd—on its face, it purports to require JPMC to produce non-responsive documents." Mot. at 13-14. Again, JPMC presents an overblown, exaggerated reading of this instruction. Instruction 19 directs that documents concerning, relating to, or explaining documents that are responsive to the Subpoena should be produced. There are any number of examples of how a document explaining the context for another responsive document would itself be responsive. One obvious example may be in the production of text messages or other electronic instant messages, where single snippets, alone, may be non-responsive on their face, but together with others make up a responsive communication. Another example may be general diligence templates or acquisition procedures and/or policies that do not directly relate to Frank, but otherwise inform the process by which JPMC pursued and closed the deal. Even so, Mr. Amar has been and remains willing to discuss this instruction to assuage JPMC's stated concern.

In summary, the Subpoena's definitions and instructions often include *default* guidance and directions that should be applied only where a specific request does not contain specific instructions or context for that request. In many cases, as JPMC well knows, any number of the instructions will not apply at all. JPMC relies on cases where the default instructions were broad and the requests were even broader. *See* Mot. at 12 (quoting *United States v. Tagliaferro*, No. 19-cr-472 (PAC), 2021 WL 980004, at *3 (S.D.N.Y. Mar. 16, 2021), which involved a "breathtakingly broad" subpoena seeking "all documents"). That is not the case here. Not a single request in Mr. Amar's Subpoena seeks "all documents." However, for avoidance of doubt and as

set forth in detail below, Mr. Amar has clarified and narrowed various requests to ameliorate any suggestion of undue burden about which JPMC has complained.

## IV.    Mr. Amar's Requests Satisfy Rule 17(c)[10]

As noted above, Mr. Amar does not agree that *Nixon* is the appropriate standard to assess the Subpoena. Nevertheless, because the Subpoena satisfies even *Nixon*'s higher standard—especially as clarified and narrowed below—Mr. Amar applies the *Nixon* factors in responding to and refuting the arguments in JPMC's Motion. Each of JPMC's unfounded objections to the Subpoena is addressed in turn.

### A.    Requests 1 and 2 Seek Specific Documents That Have Not Been Produced and Should Not Be Quashed

Request 1: Documents and Communications related to internal discussions involving ▮▮▮▮▮▮▮▮ (identified as "Executive-1" in the Criminal Complaint and "Head of Corporate Development" in the Civil Complaint) and other JPMC employees in or about March 2021 regarding her views, and the views of other JPMC employees, as to whether Frank was an appealing acquisition target for JPMC due to the marketing potential of Frank's large customer base, as referenced in ¶ 19(a) of the Criminal Complaint and ¶ 38 of the Civil Complaint.

Request 2: Documents and Communications related to internal discussions involving ▮▮▮▮▮▮▮▮ and other JPMC employees in or about March 2021 regarding alleged representations regarding the marketing potential of Frank's large customer base, as referenced in ¶ 19(a) of the Criminal Complaint.

With respect to Requests 1 and 2, JPMC contends that it already has produced documents from ▮▮▮▮▮▮▮▮ and intends to produce additional documents in or about March 2021, which is outside the time frame of the Government's subpoena. JPMC argues, however, that these requests lack sufficient specificity because they ask for "internal discussions" about ▮▮▮▮

---

[10] For the Court's convenience, Exhibit A, annexed hereto, summarizes the proposed custodians, time periods, and search terms to narrow and clarify the Subpoena.

████████ and "other JPMC employees' views" about whether Frank was an appealing acquisition target. *See* Mot. at 49-50.

To begin, Requests 1 and 2 are sufficiently specific. The requests seek documents and communications regarding internal discussions about the views of ████████ and "other JPMC employees" regarding: (i) whether Frank was an appealing acquisition target for JPMC due to the marketing potential of Frank's large customer base; and (ii) alleged representations regarding the marketing potential of Frank's large customer base. The specific subject matter at issue provides adequate notice of a reasonable time frame—*i.e.*, the period of initial outreach in March 2021, prior to the commencement of due diligence (in July 2021). But for avoidance of doubt, Mr. Amar seeks responsive documents only for the time period of March 23, 2021, to June 30, 2021.

JPMC also takes issue with Mr. Amar's request for documents regarding the views of "other JPMC employees" and criticizes Mr. Amar for not specifying particular individuals. *See* Mot. at 50. JPMC's confusion is surprising, given that each of these requests is tethered to Paragraph 19(a) in the Criminal Complaint, which parrots allegations in the Civil Complaint that JPMC itself drafted. *Compare* Crim. Compl. ¶ 19(a), *with* Civ. Compl. ¶ 38 (referring to "another executive at JPMC"). Regardless, JPMC's productions to date strongly suggest that the following individuals communicated about Frank's acquisition appeal and alleged misrepresentations regarding its marketing potential during the March 23 to June 30, 2021 time period: ████████
████████████████████████████████████████████████████████
████████████████████████████ JPMC has not produced any communications from these custodians for this narrowed time period. Indeed, for some of these custodians (████████████████████
████████████████), JPMC has not searched or produced documents from their custodial files.

JPMC's productions to date demonstrate that such communications likely exist. For example, on March 23, 2021, Frank board member Michael Eisenberg pitched Frank to JPMC employee ███████████ over email, which culminated in a March 29, 2021 meeting between Ms. Javice, ██████████████████████. *See* USAO_Rel_000113533 (██████████ ████████████████████████████████████████████████████████████ ███████████████). The following month, ██████ told Ms. Javice he wanted to continue their discussions and arranged a meeting. *See* USAO_Rel_000114945 (████████████████ ████████████████████████████████████████████████████████████ ███████). In May, Ms. Javice and ██████ met, and he connected her with ██████████. USAO_Rel_000967384 (████████████████████████████████████████████ ████████████████████████). JPMC has not searched or produced any custodial files of ██████ or ██████████, nor has it explained why ██████████████ communications are relevant but those of ██████ or ██████████ (or their respective teams) are not. *See* USAO_Rel_001714061 (████████████████████████████████████████████████████████████ ████████████████████████████████████████).[11] To be clear, the Government has alleged that Ms. Javice and Mr. Amar committed fraud in connection with the sale of Frank to JPMC. The documents produced in this case reveal that JPMC's discussions with Frank began in March 2021 with specific individuals. Mr. Amar is entitled to those documents to put on his defense.

---

[11] Mr. Amar understands that JPMC has not searched and produced communications from before July 1, 2021, in response to the Government's subpoenas. Mr. Amar reserves his right to seek additional documents from additional custodians involved in these early Merger discussions.

**B.  Requests 3, 4, 6, 7, 8, 9, and 10 Seek Specific Documents That Have Not Been Produced and Should Not Be Quashed**

Request 3: Documents and Communications related to internal discussions of the content and subject matter of the alleged July 2, 2021 email from Ms. Javice to ███████████████, as referenced in ¶ 19(b) of the Criminal Complaint, including related to the alleged representation by Ms. Javice to ███████████████ that Frank had "5.6M active households in the US and . . . will end the year with close to 10M families," and how that representation impacted the decision to proceed with the Acquisition and/or the price that JPMC paid to acquire Frank.

Request 4: Documents and Communications related to internal discussions regarding the 18-page pdf of a PowerPoint presentation regarding Frank (defined in the Criminal Complaint as the "July 2 Pitch Deck"), as referenced in ¶ 19(b) of the Criminal Complaint, its purported representation that Frank had 4.25 million users, and its alleged impact on the decision to proceed with the Acquisition and/or the price that JPMC paid to acquire Frank.

Request 6: Documents and Communications related to internal discussions regarding the 60-page PowerPoint presentation regarding Frank (defined in the Criminal Complaint as the "July 7 Pitch Deck"), as referenced in ¶ 19(d) of the Criminal Complaint, its purported representation that Frank had 4.25 million users, and its alleged impact on the decision to proceed with Acquisition and/or the price that JPMC paid to acquire Frank.

Request 7: Documents and Communications related to internal discussions regarding the spreadsheet allegedly uploaded to the "data room" by Ms. Javice on or about July 8, 2021 (defined in the Criminal Complaint as the "Spreadsheet"), as referenced in ¶ 19(e) of the Criminal Complaint and ¶ 54 of the Civil Complaint, and its alleged impact on the decision to proceed with Acquisition and/or the price that JPMC paid to acquire Frank.

