## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

UNITED STATES OF AMERICA,

       - v. -

CHARLIE JAVICE and OLIVIER AMAR,

       Defendants.

-------------------------------------------------------x

23 Cr. 251 (AKH)


## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANT OLIVIER AMAR'S MOTION TO DISMISS
## THE INDICTMENT OR IN THE ALTERNATIVE FOR A BILL OF PARTICULARS

KOBRE & KIM LLP
Sean S. Buckley
Steven G. Kobre
Alexandria E. Swette
Ana Frischtak
800 Third Ave
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

Sydney Sgambato Johnson (pro hac vice)
Jake Rush (pro hac vice forthcoming)
1919 M Street, NW
Washington, DC 20036
Tel: (202) 664-1900
Fax: (202) 664-1920

*Counsel for Defendant Olivier Amar*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................iv

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND .............................................................................................................2

I.     The Indictment ................................................................................................3

II.    The Complaint ................................................................................................4

    A.    The Complaint's Nonexistent Allegations as to Mr. Amar and Bank-1 ...........4

    B.    The Complaint's Barebones Allegations as to Mr. Amar's Role in an Alleged Scheme to Defraud JPMC ..................................................................5

ARGUMENT ...................................................................................................................9

I.     The Indictment Lacks Specificity, is Constitutionally Deficient, and Fails to State a Claim as to Mr. Amar and Should Be Dismissed .........................................................9

    A.    Applicable Law ..............................................................................................9

    B.    The Indictment Is Unconstitutionally Vague and Lacks Specificity ..............13

        1.    The Indictment Does Not Allege with Adequate Specificity That Mr. Amar Made or Knew of Any Materially False Statements...........13

        2.    The Indictment Does Not Allege with Adequate Specificity That Mr. Amar Participated Knowingly, Willfully, and with Intent to Defraud ............................................................................................16

        3.    The Indictment Does Not Allege Conspiracy with Adequate Specificity .......................................................................................17

    C.    The Indictment Fails to State a Claim Against Mr. Amar ..............................19

        1.    The Indictment Fails to Allege Adequately That Mr. Amar Made or Knew of Any Materially False Statements Made "in Connection with" the Sale of Frank ..................................................................20

        2.    Mr. Amar's Alleged After-the-Fact Conduct Fails to State a Claim ...21

        3.    The Indictment Fails to Allege Adequately That Mr. Amar Deprived JPMC of a Tangible Property Interest ..................................................22

        4.    The Transaction Alleged in the Indictment Cannot State a Claim for Bank Fraud ..........................................................................................25

II.    Counts Two Through Four Are Duplicitous ................................................................27

    A.    Applicable Law ............................................................................................28

    B.    Discussion .....................................................................................................29

        1.    Counts Two Through Four Improperly Plead a Single Scheme to Defraud .........................................................................................29

        2.    Count Three Charges as One Scheme Conduct Against Multiple Financial Institutions ......................................................................30

III.   In the Alternative, the Government Should Provide a Bill of Particulars ...................31

    A.    Applicable Law ............................................................................................32

B.    Discussion ........................................................................................................33

    1.    The Government Must Specify All Alleged Misrepresentations and Circumstances Indicating Mr. Amar's Knowledge and Concealment of Them ..............................................................................................33

    2.    The Government Must Specify Mr. Amar's Conduct Indicating Knowledge of and Knowing Participation in a Scheme to Defraud ....34

    3.    The Government Must Specify the Other "Potential Acquiring Companies" ...........................................................................................38

CONCLUSION ....................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of China, N.Y. Branch v. NBM LLC*,
  359 F.3d 171 (2d Cir. 2004) ..................................................................................26

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ............................................................................................20

*Bosio v. Norbay Sec., Inc.*,
  599 F. Supp. 1563 (E.D.N.Y. 1985).....................................................................20

*Campbell v. United States*,
  No. 06-cr-41 (CM), 2015 WL 1062176 (S.D.N.Y. Mar. 9, 2015) ......................11

*Ciminelli v. United States*,
  598 U.S. 306 (2023) ....................................................................2, 19, 23, 24, 25

*Cleveland v. United States*,
  531 U.S. 12 (2000) ..............................................................................................23

*Clinton v. Sec. Benefit Life Ins. Co.*,
  63 F.4th 1264 (10th Cir. 2023).............................................................................13

*Cochran v. United States*,
  157 U.S. 286 (1895) ............................................................................................11

*Freschi v. Grand Coal Venture*,
  551 F. Supp. 1220 (S.D.N.Y. 1982) ...................................................................20

*Kelly v. United States*,
  590 U.S.----, 140 S. Ct. 1565 (2020) .................................................................24

*Kogan v. Nat'l Bank of N. Am.*,
  402 F. Supp. 359 (E.D.N.Y. 1975).....................................................................20

*Loughrin v. United States*,
  573 U.S. 351 (2014) ............................................................................................26

*Masoud v. Holder*,
  487 F. App'x 633 (2d Cir. 2012).........................................................................12

*Neder v. United States*,
  527 U.S. 1 (1999) ................................................................................................13

*O'Malley v. New York City Transit Auth.*,
  896 F.2d 704 (2d Cir. 1990) ...............................................................................16

*Pepsico, Inc. v. W. R. Grace & Co.*,
   307 F. Supp. 713 (S.D.N.Y. 1960) ....................................................................20

*Pettus v. Erole*,
   No. 19-cv-5893 (AMD), 2019 WL 5863983 (E.D.N.Y. Nov. 8, 2019) ...............13

*Russell v. United States*,
   369 U.S. 749 (1962) .............................................................................10, 11, 32, 35

*S.E.C. v. Govil*,
   86 F. 4th 89 (2d Cir. 2023) ................................................................................24

*S.E.C. v. Masri*,
   523 F. Supp. 2d 361 (S.D.N.Y. 2007) ...............................................................17

*S.E.C. v. Narayan*,
   No. 16-cv-1417 (BML), 2017 WL 4652063 (N.D. Tex. Aug. 28, 2017)............21

*S.E.C. v. Papa*,
   555 F.3d 31 (1st Cir. 2009) ................................................................................21

*S.E.C. v. Texas Gulf Sulphur Co.*,
   401 F.2d 833 (2d Cir. 1968) ...............................................................................20

*Shaw v. United States*,
   580 U.S. 63 (2016) .........................................................................................25, 27

*Troyer v. Karcagi*,
   476 F. Supp. 1142 (S.D.N.Y.1979) ....................................................................20

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) ............................................................................................20

*UMB Bank, N.A. v. Benton*,
   No. 21-cv-832 (BP), 2022 WL 16753765 (W.D. Mo. June 29, 2022)................27

*UMB Bank, N.A. v. Guerin*,
   89 F.4th 1047 (8th Cir. 2024)..............................................................................27

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
   822 F.3d 650 (2d Cir. 2016) ...............................................................................12

*United States v. Abakporo*,
   959 F. Supp. 2d 382 (S.D.N.Y. 2013) ................................................................28

*United States v. Abrams*,
   539 F. Supp. 378 (S.D.N.Y. 1982) .....................................................................10

*United States v. Aispuro*,
   No. 08-cr-2936 (JB), 2010 WL 1404196 (D.N.M. Mar. 16, 2010)....................37

*United States v. Aleynikov*,
   676 F.3d 71 (2d Cir. 2012) ........................................................................9

*United States v. Alladawi*,
   No. 22-cr-8 (CJC), 2023 WL 8702719 (C.D. Cal. Dec. 15, 2023)......................................24

*United States v. Almaleh*,
   2022 WL 602069 (S.D.N.Y. Feb. 28, 2022) ....................................13

*United States v. Anderson*,
   747 F.3d 51 (2d Cir. 2014) ....................................................18, 19

*United States v. Aracri*,
   968 F.2d 1512 (2d Cir. 1992) .................................................28

*United States v. Ashley*,
   905 F. Supp. 1146 (E.D.N.Y. 1995) .........................................11, 16

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000) ..................................................12, 13

*United States v. Bessigano*,
   No. 08-cr-110 (JTM), 2008 WL 4833110 (N.D. Ind. Nov. 4, 2008) ..................29

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) .................................................20

*United States v. Bin Laden*,
   92 F. Supp. 2d 225 (S.D.N.Y. 2000) .........................................34

*United States v. Bortnovsky*,
   820 F.2d 572 (2d Cir. 1987) ..................................................32

*United States v. Bouchard*,
   828 F.3d 116 (2d Cir. 2016) ..................................................26, 27

*United States v. Caine*,
   270 F. Supp. 801 (S.D.N.Y. 1967) ...........................................37

*United States v. Calderon*,
   944 F.3d 72 (2d Cir. 2019) ...................................................12

*United States v. Carona*,
   No. 06-cr-224 (AG), 2008 WL 1970199 (C.D. Cal. May 2, 2008)......................35

*United States v. Carter*,
   No. 08-cr-51 (SSB), 2013 WL 12213387 (S.D. Ohio Sept. 30, 2013)................22

*United States v. Ceballos*,
   340 F.3d 115 (2d Cir. 2003) ..................................................18

*United States v. Cephas*,
   937 F.2d 816 (2d Cir. 1991) .......................................................................36

*United States v. Chacko*,
   169 F.3d 140 (2d Cir. 1999) .......................................................................27

*United States v. Chocron*,
   No. 20-cr-400 (JSR), 2021 WL 3005086 (S.D.N.Y. July 14, 2021) ...................12

*United States v. Clifford*,
   426 F. Supp. 696 (E.D.N.Y. 1976) .............................................................33

*United States v. Conley*,
   826 F. Supp. 1536 (W.D. Pa. 1993) ...........................................................29

*United States v. Constantinescu*,
   No. 22-cr-612 (ASH), 2024 WL 1221579 (S.D. Tex. Mar. 20, 2024) ..................23, 24, 25

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012) .......................................................................15

*United States v. Covino*,
   837 F.2d 65 (2d Cir. 1988) .......................................................................23

*United States v. Crisci*,
   273 F.3d 235 (2d Cir. 2001) .......................................................................12

*United States v. Crowley*,
   236 F.3d 104 (2000) .................................................................................9, 10

*United States v. D'Amato*,
   39 F.3d 1249 (2d Cir. 1994) .................................................................12, 17

*United States v. Davidoff*,
   845 F.2d 1151 (2d Cir. 1988) .................................................................35, 37

*United States v. Evans*,
   844 F.2d 36 (2d Cir. 1988) .......................................................................23

*United States v. Farmigoni*,
   934 F.2d 63 (5th Cir. 1991) .......................................................................31

*United States v. Gleason*,
   616 F.2d 2 (2d Cir. 1979) .........................................................................17

*United States v. Gonzalez*,
   686 F.3d 122 (2d Cir. 2012) .....................................................................10

*United States v. Gramins*,
   939 F.3d 429 (2d Cir. 2019) .....................................................................12

*United States v. Guadagna*,
    183 F.3d 122 (2d Cir. 1999) ...................................................................22

*United States v. Hardy*,
    762 F. Supp. 1403 (D. Haw. 1991) ........................................................30

*United States v. Hinton*,
    127 F. Supp. 2d 548 (D.N.J. 2000) .........................................................31

*United States v. Holmes*,
    No. 18-cr-258 (EJD), 2020 WL 666563 (N.D. Cal. Feb. 11, 2020)..............33, 34

*United States v. Jabar*,
    19 F.4th 66 (2d Cir. 2021) .......................................................................12

*United States v. Jackson*,
    926 F. Supp. 2d 691 (E.D.N.C. 2013) .....................................................22

*United States v. Johnson*,
    225 F. Supp. 2d 982 (N.D. Iowa 2002) ...................................................36

