UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                   :

UNITED STATES OF AMERICA        :

                                   :

          - v. -              :    S1 23 Cr. 251 (AKH)

                                   :

CHARLIE JAVICE and           :
OLIVIER AMAR,                :

                                   :

                Defendants.      :

                                   :

------------------------------------------------------x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Rushmi Bhaskaran
Nicholas W. Chiuchiolo
Micah F. Fergenson
Dina McLeod
Assistant United States Attorneys

*- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................................1

BACKGROUND ...................................................................................................................3

    A.   The Offense Conduct ...................................................................................3

    B.   The Complaint, Indictment, and the S1 Indictment ...................................5

ARGUMENT .......................................................................................................................6

I.  The Court Should Deny the Defendants' Motions to Dismiss the S1 Indictment for Lack of Specificity and Failure to State an Offense ...........................................................................6

    A.   Applicable Law ...........................................................................................6

    B.   The S1 Indictment Properly Alleges the Crimes Charged ........................8

        1.   The S1 Indictment is Sufficiently Specific to Put Javice on Notice of the Nature of the Charged Frauds ...........................................................................10

        2.   The S1 Indictment is Sufficiently Specific as To Amar and Alleges Federal Crimes Against Amar ...................................................................13

        *3.*   The S1 Indictment Properly Alleges Wire Fraud Following the Supreme Court's Decision in *Ciminelli* ...............................................................................16

        4.   The S1 Indictment Adequately Alleges Materiality ................................17

        5.   The S1 Indictment Properly Alleges Bank Fraud ...................................19

II.  The Court Should Deny the Defendants' Duplicity Motion ................................................22

    A.   Applicable Law .........................................................................................22

    B.   The S1 Indictment is Not Duplicitous ......................................................23

    C.   Amar's Remaining Duplicity Arguments Are Meritless ..........................26

III.    The Defendants' Demand for a Bill of Particulars Should Be Denied .........................................27

    A.   Relevant Facts ...........................................................................................27

    1.   The Complaint .........................................................................................27

    2.   Additional Information Provided to Amar ................................................29

    3.   Rule 16 Discovery ...................................................................................30

    4.   Search Warrant Affidavits ........................................................................30

    B.   Applicable Law .........................................................................................31

    C.   Discussion .................................................................................................33

        1.   The Requests for Bills of Particulars ......................................................33

        2.   The Bill of Particulars as to "Unindicted Co-conspirators" Should Be Denied ..............35

        3.   The Bill of Particulars As to Any Potential Victim Should be Denied............................38

        4.   The Bill of Particulars as to Every Possible Misrepresentation Made During and in Furtherance of the Scheme Should be Denied ...................................................39

5.  Amar's Additional Requests for a Bill of Particulars as to The Details of the Proof Against Him Should be Denied ................................................................... 47

IV.  The Warrant Affidavit Established Probable Cause as Magistrate Judge Locke Found, and There is No Basis for Suppression ................................................................... 50

1.  Deference to Judicial Findings of Probable Cause .......................................... 53
2.  Overbreadth in Complex Investigations ......................................................... 55
3.  Particularity in Complex Investigations ......................................................... 56
4.  Good-Faith Reliance on Judicially Authorized Warrants ............................... 59

CONCLUSION ................................................................................................................ 71

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004)...............................21

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952) ...................................................7

*Bosio v. Norbay Sec., Inc.*, 599 F. Supp. 1563 (E.D.N.Y. 1985)………………………...……….16

*Coyne v. Los Alamos Nat's Sec.*, 15 Civ. 54, 2017 WL 3225466 (D.N.M. May 1, 2017)........................62

*Costello v. United States*, 350 U.S. 359 (1956) .............................................................................7

*Ciminelli v. United States*, 598 U.S. 306, 143 S. Ct. 1121 (2023) .............................................16

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018).................................................................53

*Franks v. Delaware*, 438 U.S. 154 (1978).....................................................................................69

*Golino v. City of New Haven*, 950 F.2d 864 (2d Cir. 1991)..........................................................59

*Groh v. Ramirez*, 540 U.S. 551 (2004) .........................................................................................57

*Hamling v. United States*, 418 U.S. 87 (1974)............................................................................7, 9

*Herring v. United States*, 555 U.S. 135 (2009)............................................................................58

*Illinois v. Gates*, 462 U.S. 213 (1983) ...............................................................................53, 54, 55

*In re 650 Fifth Ave.*, 934 F.3d 147 (2d Cir. 2019)………………………………………………67

*Kaley v. United States*, 571 U.S. 320 (2014) ...............................................................................53

*Kogan v. Nat'l Bank of N. Am.*, 402 F. Supp. 359 (E.D.N.Y. 1975)…………...……………….16

*Lamb v. Liberty Univ.*, 21 Civ. 55, 2022 WL 3692670 (W.D. Va. Aug. 25, 2022)...................62

*Loughrin v. United States*, 573 U.S. 351 (2014)...........................................................................20

*Miranda v. Arizona*, 384 U.S. 436 (1966)………………………………………………………69

*Neder v. United States*, 527 U.S. 1 (1999) ............................................................................. 17, 18

*Pepsico, Inc. v. W. R. Grace & Co.*, 307 F. Supp. 713 (S.D.N.Y. 1960)…………...……………16

*Russell v. United States*, 369 U.S. 749 (1962) ........................................................................7, 11

*S.E.C. v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007)…………………………...……………15

*S.E.C. v. Papa*, 555 F.3d 31 (1st Cir. 2009)…………………………………………...………16

*S.E.C. v. Narayan*, No. 16 Civ. 1417 (BML), 2017 WL 4652063 (N.D. Tex. Aug. 28, 2017)…………...16

*S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968)……………………………………15

*UMB Bank, N.A. v. Benton*, No. 21 Civ. 832 (BP), 2022 WL 16753765 (W.D. Mo. Jun. 29, 2022)……..21

*Williams v. United States*, 458 U.S. 279 (1982)…………………………………………………………..22

*Wilson v. Dalene*, 699 F. Supp. 2d 534 (E.D.N.Y. 2010)…………………………………………..….15

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) ...........................................54, 57, 58, 60, 66

*United State v. Curtis*, 506 F.2d 985 (10th Cir. 1974)..................................................... 12

*United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999)..................................................57

*United States v. Abrams*, 539 F. Supp. 378 (S.D.N.Y. 1982)………………………………………… 11

*United States v. Akhavan*, No. 20. Cr. 188 (JSR), 2020 WL 2555333 (S.D.N.Y. May 20, 2020)............. 40

*United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012)..................................................7

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) ...................................................8

*United States v. Amendolara*, No. 01 Cr. 694 (S.D.N.Y. Oct. 21, 2002)....................................35

*United States v. Anderson*, 747 F.3d 51 (2d Cir. 2014)………………………………………….…. 15

*United States v. Aracri*, 968 F.2d 1512 (2d Cir. 1992) ...................................................24

*United States v. Awan*, 459 F. Supp. 2d 167 (E.D.N.Y. 2006) ............................................. 11, 12

*United States v. Barrett*, 178 F.3d 643 (2d Cir.1999) ...................................................25

*United States v. Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003) .........................................32

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987)........................................31, 32, 40, 41

*United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016)...........................................20, 21

*United States v. Brewster*, No. 19 Cr. 833 (SHS), 2021 WL 3423521 (S.D.N.Y. Aug. 5, 2021)............... 17

*United States v. Buck*, 813 F.2d 588 (2d Cir. 1987).....................................................68

*United States v. Busch*, 18 Cr. 79, 2018 WL 5312759 (S.D. Ohio Oct. 25, 2018)…………………………19

*United States v. Carter*, No. 08 Cr. 51 (SSB), 2013 WL 12213387 (S.D. Ohio Sept. 30, 2013)…………………………………………………………………………………………………………15

*United States v. Chalmers*, 410 F. Supp. 2d 278 (S.D.N.Y. 2006) ........................................31

*United States v. Chime*, No. 11 Cr. 244, 2011 WL 3420717 (N.D. Ohio Aug. 4, 2011)...........................19

*United States v. Clark*, 638 F.3d 89 (2d Cir. 2011) ...............................................55, 59, 67, 68

*United States v. Clifford*, 426 F. Supp. 696 (E.D.N.Y. 1976)...........................................43

*United States v. Columbo*, No. 04 Cr. 273 (NRB), 2006 WL 2012511 (S.D.N.Y. July 18, 2006)............43

*United States v. Constantinescu*, No. 22 Cr. 612 (ASH), 2024 WL 1221579 (S.D. Tex. Mar. 20, 2024)..17

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012)…………..……………………………………...15

*United States v. Cordones*, No. 11 Cr. 205 (AKH) (S.D.N.Y. Mar. 17, 2022)...................................31, 35

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988)…..………………………..……………….41

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994)………………………………………..…….... 15

*United States v. D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010) ............................................................ 57

*United States v. Davis*, 471 F.3d 783 (7th Cir. 2006) .......................................................... 24

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021)...................................................... 8, 13, 16

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ................................................................. 7

*United States v. DiScala*, No. 14 Cr. 399, 2018 WL 1187394 (E.D.N.Y. Mar. 6, 2018) ........................ 23

*United States v. Dupree*, 781 F. Supp. 2d 115 (E.D.N.Y. 2011) ............................................. 55

*United States* v. *Falso*, 544 F.3d 110 (2d Cir. 2008)….. ...................................................... 68

*United States v. Fea*, No. 10 Cr. 708, 2011 WL 2119708 (S.D.N.Y. May 24, 2011) ............................... 38

*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987) ................................................... 44

*United States v. Fruchter*, 104 F.Supp.2d 289 (S.D.N.Y. 2000) .................................................. 67

*United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013) .......................................................... 55, 56

*United States v. Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001) ....................................................... 33

*United States v. Goldberg*, 756 F.2d 949 (2d Cir. 1985) ....................................................... 7

*United States v. Gonzalez-Arocho,* No. 22 Cr. 418 (PAD), 2024 WL 277507 (D.P.R. Jan. 25, 2024) ...... 63

*United States v. Gotti*, 42 F. Supp. 2d 252 (S.D.N.Y. 1999) ..................................................... 56

*United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999)…………………………………………..…15

*United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012) ...................................................... 42

*United States v. Hamilton,* 334 F.3d 170 (2d Cir. 2003) ........................................................ 14

*United States v. Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994)........................................................ 32

*United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010) ................... 55

*United States v. Hillie*, 227 F.Supp. 3d 57 (D.D.C. 2017)…….………………………………………11

*United States v. Hinton*, 127 F. Supp. 2d. 548 (D.N.J. 2000) ......................................................... 25

*United States v. Jacobson*, 4 F. Supp. 3d 515 (E.D.N.Y. 2014) ......................................... 55, 57, 65

*United States v. Jackson*, 926 F. Supp. 2d 691(E.D.N.C. 2013)………………………….………....16

*United States v. Jowers*, Nos. 96-6619, 96-6621, 1997 WL 539692 (6th Cir. 1997)………………..……15

*United States v. Kahale,* 14-3377-cr (2d Cir. Nov. 21, 2016)....................................................41

*United States v. Keuylian*, 23 F. Supp. 3d 1126, 1128 (C.D. Cal. 2014).................................... 12

*United States v. Klein,* 476 F.3d 111 (2d Cir. 2007)...................................................................18

*United States v. Lake*, 233 F. Supp. 2d 465 (E.D.N.Y. 2002)......................................................65

*United States v. Lauria*, 70 F.4th 106 (2d Cir. 2023)...............................................................63

*United States v. Lazarenko*, 564 F.3d 1026 (9th Cir. 2009).......................................................15

*United States v. Leon*, 468 U.S. 897 (1984)..............................................................................58, 66

*United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) ..................55, 67

*United States v. Lewis*, 594 F.3d 1270 (10th Cir. 2010)............................................................15

*United States v. Love*, 859 F. Supp. 725 (S.D.N.Y. 1994)........................................................35

*United States v. Lustyik*, 57 F. Supp. 3d 213 (S.D.N.Y. 2014)......................................55, 57, 65

*United States v. Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ...............................31, 32, 43

*United States v. Margiotta*, 646 F.2d 729 (2d Cir. 1981) ........................................................23, 24

*United States v. Marti*, 421 F.2d 1263 (2d Cir.1970) ...............................................................65

*United States v. Martin*, 426 F.3d 68 (2d Cir. 2005) ...............................................................53

*United States v. Martinez*, No. 22 Cr. 251 (LJL), 2023 WL 2403134 (S.D.N.Y. Mar. 8, 2023).....40, 46, 48

*United States v. Martino*, 664 F.2d 860 (2d Cir. 1981) ...........................................................53

*United States v. Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001).................................................31

*United States v. Moloney*, 287 F.3d 236 (2d Cir. 2002)...........................................................22

*United States v. Mora*, No. 19 Cr. 514 (JPO) (S.D.N.Y. Dec. 21, 2020)..................................44

*United States v. Morse*, 785 F.2d 771 (9th Cir. 1986...............................................................23

*United States v. Moses*, No. 02 Cr. 040, 2002 WL 32351156 (E.D. Pa. Apr. 5, 2002) ..............47

*United States v. Murphy*, No. 21 Cr. 280 (AKH) (S.D.N.Y. Apr. 28, 2022) .............................31

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ............................................36

*United v. Nance*, 533 F.2d 699, 700-702 (D.C. Cir. 1976 )......................................................11

*United States v. Nicolo*, 523 F. Supp. 2d 303, 317 (W.D.N.Y. 2007), aff'd, 421 Fed. App'x 57 (2d Cir. 2011).......................................................................................................................................35

*United States v. Olmeda*, 461 F.3d 271 (2d Cir. 2006)..............................................22, 23, 26

*United States v. Omer*, 395 F.3d 1087 (9th Cir. 2005)............................................................19

*United States v. Orena*, 32 F.3d 704 (2d Cir. 1994).................................................................39

*United States v. Panza*, 750 F.2d 1141 (2d Cir. 1984).............................................................32

*United States v. Patane,* 542 U.S. 630, 637-42 (2004)............................................................70

*United States v. Patrisso*, 262 F. 2d 194 (2d Cir. 1958)..........................................................15

*United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) ...............................................................16

*United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287 (S.D.N.Y. 2018)................................................ 55, 58

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000)................................................................................ 11

*United States v. Raniere*, 384 F. Supp. 3d 282 (E.D.N.Y. 2019).......................................................... 42

*United States v. Ray*, No. 20 Cr. 110 (LJL), 2021 WL 3168250 (S.D.N.Y. July 27, 2021) ................ 37, 39

*United States v. Regan*, 706 F. Supp. 1102 (S.D.N.Y. 1989) ............................................................... 58

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007)……………………………………………...12

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007)……………………………………………...7

*United States v. Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003) ........................................................ 7, 25, 32

*United States v. Rigas*, 281 F.Supp. 2d 660 (S.D.N.Y. 2003)…………………………………………...25

*United States v. Riley*, 906 F.2d 841 (2d Cir. 1990) ........................................................................... 57

*United States v. Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003) ................................................. 31, 35, 38

*United States v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977)………...…………………………………...15

*United States v. Roy*, 783 F.3d 418 (2d Cir. 2015) ............................................................................. 14

*United States v. Sattar*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004).......................................................... 50

*United States v. Shi Yan Liu*, 239 F.3d 138 (2d Cir. 2000)................................................................ 56

*United States v. Smith*, 673 F. Supp. 3d 381 (S.D.N.Y. 2023)…...……………………………………70

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ...................................................... 7, 8, 10, 11, 13

*United States v. Sturdivant*, 244 F.3d 22 ........................................................................................... 22, 25

*United States v. Tajideen*, 319 F. Supp. 3d 445 (D.D.C. 2018) .......................................................... 44

*United States v. Tawik*, 391 F. App'x 94 (2d Cir. 2010)..................................................................... 23

*United States v. Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998) ...................................................................... 43

*United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989) ...................................................................... 22

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014)………...…………………………16

*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017) ....................................................................... 56

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ......................................................................... 6, 22

*United States v. Wagner,* 989 F.2d 69 (2d Cir. 1993) ....................................................................... 53, 66

*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018) .......................................................................... 7

*United States v. Weigand*, 482 F. Supp. 3d 224 (S.D.N.Y. 2020) ................................................. 18,19, 20

*United States v. Williams*, 504 U.S. 36 (1992) .................................................................................... 8

*United States v. Wuagneux*, 683 F.2d 1343 (11th Cir.1982).........................................................................65

*United States v. W.R. Grace*, 429 F.Supp. 3d 1307 (D. Mont. 2006)……………….…………………19

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008) ........................................... 6, 7, 8, 10, 16

*United States v. Young*, 745 F.2d 733 (2d Cir. 1984) ........................................................... 57, 58

*United States v. Yu*, No. 22 Cr. 208 (CBA), 2023 WL 4687970 (E.D.N.Y. July 21, 2023) .......................36

*United States v. Zeidman*, 540 F.2d 314 (7th Cir. 1976) ........................................................24

*United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013)........................................56

*Walczyk v. Rio*, 496 F.3d 139 (2d Cir. 2007) ...................................................................... 53, 54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                  :
UNITED STATES OF AMERICA      :
                                  :
        - v. -               :    S1 23 Cr. 251 (AKH)
                                  :
CHARLIE JAVICE and          :
OLIVIER AMAR,               :
                                  :
                Defendants.     :
------------------------------------------------------x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**

       The Government respectfully submits this memorandum of law in opposition to the pretrial

motions of Charlie Javice and Olivier Amar, the defendants, seeking to dismiss the indictment and

various other relief. *See* Dkt. Nos. 114 (Javice motion to dismiss the indictment and for a bill of

particulars, or "Javice Mot."), 117 (Amar motion to dismiss the indictment and for a bill of

particulars, or "Amar Mot. to Dismiss"), and 119 (Amar motion to suppress, or "Amar Mot. to

Suppress").

