**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

UNITED STATES OF AMERICA,

        - v. -

CHARLIE JAVICE and OLIVIER AMAR,

           Defendants.

-----------------------------------------------------------x

23 Cr. 251 (AKH)

**REPLY IN SUPPORT OF DEFENDANT OLIVIER AMAR'S MOTION TO DISMISS**
**THE INDICTMENT OR IN THE ALTERNATIVE FOR A BILL OF PARTICULARS**

KOBRE & KIM LLP
Sean S. Buckley
Steven G. Kobre
Alexandria E. Swette
Genna L. Sinel
800 Third Avenue
New York, NY 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

Victoria Fordin (*pro hac vice forthcoming*)
Jake Rush (*pro hac vice forthcoming*)
1919 M Street, NW
Washington DC 20036
Tel: (202) 664-1900
Fax: (202) 664-1920

*Counsel for Defendant Olivier Amar*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.      The Lack of Specificity as to Mr. Amar Warrants Dismissal ............................. 3

II.     Alternatively, the Lack of Specificity as to Mr. Amar Warrants Particulars ..................... 5

        A.      Particulars Are Warranted as to the Alleged Misrepresentations and
                Mr. Amar's Knowledge and Concealment Thereof (Request 1) ........................... 6

        B.      Particulars Are Warranted as to Mr. Amar's Conduct Indicating Knowledge
                of and Knowing Participation in a Scheme to Defraud (Requests 2–3) ................ 8

        C.      Particulars Are Warranted as to the User Data Files (Requests 4–5) .................... 9

        D.      Particulars Are Warranted as to the Identity of the Other "Potential
                Acquiring Companies" and "Financial Institutions" (Requests 6–7) .................. 10

        E.      Particulars Are Warranted as to the Unnamed Co-Conspirators (Request 8) ....... 11

        F.      Voluminous Discovery Is No Substitute for Particulars ....................................... 13

III.    The Indictment Should be Dismissed for Other Infirmities ............................................. 16

        A.      The Indictment Impermissibly Relies on the "Right-to-Control" Theory
                of Fraud ........................................................................................................... 16

        B.      The Government Fails to State a Claim for Bank Fraud ..................................... 18

        C.      Counts Two Through Four Are Duplicitous and Should be Dismissed .............. 20

CONCLUSION .......................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ciminelli v. United States,*
    598 U.S. 306 (2023) .................................................................................................. 17

*Kelly v. United States*,
    140 S. Ct. 1565 (2020) .............................................................................................. 17

*Loughrin v. United States*,
    573 U.S. 351 (2014) .................................................................................................. 18

*Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*,
    483 F. Supp. 3d 195 (S.D.N.Y. 2020) ................................................................ 21, 22

*Sec. & Exch. Comm'n v. Govil*,
    86 F.4th 89 (2d Cir. 2023) ........................................................................................ 17

*United States v. Madrid*,
    916 F. Supp. 2d 730 (W.D. Tex. 2012) .............................................................. 12, 21

*United States v. Palmer*,
    No. 20-cr-379 (MKV), 2021 WL 1614837 (S.D.N.Y. Apr. 26, 2021) .............. 12, 21

*United States v. Rajaratnam*,
    No. 09-cr-1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ...................... 15

*UMB Bank, N.A. v. Benton*,
    No. 21-cv-832 (BP), 2022 WL 16753765 (W.D. Mo. June 29, 2022) .......... 18, 19, 20

*United States v. Ashley*,
    905 F. Supp. 1146 (E.D.N.Y. 1995) ...................................................................... 3, 4

*United States v. Bin Laden*,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000) ....................................................................... 15

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987) ............................................................................... 14, 15

*United States v. Bouchard*,
    828 F.3d 116 (2d Cir. 2016) ..................................................................................... 19

*United States v. Constantinescu*,
    No. 22-cr-612 (ASH), 2024 WL 1221579 (S.D. Tex. Mar. 20, 2024) .......... 16, 17, 18

*United States v. Curtis*,
    506 F.2d 985 (10th Cir. 1974) .................................................................................... 4

*United States v. Davidoff*,
    845 F.2d 1151 (2d Cir. 1988) ................................................................................... 15

*United States v. Dawkins*,
999 F.3d 767 (2d Cir. 2021) ................................................................. 5

*United States v. Hinton*,
127 F. Supp. 2d 548 (D.N.J. 2000) ..................................................... 20

*United States v. Holmes*,
No. 18-cr-258 (EJD), 2020 WL 666563 (N.D. Cal. Feb. 11, 2020) ......... 8

*United States v. Kahale*,
789 F. Supp. 2d 359 (E.D.N.Y. 2009) ............................................. 13, 15

*United States v. Margiotta*,
646 F.2d 729 (2d Cir. 1981) .......................................................... 20, 21

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000) ......................................... 12, 13, 15

*United States v. Rigas*,
281 F. Supp. 2d 660 (S.D.N.Y. 2003) ................................................ 21

*United States v. Savin*,
No. 00-cr-45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ........... 14

*United States v. Shine*,
No. 17-cr-28 (FPG) (JJM), 2018 WL 1721924 (W.D.N.Y. Feb. 26, 2018) ........... 21

*United States v. Steffen*,
687 F.3d 1104 (8th Cir. 2012) ............................................................ 4

*United States v. Strawberry*,
892 F. Supp. 519 (S.D.N.Y. 1995) ..................................................... 11

*United States v. Stringer*,
730 F.3d 120 (2d Cir. 2013) .............................................................. 15

*Yeager v. United States*,
557 U.S. 110 (2009) ........................................................................ 22

## Rules

Dep't of Justice Manual 9-11.151 .......................................................... 13

Fed. R. Crim. P. 7(c)–(f) ...................................................................... 15

Fed. R. Crim. Pro. 12(b)(3)(B)(v) .......................................................... 18

Federal Rule of Evidence 408 ............................................................... 13

FINRA Rule 4511 .............................................................................. 19

Defendant Olivier Amar respectfully submits this memorandum of law in reply to the Government's Opposition to Defendants' Pretrial Motions, dated May 3, 2024 (ECF No. 122) (the "Opposition"), and in furtherance of his Motion to Dismiss the Indictment or in the Alternative for a Bill of Particulars, dated April 5, 2024 (the "Motion to Dismiss") (ECF No. 117).

