July 24, 2024

<u>**BY ECF**</u>

The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

Re:    <u>United States v. Charlie Javice and Olivier Amar, 23 Cr. 251 (AKH)</u>

Dear Judge Hellerstein:

Defendants Charlie Javice and Olivier Amar (the "Defendants") and non-party JP Morgan Chase, N.A. ("JPMC") jointly submit this application pursuant to the Court's Order dated June 11, 2024, ECF No. 137, in advance of the privilege hearing scheduled for August 6, 2024, ECF No. 142. Consistent with this Court's orders, Defendants have identified in **Appendices A through G**,[1] privilege designations by JPMC that remain in dispute. **Appendix H**, to be filed by JPMC separately and *ex parte*, contains a representative set of 12 documents that Defendants have selected for the Court's *in camera* review.[2]

## DEFENDANTS' POSITION

For over a year, Defendants have sought a legally sufficient privilege log and the production of responsive, non-privileged documents from JPMC. Despite multiple orders from

---

[1]  Defendants have redacted Appendices A through F from the  public filing and will share them directly with the Court, counsel of record, and JPMC.

[2] The parties conferred over Zoom on Monday, July 15 for approximately 30 minutes. JPMC was represented on the call by Sidney Bashago, Christian Hines, Katherine Swan, and Michelle Adler of Davis Polk & Wardwell LLP. Ms. Javice was represented on the call by Erica Perdomo and Alanah Harris of Quinn Emanuel Urquhart & Sullivan LLP. Mr. Amar was represented on the call by Alexandria Swette and Jake Rush of Kobre & Kim LLP. The parties held additional conferrals, including on the following dates: June 28, 2024, June 4, 2024, May 24, 2024, April 16, 2024, March 8, 2024. *See* Individual Rules of Hon. Alvin K. Hellerstein, Rule 2.E.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 2

this Court requiring JPMC's compliance, JPMC persists in withholding from Defendants documents to which Defendants are legally entitled that are critical to the defense of this action. Just three months before trial, JPMC continues to produce documents and revised logs piecemeal in response to Defendants' long-standing and valid challenges.

The Government's central claim in this case is that Defendants—former executives of Frank, which was acquired by JPMC in September 2021—misrepresented certain information about Frank to JPMC in connection with the acquisition. Because JPMC assumed ownership of Frank's documents and communications (including Defendants' own communications) at the time of the acquisition, JPMC—not Defendants or the Government—possesses the most important and largest body of documents for the prosecution and defense of this action. This Court should compel JPMC to produce *all* responsive and non-privileged documents and should not permit JPMC to rely on an inconsistent and self-serving privilege review.

Through this application, Defendants respectfully seek production of three categories of documents that JPMC continues to impermissibly withhold on purported grounds of privilege:

- **Global Waiver:** JPMC failed to produce a legally sufficient privilege log on or before the Court-ordered deadlines of October 2023 and March 2024 and, therefore, has waived privilege over more than 31,000 documents listed in its logs—more than 23,000 of which continue to be withheld in whole or part. Defendants request that the Court order JPMC to produce, without redactions, all of the documents identified on its log dated March 31, 2024 not previously produced in full by August 20, 2024.

- **Non-Privileged Documents:** JPMC is still withholding multiple categories of non-privileged documents, conceding as much by belatedly and serially producing documents over which it previously asserted privilege. Defendants request that the Court order JPMC to produce these documents, listed in **Appendices A through F**, by August 20, 2024.

- **Defendants' Own Communications:** JPMC has asserted privilege as the basis for withholding Defendants' own communications from them, even though Defendants—as former executives of Frank—were parties to these communications and sought and obtained the legal advice contained in these communications. Defendants request that the Court order JPMC to produce these documents, listed in **Appendix G**, by August 20, 2024.

In this application, Defendants highlight exemplar documents selected for the Court's *in camera* review, but Defendants urge the Court to request and review *in camera* additional documents set forth in **Appendices A through G** to assist in the Court's determination of these important issues.

## I.    Background

One year ago, Defendants moved this Court to require JPMC—the self-described "victim" and the holder of Defendants' pre- and post-acquisition documents and communications—to produce a comprehensive and legally sufficient log of documents withheld on grounds of attorney-

Hon. Alvin K. Hellerstein
July 24, 2024
Page 3

client privilege and work product protection. Since then, Defendants' good faith attempts to obtain these documents have been protracted, but—in large part—futile:

- <u>June 2023</u>: Defendants commence discussions with Government about obtaining log of documents withheld by JPMC on grounds of privilege.

- <u>August 2023</u>: Court orders JPMC to produce privilege log to the Government. *See* Aug. 23, 2023 H'rg Tr. at 5:13–6:10 (discussing JPMC's delay in furnishing a privilege log).

- <u>October 2023</u>: JPMC produces logs totaling 31,570 entries, which are deficient.

- <u>October to December 2023</u>: Defendants meet and confer with counsel to JPMC regarding privilege log deficiencies and provide examples in writing.

- <u>January 2024</u>: Court orders JPMC to file by March 29, 2024 "a complete and comprehensive privilege log consistent with the requirements of Local Rule 26.2." *See* ECF No. 87 ¶ 2 (Third Order Regulating Proceedings).

- <u>January 2024</u>: JPMC retains new counsel.

- <u>February 2024</u>: Defendants meet and confer with new counsel concerning deficiencies in log entries, providing examples of thousands of non-privileged documents included on logs.

- <u>March 2024</u>: JPMC produces a composite log totaling 33,565 entries, which adds nearly 2,000 new entries, and is otherwise substantially similar to the October 2023 logs, failing to correct entries identified by Defendants as deficient.

- <u>April 2024</u>: After Defendants inform JPMC of their intention to move to compel, JPMC concedes its log is deficient and belatedly undertakes a re-review of the log.

- <u>May 23, 2024</u>: JPMC produces more than 15,000 previously withheld and redacted documents and a new, substantially and materially changed, privilege log. The new log entries even received a new numbering system with the prefix "JPMCPRIV_REVISED." Defendants understand this revised log to be a final, comprehensive log, as ordered by the Court, reflecting JPMC's final and considered privilege determinations.

- <u>May 2024 to July 15, 2024</u>: Defendants continue in good faith to confer with JPMC concerning deficiencies in the revised log and documents that should be produced, including in draft correspondence to this Court and appendices provided to JPMC for

Hon. Alvin K. Hellerstein
July 24, 2024
Page 4

review on July 1, 2024.[3] JPMC asks this Court to move the hearing on these issues so that it can respond to Defendants' arguments.

- <u>July 18, 2024</u>: JPMC produces over 200 documents previously withheld for privilege, along with an updated privilege log.

JPMC continues to withhold, in whole or in part, more than 23,000 documents without sufficient legal basis and with many entries on the log still failing to satisfy the minimum standards set forth in the applicable local and federal rules and as ordered by the Court.

## II.    Challenges to JPMC's Privilege Log and Withholding of Documents

### A.    Global Waiver

As detailed below, JPMC has globally waived any claim of privilege over the more-than 31,000 documents referenced in its original, deficient privilege logs, 23,000 of which continue impermissibly to be withheld. JPMC's deficiencies and delays are flagrant, warranting this extraordinary relief.

As set forth in the chronology above, from October 2023 through the present, JPMC has submitted multiple logs that fail to meet minimum legal requirements and this Court's orders. Namely, JPMC's logs: (i) include thousands of non-privileged documents; and (ii) fail, in hundreds of entries, to sufficiently identify withheld documents by date, author, file type, "general subject matter," and/or basis for withholding. *See* S.D.N.Y. Local Rule 26.2(a)(2); *see also* ECF No. 87 (Jan. 19, 2024 Order) (directing JPMC to "file by March 29, 2024 a complete and comprehensive privilege log consistent with the requirements of Local Rule 26.2.") (emphasis added).

On March 31, 2024, in violation of this Court's January 19, 2024, Order, JPMC resubmitted a single log that was substantively identical to its October 2023 logs, merely adding approximately 2,000 new entries. This log was not compliant with Local Rule 26.2, and JPMC did not remedy any of the deficiencies contained in the original logs. In April 2024, after spending countless hours attempting to make sense of JPMC's log, Defendants informed JPMC of their intent to move to compel. Counsel to JPMC then conceded that the log required a top-to-bottom re-review. JPMC enlisted dozens of attorneys to undertake this project, promised to remedy the deficiencies in short order, and requested that Defendants delay seeking Court intervention.

As a result of its re-review, on May 23, 2024, JPMC provided Defendants with a completely revised log and belatedly produced 15,000 previously withheld or redacted documents, underscoring the inadequacy of JPMC's original logs and its overbroad assertions of privilege. In

---

[3] In addition to JPMC's productions on May 23 and July 18, 2024, JPMC produced hundreds of documents previously withheld and listed on its privilege log on May 10, May 16, May 25, and June 14. These productions also included, for the first time, documents responsive to year-old subpoenas that were previously withheld and never logged. *See* JPMC Production Letters to Defendants, dated May 10, 2024; May 16, 2024; May 25, 2024; June 14, 2024; July 18, 2024.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 5

addition to revising thousands of individual log entries, JPMC added categorical columns for "Relevant Attorneys," "Slack Recipients," and "IM Message Type." JPMC's "amended privilege log is essentially a concession that the initial privilege log was inadequate" and that JPMC waived privilege with respect to all documents on the log. *Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C.*, 499 F. Supp. 2d 475, 479 (S.D.N.Y. 2007) (affirming order requiring plaintiff to produce all documents listed on its original, deficient privilege log on the basis of waiver, notwithstanding that plaintiff later amended its privilege log); *SEC v. Yorkville Advisors, LLC*, 300 F.R.D. 152, 165, 167 (S.D.N.Y. 2014) (finding Securities and Exchange Commission waived privilege over documents listed in deficient privilege log and could not undo that waiver by filing a corrected log one year later, and holding that "failure to serve indices of privileged documents in a timely and proper manner operates as a waiver of any applicable privilege" despite minor revisions in comparison to the significant flaws in JPMC's log).

As recently as last week, JPMC continues to amend its privilege log and discover new responsive documents that it should have identified a year ago. For instance, on July 18, 2024, JPMC produced more than 200 previously withheld documents, which Defendants had challenged as not privileged. JPMC also produced approximately 400 newly discovered and previously undisclosed documents and logged approximately 100 new documents, which it added to its privilege log for the very first time without explaining why these documents were not included in JPMC's earlier logs. JPMC's failure to identify and log these documents in response to the Court's October and January orders (or any time since) has the same effect as failing to produce a log altogether for those documents. *See Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 86 (S.D.N.Y. 2019) ("The lack of a reasonable explanation for the omissions on the privilege log error strongly suggests that this is a situation where there has been a 'flagrant' violation of Local Rule 26.2 that should result in a waiver of any claim to privilege or protection under the work product doctrine."); *Dey, L.P. v. Sepracor, Inc.*, No. 07-cv-2353 (RLE), 2010 WL 5094406, at *2 (S.D.N.Y. Dec. 8, 2010) (finding waiver when producing party withheld documents for two years without noting them in a privilege log even though delay was not willful).

JPMC's non-compliance with Local Rule 26.2 and this Court's orders is egregious, and established precedent supports a finding of global waiver for all documents remaining on JPMC's privilege log. *See, e.g.*, *Sepracor*, 2010 WL 5094406; *Yorkville Advisors*, 300 F.R.D. 152. JPMC's reliance on readily distinguishable cases concerning low-level privilege log deficiencies—*e.g.*, *Brown v. Barnes & Noble, Inc.*, 474 F. Supp. 3d 637, 647–48 (S.D.N.Y. 2019) (failing to produce a new log with each rolling production); *Chevron Corp. v. Donziger*, No. 11-CV-691 (JCF), 2013 WL 4045326, at *3 (S.D.N.Y. Aug. 9, 2013) (vague privilege descriptions); *Pem-Am., Inc. v. Sunham Home Fashions, LLC*, No. 03-CV-1377, 2007 WL 3226156, at *2 (S.D.N.Y. Oct. 31, 2007) (brief delay in production of a privilege log)— is unavailing.

Accordingly, Defendants respectfully request that the Court hold that JPMC has waived privilege as to every document listed on JPMC's privilege logs and require JPMC to produce in

Hon. Alvin K. Hellerstein
July 24, 2024
Page 6

full, on or before August 20, 2024, all 23,000 withheld documents on its log that have not previously been produced.[4]

### B.    Specific Waiver: Non-Privileged Documents

Even if this Court does not find waiver as to all documents identified on JPMC's privilege log, it nevertheless should find waiver as to five specific categories of documents, detailed below and identified in **Appendices A through F**:[5]

### 1.    Business Communications and Documents of Frank's COO and CLO

This Court should compel JPMC to produce non-privileged business communications and documents of Matt Glazer, Frank's Chief Operating Officer ("COO") and Chief Legal Office ("CLO"), as set forth in **Appendix B**. Because Mr. Glazer acted in both a business and a legal capacity, it is hornbook law that only his provision of *legal* advice in a *legal* capacity is arguably privileged. The privilege does not encompass communications concerning non-legal services provided by the attorney, notably business or other functions that a non-lawyer can perform. *See, e.g.*, *Barak Stiftung v. Toepfer*, No. 05-cv-10157 (RMB/MH), 2006 WL 2959168, at *2 (S.D.N.Y. Oct. 16, 2006) ("The privilege does not encompass communications concerning non-legal services provided by the attorney, notably business or other functions that a non-lawyer can perform."); *Fox News Network, LLC v. U.S. Dep't of The Treasury*, 739 F. Supp. 2d 515, 560 (S.D.N.Y. 2010) ("It bears emphasis that the attorney-client privilege protects only legal advice, not economic, business, or policy advice. Thus, to the extent attorneys were advising Treasury about such topics as complying with EESA or how the new statute interacted with existing law, their communications plainly were privileged. On the other hand, advice about 'risks or costs in terms of expense, politics, insurance, commerce, morals, and appearances' typically is not legal advice.").

---

[4] Even if this Court declines to find global waiver, JPMC has, at a minimum, waived its assertion of privilege over all documents corresponding to privilege log entries that continue to fall short of Rule 26.2(a)'s requirements. *See* Local Rule 26.2(a) (requiring type, general subject matter, date, author, addressees, and other recipients of privileged document); *see also United States v. Constr. Prod. Research, Inc.*, 73 F.3d 464, 473-74 (2d Cir. 1996) (finding the privilege log at issue to be "deficient" and so "Respondents have failed to demonstrate their claims of privilege"); *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 474 (S.D.N.Y. 1993) (information required by law); *Yorkville Advisors*, 300 F.R.D. at 167 ("[T]he SEC waived its privilege protections by failing to produce in a timely manner a privilege log that complied with the applicable rules."). Over 300 entries on JPMC's log do not meet these fundamental requirements. *See* **Appendix A**.

