

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 20, 2025

**BY ECF AND EMAIL**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Charlie Javice and Olivier Amar*, 23 Cr. 251 (AKH)

Dear Judge Hellerstein:

    The Government respectfully writes to request that the Court address a potential conflict of interest for David Siegal, Esq., one of defendant Charlie Javice's current lawyers. As explained below, Mr. Siegal has personal knowledge of facts relating to the charges in the above-referenced Indictment and may therefore become a sworn or unsworn witness at trial. The Government therefore requests that the Court conduct a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982). Even if the potential conflict is waived by Javice, the Government requests that the Court issue an order barring Mr. Siegal from conducting cross-examination or jury argument about matters in which he was personally involved.

    For the avoidance of doubt, the Government does not allege, and its requests are not meant to suggest in any way, that Mr. Siegal is criminally implicated in the conduct charged against the defendant.

**I. Background**

    This case concerns lies told by Javice and her co-defendant Olivier Amar during their attempts to sell their company, Frank, in the spring and summer of 2021, and the defendants' subsequent attempts to cover up the fraud. The company that purchased Frank, J.P. Morgan Chase ("JPMC"), ultimately uncovered the defendants' fraud, but not until the fall of 2022. Prior to the fraud's discovery, Javice and Amar worked as JPMC employees.

    During Javice's employment at JPMC, multiple JPMC employees submitted referrals to JPMC's internal investigation unit for misconduct by Javice, separate and apart from the fraud charged in the Indictment. The referrals regarding Javice's misconduct prompted a JPMC internal investigator ("Investigator-1") to open an investigation into Javice, and Investigator-1 interviewed Javice twice as part of his investigation.

Mr. Siegal, one of Javice's current counsel in this case, also represented Javice during the internal investigation. In that role, Mr. Siegal conveyed a representation to JPMC via email, on behalf of Javice, that was false, and Mr. Siegal was also present for the two interviews conducted by Investigator-1. During the second interview, Javice made false statements and other material admissions when asked about the conduct that is the subject of the charges in this case. The Government expects to call Investigator-1 as a witness at trial to testify about these matters.

### A. General Background to the Internal Investigation

At the start of the internal investigation conducted by JPMC, JPMC had not yet uncovered Javice's lies relating to Frank's "user" data. Instead, referrals led to Javice being investigated within the workplace for the following issues: misuse of corporate credit cards for personal expenses, personal investments that violated JPMC's rules, and the use of personal unmonitored communication channels such as using her legacy "@withfrank.org" email address and texting about business matters on a personal phone. In addition, prompted by a whistleblower's complaints, the internal investigation expanded to cover issues relating to Frank's website visitor metrics—specifically, whether the defendants made misrepresentations in monthly reports submitted to JPMC management regarding their website's visitors during the early months of 2022.

### B. Email Exchange with Mr. Siegal: Government Exhibit 1508

As part of the internal investigation, Investigator-1 and his colleagues had discussion with Mr. Siegal regarding, among other things, Javice's use of personal texts for business matters. In response to representations by Javice that she texted on her personal phone only about non-substantive work matters, Investigator-1 and his colleagues requested examples. Specifically, on August 3, 2022, an investigative counsel at JPMC wrote to Mr. Siegal:

> As previously mentioned, we request (1) 2-3 examples of JPM related texts concerning logistics (meeting times, "I'm running a few minutes late", etc.) from Charlie's personal phone, and (2) confirmation that during her review of her text messages, Charlie did not find substantive business-related texts on her personal phone.

GX 1508 at 1.[1] The following day, on August 4, 2022, Mr. Siegal replied:

> As requested, enclosed please find three (3) examples of non-substantive, JPM related text communications concerning logistics. Charlie further confirms that, in the course of reviewing her texts for purposes of providing these examples, she did not find substantive business-related texts on her personal phone.

