**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | 23-cr-00251-AKH |
| v. | |
| CHARLIE JAVICE and OLIVIER AMAR, | |
| Defendants. | |

**OPPOSITION TO GOVERNMENT'S MOTION TO PRECLUDE DEFENDANT**
**OLIVIER AMAR'S EXPERT WITNESSES**

## TABLE OF CONTENTS

TABLE OF CONTENTS...........................................................................................................i

TABLE OF AUTHORITIES..................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 2

APPLICABLE LAW ............................................................................................................. 3

DISCUSSION ....................................................................................................................... 5

I.      There is No Basis to Preclude Dr. Cohen's Testimony ................................................. 5

    A.     Dr. Cohen's Expected Testimony ................................................................. 5

    B.     Dr. Cohen's Expected Testimony Is Relevant and Necessary...................... 6

    C.     Dr. Cohen's Expected Testimony on the Adequacy of JPMC's Validation Exercise is Admissible ................................................................................................ 9

          a.    Dr. Cohen is Eminently Qualified to Testify on this Subject Matter...................... 9
          b.    Dr. Cohen's Expected Testimony Will Not Mislead or Confuse the Jury.............. 9
          c.    Dr. Cohen's Expected Testimony is Not Victim Blaming .................................. 10

    D.     Dr. Cohen is Not Offering Improper State of Mind Testimony ................................ 12

II.     There is No Basis to Preclude Professor Meadow's Testimony....................................... 14

    A.     Professor Meadow's Expected Testimony................................................................. 14

    B.     Professor Meadow's Expected Testimony Does Not Victim Blame and is Relevant 15

    C.     Professor Meadow's Expected Testimony is Proper ................................................. 16

III.    There is No Basis to Preclude Professor Solomon's Testimony ..................................... 18

    A.     Professor Solomon's Expected Testimony................................................................. 18

    B.     Professor Solomon's Expected Testimony Does Not Opine on Issues of Law.......... 20

    C.     Professor Solomon is Not Victim Blaming ............................................................... 22

    D.     Professor Solomon's Testimony is Permissible Under Fed. R. Evid. 704 ................. 23

IV.    There is No Basis for a *Daubert* Hearing ........................................................................ 23

CONCLUSION.................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                           **Page(s)**

*Alto v. Sun Pharm. Industries, Inc.*,
  2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021) ......................................................................... 21

*Antilles S.S. Co. v. Members of Am. Hull Ins. Syndicate*,
  733 F.2d 195 (2d Cir. 1984) ................................................................................................... 20

*Armogianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ..................................................................................................... 4

*Borawick v. Shay*,
  68 F.3d 597 (2d Cir. 1995) ....................................................................................................... 4

*Campbell v. Metro. Prop. & Cas. Ins. Co.*,
  239 F.3d 179 (2d Cir. 2001) ..................................................................................................... 4

*Crane v. Kentucky*,
  476 U.S. 683 (1986) ........................................................................................................... 8, 17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ................................................................................................................. 3

*Diaz v. United States*,
  602 U.S. 526 (2024) ............................................................................................................... 13

*Dominion Res. SVC, Inc. v. Alstom Power, Inc.*,
  2018 WL 3752878 (D. Conn. Aug. 8, 2018) ......................................................................... 21

*Floyd v. City of New York*,
  910 F. Supp. 2d 506 (S.D.N.Y. 2012) ................................................................................... 24

*Highland Cap. Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005) .............................................................................. 16, 17

*In re Digital Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) ......................................................................................... 4, 14

*In re Elec. Books Antitrust Litig.*,
  2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ....................................................................... 23

*In re Elysium Health-ChromaDex Litig.*,
  2022 WL 421135 (S.D.N.Y. Feb. 11, 2022) ......................................................................... 21

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
  638 F. Supp. 3d 227 (E.D.N.Y. 2022) ................................................................................... 18

*In re Terrorist Attacks on September 11, 2001*,
  2023 WL 3116763 (S.D.N.Y. Apr. 27, 2023) ....................................................................... 16

*In Rezulin Prods. Liability Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................... 13

*Joffe v. King & Spalding LLP*,
    2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019) ...................................................... 3

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ...................................................................................... 4, 24

*Marx & Co. v. Diners' Club, Inc.*,
    550 F.2d 505 (2d Cir. 1977) ........................................................................ 20, 21

*Medidata Sols., Inc. v. Veeva Sys., Inc.*,
    2022 WL 585715 (S.D.N.Y. Feb. 24, 2022) ...................................................... 7, 8

*N. Am. Soccer League LLC v. U.S. Soccer Fedn., Inc.*,
    2024 WL 2959967 (E.D.N.Y. June 12, 2024) ..................................................... 13

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005) ............................................................................... 3

*Pearlman v. Cablevision Sys. Corp.*,
    2015 WL 8481879 (E.D.N.Y. Dec. 8, 2015) ....................................................... 21

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*,
    161 F.3d 77 (1st Cir. 1998) ................................................................................. 4

*Sawant v. Ramsey*,
    2012 WL 3265020 (D. Conn. Aug. 9, 2012) ....................................................... 23

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ........................................................................... 7

*Tchatat v. City of New York*,
    315 F.R.D. 441 (S.D.N.Y. 2016) ......................................................................... 4

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) .......................................................................................... 16

*United States v. Abarca*,
    2021 WL 6803226 (2d Cir. Dec. 15, 2021) ..................................................... 8, 17

*United States v. Adelekan*,
    567 F. Supp. 3d 459 (S.D.N.Y. 2021) ................................................................ 12

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000) .............................................................................. 23

*United States v. Ayers*,
    2024 WL 1468109 (E.D.N.Y. Apr. 4, 2024) ......................................................... 7

*United States v. Blum*,
    62 F.3d 63 (2d Cir. 1995) ................................................................................... 9

*United States* v. *Chastain*,
2023 WL 2966643 (S.D.N.Y. Apr. 17, 2023) .......................................................... 18

*United States* v. *Gentile*,
2024 WL 2941849 (E.D.N.Y. June 11, 2024) ......................................................... 22

*United States* v. *Guo*,
2024 WL 1939221 (S.D.N.Y. May 2, 2024) .................................................... 22, 23

*United States* v. *Harvey*,
547 F.2d 720 (2d Cir. 1976) ..................................................................................... 9

*United States* v. *Kaziu*,
559 Fed. Appx. 32 (2d Cir. 2014) ............................................................................ 8

