UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                         :

UNITED STATES OF AMERICA      :

             - v. -          :   S1 23 Cr. 251 (AKH)

                                           :

CHARLIE JAVICE and          :
OLIVIER AMAR,                :

               Defendants.     :

------------------------------------------------------- x

## THE GOVERNMENT'S OPPOSITION
## TO THE DEFENDANTS' MOTIONS *IN LIMINE*

DANIELLE R. SASSOON
United States Attorney

Rushmi Bhaskaran
Nicholas W. Chiuchiolo
Micah F. Fergenson
Georgia V. Kostopoulos
Assistant United States Attorneys

*- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 2

  I.  The JPMC and Bank-1 Notes Are Admissible .......................................................... 2

  II. The Firm-1 Evidence Is Admissible ......................................................................... 4

  III.  Attorney-1's Testimony is Admissible ..................................................................... 7

  IV.  The Defendants' Statements Discussing Elizabeth Holmes' Fraud Conviction Are Admissible ................................................................................................................ 9

      A.  Relevant Facts .................................................................................................. 11

      B.  Legal Standard.................................................................................................. 13

      C.  Argument .......................................................................................................... 14

  V. Evidence Relating To Intended Victims Is Admissible ............................................ 17

      A.  Relevant Evidence Relating to Targets of the Fraud Besides JPMC Is Admissible . 17

      B.  Potential Buyers Were "Intended Victims"...................................................... 21

      C.  Amar's Duplicity-Based Arguments Are Meritless and Have Already Been Rejected 22

  VI. *Ciminelli* Has Nothing To Do With This Case. ....................................................... 24

  VII. Exclusion of Witnesses from the Courtroom............................................................ 26

  VIII. The Government Does Not Seek to Offer Certain News Articles in Its Case-in-Chief ... 27

CONCLUSION.................................................................................................................... 27

## PRELIMINARY STATEMENT

In advance of the trial of defendants Charlie Javice ("Javice") and Olivier Amar ("Amar"), the Government respectfully submits its opposition to the defendants' motions *in limine*. *See* Dkts. 196 ("Javice Br."), 202 ("Amar Br."), and 206 ("Amar Ciminelli Br."). The defendants' motions *in limine* should be denied in their entirety, because:

- The JPMC and Bank-1[1] Notes are admissible business records (Javice Br. 8-10);

- The evidence regarding the defendants' failed efforts to raise money from a financial firm ("Firm-1") is admissible as direct evidence, and in the alternative, pursuant to Rule 404(b) (Javice Br. 10-11);

- Testimony from Frank's former Chief Operating Officer and Chief Legal officer ("Attorney-1") testimony about non-privileged events is admissible (Javice Br. 13-17);

- The defendants' statements related to Elizabeth Holmes are admissible (Javice Br. 3-5);

- Evidence regarding other intended victims of the charged fraud is admissible as direct evidence (Amar Br. 4-14);

- *United States v. Ciminelli* is wholly inapposite to the charges in this case and presents no evidentiary limits on this prosecution; and

---

[1] The Government referred to Bank-1 as "Bank-2" in its motions *in limine*. For purposes of responding to this defendants' motions *in limine*, the Government will use "Bank-1."

- Witnesses, apart from law enforcement officers, may not be present in the courtroom prior to their testimony, but there is no basis to exclude their attorneys from the courtroom (Javice Br. 12).

Lastly, the defendants' objections to proposed GX 203, 206, 207, 209, 210, 211, 213, 1049, 1401, 1404, 1413, 1482, 1487, 1495, 1502, and 2006 should be denied as moot because the Government does not seek to offer those exhibits in its case-in-chief.  (Javice Br.  6-10).

## ARGUMENT

### I.    The JPMC and Bank-1 Notes Are Admissible

For the reasons set forth in the Government's motions *in limine* (*see* Dkt. 199 at 17-22), the Bank-1 Notes, which have been marked as GX 2016, and the JPMC Notes, which have been marked GX 1396, are admissible as business records which contain the defendants' statements.[2] Witness testimony from Bank-1 and JPMC can properly lay the foundation that these notes constitute business records, because relevant witnesses from Bank-1 and JPMC will testify that: (1)  they are knowledgeable of the relevant records; (2) the Bank-1 Notes and JPMC Notes were made at or near the time of the meetings which they document by individuals who attended those meetings; (3) the Bank-1 Notes and the JPMC Notes were kept in the course of a regularly conducted business activity, namely, potential transactions pursued by Bank-1 and JPMC; and (4) taking notes like the Bank-1 Notes and JMPC Notes was a regular practice of both institutions. *See* Fed. R. Evid. 803(6); *United States v. Kaiser*, 609 F.3d 556, 575 (2d Cir. 2010) (holding that a witness's handwritten notes of telephone conversations were business records because they were "maintained in a consistent way and [were] focused on a certain range of issues that were relevant

---

[2]    At this time, the Government does not seek to offer as business records GX 1049, 1401, 1404, 1413, 1482, 1487, 1495, 1502, and 2006.

to [the witness's] business[,]" even though the note-taker indicated that he wrote down only "highlights" and matters he thought "important").  Witness testimony will further establish that the defendants made the statements contained in the notes.

