```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                   v.                      23 CR 251 (AKH)
 4
     CHARLIE JAVICE
 5   OLIVIER AMAR
                                           Motions
 6            Defendants.
     ------------------------------x
 7
                                           New York, N.Y.
 8                                         January 23, 2025
                                           10:50 a.m.
 9

10   Before:

11              HON. ALVIN K. HELLERSTEIN,

12                                         District Judge

13                        APPEARANCES

14   DANIELLE R. SASSOON
            United States Attorney for the
15          Southern District of New York
     BY:  MICAH FERGENSON
16          RUSHMI BHASKARAN
            NICHOLAS CHIUCHIOLO
17          GEORGIA KOSTOPOLOUS
            Assistant United States Attorneys
18
     KOBRE & KIM
19          Attorneys for Defendant Amar
     BY:  SEAN S. BUCKLEY
20          STEVEN G. KOBRE
            JONATHAN D. COGAN
21          ALEXANDRIA E. SWETTE

22

23

24

25
```

1    APPEARANCES CONTINUED:

2

3    RONALD SULLIVAN LAW PLLC
          Attorney for Defendant Javice
     BY:  RONALD S. SULLIVAN
4          RICHARD M. DeMARIA

5    BAEZ LAW FIRM
          Attorney for Defendant Javice
6    BY:  JOSE A. BAEZ

7    MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO PC
          Attorney for Defendant Javice
8    BY:  DAVID M. SIEGAL

9    QUINN EMANUEL URQUHART & SULLIVAN LLP
          Attorneys for Defendant Javice
10   BY:  ERICA PERDOMO

11

     Also Present:
12
     MICHAEL GARTLAND, Paralegal Specialist (USAO)
13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court; cased called)

2          DEPUTY CLERK:  Counsel, please state your appearances

3    for the record.

4          MR. FERGENSON:  Good morning, your Honor.

5          Micah Fergenson, Rushmi Bhaskaran, Nicholas

6    Chiuchiolo, Georgia Kostopoulos for the government.  We're also

7    joined at counsel table by our paralegal Michael Gartland.

8          THE COURT:  Good morning.

9          MR. SULLIVAN:  Good morning, your Honor.

10         Ronald Sullivan, here at counsel table with Jose Baez

11   on behalf of Charlie Javice, who is present.

12         MR. BUCKLEY:  Good morning, your Honor.  Sean Buckley,

13   Steven Kobre, Johnathan Cogan and Alexandria Swette on behalf

14   of Mr. Amar, who is present at counsel table.

15         THE COURT:  Okay.

16         Let me take the competition first.  Mr. Siegal, what

17   is your position?

18         MR. SIEGAL:  Good morning, your Honor.

19         THE COURT:  Those who are going to be speaking, you

20   don't need to wear a mask.

21         MR. SIEGAL:  We've discussed with the government --

22   actually, they submitted a script late yesterday, your Honor.

23   We had discussed actually potentially tabling this issue, but

24   our position is --

25         THE COURT:  We're not going to table the issue.

```
 1              MR. SIEGAL:  I have committed to not be the attorney

 2    cross-examining the investigator they have identified in their

 3    letter.  We also, I think, are in agreement with the government

 4    that any references to my firm or me in the document they

 5    intend to offer will be redacted.  Beyond that, the relief the

 6    government seeks, we will be opposing.  We have no objection to

 7    a Curcio --

 8              THE COURT:  What is the relief beyond that?

 9              MR. SIEGAL:  The government --

10              THE COURT:  The only other thing I remember is that

11    you can't get involved in openings and closings.

12              MR. SIEGAL:  Yes, your Honor, that is the extent to

13    which we would object.  Obviously, I would not -- to the extent

14    I was doing argument to the jury, I would not be speaking in a

15    voice that would suggest I have any personal knowledge of the

16    events or the facts.  To the extent I would be arguing to the

17    jury, it would be based on testimony in the record, and that's

18    it.  And we don't think that the law supports the notion of

19    precluding my availability to argue.  And none of the cases

20    cited by the government support that position.  They said we

21    can submit --

22              THE COURT:  Mr. Fergenson.

23              MR. FERGENSON:  Yes, Judge.  That doesn't cure the

24    problem.  The law bars an attorney from acting as an unsworn

25    witness during cross-examinations and also during jury
```

1    argument.  It's for that reason we sought the relief we sought

2    And the Court should bar Mr. Siegal from doing so.

3            THE COURT:  He says he will just be talking about the

4    evidence and not using any personal information that's not in

5    the evidence.

6            MR. FERGENSON:  The law, your Honor, just draws a

7    clear line that potential witnesses who are attorneys in the

8    case --

9            THE COURT:  But he's not a witness.

10           MR. FERGENSON:  He's a potential witness, your Honor.

11           THE COURT:  Yeah, but we're talking about -- let's

12    leave out openings.  Let's just talk about closings.

13           MR. BAEZ:  Excuse me, your Honor.  Jose Baez.  I can

14    represent to the Court that Mr. Siegal is not doing neither

15    openings or closings, so we can address that.

16           THE COURT:  That does not solve the problem.

17           MR. BAEZ:  Understood.

18           THE COURT:  Mr. Siegal?

19           MR. SIEGAL:  Your Honor, I'm not opening in the case.

20           THE COURT:  And you're not closing in the case.

21           MR. SIEGAL:  I guess I'm not closing in the case.

22           THE COURT:  And you're not doing cross-examination.

23           MR. SIEGAL:  I'm not cross-examining that witness,

24    your Honor.

25           THE COURT:  So all the relief the government wants is

1   there.

2            MR. FERGENSON:  Thank you, your Honor.

3            THE COURT:  I'll put this in an order, and we'll go

4   on.

5            MR. FERGENSON:  I think, your Honor, we don't need to

6   do the Curcio script today, but at some point we would like to

7   proceed with the Curcio hearing.  It doesn't need to be today,

8   your Honor.

9            THE COURT:  I'm wondering why we need it, but it can't

10  be harmful.  Let me ask Ms. Javice.  Is Ms. Javice here?

11           DEFENDANT JAVICE:  Yes, your Honor.

12           THE COURT:  So the law gives you the right to a

13  conflict-free lawyer.  You've heard that Mr. Siegal, because he

14  may have been for the representation a potential witness, and

15  now that he is where he is in terms of not being able to

16  cross-examine or open or close -- not being able to

17  cross-examine that particular witness or open or close, you're

18  getting a counsel that cannot fulfill his duty to give you his

19  zealous and full representation.  That doesn't mean you

20  shouldn't have him, but it's your choice, and I want to make

21  sure that you exercise your choice intelligently and

22  responsibly.

