UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------- x
                                    :

UNITED STATES OF AMERICA       :

                                    :

          - v. -                 :   S1 23 Cr. 251 (AKH)

                                    :

CHARLIE JAVICE and            :
OLIVIER AMAR,                  :

                                    :

                Defendants.       :

                                    :

----------------------------------------------------- x

### THE GOVERNMENT'S OPPOSITION
### TO THE DEFENDANTS' MOTION TO COMPEL DISCLOSURE
### AND RELATED RELIEF

 

DANIELLE R. SASSOON
United States Attorney

Rushmi Bhaskaran
Nicholas W. Chiuchiolo
Micah F. Fergenson
Georgia V. Kostopoulos
Assistant United States Attorneys

*- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ................................................................................................ 2

    A.   Relevant Procedural History ................................................................................. 2

    B.   The Government's Independent Investigation and Productions to the Defendants .... 4

I.  JPMC Is Still Not Part of the Prosecution Team. ..................................................... 5

    A.   Applicable Law ...................................................................................................... 5

    B.   The Defendants Factual Claims Have No Basis in Fact ........................................... 7

        1.   The Government Did Not Outsource Its Investigation To JPMC.......................... 7
        2.   The Government Did Not Outsource its *Brady* Obligations................................. 9
    C.   In Addition To Lacking Any Support in Fact, the Defendants' Argument Have No
        Support in the Law. ............................................................................................ 11

II. The Defendants Do Not Allege a Cognizable *Brady* Violation............................... 12

        1.   *Brady v. Maryland* ....................................................................................... 13
        2.   *Spoliation of Evidence* ................................................................................. 14
    D.   The Defendants' Claims Regarding Deleted or Unproduced Documents are Meritless
        20

    E.   The Government Was Not Involved in JPMC's Privilege Determinations. ............. 22

    F.   The Defendants Are Not Entitled To The Relief They Seek. ................................. 24

III.   No Evidentiary Hearing Is Necessary.................................................................. 25

CONCLUSION.................................................................................................................... 26

## PRELIMINARY STATEMENT

More than one year ago, this Court held that J.P. Morgan Chase ("JPMC"), the largest bank in the United States, is not an arm of the prosecution. *See* Dkt. 61, at 1. Now, on the eve of trial, the defendants seek to disturb the Court's holding through a procession of factual distortions and conspiracy-driven speculation. They do so to obtain voluminous and wide-ranging records that are not in (and have never been) in the Government's possession, based on non-existent and imagined *Brady* violations. None of these claims have merit, and none are cognizable violations of law.

Other than the looming trial date, nothing has changed since the Court last held that JPMC is not an arm of the prosecution team. The defendants' motion alleges a smorgasbord of Government misconduct, including alleged efforts to conceal and even destroy exculpatory evidence. The defendants lodge these serious allegations based on a scattershot patchwork of misinformation, half-truths, and downright misrepresentations. For example, to support their otherwise baseless allegation that the Government did not independently investigate this case, the defendants allege that the criminal complaint falsely alleges that the Government reviewed specific records when, in fact, the Government did not even possess the records in question, and the Complaint's allegation was simply based on JPMC's say-so. The defendants' allegation is wrong and easily refuted by records produced in discovery, showing that the Government obtained the records in question months before the Complaint was filed. The defendants also allege that the Government colluded with JPMC to weaponize the attorney-client privilege in order to shield exculpatory records from the defense. Having no evidence to support such a serious allegation, the defendants resort to *ipse dixit* and conspiracy theory. Each of the defendants' allegations falls flat.

Had the defendants properly met and conferred with the Government, the defendants' inaccuracies and misapprehensions would have been corrected. There was no real meet-and-confer. Instead, defense counsel summarily informed the Government that they would be seeking "sanctions" for unspecified *Brady* violations and other misconduct. When asked for specifics and the bases of the contemplated motion, defense counsel refused to engage. They refused to identify even a single document that supported their secret allegations. Instead, the defense took the position that a true meet-and-confer was pointless because the Government would never agree to "sanctions" and that the Government would learn about the defendants' allegations when filed on the docket.

The result is that the defendants' motion seeks to relitigate already-decided issues on the basis of nothing more than misunderstanding, rank speculation, and accusation. The defendants' fail to demonstrate any violation of the Government's disclosure obligations. The defendants' wish that the Government had conducted its investigation differently does not give rise to a *Brady* claim. The motion should be denied.

## RELEVANT BACKGROUND

### A. Relevant Procedural History

On October 13, 2023, the defendants filed a motion to compel (the "First Motion") arguing that JPMC was an arm of the government's prosecution team. Dkt. 58. The First Motion made numerous claims—several of which the defendants repeat in their latest motion (the "Second Motion")—including allegations that: (1) the Government's Complaint parrots JPMC's civil complaint (*compare* First Motion, at 5-6, *with* Second Motion, at 6); (2) the Government filed its Complaint after receiving a limited set of documents from JPMC (compare First Motion, at 6, *with* Second Motion, at 6); (3) the Government and JPMC have been in close contact (*compare* First Motion, at 7-8, *with* Second Motion, at 4-8); (4) the Government did not enforce its subpoena

against JPMC (*compare* First Motion, at 9-12, *with* Second Motion at 15-21); and (5) JPMC directed the Government's investigation (*compare* First Motion, at 6-9, *with* Second Motion, at 3-8). Among various forms of relief sought, the defendants asked the Court to intercede in the JPMC's compliance with the Government's grand jury subpoenas to JPMC, such as by ordering the Government to demand that JPMC enlarge the number of custodians for whom documents must be searched in connection with the Government's grand jury subpoenas to JPMC.

