UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CHARLIE JAVICE and OLIVIER AMAR,<br><br>Defendants. | 23-cr-00251-AKH |

**REPLY IN SUPPORT OF DEFENDANT OLIVIER AMAR'S MOTION TO COMPEL
COMPLIANCE WITH RULE 16, *BRADY*, AND *GIGLIO***

**PRELIMINARY STATEMENT AND REQUESTED RELIEF**

For years, Defendants have had to seek repeat intervention from this Court on a variety of discovery and disclosure issues, distracting and delaying the preparation of their defense, because of the Government's willful and intentional avoidance of material evidence that is effectively within the Government's "control." The Government treated JPMC—an interested third party who happens to hold nearly all of the documents and witnesses in this case—as an agent of the prosecution, despite being on notice that the Bank had a demonstrated practice of allowing highly relevant documents to be deleted, holding back relevant and exculpatory documents on the basis of unfounded privilege calls, and neglecting to search and produce the files of key custodians. But for the concerted efforts of Defendants, and the assistance of this Court, the defense exhibit lists would look much different today. This prejudice warrants relief. Defendants do not seek to dictate the manner in which the Government investigates its case, as the Opposition half-heartedly suggests. Instead, Defendants simply seek to hold the Government to its constitutional obligations and this Court's Rule 5(f) order. *See* ECF No. 20.

For the reasons set forth below and in Defendants' motion to compel, ECF No. 232, the Defendants respectfully request that the Court grant the following relief:[1]

(1) Order the Government to obtain from JPMC, and produce to Defendants, the Bank's notes from its internal investigation of Defendants, including notes from the interviews of witnesses on the Government's "will" or "may" call list;

(2) Order the Government to obtain from JPMC, and produce to Defendants, communications and documents from the relevant time period from the inboxes and files of the Government's witnesses to the extent available, including ▇▇▇▇▇▇ ("Engineer-1"), ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ("Executive-1), and ▇▇▇▇▇▇ ("Executive-2");

(3) Order the Government to obtain the FDIC OIG's entire investigative file and review the file for *Brady*, *Giglio*, or other information material to the preparation of the defense and

---

[1] If the Court denies the relief requested, and depending on the evidence admitted and arguments made at trial, Defendants reserve the right to seek an adverse jury instruction (as is detailed above).

  produce any such documents or information, including any memoranda, notes, or other summaries of interviews conducted by the Government, calls and/or meetings with potential Government witnesses, and/or any communications between the SDNY and the FDIC OIG related to the investigations of Ms. Javice, Mr. Amar, and/or Frank; and

(4) Provide an adverse jury instruction allowing defense counsel to argue and admit evidence concerning the Government's investigative methods or lack thereof, such that the jury is permitted to consider the fact that certain materials were not sought, obtained, or preserved in evaluating whether the Government has met its burden of proof.

The "United States Attorney is the representative not of an ordinary party to a controversy," and thus its "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). Given that trial will commence in two weeks, Defendants respectfully request that the Court compel the Government to produce these materials.

## ARGUMENT

### I. The Government Treated the Bank Like an Agent of the Prosecution, and In Doing So, Improperly Outsourced Its Discovery and Disclosure Obligations

To distract the Court from the significant detail within the 3500 materials sufficient to find the Bank's lawyers acted as agents under applicable law, the Government selectively focuses on discrediting a few facts (while ignoring others entirely).[2] But even those efforts are seemingly disingenuous. Most notably, the Government has no good answer for its failure to timely obtain, preserve, and produce Frank's Google Analytics database. The Government concedes that the data it ultimately produced—months after the Government claimed the case was trial ready—was wholly reliant on JPMC's collection and preservation efforts, which were triggered by defense counsel's demand on JPMC to preserve the data before the database would be shut down. *See* Mot.

---

[2] The Government claims that defense counsel did not engage in a "true meet-and-confer" to frame the motion as seeking to "relitigate already-decided issues." Gov. Br. at 2. Not so. Defense counsel informed the Government that it intended to move to compel substantially based on the facts newly disclosed in the Government's own 3500 materials, identifying the relevant materials as the meeting notes between JPMC's counsel and SDNY.

Compel. Br. at 12–13. The Government is aware that Defendants did not receive any substantive production relating to Google Analytics from its search warrant on Google. *See* USAO_00031547-00031563 (screenshots identifying Frank's Google Analytics account).

