# EXHIBIT A

K1TMAVEVD1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                v.                        19 CR 373 (PGG)

MICHAEL AVENATTI,

                Defendant.                Voir Dire
------------------------------x
                                          New York, N.Y.
                                          January 29, 2020
                                          10:10 a.m.
Before:


                    HON. PAUL G. GARDEPHE,

                                          District Judge
                                          -and a Jury-

                            APPEARANCES

GEOFFREY S. BERMAN
        United States Attorney for the
        Southern District of New York
BY:  MATTHEW D. PODOLSKY
     DANIEL RICHENTHAL
     ROBERT B. SOBELMAN
     Assistant United States Attorneys

BLACK SREBNICK KORNSPAN & STUMPF, P.A.
        Attorneys for Defendant
BY:  HOWARD M. SREBNICK
     -and-
SCOTT A. SREBNICK
JOSE M. QUINON
MICHAEL D. DUNLAVY
     -and-
PERRY GUHA, LLP
BY:  E. DANYA PERRY
     GEORGE BARCHINI

Also Present:
DeLeassa Penland, Special Agent (USAO)
Andrew Hamilton, Paralegal
Juliana Manrique, Paralegal
Michael Lyon, Trial Technician

1              MR. STABILE:  It talks about risks of impartiality.

2              THE COURT:  I understand that you think that his

3     contact with Nike raises issues about whether he could be fair

4     and impartial.  I don't need case citation for that

5     proposition.  I can understand it.

6              Mr. Godinez, can you please come up, sir.

7              (Juror present)

8              THE COURT:  How are you?

9              JUROR:  Doing well.

10             THE COURT:  I just wanted to review with you, so that

11    I'm clear in my own mind.  I had asked you questions about

12    Nike, and I know that you had some responses.  I just want to

13    remember what contact you had.

14             I know that you told me today that you essentially

15    test products for them?

16             JUROR:  Yes.

17             THE COURT:  And they can be gift cards or whatever in

18    exchange for that.  I think you said that happens like every

19    six months or so?

20             JUROR:  Yes.

21             THE COURT:  Do you have any sense of the value of that

22    merchandise that you get from them every six months?

23             JUROR:  That's the thing.  It's products that have yet

24    to be released, so there isn't a value to it.  They don't even

25    know if they are going to release it to begin with.

K1TMAVEVD3

1           THE COURT:  That's why you're testing it?

2           JUROR:  Exactly.

3           THE COURT:  You tell them whether you like it or not?

4           JUROR:  Absolutely.

5           THE COURT:  Did you also tell me that you had applied

6      for a job at Nike?  Refresh my memory of any other contact you

7      had with Nike other than getting this merchandise and giving

8      them reviews of it.

9           JUROR:  Absolutely.  Six, seven years ago I had been

10     on their campus.  I've been to their employee store.  I wasn't

11     working for them.  But the team I was working with was

12     affiliated with Nike.

13          THE COURT:  What kind of team was that?

14          JUROR:  This was the Major League Soccer team, the

15     Portland Timbers in Oregon.

16          THE COURT:  Were they sponsor of the team?

17          JUROR:  No.  Since they are already in the city, they

18     just had a connection.  As far as applications, this was like

19     right when I graduated college I applied for a job there.

20          THE COURT:  How many years ago was that?

21          JUROR:  2013, 2014, I believe.

22          THE COURT:  What kind of job were you looking for?

23          JUROR:  Sales associate job for their store in the

24     Upper East Side.

25          THE COURT:  Since that time, since you applied and

K1TMAVEVD3

1    other than your review work for them where they give you

2    products and you give them reviews of it, any other contact

3    that you had with Nike over say the last six or seven years or

4    essentially when you graduated from school?

5        JUROR:  Not tied to the office, but to an employee,

6    yes.  Where almost a month ago I played at their New York City

7    headquarters, played basketball there, and I'm playing there

8    this Friday.

9        THE COURT:  That's through a friend that you have who

10    works at the company?

11        JUROR:  Yes.

12        THE COURT:  That's what gives you access to their

13    facility?

14        JUROR:  Absolutely.

15        THE COURT:  Do the lawyers have additional questions

16    they want to put to the juror?

17        MR. RICHENTHAL:  Good afternoon.

18        In trying to become sales associate, do you take any

19    steps to demonstrate why you think you could be a good sales

20    associate, and if so, can you describe those to the lawyers and

21    the Court?

