# EXHIBIT A

1  Analytics?
2  A.  Yeah, it was the number of users on Google Analytics across
3  the life span of Frank website.
4  Q.  And Google Analytics users meaning unique website visitors?
5  A.  Yes.
6  Q.  Why did you—before you updated the website, Ms. Wong, why
7  did you confirm that with Mr. Amar?
8  A.  For marketing, we have to make sure that each claim that we
9  have on our website is valid, and so I always confirm whether
10 those numbers are accurate and they do come from a certain
11 place.
12 Q.  All right.  Now I want to jump ahead a little bit to August
13 2021.  And did there come a time, Ms. Wong, where Mr. Amar
14 asked you about BigQuerying Google Analytics?
15 A.  Yes.
16         MR. FERGENSON:  Mr. Gartland, could we please show the
17 witness what's marked as Government Exhibit 802-6.
18         And we can look at the next page.
19 Q.  Ms. Wong, is this the Slack where Mr. Amar made that
20 request to you?
21 A.  Yes.
22         MR. FERGENSON:  The government offers Government
23 Exhibit 802-6.
24         MR. COGAN:  No objection.
25         MR. TAYBACK:  No objection.

1   A.   6 million.
2   Q.   For the year.
3   A.   For the year.
4   Q.   Which is about 500,000 a month.
5   A.   About.
6   Q.   Emails were sent out—
7            MR. TAYBACK:  Take this down.
8   Q.   Emails were sent out for marketing purposes as well as
9   transactional or compliance purposes?
10  A.   Yes.  They're sent out for two different reasons—one, for
11  marketing purposes; the other piece is for confirmation-type
12  transactional emails.
13  Q.   And also things like the policy, privacy policy you
14  mentioned.
15  A.   Yes, and privacy policy, updates.
16  Q.   Now during the time at Chase with Frank did you also—you
17  were asked some questions on direct about a legal claims
18  review.  Do you recall that?
19  A.   Yes.
20  Q.   And I believe that was a process where Chase also wanted to
21  go through and understand all of the representations made on
22  Frank's website, correct?
23           MR. FERGENSON:  Objection, to relevance.
24           THE COURT:  Sustained.
25  Q.   Did you discuss in connection with this review with anyone

1  from Chase how many users Frank had?
2           MR. FERGENSON: Objection. Victim negligence.
3           THE COURT: Sustained.
4  Q.  Did in fact, while you were there, Chase sign off on the
5  representations in Frank's website?
6           MR. FERGENSON: Objection.
7           THE COURT: Sustained.
8  Q.  Did you have to make any changes to the number of users
9  represented on Chase—Frank's website after you started at
10 Chase?
11          MR. FERGENSON: Same objection.
12          THE COURT: Sustained.
13 Q.  Did you, while you were at—I'll switch topics. While you
14 were at—
15          THE COURT: You're switching topics? Then this is a
16 good time to break.
17          MR. TAYBACK: I'm sorry?
18          THE COURT: If you're switching topics, it might be a
19 good time to break.
20          MR. TAYBACK: Yes.
21          THE COURT: How much longer do you think with this
22 witness?
23          MR. TAYBACK: About 20 minutes, your Honor.
24          THE COURT: All right. Members of the jury, we'll see
25 you tomorrow at 10:00.

```
1    A.   There were many others.
2    Q.   And why was Frank, while you were there, interested in
3    having partnerships like that?
4    A.   It increased the number of users and account holders.
5             THE COURT:  It's a rather obvious answer, isn't it?
6    Q.   When you—
7             THE COURT:  Mr. Tayback, let's focus on what we're
8    here for.
9    Q.   When you—
10            THE COURT:  This is not a deposition.
11            MR. TAYBACK:  I understand.
12            THE COURT:  It's a trial.  There are 14 jurors who
13   have taken time out of their lives.  We owe them economy and
14   efficiency.
15            MR. TAYBACK:  I understand, your Honor.
16            THE COURT:  It means focusing on the issues that are
17   at the heart of the case.  Please do that.
18   BY MR. TAYBACK:
19   Q.   The Sallie Mae, as an example, had a microsite on the Frank
20   website, correct?
21   A.   Yes.
22   Q.   And as part of that—they're a big—a bank themselves,
23   correct, Sallie Mae?
24   A.   Yes.
25   Q.   Did you have to justify the claims that Frank made on its
```

```
P341JAV5                         J. Wong - Cross
```

