# KOBRE & KIM

800 Third Avenue
New York, New York 10022
www.kobrekim.com
Tel +1 212 488 1200

March 23, 2025

**BY ECF**

The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Charlie Javice and Olivier Amar*,
             23 Cr. 251 (AKH)

Dear Judge Hellerstein:

    Defendant Olivier Amar respectfully moves to admit certain documents that are central to his defense that he was not in a conspiracy with Ms. Javice and, to the extent she intended to defraud JPMC, Mr. Amar did not willfully blind himself to that fraud.[1] These documents demonstrate that on multiple occasions in the summer of 2021, Mr. Amar pulled (or caused to be pulled) data directly from Google Analytics or other sources and Ms. Javice then altered or otherwise mischaracterized that data before causing it to be passed on to JPMC. Ms. Javice and the Government have repeatedly objected to the introduction of this category of evidence. This evidence is crucial to Mr. Amar's defense, Mr. Amar does not offer any of the statements contained within these documents for their truth, and Ms. Javice's objections related to antagonism, if sustained, unfairly curtail Mr. Amar's own defense.

    Below is a description of one example of these documents, which we respectfully submit establishes the contours of this subset of evidence for purposes of evaluation of relevance, unfair prejudice, and other related matters. The example described below establishes both how and why Mr. Amar should be permitted to offer this type of evidence, and we append a list of the other

---

[1] If the Government agrees to withdraw its request for a conscious avoidance charge, or the Court indicates that it will not provide such an instruction to the jury, Mr. Amar will re-evaluate his position accordingly.

Americas (New York, Delaware, Miami, San Francisco, São Paulo, Washington DC)
APAC (Hong Kong, Seoul, Shanghai), Caribbean (BVI, Cayman Islands), EMEA (Cyprus, Dubai, London, Tel Aviv)

Kobre & Kim refers to Kobre & Kim llp, a New York Limited Liability Partnership.

examples of evidence that we submit fall under this same umbrella.[2] As described in further detail below, the exemplar relates to a request from JPMC for the "age distribution" of Frank's users.

*     *     *     *     *

The "age distribution" episode shows that: (1) Mr. Amar pulled data directly from Mixpanel, one of Frank's databases, and provided it to Ms. Javice; (2) Ms. Javice then altered that data (without consulting or notifying Mr. Amar); and (3) caused that altered data to be provided to JPMC. This demonstrates that Mr. Amar was not involved in a conspiracy with Ms. Javice, including because there is no evidence of any discussion between Ms. Javice and Mr. Amar regarding altering the data. It also demonstrates that Mr. Amar had no intent to defraud because Mr. Amar did not hesitate to provide, in response to a JPMC request, data that he pulled directly from one of Frank's databases and that clearly indicated that the real number of Frank's FAFSA users was nowhere near 4.25 million.

The "age distribution" episode is as follows:

- During diligence for the Frank acquisition, JPMC requested "a distribution of customers who have filled out the [FAFSA] application by age," in other words the age distribution of Frank's FAFSA users. This was important to JPMC because the value proposition for JPMC was the ability to market new checking and savings accounts to the 18-24 year-old sector, and JPMC viewed the receipt of the age distribution data both (1) as confirmation that Frank *had* age data, which would allow JPMC to identify which individuals to market to, and (2) because JPMC was concerned in particular about the segment of Frank's users that was identified as "adult learners," which would likely be less fruitful for marketing new checking and savings accounts. **GX 1391; GX 1098; GX 1335; GX 1386 (Mr. Amar seeks to admit these documents through this motion).**

- LionTree received this diligence request from JPMC and passed it on to Ms. Javice. Ms. Javice then discussed the request with Mr. Amar and instructed him to pull data directly from Mixpanel, one of Frank's databases. **DX OA 213 at page 12; GX 801-1 (Mr. Amar seeks to admit these documents through this motion).**[3]

---

[2] At the very least, of the exhibits identified in Appendix A, the Court should admit the documents not yet in evidence that are related to the virtual data room documents shared with Capital One and JPMC, and for which the Government introduced significant evidence as proof of the alleged fraud. *See* Items No. 1–4 in Appendix A.

