P415JAVA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                    v.                      23 Cr. 251 (AKH)

CHARLIE JAVICE, OLIVIER AMAR,

                    Defendants.
------------------------------x
                                        New York, N.Y.
                                        April 1, 2025
                                        2:30 p.m.

Before:

                    HON. ALVIN K. HELLERSTEIN,

                                        District Judge


                          APPEARANCES

MATTHEW PODOLSKY
     Acting United States Attorney for the
     Southern District of New York
BY:  RUSHMI BHASKARAN
     GEORGIA V. KOSTOPOULOS
     Assistant United States Attorneys

RONALD SULLIVAN LAW PLLC
     Attorneys for Defendant Charlie Javice
BY:  RONALD S. SULLIVAN, JR.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Attorneys for Defendant Charlie Javice
BY:  CHRISTOPHER TAYBACK
     ERICA PERDOMO
     KIRSTEN NELSON

KOBRE & KIM LLP
     Attorneys for Defendant Olivier Amar
BY:  SEAN S. BUCKLEY
     ALEXANDRIA E. SWETTE
     JONATHAN D. COGAN


ALSO PRESENT:  MEHERUN MAYER, Pretrial Officer
               JOSHUA ROTHMAN, Pretrial Services

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

P415JAVA

(Case called)

THE COURT:  I have studied the pretrial services report, and I have read each of your letters and I remember what you said to me on Friday.

Is there anything else that you wish to tell me? Mr. Sullivan?

MR. SULLIVAN:  Yes, your Honor.  I couldn't hear you.

So, the only thing I would add to what your Honor has already read, in terms of the dual citizenship issue, I will note that Ms. Javice has never lived or resided in France.  As the Court notes, the government has her passport so there is not a realistic chance of her fleeing to France.

I think everything else has been covered in the letter.  The only thing that hasn't, and the only thing that I will correct, is in the government's letter they ask you to return to the status quo, the original state, and that's not correct.  There was no monitoring system when Ms. Javice was first released on bond, that came later, and then your Honor twice --

THE COURT:  When was it imposed?

MR. SULLIVAN:  I'm sorry?

THE COURT:  When was it imposed?

MR. SULLIVAN:  It was imposed, I don't have the date right in front of me --

THE COURT:  It was not part of the recommendation

P415JAVA

package.

          MR. SULLIVAN:  It was not part of the original
package.

          THE COURT:  By pretrial.  I don't remember having
ordered it initially.

          MR. SULLIVAN:  It wasn't GPS monitoring, initially.
Your Honor's stepped down twice her bail conditions, and in
November '24 removed the GPS monitoring.

          The big thing, your Honor, is that were the Court to
grant the government's application, it would remove the
possibility of the one thing that Ms. Javice can now do and
that is teach her classes.  If your Honor is like me, I wasn't
a hundred percent sure exactly what Pilates is and this may be
helpful to the Court.  If I can have marked as the next
Government Exhibit or next Court Exhibit, is it 14?

          THE COURT:  Whatever.  Exhibit A to the bail hearing.

          MR. SULLIVAN:  Thank you.

          THE COURT:  Incidentally, the seventh recommendation
in the pretrial services report reads:  Curfew enforced by
location monitoring.  So, it was part of the original
suggestion of the probation officer.

          MR. SULLIVAN:  Yes, location monitoring, but had to
get it switched to ankle monitoring.

          What the Court has in front of it is an example of
what I spoke about on Friday and the way that the instructors

P415JAVA

use balance and have their ankles restrained in these various sorts of ways in order to teach the class.  And, quite frankly, her conditions of release that were existing, have worked. There is no record of any failure of compliance and, as illustrated in Bond Exhibit A, it would be functionally impossible, or at least highly impractical to be able to engage in the one bit of work that Ms. Javice can do now, at least up until we see you in August.  So, we would ask the Court to maintain the status quo which has worked.

We have shown, by clear and convincing evidence, that there is no realistic risk of flight and, in fact, these days there is really no realistic risk of flight for most people. There is, you know, I think maybe 1 percent of people try to flee and everybody gets caught.  I mean it is just not, in this day and age, your Honor, it is -- people jumping bail, so to speak, is really not a realistic alternative.

THE COURT:  The next case I have involves --

MR. SULLIVAN:  I'm sorry?

THE COURT:  The next case I have involves someone who jumped bail.

MR. SULLIVAN:  Well, you --

THE COURT:  I had someone jump bail in the middle of trial.

MR. SULLIVAN:  And that has not been Ms. Javice so she has been here every day, on time.

P415JAVA

THE COURT:  No, it has not been Ms. Javice.

MR. SULLIVAN:  She is here today again.

THE COURT:  Let me be open with you, Mr. Sullivan. She's had a perfect record up to now regarding court appearances.  I can't rule out the possibility of flight. There are other ways of escaping the United States, and although I don't think it probable, the standard I have to deal with is a standard where I have to find, by clear and convincing evidence, that the person is not likely to flee and I can't reach that bar.

MR. SULLIVAN:  Let me attempt to assist the Court in reaching the bar.

THE COURT:  I am quoting from 3143 Title 18.

MR. SULLIVAN:  Right.  I mean, one of the factors the Courts, particularly in the Second Circuit, have relied on to suggest that the bar has not been reached post-verdict, is either conduct during trial or some conduct --

THE COURT:  There is no indication, Mr. Sullivan.

