# EXHIBIT A

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                        23 CR 251 (AKH)
 4
     CHARLIE JAVICE
 5   OLIVIER AMAR
                                           Motions
 6             Defendants.
     ------------------------------x
 7
                                           New York, N.Y.
 8                                         January 23, 2025
                                           10:50 a.m.
 9

10   Before:

11                   HON. ALVIN K. HELLERSTEIN,

12                                         District Judge

13                         APPEARANCES

14   DANIELLE R. SASSOON
          United States Attorney for the
15        Southern District of New York
     BY:  MICAH FERGENSON
16        RUSHMI BHASKARAN
          NICHOLAS CHIUCHIOLO
17        GEORGIA KOSTOPOLOUS
          Assistant United States Attorneys
18
     KOBRE & KIM
19        Attorneys for Defendant Amar
     BY:  SEAN S. BUCKLEY
20        STEVEN G. KOBRE
          JONATHAN D. COGAN
21        ALEXANDRIA E. SWETTE

22

23

24

25
```

1    APPEARANCES CONTINUED:

2

3    RONALD SULLIVAN LAW PLLC
          Attorney for Defendant Javice
     BY:  RONALD S. SULLIVAN
4         RICHARD M. DeMARIA

5    BAEZ LAW FIRM
          Attorney for Defendant Javice
6    BY:  JOSE A. BAEZ

7    MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO PC
          Attorney for Defendant Javice
8    BY:  DAVID M. SIEGAL

9    QUINN EMANUEL URQUHART & SULLIVAN LLP
          Attorneys for Defendant Javice
10   BY:  ERICA PERDOMO

11

     Also Present:
12
     MICHAEL GARTLAND, Paralegal Specialist (USAO)
13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; cased called)

2              DEPUTY CLERK:  Counsel, please state your appearances

3    for the record.

4              MR. FERGENSON:  Good morning, your Honor.

5              Micah Fergenson, Rushmi Bhaskaran, Nicholas

6    Chiuchiolo, Georgia Kostopoulos for the government.  We're also

7    joined at counsel table by our paralegal Michael Gartland.

8              THE COURT:  Good morning.

9              MR. SULLIVAN:  Good morning, your Honor.

10             Ronald Sullivan, here at counsel table with Jose Baez

11   on behalf of Charlie Javice, who is present.

12             MR. BUCKLEY:  Good morning, your Honor.  Sean Buckley,

13   Steven Kobre, Johnathan Cogan and Alexandria Swette on behalf

14   of Mr. Amar, who is present at counsel table.

15             THE COURT:  Okay.

16             Let me take the competition first.  Mr. Siegal, what

17   is your position?

18             MR. SIEGAL:  Good morning, your Honor.

19             THE COURT:  Those who are going to be speaking, you

20   don't need to wear a mask.

21             MR. SIEGAL:  We've discussed with the government --

22   actually, they submitted a script late yesterday, your Honor.

23   We had discussed actually potentially tabling this issue, but

24   our position is --

25             THE COURT:  We're not going to table the issue.

```
 1            MR. SIEGAL:  I have committed to not be the attorney
 2   cross-examining the investigator they have identified in their
 3   letter.  We also, I think, are in agreement with the government
 4   that any references to my firm or me in the document they
 5   intend to offer will be redacted.  Beyond that, the relief the
 6   government seeks, we will be opposing.  We have no objection to
 7   a Curcio --
 8            THE COURT:  What is the relief beyond that?
 9            MR. SIEGAL:  The government --
10            THE COURT:  The only other thing I remember is that
11   you can't get involved in openings and closings.
12            MR. SIEGAL:  Yes, your Honor, that is the extent to
13   which we would object.  Obviously, I would not -- to the extent
14   I was doing argument to the jury, I would not be speaking in a
15   voice that would suggest I have any personal knowledge of the
16   events or the facts.  To the extent I would be arguing to the
17   jury, it would be based on testimony in the record, and that's
18   it.  And we don't think that the law supports the notion of
19   precluding my availability to argue.  And none of the cases
20   cited by the government support that position.  They said we
21   can submit --
22            THE COURT:  Mr. Fergenson.
23            MR. FERGENSON:  Yes, Judge.  That doesn't cure the
24   problem.  The law bars an attorney from acting as an unsworn
25   witness during cross-examinations and also during jury
```

1  argument.  It's for that reason we sought the relief we sought

2  And the Court should bar Mr. Siegal from doing so.

3          THE COURT:  He says he will just be talking about the

4  evidence and not using any personal information that's not in

5  the evidence.

6          MR. FERGENSON:  The law, your Honor, just draws a

7  clear line that potential witnesses who are attorneys in the

8  case --

9          THE COURT:  But he's not a witness.

10          MR. FERGENSON:  He's a potential witness, your Honor.

11          THE COURT:  Yeah, but we're talking about -- let's

12  leave out openings.  Let's just talk about closings.

13          MR. BAEZ:  Excuse me, your Honor.  Jose Baez.  I can

14  represent to the Court that Mr. Siegal is not doing neither

15  openings or closings, so we can address that.

16          THE COURT:  That does not solve the problem.

17          MR. BAEZ:  Understood.

18          THE COURT:  Mr. Siegal?

19          MR. SIEGAL:  Your Honor, I'm not opening in the case.

20          THE COURT:  And you're not closing in the case.

21          MR. SIEGAL:  I guess I'm not closing in the case.

22          THE COURT:  And you're not doing cross-examination.

23          MR. SIEGAL:  I'm not cross-examining that witness,

24  your Honor.

25          THE COURT:  So all the relief the government wants is

1    there.

2             MR. FERGENSON:  Thank you, your Honor.

3             THE COURT:  I'll put this in an order, and we'll go

4    on.

5             MR. FERGENSON:  I think, your Honor, we don't need to

6    do the Curcio script today, but at some point we would like to

7    proceed with the Curcio hearing.  It doesn't need to be today,

8    your Honor.

9             THE COURT:  I'm wondering why we need it, but it can't

10   be harmful.  Let me ask Ms. Javice.  Is Ms. Javice here?

11            DEFENDANT JAVICE:  Yes, your Honor.

12            THE COURT:  So the law gives you the right to a

13   conflict-free lawyer.  You've heard that Mr. Siegal, because he

14   may have been for the representation a potential witness, and

15   now that he is where he is in terms of not being able to

16   cross-examine or open or close -- not being able to

17   cross-examine that particular witness or open or close, you're

18   getting a counsel that cannot fulfill his duty to give you his

19   zealous and full representation.  That doesn't mean you

20   shouldn't have him, but it's your choice, and I want to make

21   sure that you exercise your choice intelligently and

22   responsibly.

23            DEFENDANT JAVICE:  I understand.  Thank you, your

24   Honor.  I would like to proceed with Mr. Siegal.

25            THE COURT:  With Mr. Siegal as your counsel, under the

1    circumstances I've laid out; namely, he cannot cross-examine

2    any particular witness.  He cannot open.  And he cannot close.

3              DEFENDANT JAVICE:  Yes, your Honor.

4              THE COURT:  Okay.  Anything else?

5              MR. FERGENSON:  May I ask the Court to ask one more --

6    at least one more question, your Honor?

7              THE COURT:  Yes, go ahead.

8              MR. FERGENSON:  We'd ask the Court to allocute

9    Ms. Javice on the fact that if she continues with Mr. Siegal as

10   one of her trial counsel, she could not call Mr. Siegal as a

11   defense witness.

12             THE COURT:  Yes.

13             MR. FERGENSON:  If, you know, they thought there was

14   something inconsistent that our witness testified to, she could

15   not then call Mr. Siegal.

16             THE COURT:  That's correct.  Mr. Siegal cannot appear

17   as a witness in the case.

18             DEFENDANT JAVICE:  I understand, your Honor.

19             THE COURT:  Mr. Siegal, you understand that too?

20             MR. SIEGAL:  I do, your Honor.

21             THE COURT:  I think that finishes the motion.

22             MR. FERGENSON:  Thank you, your Honor.

23             THE COURT:  The motion is granted on consent.

24             The next motion I want to take up is a motion by the

25   government to compel on a reciprocal basis.

1          What is it, Mr. Fergenson, that you are not getting
2     that you want?
3          MR. FERGENSON:  Your Honor, AUSA Chiuchiolo is going
4     to address this motion.
5          THE COURT:  What is it, Mr. Chiuchiolo, that you're
6     wanting and not getting?
7          MR. CHIUCHIOLO:  Your Honor, I'll start with Rule 16
8     and Rule 17 issues.  The government has received no Rule 16
9     materials from the defense.  We received for the first time
10    shortly before we made our motion a small production from
11    Mr. Amar of materials that the government had actually
12    provided.  And it appears in Mr. Amar's response that their
13    view is "we'll give you stuff if we decide we're going to use
14    them."  And that really flies in the face of the rule and the
15    mutual exchange that's supposed to happen.

16          And so we don't really know what they have that they
17    might use, but we do know that Mr. Amar has issued several
18    Rule 17 subpoenas.  We have two of them, and the two we have
19    are clearly improper on their face.  They seek -- one is to the
20    SEC, and one is to the FDIC, and they basically seek any
21    records in the agency's possession that could reflect --
22          THE COURT:  Let's do Rule 16 first.
23          MR. CHIUCHIOLO:  There's an interplay, your Honor,
24    because if they're planning to use Rule 17 subpoenas for
25    purposes of --

1          THE COURT:  When you say the subpoenas are not -- are

2    not lawful subpoenas, that means the SEC and the FDIC have the

3    opportunity to come in and move to quash.

4          MR. CHIUCHIOLO:  I think the case law on that, your

5    Honor, if the impropriety of a subpoena is before the Court,

6    and we have these two subpoenas, the Court can and should rule

7    on that.  It's *United States v. Weissman*.  And these two

8    subpoenas which I can hand up to the Court, I mean, I -- in

9    Mr. Amar's letter, they essentially concede as much.  I think

10   they offer to perhaps change the return date on the subpoenas,

11   but I don't think that they are defensible on their face.  But

12   it raises the issue, your Honor, of what other subpoenas are

13   out there that could also be improper.

14          We are not -- all we're asking is to just give us the

15   subpoena returns, which is often what happens in most cases.

16   Give us the subpoena returns so there's not unfair surprise,

17   and we don't have delay during trial to try to figure this out.

18   We're only two weeks before trial.  It seems like a pretty

19   reasonable request.

20          THE COURT:  All right.  Who's going to respond?

21          MR. BUCKLEY:  Your Honor, Sean Buckley on behalf of

22   Mr. Amar.  I'm still unclear as to the exact relief that it is

23   that the government is seeking.  But let me just address the

24   subpoena issue in turn.  With respect to the large subpoena

25   returns that have been received, they have been from JP Morgan

1    Chase, and those have been simultaneously produced to the

2    government.  So there is no issue with respect to those Rule 17

3    subpoenas that --

4            THE COURT:  They're not interested in the subpoenas

5    which you have produced.  They're interested in the subpoenas

6    you haven't produced.

7            MR. BUCKLEY:  With regard to the subpoena that they

8    identified that was issued to Zoom, I can represent to the

9    Court that we do not intend to use any materials from Zoom in

10   our case-in-chief nor do we intend to use those materials to

11   impeach any witness.  Beyond that, they are not entitled to

12   those materials.  We have complied with Rule 16.

13           THE COURT:  Have you received production from the SEC?

14           MR. BUCKLEY:  We have not yet, your Honor.  The SEC

15   requested that we extend its deadline to respond to the

16   subpoena by one week by virtue of today's conference.  I'm

17   happy to address, if the Court would like to hear, the

18   propriety of that subpoena because we disagree --

19           THE COURT:  What about the subpoena to the FDIC?

20           MR. BUCKLEY:  The subpoena to the FDIC, after some

21   back and forth with various agencies within the FDIC was

22   successfully served, I believe, two days ago.  So its return

23   has not yet been received.  And these are materials, Judge,

24   that relate to interviews conducted by the U.S. Attorney's

25   Office.