Request 8: Documents and Communications related to internal discussions of the content and subject matter of the alleged July 9, 2021 email from ███████████████ (identified in the Criminal Complaint as "a JPMC employee"), to the investment advisors representing Ms. Javice regarding next steps and due diligence meetings, as referenced in ¶ 19(f) of the Criminal Complaint.

Request 9: Documents and Communications related to internal discussions of the content and subject matter of the alleged August 4, 2021 email from Ms. Javice to ███████████████ (identified in the Criminal Complaint as "Executive-2") regarding Frank's user breakdown according to "the Spreadsheet," as referenced in ¶ 19(h) of the Criminal Complaint.

<blockquote>
<u>Request 10</u>: Documents and Communications related to internal discussions of the content and subject matter of the alleged August 1, 2021 email from ███████████ describing the information about Frank user data sought by JPMC, as referenced in ¶ 21(d) of the Criminal Complaint and ¶¶ 5 and 64 of the Civil Complaint.
</blockquote>

JPMC contends that Requests 3, 4, 6, 7, 8, 9 and 10 seek documents already produced and otherwise fail for lack of specificity. *See* Mot. at 50-55. JPMC's arguments fail.

i. <u>JPMC's Approach to Requests 3, 4, 6, 7, 8, 9, and 10 Falls Short, and These Requests Seek Documents That Have Not Been Produced</u>

For Requests 3, 7, 8, 9, and 10, JPMC contends it has previously produced "all documents containing" the documents referenced in each of the requests, namely:

- "all documents containing" the July 2, 2021 email from Javice to ███████ referenced in ¶ 19(b) of the Criminal Complaint and responsive, non-privileged documents from ███████ custodial file, Mot. at 50;

- "all documents containing" the Spreadsheet, including all JPMC internal communications with the Spreadsheet as an attachment, as well as the July 8, 2021 Email referenced in 19(e) of the Criminal Complaint, *id.* at 53;

- "all documents containing" the July 9, 2021 email from ████ to investment advisors representing Ms. Javice referenced in ¶ 19(f) of the Criminal Complaint and responsive, non-privileged documents from ████ custodial file, *id.* at 53;

- "all documents containing" the August 4, 2021 email from Javice to ████ referenced in ¶ 19(h) of the Criminal Complaint and responsive, non-privileged documents from ███████ custodial file, *id.* at 54;

- and "all documents containing" the August 1, 2021 email from ████████s referenced in ¶ 21(d) of the Criminal Complaint and responsive, non-privileged documents from ███████ custodial file, *id.* at 54. According to JPMC, this suffices.

But Mr. Amar does not seek only documents *containing* the July 2, July 8, July 9, August 4, and August 1, 2021 emails—Mr. Amar seeks discussions regarding the substance of these emails and the points raised therein. For Request 3, Mr. Amar seeks discussions regarding Ms. Javice's alleged representation in the July 2 email that Frank had "5.6M active households in the US and

. . . will end the year with close to 10M families," and how that representation impacted the decision to proceed with the acquisition and/or the price that JPMC paid to acquire Frank. For Request 8, Mr. Amar seeks discussions regarding the next steps and due diligence meetings referenced in the July 9 email.[12] For Request 7, Mr. Amar seeks internal discussions about "the Spreadsheet" containing user data allegedly uploaded to the data room by Ms. Javice and discussed internally by JPMC employees on July 8, 2021, not merely the spreadsheet. JPMC has not even searched the custodial files of all JPMC employees discussing the spreadsheet in the email referenced in ¶19(e) of the Criminal Complaint. *See* USAO_Rel_000022234 (█████████ ██████████████████████████████████████████████████ ██████████). JPMC has not searched and produced documents from ██████ at all. For Request 9, Mr. Amar seeks discussions regarding the August 4 email and the user breakdown referenced therein. For Request 10, Mr. Amar seeks the internal discussions prompting ██████████ description of information sought by JPMC and why that information would be necessary to move forward with the acquisition of Frank, as referenced in the August 1 email. JPMC's productions to date, and its proposed approach, do not adequately respond to these requests. Agreeing to produce documents *containing* these foundational materials does not adequately respond to these requests.

Similarly, for Requests 4 and 6, JPMC agrees to "review its files and produce any other responsive, non-privileged JPMC internal communications" that include the July 2 Pitch Deck, the July 7 Pitch Deck, and the Spreadsheet as attachments. Mot. at 51-52. But Mr. Amar does not only seek emails *attaching* the July 2 Pitch Deck, the July 7 Pitch Deck, and the Spreadsheet as attachments—Mr. Amar seeks communications discussing the July 2 Pitch Deck, the July 7 Pitch

---

[12] In particular, Mr. Amar seeks discussions regarding the "internal conversations" that apparently took place on July 9, 2021, causing JPMC to "push ahead full steam" with diligence, as referenced in ██████ email. *See* USAO_Rel_001734504.

Deck, and the Spreadsheet as attachments, and the purported representations contained therein. Common sense dictates that relevant information will be found in readily identifiable related materials that do not necessarily attach the July 2 Pitch Deck, the July 7 Pitch Deck, and the Spreadsheet. Indeed, by producing the communications attaching these materials (and agreeing to search for additional communications attaching the materials), JPMC has conceded the relevance of those subject matters. It defies logic to contend that communications discussing the same materials, but that do not attach the referenced docs, are somehow not equally responsive, relevant, and ascertainable. As such, JPMC's offer to provide additional documents falls short, and JPMC should be required to review and produce any threads, offshoots, and other related types of communications concerning the July 2 Pitch Deck, the July 7 Pitch Deck, and the Spreadsheet.

ii.  Requests 3, 8, 9, and 10 Are Sufficiently Specific

JPMC erroneously contends that Requests 3, 8, 9, and 10 seek documents from a three-year period and from unidentified individuals. Mot. at 50-51, 53-55. Again, JPMC is wrong, and Requests 3, 8, 9, and 10 are sufficiently specific.

Request 3. To start, Request 3 targets discussions pertaining to a July 2, 2021 email from Ms. Javice to ▇▇▇▇▇ regarding Frank households and users. As such, Mr. Amar agrees to limit Request 3 to the discrete time period of June 28, 2021, to September 15, 2021 and from January 1, 2022 through March 31, 2022. This includes the initial diligence period (June 28 to Sept. 15) and the 2022 time period when JPMC began re-reviewing diligence materials for representations regarding Frank's users and discussing the materiality or lack thereof of such representations. JPMC easily could run targeted search terms during this narrowed time period to gather documents responsive to this request. *See* Ex. A.

As to the custodians for Request 3, JPMC's productions to date confirm that JPMC employees (beyond ▇▇▇▇▇) were involved in such discussions: ▇▇▇▇▇▇▇

██████████████████████████████████████████████████████

███████████████████████████████. JPMC has not produced *any* documents ███████████

████████████████████████████████ despite documents demonstrating their key

involvement. *See, e.g.*, USAO_Rel_001713238 (█████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████); USAO_Rel_001720464 (██████████████████████████

██████████████████████████████████████████████████████);

USAO_Rel_001731630 (███████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████).

Request 8. Similarly narrow is Request 8, which targets discussions pertaining to a July 9,

2021 email from ████████████ to Ms. Javice and her investment advisors regarding "a number of

internal conversations" and JPMC's plan to push "full steam ahead" with diligence. Mr. Amar

agrees to limit Request 8 to the discrete time period of June 28 to July 11, 2021. As to custodians,

JPMC's productions to date confirm that JPMC employees (beyond ██████████) were involved

in such discussions about the lead up to diligence, including B████████████████████████

██████. *See, e.g.*, USAO_Rel_001711931 ████████████████████████████

██████████████████████████████████████████████████████

████; USAO_Rel_000005923 (████████████████████████████████

██████████████████████████████████████████████████████

████████████████). JPMC has not searched or produced the custodial files of any of these

critical individuals.