*United States v. Josten*,
    704 F. Supp. 841 (N.D. Ill. 1989) ...........................................................14

*United States v. Jowers*,
    125 F.3d 856 (6th Cir. 1997) ..................................................................22

*United States v. Kalu*,
    791 F.3d 1194 (10th Cir. 2015) ..............................................................14

*United States v. Kaplan*,
    No. 02-cr-883 (DAB), 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ...............33

*United States v. Keuylian*,
    23 F. Supp. 3d 1126 (C.D. Cal. 2014) .....................................................15

*United States v. Krown*,
    675 F.2d 46 (2d Cir. 1982) ......................................................................27

*United States v. Laljie*,
    184 F.3d 180 (2d Cir. 1999) ....................................................................27

*United States v. Lange*,
    834 F.3d 58 (2d Cir. 2016) ......................................................................18

*United States v. Lazarenko*,
    564 F.3d 1026 (9th Cir. 2009) ................................................................21

*United States v. Lewis*,
    594 F.3d 1270 (10th Cir. 2010) ..............................................................15

*United States v. Margiotta*,
  646 F.2d 729 (2d Cir. 1981) ......................................................................28

*United States v. Miller*,
  471 U.S. 130 (1985) ...................................................................................10

*United States v. Mittelstaedt*,
  31 F.3d 1208 (2d Cir. 1994) ......................................................................20

*United States v. Mulheren*,
  938 F.2d 364 (2d Cir. 1991) ......................................................................16

*United States v. Murgio*,
  209 F. Supp. 3d 698 (S.D.N.Y. 2016) .......................................................35

*United States v. Nachamie*,
  91 F. Supp. 2d 565 (S.D.N.Y. 2000) .........................................................38

*United States v. Nagi*,
  No. 15-cr-148 (HBS), 2016 WL 11264717 (W.D.N.Y. June 27, 2016) .............12

*United States v. Nagi*,
  254 F. Supp. 3d 548 (W.D.N.Y. 2017).......................................................12

*United States v. Nance*,
  533 F.2d 699 (D.C. Cir. 1976)...................................................................15

*United States v. O'Brien*,
  926 F.3d 57 (2d Cir. 2019) ..........................................................................9

*United States v. Patrisso*,
  262 F. 2d 194 (2d Cir. 1958) .....................................................................17

*United States v. Pierce*,
  224 F.3d 158 (2d Cir. 2000) ......................................................................22

*United States v. Pirro*,
  212 F.3d 86 (2d Cir. 2000) .......................................................9, 10, 11, 12

*United States v. Pleasant*,
  125 F. Supp. 2d 173 (E.D. Va. 2000) ........................................................29

*United States v. Praddy*,
  725 F.3d 147 (2d Cir. 2013) ......................................................................18

*United States v. Rackley*,
  986 F.2d 1357 (10th Cir. 1993) .................................................................26

*United States v. Ragosta*,
  970 F.2d 1085 (2d Cir. 1992) ....................................................................11

*United States v. Ramirez*,
  No. 20-cr-022 (PAC), 2022 WL 865860 (S.D.N.Y. Mar. 23, 2022)....................................38

*United States v. Ray*,
  20-cr-110 (LJL), 2021 WL 3168250 (S.D.N.Y. July 27, 2021)....................................32, 38

*United States v. Rigas*,
  490 F.3d 208 (2d Cir. 2007) ...............................................................13, 26, 28

*United States v. Rosenblatt*,
  554 F.2d 36 (2d Cir. 1977) ...............................................................................18

*United States v. Schock*,
  No. 16-cr-30061 (CSB), 2017 WL 4780614 (C.D. Ill. Oct. 23, 2017)..............................29

*United States v. Smith*,
  985 F. Supp. 2d 547 (S.D.N.Y. 2014) .........................................................................10

*United States v. Spero*,
  331 F.3d 57 (2d Cir. 2003) ...............................................................................10

*United States v. Starr*,
  816 F.2d 94 (2d Cir. 1987) ...............................................................................23

*United States v. Stavroulakis*,
  952 F.2d 686 (2d Cir. 1992) .............................................................10, 11, 23, 27

*United States v. Steffen*,
  687 F.3d 1104 (8th Cir. 2012) .........................................................................11

*United States v. Sterritt*,
  No. 21-cr-193 (KAM), 2023 WL 4140269 (E.D.N.Y. June 22, 2023) ...............................38

*United States v. Stringer*,
  730 F.3d 120 (2d Cir. 2013) ...........................................................................32

*United States v. Sturdivant*,
  244 F.3d 71 (2d Cir. 2001) ...............................................................................28

*United States v. Sutton*,
  No. 21-cr-0598 (PLF), 2022 WL 1183797 (D.D.C. Apr. 21, 2022) ..................................37

*United States v. Tanner*,
  471 F.2d 128 (7th Cir. 1972) .........................................................................29

*United States v. Teyibo*,
  877 F. Supp. 846 (S.D.N.Y. 1995) .........................................................................12

*United States v. Tomasetta*,
  429 F.2d 978 (1st Cir. 1970) .........................................................................14

*United States v. Trie*,
    21 F. Supp. 2d 7 (D.D.C. 1998)..........................................................33, 34, 35, 37

*United States v. Ulbricht*,
    31 F. Supp. 3d 540 (S.D.N.Y. 2014) ...........................................................18, 19

*United States v. Upton*,
    856 F. Supp. 727 (E.D.N.Y. 1994) .....................................................................33

*United States v. Urso*,
    369 F. Supp. 2d 254 (E.D.N.Y. 2005) ...............................................................11

*United States v. Vasquez-Ruiz*,
    136 F. Supp. 2d 941 (N.D. Ill. 2001) .................................................................39

*United States v. Velastegui*,
    199 F.3d 590 (2d Cir. 1999) ...............................................................................3

*United States v. Walsh*,
    194 F.3d 37 (2d Cir. 1999) ................................................................................10

*United States v. Willis*,
    475 F. Supp. 2d 269 (W.D.N.Y. 2007) ..............................................................29

*Will v. United States*,
    389 U.S. 90 (1967) ......................................................................................32, 34

*Williams v. United States*,
    458 U.S. 279 (1982) ...........................................................................................27

*Wilson v. Dalene*,
    699 F. Supp. 2d 534 (E.D.N.Y. 2010) ...............................................................20

*Yeager v. United States*,
    557 U.S. 110 (2009) ...........................................................................................30

**Statutes**

15 U.S.C. § 78j(b)..............................................................................................3, 12
15 U.S.C. § 78ff.......................................................................................................3
18 U.S.C. § 20.......................................................................................................31
18 U.S.C. § 1343..............................................................................................3, 12
18 U.S.C. § 1344...................................................................3, 12, 25, 26, 27, 31, 38
18 U.S.C. § 1349.....................................................................................................3

**Rules**

Fed. R. Crim. P. 7 ................................................................................................32
Fed. R. Crim. P. 12 ...............................................................................9, 10, 11, 28

**Regulations**

17 C.F.R. § 240.10b-5....................................................................................................12

## PRELIMINARY STATEMENT

The Government's "prosecute first, investigate later" approach in this case has produced a barebones, constitutionally deficient Indictment that fails to state a claim against Olivier Amar. This comes as no surprise, given that the Indictment is a practical carbon copy of the one filed against Charlie Javice, but with Mr. Amar hastily shoehorned in, and includes no particulars as to him. Even resorting to the Criminal Complaint and the Government's own proffers—which attempt to fill in elements of its case with facts not included in the Indictment—the allegations fall woefully short.

In a case centered on supposed misrepresentations, neither the Indictment nor the Complaint identifies a single false or misleading statement uttered by Mr. Amar, let alone a material one. They also do not identify any material misstatements that Mr. Amar heard, read, or was otherwise privy to (or that he knew, or could have known, were false). Against this backdrop, the Complaint, standing in for an already skeletal Indictment, vaguely alleges a small handful of innocuous, lawful, and business-as-usual acts by Mr. Amar—namely, he acquired student records (agnostic to JPMC's supposed efforts to validate Frank's data in connection with the merger), and he passed along an email regarding a request for user data (months after the merger).

But if the Complaint makes one thing clear, it is that Mr. Amar's alleged conduct was wholly divorced from the closing of the Frank deal. The records he purchased were never used in connection with diligence, and they were not shared with JPMC until months after the merger for an entirely different purpose (a marketing campaign). Simply put, the records did not have—and could not have had—any bearing on JPMC's decision to acquire Frank. What is more, Mr. Amar's purely after-the-fact conduct, alleged (without basis) to be a "coverup" for misrepresentations he did not make or know about and part of a scheme in which he did not

knowingly participate, fails as a matter of law to allege Mr. Amar's knowing participation in a scheme to defraud.

The Indictment is constitutionally flawed for other reasons, too. Mr. Amar's conduct in the supposed scheme to defraud is not alleged to have deprived JPMC of money or property. Even accepting the allegations as true, JPMC was deprived of, at most, access to accurate information about Frank's marketable users. This alleged deprivation, which took place months after JPMC purchased Frank, does not implicate a tangible property interest. As such, *Ciminelli v. United States*, 598 U.S. 306 (2023), requires dismissal of the Indictment.

Even when read in a light most favorable to the Government, and with the additional allegations in the Complaint and the Government's proffers to the Court, the Indictment fails to allege adequately that Mr. Amar knowingly participated in a scheme to defraud. With Mr. Amar's liberty, reputation, and assets on the line, basic principles of fairness and the Constitution demand far more. Mr. Amar is entitled to proper notice of the Indictment's charges against him, or at the very least additional particulars regarding his role in the alleged scheme—not threadbare legal conclusions that will leave him surprised at trial and unable to prepare a defense.

## BACKGROUND

In 2017, Ms. Javice founded Frank, a for-profit company that aimed to streamline the process for college students to fill out the Free Application for Federal Student Aid ("FAFSA"). In September 2021, JPMorgan Chase Bank, N.A. ("JPMC"), acquired Frank for $175 million and shuttered it a year later. On March 31, 2023, the Government filed a Criminal Complaint against Ms. Javice, alleging that she defrauded JPMC by misrepresenting Frank's users. ECF

No. 1 (the "Complaint").[1] Mr. Amar is an alleged "co-conspirator," identified as "CC-1," in the Complaint.

JPMC and the Government had been in contact since at least October 2022, when the Government issued a subpoena to JPMC for Mr. Amar's financial records. JPMC also appears to have delivered a subset of curated, self-serving documents, which incidentally formed the basis for cornerstone allegations in the Complaint—and, by extension, the Government's flawed theory of the case (as inadequately set forth in the Indictment). The Government unsealed an indictment against Ms. Javice on May 18, 2023. ECF No. 18. Then, in apparent reliance on the paper-thin allegations in the Complaint, Mr. Amar was thrust into this case as a defendant in a superseding indictment, which does nothing more than parrot the underlying indictment against Ms. Javice, and which was returned on July 12, 2023. ECF No. 27 (the "Indictment").[2]

## I.     The Indictment[3]

The Indictment charges Mr. Amar in four counts: conspiracy to commit wire fraud and bank fraud (18 U.S.C. § 1349); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); and securities fraud (15 U.S.C. §§ 78j(b) and 78ff, and related regulations). *See* Indictment ¶¶ 1–6. In the six scant paragraphs dedicated to the actual charged crimes, the Indictment does no more than track the elements of these statutes, adding only "in or about June 2021 through

---

[1] The criminal action was filed approximately four months after JPMC filed a civil suit against Ms. Javice and Mr. Amar in Delaware federal court, which is stayed. *See JPMorgan Chase Bank, N.A. v. Javice, et al.*, No. 22-cv-1621 (JDW) (D. Del.). Simultaneous with the unsealing of the Complaint, the SEC filed a civil complaint against Ms. Javice. *S.E.C. v. Javice, et al.*, No. 23-cv-2795 (DLC) (S.D.N.Y.).