**PRELIMINARY STATEMENT**

       On July 12, 2023, a grand jury returned Superseding Indictment 23 Cr. 251 (AKH) (the

"S1 Indictment") charging Javice and Amar with fraud offenses they committed as executives at

their financial aid start-up company, Frank—fraud that led a large financial institution to pay $175

million for their company and netted the defendants millions of dollars in profits.  The defendants

now ask the Court to spare them from a trial on the merits on any of the S1 Indictment's four

counts, arguing the allegations against them lack specificity and do not amount to crimes.  In the

alternative, the defendants ask the Court to supply the defendants with an itemized list of the

Government's trial proof.  Finally, Amar argues for the suppression of evidence from a lawful search warrant issued by a United States magistrate judge.

The law does not afford the defendants the extraordinary pre-trial relief they seek. When a charge contains the essential elements of the offense and gives notice of the core criminality at issue, as those in the S1 Indictment do, nothing more is required to justify a trial on the merits.   In addition, a recurring theme in Amar's motions is that Amar has not committed any crimes, and therefore all four counts are invalid.  But that is an argument for a jury, not a basis for dismissal.

Nor do the defendants offer any argument to warrant the extraordinary requests for particulars that they seek.  The defendants' desire for the details of the Government's case is not a basis upon which to seek a bill of particulars.  The defendants have been given fair notice of the charges against them, including in the detailed Complaint, text-searchable discovery, hand-selected excerpts of communications provided by the Government, and more.  The defendants have more than adequate information to prepare for trial and the request for particulars is simply an attempt to learn more about the Government's case than that to which they are entitled.

Amar also encourages the Court to substitute his assessment of the evidence for that of Magistrate Judge Steven I. Locke, who found probable cause, based on the warrant affidavit to believe a crime had been committed. But this Court must read the warrant as a whole and accord considerable deference to the issuing magistrate, so Amar's arguments fail from the start.

The defendants may not obtain dismissal of the charges, detailed particulars of the Government's case, and suppression of the evidence merely because they assert their innocence. The defendants' motions should be denied in their entirety.

BACKGROUND

### A.  The Offense Conduct

In 2021, defendants Javice and Amar engaged in a calculated scheme to falsely and dramatically inflate the number of customers of their company, Frank, in order to fraudulently induce J.P. Morgan Chase ("JPMC") to acquire Frank for $175 million.  *See, e.g.*, Compl. ¶ 8.[1]

In or about 2017, Javice founded Frank, a for-profit company that offered an online platform designed to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA").  The FAFSA is a federal government form, available free of charge, that students use to apply for financial aid for college or graduate school.  Javice was Frank's CEO.  *See, e.g.*, Compl. ¶¶ 9, 15-16.  Amar was Frank's Chief Growth Officer.  In or about 2021, Javice began to pursue the sale of Frank to a larger financial institution.  Two major banks—one being JPMC, with the other identified as "Bank-2" in the Complaint and the S1 Indictment—expressed interest and began acquisition processes with Frank.  Javice represented repeatedly to JPMC and Bank-2 that Frank had 4.25 million customers or "users."  Javice explicitly defined "users"—to both banks— as individuals who had signed up for an account with Frank and for whom Frank therefore had at least four identified categories of data (*i.e.*, first name, last name, email address, and phone number).  In fact, Frank had fewer than 300,000 users.  *See, e.g.*, Compl. ¶¶ 10, 18-19, 22-23.

Bank-2 ultimately declined to acquire Frank, but JPMC's acquisition process continued. When JPMC sought to verify the number of Frank's users and the amount of data collected about those users—information that was critical to JPMC's decision to move forward with the acquisition process—Javice fabricated a data set.  In order to do this, Javice and Amar first

---

[1] Citations to "Compl." refer to the criminal complaint.

approached a Frank employee and asked him to create a synthetic data set using, as a starting point, a smaller set of actual Frank data.  The employee raised concerns about the legality of the request, and ultimately declined.  *See* Compl. ¶ 22.

Javice then approached a data scientist and hired him to create an artificially-generated data set (a so-called synthetic data set).  Then, Javice provided that synthetic data set to an agreed-upon third-party vendor for the purpose of confirming to JPMC that the data set had over 4.25 million rows, consistent with Javice's misrepresentations. Through this process, Javice caused the third-party vendor to convey to JPMC that the data set had over 4.25 million entries.  *See, e.g.*, Compl. ¶¶ 11, 21, 24-26.

In reliance on Javice's fraudulent representations about Frank's users, JPMC agreed to purchase Frank for $175 million. Javice and Amar made millions of dollars from the acquisition. *See, e.g.*, Compl. ¶¶ 12, 31.

Unbeknownst to JPMC, at or about the same time that Javice was creating the fabricated data set, Javice and Amar sought to purchase, on the open market, real data for over 4.25 million college students to cover up their lies.  Javice and Amar succeeded in purchasing a data set of 4.5 million students for $105,000, but it did not contain all the data fields that Javice had represented to JPMC were maintained by Frank.  Javice then purchased an additional set of data on the open market, in order to augment the data set of 4.5 million users.  After JPMC acquired Frank, JPMC employees asked Javice and Amar to provide the data set of Frank users so that JPMC could begin a marketing campaign to those users.  In response, Javice and Amar provided what was supposedly Frank's user data.  In fact, Javice and Amar provided the data they had purchased on the open market, at a small fraction of the price that JPMC paid to acquire Frank and its purported users. *See, e.g.*, Compl. ¶¶ 13, 28-30, 32.

### B.  The Complaint, Indictment, and the S1 Indictment

On March 31, 2023, a criminal complaint ("Complaint") was authorized by the Honorable Robert W. Lehrburger which charged defendant Charlie Javice in four counts with violations of Title 18, United States Code, Section 1349 (conspiracy to commit bank and wire fraud), 1343 (wire fraud); 1344 (bank fraud) and Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud).  (*See* Dkt. No. 1).

Judge Lehrburger signed an arrest warrant for Javice, which was executed on April 3, 2023. Also on April 3, 2023, the Honorable Steven I. Locke of the Eastern District of New York issued a search warrant to search Amar's person and premises for electronic devices, upon a finding of probable cause that those devices contained evidence, fruits, and instrumentalities of a scheme to submit false statements and information about a company, TAPD, Inc., d/b/a Frank ("Frank"), in order to induce JPMC to acquire Frank for approximately $175 million and to cover up that scheme by continuing to make false statements to JPMC, in violation of 18 U.S.C. §§ 1349 (conspiracy to commit bank and wire fraud); 1343 (wire fraud); 1344 (bank fraud); and 2 (aiding and abetting); and 15 U.S.C. §§ 78j(b) & 78ff, and 17 C.F.R. § 240.10b-5 (securities fraud).  On the same day that Javice was arrested, federal law enforcement agents seized Amar's cellphone pursuant to the search warrant.

On May 18, 2023, a grand jury in this District issued an Indictment charging Javice with the same four counts as in the Complaint.  On July 12, 2023, a grand jury in this District issued the S1 Indictment charging Javice and Amar in the same four counts.

**ARGUMENT**

### I.     The Court Should Deny the Defendants' Motions to Dismiss the S1 Indictment for Lack of Specificity and Failure to State an Offense

The defendants move to dismiss all counts in the S1 Indictment on the grounds that it: (1) lacks specificity as to Javice and Amar (Javice Mot. at 6-9; Amar Mot. to Dismiss at 13-19); (2) fails to state an offense against Amar (Amar Mot. to Dismiss at 19-25); (3) charges a "right-to-control" wire fraud theory that was struck down in *Ciminelli v. United States*, 598 U.S. 306 (Amar Mot. to Dismiss at 22-25); (3) fails to allege materiality (Javice Mot. at 13-15); and (4) fails to state a claim for bank fraud (Javice Mot. at 9-13; Amar Mot. at 25-27).   These motions are meritless.   As discussed below, the charges in the S1 Indictment track the relevant statutes and provide the defendants with the approximate time and place of the alleged crimes, and the defendants' alleged misconduct falls within the heartland of what those statutes prohibit.   The defendants, moreover, have been given more than sufficient notice of the charges against them through the Complaint and the voluminous discovery in this case.

#### A.  Applicable Law

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"   *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (*quoting* Fed. R. Crim. P. 7(c)(1)).[2]   To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."   *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008).   Only in "very rare cases," such as those involving a refusal to answer questions before Congress, must an indictment specify "how a

---

[2] Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

particular element of a criminal charge will be met." *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) (discussing the special case of *Russell v. United States*, 369 U.S. 749 (1962)). Otherwise, an indictment is sufficiently specific if it "'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Stringer*, 730 F.3d at 124 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also Yannotti*, 541 F.3d at 127.

"Since federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012); *see also* Fed. R. Crim. P. 12(b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."). However, the indictment need only allege the "core of criminality" the Government intends to prove at trial, since the indictment is "read . . . to include facts which are necessarily implied by the specific allegations made." *United States v. Rigas*, 490 F.3d 208, 228-29 (2d Cir. 2007).

On a pretrial motion to dismiss pursuant to Fed. R. Crim. P. 12(b), the allegations in the indictment must be taken as true. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). The dismissal of an indictment is an "extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001); *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018) (holding

that dismissal of an indictment is a "drastic remedy" that should be utilized with caution and only in extreme cases.").

When a defendant has been given sufficient notice of the charges against him by means of, for example, a criminal complaint or discovery, prejudice will not have been shown, and the indictment should stand. *See, e.g.*, *Stringer*, 730 F.3d at 124 ("When the charges in an indictment have stated the elements of the offense and provided even minimal protection against double jeopardy, this court has repeatedly refused, in the absence of any showing of prejudice, to dismiss . . . charges for lack of specificity."); *Yannotti*, 541 F.3d at 127 (finding no prejudice where the government provided the defendant with ample discovery, allowing the defendant to be informed of the government's prosecution theory, "even if that information was not plead in the indictment."). Moreover, it is well settled that, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial," a facially valid indictment is not subject to challenge based on the quality or quantity of evidence. *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998); *see United States v. Williams*, 504 U.S. 36, 54 (1992). To that end, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). Rather, "[t]hat is something [courts] do after trial." *Id.* This is consistent with the well-established principle that summary judgment proceedings "do[ ] not exist in federal criminal procedure." *Id.*

**B. The S1 Indictment Properly Alleges the Crimes Charged**

The S1 Indictment tracks the relevant statutory language and provides the approximate times and places of the alleged offenses. In all counts, the S1 Indictment describes the scheme as one involving the defendants making false and fraudulent statements and representations about

Frank and its user data; it describes the victims of those scheme to include potential acquiring companies, Bank-1, and JPMC; and it states that the purpose of the scheme was (1) with respect to the wire fraud, bank fraud, and conspiracy counts, to defraud those victims of money, in the form of the acquisition price, salary, bonus, and other compensation, or (2) with respect to the securities fraud count, in connection with the acquisition of the equity shares, options, and warrants of Frank.  *See* S1 Indictment, ¶¶ 2-6.  In doing so, the S1 Indictment provides the defendants with a "plain, concise, and definite written statement of the essential facts constituting the offense charged" (*see* Fed. Rule. Crim. Proc. 7) and is more than sufficient to "fairly inform[ ] a defendant of the charge against which he must defend and "enable[ ] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117.

In addition to the S1 Indictment, the defendants have been given more than sufficient notice of the charges against them through discovery and court filings.  *See Stringer*, 730 F.3d. at 124-25.  For example, the Complaint contains over 20 pages of detailed factual allegations regarding the defendants' conduct.  In addition, the defendants have received approximately 1.3 million pages of text-searchable discovery.  This includes, among other things: search warrant affidavits setting forth factual allegations regarding both the defendants' conduct; information concerning the victims of the scheme, including JPMC, Bank-1, and the potential acquiring companies; documents containing the misrepresentations that were made to these victims; documents concerning Frank's user data, including the defendants' internal communications concerning that data; and JPMC's internal assessments of the Frank deal.  Under these circumstances, the defendants cannot complain that they are not on notice of the nature of the crimes with which they are charged.  Accordingly, they have suffered no prejudice, and the S1 Indictment must stand.

### 1. The S1 Indictment is Sufficiently Specific to Put Javice on Notice of the Nature of the Charged Frauds

In the face of a properly alleged S1 Indictment, a detailed Complaint, and troves of discovery, Javice argues that she is "left to guess at what, exactly, [the defendants] are alleged to have done to carry out—and conspire to carry out—the charged schemes."  (Javice Mot. at 6). Javice, for example, complains that the S1 Indictment is "silent as to which statements were false or fraudulent, or when, how, and to whom they were made;" does not identify the specific electronic communications or monetary wires that were sent in connection with the scheme; and apart from JPMC, fails to identify any victim of the scheme.  *Id.*  But neither Rule 7 nor the case law requires the S1 Indictment to allege any such facts, particularly where, as here, the S1 Indictment tracks the statutory language; goes beyond the statutory language to describe the contours of the scheme; and is complemented by a detailed Complaint and voluminous discovery. *See Yannotti*, 541 F.3d at 127.

None of the cases Javice cites support her argument that the S1 Indictment fails to put her on notice on the crimes with which she is charged.   Javice starts with cherry-picked citations from the Second Circuit Court of Appeal's decision in *United States v. Stringer*.  (Javice Mot. at 7). But in *Stringer*, the Second Circuit found that, in light of the Government's other pretrial disclosures, the defendant understood the pertinent details of his alleged offense, and that the language of the operative indictment—which tracked the statutes of the crimes charged—sufficed to protect him from double jeopardy.  *Stringer*, 730 F.3d at 124-25 ("The government had provided him with the criminal complaint, which outlined his crimes in detail, as well as disclosures that included the victims' names, well in advance of trial.  Taking these disclosures into account, it is beyond question that Stringer was sufficiently informed to defend against the charges and to be protected against the risk of double jeopardy. . .").  The same is true here:  the

defendants cannot reasonably deny that they understand that they are alleged to have made false misrepresentations about Frank and its users to potential acquiring companies, Bank-1, and JPMC, in order to obtain millions of dollars.

Many of the cases on which Javice relies have nothing to do with the fraud statutes charged here.[3]  For example, *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000), concerned various tax crimes—which the court described as "[o]ne of the most esoteric areas of the law"—that had an element of willfulness "predicated upon a voluntary, intentional violation of a known legal duty." *Pirro*, 212 F.3d at 90.  The *Pirro* court dismissed certain allegations in the indictment predicated on a willful failure to report an ownership interest in an S corporation because there was no known legal duty to report any such ownership interest, and accordingly those allegations did not charge a crime.  *Id.* at 90-91.  That is a far cry from this case, where none of the charged crimes rely on the existence of known legal duties.  Equally inapplicable is *United States v. Awan*, 459 F. Supp.

---

[3] Javice's citation to the Supreme Court's decision in *Russell v. United States*, 369 U.S. 749 (1962) is particularly unavailing.  The Second Circuit has described *Russell* as "a 50 year-old precedent, which is one of the very rare cases in which an indictment that tracked the statutory language and furnished the pertinent dates was held insufficient."  *Stringer*, 730 F.3d at 125.  The Circuit went on to stress the unique facts of *Russell*, which arose in the prosecution of a witness for refusing to answer questions during the notorious McCarthy hearings of the early 1950s.  *Id.* at 125-26 (*citing United States v. Resendiz-Ponce*, 549 U.S. 102 (2007)).  Other cases Javice cites in support of her motion are easily distinguishable because the underlying indictments, unlike here, did not provide sufficient notice of the charged crimes.  *See United v. Nance*, 533 F.2d 699, 700-702 (D.C. Cir. 1976 ) (dismissing counts charged under D.C. law but upholding a federal wire fraud count because it "completely charges the factual basis for the alleged crime"); *United States v. Hillie*, 227 F. Supp. 3d 57, 72 (D.D.C. 2017) (dismissing an indictment charging child pornography offenses because the indictment was "barren of factual averments regarding the what, where, or how of Hillie's conduct, and thus, a non-clairvoyant reader cannot possibly ascertain the substance of the government's accusations from the face of the charging instrument"); *United States v. Abrams*, 539 F. Supp. 378, 384 (S.D.N.Y. 1982) (dismissed two obstruction of justice counts which, while tracking the statutory language, provided "no other factual specifics").  Here, by contrast, the S1 Indictment provides numerous specifics as to the charged crimes, including the nature of the false and fraudulent representations, the intended victims, and the purpose of the scheme.