## PRELIMINARY STATEMENT

In a case centered on alleged misstatements, Mr. Amar is entitled to know what those statements are, who made them (and whether he is alleged to have made or known about any), to whom they were made, and the manner in which they were false or misleading. The transaction underlying this case is a $175 million merger. The intake, assessment, diligence, and closing spanned months; involved multiple pitches, meetings, and calls; required the exchange of numerous documents, charts, and statistics (including, most relevant here, various kinds of user data and metrics across multiple Frank products); and implicated over 100 bank employees. Indeed, the Government has produced nearly 4 million pages of documents in this case to date.

Against this backdrop, the Government points to a smattering of exchanges—none of which involve Mr. Amar—to allege broadly that Defendants "falsely represented to JPMC . . . that Frank had over 4 million users or customers" "in oral statements, in electronic communications, in PowerPoint presentations, and in data room documents." Compl. ¶ 19. Throughout the Complaint, the allegations freely bounce between statements concerning "households," "customers," "users," "students," "families," "unique ID[s]," "data fields," "apps," "records," and "FAFSA in Process"—all terms that mean different things in different contexts—and refer to a variety of historical, current, and projected numbers ranging from 4.25 million (at times, 4.265 million), to 5.6 million, to 5.4 million, to 8 million. *See, e.g.*, *id*. And the Complaint frequently uses generic, non-exclusive descriptors—"for example," "similarly," "repeatedly," and so forth.

This lack of specificity as to Mr. Amar necessitates the dismissal of the Indictment or, at the very least, a bill of particulars in order to focus these sweeping allegations and avoid a trial by surprise.

Rather than particularize its vague, imprecise allegations, the Government hides behind voluminous discovery and inappropriately weaponizes confidential pre-indictment exchanges between Mr. Amar and the Government (in which the Government simply provided Mr. Amar with snippets of his own WhatsApp exchanges with Ms. Javice—messages it later provided in discovery). The Government's position smacks of gamesmanship and is inconsistent with the presumption of innocence. Expansive discovery does not correct the barebones allegations against Mr. Amar—in fact, it has the opposite effect. And putting aside the improper use of information exchanged in off-the-record attorney proffers, the excerpted communications do nothing to put Mr. Amar on notice of any allegedly false or misleading statements, let alone any made by him. Ultimately, Mr. Amar is left to sift through nearly 4 million pages of discovery to try to guess which statements he has to defend against, instead of the Government simply providing those statements to Mr. Amar.

The Government also does little to address the many other fatal deficiencies of the Indictment, each demanding its dismissal. *First*, the Opposition shirks the *Ciminelli* problem. The Complaint impermissibly relies on a "right to control" theory in disguise, whereby Mr. Amar is alleged to have deprived JPMC of its right to information necessary to make a discretionary economic decision *after* the consummation of the merger—not money or property. *Second*, the Government distorts the meaning of the bank fraud statute, which does not apply to instances where JPMC is functioning in a capacity outside of a traditional FDIC-insured institution (the very type of entity that the bank fraud statute was designed to protect). *Third*, the Opposition sidesteps the duplicity issue almost entirely. The Indictment and Complaint illustrate that the Government

impermissibly alleges two distinct schemes within the same counts; each scheme has a distinct purported "victim," alleged perpetrators, and alleged misconduct.

For the reasons stated in Mr. Amar's Motion to Dismiss, as bolstered by the points set forth below, all counts as to Mr. Amar warrant dismissal or, at a minimum, require a bill of particulars so that Mr. Amar is on sufficient notice regarding his supposed role in the alleged scheme.

## ARGUMENT

### I.    The Lack of Specificity As to Mr. Amar Warrants Dismissal

The Indictment, even coupled with the Complaint, omits key allegations that underlie the charges that Mr. Amar must meet at trial, including what misrepresentations he is alleged to have made (or otherwise known about) and the manner in which they are false. Insofar as the alleged misrepresentations are not his, he is entitled to know who made them, to whom, and how they are attributable to him (such that he willingly and knowingly conspired to cover them up, as the law requires ).[1] Dismissal is warranted on this basis alone.

*United States v. Ashley*, 905 F. Supp. 1146 (E.D.N.Y. 1995), is instructive. There, a defendant was charged by indictment with multiple counts of wire fraud in connection with two separate alleged schemes to defraud two separate entities (a bank and Freddie Mac), among other charges. *Id.* at 1157. Regarding the wire fraud charges, the defendant argued on a motion to dismiss that the Government "fail[ed] to advise him of what false or fraudulent representations or promises he is alleged to have made, and fail[ed] to allege that [defendant] made *any* false or fraudulent pretense representation or promise." *Id.* at 1158 (alterations and internal quotation marks omitted). In dismissing those wire fraud counts for lack of specificity, the court held "[t]hese counts, after

---

[1] The Indictment also fails to allege adequately that Mr. Amar intended to defraud Bank-1 or JPMC, *see* Mot. to Dismiss at 16–17, or that Mr. Amar conspired to commit fraud, *see* Mot. to Dismiss at 17–19.