[5] Defendants' challenges in **Appendices A through G** include all family members (*i.e.*, attachments and parent documents), to the extent the family document is withheld on the same basis as the challenged document.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 7

As COO, Mr. Glazer worked closely with Defendants to oversee Frank's day-to-day operations and make business decisions affecting the Company. JPMC's privilege log improperly contains numerous non-legal business communications in which Mr. Glazer does not appear to be acting in the capacity of a lawyer, specifically during the diligence process with (at least) Bank-1, where the Government alleges Glazer was involved on a daily basis. *See* ECF No. 140, June 24, 2024 Disclosure Letter ("Gvt. Disclosure Letter") (citing USAO_Rel_000188687).

Defendants have identified the following exemplar documents from **Appendix B** for the Court's *in camera* review:

- **JPMCPRIV_REVISED_000418** – Withheld June 11, 2021 Slack communication between Mr. Glazer, Ms. Javice, and a Frank engineer.

- **JPMCPRIV_REVISED_000438** – Withheld June 15, 2021 Slack communication between Mr. Glazer, Ms. Javice, Mr. Amar, and two Frank engineers regarding diligence with Bank-1.

- **JPMCPRIV_REVISED_002733** – Withheld August 3, 2021 Slack communication between Mr. Glazer and Ms. Javice during JPMC diligence and data validation exercise. This Court should compel JPMC to produce all documents where Mr. Glazer was acting in a ***business***—not legal—capacity. *See* **Appendix B**.[6]

### 2. JPMC's Pre-Merger Diligence Communications

This Court should compel JPMC to produce its own internal non-privileged pre-merger diligence communications between July 2021 and September 2021. *See* **Appendix C**.

Based on Defendants' review of JPMC's privilege log, it appears that JPMC has impermissibly withheld non-privileged business documents and communications dated July 2021 to September 2021, the period during which JPMC conducted its due diligence, which plays a key role in the Government's allegations against Defendants. *See*, *generally*, Gvt. Disclosure Letter. These documents, which are identified on **Appendix C**, do not appear to be privileged, particularly given the nature of some of the withheld documents, which appear to be oriented towards business, rather than legal, issues, much less the provision of legal advice. Indeed, many of the withheld communications do not include lawyers in the to, from, or cc fields of the privilege log and specifically concern business decisions and topics at issue in this action, including JPMC's acquisition of Frank and discussions among JPMC business decisionmakers referred to in the Complaint. *See* ECF No. 1.

---

[6] Since Defendants first expressed concern that JPMC was withholding non-legal business documents involving Matt Glazer based on Mr. Glazer's mere presence therein, JPMC has produced hundreds of previously withheld documents that fall in this category, including as recently as last week. Still, the remaining purportedly privileged documents in this category are often so heavily redacted that it is difficult to determine the subject matter. Defendants have made every effort to ascertain the nature of these documents to facilitate the Court's review.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 8

Defendants have identified the following exemplar documents from **Appendix C** for the Court's *in camera* review:

- **JPMCPRIV_REVISED_001591** – Withheld email with subject line "RE: UPDATE Call debrief" from Leslie Wims Morris, a JPMC executive who oversaw key aspects of the Frank acquisition, to another JPMC employee that is not a lawyer. Based on the subject line and timestamp of this email, it appears to be a continuation of a conversation among a larger group of JPMC executives and lawyers involved in the Frank diligence review. *See* JPMC_01188751. That earlier email was produced with limited redactions and includes the unredacted non-privileged communications of multiple JPMC lawyers, demonstrating both that not all communications by lawyers are privileged and that JPMC has inconsistently applied the rules of privilege and withheld documents that should be redacted.

- **JPMCPRIV_REVISED_002609** – Withheld email with subject line "FW: Finland – key data questions" from JPMC employee Alex Sweeney, who oversaw key aspects of the Frank acquisition, to other JPMC employees. There are no lawyers on the email as logged in the privilege log.[7] The email is dated August 1, 2021, during Frank's diligence with JPMC. The Complaint references this email chain specifically.[8]

- **JPMCPRIV_REVISED_000773** – Withheld email with the subject line "FW: Project Frontier" from JPMC employee Adam Seltzer, who oversaw key aspects of the Frank acquisition, to other JPMC employees. There are no lawyers on the email. "Frontier" is a pseudonym that was used to identify Frank during due diligence. The email is dated July 8, 2021, one day after Ms. Javice presented a pitch deck to JPMC, as referenced in the Complaint.

This Court should compel JPMC to produce all documents between July 1, 2021 and September 30, 2021 that do not include a lawyer, seek or obtain legal advice, and instead concern business discussions around the merger, which are not privileged. *See* **Appendix C**.

### 3. Skype and Slack Chats

---

[7] In its position, below, JPMC incorrectly states that JPMCPRIV_REVISED_002609 and JPMCPRIV_REVISED_000773 "plainly include attorneys in the to/from line of the top email." As evidenced in the highlighted privilege log excerpts in **Appendix C**, no attorney is listed in the "to" or "from" cells on the privilege log.

[8] *See* ECF No. 1 ("On or about August 1, 2021, Executive-1 sent an email to JAVICE (the "August 1 Email"), with the subject line containing "key data questions"). This Court previously held, with respect to emails cited in the Complaint, that if it "is part of a chain or refers to other documents, those documents in that chain have to be produced." Nov. 2, 2023 Hr'g Tr. at 41:22-24.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 9

This Court should likewise compel JPMC to produce non-privileged Skype and Slack chats and non-privileged portions of these chats. *See* **Appendix D**. Defendants challenge JPMC's designation as privileged certain withheld chats because JPMC's log entries are overbroad and sweep in entire sets of direct messaging communications, including portions of messaging communications that are clearly not privileged.[9]

Direct messaging communications, or chats, are typically exchanged in continuous chat sessions, which can include as few as two participants or a larger group; each chat can contain one hundred or more individual messages. Skype and Slack are two of the more common direct messaging platforms used by companies. For the time period relevant to the alleged conduct, Frank used Slack and JPMC used Skype for in-house direct messaging. As with email (or any other form of communication), the mere presence of a lawyer in a chat does not establish that the entirety of the chat is privileged. Indeed, the relatively less formal nature of chat communications, both in substance and tone, makes the presence of a lawyer even less likely, on its own, to signal that legal advice is being sought or conveyed.[10] In addition, a single chat thread, when downloaded and produced in a legal proceeding, may (and typically does) span multiple days and subject matters, making it highly unlikely that the entirety of any particular chat thread is privileged.

Defendants challenge as overbroad JPMC's withholding of entire Skype and Slack chat threads, which identify chat participants and the time and date of the very first message in the chat thread, even though the thread may include more than one hundred individual communications exchanged over the course of hours. *See* JPMC_01204511.

JPMC also has waived any privilege over the chats in **Appendix D** because the entries for withheld chat threads are legally insufficient under Local Rule 26.2 and this Court's orders. For example, the Slack message entries do not include subject lines and neither the Skype nor the Slack message entries include equivalent descriptions of each withheld message, the date and time of the withheld message, or even the number of withheld messages per thread. See *Bowne*, 150 F.R.D. at 474 ("[I]f the party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege, his claim will be rejected").

Defendants have identified the following exemplar documents from **Appendix D** for the Court's *in camera* review:

---

[9] After reviewing Defendants' drafts of this submission and **Appendix D**, JPMC produced certain Slack and Skype messages to Defendants last week, including a fully withheld Skype message that Defendants had identified for the Court's *in-camera* review, which JPMC has now produced in full with no redactions.

[10] Informal modes of communication sometimes result in more candid communication. Further, the Government's June 24, 2024 letter in response to Defendants' motions for a Bill of Particulars cites to at least one chat thread as purported evidence of the alleged scheme. *See* ECF No. 140. Defendants are entitled to the full set of responsive chat communications, not just a sampling selected by JPMC.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 10

- **JPMCPRIV_REVISED_000438** – Withheld Slack communication between Mr. Glazer, Ms. Javice, Mr. Amar, and Frank engineers Jen Wong and Patrick Vovor with no general subject matter identified. The Slack communications occurred on June 15, 2021, while Frank was engaged in diligence with Bank-1.

- **JPMCPRIV_REVISED_004026** – Withheld Skype communication between Sindhu Subramaniam, a JPMC employee responsible for conveying information regarding Frank to the senior executive team and memorializing it in various trackers, and JPMC in-house counsel. The communications occurred on September 14, 2021, the date of the Frank purchase closing.

This Court should compel JPMC to produce all Slack and Skype chats (or portions thereof) that do not include a lawyer or seek or obtain legal advice. *See* **Appendix D**.

### 4. Slide Decks and Spreadsheets Not Authored by Attorneys

Defendants move for an order compelling production of non-privileged slide decks and spreadsheets listed in **Appendix E**, which are not authored by attorneys and do not seek or obtain legal advice.[11] *See* Appendix E.

JPMC has impermissibly withheld multiple PowerPoint slide decks and Excel spreadsheets related to Frank's business, as set forth in **Appendix E**. Defendants have received versions of many of these documents in discovery, evidencing that the documents constitute business materials, not requests for or the rendition of legal advice. To the extent there may be privileged communications embedded within the withheld documents, those communications should be redacted and the remainder of the documents produced.

Defendants have identified the following exemplar documents from **Appendix E** for the Court's *in camera* review:

- **JPMCPRIV_REVISED_010482** – Withheld Spreadsheet file titled "Microsoft_Excel_Worksheet.xlsx." There is *no author* listed for this document. The document is listed on the privilege log as an e-mail attachment with "Bates Parent" JPMC_01020366, but JPMC has not produced JPMC_01020366, and JPMC_01020366 is not listed on the privilege log.

- **JPMCPRIV_REVISED_004445** – Withheld "E-Doc" PowerPoint file titled "Finland_Integration assessment framework.v4.pptx." The author of this document is *not* a lawyer. There is no "Bates Parent" listed for this document.

---

[11] Last week, having reviewed Defendants' drafts of this submission and **Appendix E**, JPMC produced certain documents from the draft Appendix, including a non-privileged Excel spreadsheet that Defendants had identified for the Court's *in camera* review, which JPMC previously withheld in full and has now produced with no redactions.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 11

- **JPMCPRIV_REVISED_004454** – Withheld "E-Doc" PowerPoint file titled "Integration assessment framework_CCB 10012021.pptx." The author of this document is **not** a lawyer. There is no "Bates Parent" listed for this document.

This Court should compel JPMC to produce all PowerPoint and Excel files (or portions thereof) that were not authored by a lawyer or seek or obtain legal advice. *See* **Appendix E**.

### 5. Documents Withheld on the Basis of Supervisory Privilege

Defendants also move for an order compelling production of documents improperly withheld on basis of bank supervisory privilege, as listed in **Appendix F**. In the alternative, Defendants move for an order compelling JPMC to promptly inform the Office of the Comptroller of the Currency ("OCC") and other applicable bank regulators that production of these documents is compelled by subpoena, submit the documents sought to the appropriate bank regulator for its review, and ask the bank regulator to promptly state its position as to whether or not it is maintaining the privilege.

JPMC has improperly withheld hundreds of documents—including **internal** JPMC documents—on the basis that they purportedly contain "non-public supervisory information," citing to the bank examination privilege held by various regulators and memorialized in 12 C.F.R. § 4.31 (Office of the Comptroller of the Currency), 12 C.F.R. § 261.1 (Federal Reserve), 12 C.F.R. §309.1 (Federal Deposit Insurance Corporation); 12 C.F.R. §1070 (Consumer Financial Protection Bureau). "[T]he bank examination privilege is a qualified privilege that protects communications between banks and their examiners in order to preserve absolute candor essential to the effective supervision of banks." *Wultz v. Bank of China Ltd.*, 61 F. Supp. 3d 272, 281 (S.D.N.Y. 2013) (internal quotations and citations omitted). Critically, the bank examination privilege belongs **solely to the regulatory authority**, not the banks that it regulates, and protects opinions and recommendations but not factual materials. *See MASTR Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*, No. 12-cv-7322 (JCF), 2013 WL 5437354, at *1 (S.D.N.Y. Sept. 27, 2013) (bank examiner privilege is "narrow in scope" and "belongs to the regulatory authority" and may not be asserted by bank).

Although the bank examination privilege is not JPMC's privilege to invoke or waive, since October 2023, JPMC nevertheless has withheld nearly one thousand responsive documents on the basis of this privilege. To Defendants' knowledge, JPMC has not informed the bank regulators that these documents are responsive to subpoenas from the Government and Defendants. Nor has any bank regulator intervened to assert privilege, suggesting to Defendants that JPMC has not informed any of its regulators that documents potentially subject to the bank examination privilege are the subject of a year-long privilege dispute in federal court. This is a clear violation of the relevant regulations, which require JPMC to "immediately notify" the OCC when it received subpoenas from the government (more than one year ago) and Defendants (in November 2023) requesting the documents listed in **Appendix F**. *See, e.g.,* 12 C.F.R. § 4.37(b)(3) (any "national bank" served with a subpoena for information that may be subject to the bank examiner privilege shall "[i]mmediately notify the Director of the OCC's Litigation Division at the Washington, DC

Hon. Alvin K. Hellerstein
July 24, 2024
Page 12

office and inform the Director of all relevant facts, including the documents and information requested, so that the OCC may intervene in the judicial or administrative action if appropriate.").

Defendants long have suspected—and JPMC recently confirmed—that JPMC relied on overbroad assertions of the bank examination privilege to withhold non-privileged documents that were not within the purview of the regulator to withhold. Last week, after Defendants shared drafts of this submission and **Appendix F** with JPMC, JPMC produced 142 documents that it had impermissibly withheld on the basis of bank examination privilege for nearly a year. This behavior is analogous to another case before this district, *Sharkey v. J.P. Morgan Chase & Co.*, No. 10-cv-3824, 2013 WL 2254553, at *1 (S.D.N.Y. May 22, 2013), in which the court held that JPMC hid behind the bank examination privilege—which JPMC had no standing to assert—to withhold responsive documents in litigation. Defendants remain concerned that JPMC continues to use bank examination privilege to shield from production documents the regulators have not and would not, in fact, designate as privileged.