*Id.* Attached to Mr. Siegal's email were screenshots from three different text message chats. *Id.* at 3-5. The second attachment to Mr. Siegal's email is an undated screenshot (the "Screenshot")

---

[1] Government Exhibit 1508, consisting of an e-mail chain and its attachments, is attached hereto.

from a WhatsApp chat between Javice and Amar (the "WhatsApp Chat"). In the Screenshot, which is depicted below, Javice and Amar discuss meeting attendance:



       The Government possesses a copy of the full WhatsApp Chat between Javice and Amar for the time period of July 19, 2021 to April 3, 2023—as extracted from Amar's cellphone, which the Government seized on April 3, 2023 pursuant to a search warrant. The full WhatsApp Chat possessed by the Government shows that Javice's representation to JPMC, as conveyed by Mr. Siegal in August 2022, was knowingly false and reflects her consciousness of guilt and lack of good faith.

       The full WhatsApp Chat contains a multitude of substantive communications about Frank and JPMC business—as well as substantive communications about the defendants' fraud on JPMC—including in the months leading up to Mr. Siegal's August 2022 email. While there are no dates visible on the Screenshot taken by Javice and conveyed by Mr. Siegal to JPMC, the Government's copy of the WhatsApp Chat shows that the messages in the Screenshot were sent

on May 17, 2022—approximately ten weeks prior to Mr. Siegal's email. In the time period after May 17, 2022 and before Mr. Siegal's email, Javice and Amar had multiple substantive communications about work matters. As one example, on June 22, 2022, the defendants had the following exchange:

| JAVICE | i dont believe in rebuilding fafsa |
| --- | --- |
| AMAR | There's no choice |
| AMAR | It won't work as is inside of Chase |
| JAVICE | let them deal with that after we go |
| AMAR | and it's too much of a security issue outside of it |
| AMAR | Why not just let them rebuild and go on vacation while they do? |
| JAVICE | cuz theyll expect us to do it |
| JAVICE | and run normally |
| AMAR | No |
| AMAR | This has its own team |
| JAVICE | remember how long that actually takes |
| AMAR | Yeah, but it has to get done |
| AMAR | they want to move forward with the final state either way |
| JAVICE | ok but estimate 18months min |
| AMAR | If [Javice's manager] is smart, she'll let us do 1B and have 2 work in parallel |
| JAVICE | we dont have heads for that |
| JAVICE | there is no parrallel |
| AMAR | That takes it into consideration |
| JAVICE | not at the hiring rate |
| AMAR | We brought it up last week |
| JAVICE | its not in the timeline |
| AMAR | It kind of is, but I'll bring it up |
| JAVICE | 6 months lead time |
| AMAR | yeah |

As another relevant example, Javice and Amar had the following exchange on June 27, 2022:

| JAVICE | Finally got a work phone - so My new work number is 3055043590 |
| JAVICE | For anything work needed :) |
| AMAR | Great. Wipe everything Chase off your personal phone |
| JAVICE | Just waiting to install email and then everything will be transferred |
| JAVICE | So it's finally done |

In selecting the non-substantive Screenshot from May 22, 2022, Javice was undoubtedly aware of her substantive communications with Amar in the WhatsApp Chat, yet nonetheless represented, through Mr. Siegal, that no such communications existed.

The Government expects to introduce Government Exhibit 1508 as an exhibit at trial and to argue that Javice concealed her substantive communications, and caused her private attorney (Mr. Siegal) to convey a falsehood to JPMC. In taking these deceptive actions, Javice sought to conceal the voluminous incriminating messages she exchanged with Amar in the WhatsApp Chat—of which the jury will be well aware as the material portions of the WhatsApp Chat, including those excerpted above, will also be offered into evidence as Government Exhibits.

C.  Accessing Javice's Frank Email Account

During the internal investigation, Investigator-1 obtained access to and reviewed Javice's email accounts—both her Chase email account *and* her "@withfrank.org" email account (the "Frank Email Account"). Through its acquisition of Frank, JPMC became the owner of the server that housed Javice's Frank Email Account, which she had used prior to the acquisition. As described in the criminal Complaint in this case (Dkt. 1), that Frank Email Account contained extensive evidence of Javice's fraud during the acquisition process.