*United States* v. *Kistner*,
2013 WL 80255 (S.D. Ohio, Jan. 7, 2013) ............................................................ 10

*United States* v. *Kurland*,
2022 WL 2669897 (E.D.N.Y. July 11, 2022) ........................................................ 11

*United States* v. *Lesniewski*,
2013 WL 3776235 (S.D.N.Y. July 12, 2013) ........................................................ 12

*United States* v. *Litvak*,
808 F.3d 160 (2d Cir. 2015) ............................................................................. 7, 16

*United States* v. *Litvak*,
889 F.3d 56 (2d Cir. 2018) .................................................................................... 11

*United States* v. *Martino*,
664 F.2d 860 (2d Cir. 1981) .................................................................................. 13

*United States* v. *Mejia*,
545 F.3d 179 (2d Cir. 2008) .................................................................................. 24

*United States* v. *Mulder*,
273 F.3d 91 (2d Cir. 2001) ...................................................................................... 7

*United States* v. *Patel*,
2023 WL 2643815 (D. Conn. Mar. 27, 2023) .................................................. 12, 16

*United States* v. *Phillips*,
2023 WL 6620146 (S.D.N.Y. Oct. 10, 2023) .......................................................... 7

*United States* v. *Raniere*,
384 F. Supp. 3d 282 (E.D.N.Y. 2019) ..................................................................... 4

*United States* v. *Rigas*,
490 F.3d 208 (2d Cir. 2007) .................................................................................. 16

*United States* v. *Smith*,
2012 WL 2338707 (D. Conn. June 19, 2012) ........................................................ 24

*United States v. Weigand,*
    520 F. Supp. 3d 609 (S.D.N.Y. 2021) .................................................................. 11

*United States v. Williams,*
    506 F.3d 151 (2d Cir. 2007) .............................................................. 3, 17, 23

*Whalen v. CSX Transportation, Inc.,*
    2016 WL 5723877 (S.D.N.Y. Sept. 29, 2016) ....................................... 22

## Rules

Fed. R. Evid. 702 ......................................................................................... Passim

Fed. R. Evid. 703 ............................................................................................... 12

Fed. R. Evid. 704 ............................................................................................... 23

Defendant Olivier Amar submits this memorandum in opposition to the Government's Motion to Preclude the Defendants' Expert Witnesses (the "Motion" or "Mot."), ECF No. 205.

## PRELIMINARY STATEMENT

The Government's Motion is a series of straw-man arguments premised upon mischaracterizations of fact and should be rejected. Mr. Amar's experts are eminently qualified in their respective fields, and the testimony they may offer not only is relevant and admissible, but will assist the jury in understanding the evidence and determining relevant facts that have been placed at issue by the Government. Specifically, the alleged misrepresentations in this case concern Frank's "users" and allegedly were made in the context of a multimillion-dollar corporate merger that was negotiated and structured with the assistance of preeminent law firms and diligenced by large internal business teams working with the assistance of outside industry experts. These circumstances put at issue complex questions of data science, electronic data management, mergers and acquisitions, and corporate due diligence. These are not matters within the personal knowledge of the average juror or lay witness.

The Government elected not to call any experts and therefore is in no position to genuinely engage with these issues through affirmative opinion testimony. Instead, well aware of the complexities of this case, the Government deploys a series of misleading arguments in an effort to deprive the jury of relevant facts. Mr. Amar's experts will not "blame the victim" or offer improper opinions regarding the parties' state of mind or issues of law. The Government cannot dictate Mr. Amar's defense strategy any more than it can exclude Mr. Amar's experts simply because it disagrees with them. Similarly, there is no basis for a *Daubert* hearing in this case, because there is no scientific analysis, mathematical calculations, modeling or application of other methodologies that call for the Court to perform its expert gatekeeping function. The Court should deny the Government's Motion.

## BACKGROUND

The Government's case hinges on the theory that Defendants conspired to defraud J.P. Morgan Chase ("JPMC") by misrepresenting the number of Frank "users." The Government has alleged that the "crucial question for JPMC was the number of Frank ***users and the quality of the data associated with those users***." *See* Compl. ¶ 21 (emphasis added). Indeed, in its recent motions *in limine*, the Government seeks permission to ask fact witnesses "hypothetical questions" regarding the "truth about the size of Frank's customer base," or the value of Frank's "user" data. ECF No. 199 at 30-33. While such testimony is improper and should be barred as a matter of law, the Government's motion makes clear the Government's misapprehension of relevant facts and its flawed theory of the case.

The Government seeks to downplay the fact that JPMC, one of the largest financial institutions in the world: (i) directed its own outside vendor Acxiom to conduct a "data validation exercise" regarding Frank's "user" data prior to the merger, in the face of an express warning from Acxiom that the exercise would *not* assess the quality of Frank's user data; (ii) used a set of highly experienced outside lawyers to negotiate a detailed Merger Agreement that omits any reference to "users" or "user data" and omits standard provisions intended to provide protection to buyers regarding pre-closing representations about the nature, condition or operations of the target seller; and (iii) conducted a superficial, essentially pre-ordained due diligence exercise led by a large and experienced internal business team.

Mr. Amar has engaged three highly qualified experts to provide opinions at trial, based on their review of the documents in this case, experience and specialized knowledge. Mr. Amar intends to call Dr. Maxime Cohen, a data scientist who holds a PhD from MIT; corporate law expert Professor Steven Solomon from the University of California, Berkeley School of Law; and Clinical Professor Scott Meadow from The University of Chicago Booth School of Business, who

specializes in entrepreneurship, venture capital, private equity mergers and acquisitions, and due diligence processes. If Mr. Amar does present a defense case, each one of these experts would provide testimony that will assist the jury in its consideration and understanding of relevant facts. The Court should deny the Government's Motion.

## APPLICABLE LAW

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In sum, "[t]he proffering party bears the burden of establishing admissibility under Rule 702 by showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact." *Joffe v. King & Spalding LLP*, No. 17 Civ. 3392 (VEC), 2019 WL 4673554, at *2 (S.D.N.Y. Sept. 24, 2019) (citing *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)).