In light of the expected testimony concerning these notes and the Second Circuit's "generous view" of the business records exception, *see United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995), none of Javice's arguments to preclude these notes are persuasive.  Javice Br. 8-10.  *First*, Javice is wrong in her assertion that these notes have unknown authors or were prepared by individuals who did not attend the meetings in question because, as discussed above, witness testimony will establish that these notes were authored by individuals who attended the meetings in question.  Javice. Br. 8.   In this regard, Javice's reliance on *Braunstein v. Sahara Plaza, LLC*, No. 16 Cv. 8879 (VSB), 2021 WL 2650369, at *9 (S.D.N.Y. Jun. 28, 2021), is inapposite.  In *Braunstein*, a plaintiff sought to introduce a set of notes as business records, but there was no testimony concerning the authorship or authenticity of the notes.  *Id.*  The opposite is true here, where witnesses from Bank-1 and JPMC will testify as to the authorship and authenticity of the notes.  Equally misplaced is Javice's reliance on *Century Pacific, Inc. v. Hilton Hotels Corp.,* 528 F. Supp. 2d 206, 216 (S.D.N.Y. 2007).  Javice Br. 8.  In *Century Pacific*, the notes that a plaintiff sought to introduce were made by a person who did not attend the meeting, were prepared eight months after the meeting in question, and there was no foundation or testimony concerning whether the taking of the notes was a regular practice of the business.  Here, by contrast, witness testimony will establish that the Bank-1 Notes and JPMC Notes were authored by individuals who attended the meetings in question, were taken during the meeting or directly thereafter, and that it was a regular practice of Bank-1 and JPMC to take such notes in the course of their regularly conducted business.

3

Javice also claims that the Bank-1 and JPMC Notes memorialize the responses of unidentified speakers.[3] Javice Br. 9.  However, witness testimony will establish that the statements reflected in the notes are the defendants' statements and are thus admissible under Rule 801(d)(2)(A) and (E).  Javice's reliance on *United States v. Scali*, No. No. 16 466 (NSR), 2018 WL 604852, at *2 (S.D.N.Y. Jan. 29, 2018), does not support her argument.  Javice Br. 9.  There, a defendant sought to admit the notes of a law enforcement agent, which contained the statements of certain witnesses whose out-of-court statements were not covered by a hearsay exception.  *Scali*, 2018 WL 604852, at *2.  Here, the statements contained in the notes are the defendants' statements and are thus admissible under Rule 801(d)(2)(A) and (E).

Accordingly, the Court should admit the Bank-1 and JPMC Notes as business records to show the attendance of the defendants at the meetings and to reflect certain statements made by the defendants at these meetings.

## II.   The Firm-1 Evidence Is Admissible

For the reasons set forth in the Government's motion *in limine* (*see* Dkt. 199 at 25-30), evidence related to Firm-1's potential investment in Frank; Javice's overreporting of the number of customer accounts Frank had; the correction of that reporting, and the admonishments that Javice and Amar received as a result of that over-reporting, are admissible as direct evidence, or in the alternative, under Rule 404(b).

---

[3]    Here, Javice also cites to *Gabel v. Richards Spears Kibbe & Orbe, LLP*, No. 07 Civ. 11031 (CM), 2009 WL 1856631, at *1 (S.D.N.Y. Jun. 26, 2009), but that decision in a civil case only contains the court's topline ruling that a certain set of notes were not admissible, without any discussion on why the court reached that conclusion.  This conclusory ruling, lacking factual context, offers no basis to preclude the JPMC and Bank-1 Notes.

Contrary to Javice's arguments, the proffered evidence is relevant as direct evidence. Javice Br. 11.  The events surrounding Firm-1's potential investment, and in particular, the creation of a spreadsheet showing Frank's users as of August 2019 ("Spreadsheet-1"),[4] are direct evidence of the defendants' knowledge of the true number of customers Frank had, and their motive to lie in order to sell Frank, which are inextricably linked to the charged conduct and necessary to complete the story of the crimes charged.  *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (direct evidence includes evidence which is "inextricably intertwined with the evidence regarding the charged offense" or "necessary to complete the story of the crime on trial").  The admonishments that Javice and Amar received as a result of the overreporting are also background evidence inextricable from the charged crimes, because those admonishments prove both the defendants knew and understood the true number of Frank's customers, and that the defendants specifically knew that lying about that information would be wrong.  The Firm-1 evidence similarly is necessary to complete the story of the charged crimes because it shows that after the defendants were unable to raise money for Frank's Series B funding round, the defendants had approximately 18 months before Frank would run of money, at which point Frank either needed to raise additional capital, seek an acquiror, or shut down.  This time pressure provided the defendants with a motive to lie in order to sell Frank, or risk losing any opportunity for the defendants to profit from the business.

---

[4]     Spreadsheet-1 has been marked as GX 1464-A and was attached as Exhibit C to the Government's motions *in limine*.

In the alternative, the proffered evidence is also admissible under Rule 404(b).[5]   As explained in the Government's motions *in limine* (Dkt. 199 at 29-30), Javice and Amar were aware of Spreadsheet-1, which was created to correct Frank's reporting on its number of users and its marketing costs, and is admissible to show Javice's and Amar's knowledge about the true size of Frank's customer base at the time they began their fraud.  In addition, evidence that Javice and Amar had inaccurately reported customer numbers to a potential investor in 2019, had to correct the numbers, and were then warned by, among other people, Attorney-1, that this sort of inaccurate reporting to investors could not occur again, is clearly probative of the defendants' intent and lack of mistake when they falsely reported customer numbers to potential acquirers by an even greater magnitude in 2021.

Finally, the evidence comports with Rule 403 because it is no more sensational than the charged crimes, which involve purchasing fake data and falsifying customer records to provide to a potential acquiring company.  *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Nor would admission of this evidence, as Javice claims, result in a "time-consuming mini-trial," (*see* Javice Br. 11), as the proffered evidence is expected to be introduced through the testimony former Frank employees whom the Government will likely be calling as witnesses, irrespective of the Court's ruling on the admission of evidence concerning Firm-1's potential investment..  That is, the Government does not expect even to call a witness from Firm-1.

---

[5]      Javice's claim that the Government did not notice its intent to offer this evidence under Rule 404(b) is meritless.  Javice Br. 10.  The defendants have been provided ample notice of this evidence, which was disclosed as part of the Government's Rule 16 disclosures (including in productions made over a year ago) and its Section 3500 disclosures made in December 2024, two months before trial.  The Government further stated its intent to offer this evidence under Rule 404(b)—as an alternative theory—when it filed its motions *in limine* on January 13, 2025.