23           DEFENDANT JAVICE:  I understand.  Thank you, your

24  Honor.  I would like to proceed with Mr. Siegal.

25           THE COURT:  With Mr. Siegal as your counsel, under the

```
 1    circumstances I've laid out; namely, he cannot cross-examine

 2    any particular witness.  He cannot open.  And he cannot close.

 3             DEFENDANT JAVICE:  Yes, your Honor.

 4             THE COURT:  Okay.  Anything else?

 5             MR. FERGENSON:  May I ask the Court to ask one more --

 6    at least one more question, your Honor?

 7             THE COURT:  Yes, go ahead.

 8             MR. FERGENSON:  We'd ask the Court to allocute

 9    Ms. Javice on the fact that if she continues with Mr. Siegal as

10    one of her trial counsel, she could not call Mr. Siegal as a

11    defense witness.

12             THE COURT:  Yes.

13             MR. FERGENSON:  If, you know, they thought there was

14    something inconsistent that our witness testified to, she could

15    not then call Mr. Siegal.

16             THE COURT:  That's correct.  Mr. Siegal cannot appear

17    as a witness in the case.

18             DEFENDANT JAVICE:  I understand, your Honor.

19             THE COURT:  Mr. Siegal, you understand that too?

20             MR. SIEGAL:  I do, your Honor.

21             THE COURT:  I think that finishes the motion.

22             MR. FERGENSON:  Thank you, your Honor.

23             THE COURT:  The motion is granted on consent.

24             The next motion I want to take up is a motion by the

25    government to compel on a reciprocal basis.
```

```
 1              What is it, Mr. Fergenson, that you are not getting
 2    that you want?
 3              MR. FERGENSON:  Your Honor, AUSA Chiuchiolo is going
 4    to address this motion.
 5              THE COURT:  What is it, Mr. Chiuchiolo, that you're
 6    wanting and not getting?
 7              MR. CHIUCHIOLO:  Your Honor, I'll start with Rule 16
 8    and Rule 17 issues.  The government has received no Rule 16
 9    materials from the defense.  We received for the first time
10    shortly before we made our motion a small production from
11    Mr. Amar of materials that the government had actually
12    provided.  And it appears in Mr. Amar's response that their
13    view is "we'll give you stuff if we decide we're going to use
14    them."  And that really flies in the face of the rule and the
15    mutual exchange that's supposed to happen.
16              And so we don't really know what they have that they
17    might use, but we do know that Mr. Amar has issued several
18    Rule 17 subpoenas.  We have two of them, and the two we have
19    are clearly improper on their face.  They seek -- one is to the
20    SEC, and one is to the FDIC, and they basically seek any
21    records in the agency's possession that could reflect --
22              THE COURT:  Let's do Rule 16 first.
23              MR. CHIUCHIOLO:  There's an interplay, your Honor,
24    because if they're planning to use Rule 17 subpoenas for
25    purposes of --
```

1          THE COURT:  When you say the subpoenas are not -- are

2    not lawful subpoenas, that means the SEC and the FDIC have the

3    opportunity to come in and move to quash.

4          MR. CHIUCHIOLO:  I think the case law on that, your

5    Honor, if the impropriety of a subpoena is before the Court,

6    and we have these two subpoenas, the Court can and should rule

7    on that.  It's *United States v. Weissman*.  And these two

8    subpoenas which I can hand up to the Court, I mean, I -- in

9    Mr. Amar's letter, they essentially concede as much.  I think

10   they offer to perhaps change the return date on the subpoenas,

11   but I don't think that they are defensible on their face.  But

12   it raises the issue, your Honor, of what other subpoenas are

13   out there that could also be improper.

14         We are not -- all we're asking is to just give us the

15   subpoena returns, which is often what happens in most cases.

16   Give us the subpoena returns so there's not unfair surprise,

17   and we don't have delay during trial to try to figure this out.

18   We're only two weeks before trial.  It seems like a pretty

19   reasonable request.

20         THE COURT:  All right.  Who's going to respond?

21         MR. BUCKLEY:  Your Honor, Sean Buckley on behalf of

22   Mr. Amar.  I'm still unclear as to the exact relief that it is

23   that the government is seeking.  But let me just address the

24   subpoena issue in turn.  With respect to the large subpoena

25   returns that have been received, they have been from JP Morgan

 1    Chase, and those have been simultaneously produced to the

 2    government.  So there is no issue with respect to those Rule 17

 3    subpoenas that --

 4            THE COURT:  They're not interested in the subpoenas

 5    which you have produced.  They're interested in the subpoenas

 6    you haven't produced.

 7            MR. BUCKLEY:  With regard to the subpoena that they

 8    identified that was issued to Zoom, I can represent to the

 9    Court that we do not intend to use any materials from Zoom in

10    our case-in-chief nor do we intend to use those materials to

11    impeach any witness.  Beyond that, they are not entitled to

12    those materials.  We have complied with Rule 16.

13            THE COURT:  Have you received production from the SEC?

14            MR. BUCKLEY:  We have not yet, your Honor.  The SEC

15    requested that we extend its deadline to respond to the

16    subpoena by one week by virtue of today's conference.  I'm

17    happy to address, if the Court would like to hear, the

18    propriety of that subpoena because we disagree --

19            THE COURT:  What about the subpoena to the FDIC?

20            MR. BUCKLEY:  The subpoena to the FDIC, after some

21    back and forth with various agencies within the FDIC was

22    successfully served, I believe, two days ago.  So its return

23    has not yet been received.  And these are materials, Judge,

24    that relate to interviews conducted by the U.S. Attorney's

25    Office.

1              THE COURT:  Are you willing to produced what you

2    receive?

3              MR. BUCKLEY:  From those subpoenas, your Honor?

4              THE COURT:  Yes.

5              MR. BUCKLEY:  Yes.  In fact, the government could have

6    requested it.  We request that --

7              THE COURT:  Let's get into that.  You're willing to

8    produce them?

9              MR. BUCKLEY:  From the SEC and the FDIC --

10             THE COURT:  From the SEC and the FDIC, are there any

11   other outstanding subpoenas?

12             MR. BUCKLEY:  Yes, Judge.  We also submitted another

13   subpoena to JP Morgan Chase for an additional limited

14   production.  We have not received any materials in response to

15   that subpoena.

16             THE COURT:  Will you share such materials as you

17   receive it from JP Morgan with the government?

18             MR. BUCKLEY:  Your Honor, certainly if we intend to

19   use them in our case-in-chief, we will share those returns with

20   the government.

21             THE COURT:  I didn't ask for a qualification.  Will

22   you share the materials you receive from JP Morgan with the

23   government?

24             MR. BUCKLEY:  Yes, your Honor.

25             THE COURT:  All right.  Now, regarding Rule 16, are

 1   there any other things that are being withheld?

 2          What's the answer?

 3          MR. BUCKLEY:  Judge, I'm not sure.  Is that question

 4   directed at counsel for Mr. Amar?

 5          THE COURT:  You were speaking, so I asked you.  Yeah,

 6   it was given to you.

 7          MR. BUCKLEY:  Whether there are any outstanding issues

 8   from the government's perspective with respect to Rule 16.

 9   Those were the ones identified in their motion.  Those are the

10   ones we came to address --

11          THE COURT:  The answer is no?

12          MR. BUCKLEY:  The answer is no, Judge.

13          THE COURT:  There are no more documents to produce.

14          And with regard to Mr. Buckley's answers as to Rule 17

15   and Rule 16, are those answers satisfactory to the defendant

16   Javice as well?  Any position from defendant Javice?

17          MR. SULLIVAN:  Yes, your Honor, we don't have a --

18   yes, your Honor.

19          THE COURT:  What's left of the motion?

20          MR. CHIUCHIOLO:  Thank you, your Honor.  That resolves

21   the Rule 16 and Rule 17.