The Government filed its opposition to the First Motion on October 27, 2023 (Dkt. 60), and the Court held oral argument on November 2, 2023. In an order issued on November 7, 2023, the Court held that "JPMC, although the victim of the defendants' alleged fraud, is not part of the government's prosecution team." Dkt. 61, at 1. The Court also held that the Government "does not have an obligation to litigate documents withheld by JPMC in good faith because of privilege," *Id.* at 2, and denied in part the defendants request to enlarge the number of custodians whose files should be searched. *Id.* The Court further ordered the Government to require JPMC to search for "responsive documents in the files and emails" of two JPMC employees, as well as JPMC officers and employees referenced in the Complaint. *Id.*

On November 9, 2023, the defendants each served JPMC Rule 17(c) subpoenas. Javice subpoena included document requests related to dozens of individuals, including ▮▮▮▮▮ and ▮▮▮▮▮▮▮ (identified as Engineer-1), whose documents the defendants seek through their motion. JPMC moved to quash on December 1, 2023. Dkt. 73. On January 17 and 18, 2024, the Court held oral argument on JPMC's motion to quash. Following rounds of negotiation and argument, the Court directed JPMC to produce certain documents in the possession and control of 14 custodians. After extensive negotiation and Court intervention, ▮▮▮ was not included in the

list of custodians for the defendants' Rule 17 subpoenas.  Nor was Engineer-1 or ,

Frank's former Chief Legal Officer.

On January 24, 2025, the defendants requested a meet-and-confer to discuss the Second

Motion.  During that meeting, the defendants told the Government that they intended to seek

"sanctions" on the Government for its alleged willful failure to produce exculpatory material,

claiming that certain 3500 material from JPMC (the "JPMC 3500"), which as noted below, had

been produced nearly six weeks before, revealed that JPMC was, notwithstanding the Court's

November 7, 2023 Order, an arm of the prosecution.  The defendants refused to identify the JPMC

3500 material that gave rise to this concern and failed to identify the allegedly exculpatory

documents that were delayed or withheld.  The defendants also informed the Government that they

would seek another adjournment of the trial.

The defendants filed their Second Motion on January 27, 2025.

**B.  The Government's Independent Investigation and Productions to the Defendants**

As the Government previously described (*see* Dkt. 60, at 5-6), the Government has

conducted an extensive, independent investigation of the allegations in this case, assisted by

Special Agents in the Federal Deposit Insurance Corporation ("FDIC") and the U.S. Attorney's

Office for the Southern District of New York.[1]  In addition to serving approximately 12 subpoenas

on JPMC alone, the Government subpoenaed approximately 100 other entities; and obtained

search warrants for the defendants' cellphones, as well as Google Drive and Dropbox accounts for

the defendants' "@withfrank" work accounts.  The Government has also interviewed dozens of

---

[1]  The defendants make the false claim that the "Government apparently had no need for an FBI or other investigative agent on the case."  Br. 6.  But as is evident from the Section 3500 material and affidavits from search warrants produced in this case, Special Agents with the FDIC and U.S. Attorney's Office assisted the Government in the investigation of this case.

witnesses, several of whom are current or former employees of JPMC, as well as individuals that have no association with JPMC, including witnesses from relevant vendors, the "Data Scientist" described in the Complaint, and representatives from other entities who were potential targets of the defendant's fraud.

To date, the Government has produced to the defendants nearly 2.9 million pages of discovery.  Of this, approximately 1.3 million pages of material came from JPMC, and the remaining 1.6 million pages were obtained from other sources.

The Government produced its Section 3500 material on December 17, 2024.  This production, made more than six weeks ago, includes the JPMC 3500, which are certain notes from the Government's discussions with JPMC's outside counsel.  The Government elected to produce the JPMC 3500 out of an abundance of caution, to the extent that certain factual statements contained therein could be attributed to a JPMC witness.

### DISCUSSION

**I.    JPMC Is Still Not Part of the Prosecution Team.**

The defendants' baseless claim that JPMC is part of the prosecution team should be rejected—again.  *See* Dkt. 61, at 1 ("JPMC, although the victim of defendants' alleged fraud, is not part of the government's prosecution team.").  As explained above, the Government conducted an extensive and independent investigation of the defendants.  *See also* Dkt. 60, Government's Opposition to the Defendant's Oct.12, 2023 Motion, at 5-6.  None of the defendants' factual contortions support a different result, and the defendants lack any legal authority to support their unfounded claims.

**A.  Applicable Law**

Rule 16 of the Federal Rules of Criminal Procedure provides for pretrial discovery of items "within the government's possession, custody, or control." Fed. R. Crim P. 16(a)(1)(E).  Likewise,

the Government's obligation to produce exculpatory materials under *Brady* extends to those materials in the prosecutors' custody, as well as information in the possession of "others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The notion of "possession" is not "so elastic as to embrace materials that the prosecution never had in its files, never inspected, and never knew about." *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980). "Clearly the government cannot be required to produce that which it does not control and never possessed or inspected." *Id.* An "unlimited duty on prosecutors" to inquire about and obtain evidence not in their possession "would condemn the prosecution of criminal cases to a state of paralysis." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). For that reason, the Circuit has rejected the argument that the "prosecution team" reaches anyone who provides information to the Government, including cooperating witnesses, by summary order. *See*, *e.g.*, *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (noting that this Court "has never held that the 'prosecution team' includes cooperating witnesses"); *United States v. Garcia*, 509 F. App'x 40, 43 (2d Cir. 2013) (same).