The Government fails to address the fact that it treated the Bank as an agent, not as an ordinary subpoena recipient or victim: the Government relied on the Bank's preservation and collection work; the Government asked for the Bank's views on whether Google Analytics captures data on users; SDNY and the Bank's counsel apparently coordinated to determine whether to produce evidence pursuant to a Rule 17 subpoena or the grand jury subpoena; and SDNY and the Bank's counsel coordinated on a response to defense counsel's inquiries relating to JPMC's collection and preservation efforts. *See* Mot. Compel Br. at 9–15. Nor does the Government have a response for why it waited to notify defense counsel that JPMC was preserving such data on the day the Government was aware Google would permanently shut down the database.

The Opposition does little to address Defendant's other points. For example, the Government minimizes the plain import of three separate JPMC documents produced in the 3500 materials—not a single email exchange as the Government contends—that show the Government relied on Bank's counsel for its assessment of materials within JPMC's possession and whether evidence existed to support exculpatory defenses largely relevant to the defenses of Mr. Amar's co-defendant. *See* Mot. Compel Br. at 6–8. If that claim is "outlandish" it is because it is remarkable that the Government would consult in that way with an "ordinary subpoena recipient" and "victim." No "conspiracy-laden speculation" is required to reach that conclusion: those notes plainly reflect that the Government conceded such materials could exist in the Bank's possession, asked for counsel's opinions on whether they existed, and apparently did not ask about such evidence specific to Mr. Amar. The Government's "explanation"—that its communication was

3

animated by defenses raised by Mr. Amar's co-defendant in the Bank's pending civil fraud suit—only further proves the intertwined nature of the Bank's separate investigation and the criminal prosecution. And it underscores the Government's failure to ask JPMC about data from Frank's Google Analytics database when it was likewise aware then that such evidence was materially relevant to Mr. Amar's potential defense. *See* Mot. Compel Br. at 9–11.

## II. The Government's Improper Outsourcing of Its Discovery and Disclosure Obligations Prejudiced Defendants

The Opposition largely attempts to diminish the prejudicial impact of its failure to enforce its subpoenas on the Bank as a "conspiracy." *See* Opp. at 20–22. That argument is as ironic (given the nature of the Government's allegations with respect to Mr. Amar) as it is wrong (given the extent of the Government's coordination with its purported victim). Defendants do not argue that the Government "conspired" to permit the destruction of documents or the delay of production of exculpatory documents. These points serve to the demonstrate that the Government was on notice that the Bank was not a typical cooperating victim or an ordinary subpoena recipient and to underscore why the Government's outsourcing of its investigation to this entity prejudiced the defense.

The Bank is an interested party with a significant financial and reputational stake in the outcome of this case. The Bank also worked hand-in-hand with the Government in connection with the prosecution of this case. And the Government—despite being aware of the Bank's incentives and demonstrated failures to obtain and preserve relevant evidence—continued to defer to the Bank's judgment. Indeed, the Government concedes it wholly relied on the Bank to preserve and collect Frank's Google Analytics database even before it issued a grand jury subpoena for those materials. The Government thus always has had the "practical ability" (by virtue of its close coordination with the Bank) and "legal right" (by virtue of the subpoenas it issued to the Bank) to

4

obtain materials within JPMC's possession and those materials are therefore in the Government's "control." *See, e.g.*, First Mot. Compel Br., ECF No. 58 at 16-20 (describing *United States v. Stein*, 488 F. Supp. 2d 350, 363 (S.D.N.Y. 2007), and its progeny).

Despite the substantial evidence that the Government outsourced its investigation to JPMC, *see* Mot. Compel Br. at 6–7, the Government falls back on its familiar refrain that the materials sought by Defendants can be sought directly from the Bank. Throughout this case, the Government and the Bank engaged in coordinated gamesmanship to block Defendants' access to relevant and potentially exculpatory materials within the Bank's files. Initially, the Government declined to enforce its own subpoenas to obtain *Brady* and responsive materials within the Bank's possession, yet strung Defendants along saying it would be unnecessary for Defendants to pursue missing documents through their own trial subpoenas. When the Government later claimed that it could not produce any *Brady* or responsive materials in JPMC's possession, Defendants were forced to seek relief from the Court.