22        JUROR:  I did have an in-person interview.  I did

23    display like my admiration for the brand, for the products, my

24    knowledge about it as well.  But that's pretty much all I can

25    remember.

K1TMAVEVD3

1          THE COURT:  Let me break in for a second because you

2     made reference to your admiration of the brand.  Can you speak

3     to that for a minute.  What is your view of the Nike brand?

4          JUROR:  I've been a fan all my life.  The reason I

5     have ties to those basketball players is because I was a

6     basketball player myself.  I played varsity basketball for

7     three years, then played intramurals and have been using their

8     products for pretty much all my life, yes.

9          THE COURT:  I take it you have a high opinion of their

10    products?

11         JUROR:  Yes.

12         MR. RICHENTHAL:  Is your opinion grounded in your view

13    of their products or their culture or something else, if you

14    can expand?

15         JUROR:  Mixture of both.  Definitely a fan of their

16    products.  Their marketing as well.

17         MR. RICHENTHAL:  Do you have that view of any other

18    athletic companies?

19         JUROR:  That's a good question.  Adidas a little bit

20    and Brooks.  I'm a big fan of their running shoes.

21         MR. RICHENTHAL:  Do you use products for all three

22    companies?

23         JUROR:  Adidas, not really.  For Brooks, yes.

24         MR. RICHENTHAL:  Have you ever posted publicly your

25    views of Nike or Adidas or Brooks?

1          JUROR:  For Nike, yes, I have.

2          MR. RICHENTHAL:  Can you tell us when and how that

3     came about?

4          JUROR:  Nike had this big marketing campaign where

5     they were hosting run clubs.  It was all free.  And I was part

6     of those run clubs.  I would post on Instagram.  This was from

7     2004 to 2015, just the year.  I have stopped posting since.

8          MR. RICHENTHAL:  Why have you stopped posting?

9          JUROR:  They just don't do it anymore.  They stopped

10    it after about a year or so.

11         MR. RICHENTHAL:  Is there anything about your view of

12    Nike that you think would cause you, one way or another, to

13    favor Mr. Avenatti or disfavor Mr. Avenatti with respect to the

14    allegations in this case?

15         JUROR:  Can you repeat that.

16         MR. RICHENTHAL:  Is there anything about your view of

17    Nike that would cause you to favor one party or disfavor one

18    party with respect to the allegations in this case?

19         JUROR:  No.  I don't know Mr. Avenatti personally.  I

20    have not seen his face before this case has started.  No.

21         MR. RICHENTHAL:  What if there was a witness, for

22    example, a lawyer, who might have represented Nike, would you

23    think that you'd have a problem looking at that witness as the

24    same as any other witness?

25         JUROR:  No.  No problem at all.

K1TMAVEVD3

1          MR. RICHENTHAL:  Are you confident in that?

2          JUROR:  Yes.

3          MR. RICHENTHAL:  Why are you confident in that, given

4   that you've said, and we appreciate your candor, that you use

5   Nike's properties and you admire the company?  Can you explain

6   why you're confident?

7          JUROR:  He is just a lawyer.  Probably represents Nike

8   and any other brand as well.  He doesn't really have any close

9   ties to Nike.

10         MR. RICHENTHAL:  Let me change the question slightly.

11  Imagine for a moment the person was not an outside lawyer but

12  in fact an employee of Nike itself.  Would you nevertheless be

13  able to look at that witness like any other?

14         JUROR:  Absolutely.  I have no ties whatsoever.

15         MR. RICHENTHAL:  Do you have any doubt about that,

16  given your admiration for the company?

17         JUROR:  No.  No doubt.

18         MR. RICHENTHAL:  Why?

19         JUROR:  Again, I don't have any personal connection,

20  nor am I even applying for a job to Nike.  I am not looking

21  towards Nike at all.  A lot of my focus now is on tech.  So do

22  I still have admiration for the company and the brand?  Yes.

23  But if I had ties to the employees and admiration of the

24  employees, no.