1    website about the number of users and other information with
2    Sallie Mae?
3             MR. FERGENSON:  Objection to relevance.
4             THE COURT:  Sustained.
5    Q.  That claims review process, did in fact you validate the
6    claims that were on the Frank website with Sallie Mae?
7             MR. FERGENSON:  Objection, relevance.
8             THE COURT:  Sustained.
9    Q.  Do you know how many users were listed as being on the
10   website at the time of the Sallie Mae claims review process?
11            MR. FERGENSON:  Objection.
12            THE COURT:  Overruled.
13   A.  By the time we were working with Sallie Mae, we definitely
14   had 4.25 million users that had visited the Frank site and all
15   its properties.  By the time the actual partnership happened
16   and we built the microsite, it was definitely more than that.
17   Q.  And in fact, did Sallie Mae sign off on having a microsite
18   with Frank representing the number of users it had?
19            MR. FERGENSON:  Objection to relevance.
20            THE COURT:  Sustained.
21   Q.  Now the relationship with Sallie Mae, that dissolved at
22   some point after the acquisition by JPMorgan Chase, correct?
23            MR. FERGENSON:  Objection to relevance.
24   A.  Correct.
25            THE COURT:  Sustained.  All these partnerships were

1    potentially of value to somebody wanting to acquire Frank,
2    weren't they?
3             THE WITNESS:  They should be, but I wouldn't know how
4    to value that.
5             THE COURT:  Now we can move on to something else,
6    Mr. Tayback, please.
7             MR. TAYBACK:  Thank you, your Honor.  I would like to
8    be heard after the conclusion of the day on a couple of these
9    topics.
10            THE COURT:  Yes.
11   BY MR. TAYBACK:
12   Q.  You talked about the various—your job wasn't just to try
13   to come up with ideas to drive visitors to the website; you
14   also tried managing the analytics that reflected how many
15   people were visiting.
16            MR. FERGENSON:  Objection, compound.
17            THE COURT:  Overruled.
18   Q.  Correct?
19   A.  Yes.
20   Q.  You talked about several of those tools on direct, and I'm
21   going to ask you now about one of them.
22            You mentioned Google Analytics several times.
23   A.  Yes.
24            MR. TAYBACK:  If you could bring up an exhibit shown
25   by the government, 802-71.

1          Close up your books and give them to Ms. Joseph on the
2    way out.  Don't discuss the case.  Keep an open mind.
3          (Jury not present)
4          THE COURT:  Don't discuss the case with anyone but
5    your lawyer.  See you tomorrow at 10.
6          (Witness not present)
7          MR. TAYBACK:  Your Honor, just so I can be clear, can
8    I—tomorrow morning I would like to be heard on some of the
9    topics which were—
10         THE COURT:  I made my ruling.
11         (Adjourned to March 5, 2025, at 10:00 a.m.)

```
 1   going through the process, scholarships, etc.
 2   Q.  And there were also strategic partnerships that Frank had
 3   worked very hard to be able to make as part of this website,
 4   right?
 5   A.  Can you be more specific.
 6   Q.  Sure.  Yesterday you testified that you were aware of these
 7   big companies that Frank had partnered with that basically let
 8   you know that Charlie Javice and Frank were about to blow up.
 9   Do you remember their saying that?
10   A.  Yes.
11   Q.  Okay.  Now—
12           THE COURT:  "Blow up" means what?
13           THE WITNESS:  Meaning that she was gaining a lot of
14   traction in the market, she had signed partnership agreements
15   with ACT and Sallie Mae.
16           THE COURT:  So you're talking about increasing.
17           THE WITNESS:  Increasing.  Specifically designed to
18   increase the number of customers that she had.  That was the
19   evidence that she conveyed of the popularity of the product
20   that she had created.
21   BY MR. BAEZ:
22   Q.  She didn't just convey this; there were legitimate
23   partnerships, correct?
24           THE COURT:  She just said so.  Let's move on.
25   Q.  Now these partnerships and these companies that you're
```