[3] In this message, Mr. Amar and Ms. Javice discuss pulling data specifically for a sample period "when we got young people," but the filename for the spreadsheet that Mr. Amar provided specifically references the period for the data that he compiled—"Age Breakdown Mar-May 2021.csv." Ms. Javice then affirmatively changes the file name to "Age_distribution_72821.xlsx" before providing to LionTree (and removing Mr. Amar from the transmission), masking the period of the data pull and rendering the document misleading. When LionTree ultimately provides the

- Mr. Amar proceeded to compile the raw data responsive to this request directly from Mixpanel, one of Frank's data repositories, corresponding to a several-month sample period. Importantly, and as reflected in the below partial screenshots of DX 204-A, Mr. Amar assembled this data in a spreadsheet that included a column for raw FAFSA user numbers for that several-month period, the total of which is *5,931* FAFSA users. The data was broken down into separate rows for each age. **DX OA 204; DX 204-A (Mr. Amar seeks to admit these documents through this motion).**

| month | (Multiple Items) | | | | |
|---|---|---|---|---|---|
| | | | March-May | | |
| Row Labels | Count of distinct id | | Age | Count | Percentage |
| 15 | 8 | | 15 | 8 | 0.16% |
| 16 | 48 | | 16 | 48 | 0.99% |
| 17 | 546 | | 17 | 546 | 11.25% |
| 18 | 1184 | | 18 | 1184 | 24.39% |
| 19 | 635 | | 19 | 635 | 13.08% |
| 20 | 406 | | 20 | 406 | 8.36% |
| 21 | 329 | | 21 | 329 | 6.78% |
| 22 | 212 | | 22 | 212 | 4.37% |
| 23 | 164 | | 23 | 164 | 3.38% |
| 24 | 139 | | 24 | 139 | 2.86% |
| 25 | 57 | | 25 | 57 | 1.17% |
| 26 | 70 | | 26 | 70 | 1.44% |
| 27 | 41 | | 27 | 41 | 0.84% |
| 28 | 52 | | 28 | 52 | 1.07% |
| 29 | 38 | | 29 | 38 | 0.78% |

\* \* \*

| | | | | | |
|---|---|---|---|---|---|
| 77 | 1 | | 77 | 1 | 0.02% |
| 78 | 1 | | 78 | 1 | 0.02% |
| 80 | 1 | | 80 | 1 | 0.02% |
| 81 | 1 | | 81 | 1 | 0.02% |
| 114 | 1 | | 114 | 1 | 0.02% |
| undefined | 1077 | | | 4854 | |
| Grand Total | 5931 | | | | |

- Ms. Javice took this data, and, unbeknownst to Mr. Amar, whose role in this episode has now ended, made at least two key adjustments, which is made clear by a comparison of **DX OA 204-A** (the data prepared by Mr. Amar) and **DX OA 200-A** (the version Ms. Javice sent to LionTree).

---

data, a LionTree representative states that he "understand[s] from charlie it's a quick pull from marketing info for last 120 days," and also provides "[a]dditional color from Charlie. this data skews slightly younger than their overall data set." CJ-0936 (Mr. Amar seeks to admit this document through this motion).

- o <u>First</u>, Ms. Javice removed the columns containing absolute counts of FAFSA users, thereby removing any indication of the relatively small number of people the percentages in the data pertain to.

- o <u>Second</u>, Ms. Javice adjusted the percentage data so that it skewed younger. Ms. Javice did this by deleting the rows for individuals over 50, and taking the percentages for individuals over 50 and *redistributing* them to the rows for 17-year-olds and 18-year-olds, the ages most likely to be new college entrants and therefore JPMC's key demographic. This results in 2.29% being added to both the 17-year-old and 18-year-old rows. Importantly, given Ms. Javice's first adjustment to remove absolute user counts, we expect the Government to contend that this would have been understood by JPMC to be a shift of 4.58% out of 4.25 million users—nearly 200,000 people—from a demographic with little marketing value into JPMC's key marketing demographic. Ms. Javice then altered the row for 50-year-olds into a "50+" row, with the same 0.43% that originally applied to only 50-year-olds. The results of Ms. Javice's manipulation are apparent. The Excel formula bars for the rows for 17 and 18-year-olds each reflect the original percentages from Mr. Amar's data—"+2.29%."

- Ms. Javice transmitted the altered data to LionTree, leaving Mr. Amar off the transmission. **DX OA 200; DX OA 200-A (Mr. Amar seeks to admit these documents through this motion).**

- LionTree then transmitted the altered data to JPMC. **DX OA 238; DX OA 238-A (already admitted subject to connection).**[4]

- JPMC received the altered data and was pleased, in particular in light of the alterations to increase the proportion of younger users—"This is great. (a) proof! (b) interesting that only 15% are under 18 with 40% being 18 or 19." **CJ 936 (Mr. Amar seeks to admit this document through this motion).**

- The altered data was featured in a presentation made to JPMC's deal-review committee, for final sign off on the Frank acquisition. The presentation highlighted that "Finland primarily services students who are 18-24 years old." **GX 1591 at PDF page 23 (already in evidence).**

---

[4] This motion is consistent with the Court's recognition that such documents are key to Mr. Amar's defense, as reflected in the Court's prior ruling permitting Mr. Amar to introduce DX OA 238 and DX OA 238-A subject to connection. *See* Mar. 6, 2025 Tr. at 1515:6–1516:12.