MR. SULLIVAN:  -- that she is not going to follow the orders of the Court.  So, clear and convincing doesn't mean beyond a reasonable doubt, it doesn't mean beyond all doubt. It means that it is clear and it convinces the Court that she's not a flight risk especially for the ankle monitor.

THE COURT:  She has never been in this spot before. This is a unique position for her.

MR. SULLIVAN:  And there are still restrictions on her liberty.  She can only be in New York and Florida.  She meets with her Florida probation officer so it is not a binary choice, either ankle monitor or nothing.  We are saying that the constellation of liberty restraints are sufficient to ensure that she will be here in August.

There is a list from the original pretrial report that she's -- pretrial services supervision has directed, that is down in Florida, surrender all travel documents, make no new applications.  That's done.  Travel restricted to the Southern District of Florida and EDNY and SDNY, and that is even restricted further, for court purposes only.  No contact with victims, witnesses outside presence of counsel.  She can only reside at a particular place.  She can't open new bank accounts or lines of credit.

And so, you know, these are meaningful restraints on her liberty.  The government wants to add yet another restraint on the liberty which has the effect of not allowing her to work.

So, our position is that clear and convincing evidence is met.

THE COURT:  Mr. Sullivan, how was her position up to trial?  She was teaching Pilates before when she had ankle monitoring?

MR. SULLIVAN:  No.  That's not right.

P415JAVA

THE COURT:  No.

MR. SULLIVAN:  Just one second.  I want to be sure I am correct on that.

THE COURT:  There was a time when you asked -- one minute.

There was a time when you asked to be relieved of that obligation, which the government did not oppose and which I granted.  Before that, didn't she have this issue?

(Counsel conferring)

MR. SULLIVAN:  Correct, and that's the point in our letter where we point out that it had two-fold negative impacts.  One, it had an impact on business, business dropped when she was wearing the ankle bracelet; and two, she was unable to do the thing well.  And as you can see from the pictures, it's -- cumbersome is an understatement.  So --

THE COURT:  I have examined a GPS device earlier today.  It is not heavy.  It probably weighs a pound.  It can't be removed by belt or by key.  The only way to remove it is by cutting it, it is a very difficult process.  And so I don't know how it would work.

I am looking at a letter of November 7, 2024, written to me by Quinn Emanuel and so ordered, where you say the imposition of location monitoring, has required Ms. Javice to wear a heavy, cumbersome GPS unit affixed to her ankle which causes physical pain and has impeded her work as a fitness

instructor and other problems.

I accept what you say that it's a restriction on her ability to do the advanced Pilates that she does.  Against that the government opposes and I can't say that there is clear and convincing evidence that there is no risk of flight.  There is a risk of flight.  I have to find by clear and convincing evidence that the person is not likely to flee.

MR. SULLIVAN:  We also have an alternative suggestion, your Honor, that might satisfy the Court and allow Ms. Javice to continue working.

So, Ms. Javice's mom is willing to serve as a third-party custodian, that's pursuant to 18 U.S.C. Section 3142(c)(1)(B)(i), and the Court may include, as a condition, that the person remain in the custody of a designated person who agrees to assume supervision and to report any violation of a release condition to the Court.  The designated person is able reasonably to assure the judicial officer that the person will appear, as required, and will not pose a danger to the safety of any other person or to the community.  That's the quote.

It is used robustly in Florida and Ms. Javice's mother is here.  The process is that the Court would swear her in and essentially track the language that she would report if Ms. Javice is not in compliance with any condition.

Section 3143(a)(1) allows for release pending

P415JAVA

sentence, "in accordance with Section 3142(b) or (c)."  So, it's the third-party custodian idea is appropriate here and it can provide the extra assurance that pushes the Court to reaching clear and convincing.

So, we would offer that as an alternative, particularly given that there is no -- there hasn't been any breaches.  And there is already a significant bond that's there, $2 million plus the house and the house is not subject to -- or the residence is not subject to forfeiture, it was purchased in 2020.

THE COURT:  Who is going to speak for the government?

MS. KOSTOPOULOS:  I am, your Honor.  Shall I take the podium?

THE COURT:  Please.

MS. KOSTOPOULOS:  Thank you.

Your Honor, I think our submission outlines, in large part, why the government has taken this position.  I am happy to respond to some of the points that defense counsel just raised.  Maybe starting with the last one, my understanding, we wouldn't agree, your Honor, that that is sufficient to ensure the defendant's return to the district and also to ensure that she is not a risk of flight.  Our understanding is that Ms. Javice's mother is already a co-signer for the bond.

THE COURT:  Supposing Ms. Javice -- I understand there is a location device -- not a location device but is there a

curfew protector which registered every time the person has left the home. And supposing there were a security agency required to accompany Ms. Javice any time she left home. She is not on home confinement, I understand, but this would establish a home confinement, except for when she would go out to do anything.

Are there no lesser alternatives?

MS. KOSTOPOULOS: Your Honor, so let's assume we are talking about home confinement as the alternative or a curfew. Those are more restrictive conditions. So I think maybe the history of the location monitoring in this case is helpful context.

Ms. Javice and Mr. Amar were subject to, as I understand it, electronic monitoring at the discretion of pretrial services with a curfew, and then subsequent to that I believe both defendants made an application to change the location monitoring to GPS monitoring without a curfew so that they would not have travel restrictions, they would not be subject to a curfew, they would wear a different kind of electronic monitor, and that monitor would give real-time GPS coordinates about their location which was satisfactory to the government and to pretrial at that point.