```
 1                THE COURT:  Are you willing to produced what you

 2       receive?

 3                MR. BUCKLEY:  From those subpoenas, your Honor?

 4                THE COURT:  Yes.

 5                MR. BUCKLEY:  Yes.  In fact, the government could have

 6       requested it.  We request that --

 7                THE COURT:  Let's get into that.  You're willing to

 8       produce them?

 9                MR. BUCKLEY:  From the SEC and the FDIC --

10                THE COURT:  From the SEC and the FDIC, are there any

11       other outstanding subpoenas?

12                MR. BUCKLEY:  Yes, Judge.  We also submitted another

13       subpoena to JP Morgan Chase for an additional limited

14       production.  We have not received any materials in response to

15       that subpoena.

16                THE COURT:  Will you share such materials as you

17       receive it from JP Morgan with the government?

18                MR. BUCKLEY:  Your Honor, certainly if we intend to

19       use them in our case-in-chief, we will share those returns with

20       the government.

21                THE COURT:  I didn't ask for a qualification.  Will

22       you share the materials you receive from JP Morgan with the

23       government?

24                MR. BUCKLEY:  Yes, your Honor.

25                THE COURT:  All right.  Now, regarding Rule 16, are
```

 1    there any other things that are being withheld?

 2            What's the answer?

 3            MR. BUCKLEY:  Judge, I'm not sure.  Is that question

 4    directed at counsel for Mr. Amar?

 5            THE COURT:  You were speaking, so I asked you.  Yeah,

 6    it was given to you.

 7            MR. BUCKLEY:  Whether there are any outstanding issues

 8    from the government's perspective with respect to Rule 16.

 9    Those were the ones identified in their motion.  Those are the

10    ones we came to address --

11            THE COURT:  The answer is no?

12            MR. BUCKLEY:  The answer is no, Judge.

13            THE COURT:  There are no more documents to produce.

14            And with regard to Mr. Buckley's answers as to Rule 17

15    and Rule 16, are those answers satisfactory to the defendant

16    Javice as well?  Any position from defendant Javice?

17            MR. SULLIVAN:  Yes, your Honor, we don't have a --

18    yes, your Honor.

19            THE COURT:  What's left of the motion?

20            MR. CHIUCHIOLO:  Thank you, your Honor.  That resolves

21    the Rule 16 and Rule 17.

22            Just quickly on Rule 26.2, I don't want to, you know,

23    make a large issue here, but the Court did order disclosure of

24    Rule 26.2 materials.  It does seem from --

25            THE COURT:  Experts.

1           MR. CHIUCHIOLO:  Yes.  And it does seem from

2    Mr. Amar's response that they're sort of taking a

3    hypertechnical meaning of the Rule's statement.

4           THE COURT:  How so?

5           MR. CHIUCHIOLO:  Well, I think they cite to the

6    definition of statement such as it has to be substantially

7    verbatim, contemporaneously recorded.  That's the same

8    definition of statement that's used in Section 3500.  And

9    obviously the government would never come in here and say,

10   well, we're not going to produce any notes because they weren't

11   "you know, substantially verbatim."

12          Rule 26.2 is designed to place the disclosure of prior

13   defense witness statements on the same legal footing as the

14   disclosure of prior government witness statements.  So we're

15   just asking -- all we're asking here is for reciprocal exchange

16   of witness statements.  The defense has noticed a lot of

17   witnesses - 27 witnesses.  We understand a lot of them are

18   not -- the defense might not have access to them and so

19   that's --

20          THE COURT:  We're talking about -- let's make it

21   specific.  We're talking about attorneys' notes taken in

22   interviewing or paralegal notes taken in interviewing potential

23   witnesses for trial.

24          MR. CHIUCHIOLO:  Exactly, your Honor.  That's the

25   heart of it, including experts.

1          THE COURT:  Who is going to respond?

2          MR. BUCKLEY:  Your Honor, with respect to Mr. Amar,

3    again, it's Sean Buckley.  The only arguments that the

4    government has raised with respect to witnesses noticed by

5    Mr. Amar pertain to expert witnesses.

6          THE COURT:  Pertain to what?

7          MR. BUCKLEY:  To expert witnesses.  Mr. Amar has

8    noticed three expert witnesses as potential witnesses at trial.

9    We explained in our papers what the requirements of Rule 26.2

10   are.

11         THE COURT:  Tell me what they are.

12         MR. BUCKLEY:  The requirements of Rule 26.2 define

13   what is a statement of a witness.

14         THE COURT:  We're talking about experts, right?

15         MR. BUCKLEY:  Of an expert witness, yes, Judge.

16         THE COURT:  There's reports that have to be given.  I

17   take the position, as Judge Rakoff took the position, that the

18   same rules of discovery that relate to experts in civil cases

19   relate to experts in federal cases and in criminal cases.

20   There is to be no surprise with experts.

21         I'm not going to delay the trial while the other side

22   is given an opportunity to find out what the expert has been

23   saying and not being told.  So you're going to have to do a

24   report and give the same scope of report to the government as

25   the government gave to you.

1          MR. BUCKLEY:  Yes, your Honor.  And we have, to be

2    clear, provided the required notice under 16(b)(1)(C) of the

3    anticipated expert testimony that has been signed by each

4    witness in compliance with Rule 16.

5          The government recently has moved in limine raising

6    various issues but has not complained about the adequacy of

7    that disclosure.  Our position is Rule 26.2 for that very

8    reason should not apply to expert witnesses because we have

9    complied with our disclosure obligations under 16(b)(1)(C),

10   and, therefore, they are not entitled to attorney work product

11   or work product prepared by paralegals in our office at our

12   direction in the course of meetings or interviews with

13   potential testifying witnesses.  Rule 26.2 just is not

14   triggered here, Judge.

15         MR. CHIUCHIOLO:  Your Honor, if I can respond?

16         THE COURT:  One minute.

17          (Pause)

18         THE COURT:  I think we're contesting 26.2(f)(1).  A

19   written statement that a witness makes and signs, that

20   defendants have agreed to be produced if they haven't already

21   produced it.  And the next part is:  Or otherwise adopts or

22   approves.  If notes are shown to the defendant, those are

23   adopted or approved.  If they're not shown, if they're just the

24   paralegal's or attorney's, they don't fit into a written

25   statement.

1              MR. CHIUCHIOLO:  Your Honor, it's the same definition

2     under 18 U.S.C. 3500.  So if we were to take --

3              THE COURT:  Yes, but the government customarily

4     produces the notes of the interviewers.

5              MR. CHIUCHIOLO:  All we're asking for is simple

6     disclosure, which is exactly what the case law says Rule 26.2

7     is designed to do.  It's to provide the exact same obligation

8     on the defense that is on the government.

9              THE COURT:  I don't think so.

10              MR. CHIUCHIOLO:  Your Honor, I would --

11              THE COURT:  It doesn't say so.  The rule doesn't say

12     so.

13              MR. CHIUCHIOLO:  Your Honor, I would direct the Court

14     to the Advisory Committee Notes on Section 26.2, which are

15     cited in a Second Circuit case *United States v. Scotti*, 47 F.3d

16     1237, 1249, and again --

17              THE COURT:  Which Advisory Note?

18              MR. CHIUCHIOLO:  26.2.

19              THE COURT:  I'm looking.

20              MR. CHIUCHIOLO:  It says:  Rule 26.2 is designed to

21     place the disclosure of prior relevant statements of an --

22              THE COURT:  Which year's amendment are you looking at?

23              MR. CHIUCHIOLO:  Well, the Second Circuit case is from

24     1995, your Honor, and it's quoting the Advisory Committee Notes

25     of 1979.

1              THE COURT:  I've read the note, and it supports the

2     government's proposition.  It cites the Supreme Court case of

3     *United States v. Nobles*, 422 U.S. 225 (1975) which involved the

4     notes of an interviewer.  Without reference to it, it having

5     been adopted or approved by the witness who was interviewed.

6     The government demanded production at the time that production

7     is required under the Jencks Act, that is after

8     cross-examination, and when the defendant refused to produce,

9     the trial court struck the testimony of the witness, and the

10    Supreme Court upheld it.

11             Now, under the practice of this Court, followed as

12    long as I've been a judge, which is 26 years, the government

13    produces under the Jencks Act not only statements signed or

14    approved or adopted by the witness, but all notes of an

15    interviewer of a witness and of the court procedures that order

16    production is accelerated to before the trial.

17             Under the Advisory Committee note explaining the rule,

18    the same should apply here because, as is said by the Advisory

19    Committee, I quote:  "The rule, with minor exceptions, makes

20    the procedure identical for both prosecution and defense

21    witnesses, including the provision directing the court,

22    whenever a claim is made that the disclosure would be improper

23    because the statement contains irrelevant matter, to examine

24    the statements in camera and excise such matter as should not

25    be disclosed," which I will do.

1          So the government's motion is granted.  Production has

2   to be made.

3          MR. CHIUCHIOLO:  Thank you, your Honor.

4          THE COURT:  I didn't ask if the defendant Javice has

5   any argument on the motion?

6          MR. BUCKLEY:  Judge, if I can just be heard on that

7   for a moment.

8          THE COURT:  First, does the defendant Javice have

9   anything to say?

10          MR. SULLIVAN:  We don't have anything additional to

11   add at this time, your Honor.

12          THE COURT:  Thank you.

13          Mr. Buckley, you do though.

14          MR. BUCKLEY:  Yes, your Honor.  So the issue here

15   unfortunately, is more nuanced, and that is because these are

16   notes that are contained in attorney work product.  Under

17   16(b)(2), attorney work product is shielded.  Now, we do have

18   notes.  The notes are of varying degrees.  They're incorporated

19   into legal memos that reflect attorney thoughts, impressions --

20          THE COURT:  Legal memos, if not shown to the witness,

21   do not qualify as statements.  The interview notes do.

22          MR. BUCKLEY:  So --

23          THE COURT:  The further use of the interview notes in

24   attorney's work product is not required to be produced unless

25   shown to the witness, okay?

```
 1              MR. BUCKLEY:  Okay, yes, Judge.

 2              MR. CHIUCHIOLO:  Judge, I would just ask - the Court

 3    had set a January 6 deadline - if we can get these materials by

 4    Monday?

 5              THE COURT:  Mr. Buckley?

 6              MR. BUCKLEY:  Your Honor, we will review and produce

 7    anything that is producible pursuant to the Court's order

 8    promptly.  I will endeavor to do it by Monday, but I make no --

 9              THE COURT:  I need to give you a date.

10              MR. BUCKLEY:  If I could have a moment, your Honor.

11              THE COURT:  Sorry?

12              MR. BUCKLEY:  If I could just have a moment to confer.

13              THE COURT:  The same question will be put to Mr. Baez.

14              MR. SULLIVAN:  This is Mr. Sullivan, your Honor.  We

15    will comply with the Court's order.  I'm not sure that we have

16    anything responsive, but to the extent we do --

17              THE COURT:  If you don't respond, you have nothing to

18    produce.

19              MR. SULLIVAN:  Right.

20              MR. BUCKLEY:  Judge, I don't think we have anything

21    that is responsive to produce; but if we do, we will do so no

22    later than next Friday, a week from tomorrow.

23              MR. CHIUCHIOLO:  Your Honor, I thought Mr. Buckley

24    said they do have witness notes.