Request 9. Request 9 targets discussions pertaining to an August 4, 2021 email between ████████ and Ms. Javice regarding Frank's user metrics according to "the Spreadsheet." As such, Mr. Amar agrees to limit Request 9 to the discrete time period of July 6, 2021, to September 15, 2021. This roughly two-month period is the diligence period when Frank's users—the subject of the alleged misrepresentation—were discussed. JPMC easily could run targeted search terms during this narrowed time period to gather documents responsive to this request. *See* Ex. A.

Request 10. Request 10 targets discussions pertaining to an August 1, 2021 email from ████████ to Ms. Javice regarding the user data sought by JPMC. As such, Mr. Amar agrees to limit Request 10 to the discrete time period of July 7, 2021, to August 8, 2021—a fraction of the initial diligence period in which these discussions took place. As to custodians, JPMC's productions to date confirm that JPMC employees (beyond ████████) were involved in such discussions, including ████████████████████████████████████████████ ████████████████████. *See, e.g.*, USAO_Rel_001732704 (████████████████████ ████████████████████████████████████████████████████████████ ████████. JPMC easily could run targeted search terms during this narrowed time period to gather documents responsive to this request. *See* Ex. A.

      iii.   Requests 4, 6, and 7 are Sufficiently Specific

Requests 4, 6, and 7 also are sufficiently specific. JPMC incorrectly relies on the general, default instruction setting forth a three-year time period and ignores the context contained in the requests themselves (a point Mr. Amar easily could have clarified had JPMC sought a good-faith conferral earlier than the day its motion was due). These requests target discussions pertaining to specific documents from July 2, 7, and 8, 2021, and certain information referenced therein. As such, Mr. Amar clarifies that Requests 4, 6, and 7 are limited to the discrete time period of July 2, 2021, to September 15, 2021—the time period in which the referenced Frank pitch and diligence

materials were actively discussed. By producing documents that attach the decks and spreadsheets referenced in these requests, JPMC has conceded the relevance of such materials. For Request 4, JPMC's productions to date confirm that ███████ participated in discussions regarding the July 2 Pitch Deck. *See, e.g.*, USAO_Rel_000070381 (███████████████████████ ████████████████████████████). JPMC has not searched or produced documents from Barnes's custodial file at all.

### C. Mr. Amar Agrees to Withdraw Request 5

> Request 5: Documents and Communications sufficient to identify who from JPMC had access to the "data room" opened by Frank on or around July 6, 2021, as referenced in ¶ 19(c) of the Criminal Complaint and ¶ 42 of the Civil Complaint.

JPMC contends that it has produced documents in response to Request 5. For Request 5, Mr. Amar asked that JPMC confirm which JPMC employees had access to the data room. In its December 14 letter to Mr. Amar, JPMC represented that it is unable to confirm every employee who had access to the data room. Therefore, Mr. Amar agrees to withdraw Request 5.

### D. Requests 11 and Request 12 Seek Specific Documents That Have Not Been Produced and the Requests Should Not Be Quashed

> Request 11: Documents and Communications related to internal discussions of the content and subject matter of the alleged August 3–5, 2021 emails from ██████████ to Ms. Javice regarding the appropriate use of "unique identifiers" for personal identifying information, the data validation report JPMC sought from Frank, the template for the data validation report that JPMC sought from Frank (defined in the Criminal Complaint as the "Template Report"), and confirming completion of JPMC's data validation request, as referenced in ¶¶ 21 and 25 of the Criminal Complaint and ¶ 67 of the Civil Complaint.

> Request 12: Documents and Communications related to discussions between ██████████ and Acxiom (identified in the Criminal Complaint

as "Vendor-1") in or around August 2021 regarding JPMC's validation request for Frank data, as referenced in ¶ 26(b) of the Criminal Complaint.[13]

JPMC contends that Requests 11 and 12 lack specificity and otherwise seek documents it has already produced. *See* Mot. at 55-56. JPMC's arguments once again fail. On this first point, JPMC moved to quash based on the three-year time period provided in the Subpoena's general instructions rather than engage with Defendants on a common-sense narrowing of the requests. *See id*. To clarify, Requests 11 and 12 specifically target documents and communications related to: (i) ▋▋▋ discussions with Javice from August 3-5, 2021 in emails regarding the data validation report; and (ii) ▋▋▋ communications with Acxiom in or around August 2021 regarding the validation of Frank data and internal discussions regarding the same. As such, Mr. Amar agrees to limit Requests 11 and 12 to the discrete time period of July 14, 2021, to September 14, 2021.

JPMC also contends it satisfied Request 12 because it has produced at least 4,031 documents that reference "Acxiom" and 1,072 documents of ▋▋▋ *See id*. But JPMC's response reveals its shortcomings. Following Mr. Amar's initial conferral with JPMC, he preliminarily agreed to withdraw Request 12 if JPMC could confirm that ▋▋▋ was the sole JPMC employee who interacted with Axciom regarding its validation of Frank's user data. Although JPMC has since confirmed that to the "current extent of JPMC's knowledge" ▋▋ ▋▋▋ was the only JPMC employee who "directly interacted" with Acxiom, JPMC's documents productions reveal that ▋▋▋ discussed Acxiom's data validation exercise with several key custodians (e.g., ▋▋▋▋▋▋▋▋

---

[13] Each of these requests seeks information related to Frank's "data validation" exercise of Frank's user data, which it performed through a third-party vendor, Acxiom. Mr. Amar understands this was a condition to close initiated on August 1, 2021.

█████ ) during the narrowed time period. *See* USAO_Rel_001760080 (███████████████████

████████████████████████████████████████████████████

██████████████████ ); USAO_Rel_001713115 (███████████████████

████████████████████████████████████████████████████

██████████████████ ). Further, custodian ███████████████ discussed the data

validation process and her thinking behind it with JPMC employee ██████████ (not a

custodian) on August 2, 2021. *See* USAO_Rel_001735152 (███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ ).

Given the exclusion of ██████ from JPMC's custodian list and that JPMC has not run "Axciom"

as a standalone search term across its custodians for this narrowed time period, its productions to

date do not adequately respond to this request. In light of this fact, JPMC's offer to "review its

files of [████████] and produce any other communications related to discussions between

████████ and Acxiom in or about early August 2021" only partially addresses the issue. Mr.

Amar requests that JPMC search the files of ████████ and the custodians listed above for

communications involving "Axciom," and other related terms during the narrow time period

specified. *See* Ex. A.

### E. Requests 13 and 14 Seek Specific Documents That Have Not Been Produced and Should Not Be Quashed

**Request 13**: Documents and Communications related to internal discussions of the content and subject matter of the alleged January 6–10, 2022 emails from ████████ (identified in the Criminal Complaint as the "Marketing Executive") regarding the transfer of certain data files, as referenced in ¶ 32(a) of the Criminal Complaint and ¶ 164 of the Civil Complaint.

**Request 14**: Documents and Communications related to internal discussions of the content and subject matter of the alleged other purported user data

files sent by Ms. Javice to JPMC, as referenced in ¶ 32(b) of the Criminal Complaint.

JPMC contends that Requests 13 and 14 seek documents it has already produced and otherwise fail for lack of specificity. *See* Mot. at 56-57. JPMC's arguments should be rejected.

On the first point, JPMC contends that having produced the emails referenced in ¶ 32(a) of the Criminal Complaint as well as the user data files referenced in ¶ 32(b) of the Criminal Complaint, JPMC has satisfied these requests.[14] *See id.* JPMC's limited production of the underlying documents referenced in ¶¶ 32(a)-(b) of the complaint and ▇▇▇▇▇▇▇ files does not address Requests 13 and 14. Requests 13 and 14 target documents and communications regarding the user data provided to JPMC, rather than the January 6–10, 2022 emails or the user data files themselves. As for JPMC's claim that it cannot search for emails that may attach the user data files, Mot. at 57, JPMC could easily run targeted search terms resulting in the identification of such correspondence. *See* Ex. A.