[2] The SEC filed an amended Complaint that same day against Mr. Amar—which is also stayed pending resolution of this proceeding.

[3] Mr. Amar disputes all allegations in the charging documents, and reserves all rights but, for the limited purpose of this motion to dismiss, accepts the Complaint's allegations as true. *See United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999).

at least in or about November 2022," Ms. Javice and Mr. Amar attempted to execute and did execute a scheme to defraud "potential acquiring companies" by "submitting false and fraudulent statements" about their company's user data, "among other things." *Id.* ¶¶ 1–2, 4, 5–6.

Unsurprisingly, given the paucity of factual allegations, the Indictment fails to specify any false statements or fraudulent conduct beyond this generic recitation of the supposed scheme and identifies only JPMC and an additional bank ("Bank-1") as alleged victims. *Id.* It also fails to provide any specificity—let alone constitutionally adequate notice—as to the allegedly false or misleading statements that Mr. Amar is said to have made or known about (or for which he is otherwise responsible). And the only change between the underlying indictment (against only Ms. Javice) and the superseding Indictment (against Ms. Javice and Mr. Amar) is the formulaic addition of Mr. Amar's name. To this extent, the Indictment neither adequately alleges, nor provides constitutionally sufficient notice of, Mr. Amar's knowing participation in a scheme to defraud JPMC or Bank-1.

## II.    The Complaint

The allegations of the Complaint similarly do not state a claim against Mr. Amar and thus do nothing to cure the constitutional defects that arise from Indictment's failure to allege adequately that Mr. Amar knowingly participated in a scheme to defraud JPMC, Bank-1, or anyone else.

### A.    The Complaint's Nonexistent Allegations as to Mr. Amar and Bank-1[4]

The Complaint alleges that Mr. Amar, identified as "CC-1," participated in a scheme to defraud only JPMC. As background to its charged scheme, the Complaint includes certain

---

[4] As noted, the Indictment alleges that an additional bank, Bank-1, is a victim of the charged scheme. The Complaint, however, refers to the Indictment's Bank-1 as "Bank-2." For ease of reference, and to avoid confusion, the Complaint's references to Bank-2 are denoted as Bank-1 in this memorandum.

allegations regarding Bank-1. Compl. ¶¶ 18(a)–(c). Tellingly, Mr. Amar is not named, implicated, or referenced (directly or by implication) in any of the sparse allegations involving Bank-1. *Id.* Nor does the Complaint allege that Bank-1 was either a victim or an object of its alleged scheme.[5] Compl. ¶¶ 1–7.

### B. The Complaint's Barebones Allegations as to Mr. Amar's Role in an Alleged Scheme to Defraud JPMC

The Complaint's allegations with respect to Mr. Amar's participation in a scheme to defraud JPMC fare no better. In short, the Complaint asserts: (i) Mr. Amar received an email from Ms. Javice regarding various kinds and sources of user data, which attached a separate spreadsheet (containing other information) that Ms. Javice allegedly said she had provided previously to JPMC, *id.* ¶ 22(d); (ii) Mr. Amar attended a meeting on August 2, 2021, with Ms. Javice and Engineer-1, wherein they discussed data generation by Engineer-1, then pivoted to discussing the purchase of data—without any alleged connection to or mention of the JPMC merger, *id.* ¶¶ 22(f)–(h); (iii) Mr. Amar legally purchased student records and provided them to Ms. Javice—who did nothing with them for several months, *id.* ¶¶ 29, 32(a); and (iv) after the merger, Mr. Amar referred JPMC's Marketing Executive to Ms. Javice for a marketing list, *id.* ¶ 32(a)(iii). These are independently and in combination insufficient to support fraud charges against Mr. Amar.

*User Representations*. The Complaint alleges misrepresentations about Frank's users to JPMC, *id.* ¶¶ 19–20, but makes no claim that Mr. Amar made any of them—let alone material ones. Nor does the Complaint allege that Mr. Amar knew about any material misrepresentations. *Id.* ¶¶ 10, 19–20, 22(d), 24(g), 30(b)(iii). For instance, there is no allegation that Mr. Amar was present when allegedly misleading statements were made to JPMC about

---

[5] As is explained in more detail below, without any apparent justification, the Indictment expanded the alleged scheme to defraud, contending that both JPMC and Bank-1 were the targets of a single scheme engineered by both Ms. Javice and Mr. Amar.

Frank's users (or was told how "user" or "FAFSA in Process" was defined in those discussions). Indeed, there is no allegation that Mr. Amar was copied on any emails to or attended any calls or meetings with JPMC wherein false statements allegedly were written or spoken. And there is no allegation that Mr. Amar obtained knowledge of any false statements in any other way. *See id.*

The Complaint alleges that, "[i]n reliance on JAVICE'S fraudulent representations about Frank's users, JPMC agreed to purchase Frank for $175 million." *Id.* ¶ 12. Notably absent from that allegation is any reference to CC-1 (*i.e.*, Mr. Amar), despite the Complaint's inclusion of CC-1 in other allegations.[6] The Complaint further states that JPMC and Frank "executed a merger agreement" on August 8, 2021, to this end. *Id.* ¶ 31(b). The Complaint does not claim that the merger agreement contains any representations or warranties as to Frank's users or even defines users (because it does not). The Complaint also does not allege—because it cannot—that Mr. Amar ever reviewed the merger agreement, was a party to it, or played any part in its negotiation.

***Data Validation Exercise***. The Complaint alleges that JPMC arranged for a third-party ("Vendor-1") to "count the number of [Frank user] records and verify the percentage" of associated data fields. *Id.* ¶ 26(c). There is no allegation, or even suggestion, that Mr. Amar had any role in this exercise, communicated about it with JPMC (or anyone else for that matter), or knew that it was happening (or why).

---

[6] References to CC-1's alleged knowledge of or participation in several other substantive allegations the Complaint contends were in furtherance of the alleged scheme are conspicuously absent and further underscore the deficiencies in the allegations of the Indictment. *See, e.g.*, Compl. ¶ 24 (describing the preparation of a "Synthetic Data Set" with "Scientist-1"); *id.* ¶ 30 (Scientist-1's efforts to "supplement" the student records allegedly provided to JPMC); *id.* ¶ 30(c) (describing subsequent data supplementation with Vendor-3); *id.* ¶ 32(b) (describing transmission of "numerous other purported user data files"). The Government's decision to include CC-1 in certain allegations of the Complaint and to omit CC-1 from many others speaks volumes about the non-existence of evidence regarding Mr. Amar's knowing participation in the alleged scheme.

***August 1 Email***. The Complaint alleges that, on August 1, Ms. Javice sent Engineer-1 and Mr. Amar a cover email discussing data she had previously sent to JPMC, including "a mix of google, mix panel [data analytics platform], and samples of the database from [another Frank engineer]." *Id.* ¶ 22(d). None of this data is alleged to have been prepared by, provided by, or otherwise known to Mr. Amar. According to the Complaint, the August 1 cover email attached an Excel spreadsheet containing a "tab titled 'FAFSA in Process.'" *Id.* ¶ 22(d). The Complaint does not allege that Ms. Javice's cover email so much as mentions (let alone elaborates on) the term "FAFSA in Process" or that Mr. Amar ever discussed the spreadsheet (or tab) with her or JPMC (or anyone) at any time. Likewise, the Complaint fails to allege that Mr. Amar opened or reviewed the spreadsheet or saw the specific tab.

***August 2 Meeting***. The Complaint alleges that, on August 2, Ms. Javice, Mr. Amar, and Engineer-1 discussed over video different kinds of data and data purchases—in the abstract, totally divorced from JPMC's interest in buying Frank. *Id.* ¶ 22(f). According to the Complaint, Ms. Javice and Mr. Amar asked Engineer-1 to "supplement a list of Frank's website visitors with additional data fields containing synthetic data."[7] *Id.* ¶ 22(f). The Complaint also states that, when Engineer-1 responded that he did not want to do anything illegal, Mr. Amar (and Ms. Javice) agreed. *Id.* ¶ 22(g). To that end, Ms. Javice added: "We don't want to end up in orange jumpsuits." *Id.* According to the Complaint, Engineer-1 subsequently heard Ms. Javice and Mr. Amar discuss "obtaining data, like phone numbers," from "an external source," *id.* ¶¶ 22(g)–(h)—legal conduct that is in no way indicative of wrongdoing. The Complaint

---

[7] Throughout the Complaint, the Government conflates "append[ing]" or enriching data (*i.e.*, supplementing missing fields in an existing user profile) with synthetic data creation (generating a new "artificial, synthetic data set" based on statistical distributions of pre-existing user data). *See, e.g.*, Compl. ¶¶ 29(a), 22(f). These two concepts produce categorically distinct kinds of data sets—each with legitimate uses in a variety of industries. The Complaint's efforts to conflate the two underscores the need to carefully parse the allegations with respect to Mr. Amar.

does not allege that on this call Ms. Javice mentioned user-related representations to JPMC, the data validation exercise, or anything about the merger at all. Nor does the Complaint allege that Mr. Amar had any involvement in ultimately acquiring or using synthetic data.

**Student Records Purchase**. The Complaint alleges that Mr. Amar purchased student records on the open market from Vendor-2 as Ms. Javice's "intermediar[y]." *Id*. ¶¶ 28–29. The Complaint contends that this purchase was part of an "effort[] to cover up [Ms. Javice's] misrepresentation." *Id.* ¶ 28. But the Complaint does nothing to explain how that could be, and its own allegations refute the claim. According to the Complaint, Mr. Amar sought to buy records of a "list of students currently in college" to "append [the] data elements to [Frank's] house file." *Id*. ¶ 29(a). The Complaint does not allege that Mr. Amar's purchase of student records had any relationship to Ms. Javice's use of artificial, "synthetic" data (it did not). The Complaint does not allege that Ms. Javice used the records to close the deal with JPMC (she did not). The Complaint does not even allege that Mr. Amar obtained the records before the completion of the data validation exercise (which, again, Mr. Amar neither was involved in nor aware of). Indeed, the Complaint does not allege that Mr. Amar knew how (or whether or when) the records obtained from Vendor-2 were to be used (if at all).

**Marketing List**. The Complaint claims Mr. Amar helped Ms. Javice cover up the alleged fraud on JPMC after the merger closed, when around January 6, 2022, a JPMC "Marketing Executive" requested Frank's "Initial . . . User Data Transfer" by the end of the week. *Id*. ¶¶ 32(a)(i)–(ii).[8] The Complaint alleges the Marketing Executive made this request to "begin a marketing campaign," not in connection with the merger. *Id.* ¶ 13. After JPMC's marketing team followed up on January 18, Mr. Amar wrote: "Copying Charlie to this email

---

[8] While the Complaint alleges that Ms. Javice's misrepresentations concerned Frank's FAFSA users, Compl. ¶ 19(b), that allegation is divorced from the Complaint's allegations about JPMC's request for users in January, which concerned marketing.

as she'd got the data ready for transfer. I'll let you both take it from here." *Id*. ¶ 32(a)(iii). The Complaint does not claim that Mr. Amar participated in the so-called coverup beyond these routine emails or that he transmitted any data to JPMC or reviewed any data that ultimately was transmitted in response to this request from marketing.