2d 167 (E.D.N.Y. 2006), which concerned an indictment charging a defendant with providing material support to terrorists in violation of Title 18, United States Code, Section 2339A.  In that case, the indictment referred only to Section 2339A's broad statutory definition of "material support"—but the statute goes on to define numerous specific categories of material support, ranging from the provision of financial support, to the provision of weapons or safe houses.  *Awan*, 459 F. Supp. 2d at 175.  In these circumstances, the court held that it could not ascertain which kind of material support the grand jury considered, and dismissed the indictment.  *Id*.  Section 2339A, however, bears no resemblance to the statutes charged in the S1 Indictment, none of which contain terms that are defined in the statute to encompass multiple kinds of liability.

Only two cases cited in Javice's motion, both of which are from outside this District, concern the statutes charged here, and both are easily distinguished.  In those cases, the root concern was that the indictments failed to make the defendants aware of what they were alleged to have done wrong, leaving them unable to defend their cases or plead double jeopardy against future prosecutions.  *See United State v. Curtis*, 506 F.2d 985, 989 (10th Cir. 1974) (dismissing an indictment the court described as "confusing as well as vague," and which failed to identify the fraudulent scheme in which the defendant participated); *United States v. Keuylian*, 23 F. Supp. 3d 1126, 1128 (C.D. Cal. 2014) (dismissing an indictment that tracked the statutory language but only alleged "a willful breach of contract.").  Here, by contrast, the S1 Indictment clearly informs the defendants that they are alleged to have engaged in a fraudulent scheme involving misrepresentations about Frank and its users to obtain money from potential acquiring companies, JPMC, and Bank-1.

### 2. The S1 Indictment is Sufficiently Specific as To Amar and Alleges Federal Crimes Against Amar

While conceding that the S1 Indictment tracks the statutory language (*see* Amar Mot. to Dismiss at 23), Amar contends that the S1 Indictment fails to: (1) adequately specify whether Amar made or knew of any materially false statements (Amar Mot. to Dismiss at 13-15); (2) adequately allege with specificity that Amar participated in the scheme knowingly, willfully, and with the intent to defraud (*id.* at 15-17); and (3) and does not adequately allege conspiracy (*id.* at 17-19). Relatedly, Amar argues that the S1 Indictment fails to state a claim that: (1) Amar made or knew any materially false statements were made in connection with the sale of Frank (*id.* at 20-21); and (2) that his conduct after the Frank acquisition is not a basis for criminal liability (*id.* at 21-22). These arguments are specious. As discussed above, the S1 Indictment properly tracks the relevant statutory language and provides Amar with the approximate time and place of the charged crime. Amar also has more than sufficient notice of the crimes charged from his counsel's discussions with the Government, the Complaint, and the voluminous discovery. Amar's arguments, moreover, amount to challenges to the sufficiency of the Government's evidence, which is not a basis for dismissal of an indictment. *Dawkins*, 999 F.3d at 780.

With respect to Amar's specificity challenges (Amar Mot. to Dismiss at 13-19), the S1 Indictment properly alleges the requisite *mens rea* in each count. *See* S1 Indictment, ¶ 1 (Amar "willfully and knowingly" engaged in a conspiracy); ¶ 4 (Amar "knowingly engaged in a wire fraud scheme); ¶ 5 (Amar "knowingly" engaged in a bank fraud scheme); ¶ 6 (Amar "willfully and knowingly" engaged in securities fraud). The S1 Indictment also properly alleges that the defendant participated in a conspiracy. *Id.* ¶ 1 (Amar "willfully and knowingly combined, conspired, confederated and agreed" to commit wire fraud and bank fraud). Because the S1

Indictment tracks the statutory language and provides the defendant with adequate notice of the crimes charged, the S1 Indictment should stand. *Stringer*, 730 F.3d at 124.

Amar's arguments also suffer from fundamental misconceptions about criminal liability under the charged statutes. For example, Amar complains that the S1 Indictment does not specify whether Amar himself made any materially false statements to Bank-1 and JPMC. (*See* Amar Mot. to Dismiss at 13-15). Amar, however, can be guilty of all crimes with which he is charged in the S1 Indictment even if he personally made no misrepresentations at all. Counts Two through Four of the S1 Indictment (the substantive counts) all charge Amar with aiding and abetting the commission of those offenses under Title 18, United States Code, Section 2, whereby a defendant is criminally liable "where the government proves that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime." *United States v. Hamilton,* 334 F.3d 170, 180 (2d Cir. 2003). Furthermore, Count One, which charges conspiracy to commit wire and bank fraud, does not require proof of an overt act. *See United States v. Roy*, 783 F.3d 418, 419 (2d Cir. 2015). Accordingly, the Government need not prove at trial—let alone allege—that Amar personally made any misrepresentations in connection with the charged schemes.

Amar's argument suffers from another fatal deficiency: while Amar purports to attack the S1 Indictment for failing to state a criminal offense—through his selective recitation of the Government's evidence—Amar's arguments actually amount to a challenge to the sufficiency of that evidence, essentially asking the Court to grant summary judgment in his favor. For example, Amar argues that "the Complaint does not allege that Mr. Amar said (or did) anything or had any

knowledge of what Ms. Javice allegedly said (or did)." [4]   (Amar Mot. to Dismiss at 14).   That is a

factual argument contesting the Government's proof, not a legal argument about the sufficiency of

the S1 Indictment.   (*See also* Amar. Mot. to Dismiss at 20-21 (arguing that the Government has

not alleged that Amar made or knew any materially false statements in connection with the sale of

Frank); *id.* at 16-17 (arguing that the Complaint does not allege facts showing that Amar knew

about the misrepresentations made to JPMC); *id.* at 17-19 (arguing that the Complaint does not

show Amar's agreement to join a conspiracy); *id.* at 21-22 (arguing that his conduct after the Frank

acquisition is not a basis for criminal liability)).   These jury arguments, moreover, rely almost

entirely on wholly inapposite case law involving summary judgment or sufficiency-of-the-

evidence challenges on appeal. [5]   Challenges to the sufficiency of the Government's evidence,

---

[4] *See also* Section III.C.5, *infra* (discussing evidence cited in Complaint and the discovery concerning Amar's participation in the charged schemes).

[5] In support of his "failure to state a claim" and specificity arguments, Amar relies on the following (inapposite) cases concerning challenges to the sufficiency of the Government's evidence or civil cases resolving motions for failure to state a claim or summary judgment.  *See United States v. Coplan*, 703 F.3d 46, 41, 47, 58 (2d Cir. 2012) (challenging sufficiency of the Government's evidence at trial); *United States v. Lewis*, 594 F.3d 1270, 1274–75 (10th Cir. 2010) (same); *United States v. Patrisso*, 262 F. 2d 194, 198–99 (2d Cir. 1958) (reversing conviction for evidentiary errors); *United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) (reversing conviction for insufficient evidence); *United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977) (overturning conspiracy conviction for insufficient evidence on an agreement among co-conspirators); *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) (upholding a conviction following a challenge to the sufficiency of the government's evidence for conspiratorial and substantive narcotics offenses); *United States v. Lazarenko*, 564 F.3d 1026, 1036–37 (9th Cir. 2009) (overturning wire fraud convictions for insufficient evidence because wire transfers were not in furtherance of the fraud); *United States v. Carter*, No. 08 Cr. 51 (SSB), 2013 WL 12213387, at *4 (S.D. Ohio Sept. 30, 2013) (denying a Rule 33 motion); *United States v. Jowers*, Nos. 96-6619, 96-6621, 1997 WL 539692 (6th Cir. 1997) (overturning conviction for insufficient evidence); *United States v. Guadagna*, 183 F.3d 122, 132 (2d Cir. 1999) (reviewing on appeal a district court's judgment of acquittal on two counts of wire fraud); *S.E.C. v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007) (deciding a summary judgment motion); *Wilson v. Dalene*, 699 F. Supp. 2d 534, 542 (E.D.N.Y. 2010) (deciding summary judgment and failure-to-state-a-claim motions); *S.E.C. v. Texas Gulf*

however, are not an appropriate basis to seek dismissal of an indictment and should be rejected. *Dawkins*, 999 F.3d at 780. Because the Government has not made "a full proffer of the evidence it intends to present at trial," the Government is entitled to a trial on the merits, and Amar's motion to dismiss on this basis must be denied. *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009).

### 3. The S1 Indictment Properly Alleges Wire Fraud Following the Supreme Court's Decision in *Ciminelli*

Having no basis to challenge the S1 Indictment's counts as charged—which involve millions of dollars in unlawful proceeds—Amar instead conjures an imagined indictment premised on the "right-to-control" theory of wire fraud, whereby the defendants only deprived JPMC of accurate information, and argues that such an indictment would not sufficiently allege a property interest under the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023). (Amar Mot. to Dismiss at 22-25). However, Amar concedes, as he must, that the S1 Indictment tracks the relevant statutory language (Amar Mot. to Dismiss at 23), which alone is a

---

*Sulphur Co.*, 401 F.2d 833, 860 (2d Cir. 1968) (affirming civil judgments as to certain defendants and dismissing the complaint as to other defendants); *Bosio v. Norbay Sec., Inc.*, 599 F. Supp. 1563, 1566 (E.D.N.Y. 1985) (resolving a motion to dismiss a civil complaint); *Kogan v. Nat'l Bank of N. Am.*, 402 F. Supp. 359, 361 (E.D.N.Y. 1975) (dismissing a civil complaint for failure to state a claim); *Pepsico, Inc. v. W. R. Grace & Co.*, 307 F. Supp. 713, 720 (S.D.N.Y. 1960) (granting motion for summary judgment; *S.E.C. v. Papa*, 555 F.3d 31, 38 (1st Cir. 2009) (granting motion to dismiss a civil complaint); *S.E.C. v. Narayan*, No. 16 Civ. 1417 (BML), 2017 WL 4652063, at *10 (N.D. Tex. Aug. 28, 2017) (dismissing a civil complaint).

Those cases that Amar cites that focus on the issue presented here—the sufficiency of a criminal indictment—either support the Government's position (*see United States v. Ulbricht*, 31 F. Supp. 3d 540, 550 (S.D.N.Y. 2014) (rejecting a motion to dismiss an indictment because it "adequately alleges both the elements of a narcotics conspiracy as well as the conduct alleged underlying the charges; the defendant is sufficiently on notice of the charges against him so as to preclude later issues of double jeopardy") or are easily distinguishable (*see United States v. Jackson*, 926 F. Supp. 2d 691, 703–04 (E.D.N.C. 2013) (dismissing obstruction conspiracy where the government conceded that a defendant's conduct was not committed in furtherance of the underlying conspiracy).

basis to deny the motion.  *See Yannotti*, 541 F.3d at 127; S1 Indictment, ¶¶ 2, 4 (alleging a scheme to "obtain money and property" tracking the language of section 1343); ¶¶ 3, 5 (alleging scheme to "obtain moneys, funds, credits, assets, securities, and other property" that was owned by, or in the custody and control of a financial institution, in the form of customer deposits and fees, tracking the language of 18 U.S.C. § 1344).  As a further indication of the S1 Indictment's reliance on a traditional property theory of wire fraud, the S1 Indictment specifically alleges that the purpose of the defendant's fraudulent schemes was to defraud the victims "out of millions of dollars—consisting of the acquisition price, as well as salary, bonus and other compensation" paid to the defendants as retained employees at JPMC.  *Id.*  If anything, Amar's arguments that his conduct could only amount to a scheme to deprive JPMC of valuable economic information is a jury argument—and it is not a basis to seek dismissal of a properly pleaded indictment.[6]

### 4.  The S1 Indictment Adequately Alleges Materiality

In each count, the S1 Indictment alleges that the defendants engaged in a scheme to defraud by making false and fraudulent statements and representations about Frank and its user data in order to defraud potential acquiring companies, including Bank-1 and JPMC, out of millions of dollars.   In other words, the S1 Indictment alleges that the defendants made material misrepresentations about Frank and its user data to induce potential acquiring companies, and ultimately, JPMC, out of millions of dollars through Frank's acquisition.  *United States v.*

---

[6]     Amar's reliance on *United States v. Constantinescu*, No. 22 Cr. 612 (ASH), 2024 WL 1221579 (S.D. Tex. Mar. 20, 2024), is misplaced.  In this case, the court held that the indictment in *Constantinescu* "indicates that losses to victims happened incidentally" and "[r]ather than plead a scheme aimed at harming someone's traditional property right, the scheme as pleaded is totally indifferent to its effect on the alleged victims."  2024 WL 1221579, at *5.  The opposite is true here:  the S1 Indictment clearly alleges that a traditional property interest—money—was the object of the defendants' scheme.

*Brewster*, No. 19 Cr. 833 (SHS), 2021 WL 3423521, at *5 (S.D.N.Y. Aug. 5, 2021) (holding that "fraud necessarily requires material misrepresentations").  Yet, ignoring the plain language of the S1 Indictment, Javice argues that that the indictment fails to allege "a material misrepresentation. . .an essential element of each offense."  (Javice Mot. at 13-15).  This argument is a red herring without support in the law.

In *Neder v. United States*, 527 U.S. 1 (1999), the Supreme Court held that materiality is an element of bank fraud, mail fraud, and wire fraud schemes proscribed in Title 18, United States Code, Sections 1344, 1341, and 1343.  Although the Supreme Court recognized that the text of those statutes did not refer specifically to materiality, the Supreme Court followed its "well-established rule of construction that where Congress uses terms that have accumulated settled meaning under. . .the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."  *Neder v. United States*, 527 U.S. at 21.  The Supreme Court then found that the well-settled, common law meaning of fraud "required a misrepresentation or concealment of a material fact."  *Id*. at 22 (emphasis in original).  Consequently, the Court held "materiality of falsehood" to be an element of these fraud statutes.  *Id*. at 25.

*Neder*, however, does not stand for the proposition that materiality must be specifically alleged in an indictment.  To the contrary, the Supreme Court found that the concept of materiality is essentially subsumed within the definition of fraud, and thus can be inferred as a required element when a scheme to defraud is charged.  *See Neder*, 527 U.S. at 21-25.  Indeed, in *United States v. Klein*, the Second Circuit Court of Appeals held that "an allegation of materiality can be

inferred from the use of the word fraud in the indictment." [7]  476 F.3d 111 (2d Cir. 2007); *see also*

*United States v. Chime*, No. 11 Cr. 244, 2011 WL 3420717, at *2 (N.D. Ohio Aug. 4, 2011)

(holding that an indictment that used the words "fraud" and "fraudulent" satisfied the materiality

element).

Here, each count of the S1 Indictment alleges that the defendants participated in a scheme

to defraud by making false and fraudulent misrepresentations about Frank and its user data.  The

defendants can therefore infer from the S1 Indictment, consistent with *Neder* and *Klein*, that their

misrepresentations to JPMC, Bank-1, and other potential acquiring companies were material.

Accordingly, the S1 Indictment properly alleges materiality.

### 5.  The S1 Indictment Properly Alleges Bank Fraud

The S1 Indictment properly tracks the statutory language of Title 18, United States Code,

Section 1344 and provides the defendants with the approximate time and place of the crime.  It

further alleges straightforward substantive and conspiratorial bank fraud charges whereby the

defendants are accused of knowingly executing, attempting to execute, or agreeing to execute a

scheme to defraud a financial institution and, through false and fraudulent pretenses, or to obtain

---

[7]  In support of her materiality argument, Javice cites to three decisions outside of the Second
Circuit: *United States v. Omer*, 395 F.3d 1087 (9th Cir. 2005), *United States v. Busch*, 18 Cr. 79,
2018 WL 5312759 (S.D. Ohio Oct. 25, 2018), and *United States v. W.R. Grace*, 429 F.Supp. 3d
1307 (D. Mont. 2006).  None of these decisions are controlling and directly contradict the Second
Circuit Court's decision in *Klein*.  Likewise, in *United States v. Weigand*, 482 F. Supp. 3d 224,
235 (S.D.N.Y. 2020), the court rejected a motion to dismiss an indictment for failure to allege
materiality as "border[ing] on the frivolous" where the indictment alleged banks would not have
engaged in certain transactions but for the material misrepresentations.  *United States v. Weigand*,
482 F. Supp. 3d 224, 235 (S.D.N.Y. 2020).  *Weigand*, however, does not stand for the proposition
that an indictment must allege what the victims would have done had they known about the
misrepresentations.

assets under the control of a financial institution. The financial institutions identified in the S1 Indictment include JPMC, Bank-1, and other potential acquiring companies.