all has been said and done, plead little more than the statutory language without any fair indication of the nature or character of the scheme or artifice relied upon, or the false pretenses, misrepresentations or promises forming a part of it." *Id.* at 1159 (alterations and internal quotation marks omitted).[2] This was in direct contrast to the specific allegations regarding two other wire fraud charges related to the separate scheme to defraud Freddie Mac, which the court did not dismiss, wherein the Government alleged specific misrepresentations at issue. *Id.* at 1155 (detailing the specific allegations, including "Liberty made certain promises with respect to each loan that it would sell to Freddie Mac, including that the borrower had the willingness and financial ability to pay the loan; Defendants then lined up 'false borrowers' to pose as mortgage applicants and caused mortgage loan applications with supporting documents containing false information to be completed and submitted to Liberty and later sold to Freddie Mac"). Here, as with the dismissed wire fraud counts, the allegations simply provide a "general description" of the purported scheme to defraud and fail to provide "what false or fraudulent representations or promises [Mr. Amar] is alleged to have made." *Id.*

The Government claims that Mr. Amar "can be guilty of all crimes with which he is charged in the [] Indictment even if he personally made no misrepresentations at all." Opp. at 14. But this argument ignores the fact that the Indictment and Complaint do not allege that Mr. Amar

---

[2] *Accord United States v. Steffen*, 687 F.3d 1104, 1113 (8th Cir. 2012) ("[A]n indictment [that] alleges a scheme to defraud under the . . . wire fraud statute[] . . . must specify facts not merely in the general words of the statute, but with such reasonable particularity as will apprise the defendant, with reasonable certainty, of the nature of the accusation . . ." (alterations and internal quotation marks omitted)); *United States v. Curtis*, 506 F.2d 985, 992 (10th Cir. 1974) (dismissing an indictment because "the indictment here, after all has been said and done, pleads little more than the statutory language without any fair indication of the nature or character of the scheme or artifice relied upon, or the false pretenses, misrepresentations or promises forming a part of it").

*knew* of any misrepresentation made to Bank-1[3] or JPMC, which is required to be alleged. The Government itself concedes that knowledge is a required element. *See* Opp.at 14 (listing the elements of aiding and abetting, including *"*that the defendant knew of the crime"). No such allegations of Mr. Amar's knowledge exist here. *See* Mot. to Dismiss at 13–15.[4]

## II.    Alternatively, the Lack of Specificity as to Mr. Amar Warrants Particulars

At the very least, particulars are warranted here, in a case involving a substantial transaction with nearly 4 million pages of complex discovery, spanning 18 months and several acquisition targets (including at least two of which, the Government contends, engaged in due diligence). Specifically, Mr. Amar is entitled to particulars regarding his alleged knowing and willful participation in the charged conspiracies and schemes, including related to: the alleged misrepresentations, whether he made them or they are attributable to him (either directly or under an agency theory), as well as his supposed knowledge and concealment thereof; the user data files; the other "Potential Acquiring Companies" and "Financial Institutions"; and any unnamed co-conspirators. The Government's chief argument to the contrary—that the barebones allegations of the Indictment coupled with the full range of discovery put Mr. Amar on notice of the charges

---

[3] The Indictment alleges that an additional bank, Bank-1, is a victim of the charged scheme. The Complaint, however, refers to the Indictment's Bank-1 as "Bank-2." For ease of reference, and to avoid confusion, the Complaint's references to Bank-2 are denoted as Bank-1 in this memorandum.

[4] The Government otherwise takes pains to argue that Mr. Amar is actually challenging the sufficiency of the *evidence* against him, not the sufficiency of the *allegations* contained in the Indictment and Complaint. Opp. at 14. Not so. Mr. Amar never once mentions the (absence of) evidence against him. The one case the Government relies on, *United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021), is clearly distinct. There, the defendants asked the court to "weigh[] whether certain factual allegations in the Superseding Indictment . . . were consistent with the charged violation" and "interpret [the statute] to require additional showings," which the Court rejected. *Id.* at 780. Mr. Amar is neither asking the Court to weigh the factual evidence presented in the Indictment (or the Complaint) or read in additional elements into the statutes of the charged offenses. He is merely asking the Court to evaluate the sufficiency of the allegations to state the charged offenses.

against him—is wrong. Opp. at 33. Voluminous discovery is no substitute for particulars. To the contrary, expansive discovery is a core reason why courts find particulars necessary.

A.     **Particulars Are Warranted as to the Alleged Misrepresentations and Mr. Amar's Knowledge and Concealment Thereof (Request 1)**

The Government argues that Mr. Amar "demand[s] to know *every* false utterance," Opp. at 27 (emphasis added), but the Government has not alleged *any* false utterance that is attributable to Mr. Amar. Indeed, the Government has yet to define the alleged misrepresentations to Bank-1 or JPMC that Mr. Amar made or knew of. Unlike a false statement in a merger contract, the potential options here are vast and amorphous—and Mr. Amar is nowhere to be found on any of them. *See* Jan. 17, 2024 Hr'g Tr. at 5:13–15, ECF No. 101 (The Court: "These misrepresentations have not been stated in a particular transactional document, which would be a normal way that most acquisitions occur.").

As charged, the alleged conspiracy involved countless representations. These span 3.6 million pages, across over 670,000 documents, between approximately 211 individuals and dozens of entities. The data room alone contains hundreds of documents (amounting to thousands of pages). These documents contain complex metrics, including many with user- and website-related data, with information on everything from "users" to "students" to "households" to "families" to "FAFSAs in progress." Despite the scale of communications and documents exchanged, the Complaint vaguely alleges that a series of misrepresentations were made "in oral statements, in electronic communications, in PowerPoint presentations, and in data room documents." Compl. ¶ 19. The Government describes these alleged misrepresentations in broad strokes, with examples that do not pertain to Mr. Amar in any way, never indicating which of these statements are actionable falsities, let alone which Mr. Amar is allegedly responsible for (or even knew about such that he could have helped cover them up).

The Government neither alleges that Mr. Amar was present for these alleged misstatements, nor how they are attributable to him. The Government's argument for Mr. Amar's involvement rests on diligence meetings (for which there are no allegations that Mr. Amar attended), pitch decks presented at these meetings (for which there are no allegations that Mr. Amar authored or reviewed), and the provision of user data to JPMC (for which there are no allegations that Mr. Amar participated in transmitting or even knew about). *See* Compl. ¶ 19.