JPMC has declined to provide this Court with any documents set forth in **Appendix F** for *in camera* review. Nevertheless, Defendants have identified the following examplar documents:

- **JPMCPRIV_REVISED_003004**– 34th chronologically consecutive withheld email on **Appendix F** with subject line "RE: [Received VIA OCC TLS] Acquisition Update." The timestamps of the multiple emails with this same subject line suggest that after receiving a document from the OCC, JPMC employees engaged in internal conversations that do not entirely constitute non-public supervisory information.

- **JPMCPRIV_REVISED_002671**– Withheld email from David Katz to JPMC employees with subject line "RE: Acquisition Update." The email subject line suggests that JPMC employees were engaged in internal conversations that do not entirely constitute non-public supervisory information.

Defendants move for an order compelling production of all documents withheld on grounds of bank supervisory privilege set forth in **Appendix F**. In the alternative, Defendants move for an order compelling JPMC to promptly seek leave from the bank regulators to produce these documents.

### C. Defendants' Own Pre-Merger Communications

JPMC continues to withhold or redact approximately 600 communications involving one or both Defendants and their counsel between January 4, 2021, and September 14, 2021, before JPMC's acquisition of Frank and during which time Defendants were two of only three executives at Frank, a closely held company that no longer exists. *See* **Appendix G**. As detailed below, Defendants are entitled to these documents—their own communications with their lawyers—as joint privilege holders with Frank, whether Delaware or federal common law governs.

Putting form over function, JPMC seeks to upset Defendants' settled expectations that this correspondence, including exchanges with their in-house counsel and close confidant during a

Hon. Alvin K. Hellerstein
July 24, 2024
Page 13

critical time (leading up to and during a merger that is now alleged to have been premised on misstatements) was privileged based on a flawed analysis of choice-of-law principles. JPMC's position is untenable and would produce an absurd outcome wherein the privilege belongs to an empty corporate chair at the expense of *bona fide* privilege holders who need the documents for their criminal defense. JPMC offers policy reasons for withholding the documents from Frank's former executives—who are not adverse to Frank—that have no application here and serve only to reinforce a legal fiction that would unfairly deprive Defendants of their right to mount a rigorous defense and confront their accusers.

Accordingly, Defendants respectfully request that the Court order JPMC to produce these documents set forth in **Appendix G**.

1. **Defendants Are Entitled to Their Own Communications, Including Communications with Matt Glazer, as Joint Privilege Holders**

a. **Courts in This Circuit Routinely Rely on State Law Privilege Doctrine to Find a Joint Privilege for Former Executives**

Federal courts in this Circuit routinely hold that former executives share a joint privilege over communications generated during their tenure, and these courts rely on state-law privilege doctrine to make those reasonable determinations. *See, e.g.*, *Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95, 105 (S.D.N.Y. 2009) (holding the partner "cannot, on behalf of [partnership], 'assert the [attorney-client] privilege to deny [Mathes] access' to any of the disputed documents, or prevent her from relying on them in preparing her defense") (quoting *Moore Business Forms, Inc., v. Cordant Holdings Corp.*, No. 13911, 1996 WL 307444, at *4 (Del. Ch. Jun. 3, 1996)); *Am. S.S. Owners Mut. Protection and Indemnity Ass'n, Inc. v. Alcoa Steamship. Co., Inc.*, 232 F.R.D. 191, 198–99 (S.D.N.Y. 2005) ("As a matter of corporate law, any [director] may have the right of access to attorney-client communications between the [company] and its counsel generated during his or her tenure."). The Second Circuit has recognized these cases. *Sampedro v. Silver Point Cap., L.P.*, 818 F. App'x 14, 18 (2d Cir. 2020), *as amended* (June 5, 2020).

JPMC acknowledges, as it must, that no binding authority requires a federal court to apply federal common law or ignore persuasive state law. Indeed, in defining federal common law itself, and in applying Federal Rule of Evidence 501, the Second Circuit has determined that federal courts "may draw on the law of privilege as it has developed in state courts," such as Delaware, where Defendants clearly have a right to re-access their own communications. *In re Grand Jury Investigation*, 399 F.3d 527, 530 (2d Cir. 2005). Looking to Delaware privilege law is particularly warranted under the circumstance here:

- *First*, although this case was brought by the federal government in federal court, this is a prosecution of corporate executives of a closely held startup, which was incorporated under the law of Delaware, USAO_Rel_000025396 ("Merger Agreement") at 5, and who acted at all times under the protections provided by Delaware law.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 14

- *Second*, the communications at issue were exchanged during merger negotiations and in the context of a merger agreement governed by Delaware law. *See* Merger Agreement at 85.

- *Third*, the withheld communications are highly likely to be material to Defendants' defense because the alleged scheme centers on Defendants' purported actions during their time as executives—in particular, in the context of efforts to sell Frank—and the Government intends to rely on Defendants' communications with Mr. Glazer in support of its case. *See* Gvt. Disclosure Letter .

- *Fourth*, Defendants are not adverse to their former company, Frank, the corporate privilege holder, which no longer exists.

Instead, JPMC advances a lengthy discussion of *Fitzpatrick v. Am. Int'l Grp., Inc.*, 272 F.R.D. 100, 105 (S.D.N.Y. 2010), a civil contracts case, to argue that the Court should ignore state-law privilege doctrine. But *Fitzpatrick*, like other federal cases, finds that a federal court "may look to state law doctrine" "in defining federal common law." *Id.* .

Moreover, *Fitzpatrick* rests on policy points that are inapposite here. The plaintiff there sought documents beyond those in which he participated. Indeed, he sought all privileged documents between the company and company counsel, as well as the communications between the parent company and its counsel. That far exceeds what Defendants seek in this submission. The company in *Fitzpatrick* also still existed at the time of the dispute, unlike Frank, which JPMC shuttered and which has no executives, board members, or employees whose corporate speech may be "chilled." *Cf. Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 278 (N.D. Ill. 2004). Similarly, the company in *Fitzpatrick* was the defendant in the underlying action, unlike JPMC, a third-party here. And further still, the company in *Fitzpatrick* is AIG Global Real Estate Investment Corporation, a subsidiary of American International Group, Inc. (AIG), an enormous corporation compared to Frank, a startup. Finally, and most importantly, unlike in *Fitzpatrick*, Defendants and JPMC are not adverse in this matter. Although JPMC has sued Defendants in a (currently stayed) civil case in Delaware, that fact serves only to underscore the need for disclosure. Under Delaware law, Defendants are entitled to re-access their own communications, and JPMC has an interest in withholding the communications here to gain a strategic advantage in its own lawsuit against Defendants, rather than to enforce legitimate privilege assertions.[12]

---

[12] The federal common law does not preclude disclosure here. Even accepting the standard articulated in *Fitzpatrick*, Defendants are entitled to re-access their pre-merger communications. The court in *Fitzpatrick* held that "the controlling issue is whether, as a legal matter, [plaintiff] should be deemed, in his individual capacity, to have been a party to the attorney-client relationship of the company for which he worked in the past." 272 F.R.D. at 105. Here, as two of three

Hon. Alvin K. Hellerstein
July 24, 2024
Page 15

### b. Defendants Are Entitled to Their Own Pre-Merger Communications, including with Matt Glazer, Under State Law

Under well-settled corporate privilege law, a company cannot withhold a former top executive's own communications. *See, e.g.*, *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, No. 13911, 1996 WL 307444, at *4 (Del. Ch. June 4, 1996) ("[A]s a general matter, a corporation cannot assert the privilege to deny a director access to legal advice furnished to the board during the director's tenure."); *Kirby v. Kirby*, No. 8604, 1987 WL 14862, at *7 (Del. Ch. 1987) ("The directors are all responsible for the proper management of the corporation, and it seems consistent with their joint obligations that they be treated as the 'joint client' when legal advice is rendered to the corporation through one of its officers or directors."); *Hyde Park Venture Partners Fund III, L.P. v. FairXchange, LLC*, 292 A.3d 178, 189 (Del. Ch. 2023) (finding corporation "has no expectation of confidentiality and cannot assert the [attorney-client] privilege against" former member of board).[13]

Under this law, Defendants are entitled to access their ***own*** pre-merger communications as top executives of (and joint privilege holders with) a small company with only thirteen total employees, who acted at all times as if their communications were privileged under Delaware law. Ms. Javice founded Frank, served as its Chief Executive Officer ("CEO"), and was a member of its Board of Directors. Mr. Amar served as Frank's Chief Growth Officer ("CGO") and routinely attended Board meetings. The only other executive was Matt Glazer, who served as Frank's Chief

---

executives of a small company, Defendants regularly relied on Mr. Glazer for individualized advice.

[13] Numerous other courts have adopted the watershed principles set forth in *Kirby. See, e.g.*, *People ex rel. Spitzer v. Greenberg*, 50 A.D.3d 195, 200-02 (N.Y. App. Div. 2008) (ordering production to former directors of privileged documents generated during their tenure as directors); *Inter-Fluve v. Montana Eighteenth Judicial Dist. Court*, 327 Mont. 14, 24 (2005) ("We hold that the confidentiality of the attorney-client privilege is not violated when a former director of a closely held corporation [who is now adverse] is allowed to discover communications between corporate counsel and other directors which occurred during his tenure as director."); *Gottlieb v. Wiles*, 143 F.R.D. 241, 247 (D. Colo. 1992) ("[A]t the time the materials [in question] were generated, [defendant] was not an outsider. As the Chairman of the Board and Chief Executive Officer, he was squarely within the class of persons who could receive communications and work product from [company] counsel without adversely impacting the privileged or confidential nature of such material."); *Harris v. Wells*, Nos. 89-391,89-482, 1990 WL 150445, at *4 (D. Conn. Sept. 5, 1990) (requiring disclosure of documents based, in part, on *Kirby*, and noting, "as a Delaware corporation, ArcoChem's directors are entrusted with the responsibility to manage the affairs of the corporation. Consequently, it [is] the corporation's directors who hold and control the corporation's attorney-client privilege"); *SPSS, Inc. v. Carnahan-Walsh*, 267 Ill. App. 3d 586, 591–92 (1994) (finding no attorney-client privilege against "president, chief operating officer, and a member of the SPSS Board" or "a member of SPSS' Policy and Planning Committee").

Hon. Alvin K. Hellerstein
July 24, 2024
Page 16

Operating Officer ("COO") and Chief Legal Officer ("CLO"). Together, Ms. Javice and Mr. Amar led Frank, viewed their communications (in particular with Mr. Glazer) as privileged, and conducted their business under the presumption of a joint privilege provided by Delaware law. JPMC's claim that it, as Frank's acquiror, alone holds the privilege over Defendants' pre-merger communications from their time at Frank ignores the reality of Frank's size, governance, management, and operations.[14] JPMC's position would render illusory the state law privilege protections Defendants presumed they had.

### c. Justice and Fundamental Fairness Demand Production of Defendants' Pre-Merger Communications

Not only should this Court find that JPMC cannot assert privilege to preclude Defendants' from accessing their own communications, but justice and fundamental fairness so require. The withheld communications are essential to Defendants' defense of the criminal charges against them, including a potential advice of counsel defense. Indeed, Defendants' communications with their counsel took place in the context of the acquisition discussions at the heart of this case, and the Government's charges go directly to Defendants' conduct as executives at Frank during the time the communications were generated. *See, e.g.*, *Spitzer*, 50 A.D.3d at 202 ("Under both New York and Delaware laws, the fact that [defendants] are no longer directors is not fatal to their motion to compel, since their conduct while directors has been called into question and the inspection is needed to prepare their [advice of counsel] defenses."). The Government's Disclosure Letter only underscores this point. Gvt. Disclosure Letter (stating intent to rely on communications between Defendants and Mr. Glazer from as early as January 2021 regarding an early alleged iteration of the core misrepresentations alleged in the Indictment). In other words, JPMC's view seems to be that it can produce ***some*** pre-merger correspondence between Defendants and Mr. Glazer, some of which the Government intends to use against Defendants, but not ***all*** correspondence, some of which will inevitably be material to Defendants' defense.

Accordingly, JPMC's privilege assertions should yield to Defendants' constitutional rights. *See, e.g.*, *United States v. Weisberg*, No. 08-cr-347 (RML), 2011 WL 1327689, at *5 (E.D.N.Y. Apr. 5, 2011) (Supreme Court has left open the issue of whether the attorney-client privilege "may be overcome, 'in exceptional circumstances,' by a criminal defendant's constitutional right to present a defense" (quoting *Swidler & Berlin v. United States*, 524 U.S. 399, 408 n.3 (1998))); *United States v. Grace*, 439 F. Supp. 2d 1125, 1143 (D. Mont. 2006) (evidence at issue was "of such probative and exculpatory value as to compel admission of the evidence over [the company's] objection as the attorney-client privilege holder"); *United States v. Herrell*, No. 21-cr-13, 2024 WL 2954408, at *4 (E.D. Ky. June 12, 2024) ("[T]his Court finds that the attorney client privilege may be pierced if a criminal defendant's interest in his Sixth Amendment rights outweighs the privilege-holder's interest in maintaining the privilege.").

---

[14] Further illustrating the closely held nature of Frank and the practical realities of how it operated, the privilege asserted by JPMC over the documents listed on **Appendix G** turns entirely on Mr. Glazer's involvement even though he regularly acted in a business, rather than a legal, capacity—including during acquisition discussions, as described above. Indeed, Mr. Glazer and Defendants worked side by side to make business decisions affecting virtually all aspects of Frank.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 17

Attempting to minimize this issue, JPMC argues that there is no advice-of-counsel exception to attorney-client privilege, relying on *United States v. Wells Fargo Bank, N.A.*, 132 F. Supp. 3d 558 (S.D.N.Y. 2015), and *United States v. Milton*, 626 F. Supp. 3d 694 (S.D.N.Y. 2022). But *Wells Fargo* is a civil case. It does not implicate a criminal defendant's constitutional rights. 132 F. Supp. 3d at 562. Additionally, *Wells Fargo* involved a dispute between a current employee and the co-defendant company. Here, on the other hand, Defendants are not adverse to Frank, and Frank is now defunct. Similarly, as JPMC tacitly concedes, *see infra*, note 24, *Milton* supports Defendants' request. There, the company had already "produced . . . all of [defendant's] electronic communications with [the general counsel] about his public statements" without issue. *Id*. at 700. This is exactly what Defendants seek from JPMC. .

For the foregoing reasons, Defendants respectfully move for an order compelling production of all documents listed in **Appendix G**.

To the extent the Court deems it appropriate, Defendants are amenable to entering into a stipulation pursuant to Federal Rule of Evidence 502(d) acknowledging that JPMC does not waive its claims of privilege over those documents by producing them to Defendants, as Defendants have repeatedly proposed to JPMC.[15]

\* \* \* \*

For the foregoing reasons, this Court should find waiver as to all documents identified on JPMC's privilege logs, or, at a minimum, with respect to the specific categories of documents identified in **Appendices A through G** and as detailed above.