D.  Javice Is Confronted with Her Acquisition Fraud During Her Second Interview

Investigator-1 conducted several interviews in the investigation. Investigator-1 interviewed Amar once, on September 6, 2022. A week later, on September 13, 2022, Investigator-1 interviewed Javice for a second time. In the time between Amar's interview and Javice's second interview, Investigator-1 became aware of emails from the Frank Email Account in which, in early August 2021, Javice and the data scientist identified in the Complaint as "Scientist-1" discussed generating the fake synthetic data set that was then submitted to JPMC to satisfy due diligence during the Frank acquisition. (*See* Dkt. 1 ¶¶ 24, 27).

At the end of the second interview, Investigator-1 questioned Javice regarding her work with Scientist-1 and certain emails they exchanged. Over an extended colloquy, Javice repeatedly lied about Scientist-1's work and never once admitted the simple truth that he created a synthetic data set at her direction. Javice was also questioned about purchasing data to cover up the fraud,

about which she also lied. Mr. Siegal was present with Javice during this interview and witnessed her false statements.

## II. Applicable Law

District courts have two separate obligations where counsel has a possible conflict of interest. First, the district court has an "inquiry obligation" when it is apprised of the possibility of a conflict of interest, under which it must "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *United States v. Levy*, 25 F.3d 146, 153 (2d Cir. 1994); *see Armienti v. United States*, 313 F.3d 807, 810 (2d Cir. 2002). If, after inquiry, "the court discovers no genuine conflict, it has no further obligation." *United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003). But if the district court finds after some inquiry that the defendant's attorney suffers from an actual or potential conflict, the district court then has a second, "disqualification/waiver" obligation, under which it is required either to disqualify the attorney if the conflict is sufficiently severe, or, if the conflict may be waived, to conduct a *Curcio* proceeding to advise the defendant of the ramifications of the conflict and obtain a waiver of any conflict from the defendant.

In the Second Circuit, *per se* conflicts have been found only in two classes of cases, and the Circuit has repeatedly refused to expand the rule beyond those categories: where trial counsel "is not authorized to practice law" and where trial counsel "is implicated in the very crime for which his or her client is on trial." *Armienti*, 313 F.3d at 823. An actual conflict is one that is so "severe" that "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation . . . ." *Levy*, 25 F.3d at 153 (citing *United States v. Fulton*, 5 F.3d 605, 612-14 (2d Cir. 1993)). An actual conflict exists "when the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action, or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client." *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004) (internal quotation marks and citations omitted). Where a conflict of interest is actual, a court is "obliged" to disqualify the attorney. *Levy*, 25 F.3d at 153. A potential conflict of interest, by contrast, is a "lesser" conflict. *Id.* A potential conflict exists where a court finds that "a rational defendant could knowingly and intelligently desire the conflicted lawyer's representation . . . ." *Id.* If "the court determines that the attorney suffers from a lesser [actual] or only a potential conflict, then it may accept a defendant's knowing and intelligent waiver of his right to conflict-free counsel and permit the defendant to be represented by the attorney of his choice." *Perez*, 325 F.3d at 125.

Disqualification may be required where an attorney is in fact, or is in a position to become, either a sworn or unsworn witness at trial. *See, e.g.*, *United States v. Kliti*, 156 F.3d 150, 156 (2d Cir. 1998)) ("When faced with an attorney as a sworn or unsworn witness, the proper recourse is to disqualify the attorney, not to exclude the testimony."). An attorney who is actually called as a witness at trial should generally be disqualified because, *inter alia*, ethical codes otherwise generally require the attorney to withdraw his or her representation. *See id.* at 156, n.8 (*citing* Model Code of Professional Responsibility DR 5-102(A)); *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993) (same); New York Rules of Professional Conduct, Rule 3.7 ("Lawyer as Witness"). A district court may properly disqualify an attorney where the Government represents that it is merely possible that the attorney will be a witness at trial. *See Jones*, 381 F.3d at 121

("The risk that [the attorney] would become a witness at trial was enough alone to allow the district court to [disqualify the attorney] under an abuse of discretion standard. We could not expect the district court to rule otherwise where it seems more likely than not that a number of conflicts will materialize.").