Under Rule 702, however, "the district court's inquiry into the reliability of expert testimony . . . is a 'flexible one.'" *Williams*, 506 F.3d at 160 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993)). It is well established law in the Second Circuit that Rule 702 "embodies a liberal standard of admissibility for expert opinions." *Nimely*, 414 F.3d 381, 395; *Tchatat v. City of New York*, 315 F.R.D. 441, 444 (S.D.N.Y. 2016) ("The Second Circuit has instructed that there is a 'presumption of admissibility of [expert] evidence' after *Daubert*."

(quoting *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995))). Accordingly, the law grants district courts "broad latitude" in making a reliability determination. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 142 (1999). Indeed, courts have found that preclusion of expert testimony is an "extreme remedy." *United States v. Raniere*, 384 F. Supp. 3d 282, 327 (E.D.N.Y. 2019).

"Rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 Comm. Notes on 2000 Amendment; *see also United States v. Raniere*, 384 F. Supp. 3d 282, 327 (E.D.N.Y. 2019) (exclusion of expert testimony is an "extreme remedy"). Thus, "only serious flaws in reasoning or methodology will warrant exclusion." *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 75 (S.D.N.Y. 2017) (citing *Armogianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). A trial judge should only exclude expert testimony "based on assumptions that are so unrealistic and contradictory as to suggest bad faith, . . ." *Id.* at 77 (citation and quotation marks omitted). "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Id.* at 75 (quoting *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)) (internal citation omitted). A party's disagreement with such testimony is not a basis for exclusion. To the extent a party wishes to "dispute the interpretation of [expert] evidence, a *Daubert* motion is an inappropriate stage in the litigation to do so" and the "'weight'" of the evidence should be argued to the jury. *Id.* at 79 (quoting *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001)).

**DISCUSSION**

I.    **There is No Basis to Preclude Dr. Cohen's Testimony**

A.  Dr. Cohen's Expected Testimony

Dr. Maxime Cohen is an expert in artificial intelligence, data science, analysis, and the use of large data sets in both business and research contexts. Dr. Cohen is the Scale AI Professor of Retail and Operations Management and Director of Research at McGill University in Montreal. Dr. Cohen has a PhD in Operations Research from the Massachusetts Institute of Technology. He has worked as a researcher for Google AI, IBM Research, and Oracle Corporation, and serves in an advisory capacity for several companies in the AI and data science space.

If called to testify, Dr. Cohen anticipates offering the following testimony at trial:

- JPMC's "data validation exercise, carried out by its vendor Acxiom, is surprisingly limited in light of industry standards and insufficient to assess and verify the alleged 4.25 million Frank 'users' in any genuine sense" because:

    o  The exercise "appears to have only verified the presence of 4.265 million rows of data and certain other select data fields."

    o  The exercise "did not include common components of a data validation exercise that seeks to confirm or analyze an existing customer base and its quality . . ."

    o  "[T]he $1,695 fee paid to Acxiom was very low and is not consistent with any genuine effort to meaningfully analyze Frank's 'user' data and its quality."

- "[T]he practice of purchasing data from third-party data providers . . . is a common practice in the tech industry, including, for example, for the purposes of enriching or augmenting an existing data set."

- "[I]t is relatively common for tech start-ups to lack consistent organization and data storage and management protocols" and, "[a]s a result, it is not surprising that a start-up like Frank may have experienced challenges accessing, consolidating and sharing its data during the due diligence process."

- "The use of synthetic data in the tech industry is also an established practice and can include many legitimate uses . . ."

5

Ex. A at 3-5.

B.  Dr. Cohen's Expected Testimony Is Relevant and Necessary

The Government seeks to exclude, on relevance and necessity grounds, Dr. Cohen's expected testimony concerning data purchasing from third-party data providers, the lack of organization and data storage management protocols in tech start-ups, and on the uses of synthetic data, claiming that these issues are not in dispute and that the Government will be calling fact witnesses to testify on these matters. Mot. at 20-21. Dr. Cohen's testimony on these issues is directly relevant to the Government's case and essential to assist the trier of fact in understanding technical and complex subject matters that are unlikely to be known to the average juror. Further, Mr. Amar has a constitutional right to present a defense of his choosing.

The relevance of data purchasing from third party providers, the lack of organization and data storage management protocols in tech start-ups and the use of synthetic data as common practices go to the heart of the Government's case against Defendants. Indeed, one of the Government's key allegations against Defendants is that the purchase of the ASL list and the creation of the synthetic data set are evidence of their intent to deceive JPMC about Frank's customer base. *See* Compl. ¶ ¶ 11, 13. Another key allegation is that Defendants deliberately delayed the transmission of Frank user data to JPMC in early 2022. *See* Compl. ¶ 32. The Government seeks to spin Mr. Amar's involvement with data purchasing and data management as an effort to aid and abet Ms. Javice in a fraudulent scheme.

The jury must understand the key contextual evidence on industry standards for purchasing data—*i.e.*, that purchasing data is a common practice and well within the range of industry norms—and will benefit from similar opinions on the uses of synthetic data. Testimony about how tech start-ups typically store and manage data will assist the jury in assessing the context within which Frank transferred its data to JPMC. In deciding whether or not Mr. Amar behaved with the

requisite fraudulent intent, the jury will necessarily need to consider whether data purchasing and synthetic data, as a general matter, are accepted, common practices in the industry, as well as typical data storage and management protocols of tech start-ups. "Such industry-specific expertise is regularly presented as expert testimony helpful to the jury." *Medidata Sols., Inc. v. Veeva Sys., Inc.*, No. 17 Civ. 589 (LGS), 2022 WL 585715, at *1 (S.D.N.Y. Feb. 24, 2022); *see Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 46 (S.D.N.Y. 2016) (expert may identify company's "practices and structures and place them within a larger context of industry norms").

Here, given the niche area of data purchasing, synthetic data and data management in start-ups, about which an average juror would have no basis for knowing, this evidence is particularly relevant and proper under Federal Rule of Evidence 702. Indeed, "courts routinely allow experts to provide background information" about an industry when it "is beyond the ken of the average juror." *United States v. Ayers*, No. 20 Cr. 239 (BMC), 2024 WL 1468109, at *2 (E.D.N.Y. Apr. 4, 2024). *See, e.g.*, *United States v. Litvak*, 808 F.3d 160, 183 (2d Cir. 2015) (finding expert testimony about bond trading would have been particularly relevant because jury likely did not know how such trading worked); *United States v. Phillips*, 22 Cr. 138 (LJL), 2023 WL 6620146, at *14 (S.D.N.Y. Oct. 10, 2023) (allowing expert testimony in market manipulation case on "standard industry practices[]" in the relevant market and on "strategies, investment theses, and incentives that FX market participants typically have . . . ."). The Second Circuit has allowed expert testimony to overview much more commonly known industries. *See United States v. Mulder*, 273 F.3d 91, 101-02 (2d Cir. 2001) ("We have upheld expert testimony on the structure and tactics of the Mafia . . . and, by virtue of television, best selling novels, and the movies, the Mafia is far better known to the general public than are labor coalitions.") (internal citation omitted).