Accordingly, the Court should admit the proffered evidence regarding Firm-1.[6]

### III.    Attorney-1's Testimony is Admissible

Javice seeks to exclude the testimony of Attorney-1 on the basis that the Government cannot use "the attorney client privilege as both sword and shield." (Dkt. 196 at 13). That is, the Government cannot elicit from Attorney-1 testimony concerning privileged events that are helpful to the Government's case while, at the same time, relying on the attorney-client privilege to block Attorney-1's testimony concerning facts helpful to the defense. Javice's concerns are misplaced because the Government does not intend to elicit any privileged communications from Attorney-1. Nor could it. The Government does not have access to—and has never had access to—privileged communications involving Attorney-1. The expected testimony of Attorney-1 relates to non-privileged events and conversations. Attorney-1 should be permitted to testify.

Attorney-1 worked at Frank from approximately 2018 through the September 2021 acquisition of Frank. During that time, Attorney-1 held various titles, including Director of Business and Legal Affairs, General Counsel, Chief Legal Officer, and Chief Operating Officer. Throughout his tenure at Frank, Attorney-1 had dual business and legal roles. The Government expects Attorney-1 to testify about, among other things, Frank's failed Series B funding round, Javice's decision to market Frank for sale, Javice's decision to count website visitors as Frank users during the sales process, discussions within Frank about how to define "user" to prospective purchasers of Frank, due diligence, and Attorney-1's separation from Frank.

Nothing that Attorney-1 will testify about is privileged. The Government will not elicit any privileged communications or legal advice that Attorney-1 rendered while working at Frank.

---

[6]    Any possible risk of undue prejudice can be addressed by a limiting instruction that the proffered evidence regarding Firm-1 is being offered for a non-propensity purpose, including for the reasons set forth above.

Likewise, the Government will not seek to introduce as exhibits any privileged communications between Attorney-1 and the defendants. Nor can it. Because the defendants sold their business to JPMC, JPMC now holds the privilege over those communications and has withheld the production of privileged records from the defendants *and* the Government. The Government expects Attorney-1 to testify about non-privileged and business-related topics. Accordingly, there is no risk that the attorney client privilege will be used "as both sword and shield." (Dkt. 196 at 13).

The cases cited by Javice about the attorney client privilege being used as both a sword and shield are inapposite. *See, e.g., In re Grand Jury Proc.*, 219 F.3d 175 (2d Cir. 2000). Those cases involve attempts by criminal defendants to invoke an advice-of-counsel defense while at the same time shield the purported legal advice from disclosure *to the prosecution*. Courts around the country have held that a privilege holder cannot both rely on privileged communications in support of a defense and shield those communications from disclosure. *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Accordingly, invocation of an advice of counsel defense generally effects a privilege waiver. *Id.* Those cases and the reasonings underlying them have no application here. The Government does not have access to, and will not be seeking to introduce, any privileged communications. Both the Government and the defendants have the same access to the same documents. Because the Government does not have access to privileged materials, it cannot possibly use the attorney-client privilege as both sword and shield. Nor does it intend to.

Javice also cites to cases concerning whether a criminal defendant can pierce the attorney client privilege in support of a defense. This issue has already been litigated in this case. For more than a year, both the Court and the Government have asked Javice to identify alleged legal advice that could be used in support of a defense. These requests were met with both silence and non-responsive answers. Other than identifying broad subject areas, Javice has identified no actual

legal advice that is material to the allegations in this case.  Indeed, Javice could not even make a proffer as to such advice.  It is simply not the case that Javice is on trial for "conduct for which she sought the advice of [Attorney-1]."  (Dkt. 196 at 14).  In any event, there is no need to relitigate this issue because Attorney-1's testimony will not implicate the attorney-client privilege.

Finally, Javice claims that allowing Attorney-1 to testify will be unfair because JPMC has made inconsistent and self-serving privilege assertions.  Unsurprisingly, Javice cannot point to a single example.  As the Court knows, there was extensive litigation in this case between JPMC and the defendants concerning the attorney-client privilege.  The Court has already ruled on the defendants' challenges to JPMC's privilege assertions.  The lack of helpful records to Javice relating to Attorney-1 is not because of JPMC's privilege assertions.  It is because such records do not exist.  (*See* Aug. 6, 2024 Hr'g Tr. at 38 ("There's nothing in this document that's relevant or material to this case"), 44 ("I do not see how any of these documents satisfy the requirement . . . that the item is material to preparing a defense")).  For these reasons, there is no basis to preclude Attorney-1's testimony and the defendants' motion to do so should be denied.

## IV.    The Defendants' Statements Discussing Elizabeth Holmes' Fraud Conviction Are Admissible

Javice moves to exclude: (a) two online publications containing comments and analysis comparing Javice to Elizabeth Holmes, a start-up founder who was convicted in 2022 of defrauding investors about the value of her company (*see* GX 206, 210) (the "Javice-Holmes Articles"); and (b) text messages between the defendants, exchanged in the midst of their own efforts to defraud JPMC, calling Holmes' conviction unfair and "dangerous" to the defendants. *See* GX 801 at lines 5922-5925, 12161-12165 (excerpts of messages sent by the defendants shortly

after JPMC's acquisition of Frank, describing Ms. Holmes's conviction as "a dangerous precedent") (excerpted *infra* at 12-13).[7]

The defendant's objection to the Javice-Holmes Articles is moot, because the Government does not intend to introduce the Javice-Holmes Articles into evidence in its case-in-chief (or present any argument comparing the defendants to the other defendants recently convicted of fraud and referenced in the defendants' motion, such as Bernie Madoff, Sam Bankman-Fried, or Martin Shkreli).