22          Just quickly on Rule 26.2, I don't want to, you know,

23   make a large issue here, but the Court did order disclosure of

24   Rule 26.2 materials.  It does seem from --

25          THE COURT:  Experts.

 1          MR. CHIUCHIOLO:  Yes.  And it does seem from

 2   Mr. Amar's response that they're sort of taking a

 3   hypertechnical meaning of the Rule's statement.

 4          THE COURT:  How so?

 5          MR. CHIUCHIOLO:  Well, I think they cite to the

 6   definition of statement such as it has to be substantially

 7   verbatim, contemporaneously recorded.  That's the same

 8   definition of statement that's used in Section 3500.  And

 9   obviously the government would never come in here and say,

10   well, we're not going to produce any notes because they weren't

11   "you know, substantially verbatim."

12          Rule 26.2 is designed to place the disclosure of prior

13   defense witness statements on the same legal footing as the

14   disclosure of prior government witness statements.  So we're

15   just asking -- all we're asking here is for reciprocal exchange

16   of witness statements.  The defense has noticed a lot of

17   witnesses - 27 witnesses.  We understand a lot of them are

18   not -- the defense might not have access to them and so

19   that's --

20          THE COURT:  We're talking about -- let's make it

21   specific.  We're talking about attorneys' notes taken in

22   interviewing or paralegal notes taken in interviewing potential

23   witnesses for trial.

24          MR. CHIUCHIOLO:  Exactly, your Honor.  That's the

25   heart of it, including experts.

 1                THE COURT:  Who is going to respond?

 2                MR. BUCKLEY:  Your Honor, with respect to Mr. Amar,

 3    again, it's Sean Buckley.  The only arguments that the

 4    government has raised with respect to witnesses noticed by

 5    Mr. Amar pertain to expert witnesses.

 6                THE COURT:  Pertain to what?

 7                MR. BUCKLEY:  To expert witnesses.  Mr. Amar has

 8    noticed three expert witnesses as potential witnesses at trial.

 9    We explained in our papers what the requirements of Rule 26.2

10    are.

11                THE COURT:  Tell me what they are.

12                MR. BUCKLEY:  The requirements of Rule 26.2 define

13    what is a statement of a witness.

14                THE COURT:  We're talking about experts, right?

15                MR. BUCKLEY:  Of an expert witness, yes, Judge.

16                THE COURT:  There's reports that have to be given.  I

17    take the position, as Judge Rakoff took the position, that the

18    same rules of discovery that relate to experts in civil cases

19    relate to experts in federal cases and in criminal cases.

20    There is to be no surprise with experts.

21                I'm not going to delay the trial while the other side

22    is given an opportunity to find out what the expert has been

23    saying and not being told.  So you're going to have to do a

24    report and give the same scope of report to the government as

25    the government gave to you.

```
 1              MR. BUCKLEY:  Yes, your Honor.  And we have, to be

 2    clear, provided the required notice under 16(b)(1)(C) of the

 3    anticipated expert testimony that has been signed by each

 4    witness in compliance with Rule 16.

 5              The government recently has moved in limine raising

 6    various issues but has not complained about the adequacy of

 7    that disclosure.  Our position is Rule 26.2 for that very

 8    reason should not apply to expert witnesses because we have

 9    complied with our disclosure obligations under 16(b)(1)(C),

10    and, therefore, they are not entitled to attorney work product

11    or work product prepared by paralegals in our office at our

12    direction in the course of meetings or interviews with

13    potential testifying witnesses.  Rule 26.2 just is not

14    triggered here, Judge.

15              MR. CHIUCHIOLO:  Your Honor, if I can respond?

16              THE COURT:  One minute.

17              (Pause)

18              THE COURT:  I think we're contesting 26.2(f)(1).  A

19    written statement that a witness makes and signs, that

20    defendants have agreed to be produced if they haven't already

21    produced it.  And the next part is:  Or otherwise adopts or

22    approves.  If notes are shown to the defendant, those are

23    adopted or approved.  If they're not shown, if they're just the

24    paralegal's or attorney's, they don't fit into a written

25    statement.
```

1          MR. CHIUCHIOLO:  Your Honor, it's the same definition

2     under 18 U.S.C. 3500.  So if we were to take --

3          THE COURT:  Yes, but the government customarily

4     produces the notes of the interviewers.

5          MR. CHIUCHIOLO:  All we're asking for is simple

6     disclosure, which is exactly what the case law says Rule 26.2

7     is designed to do.  It's to provide the exact same obligation

8     on the defense that is on the government.

9          THE COURT:  I don't think so.

10          MR. CHIUCHIOLO:  Your Honor, I would --

11          THE COURT:  It doesn't say so.  The rule doesn't say

12     so.

13          MR. CHIUCHIOLO:  Your Honor, I would direct the Court

14     to the Advisory Committee Notes on Section 26.2, which are

15     cited in a Second Circuit case *United States v. Scotti*, 47 F.3d

16     1237, 1249, and again --

17          THE COURT:  Which Advisory Note?

18          MR. CHIUCHIOLO:  26.2.

19          THE COURT:  I'm looking.

20          MR. CHIUCHIOLO:  It says:  Rule 26.2 is designed to

21     place the disclosure of prior relevant statements of an --

22          THE COURT:  Which year's amendment are you looking at?

23          MR. CHIUCHIOLO:  Well, the Second Circuit case is from

24     1995, your Honor, and it's quoting the Advisory Committee Notes

25     of 1979.

1          THE COURT:  I've read the note, and it supports the

2    government's proposition.  It cites the Supreme Court case of

3    *United States v. Nobles*, 422 U.S. 225 (1975) which involved the

4    notes of an interviewer.  Without reference to it, it having

5    been adopted or approved by the witness who was interviewed.

6    The government demanded production at the time that production

7    is required under the Jencks Act, that is after

8    cross-examination, and when the defendant refused to produce,

9    the trial court struck the testimony of the witness, and the

10   Supreme Court upheld it.

11         Now, under the practice of this Court, followed as

12   long as I've been a judge, which is 26 years, the government

13   produces under the Jencks Act not only statements signed or

14   approved or adopted by the witness, but all notes of an

15   interviewer of a witness and of the court procedures that order

16   production is accelerated to before the trial.

17         Under the Advisory Committee note explaining the rule,

18   the same should apply here because, as is said by the Advisory

19   Committee, I quote:  "The rule, with minor exceptions, makes

20   the procedure identical for both prosecution and defense

21   witnesses, including the provision directing the court,

22   whenever a claim is made that the disclosure would be improper

23   because the statement contains irrelevant matter, to examine

24   the statements in camera and excise such matter as should not

25   be disclosed," which I will do.

1          So the government's motion is granted.  Production has

2    to be made.

3          MR. CHIUCHIOLO:  Thank you, your Honor.

4          THE COURT:  I didn't ask if the defendant Javice has

5    any argument on the motion?

6          MR. BUCKLEY:  Judge, if I can just be heard on that

7    for a moment.

8          THE COURT:  First, does the defendant Javice have

9    anything to say?

10          MR. SULLIVAN:  We don't have anything additional to

11    add at this time, your Honor.