Likewise, courts have held that "the fact that a third-party corporation is cooperating with the Government's investigation—as many do—does not turn it into an 'agent' of the Government." *United States v. Tomasetta*, No. 10 Cr. 1205 (PAC), 2012 WL 896152, at *4 (S.D.N.Y. Mar. 7, 2012); *see also United States v. Hwa*, No. 18 Cr. 538 (MKB), 2021 WL 11723583, at *53 (E.D.N.Y. Sep. 3, 2021); *United States v. Josleyn*, 206 F.3d 144, 152 (1st Cir. 2000) ("While prosecutors may be held accountable for information known to police investigators, we are loath to extend the analogy from police investigators to cooperating private parties who have their own set of interests.") (citing *Kyles*, 514 U.S. at 437–38).

**B.  The Defendants Factual Claims Have No Basis in Fact**

In making their renewed motion for the Court to find that JPMC is an arm of the prosecution team, the defendants cherry-pick and misconstrue the JPMC 3500 to present a distorted narrative of the Government's investigation and JPMC's role.  However, the record makes abundantly clear that JPMC is not—and has never been—an arm of the prosecution.

**1.  The Government Did Not Outsource Its Investigation To JPMC**

Contrary to the conspiracy-laden picture painted by the defendants, nothing in the JPMC 3500 material suggests that the Government outsourced its investigation to JPMC.  Br. 4-6. Instead, the Section 3500 material reflect routine communications and information sharing between outside counsel for a victim, the recipient of a dozen grand jury subpoenas, and the Government.  They also reflect, as is typical, instances where JPMC presented information to the Government from JPMC's own investigation, including the identities of potential witnesses or entities that may have information relevant to the Government's investigation, or identified documents in JPMC's productions to the Government.

In an effort to relitigate the Court's prior ruling, and obtain information to which they are not entitled or did not bother to obtain from their own subpoena, the defendants offer distorted interpretations of the JPMC 3500, or rehashed arguments that the Court previously rejected.[2]  For example, as purported proof that the Government did not independently investigate this case, the defendants argue that the Government's allegation in the Complaint that Vendor-1 sent a validation report (the "Validation Report") to JPMC (Complaint ¶ 25, 26(e)) was not based on the

---

[2] As they did in the First Motion, the defendants cite to parallels between JPMC's civil complaint and the Government's complaint.  That is unsurprising, as both complaints describe an overlapping set of facts, sourced from overlapping documents and overlapping witnesses, regarding the defendants' alleged fraud on JPMC.  Notably, the Complaint also describes conduct against victims other than JPMC, including the defendants' attempt to defraud Bank-1.

Government's independent review of records, but was rather based on "JPMC's own representations, either shared in meetings or duplicated from the Bank's civil complaint, *which the Government did not verify before filing the charges*." Br. 5-6 (emphasis added). The defendants base this claim on an email from JPMC's outside counsel to the Government, produced in the Government's JPMC 3500, identifying the Validation Report as having been produced in JPMC's productions on March 31, 2023, the same day that the Complaint was filed. From here, the defendants make the sweeping allegation that the Government's misrepresented that it independently investigated the allegations in the Complaint, and instead relied on JPMC's say-so.

The defendant's claim is false—and this should have been apparent to them. As the defendants know, the Government independently subpoenaed Vendor-1 for records, which it first received on January 26, 2023—more than two months prior to filing the Complaint in this case—and that production contained the Validation Report. *See* GX 1006, 1006A. In producing Vendor-1's records to the defendants in Rule 16 productions, the Government organized Vendor-1's productions by their date of production to the Government. Even if the fact that the Government obtained the Validation Report from Vendor-1 was not apparent to defense counsel—and it should have been—this is precisely the type of issue that the defendants should have raised in their so-called "meet and confer" prior to filing a motion. But instead, the defendants opted to file their motion based on an inaccurate premise, rather than respond to the Government's repeated and reasonable requests for the defendants to identify the bases for their Second Motion.

The defendants also suggest some impropriety in the fact the Government did not interview the individual identified as the "Marketing Executive" until after the Complaint was filed, and, using the JPMC 3500, the defendants make the sweeping and unsupported claim that the Government only interviewed the Marketing Executive after JPMC identified certain documents.

Br. 6. These claims are baseless. As for the Complaint, it accurately describes an email that the Marketing Executive sent to Amar—it does not purport to describe statements given by the Marketing Executive in an interview. Furthermore, it is completely routine for the Government to interview witnesses based on information provided by victim companies or other third parties—such information is sometimes informally called a "lead." The Government investigates leads and makes its own assessment of the evidence resulting from those leads. These are foundational techniques of criminal investigation. Moreover, ascribing some kind of malicious intent to the provision of information to the Government, by a fraud victim, would only serve to chill victims from coming forward and cooperating with law enforcement. Such conduct should not be sanctioned; it should be encouraged.