Once again, on the eve of trial, the Government seeks to stymie Defendants' efforts to seek materials that are demonstrably and admittedly within its control. The Court should reject the Government's suggestion that the Government should be absolved of its discovery and disclosure obligations because Defendants were able to seek materials from JPMC through Rule 17 subpoenas. It is the Government's obligation to obtain and present all evidence within its custody and control that is "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). And they cannot avoid its disclosure obligations by devolving them to a private company. They have not done so despite a record that now is clear that they should have done so.

**III.    The Government Conducted a Joint Investigation with the FDIC OIG and Therefore Should Review Its Full Investigative File for and Produce Any *Brady*, *Giglio*, or Other Information Material to the Preparation of the Defense**

In its Opposition, the Government now admits for the first time that the FDIC acted as the investigative agency for the SDNY—or, in other words, was a member of the prosecution team. According to the Government, its "extensive, independent investigation of the allegations in this case [was] assisted by Special Agents in the Federal Deposit Insurance Corporation ("FDIC") and the U.S. Attorney's Office for the Southern District of New York." Opp. at 4. The Government has thus admitted that its obligations under *Brady*, *Giglio*, and their progeny extend to the FDIC's files related to this investigation. It remains unclear whether the Government has reviewed the files of the FDIC as it is required to do.

Courts in the Second Circuit have routinely held that "[w]here the [government] conducts a 'joint investigation' with another state or federal agency, . . . the prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady* evidence." *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012); *see also United States v. Blaszczak*, 308 F. Supp. 3d 736, 741 (S.D.N.Y. 2018) ("[*Brady*] extends to anyone who is an 'arm of the prosecutor.'" (quoting *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975))); *United States v. Martoma*, 990 F. Supp. 2d 458, 462 (S.D.N.Y. 2014) ("[T]he Court finds that the USAO and the SEC conducted a joint investigation of the Defendant, and therefore the USAO's obligation to produce [*Brady/Giglio* material in] communications . . . extends to documents in the sole possession of the SEC."). That obligation extends to all such files, not just the ones the Government wishes to review. *See, e.g.*, *Gil*, 297 F.3d at 101 (finding, under *Brady*, the DOJ must produce any "evidence favorable to the accused when such evidence is material to guilt or punishment" that is known to the DOJ, even if in the possession of another government agency); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (finding the government "has a duty to learn of any

6

favorable evidence known to the others acting on [its] behalf in the case" (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995))).

Defendants have been raising this issue for many weeks. On December 23, 2024, shortly after the Government provided its 3500 material, counsel for Mr. Amar emailed the Government, flagging that "[r]epresentatives from the SEC and FDIC attended several witness interviews" and requesting production of "notes, communications, or memoranda from these agencies." *See* Ex. A (December 23, 2024 email from Defendants to SDNY). The Government responded on December 30, 2024, stating that it had already "provided all the notes of witness interviews that are in the Government's possession, which includes notes, if any, taken by agents with the FDIC." *Id.* Thereafter, Defendants issued a Rule 17(c) subpoena to the FDIC on January 14, 2025, seeking materials related to interviews of individuals on the Government's witness list that it appears, based on the Government's disclosures, that FDIC personnel attended. Following service of that subpoena, during a meet and confer, a representative of the FDIC OIG acknowledged on a January 27, 2025 conferral that the FDIC OIG is "part of the prosecution team" and would have expected the Government to have turned over all relevant records to Defendants.

## CONCLUSION

To address these failures, the Court is authorized to impose a wide range of remedies to ensure the Government abides by its disclosure obligations. *See* Due Process Protection Act ("DPPA"), 134 Stat. 894, Pub. L. No. 116-182 (2020); ECF No. 20. For the reasons set forth above, and those presented in its opening brief, Defendants respectfully request the Court grant the relief requested.

Dated: February 3, 2025

Respectfully submitted,

**KOBRE & KIM LLP**

*/s/ Alexandria E. Swette*
Alexandria E. Swette
Sean S. Buckley
Jonathan D. Cogan
Daisy Joo
800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Alexandria.Swette@kobrekim.com
Sean.Buckley@kobrekim.com
Jonathan.Cogan@kobrekim.com
Daisy.Joo@kobrekim.com

Matthew I. Menchel
201 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
Tel: (305) 967-6100
Matthew.Menchel@kobrekim.com

Erika L. Berman (pro hac vice forthcoming)
1919 M Street, NW
Washington, DC 20036
Tel: (202) 664-1900
Erika.Berman@kobrekim.com

*Counsel for Defendant Olivier Amar*