25         THE COURT:  Remind us what your occupation is, what it

K1TMAVEVD3

```
1    is you're doing now.

2              JUROR:  Yes.  I'm an account manager for a company

3    called ZeroCater.  It's a corporate catering service here in

4    the city.

5              THE COURT:  And how long have you been doing that?

6              JUROR:  Six months.

7              THE COURT:  I'm sorry.  Could you tell us again what

8    you did before that.

9              JUROR:  Yes.  Absolutely.  I was working for -- I'm

10   sorry.  It's a tech startup in the city called Annie Moto.

11   They do video engineering.  And I was doing similar work.  Like

12   client success, client support.

13             THE COURT:  Other questions.

14             MR. QUINON:  Good morning.  Let me ask you this.  You

15   posted about the product Nike, did you not?

16             JUROR:  Um-hum.

17             MR. QUINON:  And how often were you posting?

18             JUROR:  Yeah.  They were hosting these run clubs for

19   about maybe once or twice a week, give or take.  They had

20   others.  But they would be at capacity.  So I would be in like

21   maybe one or two.

22             MR. QUINON:  Where were you posting?

23             JUROR:  Most times -- for the most part, it was

24   Instagram.  Actually, all the time, it was Instagram.

25             MR. QUINON:  And the purpose of the posting was what,
```

K1TMAVEVD3

1    to promote Nike?

2              JUROR:  To promote Nike as well as the products.

3              MR. QUINON:  So you're promoting the company as well

4    as the products.  That was the purpose?

5              JUROR:  Sometimes they will give us free stuff, like a

6    T-shirt, free bag, things like that.

7              MR. QUINON:  But you understood that the idea that

8    they are giving you the free product is for you to advance

9    their economic interests?

10             JUROR:  Absolutely.  I recognize that.

11             MR. QUINON:  And not only were you advancing their

12   economic interests to some degree, even though you can't place

13   a precise value on what you were receiving, you are receiving

14   merchandise that was good for you to have, correct?

15             JUROR:  Yeah.

16             MR. QUINON:  Tell me a little bit more about this

17   posting.  You can tell by my age, I am not too familiar with

18   this Internet stuff.

19             JUROR:  No worries.

20             MR. QUINON:  Tell me a little bit about frequency, and

21   what was the latest that you've been posting?

22             JUROR:  Well, the latest I've been posting, like

23   outside of Nike or about Nike?

24             MR. QUINON:  This is just about Nike.  That's all we

25   are talking, about Nike.

K1TMAVEVD3

1          JUROR:  I haven't posted any Nike stuff since that's

2     ended.  That ended like 2014, 2015, somewhere around there.

3          MR. QUINON:  Since 2014, '15, you have not posted

4     about Nike?

5          JUROR:  Not at all.

6          MR. QUINON:  And nothing about Nike products?

7          JUROR:  Not at all.  Actually, for the testing, the

8     products that I test, one of the specific rules to be

9     maintained as a tester, you cannot post on social media.

10          MR. QUINON:  Just so I understand, the last posting

11     would have been '14, '15.

12          JUROR:  Um-hum.

13          MR. QUINON:  But since that time you have been

14     receiving products, correct?

15          JUROR:  Yes.

16          MR. QUINON:  When you receive these products, are you

17     encouraged to share with friends and people about how you feel

18     about the product?

19          JUROR:  Doesn't specifically state it, but they also

20     don't tell us not to.  I do share my knowledge and what I feel

21     about the product, but I do not post it publicly on social

22     media or any platforms.

23          MR. QUINON:  The judge asked you were how often you

24     would receive it, and you said somewhere along the lines of

25     months in between?

1          JUROR:  Six, seven months, sometimes longer, but

2     usually between six and seven months.

3          MR. QUINON:  What kind of quantity do you get of these

4     products?

5          JUROR:  It's always like one piece.  Whether it be a

6     pair of shoes, pair of pants, or the latest one, which was two

7     weeks ago, that I completed was just a jacket.

8          MR. QUINON:  Let's say you get this jacket.  What is

9     the process for you?  I suppose they want some feedback, right?

10          JUROR:  Um-hum.

11          MR. QUINON:  How do you arrange to give your feedback

12     to them?  How is that done?

13          JUROR:  We have a platform.  They have a website that

14     I log into where I fill out daily sort of like a survey, and

15     then at the end I give general feedback at the end of that

16     survey.  I do this each time I wear it.  And that's pretty much

17     it.

18          MR. QUINON:  Essentially, every time you wear whatever

19     apparel they give you, you have to report to them what you wore

20     that day and where you wore it to?  What do you report?

21          JUROR:  Those two things.  They want to report the

22     length of time that I wore it because you have to hit a minimum

23     of a certain amount of times that you wore it.  And then they

24     also want to know just my general feedback about the product.