1  Q.  Did Frank eventually come back on your radar?
2  A.  It did.
3  Q.  Approximately when?
4  A.  July 2021.
5  Q.  And why did Frank come back on your radar in July of 2021?
6  A.  Because the company was actively looking to sell itself in
7  the market.  And I had received a phone call from Noah
8  Weintraub, a vice chairman in our investment bank, saying he
9  had received a call from one of Frank's investors letting him
10 know that they were in the middle of a process and asking if we
11 wanted to take another opportunity to evaluate whether this was
12 an acquisition we wanted to pursue.
13 Q.  After learning that Frank was on the market, did you speak
14 with anyone at Frank?
15 A.  Yes.
16 Q.  Who did you speak with?
17 A.  Ms. Javice.
18 Q.  Was this an in-person meeting or virtual?
19 A.  Virtual.
20 Q.  What did Ms. Javice say about Frank's business?
21 A.  So we wanted to learn more and get an update on the
22 business, and Ms. Javice communicated that her business had
23 achieved a lot of traction since we last spoke.  More
24 specifically, she conveyed that, whereas initially she said she
25 had 4.25 million customers, that she was now on track with 5.6

1   million customers and that she was on track to have as many as
2   10 million customers by the end of 2021.
3          She also conveyed that the Frank had signed strategic
4   partnerships with the likes of Sally Mae, ACT, and that they
5   had also signed commercial relationships with companies who
6   wanted to utilize her site to talk about how to avail yourself
7   of financial aid through the Frank service.
8          Then also she talked about how the Frank was acquiring
9   customers so rapidly at a very low customer acquisition cost.
10  Q.   Let's break that out a little bit.
11         Was the number of customers that Frank had important
12  to you?
13  A.   Extremely.
14  Q.   Why?
15  A.   Because it is, as I described earlier, when we talk about
16  wanting to grow our customer base, the fact that she had 4.25
17  million customers in a segment where at the time we only had
18  about four to four and a half million customers, the number of
19  customers that she had was very important to how we thought
20  about the attractiveness of the opportunity.
21  Q.   At a very rudimentary high level, the more customers Frank
22  had the more potential checking accounts Chase could sell?
23  A.   Correct, correct.
24  Q.   You mentioned the low customer acquisition cost.  Was that
25  important to you?

```
 1    guess get a grade so they could get into colleges.
 2    Q.   What relationship, if any, did Frank have with ACT?
 3    A.   We had a partnership with them.
 4    Q.   What kind of partnership?
 5    A.   We worked with them to help provide email and lead data
 6    about our students to ACT.
 7    Q.   And you said lead data.  Could you explain to the jury what
 8    you mean by that or what you would provide, how the partnership
 9    worked.
10    A.   I don't know exactly the exact pieces of data, but we would
11    provide ACT essentially information about the student coming
12    down to email address, first name, last name.
13    Q.   And what would ACT do with the lead?
14    A.   That I am unsure of.
15    Q.   To your knowledge did ACT ever request that Frank buy
16    third-party data for augmentation?
17    A.   Not to my knowledge.
18    Q.   Are you familiar with a company called Sallie Mae?
19    A.   Yes.
20    Q.   What is Sallie Mae?
21    A.   They provide student loans to students.
22    Q.   What relationship, if any, did Frank have with Sallie Mae?
23    A.   We also had a partnership with them as well.
24    Q.   And what kind of partnership did Frank have with Sallie
25    Mae?
```

1   A.   We worked with them to help the students that they sent to
2   us to fill out the FAFSA application.
3   Q.   And how did you work with them to do that?
4   A.   So we created a Sallie Mae version of the Frank website,
5   and then students will come to that page, sign up for a Frank
6   account, and they would then further fill out the FAFSA
7   application through us.
8   Q.   And to your knowledge did Sallie Mae ever request that
9   Frank buy third-party data for augmentation?
10  A.   No.
11  Q.   Ms. Wong, in your time as Frank's marketing director, did
12  you ever purchase third-party data for data augmentation?
13  A.   No.
14  Q.   Did you ever assist in purchasing any third-party data for
15  augmentation—
16  A.   No.
17  Q.   —for any other marketing purpose?
18  A.   No.
19  Q.   Now did there come a time when Mr. Amar discussed a
20  marketing campaign using third-party data with you?
21  A.   Yes.
22  Q.   And approximately when was that?
23  A.   Summer 2021.
24  Q.   And what did Mr. Amar discuss with you?
25  A.   Emailing a list of users.