As reflected in the above narrative, these documents are critical to Mr. Amar's defense—not only did Mr. Amar not participate in Ms. Javice's scheme, but Ms. Javice also took steps to prevent Mr. Amar from becoming aware of her misrepresentations. In other words, this evidence:

1. Shows that Mr. Amar was not conspiring with Ms. Javice to inflate numbers—in fact, it supports just the opposite conclusion;

2. Shows that Mr. Amar was operating in good faith and had no intent to deceive;

3. Undermines the Government's allegations of fraudulent intent—the data he provided was pulled directly from Frank's data repositories and reflected monthly user figures that could not possibly add up to anywhere near 4.25 million; and

4. Rebuts any notion that Mr. Amar consciously avoided red flags—Ms. Javice prevented him from seeing any.

The evidence is highly relevant to Mr. Amar's state of mind and critical to Mr. Amar's defense. These documents are indisputably authentic and are being offered for non-hearsay purposes, as described above. The Court should allow Mr. Amar to admit the documents listed and described above, as well as the documents listed in Appendix A, that are not yet in evidence.

\* \* \* \* \*

The Government and Ms. Javice have objected repeatedly throughout trial to the admission of similar evidence and related testimony described above, and some of the evidence and related testimony in Appendix A. *See* Feb. 25, 2025 Tr. at 376:4–378:22; Feb. 27, 2025 Tr. at 742:7–743:19; Feb. 27, 2025 Tr. at 756:20–759:17; Mar. 5, 2025 Tr. at 1228:5–1233:14; Mar. 17, 2025 Tr. at 2525:19–2526:25; *see also* Mar. 17, 2025 Tr. at 2573:18–2575:24; ECF No. 292.

By objecting to this evidence, the Government seeks to prevent Mr. Amar from putting on a full defense in violation of the Sixth Amendment. The Court should not countenance those efforts. *See United States v. Mi Sun Cho*, 713 F.3d 716, 721 (2d Cir. 2013) ("A defendant has a fundamental due process right to present a defense." (citing *Washington v. Texas*, 388 U.S. 14, 19 (1967)); *Grotto v. Herbert*, 316 F.3d 198, 205–06 (2d Cir. 2003) ("It is, of course, well established as a fundamental matter of due process that the defendant in a criminal case has the right to present a defense, that is, to present to the jury admissible evidence that might influence the determination of guilt." (citing *Taylor v. Illinois*, 484 U.S. 400, 409 (1988)); *see also Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (defendants entitled to a "meaningful opportunity to present a complete defense" (quotation marks omitted)).

Mr. Amar must be able to assert his defense. The Court acknowledged at the January 23, 2025 pretrial conference that "If I were to curtail a defense, I would triggering a mistrial, wouldn't I? Isn't that right? I can't restrict your ability to put in relevant information." *See* Jan. 23, 2025 Hrg. Tr. at 20:18–20. The Court has recognized at certain moments in this trial that Mr. Amar must be permitted to put on his defense, even if it comes at Ms. Javice's expense. *See, e.g.*, Mar. 11, 2025 Tr. at 1804:2–1822:24. The Court should adhere to its prior ruling.

For the foregoing reasons, Mr. Amar requests that the Court issue a ruling that the documents referenced in this letter, as well as the documents referenced in Appendix A, are admissible and may be admitted during Mr. Amar's case in chief.

Respectfully submitted,

*/s/ Alexandria E. Swette*
Alexandria E. Swette
Sean S. Buckley
Jonathan D. Cogan
Matthew I. Menchel
Daisy Joo
Michael Cinnamon
KOBRE & KIM LLP
800 Third Ave.
New York, NY 10022
Tel: (212) 488-1200