If we were to move to what your Honor proposes, the security company piece of it is harder for me to address because I don't think that is something that pretrial offers in

its sort of suite of supervision.  But, if we were to move what is essentially home confinement with curfew enforced by electronic monitoring, I don't think the government has an objection to that, it is just a more restrictive set of conditions.

A stand-alone GPS monitor with no curfew that otherwise maintains the conditions the defendants are subject to, at least from the government's point of view, the least restrictive form of monitoring that the defendants can be subject to while mitigating a risk of flight and I think that's where our proposal comes from.

Our understanding, your Honor, from talking to pretrial, is, and certainly from reviewing the statute, is that given the combination of factors at issue in this case, we would be well within our rights to seek remand and we understand that pretrial would not object to that application. We haven't sought that, in part, given that both defendants have been compliant with the conditions of their release up until this point.  We tried, I think, to reach an agreement with defense counsel that was more narrowly tailored that was also supported by pretrial that involves imposition of location monitoring.  And frankly, stand-alone GPS monitoring, which is as we understand it, among the least restrictive forms of electronic monitoring available, there is no restrictions on employment, there is no restrictions on travel beyond those

P415JAVA

already imposed, there is no curfew.  There is just the requirement to wear an ankle monitor which would be the case for any form of electronic monitoring that the defendants were subject to.

THE COURT:  Mr. Sullivan, any other suggestions?

MR. SULLIVAN:  So, I would have to look into the security piece --

THE COURT:  I don't think it works.

MR. SULLIVAN:  OK.  I have done that before.  It is complicated.

I will say, your Honor, just to add in terms of the custody argument, Ms. Javice' mother lives actually in the same building as Ms. Javice just three floors down, so she is in a very good position --

THE COURT:  A mother can't be a surety for a daughter.

MR. SULLIVAN:  Well, third-party custodian, but I take your point.

THE COURT:  Let's suppose she ran away.  Would her mother be so quick to report?

MR. SULLIVAN:  If your Honor swears her in and --

THE COURT:  She would have to decide between a duty to her daughter and duty to a third-party.

MR. SULLIVAN:  I understand your point.  I think the law presumes that if a person takes an oath that a person is going to comply with the oath.

P415JAVA

THE COURT:  I can't put her mother into this position.

MR. SULLIVAN:  Understood, your Honor.

The other point I would make is --

THE COURT:  Another complication is that you can't just take off the bracelet and put it back on.  You have to tear it and close it and then come back to pretrial services to put it on again so it doesn't have flexibility to it.

MR. SULLIVAN:  It does not have flexibility and that would be injurious to her employment.

And the other thing I guess for the Court to consider is a counter-factual, and that is, well, who is the defendant that can prove by clear and convincing evidence that some increased form of detention is not warranted?  If not these two, then who?  People who have been perfect in their compliance?  People who have the moral suasion of family and friends?

THE COURT:  People who are not dual citizens of a country where extradition of its own citizens is not permissible.

MR. SULLIVAN:  So, again, Ms. Javice has never lived in France, was not born in France, and I'm not --

THE COURT:  Isn't she a dual citizen?

MR. SULLIVAN:  She is a dual citizen.  I'm not sure of the proposition that France will not extradite.  I know the government has said that and I am not aware of that position of

P415JAVA

France, that they will not extradite.

THE COURT:  I'm aware.

MR. SULLIVAN:  The other thing, your Honor, she has no family anymore in France so it's -- to the extent there are ideal candidates for making clear and convincing evidence, I think you have those candidates in front of you.  Otherwise, the law would be written to say that it is mandatory that, you know, without exception, that people wear an ankle bracelet. You know, here you just -- every factor seems to suggest that she will comply because she has complied.  I understand the dual citizenship piece.  Again, I haven't seen an order or -- I just haven't seen it from the French government that says they will not extradite but that presumes so much.

She doesn't have a passport, she doesn't have family there.  It presumes a lot.

Brief indulgence, your Honor?

(Pause)

MR. SULLIVAN:  If the Court is not inclined to put the mother in the position as third-party custodian, we can certainly identify someone other than family.  You know, her boss, for example, at the Pilates facility is also a neighbor, or we can identify someone else.  And again, that could satisfy both concerns.  The process is she would come in, swear them, and they would be obligated to report.

THE COURT:  Does the government know of a device that

identifies probation when a defendant leaves home and returns to home?

MS. KOSTOPOULOS:  Your Honor, I think that is what we addressed earlier.

Pretrial may be better equipped to describe the types of monitors.

THE COURT:  We don't have pretrial here.

MS. KOSTOPOULOS:  We do, yes, we have two pretrial officers sitting at the counsel table.

THE COURT:  Perhaps I will ask a few questions.

MS. KOSTOPOULOS:  I am happy to address it initially or --

THE COURT:  I prefer pretrial take the question.

MS. KOSTOPOULOS:  Sure.

THE COURT:  I have discussed this case with these two people before.  They brought up to chambers a sample of an ankle monitor and I examined it and asked a few questions but let's put this on the record.

What is the protection or the device that makes you aware of a defendant who leaves home and comes back?

OFFICER ROTHMAN:  The equipment, your Honor, is referring to is what is called "RF" or radio frequency equipment.  That notifies the monitoring software computer when somebody leaves their residence and returns home, not their whereabouts when they are outside in the community.