25              THE COURT:  If they have, he will be producing.  If he
```

1    doesn't have, he's not going to be producing.  Can you live

2    with Friday?

3            MR. CHIUCHIOLO:  Yes, your Honor, that's fine.

4            THE COURT:  Okay.  Production by Friday.

5            The only thing left now is the motion to sever.  Are

6    both sides making the motion?  Are both defendants making the

7    motion, or only Mr. Amar?

8            MR. SULLIVAN:  On behalf of Ms. Javice, we filed the

9    motion, so yes.

10            THE COURT:  Okay.

11            MR. COGAN:  Your Honor, on behalf of Mr. Amar, this is

12   Johnathan Cogan.  We haven't made a motion to sever, and so we

13   haven't asked for a severance.  We want to make sure that the

14   defense that we're prepared to put forward, which is

15   antagonistic in nature, isn't going to be curtailed in any way.

16   If it's going to be curtailed, then we would want there to be a

17   severance, but we have not made a motion for --

18            THE COURT:  If I were to curtail a defense, I would

19   triggering a mistrial, wouldn't I?  Isn't that right?  I can't

20   restrict your ability to put in relevant information.

21            MR. COGAN:  Yes, your Honor.  Thank you.

22            THE COURT:  That's self-evident.

23            MR. COGAN:  I wanted to clarify that we were not

24   making a motion to sever with that understanding.  With that

25   understanding, we haven't made a motion.

1          THE COURT:  That kind of thing is an instruction to

2     the jury.

3          What's the position of the defendant, Mr. Sullivan?

4          MR. SULLIVAN:  That a limiting instruction is

5     insufficient and will not cure the constitutional defect that

6     exists.  So our position is based on the limited information

7     that we have, even that limited information that Ms. Javice is

8     unable to receive a fair trial.  There are a couple cases in

9     the district courts of New York that are apposite for this

10    issue.  The *Shkreli* case, the *Nordlicht* case, which we cited n

11    our brief, and based on the limited information we have, our

12    position is that the problem is of constitutional dimensions.

13         Now, Mr. Amar's lawyers have indicated that they have

14    additional information to the information that they provided,

15    additional evidence and potentially additional testimony.  We

16    don't know what that is, but these very experienced lawyers

17    from this district, many whom are former prosecutors, have used

18    the word antagonistic.  That word has meaning, as your Honor

19    knows.

20         THE COURT:  Who said that?

21         MR. SULLIVAN:  Mr. Amar's counsel.

22         THE COURT:  Who said antagonistic?

23         MR. SULLIVAN:  Antagonistic to our defense.  And

24    they've also indicated that they're prepared to make a

25    declaration.

1          I will also just point out -- we learned this on

2     January 8, your Honor.  And by January 10, we wrote your Honor

3     as soon as it was brought to our attention that the defense was

4     going to be antagonistic.  And based on what we've seen, it is

5     of an order of magnitude that it is sufficiently severe that a

6     limiting instruction cannot cure it.

7          THE COURT:  Well, I don't know what is meant by

8     antagonistic, and there is nothing in the record now that shows

9     any antagonism.

10          The allegation is that the defendants participated in

11     the same transaction or series of transactions constituting the

12     offense alleged in the superseding indictment.  That means

13     there is joinder that is permissible and in fact desirable

14     because the acts are unified by some substantial identity of

15     facts or participants or arise out of a common plan or scheme.

16     And that's held by the Second Circuit in *United States v.*

17     *Feyrer*, 333 F.3d 110.

18          The presumption is strong that severance should be

19     denied.  A defendant who seeks separate trials carries a heavy

20     burden of showing that joinder will result in substantial

21     prejudice, and that prejudice must be sufficiently severe to

22     outweigh the judicial economy that will be realized by avoiding

23     lengthy multiple trials.

24          This trial is a complicated trial.  It promises to be

25     a complicated trial.  It will take weeks of the Court's and a

1    jury's time, and it would just be unnecessarily duplicative and

2    useless to have two trials where there can be one.  Limiting

3    instructions are available to make sure that the jury

4    understands that the guilt of each defendant must be judged

5    separately.  I will give those instructions, and I will be glad

6    to get the help of the parties in drafting those instructions.

7        MR. SULLIVAN:  May I be heard briefly, your Honor,

8    just on one last thing?

9        THE COURT:  Yes.

10        MR. SULLIVAN:  So I would certainly encourage the

11    Court to at least consider in camera, as Mr. Amar's lawyers

12    have volunteered to do, the nature of the antagonistic defense

13    because one of the other aspects of the balancing test that

14    your Honor rightly articulated is, is the trial itself going to

15    be disrupted by constant objections, constant sidebars,

16    objections to the openings.

17        Right now we have no idea what they're going to say.

18    And certainly if there is something objectionable, I have an

19    ethical duty to stand up and object.  I don't like to object

20    during openings, obviously, and as a practice don't, but must

21    if something comes out that we have not had time to test or

22    vet.  So there are a series of motions in limine that --

23        THE COURT:  I will say this:  I don't mind objections.

24    It's my job to rule on objections.  If something in an opening

25    or a closing is objectionable, I want you to object.  So I have

 1    no rule against objections.

 2         MR. SULLIVAN:  Very well, your Honor.

 3         THE COURT:  I don't really take sidebars.  We don't

 4    waste any time on sidebars.  I depend on both -- all counsel to

 5    educate me on what's going to happen and what may be

 6    controversial, so I'm prepared and I will rule.  If I need a

 7    sidebar, it will be very brief.

 8         MR. SULLIVAN:  We are absolutely unable to educate the

 9    Court on what may be controversial because we don't know.  And

10    that's sort of the point of the declaration, your Honor.  We

11    don't know what the nature of the antagonism is beyond what

12    we've laid out generally, which we still maintain is

13    sufficient.

14         THE COURT:  Mr. Buckley will know, and he'll tell me

15    in advance.  I don't see any need to make this decision now.

16    It's not Mr. Buckley saying that it's going to be at the

17    derogation -- his defense is going to be at the derogation of

18    Ms. Javice.

19         MR. SULLIVAN:  I think it is, your Honor.  That's

20    certainly my understanding of the conversation.

21         THE COURT:  You want me to hear anything?

22         Mr. Buckley?

23         MR. COGAN:  I'm speaking on this, your Honor.  This is

24    John Cogan.  I missed the question.

25         THE COURT:  Do you want me to hear you out of the

1    hearing of the prosecution and Ms. Javice as to what you think

2    might be at the expense of Ms. Javice?

3              MR. COGAN:  Yes, your Honor.  The very reason we're

4    having this discussion now is because we spotted the issue that

5    Mr. Sullivan just said, which is that we see --

6              THE COURT:  So the answer is yes?

7              MR. COGAN:  The answer is yes.

8              THE COURT:  Does the government object?

9              MS. BHASKARAN:  Your Honor, we have no opposition to

10   the Court having an initial ex-parte inquiry on this issue.

11   If, however, the Court determines that there is some sort of

12   colorable issue that rises to the level of a mutually

13   antagonistic defense, as that term has been explained by the

14   Circuit, then we respectfully request enough information in

15   order to respond because as the Court has noted --

16             THE COURT:  I'll deal with that issue after I take the

17   in camera discussion.  So we'll have a brief recess.  I'll have

18   two people from the defense and Mr. Amar come to the robing

19   room with the reporter.  That part will be under seal.

20             (Continued on next page)

21

22

23

24

25

```
 1              (In the robing room)

 2              THE COURT:  So who do we have here?

 3              MR. COGAN:  Jonathan Cogan, Sean Buckley and Mr. Amar.

 4              THE COURT:  Okay.

 5              MR. COGAN:  Maybe I could just give 30 seconds of

 6    context for what we have and what we can share.