On the second point, Requests 13 and 14 are sufficiently specific. JPMC contends that Requests 13 and 14 fail to specify "individuals over a nearly three-year time period." Mot. at 56-57. Again, JPMC's confusion is surprising, given that Request 13 is tethered to Paragraph 32(a) in the Criminal Complaint, which parrots allegations in the Civil Complaint that JPMC itself drafted. *Compare* Crim. Compl. ¶ 32(a), *with* Civ. Compl. ¶ 164. What is more, JPMC moves to quash an entire subpoena request on the basis of a date range that Mr. Amar easily could have clarified in a conferral. To be clear, these requests target particular discussions at a time when JPMC received and analyzed user data files provided by the Frank team (a time that is part and parcel of the fraud

---

[14] JPMC notes it will search for and produce responsive documents from ▇▇▇▇▇▇▇, with respect to Request 13. Mot. at 56.

allegations in this case). As such, Mr. Amar agrees to limit Requests 13 and 14 to the discrete time

period of January 1, 2022, to March 31, 2022.

As to custodians, JPMC employees beyond ██████████ were involved in analyzing

Frank's user data for marketing purposes, including ████████████████████████

████████████████████████████████████████. Indeed, these

individuals engaged in the email exchanges quoted in 32(a) of the Criminal Complaint. JPMC's

failure to search or produce any of their documents is puzzling. *See, e.g.*, USAO_Rel_001194563



(████████████████████████████████

██████████████); USAO_Rel_000598413 (████████████████

████████████████████████; JPMC_01150818 (████████████

████████████████████████████████

██████████████).

### F. Request 15 Seeks Specific Documents That Have Not Been Produced and Should Not Be Quashed[15]

Request 15: Documents and Communications related to JPMC's decision
to offer $175 million to acquire Frank and how JPMC arrived at that
valuation.

JPMC contends that Request 15 seeks documents it has already produced and lacks

specificity. *See* Mot. at 57-58. Again, both of JPMC's arguments fail.

On the first point, JPMC contends that it has satisfied this request because it has produced

"valuation documents" and "materials that were prepared in advance of JPMC's deal review forum

---

[15] On December 7, 2023, Mr. Amar asked JPMC whether JPMC had "an acquisition committee or
other body that reviewed and/or approved the Frank acquisition." On December 14, JPMC replied,
indicating that JPMC "does not have an acquisition committee," but that the Frank acquisition was
"reviewed and approved by the Management Leadership Team ("MLT") for Consumer &
Community Banking." JPMC has not yet identified the members of the MLT. As such, Mr. Amar
reserves his right to seek additional documents from those committee members.

regarding Frank, in which JPMC's key decisionmakers convened to discuss and approve deals." *See id*. But JPMC misses the finer point. Mr. Amar seeks documents and communications from key decisionmakers *whose custodial files have not been searched or produced* regarding the decision to acquire Frank at a purchase price of $175 million. Such discussions from key decisionmakers regarding the purchase price are essential given JPMC's analyses reflecting that the overwhelming majority of Frank's value was derived from its "goodwill." *See* USAO_Rel_001720902-903 (██████████████████████████████████ ███████████████████████████████ JPMC's production of certain valuation documents and internal assessment materials does not obviate Mr. Amar's need for additional documents from key individuals responsive to this request.

On the second point, JPMC moves to quash Request 15 because it fails to specify "any identification of individuals over a nearly three-year time period." Mot. at 58. JPMC again is wrong. As to time period, Request 15 targets documents and communications possessed or exchanged by key decisionmakers at JPMC as they relate to the valuation of Frank at $175 million in a five to sixth-month period leading up to the Merger. Therefore, Mr. Amar agrees to limit Request 15 to the discrete time period of March 31, 2021, to September 14, 2021.

As to custodians, JPMC's productions to date suggest that the following JPMC employees were involved in discussions about whether to acquire Frank and, presumably, for how much given its value add to JPMC: ██████████████████████████████████ ███████████████████████████████. JPMC has not searched for or produced the custodial files of ████████████████ despite documents showing their involvement on this topic. *See, e.g.*, USAO_Rel_001806618 (██████████████ ███████████████████████████████████████

██████████████████████████████████████████████████████████████ );

USAO_Rel_001711931 (██████████████████████████████████████

████████████████████████████ .

And while JPMC has represented that it has searched the custodial files of ████████

██████████████████████████████ for responsive materials, internal communications

specifically discussing JPMC's decision to offer $175 million to acquire Frank and how JPMC

arrived at purchase price remain outstanding. To support its argument that Request 15 has been

satisfied, JPMC points to documents that post-date the decision to acquire Frank at a price of $175

million. A retrospective reference to the price tag without the underlying assumptions justifying

the purchase price does not suffice. *See e.g.*, Mot. at 58 n.44 (citing USAO_Rel_001889003, ████

████████████████████████████████████████████████████████████████

███████ ). Mr. Amar therefore requests that JPMC run additional search terms on its existing

custodians (as well as those of ████████████████████ whose documents have not been searched

and produced) during the narrowed time frame. *See* Ex. A.

### G. Request 16 Seeks Specific, Relevant Documents and Should Not Be Quashed

<u>Request 16</u>: Documents and Communications regarding all transactions
prior to July 2021 in which JPMC purchased student data from ASL
Marketing, Acxiom LLC, or other data vendors.

JPMC contends that Request 16 lacks specificity and "seeks documents that are wholly

irrelevant to the charges in the Indictment." Mot. at 58. JPMC's arguments fail.

On the first point, JPMC contends that Mr. Amar does not identify "individuals from whom

information is sought." *See id.* As to custodians, JPMC's productions to date confirm that the

following JPMC employees have been involved in student data purchases on behalf of JPMC:

████████████████████████████████████████████████████████████████

████████████████████████████ .

As to relevance, the Government's primary allegations against Mr. Amar, as referenced in ¶ 29 of the Criminal Complaint and subtitled "CC-1 Purchases an Incomplete Student Data Set from Vendor-2," relate to his alleged purchase of data from ASL Marketing. While both JPMC and the Government portray the purchase of customer data on the open market as part of a fraudulent scheme, *see* Crim. Compl. ¶¶ 13, 28-29; Civ. Compl. ¶¶ 122, 124, 128, 133-142, start-ups and larger corporations alike regularly engage in the practice of buying and selling user data for reasons within normal course of business. Buying and selling student lists is a prominent practice for any company attempting to target potential college-aged consumers, as the requested documents will show.

Furthermore, the requested documents are squarely relevant to materiality. Documents regarding JPMC's frequent experience with buying student data will demonstrate its familiarity with the fair market value of customer data. While Frank's user base was one aspect of JPMC's decision to purchase Frank, it was not a material one, and would not alone have warranted anywhere near the $175 million valuation price. *Contra* Crim. Compl. ¶ 12; Civ. Compl. ¶¶ 182-185. Indeed, documents produced to date demonstrate that the purchase price was primarily determined by factors outside of Frank's existing customer accounts—for example, JPMC placed a premium on Frank's partnerships. *See* USAO_Rel_001722002 at █████████████

████████████████████████████████████████████

███████████████████ ); *see also* USAO_Rel_001730711 ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ ). Request 16 seeks documents that exist, which have not been produced, that bolster this point.

### H.  Requests 17, 18, and 19 Seeks Specific Documents That Have Not Been Produced and Should Not Be Quashed

Request 17: Documents and Communications sufficient to identify who from JPMC attended the following meetings or calls:

a.  July 1, 2021 call between Ms. Javice and ███████████████ ████, and potentially other JPMC representatives;

b.  July 7, 2021 meeting in which Ms. Javice allegedly delivered a management presentation to JPMC's representatives, accompanied by a 60-page PowerPoint deck, as referenced in ¶ 19(d) of the Criminal Complaint;

c.  July 12, 2021 diligence meeting with Ms. Javice, as referenced in ¶ 19(g) of the Criminal Complaint and ¶ 43 of the Civil Complaint;

d.  July 13, 2021 diligence meeting with Ms. Javice, as referenced in ¶ 19(g) of the Criminal Complaint and ¶ 44 of the Civil Complaint;

e.  July 19, 2021 diligence meeting with Ms. Javice, as referenced in ¶ 48 of the Civil Complaint;

f.  July 20, 2021 diligence meeting with Ms. Javice, as referenced in ¶ 48 of the Civil Complaint; and

g.  August 2, 2021 Zoom call between ████████████, Ms. Javice, and potentially other JPMC representatives, as referenced in ¶ 21(e) of the Criminal Complaint.

Request 18: Written or electronic notes of oral Communications from the meetings referenced in Request 17, including drafts of such notes or memoranda.