## ARGUMENT

The Indictment should be dismissed because, at bottom, Mr. Amar is alleged to have knowingly participated in a scheme to defraud JPMC in connection with the Bank's acquisition of Frank without any knowledge of the alleged falsehoods underlying the scheme and without communicating any falsehoods himself. He is alleged to have done so based on sparse conduct that not only is legitimate but also is wholly detached from JPMC's acquisition of Frank (and largely post-dating the merger). And the object of his alleged role in the scheme was not money or property. Even when read in a light most favorable to the Government, and with the additional allegations in the Complaint and the benefit of the Government's proffers to the Court, the Indictment fails to allege adequately that Mr. Amar knowingly participated in a scheme to defraud the Bank—let alone with sufficient specificity to give constitutionally adequate notice.

**I.      The Indictment Lacks Specificity, is Constitutionally Deficient, and Fails to State a Claim as to Mr. Amar and Should Be Dismissed**

**A.      Applicable Law**

Pursuant to Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure, a defendant may move to dismiss an indictment for various defects, including a "failure to state an offense" and a "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B); *United States v. O'Brien*, 926 F.3d 57, 82–83 (2d Cir. 2019); *see United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) ("[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." (citing *United States v. Pirro*, 212 F.3d 86, 91–92 (2d Cir. 2000))); *see also United States v. Crowley*, 236 F.3d 104, 108 (2000) ("Federal Rule of

Criminal Procedure 12(b)(2) [the predecessor to Rule 12(b)(3)(B)(iii)] explicitly provides that a claim that an indictment is insufficiently specific 'must be raised prior to trial.'" (quoting then existing Fed. R. Crim. P. 12(b)(2))); *United States v. Spero*, 331 F.3d 57, 61 (2d Cir. 2003) (finding that because it "was not raised prior to trial, as unambiguously required by the law of the Circuit," the claim that the indictment was "insufficiently specific . . . must be rejected" (citing *Crowley*, 236 F.3d at 108)).

A deficient indictment "offends both the Fifth and Sixth Amendments." *Pirro*, 212 F.3d at 92. The Fifth Amendment requires that a defendant "be[] tried on the evidence presented to the grand jury" and "the grand jury act[] properly in indicting him," *id*. (citation omitted), that "an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury," *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (quoting *United States v. Abrams*, 539 F. Supp. 378, 384 (S.D.N.Y. 1982)), and that an indictment contain "enough detail that he may plead double jeopardy in a future prosecution based on the same set of events," *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). "The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment." *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012) (quoting *United States v. Miller*, 471 U.S. 130, 139 (1985)).[9]

An indictment must be dismissed "when it does not describe conduct that is a violation of the criminal statute charged." *United States v. Smith*, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014) (internal quotation marks and citations omitted), *aff'd sub nom. United States v.*

---

[9] *See also Russell*, 369 U.S. at 770 ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." (internal quotation marks and citations omitted)).

*Halloran*, 664 F. App'x 23 (2d Cir. 2016). There are "limitations" to the oft-cited proposition that an indictment that merely tracks statutory language is sufficiently specific for purposes of the Constitution and Rule 12(b)(3)(B)(iii). *See, e.g.*, *Pirro*, 212 F.3d at 93. An indictment must not only allege the essential elements of the offense, but also contain sufficient factual detail to "apprise[] the defendant of what he must be prepared to meet." *Cochran v. United States*, 157 U.S. 286, 290 (1895). Where the statutory terms are generic, descending into particulars is required. *Id*.; *see also United States v. Urso*, 369 F. Supp. 2d 254, 267 (E.D.N.Y. 2005) (each allegation, read in context of the whole indictment, must be "pled with sufficient factual particularity"); *United States v. Ashley*, 905 F. Supp. 1146, 1159–60 (E.D.N.Y. 1995) (dismissing fraud counts because "it is not sufficient . . . to merely plead the statutory language"); *cf. Russell v. United States*, 369 U.S. 749 (1962), 751–52, 788 (reversing convictions based on defective indictments where defendants were charged with refusing to answer a question pertinent to subject under congressional inquiry, but indictments did not say what the subject under inquiry was).

Courts recognize the special need to include facts in criminal fraud cases because of the generic nature of the term "scheme to defraud," which is not "capable of precise definition." *See Stavroulakis*, 952 F.2d at 694 (internal quotation marks and citations omitted); *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir. 1992); *accord United States v. Steffen*, 687 F.3d 1104, 1113 (8th Cir. 2012) ("[A]n indictment [that] alleges a scheme to defraud under the . . . wire fraud statute[] . . . must specify facts not merely in the general words of the statute, but with such reasonable particularity as will apprise the defendant, with reasonable certainty, of the nature of the accusation . . ." (alterations and internal quotation marks omitted)).

In analyzing motions to dismiss under Rule 12(b)(3)(B), courts are typically limited to the four corners of an indictment. *Campbell v. United States*, No. 06-cr-41 (CM), 2015 WL 1062176, at *8 (S.D.N.Y. Mar. 9, 2015). "[T]he indictment must be considered as it was

actually drawn, not as it might have been drawn." *Pirro*, 212 F.3d at 92 (2d Cir. 2000). Where, as here, an indictment is devoid of specific factual content, the allegations in a criminal complaint may be "relevant in assessing whether the defendant is on notice of the charges against him." *United States v. Chocron*, No. 20-cr-400 (JSR), 2021 WL 3005086, at *2 (S.D.N.Y. July 14, 2021). Even so, the complaint (and any partial proffers by the Government) must "fill in [the] factual gaps" left by the indictment. *See United States v. Nagi*, No. 15-cr-148 (HBS), 2016 WL 11264717, at *4, *7 (W.D.N.Y. June 27, 2016) (Scott, M.J.) (noting criminal complaint is "merely the averment of [a government] agent and not facts necessarily found by the Grand Jury"), *R. & R. adopted*, 254 F. Supp. 3d 548 (W.D.N.Y. 2017).

"The gravamen" of wire,[10] securities,[11] and bank[12] fraud is the "scheme to defraud." *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016) (internal quotation marks and citations omitted). The essential elements of a "scheme to defraud" are: (i) the existence of a scheme, *see United States v. D'Amato*, 39 F.3d 1249, 1256–57 (2d Cir. 1994); (ii) intent to defraud on the part of the defendant, *see id.* at 1257; *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) ("Essential to a scheme to defraud is fraudulent

---

[10] Wire fraud under 18 U.S.C. § 1343 requires that a defendant must knowingly participate (1) in a scheme to defraud; (2) to get money or property; (3) using interstate wires. *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); *Masoud v. Holder*, 487 F. App'x 633, 635 (2d Cir. 2012).

[11] Securities fraud under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 (Rule 10b-5) requires that a defendant must, among other things, (1) employ a scheme to defraud or make an untrue statement of material fact; (2) in connection with the purchase or sale of a security; and (3) participate in the scheme knowingly, willfully, and with intent to defraud. *See United States v. Gramins*, 939 F.3d 429, 443–44 (2d Cir. 2019) (citing 15 U.S.C. § 78j(b)); *see also United States v. Teyibo*, 877 F. Supp. 846, 861 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 681 (2d Cir. 1996).

[12] Bank fraud under 18 U.S.C. § 1344 requires that a defendant "(1) engage[] in a course of conduct designed to deceive a federally chartered or insured financial institution into releasing property; and (2) possess[] an intent to victimize the institution by exposing it to actual or potential loss." *United States v. Crisci*, 273 F.3d 235, 239–40 (2d Cir. 2001) (internal quotation marks and citations omitted). In other words, "[t]he federal bank fraud statute criminalizes the knowing execution of a scheme to defraud a financial institution." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (internal quotation marks and citations omitted).

intent."); and (iii) a false statement or material misrepresentation or concealment of a material fact, *see Neder v. United States*, 527 U.S. 1, 25 (1999) (finding federal fraud statutes require materiality even though text does not say so); *Pettus v. Erole*, No. 19-cv-5893 (AMD), 2019 WL 5863983, at *2 (E.D.N.Y. Nov. 8, 2019) ("A necessary element of a scheme to defraud is the making of a false statement or material misrepresentation, or the concealment of a material fact." (quoting *Neder,* 527 U.S. at  25)).

### B.      The Indictment Is Unconstitutionally Vague and Lacks Specificity

The lack of specifics in the Indictment, even if supplemented by the allegations in the Complaint and the Government's own proffers to this Court, requires dismissal. First, the Indictment does not allege that Mr. Amar made or knew about any materially false statements to JPMC, Bank-1, or anyone else for that matter. And second, the Indictment fails to allege adequately that Mr. Amar knowingly participated in a scheme to defraud with the specific intent to defraud.

### 1.      The Indictment Does Not Allege with Adequate Specificity That Mr. Amar Made or Knew of Any Materially False Statements

Even taking as true the Government's allegations as advanced in the Complaint, the Indictment fails to allege that Mr. Amar made any representations to Bank-1 or JPMC—let alone materially false ones—or even that he knew of any. It is well settled that an indictment must allege "the 'core of criminality' the government intend[s] to prove" at trial. *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007) (citations omitted). Where the charged crime "involves making false statements, the 'core of criminality' is not the substance of the false statements but rather that *knowing falsehoods were submitted*." *Id.* (emphasis added); *United States v. Almaleh*, No. 17-cr-25 (ER), 2022 WL 602069, at *1 (S.D.N.Y. Feb. 28, 2022) (same). A knowing falsehood can be an "affirmative misrepresentation," *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000), or knowledge and concealment of a material fact, *see, e.g.*, *Pettus*, 2019 WL 5863983, at *2; *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1282 (10th Cir.

2023) (scheme to defraud requires "knowledge of a false statement"); *United States v. Kalu*, 791 F.3d 1194, 1205 (10th Cir. 2015) ("Intent to defraud [an element of a scheme to defraud] may be inferred from the defendant's misrepresentations [or] knowledge of a false statement." (citations omitted)). The Complaint here alleges neither.

As to Bank-1, the Complaint does not allege that Mr. Amar said (or did) anything or had any knowledge of what Ms. Javice allegedly said (or did). This silence is fatal and cannot be cured by the mere inclusion of Bank-1 in each Count of the Indictment, which does not even mention Bank-1 as part of any separate scheme to defraud. Indeed, that alleged scheme appears in the Complaint alone, and even then only as background. *See United States v. Josten*, 704 F. Supp. 841, 844 (N.D. Ill. 1989) ("Here, the indictment does not state the allegedly false representations, nor does it name the victims of the allegedly improper conduct or the accounts to which it pertained, nor does it give any specific dates upon which the challenged activity took place. . . . The combination, however, leaves the presumably innocent defendant speculating as to which of the many transactions and representations that took place over the eight month period are the subject of his indictment."); *see also United States v. Tomasetta*, 429 F.2d 978, 980 (1st Cir. 1970) (finding indictment defective because it failed to allege "precise time and place" of the offense).

As to JPMC, prior to the Bank purchasing Frank, the Complaint alleges only that Mr. Amar: (i) received an email from Ms. Javice regarding various sources of user data, which attached a spreadsheet that she apparently had previously provided to JPMC (which he is not alleged to have opened, read, or otherwise discussed with Ms. Javice or anyone else); (ii) attended a meeting with Ms. Javice and Engineer-1, at which they discussed data generation and acquisition (with no asserted connection to JPMC's efforts to acquire Frank); and (iii) later

bought student records (again, with no asserted connection to the potential JPMC merger).[13] The Complaint does not allege that Mr. Amar made any misstatements to JPMC in the course of this conduct. The Complaint also does not allege that Mr. Amar was aware of any false statements to JPMC (or even had sufficient knowledge or context to understand how statements made to JPMC could have been false or misleading). Meanwhile, the Indictment vaguely alleges that Mr. Amar misrepresented "other things" besides Frank's users, without further elaboration, and without specifying what those things are or how they were false, and neither the Complaint nor the Government's proffers to this Court fills in the gaps. Indictment ¶¶ 2–5.