Ignoring the plain language of the S1 Indictment, Javice and Amar both argue that these counts should be dismissed because the counts "only tangentially involve banks."  (Javice Mot. 9-12; Amar Mot. to Dismiss at 25-27).   These arguments are devoid of supporting legal authority and grossly misstate the scope of the federal bank fraud statute.

The bank fraud statute, Title 18, United States Code, Section 1344, sets forth two prongs under which a defendant may commit the crime of bank fraud, and both prongs are alleged in the S1 Indictment. The first prong, Section 1344(1), makes it a crime to "knowingly execute[ ], or attempt[ ] to execute, a scheme or artifice … to defraud a financial institution." 18 U.S.C. § 1344(1).  The second prong, Section 1344(2), makes it a crime to "knowingly execute[ ], or attempt[ ] to execute, a scheme or artifice … to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2). Section 1344(2) requires the Government to prove "that the defendant intend[ed] to obtain any of the moneys … or other property owned by, or under the custody or control of, a financial institution" through false or fraudulent pretenses.  *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016). Section 1344(2) does not require a showing that "a defendant intended to defraud a federally insured bank or other financial institution." *Loughrin v. United States*, 573 U.S. 351, 355, 356-57 (2014) ("nothing in the [Section 1344(2)] clause … demands that a defendant have a specific intent to deceive a bank").  Rather, the Government may prove a violation of 1344(2) by establishing that the defendant "acquire[d] (or attempt[ed] to acquire) bank property by means of [a] misrepresentation." *Id.* at 362-63.  Nor does Section 1344(2) require proof that the "defendant's

scheme created a risk of financial loss to the bank." *Id.* at 366 n.9.  In other words, to properly allege a bank fraud offense, the indictment "need only describe a scheme to deprive [the bank] of something of value, or to obtain any of the moneys. . .or other property owned by, or under the custody or control of, a financial institution." *Weigand*, 482 F. Supp. 3d at 235 (S.D.N.Y. 2020), (citing *Shaw v. United States*, 580 U.S. 63 (2016) and *Loughrin*, 573 U.S. at 356).  Accordingly, "[i]n describing the sorts of harm that qualify… the Supreme Court's bank fraud precedents cast a wide net." *Weigand*, 482 F. Supp. at 235.

Nothing in Section 1344, nor in the case law, limits substantive or conspiratorial bank fraud charges to only those situations that involve "the core functions of the federal banking system." (Amar. Mot. to Dismiss at 27; Javice Mot. at 10).[8]  Indeed, the defendants cannot cite a single case for their novel proposition that the bank fraud statute does not apply to a bank that is defrauded of millions of dollars when acquiring a company.[9]  *United States v. Bouchard*, on which both

_____

[8] The defendants suggest that this prosecution does not vindicate the Government's interest in protecting financial institutions. (Javice Mot. at 12; Amar Mot. to Dismiss at 26).  That is, at best, a policy argument.  It is also wrong.  Here, the defendants are charged with their participation in a multi-million dollar fraud on traditional banks, one of which ultimately acquired Frank for $175 million for the purpose of acquiring new banking customers.   These facts, accordingly, clearly implicate the government's interest in protecting American financial institutions and go to the heartland of the bank fraud statute.

[9] Here, again, the defendants rely on wholly inapposite case law, none of which limit the scope of the federal bank fraud statute to prosecutions involving "core" banking functions.  *See Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004) (describing differences between the criminal bank fraud statute and a civil RICO action predicated on bank fraud and holding that, in a civil case, a plaintiff must show that a defendant's actions caused the loss to the plaintiff); *UMB Bank, N.A. v. Benton*, No. 21 Civ. 832 (BP), 2022 WL 16753765 (W.D. Mo. Jun. 29, 2022) (granting a motion to dismiss in a civil RICO action predicated in part on bank fraud because the defendant's conduct did not form a pattern of racketeering and did not proximately cause any damage).  Equally unavailing is Amar's analogy (*see* Amar Mot. to Dismiss at 27) to

defendants rely, is inapposite.  (Javice Mot. at 10-12; Amar Motion to Dismiss at 26-27).  In that case, which involved a challenge to the sufficiency of the Government's evidence at trial, the Second Circuit overturned a bank fraud conviction because the defrauded entity was not FDIC-insured and was a "bank subsidiary[ ]" which is a "distinct legal entit[y]" from the parent bank. *Bouchard*, 828 F.3d at 126.  That case has no application to the defendants' motion to dismiss because the Government has alleged that qualifying financial institutions, including JPMC, Bank-1, and potential acquiring companies, were defrauded.

## II.    The Court Should Deny the Defendants' Duplicity Motion

### A.    Applicable Law

An indictment is impermissibly duplicitous if (1) the indictment combines two or more distinct crimes into one count, in contravention of Rule 8 of the Federal Rules of Criminal Procedure; and (2) the defendant is thereby prejudiced.  *See United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).  Duplicitous indictments can present three types of prejudice: (1) lack of notice of the crime charged; (2) the possibility that a second trial on the same charge would not be barred by the Double Jeopardy Clause; and (3) the potential uncertainty with respect to the jury's verdict and the sentencing implications of that verdict.  *Id.* at 77-78.

An indictment, however, is not prejudicial merely because it charges in one count what it could have charged in several.  The Second Circuit "has long held that acts that could be charged

---

Title 18, United States Code, Section 1014.  As the Supreme Court held, to sustain a conviction under Section 1014, "the Government must establish two propositions: it must demonstrate (1) that the defendant made a 'false statement or report,' or 'willfully overvalue[d] any land, property or security' and (2) that he did so 'for the purpose of influencing in any way the action of [a described financial institution] upon any application, advance, ... commitment, or loan.'" *Williams v. United States*, 458 U.S. 279, 284 (1982) (quoting Section 1014).  Accordingly, unlike the bank fraud statute, Section 1014 is statutorily limited to false statements intending to influence a bank's action on certain proscribed activities.

as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *Vilar*, 729 F.3d at 79. "As long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible." *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989); *see also United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006) ("[T]his court has long held that acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme."); *United States v. Moloney*, 287 F.3d 236, 241 (2d Cir. 2002) (one count of money laundering alleging a series of financial acts); *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (combining 50 mailings into one count of mail fraud); *United States v. DiScala*, No. 14 Cr. 399, 2018 WL 1187394, at *27 (E.D.N.Y. Mar. 6, 2018) (rejecting the argument "that each single transaction of securities fraud must be charged separately," and emphasizing that "the approved practice in the Second Circuit, where indictments will charge both securities fraud and a conspiracy to commit said fraud, allege a starting and ending date in the securities fraud count, and allege the means of committing the fraud").

As the Second Circuit has observed, "duplicity may actually inure to a defendant's benefit by limiting the maximum penalties he might face if he were charged and convicted on separate counts for what amounts to a single scheme." *Olmeda*, 461 F.3d at 281. Being charged with a single count also provides the defendant with the benefit of avoiding "the portrayal to the jury as the perpetrator of [multiple] crimes." *Id.* (citation omitted).

## B.  The S1 Indictment is Not Duplicitous

The defendants argue that Count Three is impermissibly duplicitous because it alleges that the defendants defrauded more than one financial institution.  (Javice Mot. at 16-17; Amar. Mot. to Dismiss at 30-31). This argument is without merit and misapprehends the charged bank fraud

scheme.  Count Three charges a single scheme to defraud, whereby the defendants sought to defraud multiple financial institutions into purchasing Frank by making false and fraudulent representations about Frank and its user data, in order to defraud those institutions out of millions of dollars.  *See United States v. Morse*, 785 F.2d 771, 775 (9th Cir. 1986) (noting "the expansive standard for a single scheme"); *cf. United States v. Tawik*, 391 F. App'x 94, 97 (2d Cir. 2010) (finding no impermissible duplicity in an indictment that charged a single scheme to defraud that included multiple deliveries).  As the evidence will demonstrate, the bank fraud scheme involved: (1) the same participants throughout its duration*,* including Javice and Amar; and (2) the same *modus operandi*, *i.e.*, the making of fraudulent and false statements about Frank and its users to obtain bank property.

The Second Circuit's decision in *United States v. Margiotta* is instructive on this issue. In *Margiotta*, the defendant was charged with committing mail fraud over a nine-year period based on separate mailings made as part of a scheme to defraud three entities—the town of Hempstead, Nassau County, and New York State — through an insurance broker kickback scheme.  *Margiotta*, 646 F.2d at 730.  The district court granted the defendant's pretrial motion to order the Government to choose a single mailing to offer to the jury to satisfy the mail fraud charge. *Id.* at 731. The Government appealed the district court's order, and the Second Circuit reversed.

After examining the policy considerations that underlie the duplicity doctrine, the Circuit held that the risks of unfairness to the defendant were "slight in a case like this where the essence of the alleged wrong is a single scheme to defraud." *Id*. at 733.  Accordingly, the court found that the 50 mailings that the Government agreed to aggregate into the mail fraud count over the course of the nine-year period charged in the indictment were not impermissibly duplicitous. *Id.* at 732-33; *see also United States v. Aracri*, 968 F.2d 1512, 1518-19 (2d Cir. 1992) (series of transfers

utilizing different companies over several years for the purpose of concealing the non-payment of taxes and transferring tax liability constituted one scheme); *Tutino*, 883 F.2d at 1141 (two sales of heroin were part of a single continuing conspiracy); *see also United States v. Davis*, 471 F.3d 783, 790-91 (7th Cir. 2006) (single count of health care fraud carried out by one defendant through three separate schemes over several years was not duplicitous); *United States v. Zeidman*, 540 F.2d 314, 317 (7th Cir. 1976) (single count of mail fraud not duplicitous even though allegations included two classes of victims and could have been charged in separate counts: "The frauds were performed by the same parties and have a sufficiently close nexus with one another that they are fairly characterized as one scheme."). The same is true here: the defendants are charged with a single bank fraud scheme, whereby the defendants made material misrepresentations regarding Frank and its number of users to JPMC, Bank-1, and other potential acquiring companies, in order to defraud those companies out of millions of dollars.

The defendants' reliance on *United States v. Hinton*, 127 F. Supp. 2d 548 (D.N.J. 2000) for the proposition that multiple financial institutions cannot be included in a single bank fraud count is misplaced. (Javice Mot. at 16; Amar Mot. to Dismiss at 31). The reasoning in this out-of-district case has been expressly rejected by a court in this District. In that case, Judge Sand held that the "number of affected banks is not the sole determinant of whether there are separate executions of a scheme" and further that "[nothing] in the context of the [bank fraud] statute" supports *Hinton's* "rigid reading" that a single count of bank fraud cannot refer to multiple financial institutions in the same count. *United States v. Rigas*, 281 F.Supp. 2d 660, 670-71 (S.D.N.Y. 2003) (*citing United States v. Barrett*, 178 F.3d 643, 647 (2d Cir.1999) and 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise–words importing the singular include and apply to several persons, parties, or things[.]")). *Hinton*

is also distinguishable on the facts, as it involved "at least 128 transactions executed in furtherance of frauds" and "alleged perpetrator(s) for a particular institution's transactions d[id] not generally overlap." *Hinton*, 127 F. Supp. 2d at 556.

In any event, the defendants' argument independently fails because they cannot explain how the S1 Indictment has prejudiced their ability to protect any of the policy goals underlying the duplicity doctrine. *Sturdivant*, 244 F.3d at 75 (indictment is only impermissibly duplicitous if defendant is prejudiced by claimed duplicity). Javice's complaint about the uncertainty about the future jury verdict (Javice Mot. 17) is specious, because the jury will be instructed that it must unanimously find that the defendant participated in the sole charged bank fraud scheme. The Government expects that the jury will *not* be instructed that it must find, unanimously or otherwise, that the defendants personally defrauded each and every financial institution listed in the "to wit" clause. In addition, Javice's concern about exposure to double jeopardy is baseless: there is no danger of prejudice in connection with her double jeopardy rights because Count Three covers the entire time span of the defendants' efforts to sell Frank through fraudulent misrepresentations.[10]

### C.  Amar's Remaining Duplicity Arguments Are Meritless

Amar seeks dismissal of Count Two through Four of the S1 Indictment because he argues that each of those counts include multiple victims. For the same reasons stated above, Counts Two through Four are not impermissibly duplicitous, because each count involves a singular scheme that targeted JPMC, Bank-1, and other acquiring companies. *Olmeda*, 461 F.3d at 281. Furthermore, for the same reasons above, Amar can show no prejudice: the Court will instruct the

---

[10] In addition, the Government could not—and would not—benefit from any prejudicial ambiguity in the indictment because "[p]rinciples of equity prohibit the government from benefitting from the prejudicial ambiguity that the government alone was responsible for creating." *Sturdivant*, 244 F.3d at 77.

jury that its verdict must be unanimous as to whether Amar participated in the charged scheme. Furthermore, the jury will be instructed that it must find that Amar participated in the scheme— not whether he personally participated in an act of deception with respect to each alleged victim.

Accordingly, the defendants' motions to dismiss the S1 Indictment as insufficient or duplicitous are wholly without merit and should be denied.

## III.    The Defendants' Demand for a Bill of Particulars Should Be Denied

The S1 Indictment, 23-page Complaint, and the extensive text-searchable discovery in this case supply the defendants with information sufficient to understand the charges against them, to prepare a defense, and to protect against double jeopardy.  The defendants will also receive trial exhibits, a witness list, and 3500 material reasonably in advance of trial.  Accordingly, the defendants have already obtained far more information about the nature of the allegations and, indeed, the Government's anticipated trial proof, than the law requires.

The defendants' requests for a bill of particulars amount to a demand for a detailed overview of the Government's trial evidence. The defendants demand to know every false utterance, every conspirator, every victim, and more. The defendants have received all the information, and more, that they need to understand the charges against them and prepare a defense.  Their motion for a "bill of particulars" is, in fact, a motion for a preview of the details of the Government's trial proof.  The motion should be rejected.

### A.  Relevant Facts

#### 1.  The Complaint

As set forth above, on March 31, 2023, the Complaint was filed, charging defendant Charlie Javice in four counts with violations of Title 18, United States Code, Section 1349 (conspiracy to commit bank and wire fraud), 1343 (wire fraud); 1344 (bank fraud) and Title 15,

United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud).  (*See* Dkt. No. 1).  Amar is identified in the Complaint as "CC-1."

The Complaint is 23 pages long.  Although the Complaint makes clear that it does not contain "all of the facts learned during the course of [the affiant's] investigation," it does provide a detailed overview of the fraudulent scheme.  The Complaint has a number of sections and sub-headings, which organize the evidence in roughly chronological order.  These sections include factual descriptions of, among other things, (1) misrepresentations about Frank's "users" to Bank-2[11] in June 2021 (*see* Complaint ¶ 18), (2) misrepresentations about Frank's "users" to JPMC in the course of pitching the company (*see, e.g.*, Complaint ¶ 19), (3) efforts to falsify data about the number of Frank customers during due diligence, including hiring a data scientist to create a fake data set (*see, e.g.*, Complaint ¶¶ 21-27), (4) efforts by the defendants to purchase student data on the open market in an attempt to cover up the misrepresentations to JPMC about the number of Frank users (*see, e.g.*, Complaint ¶¶ 28-30), and (5) the defendants' providing the purchased student data—misrepresented as Frank user data—to JPMC, after the acquisition (*see, e.g.*, Complaint ¶ 32).

In its overview of the fraudulent scheme, the Complaint identifies numerous key documents with specificity, including quotations from the document, the date of the document, and the sender and/or recipient.  The Complaint also provides visual depictions of certain documents, including Frank's website, the pitch deck used to market Frank, Slack messages between Javice and a Frank employee, and emails.  (*See, e.g.*, Complaint ¶¶ 15, 19(b)(i), 21(d), 22(j)).

---

[11] The Government has provided the identity of Bank-2 to the defendants, along with Rule 16 discovery produced by Bank-2 to the Government.

### 2. Additional Information Provided to Amar

As noted above, defendant Charlie Javice was arrested on April 3, 2023. Simultaneously, federal law enforcement agents executed a search warrant for electronic devices belonging to defendant Olivier Amar.