Paraphrasing the Complaint, the Government broadly alleges that "Javice represented repeatedly to JPMC and Bank-2 that Frank had 4.25 million customers or 'users.'" Opp. at 3 (citing Compl. ¶¶ 10, 18–19, 22–23). But Mr. Amar is not alleged to have been present for the communications or conversations in which the definition of "users" was allegedly provided to "both banks"—that is, the supposed key to the falsity of this alleged misstatement. If, as the Government suggests, these misrepresentations were the material bases for JPMC's acquisition of Frank, then the Government has failed to make any allegations of Mr. Amar's supposed knowledge or involvement in deceiving the Bank. The closest the Government gets to implicating Mr. Amar is the provision of a user data file four months *after* the merger closed, and where all Mr. Amar allegedly does is refer a JPMC employee to Ms. Javice. *See* USAO_Rel_000022126.

The Government's half-hearted argument that Defendants have "easily searchable discovery" serves only to emphasize the point that particulars are warranted. *See* Opp. at 40. Running searches for terms like "households," "customers," "users," "students," "families," "unique ID[s]," "data fields," "apps," "records," and "FAFSA in Process"—all terms that the Complaint uses to describes representations made about individuals who engaged with Frank's products—yields hundreds of thousands of hits across tens of thousands of documents. The same

goes for the variety of numbers thrown around (5.6 million, 5.4 million, 4.25 million, 4.265 million, 5.4 million, and 8 million).

### B.    Particulars Are Warranted as to Mr. Amar's Conduct Indicating Knowledge of and Knowing Participation in a Scheme to Defraud (Requests 2–3)

The Government fails to point to any allegations of a nexus between Mr. Amar's innocuous alleged conduct and a scheme to defraud, leaving him to guess or otherwise uncover in the nearly 4 million pages of discovery specifics of his supposed wrongdoing. The Government relies on only two examples in claiming that Mr. Amar's conduct is not innocuous or tangential to the conspiracy, neither of which actually supports the Government's claim. Both examples mischaracterize the allegations in the Government's Complaint. The Government's efforts to rewrite now its allegations underscore its shifting theory of the case, with its Opposition further confusing its theory as to Mr. Amar. It is unclear what the Government will present at trial with respect to Mr. Amar, rendering it impossible to adequately prepare his defense. *See, e.g.*, *United States v. Holmes*, No. 18-cr-258 (EJD), 2020 WL 666563, at \*9 (N.D. Cal. Feb. 11, 2020) (ordering a bill of particulars in light of the Government's shifting theory of the case). Nor do these vague, shifting allegations provide sufficient notice that would trigger a bar to re-prosecution under double jeopardy. This is precisely why a bill of particulars is necessary in this case.

First, the Government points to the August 2, 2021, call among Engineer-1, Ms. Javice, and Mr. Amar, wherein Mr. Amar and Ms. Javice allegedly "asked Engineer-1 to supplement a list of Frank's website visitors with additional data fields containing synthetic data." Compl. ¶ 22(f); *see* Opp. at 49. But neither the Indictment nor the Opposition connects the dots from this conversation to the merger, the data validation exercise, the alleged misrepresentations to JPMC, or any alleged scheme to defraud Bank-1 or JPMC. Notably, the Government's misstates its own allegations, now claiming in its Opposition that *Mr. Amar* is the one who made this request, as

opposed to Mr. Amar and Ms. Javice together, as set forth in the Complaint. *Compare* Opp. at 49,
*with* Compl. ¶ 22(f). Even more, the Google warrant affidavit on which the Government relies
states this allegation a third way: *Ms. Javice* made the request. The Government's shifting theory
leaves Mr. Amar uncertain as to what he will face at trial.

Second, the Government recites a handful of allegations in the Complaint regarding Mr.
Amar's alleged role in "covering up" the fraud. Opp. at 49. But that is not what the Complaint
says. Most of these allegations facially pertain to Ms. Javice's alleged efforts to cover up her
alleged misrepresentations. *See* Compl. ¶ 28 ("Almost immediately, CHARLIE JAVICE . . . began
efforts to cover up her misrepresentation about Frank's purported 4.25 million student users by
purchasing data for millions of students on the open market."). As for Mr. Amar's conduct, the
Complaint does not allege that he knowingly (let alone willfully) was part of a coverup of any
alleged misrepresentations regarding users or that he was even aware of such alleged
misrepresentations. Rather, it simply alleges conduct related to his "purchase of the Vendor-2 Data
set." *Id*. at ¶ 29. Additionally, the chats referenced by the Government in its Opposition, which do
not appear in the Indictment or the Complaint, likewise do not make any such connection between
the purchase of the Vendor-2 Data set and any knowing participation in a cover up of any alleged
misrepresentations by Mr. Amar. These are the details Mr. Amar seeks through this request for a
bill of particulars.

### C.    Particulars Are Warranted as to the User Data Files (Requests 4–5)

The Complaint cryptically alleges that Ms. Javice sent "numerous other purported user data
files" containing misrepresentations to JPMC, Compl. ¶ 32(b), but never elaborates on what the
"numerous other purported user data files" are, when or why Ms. Javice sent them to JPMC,
whether or how Mr. Amar was involved in preparing or transmitting them, whether Mr. Amar
knew about them, or how the files included misrepresentations about Frank's users, *see* Mot. to

Dismiss at 37. The Government does little to address this and instead simply refers to a handful of "emails related to the defendants' provision of [] files to JPMC" that are "easily located in the Rule 16 discovery." Opp. at 47 & n.19. Not so.