## JPMC'S POSITION

### I.    JPMC's Record of Cooperation and Good-Faith Efforts To Resolve the Instant Dispute

JPMC, a third party and the victim in this case, has worked constructively with Defendants, produced responsive materials, and cured prior alleged deficiencies in the relevant privilege logs.[16]

Defendants' account about delays are misleading and incorrect, or at least exaggerated.

---

[15] "A federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court—in which event the disclosure is also not a waiver in any other federal or state proceeding." Fed. R. Evid. 502(d); *In re General Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 526 (S.D.N.Y. 2015) ("Rule 502(d) provides that this Court's ruling on the question of waiver is binding on other courts throughout the country.").

[16] Although Defendants refer to JPMC as "the self-described 'victim'" in this case, this Court itself has described JPMC as "the victim of defendants' alleged fraud."  (*See* Dkt. No. 61.)

Hon. Alvin K. Hellerstein
July 24, 2024
Page 18

*First*, JPMC has provided a comprehensive privilege log, consistent with the applicable local and federal rules. Local Rule 26.2(a) requires the following information to be provided for privileged documents: document type, general subject matter, date, author, addresses, and any other recipients. JPMC has provided this information on its privilege log, except where the information does not exist. For example, Defendants object to a Slack communication because JPMC's privilege log does not provide a subject line. Defendants ignore the fact that Slack communications do not have subject lines and that the Bank provided all other information required by Local Rule 26.2(a) for the document.

*Second*, while Defendants note JPMC has withheld approximately 23,000 documents, they fail to reference that JPMC—again, a third party—has produced over 320,000 documents, and in the course of their review, withheld approximately 8,300 documents, a fraction of the material reviewed. This volume is not surprising given the involvement of attorneys in a corporate transaction of this type and scale. Any suggestion that JPMC has improperly withheld non-privileged documents, or failed to log privileged documents, is without merit.

Moreover, JPMC has met every court-ordered deadline, and only sought extensions in limited and extenuating circumstances. For example, when JPMC rereviewed over 31,000 documents, with Defendants' consent, JPMC sought a one-week adjournment to meet that deadline.

Defendants' timeline is selective, and, given the flaws in their legal arguments, ultimately irrelevant. To avoid confusion, we will correct a few obvious omissions to this flawed timeline. For example, Defendants state that in January 2024, the Court ordered JPMC to produce "a complete and comprehensive privilege log consistent with the requirements of Local Rule 26.2." (Defendants' Position ("Defs.' Pos.") at 3.) In January 2024, the Court ruled on JPMC's motion to quash, ultimately narrowing Defendants' Rule 17 subpoenas. The Court also set deadlines for the Bank to complete its Rule 17 productions and produce a revised, consolidated privilege log which included new entries relating to the Rule 17 review, which was still pending at the time. Over the course of the next several months, JPMC completed its response to the Rule 17 subpoenas as ordered. On March 29, 2024, again consistent with the Court's Order, JPMC produced a modified and consolidated log to Defendants, which included entries related to the grand jury subpoenas and Rule 17 subpoenas.

Consistent with the Court's Order, counsel for Defendants and JPMC conferred more than five times to begin addressing Defendants' challenges to JPMC's privilege logs. Due to the number of challenges raised by Defendants, JPMC's new counsel, who had been engaged in February 2024, offered to conduct a re-review of the documents across all privilege logs prepared by the Bank's former counsel. Despite the re-review of over 31,000 documents, JPMC requested only one additional week to prepare the modified privilege log. Defendants agreed to JPMC's proposal.

Throughout May 2024, JPMC made a series of rolling productions to Defendants, with documents that it determined were no longer privileged and could be removed from JPMC's privilege log. On May 23, consistent with the Court's Order, JPMC produced a revised and

Hon. Alvin K. Hellerstein
July 24, 2024
Page 19

consolidated privilege log to Defendants. The privilege log reflected the re-review of over 31,000 documents, conducted by over 90 attorneys, in just one month. The privilege log also addressed all of Defendants' challenges and included entries relating to all documents reviewed to date in response to the grand jury subpoenas and Rule 17 subpoenas.

In fact, on June 4, 2024, during a meet and confer with Defendants, counsel for Olivier Amar thanked counsel for JPMC, noting that they recognized the significant amount of work that went into the privilege re-review and that they had noted the number of produced documents and more precise privilege redactions implemented by JPMC.

## II.    JPMC's Response to Defendants' Privilege Challenges

### A.    JPMC Has Not Waived Privilege Over Any Documents, and its Privilege Log Fully Complies With the Requirements of Local Rule 26.2(a)

JPMC has produced a privilege log that complies in all respects with federal and local rules. Defendants nonetheless seek to invade the Bank's privilege by arguing that the Bank has waived privilege over every document on its privilege log. In the alternative, Defendants argue that the Bank has waived privilege over a narrower set of documents that allegedly fail to comply with these rules. For the reasons set forth below, neither argument has merit.

### i.    JPMC Has Not Waived Privilege Over Any Documents on Its Privilege Log

JPMC has addressed Defendants' concerns regarding the Bank's original privilege log and narrowed the range of disputes before the Court. These steps include months of good-faith negotiations and the production of a revised log that complies with local rules. Defendants now argue, however, that the Bank has "globally" waived privilege over every single document on its privilege log. (*See* Defs.' Pos. at 4–5.) This attempt to override the Bank's privilege distorts key facts, misrepresents prior discussions with Defendants, and departs from the relevant law.

As an initial matter, and as noted above, Defendants' argument either omits or misstates several significant facts. In particular, as requested by Defendants, and as ordered by the Court, during February and March 2024, JPMC focused on responding to Defendants' Rule 17 subpoenas.[17]

Further, Defendants fail to consider the Southern District's doctrine governing privilege log waivers. Although "[w]ithholding privileged materials without including the material in a privilege log may be viewed as a waiver of the privilege or protection," *Universal Standard Inc.*

---

[17] JPMC informed Defendants during meet and confers during this time period that JPMC was focused on meeting the court-ordered Rule 17 deadlines and would address Defendants' privilege concerns after producing the consolidated privilege log on March 29, 2024. JPMC then turned to addressing Defendants' concerns regarding the privilege log. Defendants did not take issue with this sequencing at the time.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 20

*v. Target Corp.*, 331 F.R.D. 80, 85 (S.D.N.Y. 2019) (citation and internal quotation marks omitted), "only *flagrant* violations" of the Local Rules "should result in a waiver of privilege," *id.* (emphasis added) (citation and internal quotation marks omitted); *see also, e.g., In re Welspun Litig.*, No. 16-CV-6792, 2018 WL 4693587, at *3 (S.D.N.Y. Sept. 21, 2018) (noting that "waiver is a 'harsh remedy' that generally is reserved for egregious noncompliance" (citation omitted)). "Whether waiver is warranted depends on such factors as the length of the delay, the willfulness of the transgression, and the harm to other parties." *Universal Standard*, 331 F.R.D. at 85 (citation omitted). For the reasons set forth below, JPMC's conduct does not constitute a "flagrant" violation for which a finding of waiver is appropriate.

Under the approach taken by courts in this District, a "flagrant" violation generally requires some combination of gamesmanship, intransigence, or a persistent refusal (or inability) to produce a privilege log that complies with local rules. *See, e.g., Yorkville Advisors*, 300 F.R.D. at 162–69 (refusing to consider a revised privilege log that the SEC submitted after a year-long delay because the agency's "justification for its belated production [was] totally inadequate," and concluding that the agency had waived privilege because its initial logs failed to specify the authors and recipients for a majority of documents, among other deficiencies); *Dey, L.P. v. Sepracor, Inc.*, No. 07-CV-2353, 2010 WL 5094406, at *3 (S.D.N.Y. Dec. 8, 2010) (concluding that the plaintiff had waived privilege over 170 documents that it withdrew from a prior privilege log and then tried to reassert privilege over roughly *two years later*); *Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 43 (S.D.N.Y. 2009) (concluding that defendants had waived privilege over an email chain on their privilege log after they failed to produce a log as initially ordered by the court; misrepresented to the court that they had no privileged documents; and then, in response to a subsequent order, produced a "woefully deficient" log that, among other flaws, failed to explain how seven nonlawyers on a putatively privileged email chain did not break privilege).[18]

As discussed, JPMC's conduct in this case bears no resemblance to the conduct at issue in cases such as *Yorkville Advisors*, *Dey*, or *Crawford*. The Bank has worked proactively and in good

---

[18] To the extent Defendants invoke *Yorkville Advisors* to suggest that the act of filing a revised privilege log is, in and of itself, a concession that should result in waiver, (*see* Defs.' Pos. at 5), they have misread the court's opinion and either overlooked or ignored extensive case law to the contrary. As noted, the court in *Yorkville Advisors* declined even to consider the SEC's revised log because it found its submission untimely. 300 F.R.D. at 165. Because that log was untimely, the court scrutinized the SEC's initial logs and found waiver based on those. *See id.* at 162–64. Moreover, numerous courts in this District have either ordered or allowed parties to file revised privilege logs; the very act of doing so does not, as Defendants suggest, constitute waiver. *See, e.g., In re Aenergy, S.A.*, 451 F. Supp. 3d 319, 328 (S.D.N.Y. 2020); *In re Welspun Litig.*, 2018 WL 4693587, at *3; *BlackRock Balanced Cap. Portfolio (FI) v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-9367, 2018 WL 3584020, at *1 (S.D.N.Y. July 23, 2018); *In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 300 (S.D.N.Y. 2003).

To the extent former District Judge Stephen Robinson's opinion in *Aurora Loan Services, Inc. v. Posner, Posner & Associates, P.C.*, 499 F. Supp. 2d 475 (S.D.N.Y. 2007), suggests a contrary result, it is an outlier compared to the vast weight of authority in this District.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 21

faith to address Defendants' concerns with its initial privilege logs and has undertaken an extensive privilege re-review, downgraded thousands of documents, and produced a revised privilege log that fully complies with local and federal rules. In this respect, the facts here are analogous to those in *Robinson v. De Niro*, No. 19-CV-9156, 2022 WL 704922 (S.D.N.Y. Mar. 9, 2022). In *Robinson*, the plaintiff argued that the defendants had waived privilege by failing to produce timely privilege logs with each tranche of documents as required. *Id.* at *3. While acknowledging this shortcoming, the court observed that the defendants had "met and conferred with [opposing] counsel about objections to privilege assertions, provided clarifying information, and re-reviewed their log based on [the] [p]laintiff's objections, resulting in their production of additional information." *Id.* at *4. Thus, the defendants' conduct "[did] not come close to the sort of flagrant violations of the discovery rules that should result in a wholesale waiver of privilege." *Id.*

Defendants' suggestion that the Bank made no effort to address the alleged deficiencies in its initial logs until April 2024, (*see* Defs.' Pos. at 4), is misleading. During that period JPMC was reviewing and producing documents in response to subpoenas for this matter. The scenario here is analogous to that in *Mortgage Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*, No. 15-CV-293, 2017 WL 2305398 (S.D.N.Y. May 18, 2017), where the court rejected the plaintiff's argument that the defendants had waived privilege after submitting a revised log and allegedly failing to remedy previous deficiencies in a prior log. As the court explained, the "defendants did not refuse to produce a privilege log" or "engage in calculated foot dragging." *Id.* at *3. "Rather, they deferred production of a log so that they could focus on producing the documents themselves more expeditiously, an approach for which they should not be punished." *Id.* (record citation omitted).

The outcome in *Mortgage Resolution* is consistent with the weight of authority in the Southern District, which indicates that even when parties commit errors in discovery, wholesale waiver is rarely imposed as a remedy. *See, e.g.*, *Brown v. Barnes & Noble, Inc.*, 474 F. Supp. 3d 637, 647–48 (S.D.N.Y. 2019) (finding waiver not appropriate where, notwithstanding the defendant's failure to provide a privilege log with each tranche of its ESI production, it had "cooperated with [p]laintiffs and timely updated the [c]ourt and [p]laintiffs of [its] progress"); *Chevron Corp. v. Donziger*, No. 11-CV-691, 2013 WL 4045326, at *2–3 (S.D.N.Y. Aug. 9, 2013) (finding that although the defendant's privilege log was "rife with vague descriptions," those inadequacies were "not flagrant enough to warrant full production of documents that likely contain[ed] some privileged material" (citation and alterations omitted)); *Pem-Am., Inc. v. Sunham Home Fashions, LLC*, No. 03-CV-1377, 2007 WL 3226156, at *2 (S.D.N.Y. Oct. 31, 2007) (concluding that the defendant's "tardiness in providing a privilege log" did not constitute a "flagrant" violation).

Finally, to the extent this Court finds fault with aspects of JPMC's discovery record in this case, it is notable that courts in the Southern District have declined to impose waiver even for much more significant conduct. In *In re Aenergy, S.A.*, 451 F. Supp. 3d 319 (S.D.N.Y. 2020), for example, although a non-party's privilege log had "significant shortcomings" (including "vague and repetitive" descriptions and incoherent categorical groupings) that evinced "obvious gamesmanship," the court declined to find waiver in part because it "[could] tell that at least some of the withheld documents [were] likely actually privileged." *Id.* at 325, 326, 327–28. Similarly, in *BlackRock Balanced Capital Portfolio (FI) v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-9367,

Hon. Alvin K. Hellerstein
July 24, 2024
Page 22

2018 WL 3584020 (S.D.N.Y. July 23, 2018), the court observed that, "notwithstanding multiple opportunities" to provide an adequate log, the defendant had produced a revised log that still "lack[ed] meaningful descriptions or intelligible identifiers" that would allow the plaintiff to evaluate whether the privilege assertion was valid. *Id.* at *4–5. Nonetheless, the court concluded that the defendant would waive privilege only if it could not "make a particularized showing" that individual documents on its log were "adequately described" and, "in fact, privileged," thus giving the defendant one last chance to remedy its deficient log within 30 days. *Id.* at *5.

Although Defendants assert in conclusory fashion that JPMC's conduct has been "flagrant," (Defs.' Pos. at 4), they make no attempt to seriously distinguish (or even address) much of the case law cited above. For example, they assert that *Brown*, *Chevron*, and *Pem-Am* are "readily distinguishable" without any engaged discussion. (*Id.* at 5.) They make <u>no</u> effort to address *In re Aenergy*, *BlackRock*, *Mortgage Resolution*, or *Robinson*.