Even where an attorney is not actually called as a sworn witness, disqualification is proper where the attorney is nonetheless in the position of serving as an unsworn witness. "An attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial." *Locascio*, 6 F.3d at 933. In such circumstances, an uncalled attorney "can still be disqualified, since his performance as an advocate can be impaired by his relationship to the events in question. For example, the attorney may be constrained from making certain arguments on behalf of his client because of his own involvement, or may be tempted to minimize his own conduct at the expense of his client. Moreover, his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." *Id.*; *see also Ciak v. United States*, 59 F.3d 296, 305 (2d Cir. 1995) ("[An attorney's] arguments to the jury about [a witness's] prior statements would be viewed as a statement of a witness as well as of an advocate – thereby creating a conflict severe enough to require [the attorney's] disqualification."); *United States v. McKeon*, 738 F.2d 26, 34-35 (2d Cir. 1984) ("If counsel were to cross-examine the witness as to her conversations with him, argue the credibility of her testimony to the jury, or suggest alternative interpretations of her account of the conversation, he would place himself in the position of an unsworn witness and implicitly put his own credibility at issue. . . . [T]he Sixth Amendment interest in counsel of choice must give way when chosen counsel is so compromised."). And because the Government, not the defendant, is prejudiced when a defense attorney becomes an unsworn witness, "[w]aiver by the defendant is ineffective in curing the impropriety in such situations." *Locascio*, 6 F.3d at 934.

"In deciding a motion for disqualification, the district court recognizes a presumption in favor of the accused's chosen counsel." *Locascio*, 6 F.3d at 931. "Where the right to counsel of choice conflicts with the right to an attorney of undivided loyalty, the choice as to which right is to take precedent must generally be left to the defendant and not be dictated by the government." *Perez*, 325 F.3d at 125. Nevertheless, "where a serious potential conflict of interest exists, a trial judge has broad discretion to refuse a defendant his or her choice of counsel." *United States ex rel. Stewart v. Kelly*, 870 F.2d 854, 857 (2d Cir. 1989); *see also Wheat v. United States*, 486 U.S. 153, 164 (1988) (holding that presumption in favor of petitioner's counsel of choice "may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict"); *United States v. Zichettello*, 208 F.3d 72, 104 (2d Cir. 2000) (noting a district court's "substantial latitude" to require disqualification even where defendants have attempted to waive any potential conflict as long as it determines that the conflict is "severe"). Thus, "[i]n order to avoid lurking potential conflicts and to preserve the public's confidence in the integrity of the judicial system," district courts have discretion to reject a defendant's waiver of an actual or potential conflict. *United States v. Oberoi*, 331 F.3d 44, 52 (2d Cir. 2003) (citing *Wheat*, 486 U.S. at 162-63); *see also United States v. Rogers*, 9 F.3d 1025, 1030-32 (2d Cir. 1993); *Locascio*, 6 F.3d at 931-35 (2d Cir. 1993). Even the risk of a potential conflict becoming an actual conflict is, in certain cases, sufficient to empower the district court to decline to accept a waiver. *See Jones*, 381 F.3d at 120-21; *United States v. Gonzales*, 105 F. Supp. 2d 220, 223 (S.D.N.Y. 2000); *United*

*States v. Rahman*, 105 F. Supp. 2d 220, 223 (S.D.N.Y. 1994) (judicial assessment "must include . . . both a prudent awareness of how little can be predicted with certainty before a trial begins and a sober regard for how much can go wrong once a trial starts").