The Government's claim that there is "no [real] dispute" concerning certain of Dr. Cohen's expected opinions underscores why such testimony may be necessary—while the Government concedes that these points are accurate and relevant, the jury must be presented with this information in order to pass judgment. Mot. at 20. The parties have not stipulated that any part of Dr. Cohen's expected testimony is uncontested, nor has the Government made any offer to do so. The Government's contention that Mr. Amar's experts should be excluded because the Government's witnesses "can be cross-examined regarding their own recollections and actions" is no answer. Mot. at 32. That the Government will call fact witnesses to testify to personal observations does not preclude expert testimony on the same topic designed to clarify or contest such testimony. *See*, *e.g.*, *United States v. Abarca*, 2021 WL 6803226, at *5 (2d Cir. Dec. 15, 2021) ("[T]he mere fact of some overlap between an expert witness's testimony and that of fact witnesses, including cooperating witnesses, does not prohibit the expert from also testifying on [the] subject." (internal quotation marks and citations omitted)); *Medidata Sols., Inc. v. Veeva Sys., Inc.*, No. 17 Civ. 589 (LGS), 2022 WL 585715, at *2 (S.D.N.Y. Feb. 24, 2022 (explaining that expert testimony is "not render[ed] . . . irrelevant or of no use to the factfinder" merely because it "may be duplicative of lay witness testimony"); *United States v. Kaziu*, 559 Fed. Appx. 32, 38 (2d Cir. 2014) (rejecting assertion that "a lay witness could . . . have attested to the same issues" as the expert because the expert "based his testimony on specialized research and training removed from the instant case"). The Court should reject the Government's attempt to constrain Mr. Amar's particular defense strategy. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (citation and quotation marks omitted).

C. <u>Dr. Cohen's Expected Testimony on the Adequacy of JPMC's Validation Exercise is Admissible</u>

### *a. Dr. Cohen is Eminently Qualified to Testify on this Subject Matter*

The Government argues that Dr. Cohen's expected testimony on JPMC's data validation exercise should also be excluded because he "is not qualified to testify as to what is a sufficient due diligence exercise" and that he is not "an expert in acquisitions or due diligence and cannot offer any expert opinion on what constitutes sufficient due diligence." Mot. at 20 n.5. The Government misses the point. As discussed, Mr. Amar has called Dr. Cohen as a *data science* expert, subject matter on which he is well qualified to testify. Mr. Amar has other experts, Professors Solomon and Meadow, highly qualified experts prepared to testify on the subject matter of acquisitions and due diligence.

### *b. Dr. Cohen's Expected Testimony Will Not Mislead or Confuse the Jury*

The Government claims that Dr. Cohen's testimony on JPMC's data validation exercise will confuse and mislead the jury. *See* Mot. at 9. Dr. Cohen's opinions are relevant to show that JPMC acted knowingly and intentionally, in a way that is irreconcilable with the Government's theory of the case and the allegations of a fraudulent scheme. Any theoretical potential for juror confusion must be balanced against Mr. Amar's right to present a defense on a crucial issue before the jury: whether the alleged misrepresentations were material. *United States v. Blum*, 62 F.3d 63, 68 (2d Cir. 1995) ("Indeed, given the importance of the . . . testimony to the defense, whatever confusion . . . that may have resulted from its admission would have to have been overwhelming to satisfy Rule 403's balancing test." (quoting *United States* v. *Harvey*, 547 F.2d 720, 723 (2d Cir. 1976))).

### c. *Dr. Cohen's Expected Testimony is Not Victim Blaming*

The Government argues that Dr. Cohen's testimony on the validation exercise carried out by JPMC's vendor, Acxiom, is inadmissible because it constitutes impermissible victim blaming. Mot. at 19. The Government mischaracterizes Dr. Cohen's expected testimony. JPMC directed its vendor, Acxiom, to conduct a data validation exercise regarding Frank's "user" data as a key component of JPMC's due diligence prior to the signing of the Merger Agreement to acquire Frank. Dr. Cohen will opine that JPMC chose to proceed with a validation analysis that did *not* include agreements on key terms or certain of those industry standard methodologies. *See* Ex. A at 3-4. JPMC directed Acxiom to proceed with the exercise even after Acxiom expressly warned that its ability to assess or validate Frank's data—the data at the heart of the Government's case—would be limited to verifying the mere presence of certain requested data for 4.25 million unique "users," rather than testing or analyzing the data in any meaningful way. The limited scope of the exercise is reflected in the minimal fee that Acxiom charged JPMC—$1,695 dollars—for the work performed. In other words, JPMC's conduct in connection with the data validation exercise reflects informed, intentional decisions made by JPMC based on JPMC's assessment of what was material to the transaction at the time.

The Government in essence concedes that, when it comes to the issue of Frank's "user" data, materiality is the very essence of the issue. It contends that the quality of Frank's "user" data was not just material—it was the linchpin of JPMC's decision to acquire Frank. Dr. Cohen's anticipated testimony about the data validation exercise is relevant and admissible because JPMC's "practices and procedures at the time of the alleged conduct are relevant to the issue of whether Defendants' actions were material." *United States v. Kistner*, 2013 WL 80255, at *7 (S.D. Ohio, Jan. 7, 2013) (denying the Government's motion *in limine* to exclude evidence or argument that mortgage lenders were negligent in approving real estate loans applications because the