By contrast, the defendants' conversations regarding the Holmes fraud, and subsequent conviction, is highly probative of the defendants' criminal intent and knowing participation in a criminal conspiracy, and should be admitted. The defendants' conversation is plainly admissible pursuant to Federal Rule of Evidence 801(d)(2)(E). Javice provides no legal or factual basis for excluding her and her co-defendant's own written communications, exchanged during and in furtherance of their own criminal efforts to defraud investors, describing their anxiety about the conviction of another founder of a fraudulent start-up, and describing her conviction as "a dangerous precedent." *See infra* at 12-13. Javice argues that, because general efforts to compare the defendants to Holmes (or other convicted fraudsters) would be improper, so too is the admission of these excerpted messages. Javice Br. 4. But the Government will not make any such argument here. Instead, the Government seeks only to offer the defendants' *own statements* about the defendants' own contemporaneous views about Holmes' criminal conduct, while in the midst

---

[7]    Despite the defendants puzzling claims to the contrary, the defendants do not identify any other proposed exhibits referencing the other recent fraud convictions invoked in the defendants' motion, including Bernie Madoff, Sam Bankman-Fried, and Martin Shkreli. And, in any event, the Government is not, as Javice asserts, seeking to introduce generic evidence or argument about "well-known, unrelated third parties convicted of fraud[.]" Javice Br. 3.

of concealing the defendants' own criminal conspiracy—specifically, the defendants' statements in the excerpted messages urging each other to follow news of the Holmes conviction, calling the conviction "dangerous," and repeating many of the defenses they intend to advance in their own case. The defendants' statements, which go directly to their state of mind and consciousness of guilt, are undoubtedly highly probative and admissible evidence, and can be accompanied by a limiting instruction. Nor will admitting the defendants' own statements in furtherance of their conspiracy unduly prejudice them.

### A. Relevant Facts

JPMC acquired Frank for approximately $175 million in the summer of 2021, after the defendants provided false, misleading, and wholly fabricated user data to JPMC. For the next year, both defendants engaged in extensive efforts to conceal their fraud from JPMC. After attempting to delay JPMC's access to Frank's user data for months, the defendants ultimately provided what they claimed was Frank's user data. In reality, the defendants provided data and customer lists they had purchased on the open market, at a small fraction of the price that JPMC paid to acquire Frank and its purported users.

Javice now moves to exclude text messages she and Amar exchanged during this time period—specifically, in January 2022, shortly after the defendants joined JPMC as full-time employees—discussing Ms. Holmes' conviction and sentencing. In those messages, the defendants share their anxiety about Ms. Holmes' conviction, calling it a "dangerous precedent," express their hope that Ms. Holmes would get a "light sentencing," blame Ms. Holmes' investors for not detecting the fraud, reassure themselves that their industry is "different" from Ms. Holmes',

and characterize the victims of Ms. Holmes' fraud as "sophisticated assholes."[8]  The excerpted

messages the defendants seek to preclude include:

| January 3-4, 2022 WhatsApp Messages |
| --- |
| JAVICE:    Wow |
| JAVICE:    The Elizabeth Holmes verdict: Theranos founder is guilty on four of 11 charges in fraud trial - The Wall Street Journal (https://apple.news/AxkwY2_ZVSNmMM3VNMweB4Q) |
| JAVICE:    Hopefully it's light sentencing |
| AMAR:    Yeah, it sets a dangerous precedent for founders either way |
| JAVICE:    I think health is different. Investors should be blamed on letting a 19 year old go rogue |
| AMAR:    They tried to make that case, they failed |

| January 23, 2022 WhatsApp Messages[9] |
| --- |
| AMAR:    Listen to the first 20 minutes of the Kara Swisher podcast Pivot. The latest episode. The part about Elizabeth Holmes |
| JAVICE:    Kk. It's still so ridiculous she got one of the top sentences in fraud possible |
| AMAR:    Yup.  Go listen |
| JAVICE:    Discrimination at its finest. She defrauded sophisticated assholes where it was a blimp of nothing |

---

[8]    Javice does not move to exclude the entirety of GX 801, which spans a several-year period, but only the defendants' exchanges regarding Holmes' prosecution and conviction, which the Government excerpts here.

[9]    While the defendants generally move to exclude argument or evidence regarding other recent fraud convictions, the defendants do not identify the January 23, 2022 message regarding Holmes as one of the messages that they seek to preclude the Government from introducing.

## B. Legal Standard

As a general matter, all relevant evidence is admissible under the Federal Rules of Evidence unless specifically excluded. *United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004) (citing Fed. R. Evid. 402). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "District courts have broad discretion to assess the relevancy of evidence[.]" *Perez*, 387 F.3d at 209 (2d Cir. 2004).

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice," among other limited reasons. Fed. R. Evid. 403. Since the rule governs the exclusion of relevant, probative evidence, prohibiting the use of evidence on this basis "is an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.,* 914 F.2d 26, 31 (2d Cir. 1990) (citation omitted). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). To the extent that there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendants are only on trial for the crimes charged, and that this evidence is solely being offered to show the defendants' state of mind, not any association with Ms. Holmes. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice); *see generally United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.").

## C. Argument

First, the defendants' state of mind, among other issues, is a central issue at the defendants' forthcoming trial and evidence of the defendants' state of mind is therefore highly probative. The defendants have repeatedly forecasted their intention to argue to the jury that at no point did they believe that their conduct was fraudulent or misleading; that they acted in good faith throughout the course of the conspiracy; that they were blindsided by the allegations that their conduct was fraudulent; and that the $175 million fraud they perpetuated was instead little more than a well-intentioned misunderstanding on the part of the defendants. In that context, the excerpted messages that Javice challenges, where both defendants discuss the high-profile conviction of another start-up founder for fraud, including statements that describe that conviction as "dangerous" for start-up founders *like the defendants*, is highly probative to rebut the defendants' claims and show their true state of mind at the time before their fraud was exposed.