12          THE COURT:  Thank you.

13          Mr. Buckley, you do though.

14          MR. BUCKLEY:  Yes, your Honor.  So the issue here

15    unfortunately, is more nuanced, and that is because these are

16    notes that are contained in attorney work product.  Under

17    16(b)(2), attorney work product is shielded.  Now, we do have

18    notes.  The notes are of varying degrees.  They're incorporated

19    into legal memos that reflect attorney thoughts, impressions --

20          THE COURT:  Legal memos, if not shown to the witness,

21    do not qualify as statements.  The interview notes do.

22          MR. BUCKLEY:  So --

23          THE COURT:  The further use of the interview notes in

24    attorney's work product is not required to be produced unless

25    shown to the witness, okay?

```
 1              MR. BUCKLEY:  Okay, yes, Judge.

 2              MR. CHIUCHIOLO:  Judge, I would just ask - the Court

 3    had set a January 6 deadline - if we can get these materials by

 4    Monday?

 5              THE COURT:  Mr. Buckley?

 6              MR. BUCKLEY:  Your Honor, we will review and produce

 7    anything that is producible pursuant to the Court's order

 8    promptly.  I will endeavor to do it by Monday, but I make no --

 9              THE COURT:  I need to give you a date.

10              MR. BUCKLEY:  If I could have a moment, your Honor.

11              THE COURT:  Sorry?

12              MR. BUCKLEY:  If I could just have a moment to confer.

13              THE COURT:  The same question will be put to Mr. Baez.

14              MR. SULLIVAN:  This is Mr. Sullivan, your Honor.  We

15    will comply with the Court's order.  I'm not sure that we have

16    anything responsive, but to the extent we do --

17              THE COURT:  If you don't respond, you have nothing to

18    produce.

19              MR. SULLIVAN:  Right.

20              MR. BUCKLEY:  Judge, I don't think we have anything

21    that is responsive to produce; but if we do, we will do so no

22    later than next Friday, a week from tomorrow.

23              MR. CHIUCHIOLO:  Your Honor, I thought Mr. Buckley

24    said they do have witness notes.

25              THE COURT:  If they have, he will be producing.  If he
```

1    doesn't have, he's not going to be producing.  Can you live

2    with Friday?

3            MR. CHIUCHIOLO:  Yes, your Honor, that's fine.

4            THE COURT:  Okay.  Production by Friday.

5            The only thing left now is the motion to sever.  Are

6    both sides making the motion?  Are both defendants making the

7    motion, or only Mr. Amar?

8            MR. SULLIVAN:  On behalf of Ms. Javice, we filed the

9    motion, so yes.

10           THE COURT:  Okay.

11           MR. COGAN:  Your Honor, on behalf of Mr. Amar, this is

12   Johnathan Cogan.  We haven't made a motion to sever, and so we

13   haven't asked for a severance.  We want to make sure that the

14   defense that we're prepared to put forward, which is

15   antagonistic in nature, isn't going to be curtailed in any way.

16   If it's going to be curtailed, then we would want there to be a

17   severance, but we have not made a motion for --

18           THE COURT:  If I were to curtail a defense, I would

19   triggering a mistrial, wouldn't I?  Isn't that right?  I can't

20   restrict your ability to put in relevant information.

21           MR. COGAN:  Yes, your Honor.  Thank you.

22           THE COURT:  That's self-evident.

23           MR. COGAN:  I wanted to clarify that we were not

24   making a motion to sever with that understanding.  With that

25   understanding, we haven't made a motion.

 1                THE COURT:  That kind of thing is an instruction to

 2     the jury.

 3                What's the position of the defendant, Mr. Sullivan?

 4                MR. SULLIVAN:  That a limiting instruction is

 5     insufficient and will not cure the constitutional defect that

 6     exists.  So our position is based on the limited information

 7     that we have, even that limited information that Ms. Javice is

 8     unable to receive a fair trial.  There are a couple cases in

 9     the district courts of New York that are apposite for this

10     issue.  The *Shkreli* case, the *Nordlicht* case, which we cited n

11     our brief, and based on the limited information we have, our

12     position is that the problem is of constitutional dimensions.

13                Now, Mr. Amar's lawyers have indicated that they have

14     additional information to the information that they provided,

15     additional evidence and potentially additional testimony.  We

16     don't know what that is, but these very experienced lawyers

17     from this district, many whom are former prosecutors, have used

18     the word antagonistic.  That word has meaning, as your Honor

19     knows.

20                THE COURT:  Who said that?

21                MR. SULLIVAN:  Mr. Amar's counsel.

22                THE COURT:  Who said antagonistic?

23                MR. SULLIVAN:  Antagonistic to our defense.  And

24     they've also indicated that they're prepared to make a

25     declaration.

1          I will also just point out -- we learned this on

2    January 8, your Honor.  And by January 10, we wrote your Honor

3    as soon as it was brought to our attention that the defense was

4    going to be antagonistic.  And based on what we've seen, it is

5    of an order of magnitude that it is sufficiently severe that a

6    limiting instruction cannot cure it.

7          THE COURT:  Well, I don't know what is meant by

8    antagonistic, and there is nothing in the record now that shows

9    any antagonism.

10         The allegation is that the defendants participated in

11   the same transaction or series of transactions constituting the

12   offense alleged in the superseding indictment.  That means

13   there is joinder that is permissible and in fact desirable

14   because the acts are unified by some substantial identity of

15   facts or participants or arise out of a common plan or scheme.

16   And that's held by the Second Circuit in *United States v.*

17   *Feyrer*, 333 F.3d 110.

18         The presumption is strong that severance should be

19   denied.  A defendant who seeks separate trials carries a heavy

20   burden of showing that joinder will result in substantial

21   prejudice, and that prejudice must be sufficiently severe to

22   outweigh the judicial economy that will be realized by avoiding

23   lengthy multiple trials.

24         This trial is a complicated trial.  It promises to be

25   a complicated trial.  It will take weeks of the Court's and a

1   jury's time, and it would just be unnecessarily duplicative and

2   useless to have two trials where there can be one.  Limiting

3   instructions are available to make sure that the jury

4   understands that the guilt of each defendant must be judged

5   separately.  I will give those instructions, and I will be glad

6   to get the help of the parties in drafting those instructions.

7            MR. SULLIVAN:  May I be heard briefly, your Honor,

8   just on one last thing?

9            THE COURT:  Yes.

10           MR. SULLIVAN:  So I would certainly encourage the

11   Court to at least consider in camera, as Mr. Amar's lawyers

12   have volunteered to do, the nature of the antagonistic defense

13   because one of the other aspects of the balancing test that

14   your Honor rightly articulated is, is the trial itself going to

15   be disrupted by constant objections, constant sidebars,

16   objections to the openings.

17           Right now we have no idea what they're going to say.

18   And certainly if there is something objectionable, I have an

19   ethical duty to stand up and object.  I don't like to object

20   during openings, obviously, and as a practice don't, but must

21   if something comes out that we have not had time to test or

22   vet.  So there are a series of motions in limine that --

23           THE COURT:  I will say this:  I don't mind objections.

24   It's my job to rule on objections.  If something in an opening

25   or a closing is objectionable, I want you to object.  So I have

 1  no rule against objections.