### 2.  The Government Did Not Outsource its *Brady* Obligations

The defendants once again cast as nefarious ongoing discussions between the Government and JPMC's counsel, suggesting, with no basis, that the Government somehow outsourced its *Brady* obligations to JPMC. Br. 6-8. These claims are outlandish and unsupported. To begin, there is nothing problematic about the Government probing counsel for JPMC to understand whether they have seen materials that are consistent with the defendants' anticipated defenses. If anything, those inquiries could have the effect of identifying information that may be helpful to the defense. Nor do those conversations mean that, in complying with the *Brady* obligations to disclose exculpatory information, the Government did nothing more than have conversations with victim's counsel, as Amar claims. See Br. 7. That is absurd. The JPMC 3500 is not a digest of the Government's investigative and prosecutorial decisions in this case, nor does it reflect the full scope of efforts that the Government has taken to gather facts relevant to this case and ensure compliance with its *Brady* obligations. Instead, all those notes do is convey factual information,

provided to the Government from JPMC. Out of an abundance of caution, the Government produced the JPMC 3500 to maximize its disclosures, to the extent statements contained in the JPMC 3500 could potentially be attributed to a witness.

Amar also uses a single email exchange produced in the JPMC 3500 to argue that the Government asked JPMC's counsel about the existence of exculpatory information related to Javice, but not for Amar, and argues that the Government was therefore deliberately avoiding obtaining exculpatory information as to Amar. Br. 7-8. This, too, is baseless. The context of the particular conversation related to the defendants' filings in the pending civil fraud lawsuit JPMC filed against Javice and Amar. While Amar filed a generally non-substantive Answer, Javice filed a detailed Answer and Counterclaim. In that counterclaim, Javice made several allegations that were starkly inconsistent with the facts learned in the Government's investigation.

As shown in Exhibit A, on May 6, 2023, Javice's counsel told the Government that he had "reason to believe members of jpm and the advisory teams were well aware of the material items in this deal and that they have information that exculpates our client." It was in this context that, a few days later, the Government inquired with JPMC's counsel as to whether there was "anything tending to exculpate Javice." Needless to say, the Government determined that the relevant allegations in Javice's counterclaim were simply false and proceeded with criminal charges against Javice.

Moreover, as this is a two-person conspiracy, any evidence that has a tendency to exculpate Javice would also tend to be exculpatory for Amar, who is alleged to have participated in the same scheme as Javice. Accordingly, nothing about this cherry-picked email between the Government and a victim of the defendants' crimes demonstrates any violation of the Government's *Brady* obligations.

### C.  In Addition To Lacking Any Support in Fact, the Defendants' Argument Have No Support in the Law.

Cooperation by a crime victim with law enforcement does not make that victim part of the Government.  *See Josleyn*, 206 F.3d at 152; *see also United States v. Pierre*, No. 22 Cr. 19 (PGG), 2023 WL 7004460, at *27 (S.D.N.Y. Oct. 24, 2023) ("[I]nformal and formal sharing of documents and information between the government and a private party is not inherently suspect, and interactions of this sort are not per se inappropriate."); *United States v. Rhodes*, No. 18 Cr. 887 (JMF), 2019 WL 3162221, at *3 (S.D.N.Y. Jul. 16, 2019) ("[C]oordination and sharing between the lawyers and agents on the criminal prosecution team, on the one hand, and [a civil enforcement authority], on the other, is, in itself, unexceptional and unproblematic.").  Indeed, even where a witness has a cooperation agreement with the Government and is required to provide information and documents to the Government, the Second Circuit has repeatedly held that such a witness is not part of the prosecution team.  *Barcelo*, 628 F. App'x at 38 (noting that this Court "has never held that the 'prosecution team' includes cooperating witnesses"); *United States v. Maxwell*, 534 F. Supp. 3d 299 (S.D.N.Y. 2021) (records in the possession of a third-party civilian are not in the possession of the prosecution team).   For these same reasons, the cooperation of JPMC, a victim of a brazen fraud, does not render it an arm of the prosecution.  Such cooperation is common and appropriate and should not be deterred.

The defendants do not cite a single authority—because there is none—that supports their remarkable claim that the Government's *Brady* obligations extend to a private party such as JPMC.  In *United States v. Connolly*, a district court found that the Government had effectively used corporate investigators to compel an employee to submit to an interview under *Garrity v. New Jersey*, 385 U.S. 493 (1967), but that case concerned very different facts and said nothing about discovery obligations.  *United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2120523

(S.D.N.Y. May 2, 2019). In *United States Blaszczak*, the district court held that even another federal agency, the SEC, was *not* an arm of the prosecution, because, among other things, the SEC was not involved in presenting a case to the grand jury, was not present for Government interviews, did not review documents obtained by the prosecution, did not develop prosecutorial strategy, and had no role in the prosecution's decision to initiate charges, even though the SEC was also investigating the defendants in parallel. *United States Blaszczak*, 308 F.Supp.3d 736, 742-743 (S.D.N.Y. 2018). Indeed, not even all government employees are necessarily part of a given prosecution team. For example, in *United States v. Stewart*, the Second Circuit held that an expert witness, who was a government employee, and who assisted prosecutors in developing mock cross examinations, was not a member of the prosecution team. 433 F.3d 273, 298-99 (2d Cir. 2006).