25          MR. QUINON:  They require you to wear it a certain

1    amount of time?

2              JUROR:  Yes.

3              MR. QUINON:  And the idea, I would think, is to wear

4    it where there are more people, correct?

5              JUROR:  Can you repeat it.

6              MR. QUINON:  The idea would be for you to wear the

7    product where people are going to see the product, correct?

8              JUROR:  Again, in their rules, that's not stipulated.

9    Again, they refrain from you to reporting at all publicly on

10   any platforms that we are testing it.  Yes, I do keep it to

11   myself.  If people see me wearing it and they ask me, I can

12   give them my general feedback about it.

13             MR. QUINON:  I'm almost done, so bear with me.

14             JUROR:  Of course.

15             MR. QUINON:  You mentioned before, when the judge

16   asked you, that you had a great admiration for the company.

17             JUROR:  Yes.

18             MR. QUINON:  This is a case that deals with the

19   company, and obviously we just want to make sure trying to find

20   out where your mind is at.  We can't see it.  We depend on you.

21   Would you feel more comfortable if this was a case that was not

22   about Nike?  Would that make you feel more comfortable to serve

23   on a case where Nike would not be involved as it is in this

24   case?

25             JUROR:  That's a good question.  Do I have a general

K1TMAVEVD3

1    curiosity about the case because of Nike?  Yes.  Does that

2    affect my judgment or does that affect the way I feel about

3    Mr. Avenatti or anyone else involved in the case?  No.

4            THE COURT:  To put another way, are you capable of

5    putting aside the contact you've had with Nike over the years,

6    including the sneakers or the coat or the T-shirt they may have

7    asked you to review?  Can you set all of that aside and would

8    you be capable of deciding the case based solely on the

9    evidence that you would hear in the courtroom if you were

10   selected to serve?

11           JUROR:  Figuratively or literally.

12           THE COURT:  I mean literally.  It could even be in the

13   back of your mind, your admiration of the company that you

14   mentioned, your contact with the company, the merchandise that

15   they have asked you to review every six or seven months.  All

16   of that.  That has to go completely out of your mind.  It can't

17   be in the back of your mind.  And you would have to decide the

18   case not based on any of that, but, rather, solely on the basis

19   of the evidence that you would seek in this courtroom.

20           JUROR:  Just for clarification, do you mean just like

21   refraining from testing the products or refraining from having

22   any --

23           THE COURT:  I'm talking more about your mind.  I'm

24   talking about your mind.  The items that we have mentioned, the

25   admiration that you've expressed for the company and their

K1TMAVEVD3

1   products and the fact that they have given you merchandise to

2   review and that you have reviewed, and the contact you had back

3   in 2014, 2015 with them.  All of that has to be completely

4   removed from your consciousness for purposes of deciding this

5   case.  It could not even be in the back of your mind, your

6   feelings about the company and your prior contact.  That has to

7   be all removed, and you have to approach it strictly from what

8   evidence have I heard in this courtroom during this trial.

9   That has to be the basis for a decision.  The question is, can

10  you do that, given the contact you've had with Nike over the

11  years?

12          JUROR:  Yes.

13          THE COURT:  Thank you.

14          (Juror not present)

15          THE COURT:  Does anyone want to say anything else?

16          MR RICHENTHAL:  I think in our view, every human being

17  is unique.  Every potential juror is unique.

18          The government had a lot of concern about

19  Ms. McFadden.  She was emotional when she gave answers.  She

20  ultimately said she can be fair and impartial.  This juror has

21  given the same answer, in my view.  He has given this answer

22  more emphatically and he has given it repeatedly.

23          I think applying consistent principle, the defense

24  would be perfectly within its rights to challenge and strike

25  this juror peremptorily.  But this juror has repeatedly not

K1TMAVEVD3

| 1 | just said that he can be fair and impartial, he has explained |

1   just said that he can be fair and impartial, he has explained

2   why, and he has explained.

3          THE COURT:  You don't have to go on for three years

4   about everything.  Try to compress it.  Otherwise, this trial

5   is going to take a lot longer than it should.

6          Anything else you want to say?  Tell me what your view

7   is.

8          MR. STABILE:  He has a direct relationship with the

9   victim.  That is extremely concerning.  And he has posted in

10   2019 and 2018.  He said it stopped in 2014, '15.  That's, quite

11   frankly, not accurate.  And he has an ongoing relationship with

12   them.  He is at this time logging into their website, giving

13   reviews on products at this very time.