1              MR. TAYBACK:  And if you could scroll through it so
2    the witness can see it, from the bottom to the top.
3    Q.  Ms. Wong, do you recognize this as an email invitation to
4    what was the presentation on SEO strategies that you made in
5    November of 2021 to a number of Chase employees?
6    A.  This looks like it.
7              MR. TAYBACK:  Your Honor, at this time we'd offer it
8    into evidence.
9              MR. FERGENSON:  Objection.
10             THE COURT:  Sustained.
11   Q.  Ms. Wong, the Zoom invitation we just looked at, that was
12   performed in the ordinary course of your business, correct?
13             THE COURT:  We have the date, we have the purpose; we
14   don't need the piece of paper.
15   Q.  In terms of the people who were attendees, was Sarah
16   Youngwood an attendee?
17             MR. FERGENSON:  Objection to relevance.
18             THE COURT:  Sustained.
19   Q.  Did it include senior JPMorgan Chase executives, to your
20   knowledge?
21             MR. FERGENSON:  Objection.
22             THE COURT:  The objection is to attendees.
23   Q.  During this meeting, did you prepare a PowerPoint to
24   describe your SEO activities for Frank?
25             MR. FERGENSON:  Objection.

1      THE COURT:  Overruled.
2  A.  I prepared this presentation.
3      MR. TAYBACK:  If I could bring up CJ 380 again,
4  pages 3 onward, flip through it briefly.
5  Q.  Do you recognize this as the presentation that you
6  prepared?
7  A.  Yes.
8      MR. TAYBACK:  At this time, your Honor, I would offer
9  380 again.
10     MR. FERGENSON:  Same document, same objection, Judge.
11     THE COURT:  Same ruling.
12 Q.  Did you describe at this presentation the size of the
13 market?
14     MR. FERGENSON:  Objection. to relevance.
15     MR. TAYBACK:  Your Honor, I can explain the relevance.
16     THE COURT:  Overruled.
17 Q.  Do you recall describing the size of the student market—
18 A.  Yes.
19 Q.  —that Frank appealed to?  And approximately, do you recall
20 how large that market was?
21     MR. FERGENSON:  Objection.
22     THE COURT:  Overruled.
23 A.  I don't remember exact numbers, but it was definitely
24 around anywhere from like around 25 million or so students.
25 Q.  And that was the number of students in college in any given

1               MR. FERGENSON:  Objection.
2               THE COURT:  Sustained.
3   Q.  After the acquisition but before the SEO presentation, did
4   you have occasion to participate with JPMorgan Chase in the
5   distribution of an email regarding privacy policy to all of
6   Frank's users?
7               THE COURT:  Sustained.
8   Q.  Was there an effort, in coordination with JPMorgan Chase,
9   to identify the universe of Frank users who had email
10  addresses?
11              MR. FERGENSON:  Objection.
12              THE COURT:  Overruled.
13              MR. FERGENSON:  We object to compound, Judge.
14              THE COURT:  Overruled.
15  A.  Can you repeat the question.
16  Q.  Sure.
17              THE COURT:  He wants to know if you had conversations
18  about the universe of Frank users who had email addresses.
19              THE WITNESS:  During—just right after acquisition?
20              THE COURT:  Yes.
21              MR. TAYBACK:  Yes.
22  A.  We had a discussion to email every single one of our users
23  that we had email addresses on for the privacy policy.
24  Q.  And that privacy policy was intended to be sent to all
25  Frank users?

```
1    Q.   All right.  Ms. Wong, I want to change topics again.  And I
2    want to focus you on the, you know, the next few weeks or the
3    next month after the JPMorgan acquisition closed.  Do you
4    recall which month the acquisition actually closed?
5    A.   September 2021.
6    Q.   Now did there come a time in the weeks after that when
7    Frank sent a privacy policy update email to Frank's users?
8    A.   Yes.
9    Q.   And who at Frank—and did you work on that?
10   A.   I worked on that.
11   Q.   And who at Frank did you work on it with?
12   A.   Jenny Zeitler.
13   Q.   And this privacy policy update email, who sent that email,
14   was it the Frank legacy employees like you and Ms. Zeitler or
15   JPMorgan employees?
16   A.   Jenny Zeitler sent this to all of our Frank users.
17   Q.   And what program did Ms. Zeitler use to send the email?
18   A.   Braze.
19   Q.   And was Braze used by Frank or by JPMorgan?
20   A.   Braze is used by J—Frank.
21   Q.   At the time, Ms. Wong, had Frank's systems like Braze been
22   integrated into JPMorgan?
23   A.   No.
24   Q.   And if you recall, Ms. Wong, did Braze ever get integrated
25   to JPMorgan?
```