*Counsel for Defendant Olivier Amar*

# APPENDIX A

# Appendix A

| Description | Exhibit # | Status |
|---|---|---|
| **#1: V.D.R. Document 3.1.10** | | |
| **During Capital One diligence, Ms. Javice mislabeled data relating to user engagement with Frank's website platform, as representative of Frank's "FAFSA Users," which was shared with Capital One and JPMC in the VDR document 3.1.10.** | DX OA 88 | **Not Admitted** |
| | DX OA 153 | **Not Admitted** |
| | GX 802-5 | **Not Admitted** |
| | GX 802-50 | Admitted |
| | GX 2020 | Admitted |
| | GX 3021 | Admitted |
| | GX 3021-B | Admitted |
| | GX 3024 | Admitted |
| | GX 3024-A | Admitted |
| | GX 3.1.10 | Admitted |
| **#2: V.D.R. Document 3.1.4** | | |
| **Ms. Javice mislabeled accurate data about users of Frank's website platform, which Mr. Amar downloaded from Google Analytics, to be representative of Frank's users who started a FAFSA application (not website visitors). This data was shared with Capital One and JPMC in VDR 3.1.4 and contained the alleged misrepresentations at the core of the Government's case—that 4.25M Frank users started a FAFSA application (*i.e.* had an account).** | GX 802-5 | **Not Admitted** |
| | GX 3009 | Admitted |
| | GX 3010 | Admitted |
| | GX 3010-A | Admitted |
| | GX 3011 | Admitted |
| | GX 3011-A | Admitted |
| | GX 3012 | Admitted |
| | GX 3012-A | Admitted |
| | GX 1509 | Admitted |

| Description | Exhibit # | Status |
|---|---|---|
| | GX 1509-A | Admitted |
| | GX 1630 | Admitted |
| | GX 1636 | Admitted |
| | GXG 516 | Admitted |
| | GXG 517 | Admitted |
| | GX 3.1.4 | Admitted |
| **#3: V.D.R. Document 3.1.8** | | |
| **Ms. Javice mislabeled data for Frank's website impressions downloaded by Mr. Amar and Ms. Wong, and represented to LionTree that the data showed "unique visitors" for Frank's website.** | GX 802-22 | **Not Admitted (subject of ECF No. 340)** |
| | GX 802-51 | **Not Admitted** |
| | OA 90 | **Not Admitted** |
| | GX 1547[5] | **Not Admitted** |
| | GXG 572 | Admitted |
| | GXG 573 | Admitted |
| | GX 3015 | Admitted |
| | GX 3017 | Admitted |
| | GX 3017-A | Admitted |
| | GX 3.1.8 | Admitted |

---

[5] Counsel for Mr. Amar attempted to introduce this exhibit with the Government's first witness, Mr. Houston Cowan. The Government objected on hearsay grounds, which the Court sustained, without the benefit of yet receiving argument or evidence relating to Mr. Amar's complete defense. *See* February 25, 2025 Tr. at 376:5–378:22. Mr. Amar respectfully requests the Court reconsider its ruling, as Mr. Amar does not offer Ms. Javice's statement for its truth, but just the opposite— that Mr. Amar never represented impressions data as visitors data.

| Description | Exhibit # | Status |
|---|---|---|
| **#4: V.D.R. Document 3.1.6** | | |
| **In an episode distinct from the one referenced in the body of this letter, Ms. Javice took raw data about Frank's users and skewed the data to shift the age distribution to reflect a more desirable demographic.** | DX OA 53 | Not Admitted |
| | DX OA 53-A | Not Admitted |
| | GX 1153 | Not Admitted |
| | GX 1153-A | Not Admitted |
| | DX OA 91 | Admitted (subject to connection) |
| | GX 3.1.6 | Admitted |
| **#5: Capital One Diligence Request for Frank's Sign-Up Data** | | |
| **Ms. Javice altered the data Mr. Amar provided to her showing the number of Frank's users who signed up to use the Frank scholarship product, to inflate the number of sign-ups.** | DX OA 197 | Not Admitted |
| | DX OA 203 | Not Admitted |
| **#6: JPMC Diligence Request About Frank's Capacity to Process FAFSA Applications** | | |
| **Ms. Javice responded to JPMC's diligence request misrepresenting the actual number of FAFSA applications that Frank's website could handle—the information that was provided to her by Frank's engineer would have been inconsistent with the alleged misrepresentations about the number of Frank's users with FAFSA applications in process.** | GX 1405 | Not Admitted |
| | DX OA 228 | Not Admitted |
| | DX OA 83 | Admitted |
| | DX OA 84 | Admitted |
| **#7: Diligence Request About Returning Frank Users** | | |
| **Ms. Javice modified a report downloaded by Mr. Amar showing data about how many of Frank's "total users" returned each month, which Ms. Javice then sent to LionTree in response to a diligence request, without Mr. Amar's knowledge.** | DX OA 176 | Not Admitted |
| | DX OA 176-A | Not Admitted |
| | DX OA 212 | Not Admitted |
| | DX OA 212-A | Not Admitted |
| | DX OA 233 | Not Admitted |