THE COURT:  This has to work with home confinement, though.

OFFICER ROTHMAN:  Yes, the RF equipment works with, as the government alluded to earlier, curfew or something more restrictive like home detention or home incarceration.

THE COURT:  Mr. Sullivan, maybe home confinement would be a more feasible option here.

MR. BUCKLEY:  Judge, it is Sean Buckley.  When the Court is ready, I would like to be heard on behalf of Mr. Amar.

THE COURT:  Of course.

MR. BUCKLEY:  Thank you.

MR. SULLIVAN:  No, that, we would not be interested. That becomes a more restrictive alternative so.  We are trying to consider something that is not as restrictive or basically still the status quo under the theory, again, your Honor, that it becomes a very small class of persons that can meet the clear and convincing standard if Ms. Javice cannot meet it, given her history.

If history is any predictor of future conduct, we submit that can and should be the Court's clear and convincing evidence, in combination with all the other restrictions that are already in place.

THE COURT:  Is there any other suggestion that pretrial services can make?

MR. BUCKLEY:  Judge, may I confer with pretrial just

P415JAVA

for a moment?

THE COURT:  Yes.

(Counsel and pretrial confer)

THE COURT:  I will take a short recess.

(Recess)

THE COURT:  Be seated, please.

Are the pretrial people here?

MS. KOSTOPOULOS:  They are, your Honor.  I think they were just making a phone call while you were on recess.  We can bring them back, if the Court would like.

THE COURT:  Mr. Sullivan, could you ask your client to show to the pretrial services officer how the ankle bracelet would impede her movements?

MR. SULLIVAN:  I have an extra copy, your Honor.  Yes. And for the record this is a model, it is not Ms. Javice.

THE COURT:  Ms. Javice -- would you let Ms. Javice show them how?

MR. SULLIVAN:  Yes.  That is what I am doing.

THE COURT:  Let Ms. Javice do it.

MR. SULLIVAN:  Oh I see.  OK.

(Defendant Javice and pretrial confer).

MR. SULLIVAN:  So, your Honor, we may have -- we do have an alternative suggestion, and Ms. Nelson was just on the phone with the probation department down in Miami, and with the Court's permission, if she could speak because it would be more

P415JAVA

direct.

THE COURT:  Yes.

MS. NELSON:  Good afternoon, your Honor.  Kirsten Nelson on behalf of Ms. Javice.

I was able to speak with a location monitoring officer in the Southern District of Florida who confirmed that the Southern District of Florida has a pilot program for what is called SMARTLink, which essentially would allow Ms. Javice to install an APP that is provided by probation on her cell phone, and would permit probation to enforce a curfew, whatever hours the Court deems appropriate.  In the alternative, we could also request voice recognition software which, as I understand it speaking with the probation officers here today, was a previous form of location monitoring that was enforced during the course of Ms. Javice's bond.

So we would respectfully request, your Honor, that the Court order either the SMARTLink application or voice recognition software in the alternative at the discretion of the probation officer.

THE COURT:  How would the SMARTLink work?  So, it fastens to the cell phone but if someone were to leave the cell phone behind, that wouldn't be protective.

MS. NELSON:  That's correct, your Honor.

So my understanding, speaking with Location Monitoring Officer Ethan Martinez in Florida, is that essentially a call

P415JAVA

would be initiated and it would be a FaceTime call, and the officer would ask Ms. Javice to verify where she is located by holding the phone up and showing the officer where she is, and the officer would be familiar with her home to be able to verify that she is home.  Of course, I defer to the probation officers here since my call was very brief with Officer Martinez, but that is what he described to me as how the program works, in order to verify that Ms. Javice is where she is supposed to be and in compliance with the conditions of her bond.

THE COURT:  And the other method was what?  What was voice recognition?

MS. NELSON:  I would defer to probation on the particulars, but my understanding is it would require Ms. Javice to install a land line in her residence and then, based on, again, the Court's parameters for a curfew, there would be an automated call generated to Ms. Javice's home when she is ordered to be at home and then there is biometric software that she would pick up the phone and say, hello, this is Charlie Javice, and probation would verify that that is in fact her and she is where she is supposed to be at the dedicated times.

THE COURT:  Ms. Kostopoulos, would these methods be useful?

MS. KOSTOPOULOS:  No, your Honor, and I am happy to

P415JAVA

address why.

THE COURT:  Before we get to Ms. Kostopoulos. Mr. Rothman and Ms. Mayer, any comments by you?

OFFICER ROTHMAN:  Yes, your Honor, just to clarify.

SMARTLink uses the location services on a person's cell phone, not just -- the location services on somebody's cell phone, so it needs to be smartphone and it would ping the GPS points on their cell phone where they are.

THE COURT:  It depends on the cell phone being carried.

OFFICER ROTHMAN:  Right.  This is one of the reasons we aren't using it in this district and didn't offer it to the Court because there is several holes in that you could just leave your cell phone home, like your Honor pointed out.

It is a pilot program in the Southern District of Florida, they're kind of trying it out, but it is not something that we are prepared to offer in this district.  If your Honor were to order it in Florida, then they would certainly enforce it but we are -- we have concerns about the sort of workarounds that somebody can use to get over it on the program but it is something that is available.

THE COURT:  Supposedly it is accompanied by using the photography application of the phone to show the whereabouts so that the probation officer knows where the person and the cell phone is at any time.