 7              THE COURT:  Yeah.

 8              MR. COGAN:  So as was discussed outside in open court,

 9    we, after reviewing the 3500 material that was produced by the

10    government at the end of last year, December, determined that

11    we had a defense that was, in our view, substantially

12    antagonistic to Ms. Javice.

13              THE COURT:  How so?

14              MR. COGAN:  And that we currently expect to run.

15              I am willing to share a written declaration or to tell

16    you verbally.  I want to be clear, particularly given what the

17    government just said before I do.  We don't want the government

18    or Ms. Javice's counsel to hear the details of our defense.  We

19    think that that would be prejudicial.  We want your Honor to

20    hear it so that you can make a determination about whether a

21    severance is appropriate.  But we would ideally like to share

22    this information with your Honor on the understanding that the

23    Court will keep it under seal and in camera until the trial

24    starts.

25              THE COURT:  This is under seal.  I decline to give any
```

 1    kinds of representations because it would compromise my ability

 2    to be a judge.  You're going to have to trust me.  And if you

 3    don't, it's up to you.

 4          MR. COGAN:  Understood, your Honor.

 5          Then maybe what I can do is I can start with some

 6    information, and you'll tell me to what extent you need to hear

 7    more information.

 8          I think what I can say is that we expect to argue at

 9    trial, and to elicit evidence at trial, showing that Ms. Javice

10    misled not only the alleged victims in this case, the two

11    banks, but also Mr. Amar, about a number of different

12    representations that were being made to the banks about the

13    company that they were in the process of selling, and also

14    about the reason she was asking him to do certain things.

15          And so at a high level, as your Honor probably

16    appreciates, what the government is contending in this case is

17    that Ms. Javice tricked JP Morgan, another bank, an investment

18    adviser that was advising Frank, their company, and various

19    other sophisticated people, including Frank's general counsel,

20    and various other very sophisticated people about fundamental

21    information about Frank's business.  That's the government's

22    case.

23          Our defense is that she deceived us as well, and we

24    plan on both eliciting evidence to that effect and also arguing

25    to the jury that for the same reason the government is saying

1    that they should convict her for having deceived all of those

2    people, they should find that she deceived us as well; that we

3    are essentially a pawn in this and a victim ourselves, not a

4    co-accomplice.

5            THE COURT:  The material proposition is not whether

6    she deceived you.  The material proposition is whether you

7    knowingly deceived the government.  So the issue is Mr. Amar's

8    knowledge.  You will be able to elicit testimony of what

9    Ms. Javice said, but the conclusion whether they were deceptive

10   or not will be the jury's.  And it does not necessarily touch

11   upon Mr. Amar's knowledge.  So the government is going to have

12   to prove what Amar said or did or joined and that it was

13   knowing.  I don't see that it rises to a point of obstruction

14   or interference of either side's defense.  It is not sufficient

15   to prevent a jury trial.

16           MR. BUCKLEY:  Your Honor, if I may, one additional

17   point, and we fully appreciate everything the Court just said,

18   but --

19           THE COURT:  I want to tell you this:  This does not

20   preclude your ability at the time you exercise it to decide

21   whether or not Mr. Amar should testify.  Nothing you say here

22   is going to restrict you in any way.

23           MR. COGAN:  Thank you.

24           MR. BUCKLEY:  Thank you, Judge.  One additional

25   concern we have that goes to part of what your Honor just said

 1    is we expect the government is going to seek a conscious

 2    avoidance charge here of willful blindness and argue that one

 3    of the ways that the jury should convict Mr. Amar is that he

 4    willfully blinded himself to various red flags, and they're

 5    going to point to various statements, we expect, by Ms. Javice

 6    and say those constituted red flags that Mr. Amar consciously

 7    avoided, and therefore you can infer that he knew of the fraud.

 8            We are going to contend that he was not aware of those

 9    red flags in part because of Ms. Javice's deception.

10            THE COURT:  So the very statements that the government

11    is going to use to prove that you were consciously avoiding

12    knowledge is statements that you're going to use that you were

13    misled.  I don't see that as rising to the point where I have

14    to have a separate trial.

15            MR. BUCKLEY:  Understood, Judge, but just --

16            THE COURT:  I am fully advised.

17            MR. BUCKLEY:  Okay.  If I could just have one moment.

18    The only other point is not just with regard to Ms. Javice's

19    statements, but we expect to elicit testimony from certain of

20    the government's witnesses that they too were misled, similarly

21    in the manner that our client was, by Ms. Javice.

22            THE COURT:  Well, I don't know if that's going to be

23    relevant or not and I can't say now.  But this is not stuff

24    that requires me to sever, and I'm not going to.

25            Okay.  Let's go out.

1        *           *           *           *           *           *

```
1                    (In open court)

2            THE COURT:  We had an in camera discussion.

3            MR. SULLIVAN:  Your Honor, I'm sorry.  Co-defendant is

4   not back in the courtroom yet.

5            THE COURT:  Thank you very much.

6            Mr. Cogan and Mr. Buckley, is everyone here?

7            MR. COGAN:  Yes, your Honor.

8            MR. BUCKLEY:  Yes, your Honor.

9            THE COURT:  Mr. Cogan, Mr. Buckley and Mr. Amar

10  presented the information that was referred to in the Kobre &

11  Kim letter of January 21.

12           After hearing the information, there is no need to

13  change my ruling.  There is really no antagonistic defense,

14  certainly nothing that could rise to an unfairness as to either

15  defendant.  And so the motion to sever is denied.