Request 19: Documents and Communications related to internal discussions of the content and subject matter of the meetings referenced in Request 17, including regarding:

a.  Ms. Javice's alleged statements in the July 12, 2021 diligence meeting with respect to Frank's definition of "user," as referenced in ¶ 19(g) of the Criminal Complaint; and

b.  Mr. Amar, his presence, and any representations or statements made by him.

JPMC asserts that it has already searched for and produced documents responsive to these requests and that Request 19 otherwise fails for lack of specificity. *See* Mot. at 58-60. JPMC agreed

to conduct further review for additional non-privileged documents responsive to Request 17 and for documents attaching the "July 12, 2021 Diligence Meeting Notes." *Id* at 60.[16]

On the first point, JPMC's reliance on its prior productions falls short of responding to Requests 17, 18, and 19. Mr. Amar seeks attendance records for these key diligence meetings and notes from all meeting attendees, including non-custodians. JPMC has not reviewed non-custodian attendees' documents for materials responsive to Requests 17, 18, and 19. Indeed, JPMC points Mr. Amar to a series of documents that actually demonstrate that additional searches for notes or communications related to these meetings are necessary. For example, JPMC points to USAO_Rel_001878050 as support, explaining that it is an "email circulating notes from July 19 and 20, 2021 meetings." Mot. at 59 n. 45. The document demonstrates that more than fifty individuals are listed as purported attendees, many of whom are not custodians. *See id*. Further, the notes JPMC has produced reveal that multiple individuals' notes were eventually combined into a final version of notes for the July 12 and 13 diligence meetings. *See, e.g.*, USAO_Rel_002168346 (███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████). JPMC has not produced its employees' individual notes that were ultimately compiled into the final version, notwithstanding that dozens of people appear to have attended these meetings, or any prior drafts of the final version of notes circulated to the wider team.

On the second point, Request 19 is sufficiently specific. JPMC contends that Request 19 fails to specify "particular individuals over a nearly a three-year time period." Mot. at 60. In fact,

---

[16] JPMC subsequently represented that it has not located additional documents in response to Request 17.

Request 19 targets specific representations made by Ms. Javice or Mr. Amar in the July 12, 2023 meeting. Mr. Amar requests that JPMC search for relevant notes between July 1, 2021 and September 15, 2021. As to custodians, JPMC's productions to date confirm that the following individuals attended and may have notes from the meetings enumerated in Requests 17-19: ███████

████████████████████████████████████████████████████████████████████

██████. JPMC's productions to date indicate that each of these individuals were present at diligence or internal meetings discussing diligence material, and some were designated as "lead" employees on particular diligence workstreams.[17] JPMC could easily run targeted search terms across these individuals' documents (as well as any other individuals who attended the meetings, per the above) and locate responsive documents. *See* Ex. A.

JPMC's offer to "review its files and produce any other responsive, nonprivileged JPMC internal communications that included the July 12, 2021 Diligence Meeting Notes"[18] referenced in Request 19, *see* Mot. at 61, is therefore insufficient and does not address, let alone cure the issue of missing drafts, additional notes, and discussions *about* the notes referenced above. Additionally, by producing documents that include or attach the July 12, 2021 meeting notes, JPMC has conceded the relevance of such materials. There thus can be no doubt that other communications discussing the substance of those documents, or the subjects discussed in them—but that themselves do not attach the actual compiled notes—are equally relevant, limited in scope, and

---

[17]  *See, e.g.*,  USAO_Rel_001711931;  USAO_Rel_001711913;  USAO_Rel_000674272; USAO_Rel_000677391; USAO_Rel_000677371; USAO_Rel_000732214 (████████).

[18] On December 14, 2023, JPMC informed Mr. Amar that, in response to Request 19(b), JPMC represents that it "does not have in its possession, custody or control Zoom call logs from July 2021." However, Mr. Amar has requested documents and communications regarding not only his presence but also representations he purportedly made. Again, JPMC's response is insufficient and does not address, let alone cure, this issue.

easily identified given the narrowed time frames proposed below. Such requests are not arbitrary and are focused on a limited subset of relevant communications that are material to the defense.

### I. Request 20 Seeks Specific Documents and Should Not Be Quashed

> Request 20: Documents and Communications regarding JPMC's review of reports from Frank's auditors and accountants that JPMC considered in its decision to acquire Frank, including any reports from Frank's auditors and accountants.

JPMC moves to quash Request 20 for a purported lack of specificity. Mot. at 60-61. In particular, JPMC argues that Mr. Amar does not "identify individuals from whom information is sought over a nearly three-year period," does not "identify any of Frank's auditors and accountants by name," and does not point to "specific reports that they may have generated in connection with the Merger." *Id.* at 61. Once again, JPMC's wholesale request to quash this request could have been resolved after a conferral. Mr. Amar understands that Frank utilized Wells Group, Deloitte, and PWC Israel in connection with certain audit reports. Whether and to what extent JPMC considered Frank's prior audit reports or waived requiring such a report is relevant to the element of materiality as previously noted by Your Honor. *See* July 13, 2023 Hr'g Tr. at 5:21-6:8. Mr. Amar, too, would expect to see internal discussions regarding any reports (or lack thereof) from Frank's auditors and accountants.

### J. Request 21 Seeks Specific, Relevant Documents That Have Not Been Produced and Should Not Be Quashed

> Request 21: Written or electronic notes of oral Communications from meetings between Mr. Amar and ███████████ in or around July–August 2021, including drafts of such notes or memoranda.[19]

---

[19] In a scrivener's error, the Subpoena inadvertently identified the time period as July–August 2021 rather than 2022.

JPMC contends that Request 21 seeks documents it has already produced and otherwise fails for lack of specificity and relevance. *See* Mot. at 61-62. JPMC's arguments should be rejected.

On this first point, JPMC contends that it satisfied this request because it produced "[Mr.] Amar's documents and communications in response to the Government's subpoenas." *Id.* at 61. But Mr. Amar's custodial file obviously does not contain ███████ notes, which Mr. Amar seeks through this request.

JPMC otherwise contends that Mr. Amar "has provided no explanation" for why ███████ should be made a custodian. *Id.* at 60-61. To start, ███████ was heavily involved in the Frank integration process—a fact that is readily confirmed by JPMC productions to date. *See, e.g.,* USAO_Rel_000109415 (███████████████████████████████████████

██████████████████████████████); USAO_Rel_000759603 (███████

████████████████████████████████████████████████████████

███████). Further, Mr. Amar had meetings with ███████ in or around July to August 2021 about issues with the Frank integration process and documents produced by JPMC confirm as much. *See, e.g.,* USAO_Rel_000543363 & USAO_Rel_000641379 (████████████████

████████████████████████████████████████████████████████

██████████████). Mr. Amar believes that ███████ took notes at these meetings.

JPMC's contention that such notes are irrelevant to the allegations in the Indictment strains credulity. As previously discussed, post-Merger conduct is directly relevant to the charges against Mr. Amar. *See supra* at § II.C (Relevance); *see also* Indictment ¶ 1 (defining the conspiracy time frame from "in or about June 2021 through at least in or about November 2022"); Crim. Compl. ¶¶ 32-33 (allegations involving Mr. Amar outlined in a section entitled, "The Fraud Continues Post-Acquisition"). After the acquisition, Frank employees prepared monthly presentations for

JPMC decisionmakers on the status of Frank's integration efforts, including Frank's growth in user numbers and compliance concerns, among other issues. *See, e.g.*, USAO_Rel_000021432 (█████ ██████████████████████████████████████████); USAO_Rel_000793167 ███████ ████████████████████████████████████████). In a case centered on alleged misrepresentations about user metrics, post-Merger discussions about those same metrics (with ██████████, among others) is directly relevant to Mr. Amar's defense.

### K.  Requests 22 and 24 Seek Specific Documents That Have Not Been Produced, Are Admissible, and Should Not Be Quashed

<u>Request 22</u>: Documents and Communications related to JPMC's assessment of the scalability of Frank's FAFSA submitter.

<u>Request 24</u>: Documents and Communications regarding any changes in laws, policies, and procedures that had an impact on Frank's business model, including Frank's FAFSA submitter.