Because these allegations leave Mr. Amar guessing and are plainly insufficient to assert a scheme to defraud, the Court should dismiss all fraud charges. *See, e.g.*, *United States v. Coplan*, 703 F.3d 46, 41, 47, 58 (2d Cir. 2012) (reversing conspiracy conviction where there was no evidence defendant "even knew" about false statements at center of conspiracy); *United States v. Lewis*, 594 F.3d 1270, 1274–75 (10th Cir. 2010) (reversing wire fraud convictions where Government failed to prove defendant "knew" about the "false statements to investors" that he was alleged to have "willfully cause[d]"); *United States v. Keuylian*, 23 F. Supp. 3d 1126, 1129 (C.D. Cal. 2014) (dismissing wire fraud indictment that failed to identify "the false pretenses, misrepresentations, or promises forming a part of" the scheme to defraud); *United States v. Nance*, 533 F.2d 699, 700–02 (D.C. Cir. 1976) (per curiam) (dismissing counts in indictment alleging false pretense fraud under D.C. law for failure to identify "the factual particulars of the false representations" that were "the very core of the offense").

---

[13] Elsewhere the Complaint alleges that Ms. Javice sent "other . . . user data files" containing misrepresentations to JPMC, but omits all facts about these transmissions, including what the files contained, how they are false, or—critically—Mr. Amar's involvement in them, if any. Compl. ¶ 32(b).

### 2. The Indictment Does Not Allege with Adequate Specificity That Mr. Amar Participated Knowingly, Willfully, and with Intent to Defraud

The Indictment also fails to allege adequately Mr. Amar intended to defraud Bank-1 or JPMC, notwithstanding the Government's efforts to fill in the gaps through the Complaint with factual allegations not presented to the Grand Jury. For one thing, the Complaint alleges only legal, run-of-the-mill business acts with respect to Mr. Amar: a conversation (untethered to the merger) about the types and purchase of data, where according to the Complaint Mr. Amar specifically disavowed even considering doing anything illegal, and a purchase of student records on the open market (not used in connection with closing). *See United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991) (finding fraudulent intent cannot be inferred from evidence "at least as consistent with innocence as with guilt," and reversing conviction for mail and wire fraud); *O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990) ("Acts done inadvertently, mistakenly, or in good faith without an intent to defraud do not satisfy the requirements of the [analogous mail fraud] statute.").

The Complaint does not allege that data validation was discussed during the conversation with Engineer-1 or at any other point. Indeed, the Complaint never alleges that Mr. Amar knew about the data validation exercise with JPMC or the purpose of the exercise when he purchased student records—which, again, were not used in connection with data validation or the merger. Simply put, there is no discernable link between Mr. Amar's legal purchase of student records and JPMC's diligence or purchase of Frank, let alone any connection to any allegedly false statement made to JPMC about Frank's users (which Mr. Amar is not alleged to have made, known about, or knowingly concealed). Even when tacking on the Complaint's additional allegations, the Indictment requires an inferential quantum leap from legitimate business conduct to place Mr. Amar remotely in the vicinity of a scheme to defraud. *See Ashley*, 905 F. Supp. at 1159–60 (dismissing fraud counts where indictment did

not provide any "facts and circumstances" informing defendant of charges, because "[s]ome substantial indication of the nature or character of any scheme or artifice to defraud . . . is requisite"); *D'Amato*, 39 F.3d at 1256, 1260 (reversing mail fraud conviction because "there was no evidence that [the defendant] knew . . . or could have known" about the fraud or his co-defendant's actions, and observing "a conviction based on speculation and surmise alone cannot stand"); *United States v. Patrisso*, 262 F. 2d 194, 198–99 (2d Cir. 1958) (reversing convictions because Government was "required to prove [the defendant's own] guilty knowledge, not that of his co-defendants").

*S.E.C. v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007), is instructive. There, the court foreclosed a similarly speculative theory of fraud at summary judgment. The SEC charged a trader and broker with securities fraud for buying 200,000 shares of a stock at the end of the day to allegedly manipulate the market. *Id.* at 374. The court rejected the SEC's theory of "manipulative intent" (analogous to fraudulent intent under the bank and wire fraud statutes) for the broker. *Id.* at 373–375. The court reasoned that the SEC did not offer evidence (either direct or circumstantial) that the broker knew about "put options" allowing the trader to sell the shares at a higher price for a million-dollar premium. Additionally, the timing and volume of the transactions—a "sizeable order in a thinly traded stock at the end of the day"—were not sufficiently "unorthodox" to indicate to the broker that "the only possible purpose for such transactions was to artificially affect the price of the security." *Id.* The same is true here. The Complaint does not allege adequately that Mr. Amar purchased the student records (a run-of-the-mill business activity) with intent to deceive JPMC or that the only possible purpose of this purchase could have been to deceive JPMC.

### 3. The Indictment Does Not Allege Conspiracy with Adequate Specificity

A conspiracy involves an agreement by at least two parties to achieve a particular illegal end. *See United States v. Gleason*, 616 F.2d 2, 16–17 (2d Cir. 1979). The Government must

prove a conspiracy existed, the defendant "knew of the conspiracy," including its general nature and extent, and the defendant "joined it with the intent to commit the offenses that were its objectives." *United States v. Ceballos*, 340 F.3d 115, 123–24 (2d Cir. 2003) (citation omitted); *see United States v. Lange*, 834 F.3d 58, 76 (2d Cir. 2016) ("On a charge of conspiracy, the Government must prove (1) knowing participation or membership in the scheme charged and (2) some knowledge of the unlawful aims and objectives of the scheme." (internal quotation marks and citations omitted)).

The Government's allegations in the Complaint do not change the fact that the Indictment fails to state a claim that Mr. Amar conspired to commit fraud. The Complaint fails to allege any unlawful purpose or objective because it fails to allege that Mr. Amar knew about the conduct or misrepresentations underlying the substantive offenses (or intended to commit those offenses). *United States v. Ulbricht*, 31 F. Supp. 3d 540, 550 (S.D.N.Y. 2014) ("The essence of the crime of conspiracy . . . is the *agreement* to commit one or more unlawful acts." (quoting *United States v. Praddy*, 725 F.3d 147, 153 (2d Cir. 2013)); *see United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) ("The law of conspiracy is well established within our Circuit. . . . [T]he government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme."). Stated differently, "[t]he government must prove that the defendant agreed to commit a *particular offense* and not merely a vague agreement to do something wrong," *Ulbricht*, 31 F. Supp. 3d at 551, but the Complaint here does not claim that Mr. Amar knew about any wrongdoing whatsoever, much less "what kind," *United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977) (defendant was not guilty of mail fraud because "he had no knowledge of such a plan").

The Indictment also does not state a claim for conspiracy because neither it nor the Complaint alleges that Mr. Amar ever knowingly agreed to join one. To allege adequately an

agreement, there must be "a meeting of [the] minds" on "[t]he essential nature of the plan." *Id.* at 38 (quotation marks and citations omitted). "Proof of the essential nature of the plan is required because the gist of [conspiracy] remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." *Id.* at 39 (internal quotation marks and citations omitted). But nowhere does the Complaint state, or even imply, any "act of agreeing," whether express or tacit. *Id.* at 38. At most, it places Mr. Amar in the vicinity of alleged misrepresentations while claiming that he committed only legal acts that are unconnected to the merger. *See, e.g.*, *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) (a defendant's "presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove" agreement to carry out unlawful conduct); *Ulbricht*, 31 F. Supp. 3d at 551 (same).

### C. The Indictment Fails to State a Claim Against Mr. Amar

The Indictment should also be dismissed because it fails, even when read in conjunction with the Complaint, to state a claim. First, there are no allegations that Mr. Amar made or knew of any material misrepresentations "in connection with" the sale of Frank. Second, Mr. Amar's post-acquisition conduct is after-the-fact conduct, which is an insufficient basis for the charges. Third, there are no allegations that Mr. Amar deprived JPMC of a tangible interest in money or property, rather than mere information, which is nonactionable under *Ciminelli*. Fourth, the bank fraud statute does not apply to the sale of Frank. Any one of these deficiencies requires dismissal; when considered as a whole, and together with the Indictment's lack of specificity, the charging instrument woefully falls short of even this Circuit's permissive pleading standards.

1.  **The Indictment Fails to Allege Adequately that Mr. Amar Made or Knew of Any Materially False Statements Made "in Connection with" the Sale of Frank**

As to the allegations pertaining to post-merger conduct, Mr. Amar's purchase of student records in August 2021—which was shared with JPMC four months later by someone else in response to a marketing request (*i.e.*, wholly unrelated to due diligence or acquisition-related matters)—cannot have been material[14] to JPMC's decision to acquire Frank because the information was not provided to JPMC in connection with the acquisition and therefore had no bearing on JPMC's investment decision. To satisfy the "in connection with" requirement, "there must be a causal connection between a defendant's misstatements or omissions and the [investor's] purchase." *Wilson v. Dalene*, 699 F. Supp. 2d 534, 542 (E.D.N.Y. 2010) (quoting *Troyer v. Karcagi*, 476 F. Supp. 1142, 1148 (S.D.N.Y.1979); *see S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir. 1968). That is, the "fraud practiced must have been prior to or contemporaneous with the sale of securities." *Bosio v. Norbay Sec., Inc.*, 599 F. Supp. 1563, 1566 (E.D.N.Y. 1985) (quoting *Freschi v. Grand Coal Venture*, 551 F. Supp. 1220, 1227 (S.D.N.Y. 1982)); *see Kogan v. Nat'l Bank of N. Am.*, 402 F. Supp. 359, 361 (E.D.N.Y. 1975) (dismissing securities fraud complaint based on when "sale was approved" compared to when "alleged fraud" occurred, because after-the-fact conduct cannot be deemed "in connection with" sale or purchase of security); *Pepsico, Inc. v. W. R. Grace & Co.*, 307 F. Supp. 713, 720 (S.D.N.Y. 1960) ("Although the plaintiff's affidavits are replete with the recital of events after May 8th [when the parties reached an oral sales agreement], not one fact is stated as to any fraud, misrepresentation, or half truth before or contemporaneous with that date."). Based on

---

[14] A misstated or omitted fact is material "if there is a substantial likelihood that a reasonable [person] would consider it important in making an investment decision." *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). Materiality requires that "the information . . . bear[s] on the ultimate value of the transaction." *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994).

the Government's own allegations, no portion of the student records Mr. Amar allegedly purchased in August 2021 were transmitted to JPMC until January 2022—well after the merger closed. By that time, any alleged scheme to defraud was done and the transmission of said records could not be "in connection with" anything, let alone a fraud.[15]

## 2. Mr. Amar's Alleged After-the-Fact Conduct Fails to State a Claim

The sole allegation of post-merger conduct against Mr. Amar is that, in January 2022, he directed a JPMC Marketing Executive to Ms. Javice for a list of users for a marketing campaign, who in turn arranged the transmission of a subset of the student records Mr. Amar purchased in August 2021. Even taken as true, the Indictment fails to state a claim against Mr. Amar because actions consisting of "covering up," after-the-fact, the alleged fraudulent activity of another are not sufficient. *See S.E.C. v. Papa*, 555 F.3d 31, 38 (1st Cir. 2009) (finding defendants who merely concealed a completed fraud are not responsible for it); *S.E.C. v. Narayan*, No. 16-cv-1417 (BML), 2017 WL 4652063, at *10 (N.D. Tex. Aug. 28, 2017) (finding defendants did not participate in scheme because their only actions were "covering up" fraudulent actions of another defendant, which is "not independently actionable activity outside of the context of [that defendant's] misrepresentations and omissions"); *see also United States v. Lazarenko*, 564 F.3d 1026, 1036–37 (9th Cir. 2009) (after-the-fact money transfers not "simply a delayed link in the fraudulent chain" because they are not "incident to the execution of the scheme . . . as conceived by the perpetrator at the time" but rather "part of an after-the-fact transaction," and holding that "fraudulent activity was completed . . . when the money reached [defendant's] control and he deposited it"). At most, the Complaint alleges that Scientist-1's Synthetic Data Set was provided (without Mr. Amar's knowledge or involvement)

---

[15] In any event, the Complaint presupposes that Ms. Javice's alleged representations regarding Frank's users were material to JPMC's acquisition of Frank but does little to justify that assumption. For example, the Complaint references the Merger Agreement but never alleges that the Merger Agreement (or any other merger document) contains any representations or warranties on the number of Frank's customer accounts or otherwise defines a Frank user.

to JPMC in connection with a data validation exercise before the merger closed, then four months later, for an entirely unrelated marketing purpose, a separate set of student records (purchased with no connection to the merger) was provided (not by Mr. Amar). On that boundless charging theory, every fraud would be a perpetual offense, and any future act could implicate any actor uninvolved in the original scheme.