After the execution of the search warrant, counsel for Amar contacted the Government and, among other things, requested an opportunity to meet with the Government and present information in an effort to persuade the Government not to charge Amar. The Government granted that request and Amar's counsel met with the Government on or about May 5, 2023. Following that presentation by Amar's counsel, on or about May 15, 2023, the Government informed Amar's counsel that it intended to proceed with charges against Amar. Amar's counsel subsequently requested the opportunity to speak to a supervisor at the United States Attorney's Office and eventually to meet with the Chief of the Criminal Division. Both of those requests were granted. Amar's counsel spoke with a supervisor on May 16, 2023 and met with the Chief of the Criminal Division on June 30, 2023.

In the context of those meetings, the Government informed Amar's counsel, among other things, that it possessed incriminating WhatsApp chats between Javice and Amar. Amar's counsel asked for the opportunity to review those chats. On June 30, 2023, the Government informed defense counsel that it intended to move forward with charges, but also stated that it would provide relevant portions of the WhatsApp messages to counsel. That same day, prior to Amar's indictment and, therefore, prior to any obligation to produce discovery to Amar, the Government provided to defense counsel 39 pages of WhatsApp chat excerpts selected by the Government as particularly relevant to Amar's knowledge and conduct. The Government requested that, if defense counsel wished to provide any additional response, they do so in writing by July 5,

2023.  The Government did not receive a response.  After confirming with Amar's counsel that they were choosing not to respond, the Government moved forward.  A grand jury in this district issued the S1 Indictment charging Amar on July 12, 2023.

### 3.  Rule 16 Discovery

In the course of Rule 16 discovery in this case, the Government has produced to the defendants approximately 1.3 million pages of discovery, consisting of materials obtained from over 40 entities and individuals.[12]  This discovery includes over 1.1 million pages of material produced by JPMC alone.  Virtually all of this discovery has been produced in an electronically-loadable, text-searchable format that allows the defendants to search by a number of different parameters, including keyword, date, and type of document.

The defendants are not without resources to review the discovery.  Because JPMC is required to indemnify the defendants, both defendants have large, well-resourced, and sophisticated legal teams.  Seven attorneys have entered notices of appearance in this case on behalf of Javice.  Five attorneys have entered notices of appearance in this case on behalf of Amar.  In addition, multiple attorneys not on the docket have represented Javice and Amar in communications with the Government.

### 4.  Search Warrant Affidavits

As part of its Rule 16 discovery, the Government has produced to the defendants a number of search warrants and affidavits, including warrants authorized by the Honorable Stewart D.

---

[12] This total does not include the largely, if not entirely, duplicative productions from the U.S. Securities and Exchange Commission ("SEC").  Nor does it include the approximately 26,000 pages of documents produced by JPMC directly to the defendants in response to their Rule 17 subpoenas.

Aaron for the search of the contents of three Dropbox[13] accounts and of the defendants' Google accounts.

The affidavits for those warrants, which were authorized in October 2023, contain additional information about the fraud scheme. For example, the Dropbox affidavit identifies additional emails relevant to the scheme, identifies relevant excerpts of WhatsApp chats between Javice and Amar, and describes how Javice and Amar used Dropbox to facilitate the fraud scheme. Similarly, the Google affidavit identifies with specificity additional emails relevant to the scheme, identifies and quotes relevant Slack messages, and describes how the defendants used Google Drive (another file sharing service) to facilitate the fraud scheme, including their effort to create a fake data set.

### B. Applicable Law

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Murphy*, No. 21 Cr. 280 (AKH), 2022 WL 1270958, at *3 (S.D.N.Y. Apr. 28, 2022) (citation and quotation marks omitted).

"A bill of particulars is not a discovery device," *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010), and the acquisition of evidentiary detail is not its function. "It is not enough that the information would be useful to the defendant." *United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229, at *8 (S.D.N.Y. Mar. 17, 2022) (citation and quotation marks

---

[13] Dropbox is a cloud-based file storage service.

omitted). The question is whether it is "necessary for the preparation of the defense," *United States v. Chalmers*, 410 F. Supp. 2d 278, 286-87 (S.D.N.Y. 2006) (emphasis added) (citation omitted). "The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories." *United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003) (citing *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (collecting cases)).

"Nor, given that a bill of particulars confines the Government's proof to particulars furnished, should a motion for a bill of particulars be granted where the consequence would be to restrict unduly the Government's ability to present its case, or permit the defendant to tailor her testimony to explain away the Government's case." *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (citations omitted); *see also United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."). As a general matter, if "the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574; *United States v. Ray*, No. 20 Cr. 110 (LJL), 2021 WL 3168250, at *3 (S.D.N.Y. July 27, 2021) ("In determining whether the Government should be required to provide a bill of particulars, the Court considers the language of the indictment but also the totality of the information available to the defendant including through pretrial discovery.") (quotation marks omitted).

Nor does the law "allow Defendants to use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government, when the Indictment, discovery, and other information provided by the government adequately notify Defendants of the charges against them." *United States v. Rigas*, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003) (citing *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)); *see also Mandell*, 710 F. Supp. 2d at 385 ("the mere existence of 'mountains of documents' does not entitle [defendant] to a bill of particulars"). In short, courts "must examine the totality of the information available to the defendant, including the indictment and general pre-trial discovery, and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Gibson*, 175 F. Supp. 2d 532, 536 (S.D.N.Y. 2001) (citing *Bin Laden*, 92 F. Supp. 2d at 233).

### C.  Discussion

The defendants' request for a bill of particulars should be denied because the S1 Indictment, the Complaint, the discovery produced to date (including search warrant affidavits), and additional information provided by the Government, including the specific identification of certain relevant communications between the defendants, are far more than sufficient to put the defendants on notice of the nature and specifics of the crimes of which they are accused and to permit them to adequately prepare their defense.  The defendants' requests for particulars amount to an impermissible attempt to use the vehicle of a bill of particulars to constrain the Government's proof at trial and to obtain a preview of the Government's trial proof.  The requests should be denied in their entirety.

#### 1.  The Requests for Bills of Particulars

In her motion, Javice seeks the following particulars:

1. The identities of the unindicted co-conspirators;

2. Details regarding each of the false or fraudulent "pretenses, representations, and promises" about Frank, its "user data," and "other things" alleged in the Indictment, including the content of each statement and information regarding when, how, and to whom each statement was transmitted and how each statement was material;

3. The identities of "potential acquiring companies" to whom the Indictment alleges Ms. Javice transmitted false and fraudulent statements; and

4. The identities of any other banks to whom the Indictment alleges Ms. Javice transmitted false and fraudulent statements.

(Javice Mot. at 18 (citations omitted), or the "Javice Request").

In his motion, Amar seeks the following particulars:

1. Each material misrepresentation attributable to Mr. Amar, including the date, content, form, by whom and to whom the misrepresentation was made, any witnesses, the manner of alleged falsity, the circumstances indicating how Mr. Amar allegedly knew about each misrepresentation, and the manner in which Mr. Amar allegedly concealed each misrepresentation;

2. Each instance in which the Government alleges Mr. Amar engaged in conduct as part of a scheme to defraud Bank-1 and the manner in which that conduct was knowing and in furtherance of the fraud;

3. Each instance in which the Government alleges Mr. Amar engaged in conduct as part of a scheme to defraud JPMC and the manner in which that conduct was knowing and in furtherance of the fraud;

4. The specific documents constituting the "other purported user data files" allegedly sent by Ms. Javice to JPMC, as referenced in the Complaint;

5. The factual bases for Mr. Amar's alleged knowledge of, involvement in, and/or concealment of, each "purported user data file" Ms. Javice allegedly sent to JPMC, including the date, content, form, recipient(s), the manner of alleged falsity, and the manner in which Mr. Amar allegedly concealed each misrepresentation;

6. The identity of all other "potential acquiring companies," as referenced in the Indictment or as anticipated to be part of the Government's affirmative case at trial;

7. The identity of all other "financial institutions," as referenced in the Indictment or as anticipated to be part of the Government's affirmative case at trial; and

8. The identity of all named and unnamed co-conspirators as alleged in the Indictment, the Complaint, and the Government's proffers to the Court.

(Amar Mot. to Dismiss at 31-32, or the "Amar Request").

## 2. The Bill of Particulars as to "Unindicted Co-conspirators" Should Be Denied

The defendants demand to know the identities of all unindicted coconspirators. (Javice Request ¶ 1; Amar Request ¶ 8). In so doing, the defendants ignore the "crucial question"— "whether the information sought is *necessary*, not whether it is *helpful*" to the preparation of the defense. *United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y. 1994) (emphasis in original). In exchange for constraining the Government's proof at trial, the defendants offer no explanation why the identification of unindicted co-conspirators is *necessary*, as opposed to merely information that would be helpful for the defendants to know. The request should be denied on this ground alone.

"[D]emands for this type of information—where, when, and with whom the Government will charge the defendant with conspiring—are routinely denied by courts in this Circuit." *United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229, at *10 (S.D.N.Y. Mar. 17, 2022) (denying defendant's request for "the disclosure of unnamed and unindicted coconspirators"); *see, also, e.g.*, *United States v. Nicolo*, 523 F. Supp. 2d 303, 317 (W.D.N.Y. 2007), aff'd, 421 Fed. App'x 57 (2d Cir. 2011) (Summary Order) ("[a]s a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars. More specifically, details regarding the date on which the conspiracy was formed, or when each participant entered into the conspiracy need not be revealed before trial. . . . Likewise, the names

of unindicted coconspirators need not be provided"); *United States v. Rittweger*, 259 F. Supp. 2d 275, 292 (S.D.N.Y. 2003) (concluding, in thirteen-count, multi-defendant securities fraud case that the indictment and discovery were sufficient and "[t]here is no need to provide a list of all unindicted co-conspirators"); *United States v. Amendolara*, No. 01 Cr. 694 (DAB), 2002 WL 31368279, at *5-6 (S.D.N.Y. Oct. 21, 2002) (denying a request for the identities of all unindicted co-conspirators because "the Indictment and discovery material already provided to Defendant Anello by the Government sufficiently facilitate his ability to avoid surprise and prepare for trial").

The factors set forth in *United States v. Nachamie* do not cut in favor of a bill of particulars.[14]  *See United States v. Nachamie*, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000).  The *Nachamie* factors are largely concerned with long-running, sprawling conspiracies in which the defendants could conceivably be in a conspiracy with people they do not know. *Id.*  ("If there are a large number of co-conspirators and a long-running conspiracy, a defendant is more likely to be surprised by the identity of other co-conspirators, whom he may never have met.").  That is simply not the case here.  The fraud is alleged to have occurred between June 2021 and November 2022—slightly over a year, and far shorter than the length of the conspiracy that informed the *Nachamie* decision.  *See, e.g.*, S1 Indictment ¶ 1; *Nachamie*, 91 F. Supp. 2d at 573 (noting that the "alleged conspiracy has operated for a significant period of time (more than three years)").

Moreover, the fraud was centered around the defendants and their company, so there is little risk that the defendants will be surprised at trial by discovering that some person unknown to them had joined the conspiracy they masterminded.  In conspiracies like the one charged here,

---

[14] These factors are:  (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation.

courts have routinely denied requests for identification of unidentified co-conspirators. *See, e.g.*, *United States v. Yu*, No. 22 Cr. 208 (CBA), 2023 WL 4687970, at *20 (E.D.N.Y. July 21, 2023) (denying motion where "the conspiracy was small and involved only four defendants and perhaps a few additional undisclosed, unindicted coconspirators; (ii) the conspiracy was relatively short, with the bulk of the planning and execution of the crime occurring over the span of a few months from August 2018 to February 2019; and (iii) Zhang was allegedly at the scene of the crime and therefore likely knows the identity and the number of his coconspirators"); *United States v. Ray*, No. 20 Cr. 110 (LJL), 2021 WL 3168250, at *5 (S.D.N.Y. July 27, 2021) (denying motion where "the nature of the conspiracy is also such that the co-conspirators would have been drawn from a limited group of people and [the defendant] would be expected to know the identities of the persons whom, if they were not Victims, would be considered to be co-conspirators").

Because there is no risk of surprise to the defendants as to this fact, the defendants' request amounts to a request for the *Government's view* of the criminal exposure of various potential trial witnesses. This is not a permissible function of a bill of particulars. As Judge Liman concluded in *Ray*, a defendant "is not entitled to have the government commit beforehand to whom it will present at trial as a victim and whom as a co-conspirator. Indictments frequently present co-conspirators as including those 'known and unknown to the Grand Jury' and the law has long been clear that the Government is not required to specify those 'known and unknown' by a bill of particulars." 2021 WL 3168250, at *6. Judge Liman also noted as to a request for the identification of co-conspirators, "[t]he defendant, or more precisely his counsel, enjoys the ability to investigate" potential witnesses and to "determine for itself whether he or she might be a defense witness, is someone who joined in the conspiracy, or know views himself or herself as a victim and thus may conduct a meaningfully directed investigation of the relevant facts and circumstances

and be prepared to respond to the charges. No more is required." *Id.* Here, too, nothing more is required where the defendants have the information needed to prepare their defense.

As is routine, the Government will disclose a witness list and 3500 material sufficiently in advance of trial for the defense to adequately prepare. Indeed, the parties have already agreed to dates for those disclosures. Accordingly, consistent with precedent in this Circuit and District, the defendants' request for names of unindicted co-conspirators should be denied.

### 3.   The Bill of Particulars As to Any Potential Victim Should be Denied

The defendants' next set of requests demand evidentiary detail about all potential victims (Javice Request ¶ 4; Amar Request ¶ 7), and potential acquiring companies (Javice Request ¶ 3; Amar Request ¶ 6). As the defendants already possess documents containing information regarding the victims and potential acquiring companies, this request should be denied.

Courts in this District routinely deny motions for bills of particulars where—as here—the Government has produced discovery sufficient to identify victims of the offense. *See United States v. Fea*, No. 10 Cr. 708, 2011 WL 2119708, at *2 (S.D.N.Y. May 24, 2011) (noting that defendant's request for bill of particulars identifying victims was meritless where government had produced other discovery containing the names of putative victims); *United States v. Rittweger*, 259 F. Supp. 2d 275, 292 (S.D.N.Y. 2003) (denying request for bill of particulars where defendants had received other discovery that they could use to determine the identities of the alleged victims).

The Government has specifically pointed the defendants to an exemplar document in the discovery related to this request. On or about April 5, 2024, following the meet and confer between the parties on the motions for a bill of particulars, the Government identified a document in the

discovery which it believed would be helpful to the defendants with respect to this request.[15]  The identified 6-page document—which was created by the investment advisory firm assisting Frank with the acquisition process—is a chart of all of the companies, including financial institutions, that had been the target of outreach by Frank as of May 6, 2021.  The document is very well-organized and identifies the company, the contacts at the company, the contacts at Frank or the investment advisory firm responsible for the outreach, the date that the initial outreach occurred, whether a non-disclosure agreement had been sent or signed, and detailed notes as to the status of the negotiation with that particular company.

The defendants not only already possess the information adequate to prepare their defense, the Government has gone further and specifically identified relevant information in the discovery.  The defendants' request should therefore be denied.  *See Ray*, 2021 WL 3168250, at *9 ("As a general matter, in our adversarial system, it is incumbent on the defense to review the discovery for itself to determine its significance; it is not the role of the government to tell the defense everything that is important and why.").[16]

#### 4.  The Bill of Particulars as to Every Possible Misrepresentation Made During and in Furtherance of the Scheme Should be Denied

The defendants also demand the identification of each and every possible misrepresentation made in the course of the scheme, including the date, content, form, speaker, and other information.

---

[15] *See* USAO_Rel_000695575-USAO_Rel_000695580.

[16] The cases cited by the defendants cut against their argument.  (*See* Javice Mot. at 23).   For example, in *United States v. Orena*, the Second Circuit "perceive[d] no deficiency in the prosecution's response" where the Government "identified twelve intended victims, but added the phrase 'and others' at the end of the list to indicate that there might be others not then known to the government."  32 F.3d 704, 714 (2d Cir. 1994).

(Javice Request ¶ 2 (seeking "[d]etails regarding each of the false or fraudulent "pretenses, representations, and promises" about Frank, its "user data," and "other things" alleged in the S1 Indictment, including the content of each statement and information regarding when, how, and to whom each statement was transmitted and how each statement was material"; Amar Request ¶ 1 (seeking "[e]ach material misrepresentation attributable to Mr. Amar, including the date, content, form, by whom and to whom the misrepresentation was made, any witnesses, the manner of alleged falsity, the circumstances indicating how Mr. Amar allegedly knew about each misrepresentation, and the manner in which Mr. Amar allegedly concealed each misrepresentation")).