To begin, Mr. Amar worked at JPMC for months following JPMC's acquisition of Frank. During that time, he exchanged countless pieces of data and information regarding individuals who used and interacted with Frank to the Bank. And if the Bates ranges provided by the Government in footnote 19 were intended to provide more clarity, they serve to do the opposite. In actuality, these Bates ranges yield two unique documents,[5] neither of which answers Mr. Amar's question as to what the "numerous other purported user data files" are. These two documents, which pertain to the January marketing list data transfer already alleged in the Complaint, *see, e.g.*, Compl. ¶ 32(a), give Mr. Amar no new information. Simply put, the Government never identifies what the "numerous other" user data files are, what information they contain (and how that information is false), or Mr. Amar's involvement in preparing or transmitting them. A bill of particulars is warranted requiring the Government to identify the documents constituting the "other . . . user data files" so that Mr. Amar can be on notice of the charges against him.

### D. Particulars Are Warranted as to the Identity of the Other "Potential Acquiring Companies" and "Financial Institutions" (Requests 6–7)

With trial less than six months away, Mr. Amar still has not been apprised of the full scope of potential acquiring companies (i.e., alleged victims) of the purported scheme to defraud. Of the nearly 4 million pages of discovery, the Government points to a single six-page document, which is "a chart of all the companies, including financial institutions, that had been the target of outreach

---

[5] In providing the Bates ranges in footnote 19, the Governments clumsily cites to 18 Bates-stamped pages, which actually amounts to just five documents. Of those five documents, three are duplicates, leaving only two unique documents.

by Frank as of May 6, 2021."[6] Opp. at 39. Setting aside the breadth of the list, the Government calls it an "exemplar" document only and concludes (despite the implication that other, unnamed victims might exist) that there is "discovery sufficient to identify the victims of the offense." *Id.* at 38. At the very least, the Government should clarify in a bill of particulars that the six-page list is exhaustive and specify which of the potential acquiring companies on the list, if any, it will allege Mr. Amar attempted to defraud at trial.

### E.    Particulars Are Warranted as to the Unnamed Co-Conspirators (Request 8)

Mr. Amar should be provided particulars on any unnamed co-conspirators in order to identify key witnesses and develop critical impeaching evidence. This is especially true because the Government does not allege Mr. Amar was present during any misrepresentations (or even knew about them). *See United States v. Strawberry*, 892 F. Supp. 519, 527 (S.D.N.Y. 1995) (requiring a bill of particulars with "the names of all persons whom the [g]overnment will claim at trial were co-conspirators" so defendant could "identify key witnesses and [] develop impeaching evidence" because the government did not allege that defendant "was present at most of the promotional events nor that he participated in the allegedly incriminating conversations with the hosts and promoters").

Contrary to what the Government argues, the *Nachamie* factors weigh heavily in favor of Mr. Amar's need for the names of unidentified co-conspirators. In deciding whether a defendant's demand for the names of known unindicted co-conspirators would achieve these ends, courts consider the following factors:

> (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-

---

[6] *See* USAO_Rel_000695575.

conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation.

*United States v. Nachamie*, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000). "If the Government has failed to provide adequate notice of the particulars, or if the discovery has been voluminous," like here, "identification of known unindicted co-conspirators will help a defendant focus his investigation and prepare for trial." *Id.* at 572–73.

First, the number of co-conspirators is unknown because the Government refuses to specify the alleged misrepresentations. Second, the breadth of the alleged conspiracy is unknown because the Government alleges it continued post-acquisition. Third, the Government otherwise has not provided adequate notice of the particulars. Fourth, the volume of pretrial disclosure is expansive. *Id.* at 573 ("[T]he Government has produced a substantial number of documents—more than 200,000 pages—but has failed to give defendants adequate notice of the particular charges against them. Providing the names of known unindicted co-conspirators therefore will allow defendants to prepare for trial.").

Finally, there is no risk of "potential danger to co-conspirators" or "potential harm to the Government's investigation," and the Government does not (and cannot seriously) argue otherwise. *Id.* (finding "no legitimate concern that disclosing the names of unindicted co-conspirators will endanger those individuals or compromise the Government's investigation"); *see* Opp. at 35–38; *United States v. Palmer*, No. 20-cr-379 (MKV), 2021 WL 1614837, at *9 (S.D.N.Y. Apr. 26, 2021) (the government's failure to respond to defendant's argument may be deemed waiver); *United States v. Madrid*, 916 F. Supp. 2d 730, 736 (W.D. Tex. 2012) (same). This case involves no threats, violence, or intimidation, and the Government's investigation has largely (if not fully) concluded. Given the lack of "legitimate law enforcement concerns," the Government's failure to provide particulars, and the voluminous discovery here, the balance favors

Mr. Amar. *Nachamie*, 91 F. Supp. 2d at 573 ("[C]onsidering the potential danger to the co-conspirators and the risk of compromising continuing investigations allows a court to balance a defendant's need for the information against legitimate law enforcement concerns.").

Because Mr. Amar is conspicuously absent from allegations of misrepresentations, *see* Compl. ¶¶ 19, 21, 24–27, and because the *Nachamie* factors weigh in Mr. Amar's favor, there is a high risk that he will be surprised at trial by unknown participants in the alleged conspiracy and he is entitled to particulars on those individuals.

### F. Voluminous Discovery Is No Substitute for Particulars

Coupled with the barebones allegations, pretrial discovery has produced nothing more than "the quintessential 'needle in a haystack' problem" that underscores rather than obviates the need for particulars. *United States v. Kahale*, 789 F. Supp. 2d 359, 376 (E.D.N.Y. 2009). This problem is even worse here, where the charges are based on documents that "outwardly appear to be legitimate business communications," which may give rise to a greater risk of unfair surprise and undermine defense preparations. *Id.* at 373. Rather than provide basic, constitutionally sufficient notice of the charges against Mr. Amar, or any particulars as to those charges, the Government falls back on the same unspecific allegations in the Complaint that never mention Mr. Amar and hides behind voluminous discovery, including Rule 16 discovery of certain search warrants and affidavits. *See* Opp. at 30–31.[7]