For the reasons set forth above, JPMC's conduct in this case—including its record of cooperation with Defendants and its production of a revised privilege log that complies with local and federal rules does not constitute a "flagrant" violation for which a finding of waiver would be appropriate.

> ### ii.    *JPMC Has Not Waived Privilege Over the Documents in Appendix A*

Defendants' alternative argument—that JPMC has waived privilege over a much smaller universe of documents (listed in Appendix A) whose corresponding privilege log entries "continue to fall short of Rule 26.2(a)'s requirements," (*see* Defs.' Position at 6 n.3)—is also without merit.

Defendants previously raised two example documents in support of this alternative argument. After receiving JPMC's explanation for both documents, Defendants removed these examples for *in camera* review. These examples, though, are instructive and remain in Appendix A (JPMCPRIV_REVISED_018680 and JPMCPRIV_REVISED_00438). Defendants previously provided these examples of an incomplete log for having no sender and no subject line in the metadata, respectively. As JPMC explained to Defendants, JPMCPRIV_REVISED_018680 is a document recovered from the deleted items folder of an inbox. The document itself does not have a sender. JPMCPRIV_REVISED_000438 similarly does not provide support for Defendants' contention that JPMC provided an incomplete log. This is a Slack communication that, based on the nature of the communication, does not have a subject line.[19]  Thus, this data is unavailable, and the metadata provided by JPMC is sufficient to meet the requirements of Local Rule 26.2.

> ### B.  <u>Defendants Are Not Entitled to Their Privileged, Pre-Merger Communications with Matt Glazer</u>

Defendants also argue, in Part II.C above (pp. 13–17), that they are entitled to access privileged, pre-merger communications involving Frank's in-house counsel, Matt Glazer. As a

---

[19] Even though subject line metadata is not available for Slack chats, JPMC provides a summary of the document in the "privilege description" field of the log.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 23

threshold matter, Defendants do not dispute that JPMC acquired Frank's privilege over these documents when it acquired Frank. Rather, Defendants argue they may view these privileged, pre-merger communications based on Delaware law or in order to evaluate a potential advice-of-counsel defense. As explained below, neither argument has merit. Accordingly, the Court should deny Defendants' request to compel production of the documents set forth in Appendix G.[20]

> 1. *Defendants Are Not Entitled To View JPMC's Privileged Documents Under the Federal Common Law of Privilege, Which Governs This Dispute, or Under Delaware Law*

Defendants argue that they shared a joint privilege with Frank, and thus, under Delaware state law, they "are entitled to access their own pre-merger communications as top executives of . . . a small company[.]" (Defs.' Pos. at 16 (emphasis omitted).) Defendants rely on a Delaware state-court doctrine established in *Kirby v. Kirby*, No. 8604, 1987 WL 14862 (Del. Ch. July 29, 1987), which provides that, "as a general matter, a corporation cannot assert the privilege to deny a director access to legal advice furnished to the board during the director's tenure," *Moore Bus. Forms*, 1996 WL 307444, at *4 (citing *Kirby*). (*See* Defs.' Pos. at 15–16.)

> a. Under the Federal Common Law of Privilege, Which Governs This Dispute, Defendants Are Not Entitled To the Documents In Question

The privilege issues in this case, however, are governed by the federal common law of privilege, not Delaware law. *See* Fed. R. Evid. 501 (providing that "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless" the U.S. Constitution, a federal statute, or rules prescribed by the Supreme Court provide otherwise); *United States v. Gillock*, 445 U.S. 360, 368 (1980) (noting that there is "little doubt that Rule 501 requires the application of federal privilege law in criminal cases brought in federal court"); *In re Grand Jury Investigation*, 399 F.3d 527, 530 (2d Cir. 2005) ("In criminal cases, Rule 501 plainly requires that we apply the federal law of privilege."). Moreover, as a court in the Southern District has explained, *Kirby* and its progeny are "fundamentally at odds" with well-established principles of corporate privilege "as recognized by the federal courts and many state courts." *Fitzpatrick v. Am. Int'l Grp., Inc.*, 272 F.R.D. 100, 106 (S.D.N.Y. 2010).

The facts and reasoning in *Fitzpatrick* are instructive here. In that case, a former president and board member of an AIG subsidiary sued the company and asserted various claims under state and federal law. *Id.* at 102. Relying on *Kirby*, the plaintiff argued that, as a litigant facing his former employer, he was entitled to access privileged communications between the company and corporate counsel from the period when he served as the company's president and one of its board members. *Id.* at 102–03. Magistrate Judge Dolinger rejected the plaintiff's "assumption" that Delaware law governed the privilege question. *See id.* at 104–05. There, as here, the "controlling issue [was] whether, as a legal matter, [the former executive] should be deemed, in his individual capacity, to have been a party to the attorney-client relationship of the company for which he

---

[20] Defendants added Appendix G to their portion of the joint letter on the morning of July 24, 2024, giving JPMC little time to evaluate the documents included therein.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 24

worked in the past[]"—an issue, the court observed, that is "properly addressed under the body of law dictated by Rule 501, since the issue is governed by the law of privilege." *Id.* at 105; *see also id.* (noting that "the federal courts have, with some consistency, invoked or implicitly relied on this rule when addressing all of the issues pertinent to the enforceability of a privilege claim" and gathering authority in support). The court then concluded that under Rule 501, "there [could] be no serious dispute" that this question "[was] governed . . . by federal common law." *Id.*[21]

After establishing that federal common law governed the privilege issue, the court undertook an extensive analysis to explain why the Delaware doctrine in *Kirby* and its offspring is fundamentally incompatible with the federal common law of privilege. *See id.* at 105–09. Building on a backdrop discussion of several "well-recognized principles of corporate privilege," *see id.* at 107, the court identified three main defects with the reasoning and analysis in *Kirby*. First, the court explained, *Kirby* "conflat[es] the role and authority of the directors when acting in their corporate and in their individual capacities." *Id.* While privileged corporate communications must obviously take place through individuals speaking for the client, "that corporate representative is properly viewed as acting in his corporate fiduciary capacity in undertaking that communication or deciding whether to assert or waive the privilege." *Id.* That the corporate representative is doing so "does not create an attorney-client relationship between that person in his individual capacity and the attorney." *Id.* The approach in *Kirby*—which "distinguish[es] the [b]oard or its individual members from the corporation" and "identif[ies] the collective (or individual) [b]oard members as the client" (rather than as mere representatives for the client)—is therefore "contrary to settled federal law, which insists that the corporation is the client and the directors and officers are only its representatives." *Id.*

*Kirby*'s second major flaw is that it overlooks the principle that a director's obligations to oversee the affairs of (and speak for) a corporation "last only so long as the director remains in that official position"—a distinction that is "crucial." *Id.* at 108. After a director has left his or her corporate position, there is no reason why that person would need—or should be expected to access or exercise control over—privileged corporate communications. *Id.* (observing that "[f]ederal courts have rejected the notion that a former director or officer . . . may subsequently claim any authority to exercise or waive the privilege at all[,]" and gathering authority in support). And third, the court observed that *Kirby* introduces "perverse implications" in scenarios such as this, where a former director strikes an adversarial posture with respect to the corporation. *Id.* That is, to "strip" a corporate client of the protection afforded by the corporate privilege "merely because a director" has assumed an adversarial relationship with the corporation would "not only pose the danger of unfair injury to the client," but also would "work[] to undercut the very goal of

---

[21] Although Rule 501 does not on its face address which law applies when a case involves both federal and state-law claims (as was the case in *Fitzpatrick*), the Second Circuit "has held that in such circumstances federal law controls, at least if the evidence in question is relevant to the federal claim." *Fitzpatrick*, 272 F.R.D. at 104. Because the privileged communications in *Fitzpatrick* were relevant to the plaintiff's federal ERISA claim, the court concluded that the privilege question was governed by federal common law. *Id.* at 105. Here, as discussed below, the determination that federal common law governs this dispute is considerably more straightforward given that it involves a federal criminal prosecution.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 25

the privilege, which is to encourage candor and a clear understanding by the client of his legal rights and responsibilities." *Id.* Accordingly, the court held that the plaintiff was not entitled to access privileged communications from his period as the defendant's president and former board member. *See id.* at 109 (gathering extensive state and federal case law in accord).

Here, as in *Fitzpatrick*, the "controlling issue is whether, as a legal matter, [Defendants] should be deemed, in [their] individual capacit[ies], to have been . . . part[ies] to the attorney-client relationship of the company for which [they] worked in the past[.]" *Id.* at 105. *Fitzpatrick* leaves no doubt that this "is an issue properly addressed under the body of law dictated by [Federal] Rule [of Evidence] 501, since the issue is governed by the law of privilege." *Id.* And, as noted above, it is clear that in federal criminal prosecutions, "Rule 501 requires the application of federal privilege law[.]" *Gillock*, 445 U.S. at 368.

Other cases have adopted *Fitzpatrick*'s reasoning and rejected the application of *Kirby* under the federal law of privilege. *See, e.g.*, *United States v. Rankin*, No. 13-CR-272, 2020 WL 3036015, at *3 (D. Conn. June 5, 2020) (concluding that *Kirby* is inconsistent with "the federal law of attorney-client privilege as stated in the published rulings of the Second Circuit" and citing *Fitzpatrick* (among other authority) in support); *Neogenix Oncology, Inc. v. Gordon*, No. 14-CV-4427, 2015 WL 5774171, at *9–10 (E.D.N.Y. Sept. 29, 2015) (relying on *Fitzpatrick* in holding that the plaintiff corporation's "privilege was not retained by [the defendant] simply because he was given access to privileged materials in his former capacity as a director and Chief Financial Officer" of the corporation); *accord Escue v. Sequent, Inc.*, No. 09-CV-765, 2012 WL 220204, at *5 (S.D. Ohio Jan. 25, 2012) (invoking *Fitzpatrick* in holding that a company could assert the attorney-client privilege with respect to its former director "even though [the director] formerly had access to the information as an owner and director of [the company]").[22]

Under the federal common law of privilege, therefore, Defendants "are not entitled, based on [their] former corporate status, to access documents reflecting privileged communications" between Frank and its counsel. *Fitzpatrick*, 272 F.R.D. at 109. The authority cited by Defendants, (*see* Defs.' Pos. at 13–14 & n.12), does not compel a different result.

---

[22] *See also, e.g.*, *Davis v. PMA Companies, Inc*., No. CIV-11-359-C, 2012 WL 3922967, at *6 (W.D. Okla. Sept. 7, 2012) (citing *Fitzpatrick*, concluding that the "*Kirby* approach seems contrary to Supreme Court precedent," and observing that "[i]t seems paradoxical to allow a party to access information previously available to that individual only because of his or her role as a fiduciary once that party is adverse to the corporation and no longer required to act in the corporation's best interests"); *In re PWK Timberland, LLC*, 549 B.R. 366, 372–73 (Bankr. W.D. La. 2015) (citing *Fitzpatrick* and noting that, "[o]nce former managers are no longer acting in their fiduciary capacity, they no longer have the right to access the company's privileged documents because there is no independent attorney-client relationship between a company's lawyers and the individual managers of that company"); *Milroy v. Hanson*, 875 F. Supp. 646, 649 (D. Neb. 1995) ("With all due respect, cases like Kirby […] make a fundamental error by assuming that for a corporation there exists a collective corporate client which may take a position adverse to management for purposes of the attorney-client privilege.").

Hon. Alvin K. Hellerstein
July 24, 2024
Page 26

Defendants rely, for example, on *Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95 (S.D.N.Y. 2009), which involved both state and federal law claims. There, the court appeared to assume without deciding that Delaware law governed the relevant privilege dispute. In a footnote at the outset of the opinion, the court suggested that some privilege issues in the case required the application of state law, while others required the application of federal common law. 258 F.R.D. at 99 n.2. Ultimately, without specifying which law would govern each particular issue, the court concluded that, "[s]ince both parties cite cases from courts in the Second Circuit, as well as from Delaware, the [c]ourt has considered the law of both of those jurisdictions, as well as other federal law where persuasive." *Id.* The court then relied on the doctrine in *Kirby* as well as a handful of federal cases (such as *American S.S. Owners*, discussed below) that have cited *Kirby*. *Id.* at 104–05.[23] In so doing, however, the court appeared to assume that Delaware law governed the issue. That is, unlike *Fitzpatrick*, the court did not specifically analyze (1) whether federal common law or state law governed the issue, or (2) whether *Kirby* and its progeny are consistent with federal common law. *See id.* The court's failure to undertake a choice-of-law analysis calls into question its reasoning and outcome.[24]

Defendants' reliance on *American S.S. Owners Mutual Protection v. Alcoa Steamship Co.*, 232 F.R.D. 191 (S.D.N.Y. 2005), is also unpersuasive for similar reasons. There, while the court concluded that "federal privilege principles govern[ed]" the case, 232 F.R.D. at 196, it later cited *Kirby* (and its derivative case law) and stated that a director on the plaintiff corporation's board had the right to access privileged communications between the plaintiff "and its counsel generated during his or her tenure." *Id.* at 198. This statement was dicta, however, and, as in *Newmarkets Partners*, the court did not analyze the threshold question of whether *Kirby* is consistent with well-established principles of federal common law.

Finally, Defendants' reliance on *Sampedro* is also misplaced. As a threshold matter, Defendants cite the Second Circuit's summary order in that case, 818 F. App'x 14, which has no precedential effect, *see* Second Circuit Local Rule 32.1.1(a). Even if that case were binding, however, the panel's order merely observed that two cases in this District—*Newmarkets Partners* and *American S.S. Owners*—"have acknowledged" the doctrine from *Kirby*. 818 F. App'x at 18. The court concluded that it was *not* error for the lower court to find that the rule (from *Kirby*) articulated in those cases did not apply to the facts before it. *Id.*; *see also Rankin*, 2020 WL 3036015, at *3 n.3 (observing, with respect to the *Sampedro* summary order, that "the Second Circuit had no occasion to approve of th[e] [*Kirby*] rule in view that it found that the rule by its terms did not apply"). At the very least, therefore, *Sampedro* fails to support Defendants' position.

---

[23] Another federal case cited by the court in *Newmarkets Partners* is *Gottlieb v. Wiles*, 143 F.R.D. 241 (D. Colo. 1992), to which Defendants also cite. In *Fitzpatrick*, Judge Dolinger noted *Gottlieb* but "decline[d] to follow [its] path," noting that it, like *Kirby*, was "fundamentally at odds with basic principles" of corporate privilege under federal common law. 272 F.R.D. at 106.

[24] *Cf., e.g.*, *Fitzpatrick*, 272 F.R.D. at 104 (explaining how choice-of-law operates under Rule 501 where a party asserts claims under both state and federal law).