### III. Discussion

The Court should hold a *Curcio* hearing to address Mr. Siegal's potential conflict of interest arising from his status as a sworn or unsworn witness at trial. Should the conflict be waived, the Court should prevent Mr. Siegal from conducting cross-examinations or jury arguments that raise the matters to which he was personally a witness.

With respect to Mr. Siegal's ability to appear as counsel for Mr. Javice at trial, the Government requests the tailored relief described above to avoid the need to disqualify Mr. Siegal. That is, the Government does not believe that disqualification of Mr. Siegal is required provided there is no potential that Mr. Siegal could be an unsworn witness at trial to the prejudice of the Government. Because Mr. Siegal is one of several counsel of record for Mr. Javice, he thereby need not participate in matters that might render him an improper unsworn witness. *Cf. United States v. Finkelstein*, No. 21 CR. 217 (PGG), 2021 WL 2555832, at *5 (S.D.N.Y. June 22, 2021) (disqualifying attorney, who was serving as sole trial counsel, because he was a potential unsworn witness). So long as such matters are handled only by Javice's other counsel—including "lead trial counsel" who appeared as counsel of record in September 2024 and prompted the adjournment of this trial from October 2024 to February 10, 2025, *see* Dkt. 162[2]—the Government submits that Mr. Siegal's potential conflict does not require his disqualification.

The Government has discussed this matter with Javice's counsel. Mr. Siegal has agreed not to conduct the cross-examination of Investigator-1, but has not agreed to refrain from arguing to the jury regarding matters to which he was a witness. The law prohibits an attorney from acting as an unsworn witness during cross examinations *and* jury arguments. *See, e.g.*, *McKeon*, 738 F.2d at 35 ("If counsel were to cross-examine the witness as to her conversation with him, argue the credibility of her testimony to the jury, or suggest alternative interpretations of her account of the conversation, he would place himself in the position of an unsworn witness and implicitly put his own credibility at issue."); *see also Locascio*, 6 F.3d at 934 (where an attorney acts as an unsworn witness, "[w]aiver by the defendant is ineffective in curing the impropriety," because "the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired."). Accordingly, the Court should prohibit Mr. Siegal from (1) cross-examining Investigator-1, or any other witness, about matters in which Mr. Siegal was personally involved and (2) making argument to the jury in this case. Those roles at trial can instead be handled by Javice's other experienced trial counsel of record in this case.

With respect to Government Exhibit 1508, if Mr. Siegal will be appearing as counsel of record before the jury, the Government is willing to anonymize the involvement of Mr. Siegal in

---

[2] In requesting the trial adjournment, Javice wrote: "In late August, Ms. Javice retained Jose Baez of The Baez Law Firm and Ronald S. Sullivan Jr. of Ronald Sullivan Law PLLC, and earlier this month, she determined that they would serve as lead trial counsel in this matter." Dkt. 162 at 2.

Government Exhibit 1508.  That is, the Government is willing to redact Mr. Siegal's name and replace it with text indicating that the email was sent from a private defense attorney for Javice.

**IV.    Conclusion**

    For the reasons stated above, the Court should:

       (1)   conduct a *Curcio* hearing regarding Mr. Siegal's potential conflict of interest; and

       (2)   assuming the conflict is waived by the defendant, prohibit Mr. Siegal from (a) cross-examining Investigator-1, or any other witness, about matters in which Mr. Siegal was personally involved or (b) making argument to the jury in this case.

           Respectfully submitted,

           MATTHEW PODOLSKY
           Chief Counsel to the Acting United States Attorney
           Acting under Authority Conferred by
           28 U.S.C. § 515

By:      /s/
           Rushmi Bhaskaran
           Nicholas W. Chiuchiolo
           Micah F. Fergenson
           Georgia Kostopoulos
           Assistant United States Attorneys
           212-637-2439 / -1247 / -2190 / -2212