"[m]ateriality of Defendants' actions and omissions is relevant to the Government's case against Defendants: in order to prove a scheme to defraud, the Government must demonstrate the materiality of the allegedly fraudulent acts. The actions or inactions of the various lenders could be probative of the issue of materiality."). Indeed, expert evidence is admissible where "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Crim. P. 702(a). This is precisely what Dr. Cohen's anticipated testimony seeks to do here. In other words, what JPMC did or did not do with regard to the data validation exercise—as well as with regard to due diligence more generally and, for example, the omission of key terms in the deal's transactional documents, as will be discussed—is indicative of what was material in the acquisition of Frank and Mr. Amar's experts are permitted to testify on these matters. *See, e.g., United States v. Weigand*, 520 F. Supp. 3d 609, 614 (S.D.N.Y. 2021) (in bank and wire fraud case, rejecting Government's argument that the evidence defendants sought—which bore upon the banks' failure to enforce their own policies against processing marijuana transactions—was not relevant and an attempt to engage in victim blaming: "[defendants] intend to argue not that banks are lackadaisical in their enforcement, *but rather that banks do not care about whether their cardholders are purchasing marijuana* (at least in states where that is legal)." (emphasis added)); *United States v. Kurland*, No. 20 Cr. 306 (NGG), 2022 WL 2669897, at *7, *12 (E.D.N.Y. July 11, 2022) (permitting the defendant to elicit testimony about materiality where it bears on elements of the fraud crimes with which he is charged and finding that defendant's "proposed questions about the alleged victims' decision-making processes, factors they considered important, or amounts of money that are material to them bear on the question of materiality . . . ."); *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) (For a misstatement to be material, there must be "a substantial likelihood that a reasonable investor

11

would find the . . . misrepresentation important in making an investment decision.") (citation omitted).

None of the cases cited by the Government involve the issue presented here: the victims' diligence practices will necessarily inform the jury's understanding of what information is material to the reasonable investor in the relevant market. Instead, the Government relies on a series of distinguishable cases in which there is no apparent dispute, or discussion, as to the materiality of the statements at issue, but defendants instead sought to assert a so-called "gullible victim" defense relying on idiosyncratic conduct or characteristics of the victims to negate the frauds perpetrated upon them. *See United States v. Lesniewski*, 2013 WL 3776235, at *2 (S.D.N.Y. July 12, 2013) (excluding evidence about defendant's negligent conduct as irrelevant to intent to defraud, without addressing whether that evidence would be relevant to materiality) (cited in Mot. at 19); *see also United States v. Adelekan*, 567 F. Supp. 3d 459, 469 (S.D.N.Y. 2021) (Court granted an unopposed motion to exclude evidence of "the gullibility of victims" without any analysis of materiality) (cited in ECF No. 199 at 15).

D. Dr. Cohen is Not Offering Improper State of Mind Testimony

The Government contends that Dr. Cohen's expected testimony is impermissible state of mind testimony, and because they are "subjective" they cannot be derived from reliable methods. Mot. at 31. This is wrong for a number of reasons.

First, Dr. Cohen's expected testimony does not include any improper opinion on Mr. Amar's state of mind and includes observations based on the documents in this case, informed by his expertise, education and industry experience, and opinions about whether these observations are consistent with typical industry practices, all of which are permissible under Federal Rule of Evidence 703 and 704(b). *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed"); *see, e.g., United States*

*v. Patel,* No. 21 Cr. 220 (VAB), 2023 WL 2643815, at *39 (D. Conn. Mar. 27, 2023) ("Additionally, while experts are not permitted to testify to an actor's state of mind, an expert can testify to whether a given practice is consistent with a given state of mind."); *United States v. Martino*, 664 F.2d 860, 864 n.3 (2d Cir. 1981) (holding "receipt of . . . expert testimony was an entirely proper exercise of the court's discretion" where the expert "gave his opinion" about the meaning of a phone conversation based on his observations and experience); *Diaz v. United States*, 602 U.S. 526, 527 (2024) (in a case involving charges against a drug courier, affirming that Rule 704(b) only prohibits expert from testifying about the particular defendant's state of mind, but did not prohibit expert from opining on the "knowledge of *most*" drug couriers) (emphasis in original).

Second, as discussed, Dr. Cohen's expected testimony is based on reliable methods under Federal Rule of Evidence 702. The Government takes issue with the fact that one source of Dr. Cohen's (and all experts' expected testimony) includes analysis of produced documents in this case. Mot. at 31-32. But as discussed, Dr. Cohen's opinions (as well as Professor Solomon and Meadow's) are not limited to reviewing discovery material, although these materials are certainly an important and proper source of his expected testimony. *See N. Am. Soccer League LLC v. U.S. Soccer Fedn., Inc.*, No. 17 Civ. 5495 (BMC), 2024 WL 2959967, at *6 (E.D.N.Y. June 12, 2024) ("It is well-established that an expert is permitted to rely on facts in the record to form his opinions.").

Third, experts can rely on their experience and specialized knowledge as a basis to offer opinions. The Government's reliance on *In Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004), is misplaced, since that case involved experts who replaced the jury's role by (i) offering purely subjective ethics judgments and speculative motives, and (ii) opining on parties' state of mind without any specialized basis. Mr. Amar's experts properly rely on their

13

specialized experience and industry standards to explain how market participants analyze user data, employ synthetic data, negotiate merger agreements, and conduct due diligence. *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 75 (S.D.N.Y. 2017) ("As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process . . . rather than excluded from jurors' scrutiny . . . .") (citation omitted).

## II.    There is No Basis to Preclude Professor Meadow's Testimony

A.  <u>Professor Meadow's Expected Testimony</u>

As a preliminary matter, the Government's attempt to exclude Professor Meadow's expected testimony is disingenuous. The Government explicitly acknowledges that "an expert in acquisitions or due diligence" would be qualified to opine "as to what is a sufficient due diligence exercise." Mot. at 20, n.5. Professor Meadow *is* that expert.

Professor Scott Meadow is an expert in entrepreneurship, venture capital, private equity, mergers and acquisitions, and the due diligence processes associated with these fields. Professor Meadow is a Clinical Professor of Entrepreneurship at The University of Chicago Booth School of Business, where he teaches courses on entrepreneurial finance, venture capital, and due diligence. He earned his Master of Business Administration in Strategy and Finance from Harvard Business School. Professor Meadow has over 30 years of experience as a general partner in venture capital and private equity firms. Professor Meadow has testified as an expert in a broad range of commercial disputes involving entrepreneurship, venture capital, private equity, mergers and acquisitions, and due diligence, among other subjects.

Professor Meadow anticipates offering the following testimony at trial, including but not limited to:

- "Ostensibly, the due diligence process conducted by JPMC in relation to its acquisition of Frank entailed many of the components of an industry-standard due diligence process."