These text messages demonstrate that, contrary to the defendants' claims, they were highly attuned to (and took deliberate steps to conceal) the criminal nature of their conduct, and were in fact afraid that their actions would be similarly detected (and lead to similar consequences). For example, at one point, the defendants even acknowledge that Holmes "tried" and "failed," *see supra* at 12-13, to make the same defense they ultimately seek to advance here—that the investors who failed to detect the fraud by a start-up, rather than the founders themselves, were to blame. The defendants repeatedly make light of Holmes' fraud, calling the victim-investors "sophisticated

14

assholes," *see supra* at 12-13, and describing her conviction as "discrimination" and "ridiculous," *id.*[10]

Equally meritless are the defendants' efforts explicit efforts to distinguish their own fraudulent conduct from Holmes.   After sharing news of her conviction, Javice reassures Amar that, unlike the industry in which the defendants perpetuated their fraud, "health is different," and that the "[i]nvestors should be blamed," *see supra* at 12-13.   The significance of the defendants' statements could not be clearer—namely, that in Javice's view, her and Amar's lies about student data are somehow less serious than lies in the health industry.   In response, Amar even acknowledges the potential weakness of that defense, adding, "They tried to make that case, they failed." *See supra* at 12-13.   Consider if the defendants were drug traffickers frantically sharing news of El Chapo's arrest and calling it "a dangerous precedent," or mobsters calling John Gotti's conviction "unfair" and "discriminatory."  *Id.*  In the context of the defendants' broader criminal conspiracy, the defendants' messages—which echo many of the defenses the defendants have themselves mounted for their own conduct—function as powerful evidence of the defendants' state of mind, as well as their shared conspiracy.

None of the defendant's arguments to the contrary are availing.   As an initial matter, the cases cited by the defense are inapposite.   None of the cases the defendants rely on involve the

---

[10]    These statements directly echo many that the defendants themselves have made in the course of pre-trial litigation. *See, e.g.*, Dkt. 58 at 3 ("The charging instruments in this case present JPMC—one of the world's largest, wealthiest, and most sophisticated financial institutions—as the unwitting victim of fraudulent conduct in connection with JPMC's acquisition of Frank.   In truth, JPMC is no victim, but instead a remorseful buyer, vindictive advocate, and an obviously interested private party with a monetary stake in the outcome of this case."); Dkt. 185 at 5 ("Ms. Javice maintains (among other things) that any representations made to JPMC, *i.e.*, the basis of the fraud alleged in the indictment, were either (1) not false or (2) not intentionally false or misleading.").

preclusion of the defendants' own statements discussing other criminal conduct.  *See* Javice Br. 3-4.  For example, Javice quotes at length from a Ninth Circuit dissent regarding improper statements made by the Government prior to the start of the defendant's trial.  *James v. United States*, 622 F. App'x 689, 691 (9th Cir. 2015) (Gould, J., dissenting).  But in *James*, the dissenting judge took issue with spontaneous comments by the prosecutors comparing the defendant to other high-profile mobsters during the empaneling of the defendant's jury.  *See generally James v. United States*, 622 F. App'x 689, 691 (9th Cir. 2015) (Gould, J., dissenting).  That is not at issue here.  So too with the remaining cases Javice relies on from this Circuit, none of which concern the preclusion of a defendant's own statements, with a co-conspirator, about their state of mind (and many of which have nothing to do with the rules of evidence that the defendants invoke in support of their motion, let alone the subject matter that is the basis for the defendants' motion).  *See, e.g., United States v. Schatzle*, 901 F.2d 252, 256 (2d Cir. 1990) (affirming lower court's decision to preclude evidence regarding victim's prior criminal conviction); *United States v. Sterling*, No. 16-CR-488 (LAK), 2017 WL 2304024, at *6 (S.D.N.Y. May 24, 2017), *aff'd*, 763 F. App'x 63 (2d Cir. 2019) (precluding expert testimony of psychiatrist who evaluated a cooperator where testimony was "entirely cumulative" of the cooperator's testimony, and was being introduced to attack the cooperator's credibility).

Nor has Javice demonstrated that the defendants will suffer any unfair prejudice—let alone any unfair prejudice that substantially outweighs the probative value of their own statements—if these messages are admitted.  The defendants' comments about the prosecution and conviction of a fellow start-up founder for a similarly fraudulent scheme are "no more sensational than the other evidence" being introduced of the defendants' crimes.  *United States v. Perez*, 387 F.3d 201, 210 (2d Cir. 2004).  The Court can also easily reject the defendant's complaints that the Government

is introducing these statements to secure the conviction of the defendants either through "guilt by association," Javice Br. 5, or by inviting the jury to improperly consider punishment during the trial, *see id*.  It does not follow, nor does the Government intend to argue, that the defendants' comments about Holmes suggest that the defendants or Frank are somehow associated with Holmes and her company, let alone her conviction.[11]  The Government is similarly not inviting the jury to consider the defendants' ultimate punishment by introducing the defendants' own statements that someone who defrauds their investors should receive a lenient sentence.  To the extent further prophylactic measures are appropriate, a limiting instruction—rather than preclusion of the evidence wholesale—is the appropriate remedy.  *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice).

### V.    Evidence Relating To Intended Victims Is Admissible

In three separate motions, Amar seeks to prevent the Government from offering evidence or argument, to varying degrees, about targets of the charged fraud offenses other than JPMC.  There is no basis in law or common sense for Amar's requests, and his efforts to improperly constrain the Government's proof and arguments at trial should be rejected.