 2          MR. SULLIVAN:  Very well, your Honor.

 3          THE COURT:  I don't really take sidebars.  We don't

 4  waste any time on sidebars.  I depend on both -- all counsel to

 5  educate me on what's going to happen and what may be

 6  controversial, so I'm prepared and I will rule.  If I need a

 7  sidebar, it will be very brief.

 8          MR. SULLIVAN:  We are absolutely unable to educate the

 9  Court on what may be controversial because we don't know.  And

10  that's sort of the point of the declaration, your Honor.  We

11  don't know what the nature of the antagonism is beyond what

12  we've laid out generally, which we still maintain is

13  sufficient.

14          THE COURT:  Mr. Buckley will know, and he'll tell me

15  in advance.  I don't see any need to make this decision now.

16  It's not Mr. Buckley saying that it's going to be at the

17  derogation -- his defense is going to be at the derogation of

18  Ms. Javice.

19          MR. SULLIVAN:  I think it is, your Honor.  That's

20  certainly my understanding of the conversation.

21          THE COURT:  You want me to hear anything?

22          Mr. Buckley?

23          MR. COGAN:  I'm speaking on this, your Honor.  This is

24  John Cogan.  I missed the question.

25          THE COURT:  Do you want me to hear you out of the

1     hearing of the prosecution and Ms. Javice as to what you think

2     might be at the expense of Ms. Javice?

3               MR. COGAN:  Yes, your Honor.  The very reason we're

4     having this discussion now is because we spotted the issue that

5     Mr. Sullivan just said, which is that we see --

6               THE COURT:  So the answer is yes?

7               MR. COGAN:  The answer is yes.

8               THE COURT:  Does the government object?

9               MS. BHASKARAN:  Your Honor, we have no opposition to

10    the Court having an initial ex-parte inquiry on this issue.

11    If, however, the Court determines that there is some sort of

12    colorable issue that rises to the level of a mutually

13    antagonistic defense, as that term has been explained by the

14    Circuit, then we respectfully request enough information in

15    order to respond because as the Court has noted --

16              THE COURT:  I'll deal with that issue after I take the

17    in camera discussion.  So we'll have a brief recess.  I'll have

18    two people from the defense and Mr. Amar come to the robing

19    room with the reporter.  That part will be under seal.

20              (Pages 26 to 30 sealed)

21

22

23

24

25

1              (In open court)

2              THE COURT:  We had an in camera discussion.

3              MR. SULLIVAN:  Your Honor, I'm sorry.  Co-defendant is

4    not back in the courtroom yet.

5              THE COURT:  Thank you very much.

6              Mr. Cogan and Mr. Buckley, is everyone here?

7              MR. COGAN:  Yes, your Honor.

8              MR. BUCKLEY:  Yes, your Honor.

9              THE COURT:  Mr. Cogan, Mr. Buckley and Mr. Amar

10   presented the information that was referred to in the Kobre &

11   Kim letter of January 21.

12             After hearing the information, there is no need to

13   change my ruling.  There is really no antagonistic defense,

14   certainly nothing that could rise to an unfairness as to either

15   defendant.  And so the motion to sever is denied.

16             MR. SULLIVAN:  May I make a record, your Honor?

17             THE COURT:  You may.

18             MR. SULLIVAN:  Thank you, your Honor.

19             It is difficult -- on behalf of Ms. Javice, it is

20   difficult to make an adequate record because I do not know what

21   was said there, and I will be making an application shortly,

22   but the record is this:  That the doctrinal line between

23   substantial prejudice that warrants a severance and one that

24   does not seems to be whether the circumstances are beyond

25   co-defendants merely finger-pointing.  If it's that, then the

1    presumption that your Honor noted of joinder should be

2    recognized.

3         However, if it's beyond that, and we are in a position

4    where Ms. Javice -- where there is a realistic scenario where

5    Ms. Javice will not only be prosecuted by the government but

6    prosecuted by Mr. Amar, and she thus becomes prejudiced on two

7    fronts, having to respond to the government and Mr. Amar.

8         At least we know what the government is going to say.

9    We have no idea what Mr. Amar is going to say.  So this

10   prejudice is compounded in the sense that a jury gets to hear

11   functionally the government's claim against Ms. Javice twice:

12   Once from the government and once from Mr. Amar.

13        If it's on that side of the doctrinal line, it's

14   considered reasonably cognizable prejudice.  Your Honor in

15   camera and here has made his ruling, I understand that.  I

16   certainly just wanted to make a record that normally in the

17   cases where there is severance, where severance is granted, the

18   moving party has an opportunity to make an argument as to what

19   side of the doctrinal line the proffer falls on.

20        So we certainly would be making -- we'll be making an

21   application to unseal for Ms. Javice's team the transcript of

22   your Honor's hearing; otherwise, I don't think we're able to

23   make an adequate record.  That's point one.

24        Point two, the Court's ruling is now, I think,

25   compounded by another data point we will advise the Court on.

1   We are not ready to argue this yet just because we don't have

2   all the details, but the short is that we learned just last

3   night that the government produced 9,500 additional documents

4   that we've never seen before, and apparently from Mr. Amar's

5   Google drive.  This seems emblematic of this larger issue of --

6   I'm going to have difficulty even knowing what to say in

7   opening if everything is sort of trial by ambush.  And here I'm

8   not making a normative claim against anybody; I am simply

9   making a claim about the way it is received.

10          One of the benefits of the Federal Rules of Criminal

11  Procedure is that there is no trial by ambush.  We know what

12  the evidence is against us; and if there is adverse evidence,

13  even if it doesn't rise to the level of legally cognizable

14  prejudicial evidence from Mr. Amar, it seems to me that we have

15  some due process rights to know what that evidence is so that

16  we can construct a defense.

17          So that's the record that I wanted to make.

18          THE COURT:  What remedy do you seek?

19          MR. SULLIVAN:  I'm sorry?

20          THE COURT:  What remedy do you seek?

21          MR. SULLIVAN:  Well, the Court has denied the remedy

22  we seek.  The remedy we seek is severance generally.  Short of

23  that, we --

24          THE COURT:  That won't change with the 3,600 documents

25  or whatever the number was.

1          MR. SULLIVAN:  9,500 documents.  So literally 10,000

2     documents out of a 13,000 document disclosure.  Ms. Perdomo has

3     dealt with that issue and knows more specificity, the

4     conversations between her and the government as recently as

5     last night.

6          THE COURT:  What remedy do you ask?  You asked for

7     severance.  I denied it.

8          MR. SULLIVAN:  Right.  The second level --

9          THE COURT:  What remedy do you want?

10          MR. SULLIVAN:  We would like access to the transcript

11     of the discussion that your Honor had in camera to be able to

12     make an adequate record as to -- as to, the way I will put it

13     what side of the doctrinal line those representations fall on.

14          THE COURT:  I deny that.

15          MR. SULLIVAN:  And brief indulgence.

16          THE COURT:  However, after the close of the case,

17     please renew the motion, and I'll entertain it again.

18          MR. SULLIVAN:  Very well, your Honor.

19          Depending on the nature of these documents -- and I'm

20     just flagging this, we might seek an adjournment.  This is

21     premature at this point.  I haven't seen any of them, but we do

22     know that at least 9,500 of them are brand new.  So I just

23     don't know the salience yet, but we may have an application

24     before your Honor very shortly.