The defendants rely on *United States v. Hunter*, but that case concerned whether another government agency was part of the prosecution team. The Second Circuit suggested that if a law enforcement agency—there, part of the DEA—became aware that it possessed exculpatory information in a federal case, it could not withhold that information on the ground that it was not part of the prosecution team. 32 F.4th at 37-38. Nothing in *Hunter* suggests that a similar concern extends to entirely private entities like JPMC. To the contrary, this Court observed that "prosecution team" limitations "prudently prevent[ ] a prosecutor" from shouldering discovery obligations that are "unworkable." *Id.* at 37. As a result, there is no support in Second Circuit precedent for the defendants' radical notion that a victim in a criminal case could be treated as an "arm of the prosecution," for the purposes of assessing Government compliance with its disclosure obligations or otherwise.

## II.    The Defendants Do Not Allege a Cognizable *Brady* Violation

The defendants try, but fail, to allege multiple *Brady* violations. None of the defendants' allegations, which are mostly based on inaccurate portrayals and wishful speculation, rise to the

level of an actual *Brady* violation. The defendants claim that the Government deprived the defense of exculpatory records from Frank's Google Analytics database. But the defendants do not, and cannot, allege that the Government failed to produce records in its possession. Rather, the defendants merely complain about the manner in which those records were collected. That type of grievance does not implicate *Brady*. In any event, the defendants received—approximately *six months before trial*—a complete set of Google Analytics records. Likewise, the defendants complain that JPMC failed to preserve unspecified custodial records. But there is no credible reason (certainly not one raised by the defense) to believe that documents that were purged by JPMC's routine processes, prior to the Government's issuance of a grand jury subpoena, contained exculpatory material. In any event, those records were never in the Government's possession or under its control. *Brady* is not implicated. Finally, the defendants assert, with no basis, that JPMC used the attorney-client-privilege to withhold exculpatory records. Even if true—and there is absolutely no reason to believe it is—the defendants do not, and cannot, impute JPMC's privilege determinations to the Government. *Brady* is not implicated by records that are privileged and not in the Government possession. The defendants' *Brady* claims have absolutely no merit.

### A. Applicable Law

#### 1. *Brady v. Maryland*

The Government has an obligation under the Due Process Clause to make a timely disclosure of any exculpatory or impeaching evidence that is material and in its possession. *See Brady* v. *Maryland*, 373 U.S. at 87; *Giglio* v. *United States*, 405 U.S. 150, 154 (1972). A violation of this obligation deprives the defendant of a fair trial only when he "show[s] that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001).

With respect to the favorability of the evidence, evidence is only considered "favorable to the defendant" if it is exculpatory or impeachment material. *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008); *Strickler v. Greene*, 527 U.S. 263, 281 (1999). With respect to prejudice, there "is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Greene*, 527 U.S. at 281; *see also, e.g., United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) ("[U]ndisclosed evidence will be deemed material only if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'") (quoting *Kyles*, 514 U.S. at 435). Put another way, undisclosed evidence can result in a new trial only if "the undisclosed information is 'material,' within the exacting standard of materiality established by the governing case law." *United States v. Spinelli*, 551 F.3d 159, 164 (2d Cir. 2008).

There is also no due process violation where, notwithstanding the absence of a disclosure by the Government, the defendant knew or should have known about the relevant information through other means. *See Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.") (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)).

### 2. *Spoliation of Evidence*

"'Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 148 (2d Cir. 2008) (*quoting Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457 (2d Cir. 2007)). "In order for an adverse inference to arise from the destruction of evidence, the party having control

over the evidence must have had an obligation to preserve it at the time it was destroyed." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). The imposition of sanctions for the loss or destruction of evidence requires the demonstration of three factors: *first*, that the evidence at issue possessed "exculpatory value that was apparent before the evidence was destroyed," *California v. Trombetta*, 467 U.S. 479,489 (1984); *second*, that the evidence was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means," *id*.; *see also United States v. Rastelli*, 870 F.2d 822, 833 (2d Cir. 1989); and *third*, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *see also In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d at 148 (defendant "pointed to no evidence that the tapes were intentionally destroyed, and therefore the destruction of the tapes could not have amounted to spoliation").

### B. The Government Disclosed All Google Analytics Records in Its Possession.

The defendants assert that the Government improperly coordinated with JPMC to deprive the defense of access to Google Analytics records, which, according to the defense, contain exculpatory information. As noted above, this claim simply does not implicate *Brady*. There is no claim here that the Government failed to produce exculpatory material in its possession. Rather the claims—which are based on speculation and inaccurate and misleading portrayals of communications between the Government and JPMC—are that the Government should have gone about collecting Google Analytics information differently. The Government is obligated to turn over exculpatory information in its possession in time for the defense to make use of it prior to trial. It is not required to investigate its case as dictated by the defendants. The Government obtained and produced to the defense the Google Analytics records that it collected directly from

Google and from JPMC. To the extent these records are exculpatory – and they are not – the defense has had them far in advance of trial and is free to use them in any admissible way at trial. The Government did not withhold or delay the disclosure of Google Analytics records.

By way of background, Google Analytics is a platform that collects data from an account holder's website to create reports with metrics measuring traffic to the website. The Google Analytics data that was produced to the defendants relates to Frank's website. The data contains reports on, among other things, website visitors and site speed, *i.e.*, data reflecting how quickly the Frank website responded to web requests. Google Analytics did not maintain records related to Frank accountholders. For example, Google Analytics did not track and maintain records on individuals who had signed up for a FAFSA account with Frank.