14          THE COURT:  I thought he said that he wasn't posting

15   anything about them and hadn't done so since 2015.

16          MR. STABILE:  Not posting.  But as a product tester he

17   said he has to go into their website.  But he has posted in

18   2018, the one I pointed out to the government, and we found one

19   from 2019.  He is posting about attending a Nike event, talking

20   about their spectacular office.

21          THE COURT:  Do you agree with that?

22          MR. RICHENTHAL:  I don't know enough about Twitter,

23   but they look like re-Tweets.

24          THE COURT:  Take a look at it.

25          MR. RICHENTHAL:  If the juror is going to be asked to

K1TMAVEVD3

1    struck for cause based on the date on a document, I think it's

2    appropriate that the juror be shown the document.

3              THE COURT:  I am going to strike him for cause.  He

4    has too many connections with Nike.  There is just no reason to

5    spend time on this anymore.  There are too many connections

6    that have gone on for too long, and we start from a proposition

7    he is getting free merchandise from them and that's for a

8    significant period of time.  I am going to strike him for

9    cause.

10             Now I have 39 people, which should be more than

11   enough.

12             Any other challenges for cause?

13             MR. RICHENTHAL:  Just for the record, your Honor, for

14   the sake of this juror, since there is media attention to this

15   case, I take it the Court is not making a finding that he was

16   not candid, but merely making a finding --

17             THE COURT:  No.  My view of it is, most of the posting

18   that he did was 2014 and 2015.  He was totally up front and

19   accurate about that.  It may have been at some point over the

20   years other postings or references to Nike have happened.  No.

21   I think he was candid.  Almost all of it was 2014 and 2015.  He

22   explained what the context was.  He struck me as a very

23   conscientious person.  I think he was trying to do his very

24   level best.  This is not in any way a comment on him.  As I

25   said at the outset, when they are excused, it's not a comment

K1TMAVEVD3

1   about them.

2           Having said all that, there are too many connections

3   between him and Nike such that I'm not comfortable with him

4   being on the jury.

5           What I'd like to do now is tell the panel, we are

6   going to break for lunch.  I want you fellows to prepare your

7   lists of peremptory challenges.  I want to reconvene before the

8   time I'm bringing the jury back to go through those

9   peremptories, figure out who the 12 lowest numbered jurors are,

10  and we will turn to alternates, complete the process so

11  whenever it is I have the jury come back, we are all set and

12  ready to go for openings.

13          MR. STABILE:  Do you want our jury and alternate

14  peremptory lists?

15          THE COURT:  Not after lunch, no.  Before the jury

16  comes back.

17          The time now is 12:25.  Is 1:30 going to be enough

18  time?

19          MR. S. SREBNICK:  It will be if we can meet

20  Mr. Avenatti here instead of in the lockup.  It's not just

21  practical.

22          THE COURT:  Can we stay in the courtroom?

23          THE MARSHAL:  Yes.  Absolutely, your Honor.

24          THE COURT:  What I have in mind is 20 minutes and it's

25  going to be a firm 20 minutes.  I am going to come back here.

K1TMAVEVD3

```
1    I am going to say I want your list of peremptory challenges.
2    You are going to give them to me.  We will figure out who the
3    12 lowest-numbered jurors are.  Then I will say, give me your
4    list of two for peremptories as to alternates.  We will agree
5    on the jury.  When they come back at 1:30, if you tell me you
6    think that's going to be enough time, we are ready to go with
7    the openings.
8            Does that work?
9            MR. SOBELMAN:  Your Honor, to clarify, we come back at
10   1:30 or they come back at 1:30?
11           THE COURT:  I'll repeat it again.  Twenty minutes from
12   now I want your lists of peremptory challenges as to the
13   members of the 12 who will make up the jury.  And right after
14   that I want you to give me your list of two, which are
15   peremptory challenges as to the alternates.  We will have
16   completed that process by say half an hour from now.  Then the
17   lawyers and the panel will come back at 1:30.  We will excuse
18   everybody except those who have been chosen as the jury or the
19   alternates, and then we will proceed with openings.
20           Really, the only open issue is what time should I tell
21   them to come back.  Is 1:30 doable or 1:45?  1:45, is that OK?
22           MR. PODOLSKY:  Do you want names?
23           THE COURT:  Names and numbers.
24           MR. PODOLSKY:  Original number that we got at the
25   beginning.
```