P415JAVA

OFFICER ROTHMAN:  Right, so you get a face recognition when you first set up the application and then every time it pings you to check in you have to match up, you have to use your facial recognition.

THE COURT:  And that is done -- why is that not sufficiently protective?

OFFICER ROTHMAN:  It is not a 24/7 monitoring, it is on random points throughout the day, it is not complete monitoring throughout the day.

And again, there is workarounds.  Somebody could leave their cell phone home and they're not reachable.  There are some other concerns there.

THE COURT:  OK.

MS. KOSTOPOULOS:  May I be heard, your Honor?

THE COURT:  I think I have heard what you were going to tell me.  Let me hear from Mr. Buckley.

Take your seat, Mr. Rothman and Ms. Mayer.

MR. BUCKLEY:  Thank you, your Honor.

So just a couple of initial points that I wanted to correct.  On Friday when I addressed the Court, I did not make the point that Mr. Amar, as requested by pretrial services, has surrendered both of his passports, both his Canadian passport and his Israeli passport, so those are in the possession of pretrial services.  He doesn't have them which makes it very difficult for him to flee anywhere, particularly

P415JAVA

internationally.

The second clarification that I wanted to make relates to a repeated error in the government's submission to the Court regarding the family home that currently is one of the things securing his $1 million personal recognizance bond.  That home, as I mentioned on Friday, it is jointly owned by Mr. Amar, as well as his wife.  Contrary to the government's representation a substantial portion of the money that was paid into that home predates the charged offense and is entirely separate.  It is monies that Mr. Amar and his wife acquired from the sale of their prior residence.  So, the family home securing it, which Mr. Amar's wife also had to sign because her interest, her 50 percent interest in that property is at risk here, you would have to believe that Mr. Amar is going to flee the country leaving his family destitute, that that house would then be forfeited to satisfy the bond.  Her share of it would be forfeited.  Separate and apart from what Mr. Amar faces under the forfeiture provisions of the crime of conviction this is a separate penalty to his wife.  That, as well, as I mentioned, is co-signed by two financially responsible people, two friends of Mr. Amar's who live here in the United States, who live on Long Island.  The Court would have to believe that he would flee and leave them destitute as well, leave them jointly and severally liable for $1 million bond.  So it is not just his house, it is not just his wife, but his two friends.  We think

that is more than clear and convincing evidence when you combine that with the fact that he has been here throughout -- and I don't want to belabor this because the Court has acknowledged --

THE COURT:  Why would an ankle bracelet be bad for him?

MR. BUCKLEY:  A number of reasons, Judge.

They are quite large, they are uncomfortable to wear, it makes it difficult to wear them with pants.  I was going to propose, while we don't think they're necessary, particularly since he has been out for the past four days since we were before your Honor and still showed up on time here without location monitoring, it is just an unnecessary additional step.

He is here, he is going to continue to be here.  He intends to file Rule 29 and Rule 33 motions on the schedule that we set.  So, perhaps we could defer until those motions are filed and we have a hearing and your Honor could see, again, that he continues to be in compliance.

But putting that aside, putting aside the aspects of wearing a GPS monitor around his family, his friends, his daughters' friends where it is quite visible, it makes him a pariah.  It is unduly restrictive, it is not necessary, and he has already had to deal with the stress of going to trial, of this being a very popularized case.  To add, that additional aspect of it is unnecessary, unjust, and unfair.

Now, if the Court feels that there is something more, I mean I think those factors weigh very heavily in favor of him establishing, by clear and convincing evidence, that he will continue to report.  He wants to continue to fight this case. He wants to continue with Rule 29 and Rule 33.  There is no risk of flight.  He would leave friends and family destitute were he to do so.

THE COURT:  OK.

MR. BUCKLEY:  So, I don't know if your Honor is willing to give me a similar preview to what you gave Mr. Sullivan as far as where the Court's thinking is with respect to Mr. Amar.  If that has not moved your Honor's determination, then I would ask for some additional time so that we could confer with the district of supervision, with Officer Brady who is out in Central Islip where Mr. Amar resides, and try to come up with an alternative package along the lines of what Ms. Nelson described, either using the application on the phone, or perhaps we could craft something involving the radio frequency that the pretrial services officers described here, craft a curfew that would give the Court assurance that he is in fact bedding down each night in his residence and that he is here each night without unduly restricting his ability to function as a father, as a family man, and just function, more generally, outside of Court.

THE COURT:  Ms. Kostopoulos, what is the location

restriction right now on both of them?

MS. KOSTOPOULOS:  Shall I take the podium, your Honor?

THE COURT:  Yes.

MS. KOSTOPOULOS:  My understanding, your Honor, is that Ms. Javice is currently permitted to travel between this district and Florida without any restriction, and Mr. Amar is prohibited -- is similarly limited to the Southern and Eastern District, the standard location restrictions that we typically place on the defendants in this district.

THE COURT:  It is not a day-to-day restriction?

MS. KOSTOPOULOS:  There is no day-to-day restriction and in fact they can apply and have applied to leave the district when pretrial, the government and the Court agreed. So, I believe Mr. Amar made such an application last year to attend a football game and it was granted.

So, you know, at its core, your Honor, the reasons that both defendants are giving to not impose a GPS monitor are that it is embarrassing, that it is cumbersome, that it is difficult to wear.  Those are not part of the statutory determinations that begin with the presumption that both defendants should be remanded following their guilty verdict.