16           MR. SULLIVAN:  May I make a record, your Honor?

17           THE COURT:  You may.

18           MR. SULLIVAN:  Thank you, your Honor.

19           It is difficult -- on behalf of Ms. Javice, it is

20  difficult to make an adequate record because I do not know what

21  was said there, and I will be making an application shortly,

22  but the record is this:  That the doctrinal line between

23  substantial prejudice that warrants a severance and one that

24  does not seems to be whether the circumstances are beyond

25  co-defendants merely finger-pointing.  If it's that, then the
```

1    presumption that your Honor noted of joinder should be

2    recognized.

3         However, if it's beyond that, and we are in a position

4    where Ms. Javice -- where there is a realistic scenario where

5    Ms. Javice will not only be prosecuted by the government but

6    prosecuted by Mr. Amar, and she thus becomes prejudiced on two

7    fronts, having to respond to the government and Mr. Amar.

8         At least we know what the government is going to say.

9    We have no idea what Mr. Amar is going to say.  So this

10   prejudice is compounded in the sense that a jury gets to hear

11   functionally the government's claim against Ms. Javice twice:

12   Once from the government and once from Mr. Amar.

13        If it's on that side of the doctrinal line, it's

14   considered reasonably cognizable prejudice.  Your Honor in

15   camera and here has made his ruling, I understand that.  I

16   certainly just wanted to make a record that normally in the

17   cases where there is severance, where severance is granted, the

18   moving party has an opportunity to make an argument as to what

19   side of the doctrinal line the proffer falls on.

20        So we certainly would be making -- we'll be making an

21   application to unseal for Ms. Javice's team the transcript of

22   your Honor's hearing; otherwise, I don't think we're able to

23   make an adequate record.  That's point one.

24        Point two, the Court's ruling is now, I think,

25   compounded by another data point we will advise the Court on.

 1   We are not ready to argue this yet just because we don't have

 2   all the details, but the short is that we learned just last

 3   night that the government produced 9,500 additional documents

 4   that we've never seen before, and apparently from Mr. Amar's

 5   Google drive.  This seems emblematic of this larger issue of --

 6   I'm going to have difficulty even knowing what to say in

 7   opening if everything is sort of trial by ambush.  And here I'm

 8   not making a normative claim against anybody; I am simply

 9   making a claim about the way it is received.

10            One of the benefits of the Federal Rules of Criminal

11   Procedure is that there is no trial by ambush.  We know what

12   the evidence is against us; and if there is adverse evidence,

13   even if it doesn't rise to the level of legally cognizable

14   prejudicial evidence from Mr. Amar, it seems to me that we have

15   some due process rights to know what that evidence is so that

16   we can construct a defense.

17            So that's the record that I wanted to make.

18            THE COURT:  What remedy do you seek?

19            MR. SULLIVAN:  I'm sorry?

20            THE COURT:  What remedy do you seek?

21            MR. SULLIVAN:  Well, the Court has denied the remedy

22   we seek.  The remedy we seek is severance generally.  Short of

23   that, we --

24            THE COURT:  That won't change with the 3,600 documents

25   or whatever the number was.

1           MR. SULLIVAN:  9,500 documents.  So literally 10,000

2    documents out of a 13,000 document disclosure.  Ms. Perdomo has

3    dealt with that issue and knows more specificity, the

4    conversations between her and the government as recently as

5    last night.

6           THE COURT:  What remedy do you ask?  You asked for

7    severance.  I denied it.

8           MR. SULLIVAN:  Right.  The second level --

9           THE COURT:  What remedy do you want?

10          MR. SULLIVAN:  We would like access to the transcript

11   of the discussion that your Honor had in camera to be able to

12   make an adequate record as to -- as to, the way I will put it

13   what side of the doctrinal line those representations fall on.

14          THE COURT:  I deny that.

15          MR. SULLIVAN:  And brief indulgence.

16          THE COURT:  However, after the close of the case,

17   please renew the motion, and I'll entertain it again.

18          MR. SULLIVAN:  Very well, your Honor.

19          Depending on the nature of these documents -- and I'm

20   just flagging this, we might seek an adjournment.  This is

21   premature at this point.  I haven't seen any of them, but we do

22   know that at least 9,500 of them are brand new.  So I just

23   don't know the salience yet, but we may have an application

24   before your Honor very shortly.

25          MR. BUCKLEY:  And, Judge, this is Mr. Buckley on

 1    behalf of Mr. Amar.  We similarly are troubled by these late

 2    disclosures.  We're trying to get to the bottom of it.  We've

 3    been having some back and forth.  We needed answers from the

 4    government.  We think that this could give rise to a

 5    suppression motion that would be material to the evidence that

 6    the government intends to offer at trial.  But we need the

 7    answers to our questions first, and we haven't gotten them yet.

 8    So we would ask --

 9            THE COURT:  What are the questions?

10            MR. BUCKLEY:  The questions relate to -- bear with me

11    for one second, your Honor.  We sent an email detailing the

12    questions to the government last night.

13            THE COURT:  Do I have a copy?  Did you file on ECF?

14            MR. BUCKLEY:  We could certainly file it, your Honor.

15            THE COURT:  You don't have to, but did you?

16            MR. BUCKLEY:  We did not.  This was some back and

17    forth with the government hoping to get some clarity on the

18    issue before we had to flag it for the Court.  Ms. Perdoma

19    has --

20            THE COURT:  Maybe we should have the government

21    explain why, what happened.

22            MR. BUCKLEY:  If we could perhaps put the questions on

23    the record that we think are necessary to be answered in order

24    to inform the nature of the relief that would be sought, and --

25            THE COURT:  Let's get the government's explanation,

1    and you can do whatever you want to do.

2         MR. FERGENSON:  Thank you, your Honor.

3         The government made a supplemental Rule 16 production

4    yesterday.  It's about 13,000 files in total, your Honor.

5    These are files that came from a search warrant return, and

6    that the government realized the day before yesterday had not

7    been produced to both defendants in a joint production.

8         THE COURT:  When did you get those documents?

9         MR. FERGENSON:  They were produced by Google in

10   October of 2023.  We are not intending to use these documents

11   in our case, your Honor.

12        THE COURT:  So they've been sitting with you for 14

13   months?

14        MR. FERGENSON:  No.  Let me give the full background

15   to the Court just so you have it.

16        We received -- we got a search warrant in