JPMC contends that Requests 22 and 24 seek documents it has previously produced and otherwise fail for lack of specificity. Mot. at 62-63. JPMC additionally argues that Request 24 seeks privileged documents and thus fails for lack of admissibility. Mot. at 63. JPMC's arguments should be rejected.

On this first point, JPMC contends it has already satisfied this request because it "previously produced information related to JPMC's assessment of the scalability of Frank's FAFSA submitter capacity" and "documents concerning the potential impact of laws or policies on Frank's business model." *Id.* at 62-63. However, JPMC's productions are insufficient because they do not include documents from *key* individuals relevant to both of these requests, and the documents JPMC cites in its Motion only underscore these glaring holes. For example, documents make clear that ████████████—the Defendants' direct supervisor—was a central figure to both of these topics, even meeting with the Department of Education about JPMC's concerns on how to scale the FAFSA product. *See, e.g.*, USAO_Rel_001774317 (█████████████████████



As such, JPMC's reliance on previously produced documents is insufficient. They have not produced documents from key individuals, including ███████████████████████ ███████████████████████████.

Further, Requests 22 and 24 are sufficiently specific. JPMC contends these Requests fail to identify individuals "over nearly a three-year time period." Mot. at 62-63. Again, a simple conferral could have resolved JPMC's incorrect interpretation. These requests target materials from the discrete time period of May 1, 2022, to August 31, 2022. As indicated above, the following JPMC employees were key stakeholders in these discussions: ████████████ ███████████████████ JPMC can easily apply search terms to capture relevant documents from these custodial files. *See* Ex. A.

---

[20] ████████████ is listed as a custodian on the list provided by the Government but to date JPMC has produced none of his documents. As a result, he is included as a custodian for relevant requests.

Lastly, regarding admissibility, to the extent Request 24 seeks privileged documents, such documents are not *per se* inadmissible, and JPMC's arguments on this point should be rejected. *See supra* § II.D (Admissibility); *see also infra* § III.Q (Request 31).

### L. Request 23 Seeks Specific, Relevant, and Admissible Documents and Should Not Be Quashed

Request 23: Documents and Communications related to Chase's decision in July–August 2022 to "Rebuild" (as opposed to "Rebrand") Frank on Chase.com and the motivations, reasons, and business case for that decision, including internal Communications of ████████████ria ████████████████.

JPMC moves to quash Request 23 because it lacks specificity and seeks inadmissible, irrelevant documents. *See* Mot. at 62-63. All three of JPMC's arguments fail.

First, JPMC contends that Request 23 "implicates documents and communications involving JPMC's in-house counsel that are protected by attorney-client and work-product privileges and therefore would be inadmissible at trial." Mot. at 62. But documents withheld on privilege grounds are not *per se* inadmissible, and JPMC offers no legal support for its position. *See infra* at § II.D (Admissibility). Regardless, this request also seeks non-privileged documents from key individuals who are not currently custodians, namely ████████████████ ████████████████ *See, e.g.,* USAO_Rel_000641379 (████████████ ████████████████████████████████ ████████████████.

Second, Request 23 is sufficiently specific. JPMC apparently takes issue with Mr. Amar's request for documents from "three custodians over a two-month time period," Mot. at 62, but does not elaborate on why this narrow time frame is not specific enough already. JPMC's specificity challenge likewise fails because the Request identifies specific individuals whose documents Mr. Amar seeks.

On the third point, JPMC contends that Request 23 "fails to seek relevant information" given the post-Merger time frame it targets. *See* Mot. at 63. Again, contrary to JPMC's arguments, post-Merger conduct is directly relevant to the charges against Mr. Amar. *See supra* at § II.C (Relevance); *see also* Indictment ¶ 1 (defining the conspiracy period as "in or about June 2021 through at least in or about November 2022"); Crim. Compl. ¶¶ 32-33 (allegations involving Mr. Amar contained in a section titled, "The Fraud Continues Post-Acquisition"). JPMC's insistence that post-Merger conduct is irrelevant flies in the face of the charging instruments in this case and the fact that it has produced voluminous documents that post-date the Merger in response to the Grand Jury Subpoenas. *See, e.g.*, USAO_Rel_001194563 (███████████████████████████████████; USAO_Rel_000021432 ███████████████████). JPMC's arguments should be rejected.

### M. Request 25 Seeks Specific Documents That Have Not Been Produced and Should Not Be Quashed

> <u>Request 25</u>: Documents and Communications related to JPMC's assessment of the July 2022 marketing campaign to Frank customers, as referenced in ¶ 13 of the Criminal Complaint and ¶ 178 of the Civil Complaint.

JPMC incorrectly contends that Request 25 seeks documents it has already produced and otherwise fails on specificity grounds. *See* Mot. at 63-64. JPMC contends that it has satisfied this request because it "previously produced documents related to JPMC's assessment of the July 2022 marketing campaign to Frank" and the "marketing campaign results." *Id.* at 63 & n.49 (citing a single document as support).[21] But JPMC has not collected documents from critical individuals who analyzed and discussed the results of the 2022 marketing campaign that allegedly revealed

---

[21] JPMC's position on the relevance of post-Merger documents is incoherent. On one hand, JPMC concedes, as it must, that certain post-Merger documents (i.e., documents concerning the marketing campaign) are relevant to the charges. On the other, it broadly argues that post-Merger documents are irrelevant. *See* Mot. at 10.

the so-called fraud in this case, including 

*See, e.g.*, USAO_Rel_000225641 (

; USAO_Rel_000543291 (

;

USAO_Rel_000545817 (

).

Second, Request 25 is sufficiently specific, and Mr. Amar provides additional clarification to make it more so. As an initial matter, this is another instance of JPMC feigning ignorance where Mr. Amar's request is specifically tied to allegations in the Criminal Complaint that mimic allegations in the Civil Complaint that JPMC itself drafted. *Compare* Crim. Compl. ¶ 13, *with* Civ. Compl. ¶ 178. Putting that aside, Request 25 targets documents and communications in relation to the July 2022 marketing campaign to Frank customers. As such, Mr. Amar agrees to limit Request 25 to the discrete three-month period from June 1, 2022, to August 31, 2022. Further, Mr. Amar limits the request to the above-named custodians, individuals who have critical communications regarding JPMC's motivation for the July 22 marketing campaign, its results, and its impact on the business case for Frank.

### N. Mr. Amar Agrees to Withdraw Requests 26 and 27

Request 26: A list of JPMC personnel with access to Frank's Google Analytics platform and the permissions of those with access.

Request 27: Documents and Communications related to internal discussions of the content and subject matter of JPMC's review of Frank's Google Analytics data in or around the time JPMC received access.

Based on JPMC's responses to the Subpoena, Mr. Amar agrees to withdraw Requests 26 and 27.

**O. Request 28 Seeks Specific, Admissible Documents That Have Not Been Produced and Should Not Be Quashed**

> <u>Request 28</u>: Documents and Communications related to internal discussions of the content and subject matter of JPMC's Internal Investigation into Frank that precipitated the termination of Ms. Javice and Mr. Amar for cause on or about November 4, 2022 and October 26, 2022, respectively, as referenced in part in ¶ 33 of the Criminal Complaint and ¶¶ 28 and 30 of the Civil Complaint.

JPMC moves to quash Request 28 because it seeks documents that JPMC has already produced and is not specific. Mot. at 64-66. In addition, JPMC argues that Request 28 seeks inadmissible documents related to "JPMC's outside counsel's investigation." *Id.* at 65.

First, and as discussed *supra* at § II.A (Documents Not Produced) JPMC has produced *some* documents responsive to this Request, including an investigative file for its Internal Investigation into Ms. Javice and Mr. Amar.[22] JPMC did not, however, search the custodial files of ███████████████████. Mr. Amar understands that ██████████ was the principal investigator and relied heavily on materials and statements from ███████████—Ms. Javice's and Mr. Amar's direct supervisor and the only other person apart from Defendants and Data Scientist-1 listed in the investigative report. *See* USAO_Rel_000109697; USAO_Rel_000109715 (███████████████████████████████████ For these reasons, JPMC's reliance on prior productions is insufficient.