Likewise, even if Mr. Amar discovered the fraud after the fact and attempted to conceal it by deferring the Marketing Executive's user list request to Ms. Javice (which not even the Complaint attempts to allege), the timing of this conduct still negates his intent to defraud, which must be determined when "the defendant obtained the money from the victim," not later. *United States v. Carter*, No. 08-cr-51 (SSB), 2013 WL 12213387, at *4 (S.D. Ohio Sept. 30, 2013); *see United States v. Jowers*, 125 F.3d 856 (6th Cir. 1997) (government presented insufficient evidence that brothers had an agreement to commit mail fraud where evidence, at best, allowed inference that one learned of the fraud after the fact, because "knowledge of the [scheme] and [an] after-the-fact attempt to conceal" it is insufficient); *United States v. Guadagna*, 183 F.3d 122, 132 (2d Cir. 1999) (affirming district court's grant of judgment of acquittal where jury could not have concluded beyond a reasonable doubt that fraudulent phone call in question occurred when defendant "had knowledge of the falsity of his statements and the requisite intent to defraud"); *United States v. Jackson*, 926 F. Supp. 2d 691, 703–04 (E.D.N.C. 2013) (defendants not liable for conspiracy where their "obstructive conduct was not committed to perpetrate the common scheme or plan of the other defendants, but rather was committed for the purpose of covering it up") (internal quotation marks and citations omitted).

### 3. The Indictment Fails to Allege Adequately That Mr. Amar Deprived JPMC of a Tangible Property Interest

"A scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000). Moreover, the Supreme Court has made clear that the fraud statutes "criminalize only

schemes to deprive people of traditional property interests." *Ciminelli,* 598 U.S. at 309 (citing *Cleveland v. United States*, 531 U.S. 12, 24 (2000)); *cf. Stavroulakis*, 952 F.2d at 694 (a conviction under a "scheme to defraud" clause (there, the bank fraud statute) requires conduct designed to release the victim's property and expose it to a loss); *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (a plan to engage in deceit is not, without more, a scheme to defraud; contemplated harm to victim required). And the victim must have been the actual or intended target of the fraud under each of the wire and securities fraud statutes. *United States v. Evans*, 844 F.2d 36 (2d Cir. 1988); *United States v. Covino*, 837 F.2d 65 (2d Cir. 1988).

While the Indictment technically recites the elements of a scheme to defraud by parroting the statutory language, the conduct the Complaint alleges to save that fatally pled scheme constitutes, at most, a deprivation of information, not a deprivation of money or property, as is required under *Ciminelli.* There is a "dearth of factual allegations that connect the alleged 'scheme' to the deprivation of [JPMC's] traditional property interests." *United States v. Constantinescu.*, No. 22-cr-612 (ASH), 2024 WL 1221579, at *4–6 (S.D. Tex. Mar. 20, 2024) (granting motion to dismiss fraud charges).

In *Ciminelli*, political operatives tailored a state-funded bidding process so that the defendant's construction company could secure state construction projects. 589 U.S. at 309–10. Reversing the Second Circuit, the Supreme Court held that, to convict for fraud, the Government must prove that a defendant sought to deprive victims of money or another tangible property interest. *See id.* at 309 ("We have held . . . that the federal fraud statutes criminalize only schemes to deprive people of traditional property interests." (citing *Cleveland*, 531 U.S. at 24)). The deprivation of an intangible right to more accurate information, even if it is "potentially valuable" and related to an economic or financial decision, is not sufficient. *Id.* Otherwise, the fraud statutes would "make[] a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law," and "criminalize[]

traditionally civil matters and federalize[] traditionally state matters." *Id.* at 314–16.[16] "*Ciminelli*'s narrow interpretation of the federal fraud statutes is merely the latest in a line of cases applying this type of reading," and indicates that the "fraud-based criminal statutes . . . must be interpreted narrowly." *United States v. Alladawi*, No. 22-cr-8 (CJC), 2023 WL 8702719, at *3–4 (C.D. Cal. Dec. 15, 2023) (overturning fraud conviction under *Ciminelli*).

The Complaint—and by extension, the Indictment—here does exactly what *Ciminelli* says it cannot: alleges that Mr. Amar participated in a supposed scheme to defraud based solely on conduct that allegedly deprived JPMC of accurate information, not a tangible property interest. First, the Complaint alleges that Mr. Amar participated in a scheme to defraud JPMC by purchasing student records on the open market. But, as the Complaint itself makes clear, the purchased student records were not used in connection with diligence, the data validation exercise, or the closing of the merger. Indeed, the Complaint does not even allege that Mr. Amar acquired them for (or in time for) the data validation exercise. Meanwhile, the Complaint leaves no doubt that the records were not used until months after the merger for an entirely separate, unrelated marketing purpose. Simply put, Mr. Amar's alleged purchase of student records was not done to obtain money or property. S*ee Kelly v. United States*, 590 U.S.----, 140 S. Ct. 1565, 1573 (2020) ("[P]roperty must play more than some bit part in a scheme: It must be an 'object of the fraud.'" (citation omitted)).

Second, to the extent the Complaint avers that Mr. Amar purchased student records to conceal Ms. Javice's misrepresentations about Frank's users, this theory, too, fails under *Ciminelli*. Even assuming the Government's allegations in the Complaint are true, the

---

[16] Although *Ciminelli* analyzed the right to control theory in the context of wire fraud, its holding extends to all federal fraud statutes. 598 U.S. at 316 ("[T]he right-to-control theory cannot form the basis for a conviction *under the federal fraud statutes*." (emphasis added)); *see S.E.C. v. Govil*, 86 F. 4th 89 (2d Cir. 2023) (applying *Ciminelli* to limit the reach of and remedy available in an enforcement action under securities laws); *Constantinescu*, 2024 WL 1221579, at *6 (dismissing securities fraud indictment for "fail[ing] a *Ciminelli* analysis").

Indictment states only that JPMC was deprived of an intangible interest of access to accurate information about Frank's marketable users, not money or property.[17] *See Shaw v. United States*, 580 U.S. 63, 72 (2016) ("[T]he scheme [to defraud] must be one to deceive the bank *and deprive it of something of value*." (emphasis added)); *Constantinescu*, 2024 WL 1221579, at*4 (construing *Ciminelli* to require more than "the right to information necessary . . . to make discretionary economic decisions"). Under *Ciminelli*, these allegations fail because "the object of the 'scheme to defraud' as alleged" is not "anchored in the deprivation of a victim's traditional property right." *Constantinescu*, 2024 WL 1221579, at *4.

Third, to the extent the Complaint alleges that Mr. Amar participated in a scheme to defraud by referring JPMC's Marketing Executive to Ms. Javice for a user list in January 2022, this theory is also a nonstarter under *Ciminelli*. The conduct alleged happened four months after the merger, was for marketing purposes wholly unrelated to the merger, and is disconnected from any possible financial gain associated with the merger or any conceivable loss to JPMC. In any event, Mr. Amar's conduct did not deprive JPMC of anything, let alone money or property, since at most Mr. Amar acted as an unwitting pass-through to others providing information (student records) to JPMC.

### 4. The Transaction Alleged in the Indictment Cannot State a Claim for Bank Fraud

In addition to failing to allege sufficiently a scheme to defraud under Section 1344, Count Three should be dismissed because Section 1344 does not apply to the commercial transaction at the heart of this case—*i.e.*, JPMC's acquisition of Frank. The bank fraud statute makes it a crime "to defraud a financial institution." 18 U.S.C. § 1344. Section 1344 is not a

---

[17] The Indictment alleges that the fraud against JPMC included "salary, bonus, and other compensation paid to [Ms. Javice and Mr. Amar] as retained employees." Indictment ¶ 2. However, the scheme advanced in the Complaint makes no reference to this novel theory of the fraud, and outside of JPMC's January 2022 request for a marketing list (for a marketing purpose unconnected to the merger), the Complaint advances no allegations to support the notion that the supposed scheme targeted salary and other post-acquisition compensation.

"plenary ban on fraud" and does not extend to "every fraud, no matter how prosaic." *Loughrin v. United States*, 573 U.S. 351, 361–62 (2014). The Second Circuit has instructed that Section 1344 "should not be read to 'federaliz[e] frauds that are only tangentially related to the banking system,' which is § 1344's core concern." *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016) (quoting *Loughrin v. United States*, 573 U.S. 351, 362 (2014)). JPMC, like many large international banks, functions both as a traditional financial institution and also as a commercial entity that operates wholly outside the federally insured banking system. The Government should not be allowed to use the bank fraud statute here to prosecute fraud charges based on alleged misrepresentations to a purchaser that just so happened to also be a bank.

To interpret Section 1344 to cover a bank's ordinary commercial transactions unrelated to its activities as a financial institution—including the acquisition of other companies— distorts the purpose of the bank fraud statute, which was intended to protect the banking system. *See Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 177 (2d Cir. 2004) ("[T]he bank fraud statute was designed to protect the integrity of the federally insured banking system." (citing *United States v. Rackley*, 986 F.2d 1357, 1361 (10th Cir. 1993))). It is not federal bank fraud where the only involvement of the "victim[]" bank is its "engage[ment] in activities far afield of the core functions of our federal banking system," *Bouchard*, 828 F.3d at 125–26, here as a purchaser of a private company.

For this reason, bank fraud charges are traditionally limited to schemes involving the "core functions" of a bank, such as accepting deposits, transferring funds, cashing checks, and making loans. *See, e.g.*, *Shaw,* 580 U.S. at 63 (2016) (making unauthorized transfers from federally-insured account); *Loughrin*, 573 U.S. at 353 (altering or forging checks to obtain federally insured deposits); *Rigas*, 490 F.3d at 226 (false statements to secure better interest rate on loan from federally insured institution); *see also, e.g., Bouchard*, 828 F.3d at 119

(mortgage fraud); *United States v. Laljie*, 184 F.3d 180, 183 (2d Cir. 1999) (fraudulent checks); *Stavroulakis*, 952 F.2d at 689 (sale of stolen checks).

Purchasing an entire private business in the commercial marketplace is not a unique, core function of a bank, and has absolutely nothing to do with the federally insured banking system. *Cf. UMB Bank, N.A. v. Benton*, No. 21-cv-832 (BP), 2022 WL 16753765, at *11 (W.D. Mo. June 29, 2022) (grating motion to dismiss) ("Here, while UMB is a bank, the alleged fraud had nothing to do with UMB's status *as a bank*—rather, the fraud concerned UMB's position *as a trustee*, a position that could have just as easily been occupied by a non-bank person or entity, and that has nothing to do with the banking system."), *aff'd sub nom. UMB Bank, N.A. v. Guerin*, 89 F.4th 1047 (8th Cir. 2024).