The defendants are not entitled to this level of detail about the Government's proof. *See United States v. Martinez*, No. 22 Cr. 251 (LJL), 2023 WL 2403134, at *2 (S.D.N.Y. Mar. 8, 2023) ("It may be easier for the defense to prepare for trial if the Government were to reveal its theory of prosecution and the evidentiary detail that it will offer in support of that theory. But that is not the function of a bill of particulars."); *United States v. Akhavan*, No. 20. Cr. 188 (JSR), 2020 WL 2555333, at *2 (S.D.N.Y. May 20, 2020) (denying bill of particulars for "specific representations made" and concluding that "[t]hese requests are simply an attempt to pin the Government to particular evidentiary details"). Nor do the defendants offer any explanation as to why—after receiving a detailed Complaint and easily searchable discovery—they are somehow flailing in the dark about the nature of the charges against them.

Javice claims that "[t]here is no information as to what these allegedly criminal statements were, how they were transmitted, when they were transmitted, where, from, where to, nor even who received them" and suggests that Javice is being required to "prepare a defense to every single representation she made, to anyone, anywhere, that might have made it to this District, over the course of 18 months." (Javice Mot. at 21). These arguments are absurd. The Complaint alone

has multiple specific examples of misrepresentations made by Javice and Amar and specific actions taken the defendants to defraud JPMC. *See, e.g.*, Complaint ¶¶ 19(b), 19(h), 22(f). Indeed, the thrust of the defendants' arguments in this case—in court and in motion practice—is that they are innocent of the charges, not that they are completely unaware of them.

Javice's reliance on *United States v. Bortnovsky* is misplaced. (*See* Javice Mot. at 22 (citing 820 F.2d 572, 573 (2d Cir. 1987)). *Bortnovsky* involved a prosecution under the Racketeer Influenced and Corrupt Organizations Act ("RICO")[17] with extremely unique facts that bear no resemblance to the facts of this case. There, the defendants were convicted by a jury on charges related to a scheme to defraud federal and state agencies, including by submitting false claims for burglary losses and false claims for fire damage. *Bortnovsky*, 820 F.2d at 573-74. At trial, the prosecution introduced evidence of twelve burglaries, although only four were alleged to have been fabricated, and evidence of numerous documents regarding those burglaries, although only three of the documents introduced were alleged to have been false. *Id.* at 574. During trial, defendants were forced to establish their innocence by proving that eight of the burglaries put before the jury, which even the prosecution was uncertain were fake, actually occurred. *Id.* The effect of this was to impermissibly shift the burden of proof onto defendants. *Id.* at 575. The Second Circuit further held that the problem was not mitigated by the disclosure of "mountains of documents to defense counsel who were left unguided as to which documents would be proven

---

[17] The Second Circuit has noted that RICO prosecutions may have unique needs for bills of particulars. *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) ("With the wide latitude accorded the prosecution to frame a charge that a defendant has 'conspired' to promote the affairs of an 'enterprise' through a 'pattern of racketeering activity' comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope."). As a result, the typical practice in this District for RICO prosecutions is for the Government to provide the defendant with a so-called "enterprise letter" in advance of trial which sets forth the nature of the proof as to the enterprise and the predicate acts.

falsified or which of some fifteen burglaries would be demonstrated to be staged." *Id.* This was particularly true because one defendant's counsel "had only four days within which to prepare a defense." *Id.*

Due to the unique facts of *Bortnovsky*, numerous courts in this Circuit have declined to extend its reasoning. In *United States v. Kahale*—which like this case, involved defendants who lied to investors about their company—Judge Matsumoto noted that "unlike the circumstances here, both *Bortnovsky* and *Nachamie* presented the quintessential 'needle in a haystack' problem to defendants who were faced with sifting through thousands of legitimate transactions in an attempt to discover which transactions the government sought to prove were fraudulent." 789 F. Supp. 2d 359, 376 (E.D.N.Y. 2009), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012). Judge Matsumoto concluded that "the Indictment and discovery materials here provide adequate notice to defendants of the crimes charged and specify precisely that the allegedly fraudulent transactions at issue involved investments made in B.I.M. in exchange for which fraudulent 'gold delivery certificates' were issued." *Id.*

Javice's claim that she is in the same position as the defendants in *Bortnovsky*—one of whom had *four days* to prepare a defense—is unconvincing. The defendants here have well over a year to prepare for trial, have been provided text-searchable evidence (something not available in 1986, when *Bortnovsky* was tried), and a detailed Complaint and several search warrant affidavits which provide extremely specific examples of misrepresentations made and fraudulent conduct that occurred during the scheme. Javice's claim that she "is left to theorize as to what representations the government contends are false," (Javice Mot. at 22), therefore rings hollow. *See United States v. Raniere*, 384 F. Supp. 3d 282, 323 (E.D.N.Y. 2019) (distinguishing *Bortnovsky* when denying a motion for a bill of particulars and noting that "[s]uch unique facts are

vastly different from the situation here, given the information Raniere has received already and the lengthy amount of time Raniere has had to prepare for trial since he was indicted over a year ago") (internal citation omitted).

Nor can the defendants simply point to the volume of discovery and claim that a bill of particulars is warranted.  (*See* Javice Mot. at 22).  Judge Garaufis rejected exactly this argument in *Raniere*, noting that "Raniere fails to elaborate on the supposed problems with the discovery provided by the Government to date.  His assertion, lifted from *Bortnovsky* but stripped of detail, that the Government provided 'mountains of documents with little guidance as to which ones are relevant' is insufficient."  *Id.* (internal citations and quotation marks omitted); *see also United States v. Mandell*, 710 F. Supp. 2d 368, 371 (S.D.N.Y. 2010) (noting that "the mere existence of 'mountains of documents' does not entitle Mandell to a bill of particulars"); *United States v. Columbo*, No. 04 Cr. 273 (NRB), 2006 WL 2012511, at *6 (S.D.N.Y. July 18, 2006) (denying request for bill of particulars and noting that "[w]hile defendants claim that the quantity of audio tapes and documents produced in this case is voluminous and overwhelming, we note that they will have had more than a year to review discovery prior to trial").

Both defendants also misleadingly quote numerous cases prosecuted under Title 18, United States Code, Section 1001 (criminalizing the making of false statements to the federal government) in an attempt to pass off entirely inapposite case law as relevant to this fraud scheme.  For example, Amar argues that "[i]n a false statements case **like this one**, '[t]he starting point for everything is the statement.'" (Amar Mot. to Dismiss at 33 (quoting *United States v. Clifford*, 426 F. Supp. 696, 703 n.4 (E.D.N.Y. 1976) (prosecution under Section 1001) (emphasis added)); *see also* Javice Mot. at 23 ("At a minimum, a defendant **charged with making false statements** should be provided with 'information as to exactly what the false statements are, what about them is false, who made

them, and how [the defendant] caused them to be made.") (quoting *United States v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998) (prosecution under Section 1001) (emphasis added)).

This is not a false statements case.  Prosecutions under Section 1001—which is used to charge individuals who, for example, lie to the FBI—revolve around discrete false statements to the federal government, often on a specific occasion. They are not fraud cases.  Crucially, in a Section 1001 prosecution, the statement itself *is* the crime.  This is in contrast to a fraud case, in which a fraudulent statement is simply a *means* to commit the crime.  *See United States v. Mora*, No. 19 Cr. 514 (JPO), 2020 WL 7496281, at *1 (S.D.N.Y. Dec. 21, 2020) ("The Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed.") (alteration and quotation marks omitted); *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987) ("It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts.").

Cases under Section 1001 are therefore far afield from this case and cannot support the defendants' extraordinary request for the minute details of the Government's trial proof.  *See United States v. Tajideen*, 319 F. Supp. 3d 445, 466 (D.D.C. 2018) (denying a request for a bill of particulars, in a case where the defendant was charged with defrauding the federal government by interfering with OFAC's lawful functions, in part by submitting misrepresentations or fraudulent statements, because "in this case false statements are not at the core of the defendant's charges against him" (brackets and internal citations omitted)).

Amar also relies on *United States v. Holmes*, but again fails to provide key context and omits a relevant portion of the quotation from the opinion.  (Amar Mot. to Dismiss at 33 (quoting No. 5:18 Cr. 00258-EJD, 2020 WL 666563, at *10 (N.D. Cal. Feb. 11, 2020)).  Amar contends

that *Holmes* stands for the proposition that this Court should order the Government to identify "the specific implicit and explicit false and fraudulent misrepresentation . . . , what about them is false, [] who made them, and [] how Defendants caused them to be made." (*See id.*).  The omitted portion of the quotation, however, makes clear that *Holmes* does not, in fact, support Amar's claim.

The defendants in *Holmes* were charged with two different fraud schemes—"a scheme to defraud investors and a scheme to defraud doctors and patients."  2020 WL 666563, at *1.  The scheme to defraud investors was similar to the scheme charged in this case; that scheme alleged that the defendant "made materially false and misleading statements to investors and failed to disclose material facts to investors," causing the investors to invest money in the defendants' company.  *Id.* at *2.  The scheme to defraud doctors and patients involved using "materially false and misleading marketing materials and advertisements."  *See id.* at *3.  The full quote from *Holmes* granting the motion for a bill of particulars reads as follows, with the portion omitted from Amar's quotation in bold: "The Government shall identify (1) the specific implicit and explicit false and fraudulent misrepresentations **in the advertisements and marketing materials**, (2) what about them is false, (3) who made them, and (4) how Defendants caused them to be made." *See id.* at *9.  The *Holmes* court's direction therefore related to the advertising materials relevant to the doctor/patient fraud.  This is notable both because this is a substantially narrower bill of particulars than that suggested by Amar and because the court actually *denied* the defendants' request for a bill of particulars for the identification of specific misrepresentations related to the investor fraud.  *Id.* at *9.  The *Holmes* court concluded that the defendants "are not left to guess about the Government's investor-fraud theory" because, as here, "the investor fraud describes the specific *type* of misrepresentations at issue."  *Id.* (emphasis added).  *Holmes* therefore only further

establishes that the defendants have received fair notice of the charges and are not entitled to a detailed accounting of the Government's trial proof.[18]

The defendants confuse a desire to know the inner workings of the Government's trial evidence with the necessity of receiving fair notice of the charges against them. They have received the latter and amply so. *See Martinez*, 2023 WL 2403134, at *2 (denying motion for bill of particulars where "[t]he Complaint generally informs the defense of the nature of the misrepresentations—they are misrepresentations in connection with PPP loans both received by MBE and made by MBE between 2020 and 2021"); *Mandell*, 710 F. Supp. 2d at 372 (concluding that the defendant's attempt "to compel the Government to particularize the allegations in the Indictment regarding misrepresentations allegedly made to investors and to identify the allegedly defrauded investors" was "nothing more than an ill-disguised attempt at general pretrial

---

[18] Amar also complains that the Government's statements in court have confused him, contending that the Government has alleged that "Ms. Javice misrepresented the definition of a Frank user," but then stated in court that "Frank's users were not 'real people.'" (Amar Mot. to Dismiss at 34). This argument is grasping at straws. It is not correct that the Government ever stated that Frank's users were not "real people." The context of the Government's statement—which has been omitted from the portion quoted by Amar—makes clear that the Government was referring, not to Frank's true customers, but to rows of data in the synthetic data set which were falsely represented as Frank's "users." (Jan. 18, 2023 Tr. at 8) ("So, **in terms of the synthetic data set**, which is one of the subjects of the complaint, first of all actually I don't know that there is actually a dispute that those people don't exist. I've never heard the defendants say, either in this case, or in their civil case, that in fact, those were real people.") (emphasis added). The Government was simply stating that the defendants have never contended that the data in the synthetic data set actually belonged to real people.

This is entirely consistent with the allegation that the defendants defrauded JPMC (and other companies) by claiming that they possessed certain amounts of data for their true customers. The synthetic data set was created not because the defendants had *no* customer data but because the real customer data they possessed was orders of magnitude smaller than had been represented. This is clearly alleged in the Complaint. (*See, e.g.*, Complaint ¶¶ 22(j)-23 (Frank employee informing Javice that true number of users was less than 300,000)). Amar's argument here—even if it sought information to which he is entitled under a bill of particulars, which it does not—is without merit.

discovery") (internal alterations omitted).  This request for particulars is therefore without basis and should be denied.

### 5.  Amar's Additional Requests for a Bill of Particulars as to The Details of the Proof Against Him Should be Denied

Amar additionally seeks what amounts to "a set of detailed interrogatories in the guise of a bill of particulars."  *See United States v. Moses*, No. 02 Cr. 040, 2002 WL 32351156, at *4 (E.D. Pa. Apr. 5, 2002).  He demands a tremendous level of detail as to the Government's proof against him, including "[e]ach instance in which the Government alleges Mr. Amar engaged in conduct as part of a scheme to defraud Bank-1 [and JPMC] and the manner in which that conduct was knowing and in furtherance of the fraud" (Amar Request ¶¶ 2-3), and evidentiary detail on "user data files" sent by Javice to JPMC and "[t]he factual bases for Mr. Amar's alleged knowledge of, involvement in, and/or concealment of, each "purported user data file" Ms. Javice allegedly sent to JPMC, including the date, content, form, recipient(s), the manner of alleged falsity, and the manner in which Mr. Amar allegedly concealed each misrepresentation."  (Amar Request ¶¶ 4-5). These extraordinary requests amount to demands for the intricacies of the Government's trial evidence; they bear no relation to any "fair notice" of the charges.

Amar contends that he does not have sufficient particulars regarding the user data files sent to JPMC.  (Amar Mot. to Dismiss at 37).  This argument is baseless.  The Complaint contains specific dates and even quotations from emails related to the defendants' provision of these files to JPMC.  *See* Complaint ¶ 32.  Those emails are easily located in the Rule 16 discovery.[19]  In

---

[19] *See, e.g.*, USAO_Rel_000022126 - USAO_Rel_000022127;
USAO_Rel_000276425 - USAO_Rel_000276426;
USAO_Rel_000276414 - USAO_Rel_000276416;
USAO_Rel_000021428 - USAO_Rel_000021430;
USAO_Rel_000022162- USAO_Rel_000022169.

addition, the Government has produced to the defendants a detailed 10-page index, produced to the Government by JPMC, of the data files.  The index contains the file name, JPMC Bates number, and detailed description (including whether and when those files were provided to JPMC's marketing team.[20]  Amar's request for the Government's bases to believe that Amar had knowledge of or involvement in the data files is an improper request for the Government's trial proof.  The Government has made a clear allegation in the Complaint, the details of which are easily located in the discovery (including a detailed index).  A bill of particulars as to the user data files should be denied.

Amar also claims that he has no idea "what theory of fraud the Government could present to the jury, or what acts they could claim implicate Mr. Amar as a knowing participant." (Amar Mot. to Dismiss at 35).  As an initial matter, a bill of particulars is not intended to provide the defendants with a preview of the Government's theory of the case or the specific details of every single act that might be presented at trial implicating a defendant.  *See Martinez*, 2023 WL 2403134, at *2 ("It may be easier for the defense to prepare for trial if the Government were to reveal its theory of prosecution and the evidentiary detail that it will offer in support of that theory. But that is not the function of a bill of particulars.").

More to the point, Amar's claim that he is in the dark as to the nature of the acts that implicate him could be accurate only if he has failed to read the Complaint, review the discovery, or read the 39-page excerpt of chats between Javice and Amar that the Government hand-selected for him as relevant to his knowledge and participation in the conspiracy.

Amar claims that the Complaint "barely place[es] him in the vicinity of a scheme, never mind implicating him in it." (Amar Mot. to Dismiss at 36).  Amar appears to have read a different

---

[20] *See* USAO_00006331-00006340.

Complaint, because the one filed in this case places him squarely in the conspiracy.  In fact, when Amar attempts to dismiss the allegations in the Complaint against him as thin, he mainly establishes the contrary, as he points to four different datapoints from the Complaint alone that place him in conspiracy.  (Amar Mot. to Dismiss at 35 ("[The Complaint] alleges only that Mr. Amar received an email from Ms. Javice with a spreadsheet she said she sent to JPMC, attended a videocall on August 2 about the types and purchase of data, legally purchased student records, and sent an email four months after the merger, to JPMC's Marketing Executive, about a marketing list, saying Ms. Javice would, 'take it from here.'").

Amar's attempt to paint the conduct ascribed to him in the Complaint as innocuous or tangential to the conspiracy is unconvincing.  As just one example, the Complaint alleges that, on the same day that JPMC asked Frank to provide a user data set that it could validate, Amar (on a videocall with Javice and Frank employee) asked a Frank employee to create a synthetic data set. *See* Complaint ¶ 22(f).  The employee's response to Amar was "I don't want to do anything illegal."  *See* Complaint ¶ 22(g).  Javice then replied, "We don't want to end up in orange jumpsuits."  *See id.*  The employee was uncomfortable with Amar's request to create the fake data set, and he told Javice and Amar that he would not do it.  *See* Complaint ¶¶ 22 (g)-(h).  In light of those allegations, Amar's present claim that the Complaint does not allege that Amar's conduct "had any connection to the merger, the data validation exercise, synthetic data, Scientist-1, or Ms. Javice's prior misrepresentations" is baffling.  (Amar Mot. to Dismiss at 36).