---

[7] As a substitute for notice and particulars, remarkably and totally inappropriately, the Government references pre-indictment exchanges with Mr. Amar's counsel to contend its job here is done. Opp. at 29–30. Not so. To begin, pre-indictment discussions—indeed pre-charge discussions—between counsel for an individual and the Government, in a context where the Government describes the individual (here, Mr. Amar) as a "subject" of the investigation, Dep't of Justice Manual § 9-11.151, have no place before the Court, let alone in this posture. Moreover, the pre-charge meeting here was not a learning exercise wherein the Government explained its case; rather, the meeting's discussions centered on Mr. Amar's counsel explaining why an indictment against Mr. Amar is a miscarriage of justice. Simply put, these pre-charge discussions, in which the Government

Specifically, the Government claims that Mr. Amar can find details about his involvement in the "1.3 million pages" of discovery and search warrants and accompanying affidavits himself. Opp. at 9, 30. As an initial matter, the Government does not even know what is in its own discovery. To date, the Government has produced nearly 700,000 *documents* (not pages as the Government states), totaling 3.6 million *pages.*[8] The Government's unfamiliarity with their own productions is striking and belies their opposition to a bill of particulars. There is a "mountain" of documents for the defense to "comb through" to divine the Government's theory of Mr. Amar's knowing participation in the schemes to defraud, which has "impermissibly" shifted the burden of proof. *United States v. Savin*, No. 00-cr-45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001); *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) ("The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel."). "It is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008) (granting bill of particulars on conspiracy charges).

Moreover, the search warrants and affidavits cited by the Government, Opp. at 30–31, provide no additional details as to Mr. Amar's alleged misrepresentations to JPMC or knowledge

---

provided cherry-picked data that it later produced as Rule 16 discovery, did not inform the defense of the basis for the charges, let alone salvage an indictment that fails to comport with the Fifth and Sixth Amendments. Mr. Amar respectfully submits that the Court should decline the Government's invitation to consider those facts and instead rule on the Indictment and the Complaint as a matter of law.

[8] The Government has produced 673,161 documents spanning *at least* 3,561,401 pages. This does not include thousands of additional documents produced by JPMC to the Government. JPMC has produced an additional 8,024 to Defendants directly, representing 40,372 pages.

of any alleged misrepresentations, nor do they provide a nexus between Mr. Amar's alleged conduct and any misrepresentation. The discovery resulting from the warrants includes hundreds of thousands of documents, only further adding to the mounds of discovery in this case, which does not replace the requirement for constitutionally sufficient notice.

Regardless, the Government's claim that its voluminous discovery in this case cures the deficiencies in its Indictment is wrong and contrary to governing case law. Producing millions of pages of documents does not excuse the Government from providing "the essential facts constituting the offense charged," *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013), or foreclose the need for a bill of particulars to clarify the "nature of the charge[s]" where an indictment lacks specificity, *Bortnovsky*, 820 F.2d at 574; Fed. R. Crim. P. 7(c)–(f). This is especially true in complex, fact-intensive cases like this one.[9]

The alleged misrepresentations at issue supposedly occurred in "data room documents" (which consist of hundreds of spreadsheets, pitch decks, and other marketing materials spanning thousands of pages, each containing a variety of numbers and user metrics) and "oral statements" (which consist of diligence and pitch meetings, which Mr. Amar did not attend). *See* Compl. ¶ 19. Not only has JPMC actively resisted the production of contemporaneous meeting notes (if they were retained), but the Government itself does not even allege Mr. Amar's attendance at these meetings (nor his involvement in the data room documents), *see id.* at ¶¶ 19–20, making it extremely difficult, if not outright impossible, to identify the specific misrepresentations at issue.

---

[9] *See, e.g.*, *United States v. Davidoff*, 845 F.2d 1151, 1155 (2d Cir. 1988) (fact that Government produced 6,000 pages of discovery did not obviate need for bill of particulars because of complex prosecution); *Nachamie*, 91 F. Supp. 2d at 571 (similar, despite 200,000 pages of discovery); *United States v. Rajaratnam*, No. 09-cr-1184 (RJH), 2010 WL 2788168, at *3 (S.D.N.Y. July 13, 2010) (collecting cases emphasizing importance of particulars given "complexity of [financial crime conspiracy] case" and "fact-intensive nature of its allegations"); *Kahale*, 789 F. Supp. 2d at 373 (stressing the need to consider the "relative complexity of the [] charges facing defendants").

## III.    The Indictment Should be Dismissed for Other Infirmities

The Governments' Opposition fails to correct the other fatal flaws of the Indictment, including (1) the Government improperly relies on an impermissible "right to control" theory, whereby Mr. Amar deprived JPMC of its right to information necessary to make an economic decision, not money or property; (2) the bank fraud statute does not apply to instances like this where a bank is functioning as a commercial entity as opposed to a bank; and (3) the Government impermissibly alleges two distinct schemes within the same counts, where each scheme has a distinct "victim," perpetrators, and alleged misconduct. Each of the foregoing are independent reasons for dismissal, as detailed further in the Motion to Dismiss.

### A.    The Indictment Impermissibly Relies on the "Right-to-Control" Theory of Fraud

The Government's attempt to reframe the Indictment under a traditional property theory of fraud simply because it uses the words "money" and "property" fails. Opp. at 17.[10] The Complaint makes clear that Mr. Amar's role with respect to any alleged scheme to defraud involves, at most, a deprivation of *information* after the merger closed, not money or property.[11] And *Ciminelli* makes clear that this is insufficient as a matter of law, even if the information relates to "discretionary economic decisions." 598 U.S. 306, 316 (2023); *see also Sec. & Exch. Comm'n v. Govil*, 86 F.4th 89, 105 (2d Cir. 2023) (applying *Ciminelli* to reject the theory that denying

---

[10] It does not matter that the indictment does not *explicitly* allege a "right-to-control" theory of fraud. *See Constantinescu*, 2024 WL 1221579, at *2, *6 (dismissing indictment for "fail[ing] a *Ciminelli* analysis" where indictment did "not explicitly cit[e] the 'right-to-control theory,'" but the "basis of the case is premised upon the provision of false information or the failure to provide information").