Hon. Alvin K. Hellerstein
July 24, 2024
Page 27

Upon closer review, though, the order in *Sampedro* also signals that the Second Circuit would have taken a skeptical view of *Kirby* (and its derivative case law) if required to confront that case law on the merits. In *Sampedro*, the plaintiff "argue[d] that because he was a director" of certain defendant entities, "he was within the privilege and should have access to the [privileged] documents" between defendants and their counsel. 818 F. App'x at 18. Addressing this argument, the panel stated it was "unpersuaded" by the law the plaintiff cited in support of his position. *Id.* The law on which the plaintiff relied is the same law Defendants now invoke before this Court, including *Newmarkets Partners*, *American S.S. Owners*, and a selection of other cases that advert to *Kirby*. (*See* Br. & Special App. for Movant-Appellant-Cross-Appellee 27–28 & n.9 (Dkt. No. 62, Case No. 19-4339 (CA2)).) Thus, the panel's order in *Sampedro* casts further doubt on *Kirby* and the cases that rely upon it.

Defendants invoke *In re Grand Jury Investigation* for the proposition that courts, in developing the federal common law of privilege, "may draw on the law of privilege as it has developed in state courts." (Defs.' Pos. at 14.) But they omit the Second Circuit's full sentence, which reads: "[W]hile we may draw on the law of privilege as it has developed in state courts, *we are not bound by it*." 399 F.3d at 530 (emphasis added). Although Defendants raise certain policy arguments as to why this Court should "[l]ook[] to Delaware privilege law" in this case, (Defs.' Pos. at 14), they cite no decisional authority in support of that position, and they do not address *Fitzpatrick*'s conclusion that, on this particular issue, Delaware law is "fundamentally at odds" with well-established principles of corporate privilege "as recognized by the federal courts and many state courts." 272 F.R.D. at 106.

For the reasons set forth above, under the federal common law of privilege, which governs the privilege disputes in this case, Defendants were not joint clients with Frank and are not entitled to access privileged, pre-merger communications with Mr. Glazer.

## b. Even Under Delaware Law, Defendants Are Not Entitled to the Documents in Question

Even if this Court were to apply Delaware law, Defendants still are not entitled to their privileged communications with Mr. Glazer. Under *Kirby* and its progeny, "*directors* are entitled to privileged communications delivered to the corporation or the board." *Icahn Partners LP v. deSouza*, No. 2023-1045-PAF, 2024 WL 180952, at *3 (Del. Ch. Jan. 16, 2024) (emphasis added); *see also Hyde Park Venture Partners Fund III, L.P. v. FairXchange, LLC*, 292 A.3d 178, 188, 193 (Del. Ch. 2023) ("Over the past quarter century, the principles articulated in *Kirby, AOC, Moore Business Forms*, and *SBC Interactive* have governed the ability of a corporation to invoke privilege against a *director* and an affiliated stockholder." (emphasis added)). Delaware law does not extend the same rights to officers of a corporation. Because Defendant Amar was not a director of Frank, he is not entitled to the privileged documents in question under the *Kirby* doctrine.

As for Defendant Javice, "a litigant's status as a director does not automatically entitle [her] to all legal advice rendered to a corporation irrespective of the circumstances." *SerVaas v. Ford Smart Mobility LLC*, No. 2020-0909-LWW, 2021 WL 5226487, at *3 (Del. Ch. Nov. 9, 2021) (citation and internal quotation marks omitted). Rather, "[a] director's right to information is correlative with his duty to protect and preserve the corporation." *Id.* (citation and internal

Hon. Alvin K. Hellerstein
July 24, 2024
Page 28

quotation marks omitted). Here, as in *SerVaas*, Javice "[is] not acting to further the interests of [Frank] or [its] stockholders," nor is she disputing her removal from its board as in *Kirby* itself. *Id.* at *4. Like the plaintiffs in *SerVaas*, who sought privileged documents in service of their individual breach of contract claims against their former company, Javice is seeking privileged documents from JPMC in her individual—rather than fiduciary—capacity. That is, Javice "had no reason to believe that [she] [was a] 'joint client[]' of company counsel with regard to the issues underlying" the criminal charges against her—"namely, [her] alleged misconduct" and "termination[.]" *Id.* Javice, in short, "cannot invade [JPMC's] attorney-client privilege in furtherance of [her] personal litigation." *Id.* at *5

Thus, even under Delaware's permissive privilege doctrine, Defendants still are not entitled to access their privileged, pre-merger communications with Mr. Glazer.

### 2. Defendants' Potential Advice-of-Counsel Defense Does Not Trump JPMC's Assertion of Attorney-Client Privilege

Defendants next argue that they are entitled to access JPMC's privileged documents to evaluate a potential advice-of-counsel defense. (*See* Defs.' Pos. at 16–17.) But neither the Supreme Court nor any federal Circuit Court has recognized an advice-of-counsel exception to the attorney-client privilege, and the two leading cases that address this issue in the Southern District—*United States v. Wells Fargo Bank, N.A.*, 132 F. Supp. 3d 558 (S.D.N.Y. 2015), and *United States v. Milton*, 626 F. Supp. 3d 694 (S.D.N.Y. 2022)—directly undermine Defendants' argument.

In *Wells Fargo*, a civil fraud case brought by the United States against the bank and one of its individual employees, the court confronted what was, at the time, a question of first impression in the Second Circuit: "whether an employee can pursue an advice-of-counsel defense that requires disclosure of his employer's privileged communications where the employer will not waive the privilege." 132 F. Supp. 3d at 561. The individual defendant in that case argued (as Defendants argue here) that his right to present an advice-of-counsel defense trumped Wells Fargo's assertion of privilege over the relevant communications, which the bank refused to waive. *Id.* at 559–61. While acknowledging that the issue "involve[d] a conflict between two indisputably weighty principles[,]" Judge Furman held that in light of binding Supreme Court precedent, the individual defendant was precluded from asserting such a defense over the bank's objection. *See id.* at 561, 562–67.

As Judge Furman explained, "any suggestion that the right to present every available defense *automatically* trumps the attorney-client privilege is plainly wrong"—"even in criminal cases[.]" *Id.* at 561; *see also id.* at 562 (observing that "the concept of a trial as a search for the truth has always failed of full realization whenever important facts are shielded from disclosure because of a lawful privilege" (quoting *United States v. Turkish*, 623 F.2d 769, 775 (2d Cir. 1980))). The individual defendant's argument, the court reasoned, must therefore be interpreted as "more nuanced and case-specific"—specifically, "that balancing the probative and exculpatory value of the evidence at issue against the need for Wells Fargo to keep the evidence confidential, the [b]ank's privilege must give way as a matter of fundamental fairness and due process." *Id.* at 562.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 29

The court explained that this argument was "all but foreclosed by the Supreme Court's decision in *Swidler & Berlin* [*v. United States*, 524 U.S. 399 (1998)]." *Id.* In holding that the attorney-client privilege survives a client's death, the Court in *Swidler & Berlin* rejected the government's argument that the privilege should give way in circumstances where upholding the privilege would lead to "extreme injustice" or the privileged information is "of substantial importance." *Id.* (citing 524 U.S. at 406–09). Because "balancing *ex post* the importance of the information against client interests introduces substantial uncertainty into the privilege's application[,]" the Supreme Court "rejected [the] use of a balancing test in defining the contours of the privilege." *Id.* (alterations omitted) (citing 524 U.S. at 409).

The Court's reasoning in *Swidler & Berlin*, Judge Furman explained, "compels the conclusion" that a balancing test is no less problematic when evaluating whether the attorney-client privilege must yield to a defendant's interest in certain evidence:

> That is, the use of a balancing test to determine whether a company, through no fault of its own, must forfeit its privilege based on an employee's later assertion of an advice-of-counsel defense would render the privilege no less uncertain than the use of such a test to determine whether the privilege applies in the first instance. And the Supreme Court has cautioned, "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."

*Id.* at 562–63 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)). Although many forms of privilege are qualified and may be overcome by a showing of sufficient need, the court noted, the attorney-client privilege is not one of them. *Id.* at 563. Allowing the individual defendant to "force disclosure" of Wells Fargo's privileged information, "even if only for the purpose of using it to defend against the Government's claims," would "transform a corporate entity's attorney-client privilege into a qualified privilege" and "upend the carefully calibrated doctrine governing when the privilege exists and who has authority to waive it." *Id.* (gathering authority).[25]

Here, Defendants argue that disclosure is warranted because the withheld communications are—in their view—material to the defense and therefore, JPMC's privilege "should yield" to Defendants' interest in asserting an advice-of-counsel defense. (Defs.' Pos. at 16–17.) That is

---

[25] In addition to relying on *Swidler & Berlin*, the court in *Wells Fargo* went on to explain why its holding is also consistent with *Ross v. City of Memphis*, 423 F.3d 596 (6th Cir. 2005), which we believe remains the only Court of Appeals decision on this issue. In *Ross*, a panel of the Sixth Circuit held the City of Memphis's former police director, who had been sued for discrimination in his individual capacity, could not force the City to waive privilege over certain communications in order to raise an advice-of-counsel defense. *Id.* at 597–99, 603–04. Relying on *Swidler & Berlin*, the court explained that holding otherwise would leave the City's "privilege dependent on *ex post* litigation choices made by its employees," an outcome that would "render[] the privilege intolerably uncertain." *Id.* at 603–04. As in *Ross*, Judge Furman explained, allowing the individual defendant to pursue his advice-of-counsel defense over Wells Fargo's objection would render the bank's privilege "intolerably uncertain." 132 F. Supp. 3d at 564.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 30

identical to the argument the court rejected in *Wells Fargo*. *See* 132 F. Supp. 3d at 562. In other words, Defendants ask this Court to "balanc[e] the probative and exculpatory value of the evidence at issue against the need for [the Bank] to keep the evidence confidential"— the type of "balancing test" that is "foreclosed" under *Swidler & Berlin*. *Id.* (internal quotation marks omitted). Here, as in *Wells Fargo* (and *Ross*, discussed at n.15), forcing JPMC to disclose its privileged communications based on the "litigation strategy" of its former employees would render the privilege "intolerably uncertain" and prejudice the Bank. *See id.* at 564 (citation omitted).[26]

To the extent Defendants suggest that their need for the privileged materials is greater than that of the individual defendant in *Wells Fargo*, that argument is also unavailing. Judge Furman's decision explicitly considered and rejected such an argument. Comparing the individual defendant in *Wells Fargo* to the individual defendant in *Ross*, the court acknowledged that the former "ha[d] a stronger argument . . . that fairness call[ed] for the [b]ank's privilege to give way, as the advice of counsel would, in and of itself, be a complete defense to the Government's claims against him[.]" *Id.* To argue that one defendant's need for privileged materials is greater than another's, though, "is merely to argue that the balancing of equitable considerations tips further in [one defendant's] direction." *Id.* Even if that is true, "*Swidler & Berlin* and *Ross* make clear that such balancing has no role whatsoever to play in the analysis." *Id.*

Although *Wells Fargo* was decided in the civil context, there is little basis to argue (as Defendants have) that this distinction calls for a different result here. While there is a footnote in *Swidler & Berlin* that appears to leave open the possibility that "exceptional circumstances implicating a criminal defendant's constitutional rights might warrant breaching the privilege[,]" the Supreme Court had no occasion to reach the issue, and in the same paragraph in which that footnote appears, the Court further noted that "there is no case authority for the proposition that the privilege applies differently in criminal and civil cases." 524 U.S. at 408–09 & n.3. Indeed, Judge Furman invoked that subsequent language when criticizing *United States v. Grace*, 439 F. Supp. 2d 1125 (D. Mont. 2006), a criminal case, discussed below, on which Defendants rely. *See* 132 F. Supp. 3d at 565.

This distinction also holds little weight in view of a more recent decision from this District. In *Milton*, a criminal fraud prosecution against the former CEO and executive chairman of an electric-battery manufacturer, the defendant filed a motion in limine seeking to elicit testimony from the company's general counsel ("GC") and other employees regarding the GC's communications related to the defendant's public- or "retail investor"-facing statements. 626 F. Supp. 3d at 697. The defendant argued that the company had waived privilege over these communications and that, even if it had not, his "constitutional right to present a complete defense" required that he be allowed to "examin[e] [these] witnesses as to these statements." *Id.* at 699. The company, which was not a party to the action, moved to intervene and for a protective order, arguing that the defendant's motion violated the company's attorney-client privilege and seeking

---

[26] Although Defendants, in support of their balancing argument, assert that they are "not adverse" to Frank in this litigation, (*see, e.g.*, Defs' Pos. at 13, 14, 17), that is true only in the limited sense that JPMC (which acquired Frank) is not a party to this criminal prosecution. More broadly, though, Defendants are adverse to JPMC, as evidenced by separate civil litigation that has been stayed pending resolution of this matter.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 31

to bar the defendant from knowingly eliciting testimony regarding those privileged communications. *Id.*[27] After granting the company's motion to intervene and concluding that it had not waived privilege over any of the communications in question, *see id.* at 699–702, the court reached the defendant's argument that "he ha[d] a constitutional right to present a defense including the privileged communications," *id.* at 702. Relying on *Swidler & Berlin* and *Wells Fargo*, the court rejected this argument, observing that the defendant "ha[d] provided no binding authority holding that privileged communications become discoverable simply because a defendant wishes to use those communications in his defense." *Id.* at 703. Thus, far from "support[ing]" their position, as Defendants suggest, (Defs' Pos. at 17), *Milton* forecloses the notion that Defendants may invade JPMC's privilege because they wish to use privileged materials in support of their defense.

Thus, courts in this District have concluded in both the civil and criminal contexts that a defendant may not override a company's valid assertion of privilege in order to mount an advice-of-counsel defense. The cases cited by Defendants, (*see* Defs.' Pos. at 16–17), are either inapposite or unpersuasive. For example, Defendants cite *Spitzer* for a proposition under state law that has nothing to do with the legal question here. They cite *Weisberg* as a means of highlighting footnote three of *Swidler & Berlin*, which is addressed above.