14

- The acquisition "does not appear to have been driven primarily by the representation concerning Frank's 4.25 million 'user' base because there are many indicators that JPMC's decision-making process was disconnected from a thorough assessment of Frank's 'user' base."

  o "The representation regarding Frank's 4.25 million 'users' was not tested or verified in any meaningful way."

  o "There was no apparent effort by JPMC to reconcile apparent inconsistencies across documents in the Frank data room, including Frank's unaudited financial statements, and the representation concerning 4.25 million 'users.'"

  o "[T]here are many indicators that JPMC's decision-making process was disconnected from a thorough assessment of Frank's overall value proposition."

  o "If it is the Government's contention that JPMC believed that 4.25 million 'users' was a representation of current Frank customers actively using Frank's FAFSA tool and other services, then there was no apparent effort by JPMC to reconcile that representation" with the "large market penetration" it implied.

  o "Frank's competitive advantage was limited[,]" with several factors posing "significant, readily apparent risks regarding Frank's ability to attract users."

- Given this lack of thorough assessment, "it is reasonable to infer that JPMC's acquisition of Frank was driven by other factors and may have been influenced by a directive to, in essence, 'get the deal done.'"

Ex. A at 7-11.

### B. Professor Meadow's Expected Testimony Does Not Victim Blame and is Relevant

The Government moves to preclude Professor Meadow's testimony on grounds that it is "impermissible negligent-victim evidence," irrelevant and confusing. Mot. at 22. As discussed, Mr. Amar, through his experts or otherwise, is not making a "gullible victim" defense. Professor Meadow intends to offer opinions that show JPMC's conduct during due diligence undermines the Government's allegation that misrepresentations regarding Frank's "users" was material in the

total mix of information, much less the linchpin of the transaction to acquire Frank. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("For a fact to be material, there must be a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

JPMC's diligence practices have obvious relevance to the jury's understanding of what information is *available* to a reasonable investor, as well as what information *matters* to a reasonable investor in this market. Evidence of JPMC's due diligence of Frank, including the factors they used to assess the purchase, is certainly relevant to the materiality of any alleged misstatements made to the bank. *See United States v. Litvak*, 808 F.3d 160, 183 (2d Cir. 2015) ("The full context and circumstances in which [the relevant securities] are traded [is] undoubtedly relevant to the jury's determination of materiality."); *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) ("Analysis of the misrepresentations must be in the context in which they were made."). For example, evidence that JPMC's decision-making was influenced by factors entirely unrelated to the purported misrepresentations would be highly probative of whether the misrepresentations were material.

C.  Professor Meadow's Expected Testimony is Proper

The Government also argues that Professor Meadow's expected testimony is improper because he is testifying as a proxy for JPMC and because the Government intends to call JPMC employees who participated in the acquisition to testify. Mot. at 23. As discussed, it is perfectly proper for an expert to testify on "whether a given practice is consistent with a given state of mind[,]" *United States v. Patel*, No. 21 Cr. 220 (VAB), 2023 WL 2643815, at *39 (D. Conn. Mar. 27, 2023) (quotation marks and citation omitted)), or "to the goals of an organization," *In re Terrorist Attacks on September 11, 2001*, No. 03MD01570GBDSN (SN), 2023 WL 3116763, at *15 (S.D.N.Y. Apr. 27, 2023). The Government cites *Highland Cap. Mgmt., L.P. v. Schneider*,

379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005), for the proposition that experts should not opine on the motivations of a victim. But the Government stretches *Highland* too far. *Highland* held that an expert could not "interject[] his opinion"—"often without citation to any record evidence[]"—as to the state of mind of others. *Id*. at 469. This is quite the opposite of what Professor Meadow— and any of Mr. Amar's experts—will do. As discussed, Professor Meadow's expected testimony is based on a plethora of sources, including review of discovery material, publicly available reports and industry specific material. Accordingly, unlike *Highland*, Professor Meadow's testimony is firmly grounded.

And also as discussed, Mr. Amar has a constitutional right to rebut the Government's case and the law does not preclude a criminal defendant from offering expert testimony on the same topic as a fact witness. *See Crane v. Kentucky*, 476 U.S. 683, 690 ("[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense." (citation and quotation marks omitted)); *see also United States v. Abarca*, No. 19 Cr. 3751, 2021 WL 6803226, at *5 (2d Cir. Dec. 15, 2021) (holding that "overlap between an expert witness's testimony and that of fact witnesses[]" is not a proper basis to exclude the expert's testimony).

Finally, the Government argues that Professor Meadow's expected testimony is "subjective" and not the product of reliable methods under Federal Rule of Evidence 702. Mot. at 22-24, 31. As explained, Professor Meadow's expected testimony is firmly grounded in case discovery, relevant JPMC and third-party publications on the subject matter, as well as on his own education, knowledge, experience, and his specific training in due diligence processes and entrepreneurship. These bases provide more than sufficient support to meet the requirements of Federal Rule of Evidence 702. *United States v. Williams*, 506 F.3d 151, 161-62 (2d Cir. 2007)

(explaining that "*Daubert* did make plain that Rule 702 embodies a more liberal standard of admissibility for expert opinions than did" its predecessor).

An illustrative example is Professor Meadow's expected testimony that: given the JPMC Deal Team does not appear to have conducted a thorough assessment of (i) Frank's "user" base, nor (ii) Frank's overall value proposition, it is reasonable to infer that JPMC's acquisition of Frank was driven by other factors and may have been influenced by a directive to, in essence, 'get the deal done. To reach this opinion, Professor Meadow first had to consider the size and capabilities of the JPMC deal team, in relation to standard due diligence processes in similar transactions—as well as review and analyze the nature and substance of the JPMC's due diligence analyses, documentation and communications evaluating Frank's business model, operations and financial performance. None of these highly specialized areas of subject matter and analyses are common knowledge determinations that a lay person could make. *See, e.g.*, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 638 F. Supp. 3d 227, 256-57 (E.D.N.Y. 2022) (expert's analysis was "beyond the ability of a layperson[]" where expert "d[id] not simply claim that some experts' benchmark rates [we]re larger than others[]" but rather quantified the percentage difference between different rates); *United States v. Chastain*, No. 22 Cr. 305 (JMF), 2023 WL 2966643, at *6 (S.D.N.Y. Apr. 17, 2023) (expert could provide testimony on the value of information about anticipated demand because it was beyond basic supply and demand concepts that are within the ken of the average juror).