### A.    Relevant Evidence Relating to Targets of the Fraud Besides JPMC Is Admissible

The Court should reject Amar's sweeping request to exclude "evidence and/or testimony *relating to* any potential acquiring company" besides Bank-1 and JPMC.  Amar Br. 5 (emphasis added).    Amar claims that doing so would amount to "trial by ambush" and devolve into "mini-

---

[11]    Nor will the Government need to introduce any extrinsic evidence regarding the Holmes conviction, given that the text messages between the defendants summarize articles describing the fraud, including the fact that Holmes was a start-up founder who was found guilty of fraud.  In any event, to the extent the Court is inclined to grand the defendant's motion to preclude the Government from offering these message excerpts as part of its case-in-chief, depending on the defendants' testimony, the Government reserves the right to cross-examine the defendants about these statements on cross-examination.

trials." Amar Br. 4-8. As discussed below, evidence related to other potential acquiring companies will not be a significant focus of the Government's case-in-chief. Nonetheless, such evidence is relevant to the fraud scheme and conduct against those other companies is plainly charged in the Indictment. Amar's claims are baseless, and his arguments lack merit.

To start, Amar misstates what evidence and testimony relating to "potential acquiring companies" the Government will elicit at trial. While the Government included a witness from ███████ on its witness list, it no longer expects to call that witness. The Government presently intends to offer evidence about potential buyers through two witnesses: (1) an employee of ████ the investment advisory firm that Frank hired and that pitched the acquisition of Frank to potential buyers and acted as the intermediary between Frank and potential buyers; and (2) an employee in the Corporate Development group at ████ which is identified as Bank-1 in the Indictment. The Government expects that the Bank-1 witness will testify regarding Bank-1's acquisition process with Frank and the representations made by Javice and Amar. Amar appears to concede such evidence relating to Bank-1 is admissible.[12] *See* Amar Br. 5. The Government expects that the ████ witness will testify regarding ████ role in the Frank acquisition, which began in early 2021 and culminated in Frank's acquisition by JPMC in August 2021. A relevant component of this narrative is that few companies showed real interest in acquiring Frank

_____

[12] Given this apparent concession, it is somewhat puzzling that Amar objects to any and all evidence relating to other targets of the defendant's fraud—which are also referred to in the Indictment. *See, e.g.*, Indictment ¶ 4 ("JAVICE and AMAR engaged in a scheme to defraud by submitting false and fraudulent statements and representations about Frank and its user data, among other things, to potential acquiring companies, including to JPMC and Bank-1, in order to defraud those companies out of millions of dollars"). While other intended victims are referred to in the Indictment simply as "potential acquiring companies," the admissibility of plainly relevant evidence about targets of a charged fraud simply does not turn on whether each fraud target was named in the indictment, particularly, where, as here, the defendants sought to defraud each of these targeted victims as part of a common scheme.

or received additional diligence documents about Frank—a fact that, in the Government's view, incentivized the defendants to continue to lie, brazenly, about Frank's business to attract and to consummate a deal.  It is also relevant, for example, that some of the diligence documents—which Bank-1 and JPMC also received—were created in connection with earlier discussions with other potential buyers.  *See, e.g.*, Amar Br. 6 (referencing "datapacks" for potential buyers).

That said, the most explicitly fraudulent diligence documents were created by the defendants, together, in connection with Bank-1's diligence process, and then also provided to JPMC.  As a result, aside from eliciting context relevant for the diligence processes of JPMC and Bank-1, the Government does not expect to delve deeply into the particulars of potential buyers apart from JPMC and Bank-1; indeed, as noted above, it does not expect to call a witness from these other potential buyers.

Particularly in light of the foregoing, the Court should reject Amar's sweeping request to exclude "evidence and/or testimony *relating to* any potential acquiring company" besides Bank-1 and JPMC.  Amar Br. 5 (emphasis added).  Contrary to Amar's claim, as explained above, the Government's expected evidence relating to potential buyers does not come close to raising concerns about "trial by ambush" or a series of confusing "mini-trials."  Amar Br. 8-10.  Indeed, it involves no additional witnesses at all.  Amar's attempt to curtail the Government's proof of relevant background and the scope of the defendants' fraud scheme should be rejected.

Nor is there merit to Amar's claim that such a broad exclusion of evidence is appropriate due to the Government's inclusion of many companies in its 2024 disclosure letter, listing the defendants' intended targets of their fraud.  Amar Br. 5 (selectively quoting the May 30, 2024 hearing).  That the defendants' lies were disseminated broadly to dozens of companies is not a result of any choice by the Government; it is a result of the defendants' own wide-ranging

misconduct.  Amar misrepresents what occurred at the May 30, 2024 hearing on the defendants'

motions, including the motion for a bill of particulars.  *Id.*  While omitted from Amar's description,

after colloquy among the Court and the parties, the Government noted that a fraud scheme does

not have to be successful to be a crime, and the Court thus instructed the Government to "list the

*targets* of the fraud."  May 30, 2024 Tr. at 17 (emphasis added).  The Government accordingly

listed the targets of the fraud—the companies to whom ███████ sent Frank's pitch materials—in

its disclosure letter.  Certainly, following the Court's directive does not mean that the Government

should be precluded from introducing relevant and admissible evidence.  Additionally, and more

generally, Amar's complaints about a lack of notice are unpersuasive, particularly now.  Since

December, over two months before the start of trial, the defendants have possessed the

Government's witness list, 3500 materials, and preliminary exhibit list.  Finally, and in any event,

as already explained, the streamlined and relevant evidence the Government expects to elicit at

trial, principally through a single witness, is nothing even close to the parade of horribles that Amar

implausibly envisions.