25          MR. BUCKLEY:  And, Judge, this is Mr. Buckley on

 1    behalf of Mr. Amar.  We similarly are troubled by these late

 2    disclosures.  We're trying to get to the bottom of it.  We've

 3    been having some back and forth.  We needed answers from the

 4    government.  We think that this could give rise to a

 5    suppression motion that would be material to the evidence that

 6    the government intends to offer at trial.  But we need the

 7    answers to our questions first, and we haven't gotten them yet.

 8    So we would ask --

 9            THE COURT:  What are the questions?

10            MR. BUCKLEY:  The questions relate to -- bear with me

11    for one second, your Honor.  We sent an email detailing the

12    questions to the government last night.

13            THE COURT:  Do I have a copy?  Did you file on ECF?

14            MR. BUCKLEY:  We could certainly file it, your Honor.

15            THE COURT:  You don't have to, but did you?

16            MR. BUCKLEY:  We did not.  This was some back and

17    forth with the government hoping to get some clarity on the

18    issue before we had to flag it for the Court.  Ms. Perdoma

19    has --

20            THE COURT:  Maybe we should have the government

21    explain why, what happened.

22            MR. BUCKLEY:  If we could perhaps put the questions on

23    the record that we think are necessary to be answered in order

24    to inform the nature of the relief that would be sought, and --

25            THE COURT:  Let's get the government's explanation,

```
 1        and you can do whatever you want to do.

 2                 MR. FERGENSON:  Thank you, your Honor.

 3                 The government made a supplemental Rule 16 production

 4        yesterday.  It's about 13,000 files in total, your Honor.

 5        These are files that came from a search warrant return, and

 6        that the government realized the day before yesterday had not

 7        been produced to both defendants in a joint production.

 8                 THE COURT:  When did you get those documents?

 9                 MR. FERGENSON:  They were produced by Google in

10        October of 2023.  We are not intending to use these documents

11        in our case, your Honor.

12                 THE COURT:  So they've been sitting with you for 14

13        months?

14                 MR. FERGENSON:  No.  Let me give the full background

15        to the Court just so you have it.

16                 We received -- we got a search warrant in

17        October 2023.  We received files from Google for what's called

18        a Google drive account.  It's like an online document-sharing

19        platform offered by Google, your Honor.  These were for the two

20        work accounts used at Frank by the defendants, each defendant.

21        The government produced in full to each defendant that

22        defendant's account.

23                 THE COURT:  When?

24                 MR. FERGENSON:  In October, after receiving the files

25        from Google.
```

 1          What the government realized two days ago that there

 2    had been files that the government had tagged as responsive to

 3    the search warrant that hadn't been produced to, you know,

 4    jointly to both defendants, meaning, your Honor, there are some

 5    of the 13,000 that were produced yesterday that hadn't been

 6    produced to Amar, and there's some, you know, that were in

 7    Javice's account and vice versa.

 8          THE COURT:  How can you distinguish what to give whom

 9    in a joint trial?

10          MR. FERGENSON:  This was -- this is the government's

11    standard practice when it gets an account like this, Judge.  We

12    give the full account to the person that was using the account.

13          THE COURT:  It's a terrible procedure.

14          MR. FERGENSON:  Fair enough, your Honor.  And look, we

15    made a mistake and not --

16          THE COURT:  It's a terrible procedure.  Everyone has

17    to be on equal plane.  It's not right that the government holds

18    information that will drip out to each particular defendant.

19    If it's required to be produced, it's required to be produced

20    in a trial.

21          MR. FERGENSON:  And we realized that it had not been

22    produced to both, your Honor, and we produced them yesterday.

23          THE COURT:  What do you think I should do now?

24          MR. FERGENSON:  I am not sure there is much to do,

25    your Honor, because we're not seeking -- these were

```
 1   documents --

 2              THE COURT:  How would you like to get 13,000 or 9,500

 3   documents, whatever the number, a week and half before trial

 4   when you're preparing your jury challenge, you're preparing

 5   your opening, you're preparing your witnesses.  How would you

 6   like that?

 7              MR. FERGENSON:  I take your point, your Honor.

 8              THE COURT:  Why did it happen?

 9              MR. FERGENSON:  We made a mistake.  It was an

10   oversight, and when we realized it, we fixed it.

11              THE COURT:  Mr. Clark may say to me "I made a

12   mistake."  What does that do to say "I made a mistake"? you've

13   been sitting on these documents 14 months.

14              MR. FERGENSON:  That's not entirely correct, your

15   Honor, but let me offer at least a couple points.

16              THE COURT:  What's not correct about it?

17              MR. FERGENSON:  We -- these documents were being

18   reviewed for responsiveness to the search warrant.  They should

19   have been produced earlier.

20              THE COURT:  In October.

21              MR. FERGENSON:  But -- well, Judge, the entirety of

22   each account is produced to that --

23              THE COURT:  You want everything that defendant gets on

24   a subpoena produced to you, but you don't give everything that

25   you received by subpoena to others.
```

 1              MR. FERGENSON:  Well, this was a search warrant, your

 2     Honor, and that is what I think makes it a little different.

 3     You know, we don't actually have the authority --

 4              THE COURT:  What's the definition of the scope of a

 5     search warrant?  What documents can you legitimately ask for?

 6              MR. FERGENSON:  It was -- I don't have the search

 7     warrant in front of me, your Honor, but it was a warrant to

 8     these -- to Google --

 9              THE COURT:  Only if the artifacts of a crime were

10     evidence of it, right?

11              MR. FERGENSON:  That's correct your Honor.

12              THE COURT:  And almost by definition, if this is a

13     crime that authorized the search warrant, every document is

14     relevant.

15              MR. FERGENSON:  That was not the way we conducted the

16     review, your Honor.

17              THE COURT:  You told me that.  I am not criticizing

18     you for that.

19              MR. FERGENSON:  Fair enough, your Honor.

20              I do want to make clear, your Honor, that the

21     documents we produced yesterday, we were not, we are not

22     seeking --

23              THE COURT:  I read in the paper today about the

24     sloppiness of the government in producing in the Menendez trial

25     documents that should not have been produced to the jury.  And

1    I'm hearing a tale now that in a different way is the same

2    thing.  It's not proper behavior.  If this were a civil trial,

3    Mr. Sullivan would be making a motion for sanctions under

4    Rule 37.

5             MR. FERGENSON:  What I can promise to your Honor is

6    that we acted in good faith.  We did make a mistake.

7             THE COURT:  There is no point in getting more into

8    this.

9             What relief do you want, Mr. Sullivan?

10            Ms. Perdomo.

11            MS. PERDOMO:  Your Honor, Erica Perdomo.

12            THE COURT:  I don't like you bending over so much.

13   You'll hurt your back.

14            MS. PERDOMO:  Erica Perdomo on behalf of defendant

15   Javice.

16            I want to draw a couple distinctions and then answer

17   your question about relief.  One of -- one point to add to the

18   narrative that Mr. Fergenson described is that there was a

19   search warrant in October of 2023, we understand.  And in April

20   of 2024, there was an initial production of what the government

21   deemed were responsive documents of about 11,000 documents.  So

22   the government had already produced responsive documents

23   pursuant to what we understood was their review of these

24   drives.  And so it is very unclear how there is an additional

25   set of responsive documents that's more than 13,000 documents

1    on the eve of trial.