To be clear, the Government does not share Amar's view that Google Analytics data is "central" to the allegations about the defendants' misrepresentations or that it contains exculpatory information. To the extent Google Analytics data is relevant, it is inculpatory. To that end, the Government intends to introduce Google Analytics data at trial in its own case-in-chief as evidence of the defendants' guilt.[3]

While not central to the Government's allegations, the Government nonetheless collected Google Analytics records pertaining to Frank's website during its investigation. Far from "wholly relying" on JPMC for these records, the Government initially obtained Google Analytics records directly from Google. On June 20, 2023, the Government served a grand jury subpoena on Google for "Google [A]nalytics account information" associated with Javice's, Amar's, and Engineer-1's accounts. The Government produced responsive records to the defense the following month, in

---

[3] Amar, on the other hand, has marked only a single page of Google Analytics data as a trial exhibit. *See* DX-OA-103.

July 2023.  Then, on October 6, 2023, the Government sought and obtained a search warrant to Google for, among other things, "[a]ll Google Analytics files and contents associated with" the defendants' accounts.  In response to the search warrant, Google produced records on October 10, 2023, November 13, 2023, and July 3, 2024, and the Government produced those records to the defense within days of receiving them.  All of these records were obtained from Google directly, without involvement of JPMC.

The following summer, in approximately June 2024, JPMC informed the Government that Google had advised that it was decommissioning the Frank Google Analytics database.  In response, on its own initiative and even though neither the Government nor the defense had requested the Google Analytics database, JPMC took immediate steps to preserve it.[4]  Specifically, JPMC retained EY (formerly Ernst & Young) to forensically image the database.  JPMC sought the Government's assistance in facilitating its continued access to the database until such time as EY could complete its collection of records.  Amar alleges that "the Government made no additional effort to collect" the materials.  Br. at 14.  This is not accurate.  The Government immediately contacted Google to ensure that the database would not be decommissioned before the data could be preserved and ultimately got Google to devise a solution for JPMC to regain access to the database.  Contrary to the defendants' assertions, the Government understands that EY was able to capture *all* records in the Frank Google Analytics database.  (*Compare* Dkt. 232-1, Ex. A, JPMC, 05 Aug. 2024 Meeting (3510-020), stating that "Ultimately JPMC was able to

---

[4] Amar appears to be under the misimpression that the Government requested the Google Analytics database from JPMC pursuant to a grand jury subpoena.  It did not.  As set forth above, the Government sought to obtain the Google Analytics database directly from Google.

capture everything in the database in some format," *with* Amar's assertion that JPMC "failed to complete its collection before Google Analytics 'shut down'" (Br. 13)).

Having learned of JPMC's voluminous collection of Google Analytics records, the Government sought those records from JPMC. On July 16, 2024, the Government served JPMC with a subpoena for "any Google Analytics data associated with . . . Frank." JPMC produced to the Government the entirety of the Google Analytics records on August 15, 2024, and the Government produced the records to the defense the very same day.[5] To assist the defense in their review, JPMC manually prepared a detailed and comprehensive index.

The defense now asserts that the Government refused to collect Google Analytics records from JPMC even though it had the ability to do so "in a strategic attempt to shield Defendants from accessing these materials in time for trial." (Br. 13). This serious accusation is baseless and wrong. Immediately after learning of JPMC's access to the database, the Government contacted Google to ensure the database would remain available until such time as JPMC's vendor, EY, could complete its forensic collection of records. The Government then issued a new subpoena to JPMC to obtain the records. The Government produced the records to the defense *the same day* it received them. At no point did the Government attempt to shield these records from the defense. To the contrary, as explained above, both the Government and JPMC worked proactively to ensure that the records were preserved and disclosed. These efforts were in addition to multiple rounds of legal process sent directly to Google. In the end, both the Government and the defense obtained a complete set of Google Analytics records approximately six months in advance of the currently scheduled trial date.

---

[5] JPMC originally produced Google Analytics records on August 9 and 12, 2024. However, those records were corrupted and were reproduced on August 15, 2024.

While the Government obtained Google Analytics records from both Google and JPMC, it was under no obligation to do so.[6]  Even if the records were exculpatory, which they are not, the Government is obligated only to produce exculpatory information that is material and in its possession.  *See United States v. Avenatti*, No. 19-CR-374 (JMF), 2022 WL 457315, at *1 (S.D.N.Y. Feb. 15, 2022) ("the Government's disclosure obligations extend only to evidence or information in the possession of the 'prosecution team'"); *see also Hutcher,* 622 F.2d at 1088 ("We reject. . .a notion of 'possession' which is so elastic as to embrace materials that the prosecution has never had in its files, never inspected, and never knew about.").  There is no claim from the defense that the Government did not produce the Google Analytics material in its possession— which, in any event, is not exculpatory.

The defense, of course, was always free to subpoena these records from JPMC.  *See United States v. Paulino*, 445 F.3d 211, 225 ("[E]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence.").  For whatever reason, they chose not to.  On November 9, 2023, Amar issued a sweeping subpoena to JPMC, seeking 34 broad categories of records.  Amar's subpoena did not request the Frank Google Analytics database.[7]

---

[6] Amar alleges repeatedly that the Government "failed" to ensure JPMC collected Google Analytics data.  Br. 9, 11, 13.  As set forth above, Amar is mistaken.  In any event, Amar does not and cannot cite to any authority putting an obligation on the Government to police a third-party's collection of records.