And Mr. Amar, in particular --

THE COURT:  I have to find clear and convincing evidence.

MS. KOSTOPOULOS:  Yes.

P415JAVA

THE COURT:  So it is not -- that overcomes the presumption.

MS. KOSTOPOULOS:  It would, your Honor, and I think we would point the Court to we don't think that deferring this question further is really to anybody's benefit.  The presumption, I think --

THE COURT:  Well, it avoids making a difficult decision.

MS. KOSTOPOULOS:  For your Honor, in your shoes, I can understand.

THE COURT:  It is a great benefit for me.

MS. KOSTOPOULOS:  Look.  I think, your Honor, let me say two things -- one on Ms. Javice, one on Mr. Amar.

On Ms. Javice, we consulted with pretrial, we spoke to, through pretrial in New York, her pretrial officer in Florida.  As your Honor pointed out, she was able to work and teach exercise classes without any real encumbrance or restriction so I just don't credit that, your Honor, as a reason why something as basic as GPS monitoring shouldn't be imposed in this case.  And the alternatives, your Honor, they're just not sufficient.  Every defendant who has fled this district, I have had cases, you have had cases, they leave their phone behind and they go.  And it is very easy, unfortunately, for defendants to obtain foreign travel documents, particularly when they're citizens of other

countries.  There is nothing stopping either defendant from going into a foreign embassy, for Canada, for Israel, for France, and obtaining a new passport and using that to flee the country.

That is the concern that emanates this presumption and it is why, even though almost every defendant in this district surrenders their passport upon arrest, many defendants do successfully flee.

And so that is the concern that is animating the government's application.

THE COURT:  You mean a Canadian citizen can just go into a Canadian consulate and say I lost my passport and get a new one?

MS. KOSTOPOULOS:  That's my understanding, your Honor.  We consulted with our office and there is no restriction.  We would essentially be relying on a foreign government to recognize that Ms. Javice and Mr. Amar have a detainer against them and not provide them with a passport but that is one of the ways the defendants have successfully fled when they have ties to a foreign country.

As to Mr. Amar, you know, I think that the factors weigh even more heavily against keeping the conditions as they are, the status quo.

Mr. Amar is not a U.S. citizen.  He is a lawful permanent resident.  He has very close ties to two foreign

P415JAVA

countries.  He has family living, as we understand it, in both countries.  That is a significant factor that we believe makes it impossible for the defendants to overcome the clear and convincing standard here.  That is precisely the sort of combination of factors that Courts in this district have routinely found frankly warrant remand under similar circumstances, for white collar offenses, precisely what the defendants are convicted of here.

And so we just don't think, your Honor, you know, we recognize that if there were another alternative it might be worth considering it but this is the least restrictive alternative, it is one that pretrial is not objecting to, it is consistent with the technology we impose on hundreds if not thousands of defendants in this district and across United States and it is an additional way of ensuring that the defendants remain in the country, that they don't flee, and it has a very limited impact on their day-to-day.  In fact, frankly, your Honor, I think no impact on their day-to-day given what both defendants have come up here and represented.  They can continue to work, they can continue to travel, they can continue to live in their homes, they can continue to request additional permission to travel outside of the districts to which they're limited, there is no curfew, there is no home incarceration, there is no detention.  And so, we strongly urge the Court to impose this very, very modest

modification to their conditions.

I am happy to address, if the Court has additional questions.

THE COURT:  No, I don't have any additional questions. I have additional reservations.

I was thinking, Mr. Sullivan, that Ms. Javice's concern is more of client relations and aesthetics rather than a physical limitation, making it more difficult to work.

MR. SULLIVAN:  I think it is both, your Honor.  It is, you know, to have your legs in the air and the monitor going up and down on the bed with those straps, it is a physical encumbrance and a significant one.

In terms of client relations, so the government isn't incorrect, yes, she did work but she taught only one class, a friends and family class and that was all she was able to do because she can't do the sorts of things that one has to do in the traditional, normal Pilates class so it is both working in tandem with each other producing a result that she can't work with the -- at least cannot effectively work with the ankle monitor on.

So, right now she teaches three or four classes a day and if it were on, it would going back to her mom and cousins in a class because she's not able to do the sorts of things that one has to do to teach Pilates.

THE COURT:  Thank you.

P415JAVA

Short recess.

(Recess)

THE COURT:  Mr. Buckley, remind me of Mr. Amar's family situation.  His wife; does he have any children?

MR. BUCKLEY:  Yes, your Honor.  He has two children, one of who resides here with him in the house, and the other is attending college in upstate New York but currently is residing in Israel.

THE COURT:  Residing where?

MR. BUCKLEY:  In Israel, your Honor.

THE COURT:  One in New York and one in Israel?

MR. BUCKLEY:  Correct, Judge.  And Mr. Amar's wife and daughter were here pretty much every single day of trial.

THE COURT:  Is his wife a citizen?

MR. BUCKLEY:  Yes, they're both U.S. nationals, Judge. All three children are U.S. nationals but they have dual Israeli nationality.

THE COURT:  And Mr. Amar and his wife?

MR. BUCKLEY:  Mr. Amar is a legal permanent resident, a green card holder here in the United States and he is a national of Canada and Israel.  His wife is a U.S. national and both his children are U.S. nationals.

THE COURT:  U.S. nationals being a citizen?

MR. BUCKLEY:  Correct, Judge.