17   October 2023.  We received files from Google for what's called

18   a Google drive account.  It's like an online document-sharing

19   platform offered by Google, your Honor.  These were for the two

20   work accounts used at Frank by the defendants, each defendant.

21   The government produced in full to each defendant that

22   defendant's account.

23        THE COURT:  When?

24        MR. FERGENSON:  In October, after receiving the files

25   from Google.

1            What the government realized two days ago that there

2    had been files that the government had tagged as responsive to

3    the search warrant that hadn't been produced to, you know,

4    jointly to both defendants, meaning, your Honor, there are some

5    of the 13,000 that were produced yesterday that hadn't been

6    produced to Amar, and there's some, you know, that were in

7    Javice's account and vice versa.

8            THE COURT:  How can you distinguish what to give whom

9    in a joint trial?

10           MR. FERGENSON:  This was -- this is the government's

11   standard practice when it gets an account like this, Judge.  We

12   give the full account to the person that was using the account.

13           THE COURT:  It's a terrible procedure.

14           MR. FERGENSON:  Fair enough, your Honor.  And look, we

15   made a mistake and not --

16           THE COURT:  It's a terrible procedure.  Everyone has

17   to be on equal plane.  It's not right that the government holds

18   information that will drip out to each particular defendant.

19   If it's required to be produced, it's required to be produced

20   in a trial.

21           MR. FERGENSON:  And we realized that it had not been

22   produced to both, your Honor, and we produced them yesterday.

23           THE COURT:  What do you think I should do now?

24           MR. FERGENSON:  I am not sure there is much to do,

25   your Honor, because we're not seeking -- these were

1  documents --

2         THE COURT:  How would you like to get 13,000 or 9,500

3  documents, whatever the number, a week and half before trial

4  when you're preparing your jury challenge, you're preparing

5  your opening, you're preparing your witnesses.  How would you

6  like that?

7         MR. FERGENSON:  I take your point, your Honor.

8         THE COURT:  Why did it happen?

9         MR. FERGENSON:  We made a mistake.  It was an

10 oversight, and when we realized it, we fixed it.

11        THE COURT:  Mr. Clark may say to me "I made a

12 mistake."  What does that do to say "I made a mistake"? you've

13 been sitting on these documents 14 months.

14        MR. FERGENSON:  That's not entirely correct, your

15 Honor, but let me offer at least a couple points.

16        THE COURT:  What's not correct about it?

17        MR. FERGENSON:  We -- these documents were being

18 reviewed for responsiveness to the search warrant.  They should

19 have been produced earlier.

20        THE COURT:  In October.

21        MR. FERGENSON:  But -- well, Judge, the entirety of

22 each account is produced to that --

23        THE COURT:  You want everything that defendant gets on

24 a subpoena produced to you, but you don't give everything that

25 you received by subpoena to others.

1          MR. FERGENSON:  Well, this was a search warrant, your

2     Honor, and that is what I think makes it a little different.

3     You know, we don't actually have the authority --

4          THE COURT:  What's the definition of the scope of a

5     search warrant?  What documents can you legitimately ask for?

6          MR. FERGENSON:  It was -- I don't have the search

7     warrant in front of me, your Honor, but it was a warrant to

8     these -- to Google --

9          THE COURT:  Only if the artifacts of a crime were

10    evidence of it, right?

11         MR. FERGENSON:  That's correct your Honor.

12         THE COURT:  And almost by definition, if this is a

13    crime that authorized the search warrant, every document is

14    relevant.

15         MR. FERGENSON:  That was not the way we conducted the

16    review, your Honor.

17         THE COURT:  You told me that.  I am not criticizing

18    you for that.

19         MR. FERGENSON:  Fair enough, your Honor.

20         I do want to make clear, your Honor, that the

21    documents we produced yesterday, we were not, we are not

22    seeking --

23         THE COURT:  I read in the paper today about the

24    sloppiness of the government in producing in the Menendez trial

25    documents that should not have been produced to the jury.  And

1    I'm hearing a tale now that in a different way is the same

2    thing.  It's not proper behavior.  If this were a civil trial,

3    Mr. Sullivan would be making a motion for sanctions under

4    Rule 37.

5            MR. FERGENSON:  What I can promise to your Honor is

6    that we acted in good faith.  We did make a mistake.

7            THE COURT:  There is no point in getting more into

8    this.

9            What relief do you want, Mr. Sullivan?

10           Ms. Perdomo.

11           MS. PERDOMO:  Your Honor, Erica Perdomo.

12           THE COURT:  I don't like you bending over so much.

13   You'll hurt your back.

14           MS. PERDOMO:  Erica Perdomo on behalf of defendant

15   Javice.

16           I want to draw a couple distinctions and then answer

17   your question about relief.  One of -- one point to add to the

18   narrative that Mr. Fergenson described is that there was a

19   search warrant in October of 2023, we understand.  And in April

20   of 2024, there was an initial production of what the government

21   deemed were responsive documents of about 11,000 documents.  So

22   the government had already produced responsive documents

23   pursuant to what we understood was their review of these

24   drives.  And so it is very unclear how there is an additional

25   set of responsive documents that's more than 13,000 documents

1   on the eve of trial.

2           THE COURT:  You'll always find there's more.

3           MS. PERDOMO:  Right now, your Honor --

4           THE COURT:  You'll always find there's more.  We are

5   where we are.  What's the remedy you want?

6           MS. PERDOMO:  Well, where we are right now is that we

7   haven't been able to finish processing these documents in our

8   electronic document system, and so I would ask the Court allow

9   us to craft a remedy in the form of a motion because right now

10  these documents could include *Brady*, they could include --

11          THE COURT:  At this point, what relief do you want, if

12  any?

13          MS. PERDOMO:  At this point, if we had to ask for some

14  relief, it would be the relief of additional time --

15          THE COURT:  How much?

16          MS. PERDOMO:  -- to review these documents.

17          MR. BUCKLEY:  Can we confer, your Honor?

18          MS. PERDOMO:  Your Honor, please let us confer.

19          THE COURT:  Maybe you don't need the time.  You're

20  both -- you're all prepared, so time is not --

21          MS. PERDOMO:  Your Honor, I do in fact that at a

22  minimum need some time.  9,500 of these documents that

23  Ms. Javice received yesterday came from Mr. Amar's Google

24  drive.  As your Honor alluded to the communications that these

25  defendants had within their email really formulate --