Second, Request 28 is sufficiently specific. JPMC claims that this Request seeks "seeks 'documents and communications related to internal discussions' without any identification of individuals over a nearly three-year time period." Mot. at 65. JPMC's insinuation that its Internal Investigation somehow took place over a three-year time period is puzzling. Request 28 targets

---

[22] Again, JPMC's position on the relevance of post-Merger documents is contradictory. *See supra* note 23.

documents and communications related to the Internal Investigation, for which key interviews began in June and ended in October. *See* USAO_Rel_000109715. As such, Mr. Amar suggests a time period of five months, not three years, from June 1, 2022, to October 31, 2022 and further narrows his requests to the custodial documents of ██████████████████████.

Lastly, regarding the admissibility of documents relating to JPMC's outside counsel's investigation, such documents are not per se inadmissible, and JPMC's arguments on this point should be rejected. *See supra* at § II.D (Admissibility); *see also infra* at § IV.Q (Request 31).

### P. Requests 29 and 30 Seek Relevant, Admissible Documents and Should Not Be Quashed

> Request 29: Documents and Communications exchanged between JPMC and the Government concerning interviews of JPMC employees regarding the Government's investigation into Ms. Javice, Mr. Amar, Frank, and the Acquisition.

> Request 30: Documents and Communications exchanged between JPMC and the Government regarding JPMC's response to the Subpoenas and any narrowing of the Subpoenas.

JPMC contends that Requests 29 and 30 should be quashed because they seek inadmissible, irrelevant documents. *See* Mot. at 66. JPMC asserts, incorrectly, that Mr. Amar "already requested that this Court issue a Rule 17(c) subpoena" seeking these documents and that "[t]his Court denied the . . . motion." *Id.* In its November 7 Order, the Court found, on the record available, "JPMC . . . is not part of the government's prosecution team." Nov. 7 Order at 1. But the Court did not rule specifically on Defendants' alternative request to issue Rule 17(c) subpoenas to JPMC regarding the Government and JPMC's coordinated efforts. To the contrary, the Court's November 7 Order suggests that Defendants may proceed with issuing subpoenas.

As was set forth in Defendants' Motion to Compel, the record available to Defendants to date contains sufficient evidence that the Government has outsourced its investigation to JPMC, which has a significant financial incentive in the Government's successful prosecution of

Defendants. *See* Motion to Compel at 24-27. Defendants have only limited insight into the Government's and JPMC's relationship and course of conduct and respectfully submit that Rule 17(c) is the appropriate vehicle for this issue. Determination of the nature and scope of JPMC's cooperation is crucial given that the Government has not provided Defendants with all documents responsive to its subpoenas, and JPMC may be holding back potential *Brady* and *Giglio* materials that are helpful to the defense and would otherwise normally trigger the Government's disclosure obligations under *Brady* and *Giglio*.

As such, the requested materials are relevant to the issue of whether the Government has outsourced its investigation to JPMC and admissible at a subsequent evidentiary hearing on the same. *See United States v. Stein*, No. S1 05-cr-888 (LAK), 2006 WL 1063298, at *2 (S.D.N.Y. Apr. 12, 2006) (approving Rule 17(c) subpoenas in advance of an evidentiary hearing regarding the defendants' Sixth Amendment claim that the government had improperly interfered with their choice of counsel by pressuring their employer to stop advancing legal fees); *United States v. Maxwell*, No. 20-cr-330 (AJN), 2021 WL 1625392, at *1 (S.D.N.Y. Apr. 27, 2021) ("While ordinarily Rule 17(c) is 'trial-focused' and 'may be used only to obtain materials admissible as evidence at trial,' at least some courts have held that Rule 17(c) can be used to compel the production of documents in connection with a suppression hearing." (quoting *United States v. Louis*, No. 04-cr-203 (LTS), 2005 WL 180885, at *3 (S.D.N.Y. Jan. 27, 2005))).[23] In sum,

---

[23] *Cf. Weigand*, 520 F. Supp. 3d at 615 ("While admissibility is the second *Nixon* factor, Rule 17(c) does not by its terms require that a subpoena seek only admissible evidence. A subpoena for evidence, itself inadmissible, that could lead to the discovery of admissible evidence, is not necessarily 'unreasonable or oppressive.'"); *United States v. Smith*, No. 19-cr-669 (EEC), 2020 WL 4934990, at *3-4 (N.D. Ill. Aug. 23, 2020) (declining to adopt a "bright-line admissibility requirement" for subpoena issued to third party) ("[E]ven *Nixon* did not require absolute certainty on admissibility or absolute precision in specificity. . . . The key is weighing the likelihood that the subpoena will uncover relevant evidence and the potential probative force of that evidence, against the burdens on complying.").

Requests 29 and 30 seek relevant, admissible documents and should not be quashed.

**Q.  Request 31 Seeks Admissible Documents and Should Not Be Quashed**

Request 31: Documents and Communications listed on the privilege logs provided by JPMC to the Government in response to the Government Subpoenas, including:

a.  To which Mr. Amar or Ms. Javice was the author, recipient, or copied;

b.  To which ▇▇▇▇▇▇▇ was the author, recipient, or copied in his capacity as the Chief Operating Officer of Frank or concerning other business-related discussions that did not involve the provision of legal advice;

c.  Involving legal advice provided by Sidley Austin to Ms. Javice or the Frank Board of Directors regarding the potential sale of Frank to Capital One, JPMC, Bank of America, or any other potential buyer;

d.  Memorializing discussions involving the Frank Board of Directors regarding the potential sale of Frank to Capital One, JPMC, Bank of America, or any other potential buyer;

e.  Regarding any diligence questions, reports, timelines, templates, or trackers concerning the potential sale of Frank to Capital One, JPMC, Bank of America, or any other potential buyer;

f.  Concerning "Project Finland Executive Update" on or around July 13, 2021;

g.  Attaching or discussing Frank's financials, including balance sheets, revenue by product, and historical profits and losses;

h.  Regarding JPMC's assessment of Frank's ADA compliance during Integration;

i.  Regarding any changes in laws, policies, and procedures that had an impact Frank's business model, including Frank's FAFSA submitter;

j.  Regarding any disruption to or shutdown of Frank's FAFSA submitter;

k.  Regarding any disruption to or shutdown of Frank's microsite; and

l.  Concerning Acxiom's data validation work during JPMC's diligence of Frank.

JPMC moves, in a single sentence, to quash Request 31 because it "seeks inadmissible documents and communications protected by attorney-client and/or work product privilege." Mot.

at 67.[24] Along that same conclusory vein, JPMC has produced multiple privilege logs withholding or redacting approximately 25,000 documents and, for months, has refused to engage with Defendants on the propriety of those privilege calls. Defendants sent many of these exact privilege challenges to JPMC on September 19, 2023, and JPMC responded that Defendants lacked standing to challenge JPMC's response to a grand jury subpoena. *See* Letter from JPMC to the Court, ECF No. 50-1 (Sept. 22, 2023) (disputing Defendants' standing to challenge privilege). At this juncture, where Mr. Amar does have standing, JPMC has not met its burden to establish that it is appropriately claiming privilege.

"It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224-25 (2d Cir. 1984);[25] *United States v. Adlman*, 68 F.3d 1495, 1500 (2d Cir. 1995) ("The party claiming the benefit of the attorney-client privilege has the burden of establishing all the essential elements"); *In re Horowitz*, 482 F.2d 72, 82 (2d Cir. 1973) ("as with all privileges, the person claiming the attorney-client privilege has the burden of establishing all essential elements"). The attorney-client privilege is "strictly confined within the narrowest possible limits" because it "stands in derogation of the public's 'right to every

---

[24] JPMC argues only that the specific log documents in Request 31 are inadmissible because they are privileged, conceding specificity and relevance—as it must, since logged documents are inherently specific and relevant by JPMC's own determination. *See* Mot. at 14-15, 67. JPMC contends, without substantiation, that Mr. Amar seeks all documents on JPMC's privilege log. Mot. at 67. Mr. Amar does not, and Request 31 is targeted to capture specific categories to relevant documents.