Limiting Section 1344 to schemes involving the core functions of the federal banking system is also consistent with how courts limit Section 1014 to lending activities by financial institutions. *See, e.g., Williams v. United States*, 458 U.S. 279, 288–89 (1982) (noting that Section 1014 is restricted to statements "in connection with conventional loan or related transactions"); *United States v. Krown*, 675 F.2d 46, 50–51 (2d Cir. 1982) ("We agree that [Section] 1014 is not designed to have general application to the passing of worthless checks, and that the language of the statute, limiting it to the specified credit transactions, must be given effect. The Second Circuit has warned against construing [Section] 1014 in such a manner as to transform what would normally be state criminal offenses into federal crimes." (citation omitted)); *United States v. Chacko*, 169 F.3d 140, 147 (2d Cir. 1999) (reciting the elements of a Section 1014 violation and requiring a statement "made for the purpose of influencing the institution to make a loan or advance").

## II.    Counts Two Through Four Are Duplicitous

Separately, Counts Two through Four should be dismissed because they are duplicitous. Fed. R. Crim. P. 12(b)(3)(B)(i). As alleged, each count combines into a single scheme to

defraud entirely separate schemes involving different banks. This fails Rule 12(b)(3) because it does not provide constitutionally adequate notice of the conduct with which Mr. Amar is charged, and because it undermines the Double Jeopardy Clause.

### A.    Applicable Law

An indictment is impermissibly duplicitous where (1) "it combines two or more distinct crimes into one count" and (2) "the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (citing Rule 8(a)'s requirement that there be a "separate count for each offense"); *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992). The law prohibits duplicitous pleading for several reasons: (1) "avoiding the uncertainty of [] a general verdict of guilty . . . as to one crime and a finding of not guilty as to another," (2) "avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged," (3) "assuring the defendant adequate notice," (4) "providing the basis for appropriate sentencing," and (5) "protecting against double jeopardy in a subsequent prosecution." *United States v. Margiotta*, 646 F.2d 729, 732–33 (2d Cir. 1981).

Where duplicitous counts would prejudice a defendant, and a motion timely is brought in advance of trial, the appropriate remedy is to dismiss. *See Rigas*, 605 F.3d at 210 ("An impermissibly duplicitous indictment is subject to dismissal."). Courts in the Second Circuit have, of course, held that a duplicitous pleading can be remedied by allowing the Government to elect to proceed on one of the alleged conspiracies for each count, *see Sturdivant*, 244 F.3d at 79; *United States v. Abakporo*, 959 F. Supp. 2d 382, 391 (S.D.N.Y. 2013); or through an instruction requiring that all members of the jury unanimously agree on the specific offense proven by the Government, *see United States v. Willis*, 475 F. Supp. 2d 269, 273 (W.D.N.Y. 2007).

But where, as here, the ongoing harm caused by jumbling together distinct schemes cannot be promptly remedied by these alternative remedies, the duplicitous counts should be

dismissed. *See United States v. Pleasant*, 125 F. Supp. 2d 173, 175–83 (E.D. Va. 2000) (dismissing duplicitous counts pretrial because of potential harm that could result by allowing the government to proceed on the indictment as charged); *United States v. Conley*, 826 F. Supp. 1536, 1544–48 (W.D. Pa. 1993) (dismissing duplicitous count pretrial where "potential prejudice abounds"); *United States v. Bessigano*, No. 08-cr-110 (JTM), 2008 WL 4833110, at *3 (N.D. Ind. Nov. 4, 2008) ("[B]ecause defendant properly raised this issue before trial, the proper remedy is dismissal of the duplicitous count, rather than trying to clarify the indictment via jury instructions."); *United States v. Schock*, No. 16-cr-30061 (CSB), 2017 WL 4780614, at *21 (C.D. Ill. Oct. 23, 2017) (dismissing charge as impermissibly duplicitous), *aff'd in part*, *appeal dismissed in part*, 891 F.3d 334 (7th Cir. 2018).

**B.     Discussion**

**1.     Counts Two Through Four Improperly Plead a Single Scheme to Defraud**

Counts Two through Four allege two separate courses of conduct carried out against two distinct entities, involving different participants and financial institutions as well as alleged misrepresentations. As to the first scheme, Ms. Javice allegedly misrepresented to Bank-1 Frank's number and definition of users. Compl. ¶ 18(a). By these same allegations, Mr. Amar was not involved in the scheme to defraud Bank-1, nor was he privy to Ms. Javice's misrepresentations to Bank-1. *See* Compl. ¶ 18. This stands in stark contrast to the alleged scheme to defraud JPMC, where the Government tries (minimally, and unsuccessfully) to implicate Mr. Amar, and where Ms. Javice allegedly provided "artificial, synthetic data" to JPMC to close the merger. *Accord United States v. Tanner*, 471 F.2d 128, 139 (7th Cir. 1972) (finding count duplicitous where it involved multiple defendants who were charged with transporting explosives on numerous dates, over the course of a few months, and involved the varied participation of the different defendants).

Mr. Amar stands to suffer significant prejudice if the duplicitous counts are not dismissed or otherwise promptly remedied. As long as the Indictment exists as written, the Government gets to "roll the dice" and not just "preserve" but exploit "the confusion," which risks "infringement of [Mr. Amar's Fifth and Sixth Amendment] rights," regardless of whether the defective charging instrument is ultimately cured. *United States v. Hardy*, 762 F. Supp. 1403, 1410 (D. Haw. 1991) (dismissing money laundering count for duplicity even though it was not "vague").

The prejudice is greater if the Indictment is not dismissed or otherwise remedied. If the jury were to return a guilty verdict on any count—an outcome in no way anticipated—it would be impossible to discern whether that conviction rests upon knowingly participating in a scheme to defraud JPMC or, separately, Bank-1, or whether the jury unanimously agreed on both schemes. In turn, on appeal, for example, the Government could defend the conviction on a scheme the jury in fact rejected, which could deprive Mr. Amar of double jeopardy protections. Relatedly, if the jury were to unanimously agree that Mr. Amar was not involved whatsoever in the scheme as to Bank-1—a likely outcome given the nonexistent allegations in the charging instruments—but hang on his involvement as to JPMC, the Government would be able to retry Mr. Amar for conduct as to both banks in violation of the Double Jeopardy Clause. *Yeager v. United States*, 557 U.S. 110, 119 (2009) (precluding Government "from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial").

## 2. Count Three Charges as One Scheme Conduct Against Multiple Financial Institutions

Count Three should also be dismissed because it charges Mr. Amar with knowingly participating in a scheme to defraud two financial institutions, if not more, which contravenes the plain language of the bank fraud statute.

An element of bank fraud is that the alleged victim be "a financial institution" as defined by federal law. 18 U.S.C. §§ 20, 1344. As that language indicates, the victim must be *one*

financial institution. *See United States v. Farmigoni*, 934 F.2d 63, 66 (5th Cir. 1991) (reading

bank fraud count "within the context of the clearly singular wording of the statute, which makes

it a crime to defraud *a financial institution*," and finding on that basis that the defendant's guilty

plea extended only to his conduct with respect to the one financial institution identified by

name in the indictment, and not the "other financial institutions" vaguely referenced there);

*United States v. Hinton*, 127 F. Supp. 2d 548, 554 (D.N.J. 2000) ("The plain language of the

statute defines one of the elements of bank fraud as a scheme to defraud 'a financial institution,'

not a scheme to defraud financial institutions."). Count Three is duplicitous because it charges

schemes to defraud with respect to at least two financial institutions—JPMC and Bank-1—not

to mention, apparently, other unspecified "potential acquiring companies." Indictment ¶ 5.

### III.     In the Alternative, the Government Should Provide a Bill of Particulars

If the Court does not dismiss the Indictment, it should order the Government to provide

Mr. Amar with a bill of particulars specifying:[18]

1.     Each material misrepresentation attributable to Mr. Amar, including the date, content, form, by whom and to whom the misrepresentation was made, any witnesses, the manner of alleged falsity, the circumstances indicating how Mr. Amar allegedly knew about each misrepresentation, and the manner in which Mr. Amar allegedly concealed each misrepresentation;

2.     Each instance in which the Government alleges Mr. Amar engaged in conduct as part of a scheme to defraud Bank-1 and the manner in which that conduct was knowing and in furtherance of the fraud;

3.     Each instance in which the Government alleges Mr. Amar engaged in conduct as part of a scheme to defraud JPMC and the manner in which that conduct was knowing and in furtherance of the fraud;

4.     The specific documents constituting the "other purported user data files" allegedly sent by Ms. Javice to JPMC, as referenced in the Complaint;

5.     The factual bases for Mr. Amar's alleged knowledge of, involvement in, and/or concealment of, each "purported user data file" Ms. Javice allegedly sent to

---

[18] To the extent the Court declines to direct the Government to provide particulars with respect to Mr. Amar's role in the schemes inadequately alleged in the Indictment, Mr. Amar reserves his right to move for a severance or any other appropriate relief to address the lack of fair notice and disparity in allegations.

JPMC, including the date, content, form, recipient(s), the manner of alleged falsity, and the manner in which Mr. Amar allegedly concealed each misrepresentation;

6. The identity of all other "potential acquiring companies," as referenced in the Indictment or as anticipated to be part of the Government's affirmative case at trial;

7. The identity of all other "financial institutions," as referenced in the Indictment or as anticipated to be part of the Government's affirmative case at trial; and

8. The identity of all named and unnamed co-conspirators as alleged in the Indictment, the Complaint, and the Government's proffers to the Court.

## A. Applicable Law

Under Rule 7, where the Indictment fails to inform a defendant of "the essential facts constituting the offense charged," *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013), a defendant may seek a bill of particulars to specify the "nature of the charge[s]," *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); Fed. R. Crim. P. 7(c)–(f). A bill of particulars enforces "basic principles of fundamental fairness" in the Fifth and Sixth Amendments. *Russell*, 369 U.S. at 765–66; *Bortnovsky*, 820 F.2d at 574.

Courts have "very broad discretion" to grant a bill of particulars. *Will v. United States*, 389 U.S. 90, 99 (1967). The "essential question" is whether the defense can "conduct a meaningfully directed investigation of the relevant facts and circumstances and be prepared to respond to the charges." *United States v. Ray*, No. 20-cr-110 (LJL), 2021 WL 3168250, at *3 (S.D.N.Y. July 27, 2021) (quotation marks and citation omitted). While a bill of particulars cannot cure a constitutionally defective indictment, it is appropriate when a skeletal indictment forecloses notice and creates unfair surprise. *United States v. Upton*, 856 F. Supp. 727, 740–41 (E.D.N.Y. 1994) (internal quotation marks and citations omitted). "[A] bill of particulars will be required even if the effect is disclosure of the Government's evidence or theories, if necessary to give the defendant enough information about the charge to prepare his defense." *United States v. Kaplan*, No. 02-cr-883 (DAB), 2003 WL 22880914, at *13 (S.D.N.Y. Dec. 5, 2003).