As another example, the Complaint clearly alleges that the purchase of student data in which Amar participated was part of the cover-up of the fraud.  *See* Complaint ¶ 28 ("Almost immediately, CHARLIE JAVICE, the defendant, began efforts to cover up her misrepresentation about Frank's purported 4.25 million student users by purchasing data for millions of students on

the open market."); *see also* Complaint ¶ 19 (describing Amar's purchase of data for 4.5 million students from Vendor-2, a process which Amar began only one day after JPMC asked for Frank's data). The selected WhatsApp chat excerpts provided to Amar by the Government include chats in which Amar discusses the purchase of the student data with Javice and references her need for a certain number of "users." In one of the chats provided to Amar before he was charged, shortly after Amar closed the deal with Vendor-2 to purchase data for 4.5 million college students on the open market, Amar messaged Javice: "You'll have 4.5m users today."

Amar claims that he "legally purchased" the student data. (Amar Mot. to Dismiss at 35). The question of whether Amar acted legally is ultimately a question for the jury. And that is exactly the problem with Amar's argument, the thrust of which is to contest the weight or inferences of the Government's allegations. Challenging the Government's specific allegations, or the inferences to be drawn from them, is very different from the Government *not providing* specific allegations of Amar's conduct in the scheme. It is clear that the Government has done so. Amar has the right to challenge the Government's proof at trial, and he will get the opportunity to do so. But he should not be permitted to use the vehicle of a bill of particulars to preview the Government's entire case-in-chief. *See United States v. Sattar*, 314 F. Supp. 2d 279, 318 (S.D.N.Y. 2004) ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories."). The request for the bill of particulars should be denied.

## IV. The Warrant Affidavit Established Probable Cause as Magistrate Judge Locke Found, and There is No Basis for Suppression

### A. **Background**

As described above, on April 3, 2023, the Honorable Steven Locke, United States Magistrate Judge for the Eastern District of New York, signed a search warrant (the "Warrant") authorizing agents to search Amar and Amar's home on Long Island for electronic devices belonging to Amar and to identify and seize from those devices certain categories of electronically stored information that contained evidence of the defendants' scheme to induce JPMC to acquire Frank, in violation of 18 U.S.C. §§ 1349 (conspiracy to commit bank and wire fraud); 1343 (wire fraud); 1344 (bank fraud); and 2 (aiding and abetting); and 15 U.S.C. §§ 78j(b) & 78ff, and 17 C.F.R. § 240.10b-5 (securities fraud) (collectively, the "Subject Offenses").   (Amar Mot. to Suppress Ex. A).

The Warrant was supported by an affidavit (the "Affidavit"), sworn to by Special Agent Jeremy Rosenman of the United States Attorney's Office.  (Amar Mot. to Suppress Ex. B).  The Affidavit set forth in detail the bases for believing that Amar had committed the Subject Offenses and that evidence of Amar's crimes would be found on Amar's electronic devices.  As to Amar's commission of the Subject Offenses, the Affidavit incorporated the entirety of the 23-page criminal complaint (in which Amar was referred to as CC-1) by reference and provided a summary of the detailed factual allegations concerning Amar's and Javice's criminal conduct.  (Amar Mot. to Suppress Ex. B ¶¶ 8-8(e)).  The Affidavit then set forth the bases for believing that evidence of the Subject Offenses would be found on Amar's electronic devices.  First, the Affidavit explained that Amar (and Javice) "used email extensively in furtherance of the fraud scheme."  (*Id.* ¶ 9(a)).  As an example, the Affidavit referred to emails between Amar and a vendor concerning Amar's attempt to purchase a "list of students currently in college," which Amar and Javice intended fraudulently to pass off as Frank's customer data set.  (*Id.* ¶ 9(a)).  Second, the Affidavit stated that Amar used an electronic messaging platform—Slack—in furtherance of the fraud scheme.

Third, the Affidavit explained that Amar and Javice "forwarded emails to each other, which were relevant to the fraud scheme, without any comment," which, as Special Agent Rosenman explained, can indicate that the parties to the email intended to continue their communications about the fraud through other electronic means. (*Id.* ¶ 9(c)). Fourth, the Affidavit contained a detailed toll analysis, showing that Amar and Javice had a high volume of cellphone communications with each other—approximately 1,838 occasions from January 3, 2021 through March 14, 2023—and their communications intensified during key periods of the fraud. (*Id.* ¶¶ 10-11). Moreover, the Affidavit explained that Javice and Amar remained in communication with each other after their terminations from JPMC in the fall of 2021 through March 2023 (up until the period for which the Government had obtained toll records and only a month before it sought the Warrant). (*Id.* ¶ 11(c)). Finally, Special Agent Rosenman, based on his considerable experience investigating fraud schemes (*Id.* ¶ 1), explained why evidence of the Subject Offenses would likely be found on Amar's electronic devices. (*Id.* ¶¶ 12-15).

On the evening of April 3, 2023, at approximately 8:30 pm—shortly after agents arrested Javice—agents executed the Warrant. Agents pulled over Amar's vehicle (in which Amar was the driver and his spouse the passenger) near Amar's home on Long Island. Amar was cooperative, gave his cellphone to the agents, and voluntarily provided the phone's passcode. While law enforcement had the authority to search Amar's home for all of his electronic devices, the agents elected not to conduct such a search because they had already secured Amar's primary cellphone

and because Amar had a minor child at home.  At no time did law enforcement agents threaten or coerce Amar or his family members.[21]

## B. **Applicable Law**

### 1. **Deference to Judicial Findings of Probable Cause**

A judge's finding of probable cause is afforded significant deference. "A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists . . . . The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (internal citations omitted) (reversing suppression order).

Moreover, "[p]robable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "A judge's probable-cause determination is not overly strict.  Presented with a warrant application, the judge must 'simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "The quanta of proof necessary to establish probable cause is 'only the probability, and not a *prima facie* showing, of criminal activity.'"

---

[21] To be clear, and as set forth below in greater detail, Amar's salacious accusation that law enforcement threatened to break Amar's phone "in pieces" if he did not provide the passcode is false.  (Amar Mot. to Suppress Ex. D ¶ 8; *see also* Amar Mot. to Suppress 4 (falsely asserting that law enforcement "threated to break [Amar's] phone into pieces)).  It also makes no sense.  Law enforcement believed (correctly, as it turned out) that Amar's phone contained evidence of his commission of the Subject Offenses.  Destroying the cellphone would only serve to thwart the agents' objective of obtaining that evidence.

*Wagner*, 989 F.2d at 72 (quoting *Gates*, 462 U.S. at 235).  Neither is there any "bright-line rule for staleness." *Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007) ("[A] magistrate is expected to consider the age of the facts in light of the conduct at issue with a view toward ensuring that probable cause exists at the time the warrant is to be executed, not simply at some past time."). And, "in circumstances of continuing or ongoing conduct, as contrasted with isolated illegal acts, 'the passage of time between the last described act and the presentation of the application becomes less significant.'" *Id.* (quoting *United States v. Martino*, 664 F.2d 860, 867 (2d Cir. 1981)).

Moreover, "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Martin*, 426 F.3d at 74 (quoting *Gates*, 462 U.S. at 232). Thus, "[i]n assessing probabilities, a judicial officer must look to 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Walczyk*, 496 F.3d at 156 (quoting *Gates*, 462 U.S. at 231). "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Such determinations must be approached in a practical way, because "probable cause is a flexible, common-sense standard." *Gates,* 462 U.S. at 231-32, *Texas v. Brown*, 460 U.S. 730, 742 (1983). Additionally, the training and experience of law enforcement agents bear significantly on probable cause determinations. *Gates*, 462 U.S. at 232. Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances, and their training and experience can all support a probable cause finding. *Id*. at 231-32.

Once a warrant has been issued by a judge and executed, the duty of a court reviewing a magistrate judge's probable cause determination on a motion to suppress is far more limited: its

task is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238-39 (quoting *Jones v. United States,* 362 U.S. 257, 271 (1960)). The issuing magistrate's decision is "entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant." *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993). Indeed, the magistrate's "finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). "Such deference derives not only from the law's recognition that probable cause is 'a fluid concept' that can vary with the facts of each case, but also from its 'strong preference' for searches conducted pursuant to a warrant." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 232, 236).  Thus, as described in *Clark*, the "task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." *Clark*, 638 F.3d at 93 (quoting *Gates*, 462 U.S. at 238).

### 2.  Overbreadth in Complex Investigations

With respect to overbreadth specifically, "a warrant is overbroad if its 'description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'" *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2nd Cir. 2013)); *see also United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *8 (S.D.N.Y. Jan. 6, 2010) (framing the overbreadth inquiry as "whether the magistrate judge authorized search warrants that were constitutionally

overbroad because they provided for the seizure of specific items for which there is no probable cause").

The more complex the crimes under investigation, the broader the categories of documents and records that may properly be seized. *See, e.g.*, *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 304-05 (S.D.N.Y. 2018) ("The level of specificity required depends on the nature of the crime and its level of complexity."); *United States v. Jacobson*, 4 F. Supp. 3d 515, 526 (E.D.N.Y. 2014) (concluding that breadth of warrant, which contained no timeframe limitation, was justified because "the crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity"); *United States v. Levy*, No. S5 11 Cr. 62 (PAC), 2013 WL 664712, at *7-8 (S.D.N.Y. Feb. 25, 2013) (explaining that broad warrant with no time limitation was justified by scope and complexity of fraud described in affidavit); *United States v. Dupree*, 781 F. Supp. 2d 115, 149 (E.D.N.Y. 2011) (describing how "[t]he nature of the crime . . . may require a broad search," including where "complex financial crimes are alleged")).

### 3.  Particularity in Complex Investigations

"Although somewhat similar in focus, particularity and overbreadth are two distinct legal issues." *Lustyik*, 57 F. Supp. 3d at 228 (quoting *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013)). While "the overbreadth inquiry asks 'whether the warrant authorized the search and seizure of items as to which there is no probable cause,'" the particularity inquiry requires a court to assess "whether the warrant 'enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize.'" *Id*. A search warrant must be "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000). "To be sufficiently particular under the Fourth Amendment, a warrant must

satisfy three requirements." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017).  It must (i) "identify the specific offense for which the police have established probable cause," (ii) "describe the place to be searched," and (iii) "specify the items to be seized by their relation to designated crimes." *Id.* (quoting *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013)). "The Fourth Amendment does not require a perfect description of the data to be searched and seized . . . ." *Id.* at 100.   Indeed, "[w]here, as here, complex financial crimes are alleged, a warrant properly provides more flexibility to the searching agents," *Dupree*, 781 F. Supp. 2d at 149, and "it may be appropriate to use more generic terms to describe what is to be seized," *United States v. Gotti*, 42 F. Supp. 2d 252, 274 (S.D.N.Y. 1999).  "[A] search warrant does not necessarily lack particularity simply because it is broad." *Ulbricht*, 858 F.3d at 100.  When a search warrant limits the scope of the search to evidence of particular federal crimes, and gives an "illustrative list of seizable items," the search warrant is sufficiently particular.  *United States v. Riley*, 906 F.2d 841, 844-45 (2d Cir. 1990) (citing *United States v. Young*, 745 F.2d 733, 759-60 (2d Cir. 1984), *cert. denied*, 470 U.S. 1084 (1985)); *see also United States v. Ables*, 167 F.3d 1021, 1034 (6th Cir. 1999) (upholding warrant over overbreadth challenge when it "supplied sufficient examples of the items that the IRS was authorized to seize . . ."); *Lustyik*, 57 F. Supp. 3d at 227 ("The inclusion of an illustrative list of seizable items brings the Warrants within the Fourth Amendment's particularity parameters."); *United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants."); *United States v. D'Amico*, 734 F. Supp. 2d 321, 363 (S.D.N.Y. 2010) ("Attachment A provides an exemplary list of records and other items falling within the scope of the Warrant,

thereby enabling the executing agents to identify with reasonable certainty what they were authorized to seize.").

The requirement is satisfied if the warrant, including its attachments, enables the executing officer to ascertain and identify with reasonable certainty those items that the magistrate judge has authorized them to seize. *See Groh v. Ramirez*, 540 U.S. 551, 557-58 (2004); *Rosa*, 626 F.3d at 58. This does not mean that the warrant must leave nothing to the discretion of the executing officer. To the contrary, "[o]nce a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *Riley*, 906 F.2d at 845. "[A] warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category. But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'" *Id.*

Moreover, "[c]ourts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant." *Young*, 745 F.2d 733 at 759 (2d Cir. 1984). Indeed, "where a particularly complex scheme is alleged to exist, it may be appropriate to use more generic terms to describe what is to be seized." *Gotti*, 42 F. Supp. 2d at 274 (citing *United States v. Regan*, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989) ("The degree to which a warrant must state its terms with particularity varies inversely with [the] complexity of the criminal activity

investigated.")); *see also Pinto-Thomaz*, 352 F. Supp. 3d at 304-05 ("The level of specificity required depends on the nature of the crime and its level of complexity.").

### 4.   Good-Faith Reliance on Judicially Authorized Warrants

Even if a warrant lacks probable cause, is insufficiently particular, or is overbroad, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144; *see also Rosa*, 626 F.3d at 64, 66. As a result, exclusion should be a "last resort" rather than a "first impulse." *Rosa*, 626 F.3d at 64 (quoting *Herring*, 555 U.S. at 140).

Thus, suppression will generally not be warranted where the evidence at issue was "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). Although the burden is on the Government to establish good faith, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.*; *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (noting that the "issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause"). Accordingly, considering this exception, "the Supreme Court [has] strongly signaled that most searches conducted pursuant to a warrant would likely fall within [the] protection" of the good faith exception. *Clark*, 638 F.3d at 100 (2d Cir. 2011) (citing *Leon*, 468 U.S. at 922).

Indeed, there are only four narrow circumstances in which the good-faith exception does not apply: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.  *Id.*

## C. **Discussion**

Amar asserts that the judicially authorized Warrant was based on insufficient probable cause, was overbroad, and was insufficiently particularized.  In support, Amar contends that the Affidavit furnished insufficient grounds to conclude that evidence of the Subject Offenses would be found on Amar's electronic devices, that the Warrant's scope exceeded the probable cause on which it was issued, and that the executing agents used the allegedly defective warrant to coerce Amar into providing his passcode.  These arguments are meritless. The Affidavit set forth extensive probable cause that Amar and Javice conspired to engage in the Subject Offenses and that evidence of their crimes would be found on Amar's electronic devices.  The result of that Affidavit was a judicially authorized Warrant that identified the conduct and criminal offenses for which evidence was being sought, described the items to be searched, and specified the items to be seized as evidence of the listed offenses.  Nothing more was required, and there is no basis to disturb the magistrate judge's finding of probable cause or to suppress the fruits of this lawful search.

### 1.  **The Judicially Authorized Search Warrant Was Supported by Probable Cause**

The Affidavit provided substantial evidence of Amar's participation in the Subject Offenses through means that made it reasonably likely that evidence of those crimes would be found on his electronic devices.  Under these circumstances, there is no basis to disturb the

"substantial deference" that is owed to the issuing judge's probable cause determination. *Rosa*, 11 F.3d at 326.

In support of his motion, Amar incorrectly claims that "[t]he gravamen of the Affidavit's asserted probable cause . . . rests entirely on Agent Rosenman's" cellphone toll analysis. Not so. As set forth above, the Affidavit detailed the many ways in which Amar used electronic means in furtherance of the fraud scheme. First, the Affidavit explained that Amar "used email extensively in furtherance of the fraud scheme." (Amar Mot. to Suppress Ex. B ¶ 9(a)). The Affidavit provided specific instances of Amar's emailing in furtherance of the fraud scheme, including with a vendor to buy customer data that the defendants would falsely pass off as Frank's own data, and with Javice in furtherance of the fraud scheme. (*Id.* ¶¶ 9(a), (c)). Second, the Affidavit explained that, in addition to the use of emails, Amar used an electronic messaging platform, Slack, to send communications in furtherance of the fraud.[22] (*Id.* ¶ 9(b)). Third, the Affidavit contained a detailed toll analysis of connections between Amar's and Javice's cellphones, with a focus on communications during key periods of the fraud. (*Id.* ¶ 11). Indeed, Amar was Javice's top contact, with 1,838 contacts between January 3, 2021 through March 14, 2023. While the cellphone toll analysis alone would have supplied sufficient probable cause to seize Amar's cellphones (including the device that was ultimately seized), the Affidavit provided much more. It is simply not the case that the Affidavit relied "entirely" on cellphone toll analysis.