[11] Specifically, the Complaint alleges that in August 2021, Mr. Amar allegedly purchased student records on the open market as Ms. Javice's "intermediar[y]" as part of an "effort[] to cover up [Ms. Javice's] misrepresentation[s]" regarding users. Compl. ¶¶ 28–29. The Complaint further alleges that, after the merger, Mr. Amar allegedly referred a JPMC Marketing Executive to Ms. Javice for a marketing list. *Id.* at ¶ 32(a)(iii).

investors "the right to make an informed decision when considering whether to make the investment" by lying to them "is not a property interest and offending that right does not result in pecuniary harm"); Mot. to Dismiss at 24–25. Indeed, it is not enough even if a defendant "engaged in deception" as to the withheld information. *See, e.g.*, *Kelly v. United States*, 590 U.S.----, 140 S. Ct. 1565, 1571 (2020) (deception only actionable if "object" is "property"); *United States v. Constantinescu*, No. 22-cr-612 (ASH), 2024 WL 1221579, at *6 (S.D. Tex. Mar. 20, 2024) (not even deceitful deprivation of "crucial" information is enough). This is the exact situation presented here: any scheme Mr. Amar is alleged to have been part of relates to providing JPMC with accurate information as to user numbers for the Bank to make a discretionary economic decision *after* it had decided to acquire, and in fact did acquire, Frank. There can be no deprivation of money or property under the facts here, even accepting the Government's allegations as true.

The Government claims that the Indictment "specifically alleges that the purpose of the defendant's fraudulent schemes was to defraud the victims 'out of millions of dollars—consisting of the acquisition price, as well as salary, bonus and other compensation' paid to the defendants as retained employees at JPMC." Opp. at 17. The Indictment does no such thing. Allegations concerning the purchase of student records, without any alleged connection to the JPMC diligence process and post-merger activity, do nothing to allege or even suggest a scheme to defraud "victims" out of "the acquisition price." *Id*. Nor is it clear how such conduct relates to any salary and bonus. The lack of factual allegations connecting the alleged fraudulent scheme to a supposed deprivation of the victims' property is a fatal defect of the Indictment. *C.f. Constantinescu*, 2024 WL 1221579, at *4 ("The most glaring issue in the Indictment is the dearth of factual allegations that connect the alleged 'scheme' to the deprivation of . . . traditional property interests (i.e., allegations demonstrating that the object of the scheme involved harm to victims)).

Lastly, underscoring the Government's uncertainty over the allegations contained in its own Indictment, the Opposition confusingly claims that whether the Government's own charges rely on the non-cognizable right to control theory is a question for the jury. Opp. at 17. This is incorrect. Where, even taking the facts as alleged as true, "the Court finds that a crime has not been stated under [the federal fraud statutes] as interpreted by *Ciminelli*," the defendants' "alleged conduct cannot amount to a 'scheme to defraud' *as a matter of law*," and the Indictment should be dismissed. *Constantinescu*, 2024 WL 1221579, at *6 (emphasis added) (granting motion to dismiss where indictment failed a *Ciminelli* analysis and thus was defective for failing to state an offense "as a matter of law" pursuant to Fed. R. Crim. Pro. 12(b)(3)(B)(v)).

### B.     The Government Fails to State a Claim for Bank Fraud

Without citing any supporting case law, the Government wrongly argues that the bank fraud statute applies to *any* transaction involving a bank, regardless of whether the transaction is a banking transaction or some other commercial transaction, like an acquisition of a non-banking entity. Such a reading grossly expands the scope of the bank fraud statute, impermissibly creating a "plenary ban on fraud," *Loughrin v. United States*, 573 U.S. 351, 362 (2014), and "federaliz[ing] funds that have nothing to do with the banking system," *UMB Bank, N.A. v. Benton*, No. 21-cv-832 (BP), 2022 WL 16753765 (W.D. Mo. June 29, 2022), *aff'd sub nom. UMB Bank, N.A. v. Guerin*, 89 F.4th 1047 (8th Cir. 2024).

Moreover, the Government's reading ignores the reality of how banks like JPMC operate in today's marketplace. JPMC functions both as a traditional bank (*i.e.*, depositing funds, cashing checks, etc.) and as a commercial entity engaged in transactions outside of the banking world, such as the buying of companies wholly unrelated to banking. In this case, JPMC clearly was operating as a commercial entity, with its banking activities having no bearing on the JPMC-Frank merger. For example, had JPMC been functioning as a bank as opposed to a commercial entity during this

merger, it would have retained all relevant internal correspondence of its employees, as required by law. *See, e.g.*, FINRA Rule 4511 (requiring regulated entities to make and preserve books and records as required under FINRA, the Exchange Act and related rules for a period of at least six years). But they did not, having deleted entire email inboxes of multiple custodians involved in this transaction. *See e.g.*, Letter from the Government to the Court, ECF No. 69 (Nov. 17, 2023) (informing the Court that two JPMC employees' email boxes were deleted). In other words, any purported fraud related to the merger is "tangentially related to the banking system" and beyond the appropriate scope of bank fraud. *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016).

*Benton*, 2022 WL 16753765, is instructive. There, a bank served as a trustee of a family trust, a role clearly beyond typical banking functions. *Id.* at *1. The trustee bank and the family beneficiaries got into a dispute regarding the bank's role as a trustee administering the trust's assets, ultimately resulting in the beneficiaries filing an unflattering probate action against the trustee bank and the trustee bank resigning as trustee. *Id.* at *2. The bank filed a RICO lawsuit predicated on a number of acts, including bank fraud. *Id.* The court dismissed the bank's claims, including bank fraud, finding that "the scheme must have some real connection to a federally insured bank, and thus implicate a federal interest." *Id.* at *10 (internal quotation marks omitted). The court further held that "a plaintiff cannot prevail simply by alleging that it is a bank and has been the victim of fraud if that fraud is 'only tangentially related to the banking system.'" *Id.* Therefore, although UMB is unquestionably a bank, the alleged fraudulent transaction had nothing to do with UMB's status *as a bank*—rather, it concerned UMB's position *as a trustee*. So, too, here: the merger has nothing to do with JPMC as a banking institution and does not implicate JPMC's banking functions in any way; rather, it has to do with JPMC's commercial activities. The Government fails to state any claim for bank fraud, and the claim should be dismissed.