Defendants also rely on *Grace*—a decision from the District of Montana that two courts in this District have said was wrongly decided. As Judge Furman observed in *Wells Fargo*, the decision in *Grace* contained no substantive analysis of the Supreme Court's decision in *Swidler & Berlin*, and "it is hard to square" the holding in *Grace* with the Supreme Court's "emphatic 'rejection' of the 'use of a balancing test in defining the contours of the attorney-client privilege,' let alone its observation that '*there is no case authority for the proposition that the privilege applies differently in criminal and civil cases.*'" 132 F. Supp. 3d at 565 (emphasis added) (alterations omitted) (quoting *Swidler & Berlin*, 524 U.S. at 408–09). Likewise, in *Milton*, Judge Ramos incorporated Judge Furman's critique of *Grace* and "decline[d] to adopt [its] balancing test . . . ,

---

[27] Although the company had produced to the defendant all of his electronic communications with the GC regarding the public statements in question and had waived privilege to allow him to elicit testimony about those communications at trial, it argued that it had not waived privilege over the GC's communications with other employees. 626 F. Supp. 3d at 700. To the extent Defendants rely on this distinction, it is of no moment for the instant dispute. Like any corporation, the company in *Milton* was entitled to waive privilege over documents and communications between its GC and the defendant. That it chose to do so does not compel JPMC to do the same here or otherwise limit the court's conclusion that "privileged communications [do not] become discoverable simply because a defendant wishes to use those communications in his defense." 626 F. Supp. 3d at 703. Notably, that statement was not conditioned on the *type* of privileged document at issue. Here, Defendants have asked JPMC to produce or make available the privileged communications with Glazer voluntarily, and the Bank has declined to do so.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 32

particularly in light of the Supreme Court's rejection of" that approach in *Swidler & Berlin*. 626 F. Supp. 3d at 703.[28]

In sum, Defendants' position is inconsistent with the Supreme Court's decision in *Swidler & Berlin*, the sole Circuit Court opinion that addresses this issue (*Ross*), and the two relevant cases from this District. Given that the "rules which result in the waiver of th[e] [attorney-client] privilege," or that "possess the potential to weaken attorney-client trust, should be formulated with caution[,]" *In re County of Erie*, 546 F.3d 222, 228 (2d Cir. 2008), this Court should reject Defendants' position and preserve the Bank's privilege over Defendants' communications with Mr. Glazer.

### 3.  *JPMC Has Produced All Documents in Which Mr. Glazer Functions in a Nonlegal Capacity*

Moreover, the Court should deny Defendants' request for an order compelling JPMC to produce certain additional communications involving Mr. Glazer. (*See* Defs.' Pos. at 6–7.) As detailed below, JPMC has already produced the universe of "non-privileged business communications" involving Mr. Glazer. (*See id.* at 6.)

Defendants are correct that Mr. Glazer served as both Frank's COO and CLO and that communications where Mr. Glazer was serving in a nonlegal role are not protected by the attorney-client privilege. However, Defendants' assertion that JPMC has withheld non-privileged communications is incorrect.

As of July 18, 2024, JPMC has produced, either in full or with redactions, over 4,200 communications involving Mr. Glazer. Of the more than 4,200 communications involving Mr. Glazer, and as of July 18, 2024, approximately 3,900 have been produced in full and approximately 300 were reproduced with targeted redactions for Mr. Glazer's legal advice. On February 2, 2024, Defendants asked Davis Polk, JPMC's new counsel at the time, to rereview communications involving Mr. Glazer that JPMC had previously redacted or withheld. Acting in good faith, JPMC agreed to do so and completed its re-review and downgrade productions on March 31, 2024, with a supplemental downgrade production completed on July 18, 2024. Consistent with Mr. Glazer's dual role, as noted by Defendants, at times, he acted in a legal capacity and the remaining communications are withheld or redacted, as appropriate.

On July 1, 2024, Defendants provided JPMC with two proposed example documents for Appendix B (specifically, JPMCPRIV_REVISED_00347 and JPMCPRIV_REVISED_001062). After receiving JPMC's response that these examples were appropriately withheld and redacted for privilege, Defendants selected three replacement examples for *in camera* review, in an attempt to identify support for their argument.

---

[28] Defendants' reliance on *United States v. Herrell*, No. 21-CR-13, 2024 WL 2954408 (E.D. Ky. June 12, 2024), is misplaced for the same reasons. *Herrell* explicitly relied on *Grace* and applied a balancing test of the kind rejected in *Swidler & Berlin*, *Wells Fargo*, and *Milton*.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 33

The remaining privileged new[29] and prior examples provided for *in camera* review will demonstrate to the Court that JPMC has met its obligation to produce business-related communications for Mr. Glazer.  Defendants' request for an order to compel JPMC to produce further documents is without merit and should be denied.  Defendants already have the requested materials in their possession.

C. JPMC Has Properly Withheld Certain Pre-Merger Communications, Including Diligence Documents

Defendants objected to over 130 pre-merger communications, emphasizing withheld communications which they assert (1) do not include attorneys, (2) relate to JPMC's acquisition of Frank, and (3) involve JPMC decisionmakers.  (*See* Defs.' Pos. at 8.)  This objection lacks basis in law and fact.

As a threshold matter, Defendants are incorrect that these communications do not include attorneys.  A significant majority of documents raised by Defendants in this category include attorneys in the top-line communications: Of the over 130 documents to which Defendants object across the example documents and Appendix C, fewer than 20 emails do not include attorneys in the to/from line of the top email.  Of emails that do not include attorneys in the top-line email, all but three contain attorney communications on the chain (as well as attorneys in the cc field), as reflected by the "Relevant Attorney" field in JPMC's privilege log.

On July 1, 2024, Defendants initially proposed four example documents for *in camera* review.  After receiving JPMC's response, in apparent recognition of JPMC's privilege claim for two of the four examples, Defendants removed both as examples for *in camera* review, and from Appendix C entirely.

The remaining two original sample documents, as well as the newly identified example documents identified by Defendants for *in camera* review, include attorneys earlier in the email chains.  *See* JPMCPRIV_REVISED_002609[30] (email chain including attorneys from Dechert and JPMC, including Brian Carmody); JPMCPRIV_REVISED_000773 (email chain including attorneys from both JPMC, including Elizabeth Fuller, and Dechert); JPMCPRIV_REVISED_001591 (email chain including attorneys from both JPMC, including Elizabeth Fuller, and Dechert).  While the top-line emails do not include attorneys, the content is intertwined with the earlier legal advice.  JPMC has also appropriately identified these attorneys

---

[29] With respect to one of the new examples provided for *in camera* review (JPMCPRIV_REVISED_002733), on July 18, JPMC produced a version of this chat in full to Defendants, with the same substantive content.  *See* JPMC_01206383.  JPMC will similarly reproduce this example document as not privileged to Defendants.

[30] Defendants assert that this example document was referenced directly in the Complaint.  This is incorrect.  JPMCPRIV_REVISED_002609 is an internal chain, distinct from the email between a JPMC executive and Charlie Javice, (*see* Compl ¶ 21.d.), and is not part of the same email chain.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 34

in the privilege log "Relevant Attorney" field even though they are not on the top email in the chain.

Thus, Defendants are simply incorrect in their assertion that the documents to which they cite do not include attorney communications.

Apart from these factual issues, to the extent Defendants suggest that communications must directly involve an attorney to be privileged, that position is inconsistent with established law. *See Baptiste v. Cushman & Wakefield, Inc.*, No. 03-CV-2102, 2004 WL 330235, at *2 (S.D.N.Y. Feb. 20, 2004). Dissemination of privileged communications to corporate employees does not vitiate the privilege so long as the receiving party had a need to know the content of the communication to perform her job effectively or to make informed decisions concerning, or affected by, the subject matter of the communication. *See id.* (concluding that "communications which reflect advice given by counsel to a corporation do not lose their privileged status when shared among corporate employees who share responsibility for the subject matter of the communication"); *see also, e.g.*, *Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 599–600 (S.D.N.Y. 2015) (finding certain communications privileged where "all recipients were able to act upon or implement the information or advice they received" and "to hold otherwise would disable corporations from implementing legal advice"); *In re Buspirone Antitrust Litig.*, 211 F.R.D. 249, 254 (S.D.N.Y. 2002) (finding "documents . . . sent to approximately five to ten other corporate employees" privileged because the employees were "key business personnel who were involved in the generic drug projects" (internal quotation omitted)); *In re Grand Jury Proc.*, No. M-11-189, 2001 WL 1167497, at *28 (S.D.N.Y. Oct. 3, 2001) (finding privilege preserved where "communications related to the corporate review were disseminated only among the employee members . . . charged with acting upon counsel's advice"). Accordingly, communications between JPMC nonlegal employees that discuss legal advice may be privileged, even if no attorney appears on the face of the document.

Moreover, certain emails to which Defendants object do not involve one JPMC employee "disclosing" privileged information to another, but rather, involve continued discussions among JPMC employees who were already privy to the legal advice given. *See, e.g.,* JPMCPRIV_REVISED_002609. These emails do not break any confines of the original privilege, and thus cannot constitute a privilege waiver.

In some instances, the emails add another JPMC employee who was not yet privy to the legal advice. *See, e.g.,* JPMCPRIV_REVISED_000773. These communications overwhelmingly involve JPMC employees referred to by Defendants themselves as "JPMC *decisionmakers* referred to in the Complaint." (*See* Defs.' Pos. at 8 (emphasis added).) Not only are these JPMC "decisionmakers" likely to be the JPMC representatives seeking legal advice directly (as they are in many of Defendants' Appendix C documents); they also needed to know various aspects of Frank-related legal advice to which they were not yet privy in order to complete their jobs in the context of the Frank acquisition.

The Court should deny Defendants' request for an order to produce the documents in Appendix C. An overwhelming majority of documents raised by Defendants in this category include attorneys on the communication. Other communications contain requests for or reflections

Hon. Alvin K. Hellerstein
July 24, 2024
Page 35

of legal advice, and the absence of an attorney on the communication alone does not undermine the privilege. To the extent the documents in the Appendix share communications among non-attorneys, these communications involve the key decisionmakers at JPMC with respect to the Frank acquisition, as Defendants acknowledge.

D. __JPMC Has Properly Withheld Certain Communications That Took Place Over Skype and Slack__

Defendants' assertion that JPMC's privilege log entries with respect to the 60 Skype and Slack Chats in Appendix D are insufficient is incorrect for several reasons.

First, Defendants mischaracterize JPMC's review and production of documents containing Skype and Slack chat messages. Defendants contend they have received a "sampling" of responsive chat communications "selected by JPMC." (Defs.' Pos. at 9 n.9.) This is incorrect and misleading. JPMC has produced over 10,000 documents containing chat messages in full, with no redactions.[31] Any implication that JPMC has intentionally produced only documents favorable to its position has no merit.

Second, Defendants' concern regarding the timespan of chats is not founded—most chats are quite short and do not include hundreds of messages. Moreover, each chat-related entry on the log includes the date and time stamp for the chat document as a whole. The chat documents are generally pulled in 24-hour periods, though some are much shorter.

JPMC recognizes that chat conversations can often cover multiple topics in one conversation, only some of which may be privileged. Thus, JPMC rereviewed the 60 chat documents in Appendix D. As of July 24, 2024, JPMC has reproduced to Defendants 13 chat documents that were previously withheld to Defendants. The remaining 47 chat documents are appropriately withheld.

Third, Defendants' assertion that "JPMC also has waived any privilege over the chats in Appendix D because the entries for withheld chat threads are legally insufficient[,]" (Defs.' Pos. at 9), is without merit. Defendants are correct that JPMC did not provide subject matter metadata for the chats in Appendix D. The explanation, though, is simple—Slack and Skype chats do not have subject lines. Defendants have sufficient information regarding the content of the message based on the list of participants and the privilege description. JPMC provided relevant available metadata and detail in the privilege log description, consistent with the requirements of local and federal rules.[32]

---

[31] This population includes the chats referenced in the Government's June 24, 2024 letter, further undermining Defendants' baseless assertion in note 6 above.

[32] JPMC has provided the following metadata in connection with Skype and Slack messages: Log Entry No.; Prior Privileged Doc. Nos. (where applicable); Bates Begin; Bates End; Bates Parent (where applicable); Log Entry Parent No.; Document Type; Date and Time; Parent

Hon. Alvin K. Hellerstein
July 24, 2024
Page 36

In sum, the Court should deny Defendants' motion to compel production of the Skype and Slack chat documents in Appendix D. Defendants have already received responsive, not privileged chat communications.[33]

E.   <u>JPMC Has Properly Withheld Certain Slide Decks and Spreadsheets Not Authored by Attorneys Insofar as Those Documents Contain Privileged Information</u>

Defendants next argue that JPMC impermissibly withheld PowerPoint slides and Excel spreadsheets that were not authored by lawyers; and that JPMC's production of different versions of the documents at issue shows that these documents are non-privileged "business materials." (*See* Defs.' Pos. at 10.) This is incorrect, and the Court should deny Defendants' request to compel JPMC to produce the documents in Appendix E.

The Defendants fail to cite any supporting law and seemingly attempt to create new, incorrect privilege law. First, Defendants' argument that JPMC impermissibly withheld business-related PowerPoint slides and Excel spreadsheets simply based on the fact that the documents were not authored by lawyers, as reflected in Appendix E, is without merit. For reasons already discussed, while the author of a document may be instructive for a potential privilege assertion, it is not the only relevant factor. For instance, while the original author of a document could be a non-attorney as represented in the author field, an attorney could review and edit the document, without the metadata for the author field changing.[34]

Second, Defendants incorrectly argue that its receipt of other, non-privileged versions of certain documents in Appendix E mandates that all versions must be non-privileged. This contention ignores the factual context of the parent emails and is inconsistent with Second Circuit precedent. As Defendants themselves acknowledge, the documents in Appendix E are attachments to email communications. Attachments do not exist independently from their emails; both email and attachment are part of a single communication. *See Durling v. Papa John's Int'l, Inc.,* No. 16-CV-3592, 2018 WL 557915, at *8 (S.D.N.Y. Jan. 24, 2018) ("When assessing whether an attachment is privileged, [defendant's] counsel can consider the contents of the parent e-mail and need not view the attachment as an entirely distinct and independent document."). As such, documents that are not privileged on their own may become privileged when part of an otherwise privileged communication. *See, e.g., Gen. Elec. Co. v. United States,* No. 14-CV-190, 2015 WL 5443479, at *1 (D. Conn. Sept. 15, 2015) ("[I]nformation communicated to an attorney in

---

Date; From (where available); To (where available); Email Subject (where available); File Name; Privilege Status; Asserted Privilege; Privilege Description; Relevant Attorneys; Slack Recipients (where available); and IM Message Type.

[33] This responsive, not privileged population of produced chats includes all chats cited in the Government's June 24, 2024 letter, contrary to Defendants' implication above.