## III.    There is No Basis to Preclude Professor Solomon's Testimony

### A.    Professor Solomon's Expected Testimony

The Government attempts to belittle Professor Solomon's credentials and experience, including by dismissively referring to him as a "California-based law professor[.]" Mot. at 24. Professor Steven Davidoff Solomon is an expert in mergers and acquisitions, corporate law and

governance, and capital markets regulation. Professor Solomon is an attorney and the Alexander F. and May T. Morrison Professor of Law at the University of California, Berkeley School of Law, where he teaches courses on mergers and acquisitions, business associations, and corporate governance. Professor Solomon earned his law degree from Columbia Law School, where he was a Harlan Fiske Stone Scholar. Professor Solomon practiced in the area of corporate mergers and acquisitions at two prominent global law firms for nearly a decade and has authored a leading law school casebook on mergers and acquisitions. He has testified as an expert in dozens of cases involving a wide range of corporate law and transactional issues, including mergers and acquisitions.

Professor Solomon anticipates offering the following expected testimony at trial, including but not limited to:

- "The transactional documents in this case are inconsistent with the Government's claim that the representations regarding Frank's 'user' data were a critical or crucial factor driving the acquisition."

  o The Merger Agreement's "seller-friendly" terms, given JPMC's size and sophistication and its "acquisition of a relatively new, small startup company that had virtually no assets or revenue."

  o "It is standard practice in a merger or purchase agreement for the buyer to include specific representations and warranties on matters that the buyer deems material to the transaction[,]" yet "[n]either the final, executed Merger Agreement, nor any draft Prof. Solomon has seen, contains any representations and warranties regarding users or customers, projections, or user or customer data[,]" nor did they contain any 10b5 or sandbagging representations and warranties.

  o "JPMC made a deliberate decision, consistent with custom and practice in an M&A negotiation, to forgo insisting upon a representation and warranty on the issue of 'users.'"

  o "Section 4.9 of the Merger Agreement expressly states that i) the buyer could not rely on any representations or documents except as set forth in the Merger Agreement, ii) JPMC had access to all books and records and assets of Frank that they desired or requested, iii) JPMC had the 'full opportunity'

to meet with management, and iv) JPMC made its 'own inquiry and investigation' and 'formed an independent judgment' concerning Frank and its business and operations."

- "The Merger Agreement was negotiated and drafted by two . . . highly sophisticated . . . law firms[,]" supporting the conclusion that "the seller-friendly terms of the Merger Agreement reflected deliberate choices" by the two parties.

Ex. A at 5-7.

B. <u>Professor Solomon's Expected Testimony Does Not Opine on Issues of Law</u>

The Government moves to preclude Professor Stephen Solomon from testifying on the omission of certain terms in the Merger Agreement and underlying transactional documents on the grounds that it is impermissible expert testimony on issues of law under Rule 702. Contrary to the Government's contention, Professor Solomon will not interpret the legal effect of particular clauses or terms in the Merger Agreement or the contract as a whole. Rather, he will testify to the absence of key terms in the context of typical industry practice, including that it is standard practice in a merger or purchase agreement for the buyer to include specific representations and warranties on matters material to the transaction, and opine on the seller-friendly nature of the merger agreement. Mot. at 25-26. For the reasons explained below, this testimony is both proper and relevant.

First, Professor Solomon does not intend to offer testimony on the *legal effect* of the contractual provisions in the Merger Agreement or the parties' obligations under the Merger Agreement. *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 508-09 (2d Cir. 1977) (explaining that expert testimony is admissible "to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry[,]" but "opinion as to the legal obligations of the parties under the contract" is not). Discussing the contractual provisions in the Merger Agreement in this case—and opining on the absence of standard provisions for mergers and acquisitions—is not an improper legal opinion. *See Antilles S.S. Co. v. Members of Am. Hull Ins. Syndicate*, 733

20

F.2d 195, 199-200 (2d Cir. 1984) (considering expert's testimony about "principles of law and custom" as evidence of the "intent of the parties"); *see also Alto v. Sun Pharm. Industries, Inc.*, No. 19 Civ. 09758-GHW, 2021 WL 4803582, at *11 (S.D.N.Y. Oct. 13, 2021) (finding expert opinion "f[ell] on the right side of the line" where the expert "evaluate[d] each individual commercial decision made by the company against the factors that he has described as those considered in industry."). The authority the Government cites in support of its argument are irrelevant; they are all breach of contract cases, and the challenged experts sought to interpret the contract provisions at issue rather than compare them to industry standards.[1] Mot. at 17.

Further, Professor Solomon's expected testimony as to what is typical practice in contract negotiations and drafting in the context of a merger or acquisition are essential background testimony that the jury will need in order to evaluate the parties' conduct. As discussed, background testimony on typical industry practices is admissible and proper. *See In re Elysium Health-ChromaDex Litig.*, No. 17 Civ. 7394 (LJL), 2022 WL 421135, at *25-26 (S.D.N.Y. Feb. 11, 2022) (expert testimony admissible where it did not consist of opinions as to ultimate issue of whether defendant's advertising was false or misleading as a matter of law, but rather "outline[d] the general background of FDA regulation and the specific requirements and regulations pertaining to" the dietary supplements at issue). Indeed, "[a]n expert may engage in a '*factual* discussion regarding the customs and practices of [an] . . . industry, an analysis of whether the conduct of the parties . . . conformed to those customs, and whether such behavior evidences the parties' intent to

---

[1] *See Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509 (2d Cir. 1977) (holding expert testimony was improper in a breach of contract case where the expert opined "as to the legal standards which he believed to be derived from the contract and which should have governed [the party's] conduct"); *Dominion Res. SVC, Inc. v. Alstom Power, Inc.*, No. 3:16 Civ. 544, 2018 WL 3752878, at *11 (D. Conn. Aug. 8, 2018) (finding in a breach of contract case that expert could opine "as to whether it is customary practice in the industry for insureds to specify whether a policy with non-eroding limits is required[]" but could not opine "on the type of policy required under the [contract]"); *Pearlman v. Cablevision Sys. Corp.*, No. 10 Civ. 4992 (JS), 2015 WL 8481879, at *8 (E.D.N.Y. Dec. 8, 2015) (finding in a breach of contract case that expert could not "interpret[] the Terms of Service and speaks to what was necessary for [a party] to fulfill the covenant of the contract" (internal citation and quotation marks omitted)).

be bound by contract.'" *Whalen v. CSX Transportation, Inc.*, No. 13CIV3784LGSHBP, 2016 WL 5723877, at *10 (S.D.N.Y. Sept. 29, 2016) (citation omitted). Accordingly, Professor Solomon's expected testimony is proper under Federal Rule of Evidence 702.