Amar also appears to complain that the disclosure letter described only Javice in certain

specific examples.  Amar Br. 7.  While the precise import of Amar's complaint is not particularly

clear, it is also irrelevant.  Amar has been charged with joining a *conspiracy* and a *scheme*—not

for, say, false statements in violation of 18 U.S.C. § 1001.  And a conspirator's "participation in a

conspiracy is presumed to continue until the last overt act by any of the conspirators." *United

States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995).  Once the conspiracy was formed,

evidence and argument about the acts taken in furtherance—by Amar or Javice—are all plainly

admissible.  Further, the background to a conspiracy is admissible under well-established Second

Circuit law.  *See, e.g.*, *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991); *Carboni*, 204

F.3d at 44; *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); Weinstein's Fed. Evid. § 404.20[2][b].

In short, the Government should be permitted to elicit the narrative of Frank's acquisition—including the salient evidence and facts relating to potential buyers besides Bank-1 and JPMC, who were contacted in the lead up to the detailed diligence processes performed by Bank-1 and JPMC. This evidence is highly relevant, not unfairly prejudicial, and will be presented efficiently. Amar's motion should be denied.

**B. Potential Buyers Were "Intended Victims"**

Amar also seeks to prevent the Government from referring to potential buyers as "intended victims." Amar Br. 10-12. But that is exactly what the potential buyers were. While, as noted, the Government's case-in-chief will not be focused on potential buyers aside from Bank-1, it is entirely appropriate for the Government to refer to potential buyers that Javice or Amar lied to as "intended victims." The Government expects that the ▆▆▆▆ witness will testify that, throughout the process, the defendants clearly conveyed to ▆▆▆▆ and to potential buyers that Frank had over 4 million "users" and "users" were defined as customers for whom Frank possessed personal data. There is nothing inaccurate or unfair about referring to the recipients of these misrepresentations as "intended victims" in argument, which as the Court will instruct the jury is not itself evidence. *See, e.g.*, *United States v. Malka*, 602 F. Supp. 3d 510, 554 (S.D.N.Y. 2022) (permitting the government to use the word "victim" in its arguments); *United States v. Patel*, No. 3:21-CR-220 (VAB), 2023 WL 2643815, at *11 (D. Conn. Mar. 27, 2023) (same); *United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017), *aff'd*, 729 F. App'x 112 (2d Cir. 2018) (same because the "Government is within its rights to take and advocate for a different view of the evidence" and the court did not "view the use of the challenged terms as unduly prejudicial in light of the issues being tried").

21

Amar's questions about whether such misrepresentations could be material are misplaced. Amar Br. 11.   Witnesses from Bank-1 and JPMC will explain the materiality of these misrepresentations to their valuation of Frank.   And even putting that aside, it is difficult to conceive of how the number of customers a business has could *ever* be immaterial to the value of the business.   *See United States v. Frenkel*, 682 F. App'x 20, 22 (2d Cir. 2017) (affirming instruction that did not require jury to consider materiality from "from the subjective perspective of the victim" because "for purposes of wire fraud, mail fraud, and bank fraud, . . . a matter is material if '*a reasonable man* would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question'" (quotation and citation omitted)). That commonsense conclusion applies with particular force here, where the defendants did not merely exaggerate or engage in puffery about their customer base: in their representations to potential buyers, the defendants fraudulently inflated Frank's customers by a factor of ten (and of course, thereafter, created fake customer data to pass JPMC's diligence, and then purchased and used other data to try to cover up their lies).

### C. Amar's Duplicity-Based Arguments Are Meritless and Have Already Been Rejected

Amar's duplicity-based argument is simply a rehashing of his already-denied motion to dismiss counts of the Indictment as duplicitous.  *See* Amar Br. 12-14; *see also* Dkt. 122 (Gov't Opp. to Defs.' Mot. to Dismiss) at 22-27; May 30, 2024 Tr. at 9-10 (denying motion to dismiss). Having lost his pretrial motion arguing that the Indictment's counts charging a single scheme to defraud are somehow duplicitous, Amar now repeats the same arguments and asks the Court to prevent the Government from "arguing the existence of a single alleged fraudulent scheme against the two specified targets in the Indictment—'Bank-1' and [JPMC]—as well as any [other] of the potential acquirors" of Frank.  Amar Br. 12.  Amar's position is meritless.  The single-scheme

argument Amar seeks to prevent the Government from making is *exactly* what the Indictment alleges (and properly so, as this Court has already ruled). *See, e.g.*, Indictment ¶ 4 ("JAVICE and AMAR engaged in a scheme to defraud by submitting false and fraudulent statements and representations about Frank and its user data, among other things, to potential acquiring companies, including to JPMC and Bank-1, in order to defraud those companies out of millions of dollars").

As the Court ruled, the Indictment's counts charging a single scheme with multiple potential victims are proper. *See* May 30, 2024 Tr. at 9-10. As the Government already explained in opposing the defendants' duplicity arguments in their Rule 12 motions, Dkt. 122 at 22-23, the Second Circuit "has long held that acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *United States v. Vilar*, 729 F.3d 62, 79 (2d Cir. 2013). "As long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible." *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989); *see also United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006) ("[T]his court has long held that acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme."); *United States v. Morse*, 785 F.2d 771, 775 (9th Cir. 1986) (noting "the expansive standard for a single scheme").