2              THE COURT:  You'll always find there's more.

3              MS. PERDOMO:  Right now, your Honor --

4              THE COURT:  You'll always find there's more.  We are

5    where we are.  What's the remedy you want?

6              MS. PERDOMO:  Well, where we are right now is that we

7    haven't been able to finish processing these documents in our

8    electronic document system, and so I would ask the Court allow

9    us to craft a remedy in the form of a motion because right now

10    these documents could include *Brady*, they could include --

11              THE COURT:  At this point, what relief do you want, if

12    any?

13              MS. PERDOMO:  At this point, if we had to ask for some

14    relief, it would be the relief of additional time --

15              THE COURT:  How much?

16              MS. PERDOMO:  -- to review these documents.

17              MR. BUCKLEY:  Can we confer, your Honor?

18              MS. PERDOMO:  Your Honor, please let us confer.

19              THE COURT:  Maybe you don't need the time.  You're

20    both -- you're all prepared, so time is not --

21              MS. PERDOMO:  Your Honor, I do in fact that at a

22    minimum need some time.  9,500 of these documents that

23    Ms. Javice received yesterday came from Mr. Amar's Google

24    drive.  As your Honor alluded to the communications that these

25    defendants had within their email really formulate --

```
 1              THE COURT:  How much time do you want?  How much time

 2      do you want?

 3              MS. PERDOMO:  We would want at least 30 days, your

 4      Honor.

 5              THE COURT:  Talk amongst yourselves because you're all

 6      ready to try the case and time doesn't help you either.

 7              MS. PERDOMO:  Your Honor, we'd ask for 30 days or one

 8      month.

 9              MR. BUCKLEY:  Judge, when you're ready, there is

10      something I want to add to this as well.

11              THE COURT:  I'm ready.

12              MR. BUCKLEY:  In addition to the time necessary to

13      review these materials, there are real constitutional

14      implications of this.  It's a Fourth Amendment violation, a

15      reasonableness violation.  This issue has come up, as the Court

16      noted, time and again.  Recently with Judge Nathan in the *Wei*

17      case and *Najad*.  The government is not permitted to go back and

18      re-search the materials that it represented both to the Court

19      and to the service provider that it would not search again

20      without getting a new warrant.  So we may seek suppression --

21              THE COURT:  Let me understand this.  The government

22      gets a pack of documents, and because it didn't notice at the

23      first instance that it made a full production for whatever

24      reason, and then looks at it again at a later time and decides

25      it needs to make more production, that doesn't mean you need a
```

1    new search warrant.  You still have the documents that were

2    given that you took under the first search warrant.

3            MR. BUCKLEY:  Judge, they took those documents under a

4    representation to the Court that they would only take documents

5    responsive to the warrant.  Again, I don't want to necessarily

6    get into this.  This is one of the things that we need

7    additional information about what was taken by whom, when and

8    given to whom because it could inform --

9            THE COURT:  Who's the aggrieved party the government

10   took more than it's supposed to?

11           MR. BUCKLEY:  The defendants, your Honor.

12           THE COURT:  They didn't take the documents from you.

13   They took the documents from Google.

14           MR. BUCKLEY:  Correct, your Honor.

15           THE COURT:  They're not your documents.

16           MR. BUCKLEY:  Your Honor, there is established law

17   that makes clear that documents taken from an electronic

18   service provider, an internet service provider like Google that

19   this can form the basis for a motion to suppress.

20           MR. FERGENSON:  May I be heard, your Honor?

21           MR. BUCKLEY:  We're just teeing this up, your Honor.

22   We're not making the motion now.  We need to understand the

23   scope of this and understand additional information from the

24   government.

25           So I just wanted the Court to be aware that it isn't

1    merely a question of us familiarizing ourselves with the

2    documents, but that there are potentially very significant

3    legal issues here that we will have to move to suppress.

4            MS. PERDOMO:  To what Mr. Buckley just said, and as

5    Mr. Buckley noted, this came up late last night, so we are not

6    fully briefed on this yet, but there is a staleness doctrine in

7    the Second Circuit.

8            THE COURT:  A what?

9            MS. PERDOMO:  Staleness with respect to search warrant

10   of --

11           THE COURT:  Salience?

12           MS. PERDOMO:  Staleness, your Honor.  Like bread will

13   go stale?  Staleness.  S-T-A-L-E-N-E-S-S.

14           THE COURT:  Staleness?

15           MS. PERDOMO:  Correct.

16           THE COURT:  What's stale?

17           MS. PERDOMO:  The warrant itself, your Honor, may be

18   stale.  And as Mr. Buckley alluded to, we would like the

19   opportunity to --

20           THE COURT:  How could it be stale?  The government is

21   not seeking more documents.  Am I right?

22           MR. FERGENSON:  Correct.

23           THE COURT:  The government has all the documents it

24   took.  So I recognize there may being an argument that there

25   was an unconstitutionality in taking more than they should have

1    taken, and that's what Mr. Buckley is arguing, but it's not a

2    staleness argument.

3            MS. PERDOMO:  Well, there is case law related to

4    staleness in terms of revisiting electronic documents that were

5    taken pursuant to a warrant, but --

6            THE COURT:  You can always go back.  That's what

7    happens in trials.  You're always going back.  You always see

8    more relevance to things that get passed over.

9            MR. FERGENSON:  Judge, like --

10           THE COURT:  Let's go back to this.  You want 30 days?

11           MR. FERGENSON:  Your Honor, if I may be heard briefly

12   on that?  Just very briefly on the points that were just

13   raised.

14           THE COURT:  Give me a moment, please.

15           MR. FERGENSON:  Yes.

16           (Pause)

17           THE COURT:  How long is this trial supposed to take?

18           MR. FERGENSON:  I believe we've estimated our case at

19   four weeks, your Honor.  And that would not include the defense

20   case, which appears to be lengthy.

21           THE COURT:  May we go off the record?

22           (Off the record)

23           THE COURT:  Folks ready?

24           MR. BUCKLEY:  Yes, your Honor.

25           MR. FERGENSON:  Your Honor, the government will give

 1  its position, your Honor, which we would submit that an

 2  adjournment is either not necessary or a short adjournment of

 3  maybe a week is appropriate.

 4          We would want to offer this context for the Court.  Of

 5  the documents from this search warrant return in its

 6  entirety -- look, the government is preparing for trial, but we

 7  presently expect to actually use and offer at trial three

 8  documents, and they're metadata.  That's what the government is

 9  going to actually use.  The 13,000, we don't -- we weren't

10  intending -- we don't intend to use any of those.

11          THE COURT:  Have you identified those three?

12          MR. FERGENSON:  We -- they are part of our Government

13  Exhibits.

14          THE COURT:  Have you identified them?

15          MR. FERGENSON:  Not yet, but we are happy to do that,

16  your Honor, to the defense.

17          THE COURT:  All right.

18          MR. FERGENSON:  One further note on that, Judge.  Like

19  I said, the government estimates four weeks for its case.  We

20  have some flexibility in when we can call witnesses.  We're

21  planning to call a records custodian from Google to put in

22  those three records and their metadata.  We could call that

23  witness at the back of our case.  That allows for a period of

24  potentially almost four weeks' additional time.