[7] Amar's subpoena requested documents and communications "related to internal discussions of the content and subject matter of JPMC's review of Frank's Google Analytics data" and a list of personnel "with access to Frank's Google Analytics platform," but did not request actual records

In short, Amar's allegations of misconduct concerning the collection and disclosure of Google Analytics records are wrong. The Government obtained Google Analytics records from both Google and JPMC. At no point did the Government "coordinate" with JPMC to "shield" the records – which are inculpatory – from the defense. And, in the end, the defense received a complete set of Google Analytics records more than six months before the start of trial. There was no *Brady* violation with respect to the Google Analytics records.

### D.  The Defendants' Claims Regarding Deleted or Unproduced Documents are Meritless

The defendants claim that, as a result of the Government's "failure to enforce its subpoena on JPMC," certain custodian files were deleted that "may have been advantageous to the defense case[.]" Br. 15-19.  These claims, couched as *Brady*, are in fact allegations of spoliation.  For all the reasons stated above, the Government never controlled these documents or had an obligation to preserve them because they belonged to JPMC, which is not an arm of the prosecution.  *See supra* Section I; *Kronisch v. United States*, 150 F.3d 112, 126.  On this basis alone, the Court should reject the defendants' spoilation-based arguments.

Even if the Government was somehow responsible for the deleted documents—and it is not—the defendants cannot make out a claim that "potentially spoliated documents would have been advantageous to the defense case." Br. 17.[8]  Whether such documents would have been

---

from the Google Analytics database.  The omission of the Google Analytics database from Amar's subpoena is curious given his recent claim that these records are "central," "of paramount importance," and "exculpatory."  Br. 9.

[8] As an additional reason why the Government could not be responsible for the routine purging of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓ documents, those documents were purged in August 2022, months before the Government even issued a grand jury subpoena to JPMC.

advantageous is pure speculation, and in any event, the defendants have other sources of information to make their arguments.  For example, with respect to ███████████, the defendants claim that notes that the Government anticipates she will authenticate at trial are of "questionable reliability," and that allegedly deleted documents may have been advantageous for the defense case.  Br. 17.  But in moving to preclude the admission of ██████ notes, Javice cite several records produced by the Government from JPMC to attack the reliability of those notes. *See* Dkt. 196, at 8-9.  In addition, the defendants currently have in their possession approximately 9,000 documents on which ██████████ name appears, demonstrating that they have ample records to examine ██████████ role.  *Rastelli*, 870 F.2d at 833.

With respect to █████, the defendants claim that "they are missing key communications about Frank's involvement in the data transfer and Mr. Amar's involvement in the same." Br. 17.[9] Hardly so.  Numerous custodians whose documents were collected, reviewed, and produced were involved in the data transfer, including ████████████, a Government witness, and ████████ name appears on approximately 1,000 documents in the Government's Rule 16 productions. Accordingly, there is no basis for a spoliation claim, where, as here, the defendants cannot show that any steps were taken to intentionally deprive them of evidence, or that the missing evidence is exculpatory, or that the missing evidence cannot be replicated through other means.  *United States v. Greenberg*, 835 F.3d 295, 304 (2d Cir. 2016).

Finally, the defendants claim that "over a year following the Government's first grand jury subpoena," "JPMC did not issue litigation holds for around eleven or more relevant custodians" and the "Government does not appear to have taken action to ensure the Bank then issued litigation

---

[9] At the Court's November 2, 2023 Hearing, the Court denied the defendants' request for ████████ documents.  *See* Dkt. 62, Transcript of November 2, 2023 Hearing, at 16-17.

holds to all key custodians." Br. 18. This claim has nothing to do with *Brady* or any other constitutional violation. In addition, any criticism that the defendants may have for JPMC's litigation holds is irrelevant to this motion, as it is not for the defendants to enforce the Government's grand jury subpoenas. Finally, the defendant's claim that, as a result of JPMC's "control over which email inboxes. . .were collected and produced to the Government," the Government did not receive "the custodial email files" of certain Government witnesses. Br. 18.[10] This claim, too, has nothing to do with *Brady* or spoliation, and is particularly unavailing in light of the defendants' prior litigation with JPMC over the scope of their own Rule 17 subpoena and the custodians to be searched.

At bottom, for all these claims involving spoliation or the absence of some particular document, the core issue remains the same: none of these complaints by the defense give rise to any cognizable *Brady* claim or other violation of law by the Government, and none of these complaints have resulted in any deprivation of constitutional rights for the defense.

### E. The Government Was Not Involved in JPMC's Privilege Determinations.

The defendants also contend that the Government conspired with JPMC to use the bank's attorney-client privilege to "delay disclosure of exculpatory documents" to the defense. Br. 19. The defendants do not set forth even a *prima facie* claim that the Government violated *Brady*—instead this is, again, a mixture of inaccuracies and conspiratorial speculation. It is not a claim

---

[10] The defendants cannot complain about the absence of documents to prepare for trial and cross-examination of Government witnesses, including Engineer-1, Wong, and Glazer. Br. 30-32. The defendants have thousands of documents related to these witnesses from the Government's discovery productions: Engineer-1's name appears on approximately 25,000 documents, █████████ name on approximately 28,000 documents, and █████████ name on approximately 24,000 documents.

that the Government withheld exculpatory information in its possession. This extreme accusation is groundless and without merit.