THE COURT:  And has his wife signed as a surety?

MR. BUCKLEY:  Yes, your Honor; because the house was posted as a bond and because she owns half of the property she is on the bond as a surety.

THE COURT:  So if he were to flee, the house would be security?

MR. BUCKLEY:  Correct.

THE COURT:  And the two co-signers would be liability for $1 million?

MR. BUCKLEY:  That's correct, Judge.

THE COURT:  I believe that clearly and convincingly persuades me that Mr. Amar is not a risk a flight, not likely to flee or pose a danger to the safety of any other person or the community if released, and I therefore release him, subject to the conditions set out with the exception of location monitoring.

Is there anything else I should do here Ms. Kostopoulos, with Mr. Amar?

MS. KOSTOPOULOS:  Your Honor, we would want to be heard on that.  I respect that you have reached a decision as to Mr. Amar, but we believe that the factors weigh even more heavily towards location monitoring for Mr. Amar given what Mr. Buckley just identified, which is the fact that his --

THE COURT:  Go to the podium.

MS. KOSTOPOULOS:  Sure.

Your Honor, I think that the core of the government's

concern is, put aside the collateral which both defendants have posted in connection with their bond, put aside the co-signers which both defendants have posted with their bond.  What Mr. Buckley has just represented is that Mr. Amar is not a U.S. citizen, he is a dual citizen of two other countries, one of which is very unlikely to extradite a citizen.  I don't know Mr. Amar's wife's status but my understanding is that both of his children are dual United States/Israeli citizens, one of his children lives in Israel.  He has other members of his family who reside in both Israel and Canada.  He has traveled multiple times to both countries in the last several years, frequent travel to both countries and that, your Honor, we argue is very compelling evidence that there is a significant risk of flight.

Mr. Amar, AS a lawful permanent, resident is likely to be removed from the United States after serving his sentence in this case.  He has even more of an incentive to flee prior to being sentenced than frankly Ms. Javice does and we outlined that in our submission.

THE COURT:  Why more?

MS. KOSTOPOULOS:  I'm sorry.

THE COURT:  Why more?

MS. KOSTOPOULOS:  Because he is going to be removed from the country.  He is not going to be allowed to remain here after his conviction and after sentence is imposed after he

P415JAVA

serves an incarceratory sentence.  That is very powerful, very compelling motivation to flee the country and there have been defendants -- I recognize that Mr. Buckley has noted that the home belongs to both him and his wife.  There is details in the pretrial report about his wife's income versus his income.  The fact remains that the home was purchased with fraud proceeds.

THE COURT:  Say again about his wife's income?

MS. KOSTOPOULOS:  The point simply, your Honor, is that the home was purchased with fraud proceeds.  It is very likely to be subject to forfeiture.  I understand that Mr. Buckley is representing of course they'll contest it, but the home was purchased after the fraud was committed in this case and after Mr. Amar received millions of dollars in connection with that fraud and was renovated with funds that were obtained from the fraud.

THE COURT:  It would be very difficult for a family to move.  There is logistical issues and all other kind of issues that would mean that Mr. Amar would be living as a fugitive for the rest of his life and whether in Israel or Canada, it would be a fugitive nonetheless.

MS. KOSTOPOULOS:  I recognize that, your Honor, but defendants make that decision and make that risk calculus all the time and it is precisely why there is a string of cases in this district and this circuit that recognize that defendants who are not U.S. citizens do not have, are likely to be removed

after serving a criminal sentence, have dual citizenship with countries that do not extradite their own citizens back to the United States have a very -- there is a very high risk that those defendants will flee and that risk is what animates the statutory presumption in this case in favor of detention.

Now, we are moving away from detention. The government hasn't made that application. Mr. Amar's counsel has not identified any burden on him to wearing a GPS monitor apart from that it would be cumbersome and embarrassing to wear. Weighed against that, your Honor, is a significant risk of flight and the fact that the defendant has to prove, by clear and convincing evidence, that now that he is facing a significant financial penalty, a significant incarceratory term, and has family that live in countries for which he is a citizen, that he is not going to leave the country and reside in one of those countries and make that decision to flee. That's a very significant concern.

THE COURT:  What is the present condition?

MS. KOSTOPOULOS:  The present conditions, your Honor, are essentially no conditions. He has a bond, there is a co-signer, it is secured by his home. He is required to remain in the Southern and Eastern Districts of New York. And if he wants to leave the Southern or Eastern Districts of New York, he has to make an application, which he has done before.

The only additional condition we are seeking, your

Honor, is the condition that the defendants were subject to after their arrest, which is GPS stand-alone monitoring, no curfew, no home detention, no incarceration, a monitor that tells pretrial that the defendants are where they need to be, that they are not attempting to leave the country, that they're not traveling to an airport, that they're not heading towards the Canadian border.  That is the only additional condition the government is seeking and it is our understanding that pretrial supports that condition and we think it is a very modest proposal weighed against factors that I have just outlined that are present, particularly with respect to Mr. Amar.  We don't think that the status quo and the financial penalties that he faces are sufficient now that we have a guilty verdict.

MR. BUCKLEY:  Judge, if I may?

THE COURT:  Mr. Buckley, the podium.

MR. BUCKLEY:  Yes.

I don't believe Mr. Amar has traveled to Israel in approximately seven years, Judge, so I'm not sure where Ms. Kostopoulos is making these representations or based upon what.