```
 1              THE COURT:  How much time do you want?  How much time
 2    do you want?
 3              MS. PERDOMO:  We would want at least 30 days, your
 4    Honor.
 5              THE COURT:  Talk amongst yourselves because you're all
 6    ready to try the case and time doesn't help you either.
 7              MS. PERDOMO:  Your Honor, we'd ask for 30 days or one
 8    month.
 9              MR. BUCKLEY:  Judge, when you're ready, there is
10    something I want to add to this as well.
11              THE COURT:  I'm ready.
12              MR. BUCKLEY:  In addition to the time necessary to
13    review these materials, there are real constitutional
14    implications of this.  It's a Fourth Amendment violation, a
15    reasonableness violation.  This issue has come up, as the Court
16    noted, time and again.  Recently with Judge Nathan in the Wei
17    case and Najad.  The government is not permitted to go back and
18    re-search the materials that it represented both to the Court
19    and to the service provider that it would not search again
20    without getting a new warrant.  So we may seek suppression --
21              THE COURT:  Let me understand this.  The government
22    gets a pack of documents, and because it didn't notice at the
23    first instance that it made a full production for whatever
24    reason, and then looks at it again at a later time and decides
25    it needs to make more production, that doesn't mean you need a
```

1    new search warrant.  You still have the documents that were

2    given that you took under the first search warrant.

3          MR. BUCKLEY:  Judge, they took those documents under a

4    representation to the Court that they would only take documents

5    responsive to the warrant.  Again, I don't want to necessarily

6    get into this.  This is one of the things that we need

7    additional information about what was taken by whom, when and

8    given to whom because it could inform --

9          THE COURT:  Who's the aggrieved party the government

10   took more than it's supposed to?

11         MR. BUCKLEY:  The defendants, your Honor.

12         THE COURT:  They didn't take the documents from you.

13   They took the documents from Google.

14         MR. BUCKLEY:  Correct, your Honor.

15         THE COURT:  They're not your documents.

16         MR. BUCKLEY:  Your Honor, there is established law

17   that makes clear that documents taken from an electronic

18   service provider, an internet service provider like Google that

19   this can form the basis for a motion to suppress.

20         MR. FERGENSON:  May I be heard, your Honor?

21         MR. BUCKLEY:  We're just teeing this up, your Honor.

22   We're not making the motion now.  We need to understand the

23   scope of this and understand additional information from the

24   government.

25              So I just wanted the Court to be aware that it isn't

1   merely a question of us familiarizing ourselves with the

2   documents, but that there are potentially very significant

3   legal issues here that we will have to move to suppress.

4            MS. PERDOMO:  To what Mr. Buckley just said, and as

5   Mr. Buckley noted, this came up late last night, so we are not

6   fully briefed on this yet, but there is a staleness doctrine in

7   the Second Circuit.

8            THE COURT:  A what?

9            MS. PERDOMO:  Staleness with respect to search warrant

10  of --

11           THE COURT:  Salience?

12           MS. PERDOMO:  Staleness, your Honor.  Like bread will

13  go stale?  Staleness.  S-T-A-L-E-N-E-S-S.

14           THE COURT:  Staleness?

15           MS. PERDOMO:  Correct.

16           THE COURT:  What's stale?

17           MS. PERDOMO:  The warrant itself, your Honor, may be

18  stale.  And as Mr. Buckley alluded to, we would like the

19  opportunity to --

20           THE COURT:  How could it be stale?  The government is

21  not seeking more documents.  Am I right?

22           MR. FERGENSON:  Correct.

23           THE COURT:  The government has all the documents it

24  took.  So I recognize there may being an argument that there

25  was an unconstitutionality in taking more than they should have

1    taken, and that's what Mr. Buckley is arguing, but it's not a

2    staleness argument.

3           MS. PERDOMO:  Well, there is case law related to

4    staleness in terms of revisiting electronic documents that were

5    taken pursuant to a warrant, but --

6           THE COURT:  You can always go back.  That's what

7    happens in trials.  You're always going back.  You always see

8    more relevance to things that get passed over.

9           MR. FERGENSON:  Judge, like --

10          THE COURT:  Let's go back to this.  You want 30 days?

11          MR. FERGENSON:  Your Honor, if I may be heard briefly

12   on that?  Just very briefly on the points that were just

13   raised.

14          THE COURT:  Give me a moment, please.

15          MR. FERGENSON:  Yes.

16          (Pause)

17          THE COURT:  How long is this trial supposed to take?

18          MR. FERGENSON:  I believe we've estimated our case at

19   four weeks, your Honor.  And that would not include the defense

20   case, which appears to be lengthy.

21          THE COURT:  May we go off the record?

22          (Off the record)

23          THE COURT:  Folks ready?

24          MR. BUCKLEY:  Yes, your Honor.

25          MR. FERGENSON:  Your Honor, the government will give

1    its position, your Honor, which we would submit that an

2    adjournment is either not necessary or a short adjournment of

3    maybe a week is appropriate.

4         We would want to offer this context for the Court.  Of

5    the documents from this search warrant return in its

6    entirety -- look, the government is preparing for trial, but we

7    presently expect to actually use and offer at trial three

8    documents, and they're metadata.  That's what the government is

9    going to actually use.  The 13,000, we don't -- we weren't

10   intending -- we don't intend to use any of those.

11        THE COURT:  Have you identified those three?

12        MR. FERGENSON:  We -- they are part of our Government

13   Exhibits.

14        THE COURT:  Have you identified them?

15        MR. FERGENSON:  Not yet, but we are happy to do that,

16   your Honor, to the defense.

17        THE COURT:  All right.

18        MR. FERGENSON:  One further note on that, Judge.  Like

19   I said, the government estimates four weeks for its case.  We

20   have some flexibility in when we can call witnesses.  We're

21   planning to call a records custodian from Google to put in

22   those three records and their metadata.  We could call that

23   witness at the back of our case.  That allows for a period of

24   potentially almost four weeks' additional time.

25        THE COURT:  The three documents you're talking about

 1          would come at the end?

 2                  MR. FERGENSON:  Correct, your Honor.  We're happy to

 3          do that.

 4                  THE COURT:  All right.  Let me hear from the

 5          defendants.

 6                  MS. PERDOMO:  Your Honor, defendant Javice's position

 7          that these 13,000 documents were documents identified as

 8          relevant to this case by the government.  So the fact that they

 9          only intend to use three suggests to defendants that it is

10          likely there are documents defendants may want to use in this

11          very large set.

12                  Moreover, Mr. Amar was the numbers guy.  This is a

13          case about numbers, and there was almost 10,000 documents of

14          his that Ms. Javice has never seen.  Our position is that in

15          order to review these documents in the way they need to be

16          reviewed, we would ask your Honor to move the trial to after

17          Passover, to the 21st of April, so we can have this case

18          prepared and not be interrupted by the holiday.

19                  MR. BUCKLEY:  And, Judge, on behalf of Mr. Amar, we

20          agree that this is a much broader issue than just three

21          documents.  We don't think the proposal of moving a Google

22          witness to the end of the trial remedies the situation at all.

23                  We do need to review these documents, including

24          several thousand documents that are new to us as well, for our

25          defense.  On behalf of Mr. Amar, we would propose March 3, so a

1    three-week continuance.  That still affords six weeks for the

2    trial to go on prior to the holiday.

3            THE COURT:  Would that be satisfactory, Ms. Perdomo?

4            MS. PERDOMO:  Your Honor, that would not be

5    satisfactory for the Javice team.  We do feel we need more --

6            THE COURT:  Why you feel you need more time?

7            MS. PERDOMO:  Part of the reason is also the three

8    weeks puts us right up at six weeks, puts the Passover holiday

9    at the end of six weeks, and we do not know precisely how long

10   the government's case is going to be.  We have two defendants

11   here putting on a defense, and we do not want to be prejudiced

12   by having to rush that defense for some end date of the trial.

13           MR. FERGENSON:  Your Honor, just one brief additional

14   comment from the government, which is that our IT -- we asked

15   our IT folks to see how many of the 13,000 are duplicates,

16   meaning what they identify as the same file being repeated.

17           THE COURT:  Did you organize them according to some

18   searches?

19           MR. FERGENSON:  We could do that, your Honor, if it

20   would be helpful to the defense.

21           THE COURT:  Have you done that?

22           MR. FERGENSON:  No.  No.  We have organized -- we

23   can -- you can distinguish which account they came from and

24   from our -- this duplication review that our IT folks did, it

25   appears the majority of these are duplicates.  So the new --

1   the unique files is a lot less than 13,000, and we can provide

2   that analysis to the defense so it can help them expedite their

3   review, your Honor.

4           MR. BUCKLEY:  Judge, respectfully, the numbers that

5   we've gotten just in the past 48 hours --

6           THE COURT:  Let's stop this.  I want to look at my

7   calendar.

8           (Pause)

9           THE COURT:  Be seated everyone.

10          Instead of starting the trial on February 11, we will

11  start the trial on February 18.  It's a one-week adjournment.

12  There are 10,000 documents that are newly produced

13  constituting, I understand, Amar's and Javice's documents.  The

14  Amar documents have already been shown to Amar.  The Javice

15  documents have already been shown to Javice.  And there are

16  duplications as well, so it's considerably going to be less

17  than 10,000 documents.  And whether that's a burden, there are

18  enough lawyers to accomplish that.

19          The price of adjourning beyond that, I run into

20  another criminal trial that needs to be tried, and it's

21  unnecessary to do that as the scarcity of large courtrooms that

22  are required for this trial.  We are not going to try the case

23  in this courtroom.  We are going to try the case in, I think

24  it's 23B, right, Brigitte?

25          DEPUTY CLERK:  Mmm-hmm.

1          THE COURT:  In 23B.  That's the ruling.  We will keep

2     the final pretrial conference on February 4.

3          MS. PERDOMO:  Your Honor, may I make a statement for

4     the record?

5          THE COURT:  You already did.  You can do it again.

6          MS. PERDOMO:  Thank you, your Honor.  Just for the

7     sake of clarity, there are, as the government has represented

8     to defendants, 13,271 total new files produced.  9,559 of those

9     Ms. Javice has never before reviewed, which is why the Javice

10    team was saying 10,000.  Those are the documents Ms. Javice has

11    never seen before.

12         And with respect to the government's representations

13    of duplicates, that is not a representation that the defense

14    team has very high faith in given the changing numbers over the

15    last 24 hours in our conversations with the government and

16    given the very intricate nature of these documents which come

17    from a drive where the defendants did all of their work at

18    Frank.

19         For instance, they would edit a spreadsheet.  If one

20    little thing changed from one document to another, that would

21    be considered a new document, and I don't know that the

22    government is able to certify that those two documents are not

23    duplicates.  The de-duplication would be something we would

24    need to undertake on our own as defendants because of the

25    complicated nature of these documents.