[25] "To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Construction Products Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

man's evidence,' and as an 'obstacle to the investigation of the truth.'" *Id.* at 81 (citation omitted). The burden of establishing the existence of a privilege and its applicability in a given case is a "heavy one since privileges are neither lightly created nor expansively construed." *In re Grand Jury Subpoenas Dated Jan. 20, 1998,* 995 F. Supp. 332, 334 (E.D.N.Y. 1998) (quotation and citation omitted). "That burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *In re Bonanno,* 344 F.2d 830, 833 (2d Cir. 1965). Furthermore, the majority view in the Second Circuit is that the party invoking the privilege also has the burden of establishing non-waiver of the privilege. *See Nikkal Indus., Ltd. v. Salton, Inc.,* 689 F. Supp. 187, 191 (S.D.N.Y. 1988); *United States v. Hatfield,* No. 06-cr-0550, 2009 WL 3806300, *3 (E.D.N.Y. Nov. 13, 2009).

Here, JPMC has asserted multiple specious privilege claims over the following categories of documents, among others:



- <u>Mr. Amar's Communications</u>. JPMC is withholding Mr. Amar's communications with other Frank or JPMC employees, even where no lawyer was present and/or only business-related items were apparently discussed. *See e.g.,* JPMCPRIV_011322 ( ▮▮▮▮▮ ▮▮▮▮ Strikingly, JPMC also withheld complete Slack communications between Mr. Amar and others. *See e.g,* JPMCPRIV_007276 ▮▮▮ ); JPMCPRIV_001105 ( ▮▮▮▮▮ ▮▮▮▮ . Defendants understand that Slack messages are typically processed in 24-hour increments or more, and therefore object to JPMC withholding Slack messages in their entirety if they contain relevant, non-privileged information. Request 31(a) seeks these non-privileged documents.

- <u>Communications with</u> ▮▮▮▮ . ▮▮▮▮ fulfilled multiple roles at Frank—in addition to serving as Frank's General Counsel, he served as the Chief Operations Officer, led Finance, and handled Human Resources. Yet, JPMC appears to be withholding broad swaths of his communications on privilege grounds regardless of the role in which he is acting for purposes of that communication. To be sure, Frank's investment advisor Lion Tree has produced many of the exact same documents involving ▮▮▮▮ that JPMC has withheld on privilege grounds, revealing that JPMC is withholding demonstrably non-

privileged communications.[26] Accordingly, Request 31(b) properly seeks non-privileged documents where ███████ was the author, recipient, or copied in his capacity as the Chief Operating Officer of Frank or concerning other business-related discussions that did not involve the provision of legal advice.

- Board Minutes and Materials. JPMC is redacting or withholding entire copies of Frank and JPMC Board minutes or materials from production. *See e.g.*, JPMCPRIV_006077 ███████████████████████████████████████████████████████ ); JPMCPRIV_006026 ( ████████████████████████████████████████████████████████ ). Defendants object to withholding non-privileged information within these Board minutes and presentations. Request 31(c) seeks these non-privileged documents.

- Frank's financials and diligence documents. JPMC is redacting or withholding documents regarding Frank's financial performance and other documents exchanged during diligence with JPMC. *See e.g.*, JPMCPRIV_007819 ( ███████████████████████████████ ); JPMCPRIV_007820 ( ███████████████████████████████████ 021 ███████████████████████████ ); JPMCPRIV_007821 ███████████████████████████████████████ ); JPMCPRIV_011097 (withholding in its entirety a ██████████████████████████████████ ). Many of these documents were shared with LionTree during diligence. *See e.g.*, LTF-0021726 ( █████████████████████████ ████████████████████████████ JPMC has not established that these documents are privileged let alone that the privilege has not been waived by Frank sharing them with JPMC (and Lion Tree) in the first place. *See Nikkal Indus.*, 689 F. Supp. at 191; *Hatfield*, 2009 WL 3806300, *3. What is more, the information exchanged as part of the diligence process is fundamental to the proof in this case (and JPMC cannot credibly contend otherwise), and the acquisition itself is more than two years stale. Requests 31(e) and 31(g) seek these non-privileged documents.

---

[26] *See* USAO_Rel_000382198 ( ████████████████████████████████████████████ ████████████████████████████████████ ; USAO_Rel_000383280 ( █████████████████████████████████████████████████████████████████ ); USAO_Rel_000675076 ████████████████████████████████████████████████████ ; USAO_Rel_000378205 ( ██████████████████████████████████████████████████████████████████████ █████████████████████████████████ .

In any event, even if some of the withheld documents reflect bona fide privilege assertions, JPMC has cited no authority finding that privileged documents are *per se* inadmissible or exempted from Rule 17(c)'s reach. The case law indicates the opposite is true. *See, e.g.*, *Weisberg*, 2011 WL 1327689, at *4 (describing the "dearth of binding authority regarding the balance that must be struck between a criminal defendant's right to subpoena evidence from third parties under Rule 17(c) and those third parties' valid assertion of attorney-client or work product privilege").

"The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." *Nixon*, 418 U.S. at 713. Even if "a particular item of evidence is privileged," it may be "nevertheless so important to the defense that its disclosure is constitutionally required." *Weisberg*, 2011 WL 1327689, at *5 ("In certain cases, a criminal defendant's constitutional right to present a defense may outweigh a third party's right to assert privilege." (citing Fed. R. Evid. 501)). JPMC's "generalized interest in confidentiality" as "the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial . . . cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice." *See Nixon*, 418 U.S. at 685, 713. Indeed, "[o]ur criminal justice system permits, and even encourages, trial judges to be over-cautious in ensuring that a defendant will receive a fair trial." *Gannett Co. v. DePasquale*, 443 U.S. 368, 379 n.6. (1979).[27]

---

[27] *Cf. United States v. W.R. Grace*, 439 F. Supp. 2d 1125, 1145 (D. Mont. 2006) ("the law requires that the privilege yield where its invocation is incompatible with a criminal defendant's Sixth Amendment rights"); *United States v. Renzi*, Case No. 08-cr-212 (TUC) (DCB) (BPV), 2010 WL 582100 at *10 (D. Ariz. Feb. 18, 2010) ("at least some of the proffered evidence would be of such exculpatory value that the exclusion of such evidence would amount to a denial of [the defendant]'s right to present a defense, and must be admitted at trial over [a co-defendant]'s claim of privilege") (citation omitted); *United States v.* Sattar, 02-cr-395 (JGK), 2003 WL 22137012 at *16 (S.D.N.Y. Sept. 15, 2003) (pursuant to its *Brady* obligations, the government sought an order authorizing the disclosure of attorney-client privileged matters notwithstanding a third party's assertion of the privilege, arguing "[the defendant]'s due process rights to potentially relevant,

Given that JPMC continues to evaluate questions of privilege and intends to produce a consolidated, comprehensive privilege log, Mr. Amar proposes that, following receipt of that consolidated log (and after a reasonable period to evaluate the claims of privilege), Defendants confer with JPMC regarding any proposed challenges to privilege and, to the extent disputes remain, propose a schedule for adjudication of those challenges by the Court (including *in camera* review of contested privilege assertions). *See, e.g.*, *Weisberg*, 2011 WL 1327689, at *5 (holding that "it is appropriate for the district court to review, *in camera*, each item in question" when determining whether a particular item of evidence is privileged).

Here, given JPMC's generalized (and dubious) assertions of privilege and its refusal to engage meaningfully in any process to review privilege challenges, JPMC's motion should be denied.

## CONCLUSION

For these reasons, JPMC's Motion to Quash lacks merit and should be denied. To the extent that JPMC remains unclear about time period, search terms, or custodians, Mr. Amar has been and remains willing to meet and confer to answer any questions or to narrow any issues.

---

exculpatory, or impeachment material outweigh [the third party]'s interest in maintaining the confidentiality of the communications").

Respectfully submitted,


/s/ Sean S. Buckley
Sean S. Buckley
Steven G. Kobre
Alexandria E. Swette
Genna L. Sinel
KOBRE & KIM LLP
800 Third Ave
New York, New York 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220
Sean.Buckley@kobrekim.com
Steven.Kobre@kobrekim.com
Alexandria.Swette@kobrekim.com
Genna.Sinel@kobrekim.com

Sydney S. Johnson (pro hac vice)
KOBRE & KIM LLP
1919 M Street, NW
Washington, DC 20036
Telephone: (202) 664-1900
Facsimile: (202) 664-1920
Sydney.Johnson@kobrekim.com

*Counsel for Defendant Olivier Amar*