### B. Discussion

#### 1. The Government Must Specify All Alleged Misrepresentations and Circumstances Indicating Mr. Amar's Knowledge and Concealment of Them

First, the Complaint fails to allege that Mr. Amar knew about any purported misrepresentations at any point during the conspiracy period, never mind knowingly concealed them. In a false statements case like this one, "[t]he starting point for everything is the statement," *United States v. Clifford*, 426 F. Supp. 696, 703 n.4 (E.D.N.Y. 1976), so the Government must identify which statements they intend to prove are false and the circumstances establishing Mr. Amar's knowledge and concealment of those statements— including speaker, date, content, form (*i.e.*, written or oral), to whom the statement was made, witnesses, manner of falsity, manner of knowledge, and manner of concealment. *Id.* ("If th[is] threshold information given is not correct, the defendant is hampered."). At present, the Government simply assumes that Mr. Amar knows what he did and heard, "a premise inconsistent with the presumption of innocence" as well as the burden of proof. *United States v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998).

*United States v. Holmes*, No. 18-cr-258 (EJD), 2020 WL 666563 (N.D. Cal. Feb. 11, 2020), is instructive. There, despite lengthy charging documents and "immense" discovery totaling 20 million pages, the court ordered the Government to identify "the specific implicit and explicit false and fraudulent misrepresentations . . . , what about them is false, [ ] who made them, and [ ] how Defendants caused them to be made." *Id.* at *9. Similarly, in *Trie*, 21 F. Supp. 2d 7, the court ordered the same particulars on the grounds that "[a] defendant faced with false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against" or, as critically, "which contributors may be witnesses against him." *Id.* at 21; *see Will*, 389 U.S. at 99, 101 (it is "not uncommon for the Government to be required to disclose the names of some potential witnesses in a bill of particulars," and

the "complex nature" of prosecution favored the identification of witnesses alleged to have heard "incriminating statements," and vacating order denying bill of particulars).

The Criminal Complaint and the Government's partial proffers have done little to clarify what the false statements are or how Mr. Amar knew about and concealed those statements. *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000) (courts must "examine the totality of the information available to the defendant" including Government's "affirmations"). In the Complaint, for instance, the Government alleges that Ms. Javice misrepresented the definition of a Frank user. Compl. ¶¶ 18(a)-(b). But in describing the schemes to the Court, the Government has stated Frank's users were not "real people," January 18, 2024 Hr'g Transcript at 8:16-21, ECF No. 101, and the data Frank provided to Chase was "synthetic," *i.e.*, "these people were made up," *id.* at 9:2–8. Not only that, in the Indictment, the Government alleges that Mr. Amar conspired to commit fraud by "submitting false statements and fraudulent statements" about Frank's users, "*among other things.*" Indictment ¶¶ 1–5 (emphasis added). Mr. Amar is entitled to know the exact false statements, the topics they pertain to, and how he is supposed to have known about (and hid) them. Again, the court in *Holmes* ordered particulars in part for this reason: the Government's ambiguous, shifting theory of the case "only expand[ed] the scope of possible misrepresentations." 2020 WL 666563, at *9; *Russell*, 369 U.S. at 768 (finding the government was not "free to roam at large" or "shift its theory of criminality").

### 2. The Government Must Specify Mr. Amar's Conduct Indicating Knowledge of and Knowing Participation in a Scheme to Defraud

Second, even the Complaint's allegations that Mr. Amar knew about a scheme to defraud and knowingly participated in it are so "enigmatic" and "difficult to follow" that without further elaboration he is left guessing at the conduct he must answer for at trial and cannot "effectively prepare his defense." *Trie*, 21 F. Supp. 2d at 21.

As to the scheme to defraud Bank-1, which when read in the light most favorable to the Government is still mere background for the scheme to defraud JPMC, the Complaint is silent on Mr. Amar's role. It is tailored solely to Ms. Javice. There is no telling what theory of fraud the Government could present to the jury, or what acts they could claim implicate Mr. Amar as a knowing participant; any would be a surprise. *See, e.g.*, *United States v. Murgio*, 209 F. Supp. 3d 698, 723 (S.D.N.Y. 2016) (ordering bill of particulars clarifying co-defendant's conduct in bribery conspiracy, notwithstanding indictment "suggest[ing] . . . no such [bribes] exist" as to that defendant, because "the preparation necessary to defend against a claim that [he] aided and abetted a bribe looks very different from the preparation necessary to defend against a charge that he personally paid one"); *United States v. Carona*, No. 06-cr-224 (AG), 2008 WL 1970199, at *2 (C.D. Cal. May 2, 2008) (ordering bill of particulars because, "[a]lleging the very specific time frame of March 17, 2004 to August 16, 2007, but providing no allegations of specific acts occurring in that time frame, Count Five of the SSI does not enable Defendants to effectively prepare for trial, or to avoid surprise at trial").

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988), illustrates this point. There, the Second Circuit reversed a guilty verdict and remanded for a new trial because "[t]he indictment put[] [defendant] on notice that he [was] obliged to defend against extortionate schemes directed at one company, AEI, and companies associated with it in contemplation of a merger," but at trial he was "confronted with evidence of extortions aimed at entirely different companies." *Id.* at 1154. There is a distinct possibility of a similar outcome without a bill of particulars clarifying Mr. Amar's knowing participation in the scheme to defraud Bank-1.

As to the scheme to defraud JPMC, the Complaint hardly fares better. It alleges only that Mr. Amar received an email from Ms. Javice with a spreadsheet she said she sent to JPMC, attended a videocall on August 2 about the types and purchase of data, legally purchased student records, and sent an email four months after the merger, to JPMC's Marketing Executive, about

a marketing list, saying Ms. Javice would "take it from here." Compl. ¶¶ 32(a)(i)–(iii). Given what the Complaint claims Ms. Javice did, it is revealing what it does not allege about Mr. Amar's purported conduct—that it had any connection to the merger, the data validation exercise, synthetic data, Scientist-1, or Ms. Javice's prior misrepresentations. *United States v. Johnson*, 225 F. Supp. 2d 982, 1003 (N.D. Iowa 2002) ("[T]his court finds it 'somewhat troubling' that the government would be reluctant to provide the defendant, in advance of trial, with more specific information as to particular acts that she, herself, had committed." (quoting *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991))). It is as if the Complaint shoehorns in Mr. Amar—barely placing him in the vicinity of a scheme, never mind implicating him in it, and certainly not as a knowing participant who concealed a material misrepresentation.

Without a bill of particulars clarifying the nexus, if any, between Mr. Amar's innocuous alleged conduct and a scheme to defraud, Mr. Amar is left sifting through a vast universe of hundreds of statements and thousands of documents, spanning 18 months and two acquisition discussions, to unearth specifics on his supposed wrongdoing. Courts grant bills of particulars in cases precisely like this one, "where the indictment alleges criminal activity that spans a significant period of time and involves voluminous discovery, multiple actors, and complex transactions."[19] *United States v. Sutton*, No. 21-cr-0598 (PLF), 2022 WL 1183797, at *2 (D.D.C. Apr. 21, 2022). Indeed, the Government has an "obligation to particularize the nature of [a conspiracy] charge to a degree that might not be necessary in the prosecution of crimes of more limited scope." *Davidoff*, 845 F.2d at 1154.

---

[19] The Indictment alleges that the conspiracy lasted 18 months, from June 2021 to November 2022. Indictment ¶ 1. To date, JPMC has purported to produce to the Government "over one million pages of documents from 146 custodians." JPMC Reply ISO Motion to Quash at 1-2, ECF No. 86; *see also* January 17, 2024 Hr'g Transcript at 4:11-18, ECF No. 101. The Government has, in turn, produced 1,428,823 documents to defense counsel.

36

That is not all the Complaint omits. It asserts—in passing, at the end—that post-merger Ms. Javice "sent numerous other purported user datafiles to [JPMC]," some of which "were files containing data from the Vendor-2 Data Set that had been supplemented with the data purchased from Vendor-3." Compl. ¶ 32(b). Yet the Complaint never explains what these files are, when or why Ms. Javice sent them, whether or how Mr. Amar was involved in preparing or transmitting them, whether Mr. Amar knew about them, or how the files included misrepresentations about Frank's users. Nor does the Complaint allege that Mr. Amar had anything to do with Vendor-3. Absent specifics as to how this still vaguer allegation implicates Mr. Amar, if at all, he is left to speculate about the nature of the conduct with which he is charged. *Trie*, 21 F. Supp. 2d at 21-22.

Courts have ordered the Government to provide particulars for far less sweeping deficiencies. *Accord Trie*, 21 F. Supp. 2d at 23 (defendant "entitled to be advised of the particular contributions and financial transactions not already identified in the indictment upon which the government intends to rely at trial"); *United States v. Caine*, 270 F. Supp. 801, 807–07 (S.D.N.Y. 1967) (ordering bill of particulars, in false advertising case about fish lures, because indictment had no explanation of why representations were false or misleading); *United States v. Aispuro*, No. 08-cr-2936 (JB), 2010 WL 1404196, at *6 (D.N.M. Mar. 16, 2010) (ordering Government, in narcotics conspiracy, to specify fraudulent acts "for which it believes each Defendant is responsible"); *cf. United States v. Sterritt*, No. 21-cr-193 (KAM), 2023 WL 4140269, at *3–4 (E.D.N.Y. June 22, 2023) (denying motion for particulars about specific acts, but only because indictment alleged "when, to whom, or how [defendant] provided the investor materials . . . when to whom or how [defendant] made any representations to investors . . . and particulars as to [defendant's] alleged conduct in furtherance of the alleged crimes" (internal quotation marks omitted)).

While the Government devotes the entirety of the Complaint to implicating Ms. Javice in the alleged schemes, Mr. Amar is an afterthought. This overwhelming disparity in allegations warrants, at a minimum, greater specificity for Mr. Amar. *See United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (ordering Government, in a second bill of particulars, to identify five false statements "by defendant" because "the Indictment [wa]s less specific with respect to some defendants than with respect to others," and as to one defendant in particular, "little else [wa]s pled with respect to his role in the offense or the frauds" aside from two meetings he attended); *United States v. Ramirez*, No. 20-cr-022 (PAC), 2022 WL 865860, at *2 (S.D.N.Y. Mar. 23, 2022) (noting the "disclosure" as to one defendant was "not as richly detailed as the disclosures concerning [the other]," and denying a bill of particulars only because the government "represented that it intends to make additional disclosures closer to trial").

### 3. The Government Must Specify the Other "Potential Acquiring Companies"

Third, and last, the Court should order the Government to identify the other "potential acquiring companies" that Mr. Amar and Ms. Javice allegedly attempted to defraud, apart from JPMC and Bank-1. Indictment ¶ 5; 18 U.S.C. § 1344(1) (financial institution an element of bank fraud); *see Ray*, 2021 WL 3168250 at *4 (government identified all six individuals who were alleged victims of RICO enterprise and one additional potential victim following service of motion for bill of particulars requesting same); *United States v. Vasquez-Ruiz*, 136 F. Supp. 2d 941, 944 (N.D. Ill. 2001) ("There is no good reason to require the defendant to engage in guesswork to determine who the victims of the offense were.").

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Indictment. In the alternative, the Court should order the Government to provide the above-mentioned particulars to Mr. Amar.

Dated: April 5, 2024

Respectfully submitted,

*/s/Sean S. Buckley*
Sean S. Buckley
Steven G. Kobre
Alexandria E. Swette
Ana Frischtak
KOBRE & KIM LLP
800 Third Ave
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220
Sean.Buckley@kobrekim.com
Steven.Kobre@kobrekim.com
Alexandria.Swette@kobrekim.com
Ana.Frischtak@kobrekim.com

Sydney Sgambato Johnson (pro hac vice)
Jake Rush (pro hac vice forthcoming)
KOBRE & KIM LLP
1919 M Street, NW
Washington, DC 20036
Tel: (202) 664-1900
Fax: (202) 664-1920
Sydney.Johnson@kobrekim.com
Jake.Rush@kobrekim.com

*Counsel for Defendant Olivier Amar*