Focusing on the Affidavit's toll analysis, Amar claims that the analysis was flawed because Amar's cellphone number was "assigned to different physical devices during the time period described in the analysis." (Amar Mot. to Suppress 3, 8-12). Based on this, Amar asserts that the

---

[22] Slack is a cloud-based team communication platform. Slack offers its users multiple functionalities, including persistent chat rooms, private group chats, and direct messaging.

Affidavit "provides no support for the claim that the actual physical devices to be seized" will contain evidence of the Subject Offenses. (*Id.* at 9). This argument is unpersuasive. As an initial matter, Amar acknowledges, as he must, that many (indeed, a plurality) of the cellphone communications that are the subject of the Affidavit's toll analysis involved the specific cellphone that agents seized from Amar. (Amar. Mot. to Suppress 10). But, more importantly, the identity of the specific electronic devices used in furtherance of the fraud scheme was not necessary. *See United States v. Johnson*, 19 Cr. 140, 2021 WL 2667168, at *5 (D. Vt. June 29, 2021), aff'd, 93 F.4th 605 (2d Cir. 2024) ("[T]he Government was under no constitutional requirement to identify a small number of electronic devices to search. The warrant application and affidavit were comprehensive in their identification of every conceivable type of electronic device as potential sources of evidence. That is because electronic files appear on many types of devices. Televisions connect to the internet; cell phones have some of the same capabilities as laptops; and electronic traces of communication and use may be found on virtually any device with a memory chip or card."); *see also United States v. Gatto*, 313 F. Supp. 3d 551, 558 (S.D.N.Y. 2018) ("[A] sufficient nexus between the alleged criminal activities and the place to be searched 'does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience.'") (quoting *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004)). Amar used various types of electronic platforms to engage in the fraud scheme—email, online chats, and cellphones—and thus there was probable cause to seize electronic devices from Amar to search those devices for evidence of the Subject Offenses.

That Amar upgraded his cellphone on two occasions between 2021 and 2023 does not diminish the Affidavit's probable cause. To the contrary, inclusion of this fact in the Affidavit would have provided additional support for Special Agent Rosenman's belief "that AMAR is in

possession of multiple electronic devices." (Amar Mot. to Suppress Ex. B ¶ 15). Amar suggests that his cellphone upgrades undermine the Affidavit's probable cause because data may not be transferred from one device to the other. (Amar Mot. to Suppress 9-10). This argument is unpersuasive. First, many of the communications between Amar and Javice that were the subject of the Affidavit's toll analysis occurred using the device that was seized from Amar. Second, "it is common for a person to transfer data from an old phone onto a new phone." *Coyne v. Los Alamos Nat's Sec.*, 15 Civ. 54, 2017 WL 3225466, at *9 (D.N.M. May 1, 2017). *See also Lamb v. Liberty Univ.*, 21 Civ. 55, 2022 WL 3692670, at *5 (W.D. Va. Aug. 25, 2022) ("It is also unusual for a person to exchange phones without transferring data from the old phone onto the new one"); (Amar Mot. to Suppress Ex. B. (warrant affidavit) ¶ 19 ("In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data.")). Third, it is also well-known that records and information commonly accessed through cellphones—such as emails and messaging applications (both of which were the subject of the Warrant and Affidavit here)—are stored on cloud-based applications that can be downloaded to multiple devices. Indeed, the cellphone seized from Amar pursuant to the Warrant contained scores of incriminating messages between Amar and Javice from 2021—before Amar upgraded his cellphone—that were saved to WhatsApp, a cloud-based messaging platform.

Amar's reliance on *United States v. Gonzalez-Arocho,* No. 22 Cr. 418 (PAD), 2024 WL 277507 (D.P.R. Jan. 25, 2024), is unavailing.[23] That case involved a search warrant for a single

_____

[23] Amar also cites *United States v. Lauria*, 70 F.4th 106 (2d Cir. 2023) to argue that "calls with a known perpetrator's phone are insufficient to establish probable cause to obtain even a limited subset of location records . . . ." *Id.* at 129. That is not the law and not what the Court held in *Lauria*. In that case, it was undisputed that the challenged search warrant affidavits merely established one communication between the defendant and an alleged coconspirator and there was no other evidence connecting the defendant to the crime, a robbery. *Id. Lauria* is not on point.

cellphone, which was specifically described in the warrant as an Apple iPhone 6S having a specific IMEI number.  *Id.* at *2.  Law enforcement ultimately seized a different cellphone—an Apple iPhone 13 with a different IMEI number.  *Id.*  That is not what happened here.  Law enforcement sought and obtained a Warrant for all electronic devices used by Amar based on, among other things, evidence that Amar used various electronic means in furtherance of his crimes.  The cellphone that law enforcement ultimately seized from Amar fit the description contained in the Warrant.  Amar does not, and cannot, allege otherwise.

In short, there was ample probable cause in the Affidavit establishing Amar's commission of the Subject Offenses and his use of numerous electronic means in furtherance of those offenses. There were no material omissions or misleading statements in the Affidavits undermining its reliability.

### 2.  The Search Warrant Was Neither Unparticularized nor Overbroad

Amar's short overbreadth argument—which relies almost entirely on cases that set out general standards—is that there was an insufficient basis to search all of Amar's electronic devices for evidence of the Subject Offenses.  (Amar. Mot. to Suppress 22-23).  As set forth above, there was abundant evidence in the Affidavit that Amar used various electronic means in furtherance of his crimes, including emails, messaging applications, and cellphones.  Given the variety of electronic means used by Amar, which could be accessed from any number of electronic devices, and Special Agent Rosenman's supported, common sense belief that Amar possessed multiple electronic devices, there was more than a sufficient basis for Magistrate Judge Locke to authorize the search of Amar's electronic devices for evidence of the Subject Offenses.  *See Yu*, 2023 WL 4687970, at *11 ("a warrant does not become overbroad for having the phrase 'any electronic devices.'").  For the same reason, the facts here are unlike the single case cited by Amar,

*United States v. Disla Ramos*, in which there was an insufficient basis to search all electronic devices. No. 22 Cr. 431 (LJL), 2022 WL 17830637, at *13 (S.D.N.Y. Dec. 21, 2022). That case involved a gun-point robbery in which the defendant's use of electronic devices in furtherance of the subject offenses was limited to a single phone call between the defendant and his co-conspirator an hour after the robbery. *Id.* at *3. Even that single call, the Court found, was a sufficient basis for a cellphone warrant. *Id.* at *17. But the Court found that the search warrant was overbroad as to other types of electronic devices because the evidence of the defendant's use of electronic devices was limited to a single telephone call. *Id.* at *18. The evidence set forth Special Agent Rosenman's Affidavit (emails, messaging applications, and cellphone communications) goes well beyond a single phone call. In any event, even if the Warrant were overbroad, which it is not, the agents only seized Amar's cellphone. They did not seize other types of electronic devices, *e.g.*, computers, hard drives, etc. *See id.* (denying motion to suppress warrant as overbroad where agents seized only a cellphone for which there was probable cause).

Amar's particularity argument is likewise without merit. Amar contends that the Warrant is unparticularized because it authorizes law enforcement to search all electronic devices that Amar "appears to use." (Amar Mot. to Suppress 24-25). A warrant that calls for seizure of "all evidence" of a given crime or crimes is sufficiently particular if it offers a list of illustrative items. *See Riley*, 906 F.2d at 843-45 (warrant containing list of illustrative items to seize was sufficiently particular notwithstanding provision allowing, as well, seizure of "other items that constitute evidence of the offenses" identified); *Lustyik*, 57 F. Supp. 3d at 227-28 (warrant permitting seizure of all "evidence, fruits, or instrumentalities" of specified crimes was sufficiently particular because it contained "an illustrative list of items to be seized," even though illustrative list was preceded by phrase "including but not limited to"); *Jacobson*, 4 F. Supp. 3d at 524 ("The reference to particular

offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants."). The Warrant did exactly that. It listed the specific Subject Offenses (further particularized by a description of the conduct that violated the Subject Offenses – "a scheme to submit false statements an information about [Frank] in order to induce [JPMC] to acquire Frank for approximately $175 million) and contained an illustrative list of items that agents were authorized to seize ("cellphones, tablets, computers, and electronic storage media").

Amar argues that the Warrant authorized law enforcement to seize "any device one would expect to find inside a family home . . . ." (Amar Mot. to Suppress 24). That is not the case. The Warrant only authorized law enforcement to seize electronic devices that appeared to the executing agents to be used by Amar. (Ex. A USAO_00000096). While, of course, there is no exact science to making such a determination, courts have repeatedly recognized that executing agents must have as a practical matter "some discretion . . . to interpret the words of every warrant no matter how particularly the items to be seized are described." *United States v. Marti*, 421 F.2d 1263, 1268 (2d Cir.1970); *see also United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir.1982) ("A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized"); *United States v. Lake*, 233 F. Supp. 2d 465, 471 (E.D.N.Y. 2002) ("[c]onstitutional particularity requires only that a warrant be 'sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items [ ] be seized.'"). In any event, Amar does not dispute that the device seized from him in fact belonged to him.

### 3.   There is No Basis to Disturb Magistrate Judge Locke's Probable Cause Finding.

Even if there were a question as to the sufficiency of the Warrant—and there is none here—Magistrate Judge Locke's determination is entitled to "substantial deference." *Wagner*, 989 F.2d

at 72.  Because "[r]easonable minds frequently may differ on the question whether a particular affidavit established probable cause," *Leon*, 468 U.S. at 914, "doubts should be resolved in favor of upholding the warrant," *Rosa*, 11 F.3d at 326.  In arguing that the Court should afford no deference to Magistrate Judge Locke, Amar points to, what he describes as, "significant deficiencies" that call into question whether the Affidavit and Warrant were reviewed with sufficient rigor.  (Amar Mot. to Suppress 18-20).  This argument has no merit.

First, Amar argues that the lack of a date range governing what materials were responsive to the Warrant somehow suggests that Magistrate Judge was not paying attention when he authorized the Warrant.  This argument is nonsense.  The Government is unaware of any authority —and Amar cites none—requiring such a temporal range.[24]  *United States v. Triumph Cap. Grp., Inc.*, 211 F.R.D. 31, 58 (D. Conn. 2002) ("absence of a temporal limitation does not render the warrant a prohibited general warrant.").  As a practical matter, date ranges can be very difficult to apply to electronic devices, as opposed to, for example, email search warrants.  That is because it is difficult to apply date filters to most data stored on cellphones, and the software used to create forensic images of cellphone data often do not have date range features.  And as a legal matter, the Warrant did not authorize seizure of electronically stored information unconnected to the Subject Offenses and thus the Warrant did not permit "the seizure of records dating back arbitrarily far and untethered to the scope of the affidavit . . . ."  (Amar Mot. to Suppress 19, quoting *United States*

---

[24] Amar cites *In re 650 Fifth Ave.*, 934 F.3d 147, 163 (2d Cir. 2019) as holding that a "premises warrant for electronic devices [was] 'facially deficient' for 'not even arguably' including a 'temporal scope for the items to be seized." That is misleading. The Second Circuit actually found the warrant deficient because "[i]t does not even arguably include *a reference to the Claimants' alleged crimes* or a temporal scope for the items to be seized." *Id.* (emphasis added). The warrant at issue in that case suffered from scores of other defects. The facts here are very different. The Warrant plainly refers to Amar's crimes—both listing the Subject Offenses and a summary of the facts underlying those offenses.

*v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *11 (S.D.N.Y. Feb. 25, 2013)).  Accordingly, the lack of date range in the Warrant does not in any way suggest or imply the inattention Amar ascribes to Magistrate Judge Locke.

Second, Amar points out that a box is checked on the cover of the Warrant authorizing the search to occur any time of day or night, which requires a reasonable cause showing.  While the Government acknowledges that this box should not have been checked, the fact that it was checked does not support the extraordinary inference that Amar asks the Court to make—that Magistrate Judge Locke was not paying attention when he reviewed the Affidavit and Warrant, requiring suppression.  *Cf. United States v. Fruchter*, 104 F.Supp.2d 289, 307 (S.D.N.Y. 2000) ("a typographical error in the warrant itself . . . is immaterial and does not require the extreme sanction of suppression or reversal of the warrant.").

### 4.  In the Alternative, the Agents Relied in Good Faith on the Search Warrant

Finally, even if there were some flaw in the Warrant, suppression would be unwarranted based on the application of the good faith exception.  First, as explained above, there is no serious argument that Magistrate Judge Locke had been "knowingly misled" or had "wholly abandoned his judicial role."  Amar points to no inaccuracies in the Affidavit.  *Clark*, 638 F.3d at 100 (2d Cir. 2011).  And, as set forth above, inclusion in the Affidavit of the facts concerning the defendant's cellphone upgrades (which Amar baselessly contends to be a reckless omission) would have served only to enhance the probable cause.

Second, the Affidavit was not "so lacking in indicia of probable cause as to render reliance upon it unreasonable."  As discussed above, there were sufficient facts set forth in the Affidavit to support the magistrate judge's probable cause determination.  Moreover, the Second Circuit has observed that "[t]his is a very difficult threshold to meet, as evidenced by the many decisions of

this Court rejecting objections to the good-faith exception on this basis." *United States* v. *Falso*, 544 F.3d 110, 128 n.24 (2d Cir. 2008) (collecting cases); *see also Leon*, 468 U.S. at 926 (concluding that the good faith exception applies where a warrant affidavit "provide[s] evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause"); *United States* v. *Clark*, 638 F.3d 89, 103 (2d Cir. 2011) (noting that "[s]uch a concern most frequently arises when affidavits are bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations").

Finally, the Warrant was not facially deficient, and it was certainly not "so facially deficient" that reliance on the Warrant was unreasonable.  This is also a very difficult threshold for a defendant to meet.  It requires a demonstration that "a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Buck*, 813 F.2d 588, 592 (2d Cir. 1987).  The defendant has not attempted to make such a demonstration, nor would he be able to.

As a last resort, Amar, makes false accusations of misconduct in an apparent attempt to ascribe bad faith to the executing agents.  Amar claims that the agents threatened to break Amar's phone into pieces (which, as noted above, would defeat the entire purpose of obtaining the Warrant) and rummage through the entirety of Amar's home unless Amar furnished to the agents the passcode to his cellphone.  Building on these false accusations, Amar argues that the agents "took full advantage" of the "overbreadth and lack of particularity in the Warrant" to coerce Amar into providing his passcode.[25]  (Amar Mot. to Suppress 26).

_____

[25] Amar does not argue that the agents subjected him to a custodial interrogation under *Miranda v. Arizona*, 384 U.S. 436 (1966).  However, even assuming Amar was in custody when he provided his cellphone passcode to the agents—which he plainly was not—*Miranda* violations do not

Amar's accusations are false.  The agents did not threaten Amar.  They did not threaten to break his cellphone into pieces.  And they did not threaten to rummage through his family home.  While Amar's false attack on the agents creates a factual dispute between the parties, it is not a dispute that requires a hearing.  Amar's argument has two parts.  First, the agents obtained an unconstitutionally broad warrant.  Second, they used the unconstitutionally broad warrant to coerce the defendant into providing his passcode.  (Amar Mot. to Suppress at 26 ("The overbreadth and lack of particularity in the Warrant empowered law enforcement to threaten him in this matter.")).  Because there are no deficiencies in the warrant—it is not overbroad or unparticularized—a finding the Court can easily make without a hearing, the Court need not consider Amar's accusations concerning the agents' alleged weaponization of the "overbreadth and lack of particularity in the Warrant."  Nor is a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) needed, because there are no misleading statements contained in the Affidavit.

---

require the exclusion of physical evidence obtained based on a subject's unwarned statements. *See United States v. Patane,* 542 U.S. 630, 637-42 (2004).  "Further still, even if one assumes that [Amar's] divulging his password was not just unwarned but also coerced, that would still likely not require suppression. Although courts and commentators have taken varying views on the matter, *see* Orin Kerr, Compelled Decryption and the Privilege against Self-Incrimination, 97 Tex. L. Rev. 767 (2019), the Court holds the view that being made to produce a phone password—at least, where, as here, there is no real dispute that the person in fact owns the phone and knows its password—does not violate the Fifth Amendment's guarantee against self-incriminating testimony."  *United States v. Smith*, 673 F. Supp. 3d 381, 388 (S.D.N.Y. 2023).

## CONCLUSION

For the foregoing reasons, the defendants' motions should be denied in their entirety.

Dated:  New York, New York
        May 3, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

        By:   _____
                              Rushmi Bhaskaran
                              Nicholas W. Chiuchiolo
                              Micah F. Fergenson
                              Dina McLeod
                              Assistant United States Attorneys
                              Telephone: (212) 637-2439 / 1247 / 2190 / 1040