### C.    Counts Two Through Four Are Duplicitous and Should Be Dismissed

Contrary to the Government's arguments, the Complaint alleges two distinct schemes: one scheme to defraud Bank-1 by misrepresenting Frank's number and definition of users, Compl. ¶ 18, and another, separate scheme to defraud JPMC by providing artificial, synthetic data to close the merger. *Id.* at ¶¶ 11, 24–27. The two distinct schemes involve allegedly different participants, different conduct, and different victims. *See e.g.*, *United States v. Hinton*, 127 F. Supp. 2d 548, 556 (D.N.J. 2000) (finding indictment duplicitous where it "lumped" into a single count schemes against six separate unrelated financial institutions, embraced at least 128 transactions, the "dates and alleged perpetrator(s) for a particular institution's transactions d[id] not generally overlap," and generally "different confederates were allegedly employed in contacts with the defrauded banks"). Despite its best effort to salvage the Indictment, the Government cannot now rewrite the Complaint to blur the line between these two separate alleged conspiracies.

The Government's only supporting authority, *United States v. Margiotta*, 646 F.2d 729 (2d Cir. 1981), is factually inapposite. In *Margiotta*, the issue before the court was whether one count for mail fraud was duplicitous where it relied on fifty individual mailings, all of which were made in furtherance of the *same* insurance-broker kickback scheme. *Id.* at 730–33. Although there were three victims in *Margiotta*, they were all victimized by the exact same course of conduct (*i.e.*, each of the 50 mailings necessarily harmed all three victims). Here, the alleged actions taken with respect to one scheme (against Bank-1, for example), do not victimize the other alleged victim (JPMC), or vice versa. For instance, if Ms. Javice made a misrepresentation to Bank-1, such a misrepresentation would clearly have no bearing on JPMC, an entirely distinct entity.

Separately, the Government argues that multiple financial institutions can be included in a single bank fraud count (Count Three), relying exclusively on *United States v. Rigas*, 281 F. Supp. 2d 660 (S.D.N.Y. 2003). But the language cited by the Government from *Rigas* did not address

the issue of duplicity at all. The language, taken out of context by the Government, concerned only the narrow question of whether the Government had failed to properly state a bank fraud claim because it alleged two separate syndicates, as opposed to individual banks, as the "financial institutions" under Section 1344—an issue which is irrelevant to this case. *Id.* at 670.

The Government fails to address Mr. Amar's arguments concerning prejudice, waiving any substantive position by simply stating, "Amar can show no prejudice." Opp. at 26. *Palmer*, 2021 WL 1614837, at *9 ("In some instances, the government's failure to respond to a defendant's argument may be deemed a waiver." (citing *United States v. Shine*, No. 17-cr-28 (FPG) (JJM), 2018 WL 1721924, at *1 (W.D.N.Y. Feb. 26, 2018))); *see also Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 206 n.6 (S.D.N.Y. 2020) ("Arguments not raised in a party's brief are deemed waived."); *Madrid*, 916 F. Supp. 2d at 736 (finding Government waived argument that it failed to raise in opposition to motion to suppress wiretap evidence).

The Government cites no case law and does not address a single one of the prejudice concerns raised in Mr. Amar's Motion to Dismiss, specifically: (1) if the jury were to return a guilty verdict on any count, it would be impossible to know if the jury found that Mr. Amar was guilty of the scheme against Bank-1 or the scheme against JPMC or both, implicating Mr. Amar's Fifth Amendment protections against double jeopardy; and (2) relatedly, if the jury agrees Mr. Amar was *not* involved in any scheme to defraud Bank-1 but hangs on Mr. Amar's involvement as to JPMC, the Government would be able to retry Mr. Amar for conduct as to *both* purported schemes. Mot. to Dismiss at 30. These are significant, constitutionally protected matters that are addressed by the Fifth Amendment. *See Yeager v. United States*, 557 U.S. 110, 119 (2009)

(precluding Government "from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial").

The Government's claim that "the Court will instruct the jury that its verdict must be unanimous as to whether Amar participated in the charged scheme," Opp. at 26–27, does not remedy or even address either of the constitutional concerns raised by Mr. Amar. Accordingly, the Government's opposition to Mr. Amar's prejudice concerns should be "deemed waived." *Farleigh Int'l Ltd.*, 483 F. Supp. 3d at 206 n.6.

## CONCLUSION

For the foregoing reasons, and those set forth in his opening memorandum of law, Mr. Amar respectfully requests that the Court dismiss the Indictment or, in the alternative, order the Government to provide the above-mentioned particulars to Mr. Amar.

Dated: May 20, 2024

Respectfully submitted,

*/s/ Sean S. Buckley*
Sean S. Buckley
Steven G. Kobre
Alexandria E. Swette
Genna L. Sinel
KOBRE & KIM LLP
800 Third Ave
New York, NY 10022
Tel: (212) 488-1200
Fax: (212) 488-1220
Sean.Buckley@kobrekim.com
Steven.Kobre@kobrekim.com
Alexandria.Swette@kobrekim.com
Genna.Sinel@kobrekim.com

Victoria Fordin (*pro hac vice forthcoming*)
Jake Rush (*pro hac vice forthcoming*)
1919 M Street, NW
Washington, DC 20036
Tel: (202) 664-1900

Fax: (202) 664-1920
Victoria.Fordin@kobrekim.com
Jake.Rush@kobrekim.com

*Counsel for Defendant Olivier Amar*