[34] Unless manually edited, the author field retains the value of the initial creator of the document. *See* Microsoft Support: change the author name for documents, presentations, or workbooks, https://support.microsoft.com/en-us/office/change-the-author-name-for-documents-presentations-or-workbooks-0ad23fe7-b82e-40c4-b9d9-391fec971a54

Hon. Alvin K. Hellerstein
July 24, 2024
Page 37

connection with obtaining or rendering legal advice is properly subject to a claim of privilege, even if the information standing alone would not otherwise be subject to a claim of privilege."); *In re Martinez Sampedro*, No. 18-MC-47, 2020 WL 8922834, at *2 (D. Conn. Mar. 2, 2020) ("[W]hereas each document, standing alone, may not contain privileged information, in this context, they were properly withheld as privileged because they constitute information communicated to an attorney in connection with obtaining or rendering legal advice." (internal quotation marks and citation omitted)).

In short, attachments to privileged emails may be properly withheld even if identical documents were produced during discovery. *See, e.g., Rainey v. Plainfield Comty Consol. Sch. Dist.*, No. 07-C-3566, 2009 WL 1033654, at *2 (N.D. Ill. Apr. 16, 2009) (concluding that non-privileged, third-party documents were discoverable in their original form but were properly withheld as attachments to an email seeking legal advice). That Defendants have received non-privileged versions of these documents takes away any reason the Court would have to compel production of their privileged versions. *See Willis Elec. Co., Ltd. v. Polygroup Trading Ltd.*, No. 15-CV-3443, 2021 WL 568454, at *8 (D. Minn. Feb. 16, 2021).

By finding that privileged email communications may confer privilege on their attachments, courts in the Second Circuit and beyond "safeguard[] against exposure of the substance of the otherwise-privileged email." *Id.* at *6. This is because "requiring disclosure of the attachments themselves creates a risk that an opponent may reverse engineer the substance of a client's request for legal advice." *Id.* at *7. "Thus, compelling disclosure would undercut a bedrock principle underlying the attorney-client privilege[; that is[,] the privilege encourages clients to make full disclosure to their lawyers." *Hilton-Rorar v. State & Fed. Commc'ns Inc.*, No. 09-CV-1004, 2010 WL 1486916, at *7 (N.D. Ohio Apr. 13, 2010).

Defendants again ignore JPMC's good-faith efforts, consistent with the Court's directive, to try to narrow the scope of documents in dispute. Defendants initially raised two example documents for *in camera* review for Appendix E. JPMC rereviewed both, considered Defendants' arguments, and reproduced one of the documents in full on July 18, 2024. After receiving JPMC's response, Defendants removed the other document as an example for *in camera* review[35] and selected three new replacement documents for *in camera* review.

---

[35] The other example initially selected by Defendants for *in camera* review was JPMCPRIV_REVISED_003947. While Defendants removed it from the example document set, this document is still in Appendix E. The parent email to this document was produced at JPMC_01162194. The parent email was directed to an attorney (James Qualls III) and contains an express request for legal advice related to the attachment. Because the attachment is part of a request for legal advice, it was properly withheld. *See Sampedro*, 2020 WL 8922834, at *2 (Attachments were "properly withheld as privileged because they constitute information communicated to an attorney in connection with obtaining or rendering legal advice" (internal quotation mark and citation omitted))

Hon. Alvin K. Hellerstein
July 24, 2024
Page 38

With respect to the three new documents, first raised by Defendants the same morning as the joint letter and example documents are due to the court:

- JPMCPRIV_REVISED_010482: Defendants are incorrect that the parent email was not produced or logged. JPMC produced the parent email at JPMC_01020366, as detailed on the log, and have included the Bates-stamped parent for the Court's review. In addition, after re-reviewing the document, consistent with the Court's directive to narrow the issues, JPMC will shortly be producing this document in full to Defendants. Duplicate versions of this document have been previously produced at JPMC_00994227 and JPMC_00996086.

- JPMCPRIV_REVISED_004445: Defendants correctly note, based on the privilege log provided by JPMC, that this document was an "E-Doc." Defendants then state that "[t]here is no 'Bates Parent' listed for this document." This is because this is a standalone electronic document, not an email attachment. This presentation reflects legal advice and was prepared for the purposes of a discussion with in-house JPMC attorneys and, thus, is protected by attorney-client privilege.

- JPMCPRIV_REVISED_004454: Defendants offer the same argument for this document as the preceding one. For the same reasons, Defendants are incorrect, and the document was appropriately withheld for privilege.

The Court should deny Defendants' request to compel JPMC to produce all PowerPoint and Excel files in Appendix E. JPMC has already produced in full over 30,000 PowerPoints and Excel files, and the remaining PowerPoints and Excel files are appropriately withheld for privilege.

F. JPMC Has Properly Withheld Documents Subject to the Supervisory Privilege

Defendants' argument that JPMC has withheld internal communications that are outside the scope of the relevant supervisory privileges is incorrect with respect to the law, regulatory requirements, and relevant facts.

First, Defendants' characterization of the governing law is misleading and incomplete. Defendants cite only the common law bank examination privilege with respect to the banking regulators,[36] and ignore the broader category of confidential supervisory information, or "CSI," exempt from disclosure. See, e.g., Alaska Elec. Pension Fund v. Bank of Am. Corp., 2016 WL 6779901, at *5–6 (S.D.N.Y. Nov. 16, 2016) (noting that federal regulations broadly protect against the disclosure of nonpublic OCC information, including but not limited to "record[s] created or obtained … [b]y the OCC in connection with the OCC's performance of its responsibilities," while

---

[36] Moreover, Defendants articulation of the privilege at issue with respect to the OCC is incomplete. The OCC prohibits the disclosure of "non-public OCC information," see 12 CFR 4.32(b) rather than just information subject to the bank examination privilege.

Hon. Alvin K. Hellerstein
July 24, 2024
Page 39

the bank examination privilege more narrowly protects "agency opinions and recommendations and banks' responses thereto" (internal quotation marks and citation omitted)).

Moreover, a regulator's privilege applies to information internal to third parties when related to regulatory inquiries or supervision. *See Se. Pa. Transp. Auth. v. Orrstown Fin Sevs.*, No. 12-CV-993, 2022 WL 3567340, at *20 (M.D. Pa. Aug. 18, 2022) (explaining that internal third-party documents are covered by the regulatory privileges where "the internal communications or documents reveal regulators' opinions and recommendations"); *see also In Re Wilmington Tr. Sec. Litig.*, No. 10-CV-990, 2016 WL 9753979, at *7 (D. Del. Aug. 16, 2016) (same). The relevant regulations also specify that CSI is not limited to simply the "opinions and recommendations" of the OCC, as suggested by Defendants, but can also include a much broader set of materials such as, for the FDIC, materials encompassing "[a]ny matter that is contained in *or related to* examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions." *See* 12 C.F.R. § 261.15(a)(8) (emphasis added).[37]

Second, Defendants ignore the relevant processes and guardrails in place to protect banking regulator privileges. Importantly, JPMC may be subject to *criminal* penalties if it discloses CSI without regulator consent. *See* 12 C.F.R. §4.37(b)(1)(ii) ("Any person who discloses or uses non-public OCC information except as expressly permitted by the Comptroller of the Currency or as ordered by a Federal court [in a proceeding in which the OCC has had the opportunity to appear and oppose discovery], may be subject to the penalties provided in 18 U.S.C. §641"); Federal Reserve Supervisory Release, Interagency Advisory on the Confidentiality of the Supervisory Rating and Other Nonpublic Supervisory Information, SR05-4 (2005) ("Any person who discloses or uses nonpublic information except as expressly permitted by one of the appropriate federal banking agencies or as provided by the agency's regulations may be subject to the criminal penalties provided in 18 U.S.C. 641"); *see also In re SunTrust Banks, Inc. ERISA Litig.*, No. 1:08-CV-3384-RWS, 2017 WL 11634376, at *1-2 (N.D. Ga. Oct. 4, 2017) (explaining that defendants were not required to produce CSI in part because "[u]nauthorized disclosure of confidential supervisory information can lead to civil and criminal penalties"); *Wuliger v. Off. of Comptroller of Currency*, 394 F. Supp. 2d 1009, 1017 (N.D. Ohio 2005) (recognizing the significant concern the OCC has for the confidentiality of its nonpublic information, as evidenced by its regulations

---

[37] *See also* 12 C.F.R. § 4.32(b)(1) (defining "non-public OCC information" to mean "[i]nformation that the OCC is not required to release under FOIA (5 U.S.C. 552) or that the OCC has not yet published or made available" and exempts from disclosure"[c]onfidential OCC information *obtained by a third party* or otherwise incorporated into the records of a third party" and "[c]onfidential information relating to operation and no longer operating national banks . . . ." (emphasis added)); 12 C.F.R. § 309.5(g)(8) (exempting from FDIC disclosure "[r]ecords that are contained in *or related to* examination, operating, or condition reports prepared by, on behalf of, or for the use of the FDIC or any agency responsible for the regulation or supervision of financial institutions" (emphasis added)); 12 CFR 1070.2(i)(1) (defining CSI as "[r]eports of examination, inspection and visitation, non-public operating, condition, and compliance reports, supervisory letter, or similar document, and *any information contained in, derived from, or related to such documents*" (emphasis added)).

Hon. Alvin K. Hellerstein
July 24, 2024
Page 40

"impos[ing] criminal penalties for improper disclosure"); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MDL-2262, 2023 WL 2871090, at *3 n.7 (S.D.N.Y. Apr. 10, 2023) (noting a party could face "significant regulatory consequences" if it disclosed CSI without receiving prior authorization from appropriate banking regulators). Here, JPMC has asserted CSI privilege over not only communications *with* regulators, but also *internal communications* relating to regulatory oversight, regulator opinions, or other CSI.

Thus, JPMC is required to protect CSI material. If such material is requested, in order to avoid the risk of civil or criminal liability, each regulator whose information is implicated must be given the opportunity to protect its information. Consistent with the governing regulations, Defendants can independently seek waivers from the relevant regulators. *See e.g.,* 12 C.F.R. § 261.15 *et seq.*; 12 C.F.R. § 4.33 *et seq.*; 12 C.F.R. § 1070.47 *et seq.*; 12 C.F.R. § 309.5 *et seq.*

On July 1, 2024, after months of engagement on the privilege log, Defendants articulated for the first time in a draft of this joint letter that it believed that certain documents withheld for CSI should be produced. To JPMC's knowledge, Defendants have taken no steps to request the documents at issue from the regulators who own the privilege. After Defendants raised this issue for the first time in July, JPMC has notified the regulators of Defendants' request for these materials. Defendants mischaracterize, though, the appropriate procedural steps and burdens. Defendants, who are seeking confidential supervisory privileged materials, must exhaust available administrative remedies for these materials. *See, e.g.,* 12 C.F.R. § 4.37(b) (1); *see also United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951) (discovery from a non-party federal agency is subject to the regulations promulgated by that agency). For instance, for the OCC, Defendants can file a request with the OCC's Director of Litigation Division in Washington, D.C., as specified in 12 C.F.R. § 4.34(a). *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126, 2016 6779901, at *6 (S.D.N.Y. Nov. 16, 2016) (finding that plaintiffs who sought information belonging to certain regulatory agencies "would have to seek relief through the established administrative process before seeking relief in court") (internal citations omitted); *Colonial BancGroup v. PricewaterhouseCoopers LLP*, 110 F. Supp. 3d 37, 43–44 (D.D.C. 2015) (stating that "[t]he [OCC's] requirements to submit an administrative request for information prior to seeking relief from the court are clear. Counsel cannot independently decide that it need not comply with the regulations . . ."); *see also In re Countrywide Fin. Corp. Sec. Litig.*, No. 07-CV-5295, 2009 WL 5125089, at *2 (C.D. Cal. Dec. 28, 2009) (holding that plaintiffs "must first exhaust all administrative procedures and submit requests to use the documents [at issue] to the FRB and OCC, pursuant to federal regulations[,]" before seeking relief from the court); *In re JPMorgan Chase Mortg. Modification Litig.*, No. l-md-02290, 2012 WL 5947757, at *2 (D. Mass. Nov. 27, 2012) ("Plaintiffs may not move to compel the production of privileged examination information until they have first contacted the agency that holds the privilege and followed the agency's procedures for obtaining information.").

As Defendants have now raised this issue, JPMC reviewed the documents cited in the July 1, 2024 version of Appendix F to see if any CSI determinations could be reconsidered. As of July 18, 2024, JPMC reproduced in full or with redactions 142 documents that were previously fully withheld. JPMC considers the remaining documents to be appropriately withheld as CSI or information subject to the bank examination privilege. In addition, JPMC is unable to provide the

Hon. Alvin K. Hellerstein
July 24, 2024
Page 41

remaining documents in Appendix F, including the two example documents identified by Defendants for *in camera* review, as JPMC does not control the privilege.

JPMC requests that the Court deny Defendants' request for an order to compel production of the remaining documents in Appendix F, and instead direct Defendants to first utilize the available administrative remedies available to them. In the alternative, if the Court orders JPMC to produce the documents in Appendix F, JPMC respectfully requests that the order is stayed in order to allow the regulators who own the privilege an opportunity to intervene and be heard.

Respectfully Submitted,

/s/ *Samuel Nitze*
Alex Spiro
Samuel Nitze
Erica Perdomo
Sarah Heaton Concannon
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10038
(202) 538-8112
alexspiro@quinnemanuel.com
samuelnitze@quinnemanuel.com
sarahconcannon@quinnemanuel.com
ericaperdomo@quinnemanuel.com

*Counsel for Defendant Charlie Javice*

/s/ *Greg D. Andres*
Greg D. Andres
Sidney Bashago
Katherine Swan
Michelle Adler
Christian Hines
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
greg.andres@davispolk.com
sidney.bashago@davispolk.com
katherine.swan@davispolk.com
michelle.adler@davispolk.com
christian.hines@davispolk.com

*Attorneys for Non-Party JPMorgan Chase Bank, N.A.*

/s/ *Sean S. Buckley*
Sean S. Buckley
Steven G. Kobre
Alexandria E. Swette
Victoria Fordin (pro hac vice forthcoming)
Jake Rush (pro hac vice forthcoming)
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200
Sean.Buckley@kobrekim.com
Steve.Kobre@kobrekim.com
Alexandria.Swette@kobrekim.com
Victoria.Fordin@kobrekim.com
Jake.Rush@kobrekim.com

*Counsel for Defendant Olivier Amar*

Appendix A

[Redacted]

<u>Appendix B</u>

[Redacted]

Appendix C

[Redacted]

Appendix D

[Redacted]

Appendix E

[Redacted]

<u>Appendix F</u>

[Redacted]

Appendix G

[Filed Under Seal]