      C. <u>Professor Solomon is Not Victim Blaming</u>

      The Government also argues that Professor Solomon's expected testimony is victim blaming. Mot. at 28. As explained, Mr. Amar intends to introduce, through his experts, testimony and evidence of JPMC's practices and procedures during its acquisition of Frank so as to assist the trier of fact in deciding what was material, and not to victim blame the bank for any failings or accuse it of being negligent in this process. The inclusion omission of key terms in the deal's transactional documents, in a multi-million dollar transaction negotiated and documented with the assistance of highly experienced and respected outside law firms, is indicative of what was material in JPMC's decision to acquire Frank.

      Indeed, the lack of a representation and warranty on users as well as other relevant terms in the Merger Agreement is relevant as "evidence about the totality of the information that defendants made available to [purchasers.]" *United States v. Gentile*, No. 21 Cr. 54 (RPK) (PK), 2024 WL 2941849, at *2 (E.D.N.Y. June 11, 2024). In particular, courts have found evidence of information contained in these types of contractual disclaimers as relevant to a defendant's defense that the "alleged misrepresentations were not material in light of all the information given." *Id.* at *2 (quoting *United States v. Guo*, No. 23 Cr. 118 (AT), 2024 WL 1939221, at *8 (S.D.N.Y. May 2, 2024)); *id.* ("[T]ransactional disclaimers provided by defendants or their companies to investors that contain warnings, such as about an investment's liquidity and about whether distributions would be paid . . . 'are part of the total mix of information for the jury to consider,' and therefore they are relevant to whether a given misrepresentation 'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" (quoting

*Guo*, 2024 WL 1939221, at *8); *United States v. Autuori*, 212 F.3d 105, 118-19 (2d Cir. 2000) (allowing the admission of disclaimers in a PPM as relevant evidence of materiality). And as an expert in mergers and acquisitions, a fact that the Government does not dispute, Professor Solomon is supremely well placed to offer this testimony.

> D.  Professor Solomon's Testimony is Permissible Under Fed. R. Evid. 704

The Government argues that Professor Solomon intends to opine that Defendants did not commit a crime because "the merger agreement did not specifically prohibit [Defendants'] conduct" and therefore it is inadmissible under Federal Rule of Evidence 704. Mot. at 28. Nonsense. Professor Solomon will not offer any opinion on the legal question of whether Defendants committed a crime or whether the terms of the Merger Agreement prohibited the conduct alleged in this case. Again, Professor Solomon will compare the terms and clauses in the Merger Agreement to standard industry practice in such transactions to assist the jury in finding whether or not user representations were material.

## IV.    There is No Basis for a *Daubert* Hearing

The Government requests, in the alternative that "the Court conduct a *Daubert* hearing to exercise its gatekeeping function and examine all five experts' qualifications, their methodology, and the relevance and reliability of the proposed expert testimony." Mot. at 33. However, there is no requirement that a court hold a *Daubert* hearing in every case, and the Government provides no basis for holding one here. *See United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) (district court did not abuse discretion in denying request for *Daubert* hearing to challenge ballistics expert's testimony); *In re Elec. Books Antitrust Litig.,* No. 11-MD-2293 (DLC), 2014 WL 1282293, at *32 (S.D.N.Y. Mar. 28, 2014) ("[N]othing in *Daubert,* or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony[.]"); *Sawant v. Ramsey*, No. 07 Civ. 980 (VLB), 2012 WL

3265020, at *17 (D. Conn. Aug. 9, 2012) ("[A] *Daubert* hearing is not required simply because a request to conduct such a hearing is raised."); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999) (district courts possess latitude in deciding how and whether to conduct special proceedings to investigate reliability).

Perhaps most importantly, Mr. Amar's experts' testimony is not rooted in the sort of scientific tests, methods, or models a *Daubert* hearing might be necessary to test. *United States v. Smith*, No. 10 Cr. 148 EBB, 2012 WL 2338707, at *4 (D. Conn. June 19, 2012) ("[W]ith respect to [defendant's] request for a *Daubert* hearing, the Court concludes that a pre-trial evidentiary hearing is not necessary. The Court is aware that pursuant to both *Daubert* and Fed R. Evid. 702, it must act as a gatekeeper and assess the reliability and relevance of expert testimony. There is no indication, however, that the government intends to offer scientific evidence that requires a *Daubert* hearing. Rather, the evidence the government intends to offer . . . falls within the 'technical, or other specialized knowledge' branch of Rule 702. The Court will determine the admissibility of such evidence when it is offered at trial." (citing *United States v. Mejia,* 545 F.3d 179 (2d Cir. 2008)); *see also* Fed. R. Evid. 702 Comm. Notes on 2000 Amendment (to be admissible as expert testimony, the testimony need not be scientific, but instead may be based on "experience alone - or experience in conjunction with other knowledge, skill, training or education . . . ."); *Floyd v. City of New York*, 910 F. Supp. 2d 506, 511 (S.D.N.Y. 2012) ("[T]he Federal Rules of Evidence favor the admissibility of expert testimony, and [the court's] role as gatekeeper is not intended to serve as a replacement for the adversary system.") (citation and quotation marks omitted). Accordingly, the Court should deny the Government's request.

## CONCLUSION

For the foregoing reasons, the Court should deny the Government's Motion to Preclude the

Defendants' Expert Witnesses, ECF No. 205.


Dated: January 27, 2025                    Respectfully submitted,

                                           **KOBRE & KIM LLP**

                                           <u>*/s/ Sean S. Buckley*</u>
                                           Sean S. Buckley
                                           Jonathan D. Cogan
                                           Alexandria E. Swette
                                           Ana Frischtak
                                           800 Third Avenue
                                           New York, NY 10022
                                           Tel: (212) 488-1200
                                           Sean.Buckley@kobrekim.com
                                           Jonathan.Cogan@kobrekim.com
                                           Alexandria.Swette@kobrekim.com
                                           Ana.Frischtak@kobrekim.com

                                           *Counsel for Defendant Olivier Amar*