Cases rejecting duplicity-based arguments like Amar's are plentiful, even on facts involving much more distinct "transactions" than the conduct encompassed by the single scheme alleged here. *See, e.g.*, *United States v. Moloney*, 287 F.3d 236, 241 (2d Cir. 2002) (one count of money laundering alleging a series of financial acts); *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (combining 50 mailings into one count of mail fraud);; *United States v. Tawik*,

391 F. App'x 94, 97 (2d Cir. 2010) (finding no impermissible duplicity in an indictment that charged a single scheme to defraud that included multiple deliveries); *United States v. Aracri*, 968 F.2d 1512, 1518-19 (2d Cir. 1992) (series of transfers utilizing different companies over several years for the purpose of concealing the non-payment of taxes and transferring tax liability constituted one scheme); *United States v. Davis*, 471 F.3d 783, 790-91 (7th Cir. 2006) (single count of health care fraud carried out by one defendant through three separate schemes over several years was not duplicitous); *see also United States v. Zeidman*, 540 F.2d 314, 317 (7th Cir. 1976) (single count of mail fraud not duplicitous even though allegations included two classes of victims and could have been charged in separate counts: "The frauds were performed by the same parties and have a sufficiently close nexus with one another that they are fairly characterized as one scheme."); *United States v. DiScala*, No. 14 Cr. 399, 2018 WL 1187394, at *27 (E.D.N.Y. Mar. 6, 2018) (rejecting the argument "that each single transaction of securities fraud must be charged separately," and emphasizing that "the approved practice in the Second Circuit, where indictments will charge both securities fraud and a conspiracy to commit said fraud, allege a starting and ending date in the securities fraud count, and allege the means of committing the fraud").

In the face of this clear authority, Amar fails to cite a single case to support his position that the Government cannot argue what the Indictment properly alleges: a scheme to defraud targeting multiple victims with the same pattern of lies. The Court should deny Amar's motion, consistent with its prior ruling on the defendants' motion to dismiss.

## VI. *Ciminelli* Has Nothing To Do With This Case.

Amar moves to preclude any evidence showing that JPMC, Bank-2, and any other financial institution "were allegedly deprived of economic information or induced to enter a financial transaction—the sale of Frank—without proof of intent to deprive them of what they bargained for." Amar Ciminelli Br. 5. Amar's arguments, based on the Supreme Court's recent decision in

*Ciminelli v. United States*, 598 U.S. 306 (2023), rejecting the so-called right-to-control theory of wire fraud, are without merit. This is not a right-to-control case. The Government has alleged, and will establish at trial, that the defendants' fraudulent scheme intended to, and in fact did, deprive a victim of property—including millions of dollars of money.

The wire fraud statute criminalizes "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. In *Ciminelli*, the Supreme Court held that the wire fraud statute covers "traditional property interests" and that the "right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest." 598 U.S. 306, 316 (2023). *Ciminelli* did not abrogate the language of the wire fraud statute, which explicitly lists "money" as a cognizable property interest. *Ciminelli* just limits the scope of the term "other property" in the statute and confirms that "other property" must be a traditional property interest.

Here, the Indictment does not allege, and the Government does not seek to establish, that the object of the defendants' fraudulent scheme was to deprive JPMC and other financial institutions the right to valuable economic information needed to make discretionary economic decisions. Rather, the object of the fraudulent scheme was money. *See* S1 Indictment (Dkt. 27) ¶ 3 ("to wit, JAVICE and AMAR engaged in a scheme to defraud . . . in order to defraud those companies out of millions of dollars . . . ."). At trial, the Government will establish that, through their scheme, the defendants obtained millions of dollars and caused JPMC to lose approximately $175 million dollars. Amar does not, and cannot, dispute that such a scheme, if proven, is covered by the wire fraud statute.

Amar tries to conflate *Ciminelli*—which related to limitations on cognizable property interests under the wire fraud statute—with limits on the types of evidence that can be used to

establish an intent to defraud.  *Ciminelli* had nothing to do with the latter; it placed no limits on the types of evidence the Government may rely on to establish an intent to defraud.  Fraud defendants commonly conceal, hide, and deprive victims of material information, such as valuable economic information, in order to obtain the victim's money.  It is called lying.  Doing so is often necessary to the success of a fraud.  For example, in this case the defendants concealed from JPMC information about Frank's true user base.  Doing so was necessary to prevent JPMC from learning the truth—that Frank only had a fraction of the number of account holders than the defendants had claimed—in order to obtain JPMC's money.  Amar does not cite to any authority supporting his novel argument that such evidence is improper.  Nor can he.

Finally, no limiting instruction is necessary here.  Rather, the Government has no doubt that the Court will properly instruct the jury on the correct elements of wire fraud.

## VII.    Exclusion of Witnesses from the Courtroom

Consistent with Fed. R. Evid. 615, the Government consents to the exclusion of witnesses (other than law enforcement agents) from the courtroom, when they are not otherwise testifying. The Government also consents to the restrictions on disclosure of trial transcripts, as set forth in Rule 615(b).  However, Javice's request, which includes sequestration of witnesses "and their representatives," goes beyond what Rule 615 authorizes.  Javice offers no support for such a request to exclude witnesses' lawyers from the courtroom.

Such an order would not only be improper, it would also be impracticable.  Many of the Government's expected witnesses are represented by pool counsel.  An order excluding witnesses' counsel from the courtroom prior to their clients' testimony would effectively prohibit counsel from being present for their own clients' testimony.  Similarly, representatives of the victims— including lawyers for JPMC and Bank-2—are entitled to be present for trial.  *See* 18 U.S.C. §

1771(a)(3).    For these reasons, the broad order sought by the defense to exclude any "representatives" of witnesses from the courtroom would plainly be improper.

## VIII.    The Government Does Not Seek to Offer Certain News Articles in Its Case-in-Chief

The Government does not seek to introduce GX 203, GX 206, GX 207, GX 209, GX 210, 211, and GX 213 in its case-in-chief at trial.  Javice Br. 6-8.   The defendants' motions to exclude these exhibits should therefore be denied as moot.

## CONCLUSION

For the foregoing reasons, the defendants' motions *in limine* should be denied.

Dated:  New York, New York
        January 27, 2025

Respectfully submitted,

DANIELLE R. SASSOON
United States Attorney

By:    _____/s/_____
       Rushmi Bhaskaran
       Nicholas W. Chiuchiolo
       Micah F. Fergenson
       Georgia V. Kostopoulos
       Assistant United States Attorneys
       Telephone: (212) 637-2439 / 1247 / 2190 / 2212