25          THE COURT:  The three documents you're talking about

 1    would come at the end?

 2            MR. FERGENSON:  Correct, your Honor.  We're happy to

 3    do that.

 4            THE COURT:  All right.  Let me hear from the

 5    defendants.

 6            MS. PERDOMO:  Your Honor, defendant Javice's position

 7    that these 13,000 documents were documents identified as

 8    relevant to this case by the government.  So the fact that they

 9    only intend to use three suggests to defendants that it is

10    likely there are documents defendants may want to use in this

11    very large set.

12            Moreover, Mr. Amar was the numbers guy.  This is a

13    case about numbers, and there was almost 10,000 documents of

14    his that Ms. Javice has never seen.  Our position is that in

15    order to review these documents in the way they need to be

16    reviewed, we would ask your Honor to move the trial to after

17    Passover, to the 21st of April, so we can have this case

18    prepared and not be interrupted by the holiday.

19            MR. BUCKLEY:  And, Judge, on behalf of Mr. Amar, we

20    agree that this is a much broader issue than just three

21    documents.  We don't think the proposal of moving a Google

22    witness to the end of the trial remedies the situation at all.

23            We do need to review these documents, including

24    several thousand documents that are new to us as well, for our

25    defense.  On behalf of Mr. Amar, we would propose March 3, so a

1    three-week continuance.  That still affords six weeks for the

2    trial to go on prior to the holiday.

3              THE COURT:  Would that be satisfactory, Ms. Perdomo?

4              MS. PERDOMO:  Your Honor, that would not be

5    satisfactory for the Javice team.  We do feel we need more --

6              THE COURT:  Why you feel you need more time?

7              MS. PERDOMO:  Part of the reason is also the three

8    weeks puts us right up at six weeks, puts the Passover holiday

9    at the end of six weeks, and we do not know precisely how long

10   the government's case is going to be.  We have two defendants

11   here putting on a defense, and we do not want to be prejudiced

12   by having to rush that defense for some end date of the trial.

13             MR. FERGENSON:  Your Honor, just one brief additional

14   comment from the government, which is that our IT -- we asked

15   our IT folks to see how many of the 13,000 are duplicates,

16   meaning what they identify as the same file being repeated.

17             THE COURT:  Did you organize them according to some

18   searches?

19             MR. FERGENSON:  We could do that, your Honor, if it

20   would be helpful to the defense.

21             THE COURT:  Have you done that?

22             MR. FERGENSON:  No.  No.  We have organized -- we

23   can -- you can distinguish which account they came from and

24   from our -- this duplication review that our IT folks did, it

25   appears the majority of these are duplicates.  So the new --

 1   the unique files is a lot less than 13,000, and we can provide

 2   that analysis to the defense so it can help them expedite their

 3   review, your Honor.

 4            MR. BUCKLEY:  Judge, respectfully, the numbers that

 5   we've gotten just in the past 48 hours --

 6            THE COURT:  Let's stop this.  I want to look at my

 7   calendar.

 8            (Pause)

 9            THE COURT:  Be seated everyone.

10            Instead of starting the trial on February 11, we will

11   start the trial on February 18.  It's a one-week adjournment.

12   There are 10,000 documents that are newly produced

13   constituting, I understand, Amar's and Javice's documents.  The

14   Amar documents have already been shown to Amar.  The Javice

15   documents have already been shown to Javice.  And there are

16   duplications as well, so it's considerably going to be less

17   than 10,000 documents.  And whether that's a burden, there are

18   enough lawyers to accomplish that.

19            The price of adjourning beyond that, I run into

20   another criminal trial that needs to be tried, and it's

21   unnecessary to do that as the scarcity of large courtrooms that

22   are required for this trial.  We are not going to try the case

23   in this courtroom.  We are going to try the case in, I think

24   it's 23B, right, Brigitte?

25            DEPUTY CLERK:  Mmm-hmm.

1          THE COURT:  In 23B.  That's the ruling.  We will keep

2     the final pretrial conference on February 4.

3          MS. PERDOMO:  Your Honor, may I make a statement for

4     the record?

5          THE COURT:  You already did.  You can do it again.

6          MS. PERDOMO:  Thank you, your Honor.  Just for the

7     sake of clarity, there are, as the government has represented

8     to defendants, 13,271 total new files produced.  9,559 of those

9     Ms. Javice has never before reviewed, which is why the Javice

10    team was saying 10,000.  Those are the documents Ms. Javice has

11    never seen before.

12          And with respect to the government's representations

13    of duplicates, that is not a representation that the defense

14    team has very high faith in given the changing numbers over the

15    last 24 hours in our conversations with the government and

16    given the very intricate nature of these documents which come

17    from a drive where the defendants did all of their work at

18    Frank.

19          For instance, they would edit a spreadsheet.  If one

20    little thing changed from one document to another, that would

21    be considered a new document, and I don't know that the

22    government is able to certify that those two documents are not

23    duplicates.  The de-duplication would be something we would

24    need to undertake on our own as defendants because of the

25    complicated nature of these documents.

```
 1                THE COURT:  Okay.  Anything else?

 2                MR. FERGENSON:  Your Honor, we have one very quick

 3   logistical question for your Honor about the trial schedule.

 4                Our understanding is that your Honor typically does

 5   not sit on Fridays during trial.

 6                THE COURT:  Well, we make exceptions.  There will be

 7   exceptions.

 8                MR. FERGENSON:  Understood.  Okay.  Should -- for this

 9   trial, should we plan to have witnesses appear -- there's just

10   some out-of-town travel involved your Honor, and so --

11                THE COURT:  I will commit to you that we will work on

12   the 21st.

13                MR. FERGENSON:  Okay.  And then the typical trial day

14   schedule, your Honor?

15                THE COURT:  Starts at 10:00 and ends at 5:00.  But

16   some days will end at 4:00.

17                MR. FERGENSON:  Thank you, your Honor.

18                THE COURT:  The 18th we will pick the jury and we will

19   go until 4:00.  We'll see.  It will work.  We'll move the case.

20                MS. PERDOMO:  Your Honor, defendant Javice reserves

21   the right to renew our motion for a continuance upon review of

22   the documents which we have not been able to access yet.

23                THE COURT:  I didn't hear you.  Say it again.

24                MS. PERDOMO:  Defendant Javice reserves the right to

25   renew our motion for continuance.
```

1          THE COURT:  Anyone can make a motion at any time.  I

2    have no rules for motions.  You want to make a motion, make a

3    motion.  You don't need to reserve anything.

4          Anything else folks?

5          MR. FERGENSON:  Not from the government.

6          THE COURT:  It's been a pleasure.

7          Oh, one more.  Javice wants a web page.  Sit down,

8    please.

9          Javice wants a web page.  Put on the record,

10   Mr. Fergenson.

11         MR. FERGENSON:  Yes, your Honor, in short, we don't

12   have what she's requesting.  We didn't archive the full Frank

13   website.  The web page that we had taken down, we produced long

14   ago.

15         THE COURT:  That is viewed as a motion.  Motion

16   denied.  There is nothing more to produce.

17         Anything else folks?

18         MR. FERGENSON:  No.  Thank you, Judge.

19         THE COURT:  Thank you.

20         (Adjourned)

21

22

23

24

25