For more than a year, the defendants have been litigating attorney-client privilege issues directly with JPMC. As part of that litigation, JPMC voluntarily agreed to downgrade documents that were initially identified as privileged, and the Court directed JPMC to downgrade a subset of documents. From the beginning, JPMC has taken consistent views on the privilege as to both the Government and the defendants. That is, both the prosecution and the defense have received the same documents with the same redactions and the same privilege assertions. At no point, to the Government's knowledge, has JPMC disclosed privileged information to the Government. Indeed, in witness interviews, the Government has consistently admonished JPMC employees not to discuss topics involving counsel, and JPMC lawyers have intervened when witnesses strayed onto topics that could implicate the privilege. The Government and the defendants are equally situated vis-à-vis JPMC's privilege assertions.

Amar claims that some of the documents that were originally withheld as privileged but later downgraded "are material to Mr. Amar's defense as they show his lack of intent to defraud . . . ." Br. 19. Amar cites to a single document that, based on the Government's review, has zero exculpatory value. But even if the cited document was exculpatory, the defendant's motion fails for the precise reason that Amar now has the document he says he needed for his defense. There is no *Brady* violation where the defendant is in actual possession of the evidence in advance of trial. The defendants do not, and cannot, cite to any authority standing for the proposition that the Government's *Brady* obligation could somehow extend to records that are both not in the Government's possession and deemed to be privileged by a third party. Moreover, the defendants cannot credibly attribute JPMC's privilege assertions to the Government. The Government has

never involved itself in JPMC's privilege determinations, and doing so could run afoul of DOJ guidance.  *See* United States Attorney Manual § 9-28.710.

At most, Amar cites to three discrete notes in the JPMC 3500 to argue that JPMC selectively chose to share privileged information with the Government, presumably implying that the Government received an unfair advantage.  But this would also not give rise to a *Brady* claim or any other actionable claim of impropriety.  At the outset, the Government disagrees with the defendants' characterization that JPMC disclosed privileged information.  For example, the defendants cite to a note in the 3500 that "JPMC review[ed] [Frank's terms and conditions], which contemplate [disclosure of user information] being fine for acquisition scenario."  Br. 20.  This note does not reflect legal advice.  The Government expects that multiple, non-lawyer witnesses from JPMC will testify at trial that they reviewed Frank's privacy policy and believed it flatly contradicted Javice's claim that Frank's terms and conditions prohibited sharing of user information with third parties.  Similarly, the defendants cite to a note in the JPMC 3500 that says that there was "no question at JPMC" "legal" that JPMC would be able to use data from Frank for marketing purposes.  Br. 20.  This is a distraction.  Even if this passing reference did constitute potentially privileged material, it is certainly not exculpatory and it has been disclosed to both the Government and the defense.  There is no *Brady* claim.  It is simply illogical to assume that based on these discrete notes—which the Government produced to the defendants and do not contain exculpatory information—that JPMC and the Government have been colluding to deprive the defendants of a fair trial by somehow hiding unspecified other information.  The Government has done no such thing, and the defendants do not credibly argue otherwise.

### F.  The Defendants Are Not Entitled To The Relief They Seek.

Accordingly, the Court should reject, once again, the defendants claim that JPMC is part of the prosecution team.  For the same reasons, the defendants are not entitled to the sweeping and

unprecedented relief they seek.  The defendants seek "full and complete" copies of notes taken by JPMC lawyers and investigators as part of the bank's internal investigation, notes from JPMC's interviews of witnesses (presumably the notes of attorneys), and "the email inboxes" of all witnesses who will testify at trial.  None of these things, to the extent they even exist, are in the Government's possession.  Any such request can be directed, at best, to JPMC.  The defendants' eleventh-hour request for the Government to intercede and somehow obtain newly desired, voluminous records from a third-party victim at the defendant's request has no basis in law.  The defense is well aware of their ability to subpoena records directly from JPMC, they have exercised that ability in the past, and they are not entitled to any other relief.  *See United States v. Meregildo*, 920 F. Supp. 2d 434, 445 (S.D.N.Y. 2013) (the Government's disclosure obligations do "not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel").

## III.    No Evidentiary Hearing Is Necessary

No evidentiary hearing is necessary.  Once stripped of the defendants' baseless allegations and distorted characterizations, the defendants offer not a single fact that creates any basis for the court to conclude that JPMC is part of the government's prosecution team.  This issue has already been fully and fairly litigated by the Court, and the defense does not set forth any basis to warrant reconsideration.  *See Analytical Survs., Inc. v. Tonga Partners*, 684 F.3d 36, 52 (2d Cir. 2012) (standard for reconsideration is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked.").  Nor does the defense provide any basis for a hearing or any further fact-finding regarding their myriad *Brady* claims, or allegations of Government impropriety.  These allegations are clearly contradicted by the available record and the defense fails to show that, even if credited, their allegations present

any material *Brady* claim or any other issue of constitutional dimension. For these reasons, the defendants' motion should be denied in its entirety.

## CONCLUSION

For the foregoing reasons, the defendants' motion should be denied.

Dated:  New York, New York
   January 31, 2025

        Respectfully submitted,

        DANIELLE R. SASSOON
        United States Attorney


By:    _____/s/_____
        Rushmi Bhaskaran
        Nicholas W. Chiuchiolo
        Micah F. Fergenson
        Georgia V. Kostopoulos
        Assistant United States Attorneys
        Telephone: (212) 637-2439 / 1247 / 2190 / 2212