(Defendant and counsel conferring)

MR. BUCKLEY:  Since 2018, approximately.

As far as the financial penalties, I think the Court hit the nail on the head when your Honor came out.  It is not financial penalties just for Mr. Amar, it is financial

P415JAVA

penalties for his wife.  It is financial penalties up to a million dollars for his co-signers, his friends who are vouching for him to be here.  He would lose his house if he were to go somewhere.

THE COURT:  We are repeating because the decision is difficult.

MR. BUCKLEY:  Yes, Judge.

THE COURT:  I will reserve decision.

Now, as to Ms. Javice.  My thought is that the ankle bracelet should remain until such time as she is able to come up with a package worked out with her Florida supervisors that assure, give further assurance of not fleeing.

MR. SULLIVAN:  Brief indulgence?

(Defendant and counsel conferring)

MR. SULLIVAN:  Your Honor, two points.

One, to the extent that the Court was leaning toward and now deferring the decision with respect to Mr. Amar, the equities weigh even stronger in favor of Ms. Javice.  As opposed to a $1 million bond, she has a $2 million bond secured by her mother and her father and her residence, so she would lose her residence and her mother and her father, severally, would be liable for $2 million.

We agree with the government that the arguments for an ankle bracelet are weaker with respect to Ms. Javice.  The argument with respect to an ankle monitor is not stylistic or

P415JAVA

for convenience or embarrassment but has a nexus to her work.

So, on the very standards that the Court was contemplating for Mr. Amar, we think that they apply with even greater force with Ms. Javice.

THE COURT:  Come up with a package with the Florida methodology.

MR. SULLIVAN:  We can certainly endeavor to do that, your Honor; yes.

THE COURT:  So if you come up with a successful package you would be able to change the terms.  All the conditions, plus ankle monitoring, will be imposed on Ms. Javice, but I intend to review those on the submission to me of the package approved by the pretrial service officers in Florida, the Southern District of Florida, that will give satisfactory evidence that there will not be flight or danger to the community.

Thank you.

MS. KOSTOPOULOS:  Your Honor, may we briefly be heard on one point?

THE COURT:  Yes.

MS. KOSTOPOULOS:  May I take the podium?

THE COURT:  Yes.

MS. KOSTOPOULOS:  I recognize I respect your Honor's ruling with respect to Mr. Amar.  The one suggestion I would ask the Court to consider, given that pretrial is here, given

the extensive discussions that we have had with pretrial, given that ultimately the burden is on Mr. Amar to put together an alternative package that satisfies the Court and resolves the concerns regarding flight.  I think the government has and pretrial has acute concerns here, we would just ask that the same be required of Mr. Amar; that he be given time to come up with an alternative package, but that both Ms. Javice and Mr. Amar be required to wear an ankle monitor until such time as they do.

There is a significant --

THE COURT:  What kind of package would you envision?

MS. KOSTOPOULOS:  We are happy to discuss it, your Honor.  It may be additional -- I know pretrial had discussed the possibility of additional financial security, a larger bond.  We attempted to have that discussion with defense counsel.  There were objections, frankly, to any modifications to the status quo.  I just think, your Honor, we have these concerns, we made this application immediately after the guilty verdict because of these concerns, and I think those concerns are only heightened and I think pretrial -- I don't want to speak for pretrial, but I think they would agree with me if we leave court today and neither of the defendants is wearing an ankle monitor.

I see the pretrial officer nodding.

I really think that the starting point here should be

P415JAVA

both defendants are required to wear an ankle monitor, and then the Court set a time by which the defendants come with an alternative package that we can certainly discuss with them, and if the parties are unable to reach an agreement or pretrial doesn't support the package, then we can come back to the Court.  But I think the intervening time where Mr. Amar is at liberty --

THE COURT:  I will accept that.  I will accept that.

MS. KOSTOPOULOS:  Thank you, your Honor.

THE COURT:  Mr. Buckley.

MR. BUCKLEY:  Your Honor, the Court reserved on --

THE COURT:  I did reserve and it is a change of view. As you have seen, I have gone back and forth on this issue and because of that, I think the proposal that Ms. Kostopoulos gave is a good one.

MR. BUCKLEY:  But --

THE COURT:  So, I accept it.  And that doesn't mean I might not come back to my present view, but I want pretrial services officers to work with Ms. Kostopoulos and with you and with Mr. Sullivan, to see if we can come up with satisfactory packages for each.

MR. BUCKLEY:  Judge, I'm happy to do that and to confer further.  Again, I think the Court came out finding --

THE COURT:  Mr. Buckley, I need more time.

MR. BUCKLEY:  I --

P415JAVA

THE COURT:  I'm not settled in my view.  And because I'm not settled in my view, I'm looking for the best way to keep the status quo until I can make up my mind.  The best way to keep the status quo is the most conservative one and that is retention of ankle bracelets until I change my mind.  So, that is the ruling.

So, for both defendants, all of the terms will continue and then the addition of wearing location monitoring bracelet.

Thank you.

MS. NELSON:  Your Honor, I apologize.  This is Kirsten Nelson on behalf of Ms. Javice.

Just to clarify the type of monitoring the Court is ordering, is it GPS monitoring?

THE COURT:  Yes.

MS. NELSON:  Thank you, your Honor.

THE COURT:  I also want to acknowledge my thanks the presence of Mr. Rothman and Ms. Mayer.

It's today.

o0o