```
 1              THE COURT:  Okay.  Anything else?

 2              MR. FERGENSON:  Your Honor, we have one very quick

 3   logistical question for your Honor about the trial schedule.

 4              Our understanding is that your Honor typically does

 5   not sit on Fridays during trial.

 6              THE COURT:  Well, we make exceptions.  There will be

 7   exceptions.

 8              MR. FERGENSON:  Understood.  Okay.  Should -- for this

 9   trial, should we plan to have witnesses appear -- there's just

10   some out-of-town travel involved your Honor, and so --

11              THE COURT:  I will commit to you that we will work on

12   the 21st.

13              MR. FERGENSON:  Okay.  And then the typical trial day

14   schedule, your Honor?

15              THE COURT:  Starts at 10:00 and ends at 5:00.  But

16   some days will end at 4:00.

17              MR. FERGENSON:  Thank you, your Honor.

18              THE COURT:  The 18th we will pick the jury and we will

19   go until 4:00.  We'll see.  It will work.  We'll move the case.

20              MS. PERDOMO:  Your Honor, defendant Javice reserves

21   the right to renew our motion for a continuance upon review of

22   the documents which we have not been able to access yet.

23              THE COURT:  I didn't hear you.  Say it again.

24              MS. PERDOMO:  Defendant Javice reserves the right to

25   renew our motion for continuance.
```

```
 1              THE COURT:  Anyone can make a motion at any time.  I
 2   have no rules for motions.  You want to make a motion, make a
 3   motion.  You don't need to reserve anything.
 4              Anything else folks?
 5              MR. FERGENSON:  Not from the government.
 6              THE COURT:  It's been a pleasure.
 7              Oh, one more.  Javice wants a web page.  Sit down,
 8   please.
 9              Javice wants a web page.  Put on the record,
10   Mr. Fergenson.
11              MR. FERGENSON:  Yes, your Honor, in short, we don't
12   have what she's requesting.  We didn't archive the full Frank
13   website.  The web page that we had taken down, we produced long
14   ago.
15              THE COURT:  That is viewed as a motion.  Motion
16   denied.  There is nothing more to produce.
17              Anything else folks?
18              MR. FERGENSON:  No.  Thank you, Judge.
19              THE COURT:  Thank you.
20              (Adjourned)
21
22
23
24
25
```