# EXHIBIT B

## PART 1 OF 2

# U.S. vs. Charlie Javice and Olivier Amar

*Charlie Javice Closing*

*March 26, 2025*

| The Contract | LionTree | GX3.1.4 | Users | Leslie Wims Morris |
|---|---|---|---|---|

**"Customer Data"** means (i) all data and content uploaded or otherwise provided by or for customers of the Company or its Subsidiaries (or their respective privileged users and end users) to, or stored by customers of the Company's or its Subsidiaries' customers (or their respective privileged users and end users) on, the Company Products; (ii) all data and content created, compiled, derived, or otherwise collected or obtained by or for the Company Products or by or for the Company or any of its Subsidiaries in or relating to the provision or operation of the Company Products; (iii) data and content compiled, or derived directly or indirectly from any of the data and content described in subclauses (i) and (ii) above and (iv) proprietary or confidential data, including Personal Data, owned, controlled, Processed or otherwise held by or on behalf of the Company or any of its Subsidiaries.

GX2000

© 2025 DOAR

EXECUTION VERSION

AGREEMENT AND PLAN OF MERGER

by and among

JPMORGAN CHASE BANK, N.A.,

FINLAND MERGER SUB, INC.,

TAPD, INC.

SHAREHOL...

(solely in its c...

**"Person"** means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, unincorporated organization, labor union or any other entity or Governmental Authority.

GOVERNMENT
EXHIBIT
2000
23 cr 251 (AKH)

FOIA Confidential Treatment Requested by JPMorgan Chase Bank, N.A
CONFIDENTIAL

JPMC_00004655
USAO_Rw_000025396

GX2000

© 2025 DOAR

The Contract | LionTree | GX3.1.4 | Users | Leslie Wims Morris



3.23   **Acknowledgment.** The Company and each Seller acknowledge that (i) none of Purchaser, Merger Sub, or any other Person on behalf of Purchaser or Merger Sub has made any representation or warranty, expressed or implied, as to Purchaser or Merger Sub, or the accuracy or completeness of any information regarding Purchaser furnished or made available to such Seller, the Company and their respective Representatives, or any other matter related to the Transactions, except as expressly set forth in Article 4 of this Agreement and the Related Documents, and (ii) neither the Company nor such Seller has relied on any representation or warranty from Purchaser, Merger Sub or any other Person on behalf of Purchaser or Merger Sub in determining to enter into this Agreement, except as expressly set forth in this Agreement and the Related Documents.

GX2000

© 2025 DOAR

| The Contract | LionTree | GX3.1.4 | Users | Leslie Wims Morris |

**3.24    No Other Representations or Warranties.** Except for the representations and warranties contained in this Article 3 or in any Related Document, no member of the Company Group nor any other Person on behalf of the Company Group makes any other express or implied representation or warranty with respect to the Company Group or with respect to any other information provided to Purchaser or its representatives, and the Company Group disclaims any other representations or warranties, whether made by a member of the Company Group or any of their respective Affiliates, officers, directors, employees, agents or representatives. Other than in connection with any representations made in this Article 3 or in any Related Document, no member of the Company Group nor any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in Data Room, management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

FOIA Confidential Treatment Requested by JP
CONFIDENTIAL

GX2000

© 2025 DOAR

**The Contract** | LionTree | GX3.1.4 | Users | Leslie Wims Morris

EXECUTION VERSION

AGREEMENT AND PLAN OF MERGER

by and among

**1**   3.23   **Acknowledgment.** The Company and each Seller acknowledge that (i) none of Purchaser, Merger Sub, or any other Person on behalf of Purchaser or Merger Sub has made any representation or warranty, expressed or implied, as to Purchaser or Merger Sub, or the accuracy or completeness of any information regarding Purchaser furnished or made available to such Seller, the Company and their respective Representatives, or any other matter related to the Transactions, except as expressly set forth in Article 4 of this Agreement and the Related Documents, and (ii) neither the Company nor such Seller has relied on any representation or warranty from Purchaser, Merger Sub or any other Person on behalf of Purchaser or Merger Sub in determining to enter into this Agreement, except as expressly set forth in this Agreement and the Related Documents.

**2**   3.24   **No Other Representations or Warranties.** Except for the representations and warranties contained in this Article 3 or in any Related Document, no member of the Company Group nor any other Person on behalf of the Company Group makes any other express or implied representation or warranty with respect to the Company Group or with respect to any other information provided to Purchaser or its representatives, and the Company Group disclaims any other representations or warranties, whether made by a member of the Company Group or any of their respective Affiliates, officers, directors, employees, agents or representatives. Other than in connection with any representations made in this Article 3 or in any Related Document, no member of the Company Group nor any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in Data Room, management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

FOIA Confidential Treatment Requested by JPMorgan Chase Bank, N.A
CONFIDENTIAL

JPMC_00004655
USAO_Rw_000025396

**3**   4.9   **Investigation and Agreement by Purchaser and Merger Sub; Non-Reliance of Purchaser; No Other Representations and Warranties.**

(b)   Except for the specific representations and warranties expressly made by the Company in Article 3 and the Related Documents, Purchaser and Merger Sub acknowledge and agree that (i) no member of the Company Group is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of the Company Group or any of the Company Group's respective businesses, assets, liabilities, operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of the business of the Company Group, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Company Group furnished to Purchaser, Merger Sub or their representatives or made available to Purchaser, Merger Sub and their representatives in the Data Room, management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) it has been advised that no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of the Company Group has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in this Agreement and subject to the limited remedies herein provided.

**4**   (c)   Other than the specific representations and warranties expressly set forth in Article 3 and the Related Documents, Purchaser and Merger Sub specifically disclaim that they are relying upon or have relied upon any such other representations or warranties that may have been made by any Person, and acknowledge and agree that each Seller, the Company Group and their Affiliates has specifically disclaimed and does hereby specifically disclaim, and shall not have or be subject to any liability for reliance on, any such other representation or warranty made by any Person.

**5**   9.3   **Entire Agreement.** This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The parties hereto have voluntarily agreed to define their rights, Liabilities and



JPMORGAN CHASE BANK, N.A.

By: _____
Name: Jennifer Piepszak
Title:



FINLAND MERGER SUB, INC.

By: _____
Name: Leslie Wims Morris
Title: Vice President

GX2000

© 2025 DOAR

4.9 **Investigation and Agreement by Purchaser and Merger Sub; Non-Reliance of Purchaser; No Other Representations and Warranties.**

(a) Purchaser and Merger Sub acknowledge that they and their Representatives have received access to such books and records, facilities, equipment, contracts and other assets of the Company Group which they and their representatives have desired or requested to review, and that they and their representatives have had full opportunity to meet with the management of the Company and to discuss the business and assets of the Company Group. Purchaser and Merger Sub acknowledge and agree that they have made their own inquiry and investigation into, and, based thereon, have formed an independent judgment concerning, the Company and the other members of the Company Group and their respective businesses and operations.

GX2000

© 2025 DOAR

The Contract | LionTree | GX3.1.4 | Users | Leslie Wims Morris

AGREEMENT AND PLAN OF MERGER

by and among

JPMORGAN CHASE BANK, N.A.,

FINLAND MERGER SUB, INC.,

TAPD, INC.

and

SHAREHOLDER REPRESENTATIVE SERVICES

(solely in its capacity as the Stockholders' Represen

Dated as of August 8, 2021

FOIA Confidential Treatment Requested by JPMorgan Chase Bank, N.A
CONFIDENTIAL

3.17    **Privacy**.

(a)    Privacy and Customer Data. Each member of the Company Group is in material compliance, and during the five (5) years prior to the Agreement Date has been in compliance, in all material respects, with all applicable Privacy Requirements. The Company Group has implemented and maintains appropriate written policies, as required by the Privacy Requirements, and have at all times publicly posted and maintained Privacy Policies required by the Privacy Requirements in a manner that complies and has complied in all material respects with the Privacy Requirements. The Company Group has obtained all consents as required by the Privacy Requirements and no disclosures contained in any Privacy Policy is or has been inaccurate, misleading, deceptive or in material violation of the Privacy Requirements. During the five (5) years prior to the Agreement Date (i) the Company Group has not received any Order, request, warning, reprimand, claim, inquiry, complaint, or notification alleging that the Company Group is in violation of or has not complied in any respect with any Privacy Requirements, and (ii) there is not currently and has been no Action against the Company or any of its Subsidiaries initiated by (a) any Person, (b) the Federal Trade Commission, (c) any data protection authority or (d) any other Governmental Authority, regarding or alleging that the Processing of Personal Data by or for the Company or any of its Subsidiaries is in violation of any Privacy Requirements. To the Company's Knowledge, no individual has claimed or threatened to claim compensation (or any offer for compensation) from the Company Group under or in relation to any Privacy Law or in connection with any actual or alleged breach of applicable Privacy Requirements.

GX2000

11

© 2025 DOAR

| The Contract | LionTree | GX3.1.4 | Users | Leslie Wims Morris |
|---|---|---|---|---|



5.2 **Access to Information; Confidentiality**.

(a)  From the Agreement Date until the earlier of the Closing Date and the termination of this Agreement, the Company shall grant Purchaser and its Representatives reasonable access, during normal business hours and upon reasonable notice, to the personnel, properties, book and records of the Company that are in the possession or under the control of the Company to the extent relating to the transition of the Company's business to Purchaser; provided, however, that (i) all requests for access shall be directed to LionTree Advisors LLC or such other person(s) as the Company may designate in writing from time to time (the "**Company Access Contact**"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Company Group, (iii) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (iv) such access or related activities would not cause a violation of any agreement to which the Company or its Subsidiaries is a party, (v) no Personal Data shall be disclosed or used other than in compliance with applicable Privacy Requirements and (vi) nothing herein shall require any member of the Company Group or its representatives to furnish to Purchaser or provide Purchaser with access to information that (A) is subject to an attorney-client or an attorney work-product privilege, (B) outside legal counsel for the Company reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to applicable Law or (C) would cause significant competitive harm to the Company if the Transactions are not consummated. Notwithstanding the foregoing, such access may be limited by the Company or any of its Subsidiaries to remote, electronic access in response to COVID-19 or any other pandemic or similar health emergency to protect the health and safety of the Company's and its Subsidiaries' respective managers, officers, directors, partners, members, equityholders, employees, advisors, consultants, agents or other representatives, or customers, lessors, suppliers, vendors or other commercial partners.

GX2000

# Entire Agreement

| The Contract | LionTree | GX3.1.4 | Users | Leslie Wims Morris |



GX2000

9.3    **Entire Agreement**.  This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein.  ==This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings== (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings.  The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the parties hereto expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents.  Furthermore, the parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction.  The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort or otherwise) with respect to any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement, other than claims based on Fraud and, with respect to any Related Claims based on the Related Documents other than this Agreement, knowing and intentional common law fraud (committed with scienter) under the laws of the State of Delaware, which excludes, for clarity, negligence and constructive fraud.

© 2025 DOAR

**The Contract**   **LionTree**   **GX3.1.4**   **Users**   **Leslie Wims Morris**



To: Michael, Alex [AMichael@liontree.com]
From: Chen, Jennifer [JChen@liontree.com]
Sent: Fri 1/8/2021 7:06:30 PM Coordinated Universal Time
Subject: RE: Targets
Attachment: Credible Labs_LionTree Proposal (06.20.19) v3B.PDF
Attachment: Project Springboard Pitch v2020.12.14_420pm.pdf

Please see attached two more examples. Let me know if either works. Additionally, below is an overview of Frank for our new business committee.

Thank you.

--

Hi [ ],

Below is a brief overview of a new sell-side opportunity with the company Frank.

Founded in 2016, Frank is the leading platform connecting students to financial aid at colleges they love. Frank's software files FAFSA applications in under 5 minutes that help match students with grants, loans, and work-study programs and gain access to scholarships and tuition fees. The company has raised $16 million and has helped 350,000 users apply for financial aid.

Let us know if you have any questions. Thank you.

--

Best,
Jen

CJ569

# Missing Men Of LionTree

The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris



- Provide strategic and financial advice and analysis in connection with a sale of the company

- Preparation and refinement of marketing materials, including management presentation and buyer friendly financial model

- Process management, including communication with potential acquirers and management of the due diligence process (including assisting in the preparation and management of the virtual data room)

CJ569

© 2025 DOAR

The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris

**Jan. 21, 2021**




**Feb. 22, 2021**





We've helped over

350,000

people access financial aid resources.

And have created a path to

$7 Billion

4.25 Million

students trust Frank.

GX215; GX216

© 2025 DOAR

# Matt Glazer Reviewed Everything

| The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris |

## Jennifer Wong Testimony

9    MR. COGAN:  Can I put that question, your Honor?

10    THE COURT:  That was the question.  I rephrased your

11  question.

12        Was Matt Glazer involved with respect to the numbers

13  reported by Google Analytics?

14    THE WITNESS:  He reviewed all the copy that we put on

15  the website and he would check off wording on every single

16  marketing claim throughout, and 4.25 was part of that copy on

17  the website as well.

Trial Tr. 1219:9-17

© 2025 DOAR

| The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris |



**Jennifer Wong Testimony**

P341JAV1                                                     1024

20    Q.  What did you do to be comfortable with making that change

21    to the website?

22    A.  I went to Google Analytics, I put in the period in

23    question, which is the entire lifetime of Frank website being

24    live, and I looked at the total number of users that had

25    visited the website over that period of time.

KIRSTEN NELSON
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Trial Tr. 1170:20-25

© 2025 DOAR

The Contract · **LionTree** · GX3.1.4 · Users · Leslie Wims Morris



## Jennifer Wong Testimony

```
9    Q.  Is that the same sort of verification process you used when

10   validating Frank's claims to its partners?

11   A.  Yes, we always made sure that the numbers are

12   substantiated.
```

Trial Tr. 1171:9-12

**The Contract** | **LionTree** | **GX3.1.4** | **Users** | **Leslie Wims Morris**



## Marc Rowan Testimony

| | |
|---|---|
| 10 | Q.  And I think—was a user, customer, website visitor, did you |
| 11 | generally understand those to be synonymous with each other |
| 12 | within Frank? |
| 13 | A.  Yes, pretty much. |
| 14 | Q.  And your understanding is based on conversations with |
| 15 | people from Frank, right? |
| 16 | A.  Not necessarily.  Apollo, on its own behalf, has a number |
| 17 | of investments in businesses that are more mature than |
| 18 | Frank—for instance, Yahoo and AOL—where the notion of a user, |
| 19 | a customer, a visitor—I'm pretty used to people using those |
| 20 | terms interchangeably. |

| | |
|---|---|
| 1 | Q.  Mr. Rowan, you understood that to be a reference to website |
| 2 | visitors, correct? |
| 3 | A.  Users, website visitors, customers, one and the same. |

Trial Tr. 3036:10-20, 3039:1-3

## Behram Panthaki Testimony

2  Q.  While were you at Frank, you also attended the board
3  meetings, correct?
4  A.  I did.
5  Q.  As did Mr. Glazer, correct?
6  A.  Yes.
7  Q.  So sometimes people who weren't on the board attended the
8  board meetings; is that right?
9  A.  That is correct.
10 Q.  And one function of those quarterly board meetings was to
11 provide the board with information about how the company's
12 performing?
13 A.  That is correct.
14 Q.  Some of that information involved how many people were
15 visiting the Frank website, correct?
16 A.  I don't recall whether we reported that, but possibly.

17 Q.  And some of the information reported was how many students
18 were or applicants were starting or completing the FAFSA form
19 through the Frank website?
20 A.  That is correct.
21 Q.  In your time attending those board meetings, they were
22 usually presented through a board deck or some PowerPoint
23 slides?
24 A.  That is correct.
25 Q.  You never said anything that was being presented was
1  inaccurate, did you?

4  A.  No.
5  Q.  Generally, you viewed the metrics being presented by the
6  company at its board meetings as being accurate, to your
7  knowledge?
8  A.  To my knowledge, yes.

Trial Tr. 477:2-478:8

© 2025 DOAR

The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris

## Disclaimer

FRANK

own judgment and analysis. ==The Company and its representatives have not made and are not making any representation or warranty== - express or implied - as to the accuracy and completeness of the Information or as to the Company, whether written or oral. ==You may rely only on representations and warranties in any definitive agreement that may be signed with regard to the Transaction== - if such an agreement is signed - between you and the Company, and subject to the terms of such definitive agreement.

The Information is as of the date it is supplied to you and should not be deemed to be an indication of the state of affairs of, or the absence of any changes or developments in, Frank at any point in time. ==The Company will have no obligation to update the Information as a result of changes or if the Company becomes aware that the Information is not accurate.==

GX1590

| The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris |
|---|---|---|---|---|









GX1.1

| The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris |



GX1.1; GXCAP1.4.3

# LionTree Did The Math



GX3002

© 2025 DOAR



The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris

## Houston Cowan Testimony

| | | |
|---|---|---|
| 22 | Q. | This is the number again that shows up; right? |
| 23 | A. | That is -- are you referring to the 650,000? |
| 24 | Q. | Correct? |
| 25 | A. | That is correct. |

| | | |
|---|---|---|
| 1 | Q. | And you testified about that little orange box there that says: Please define full accounts. |
| 2 | | |
| 3 | | Do you see that? |
| 4 | A. | I do. |
| 5 | Q. | Your testimony was that you asked about it and no one ever got back to you. |
| 6 | | |
| 7 | A. | That is the best of my recollection; yes, Mr. Baez. |

Trial Tr. 263:22-264:7

© 2025 DOAR

# Corrected Deck



© 2025 DOAR

# Do The Math

| The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris |



### Section 3: Operational Update & Key KPIs

- o What are the key business statistics that the Frank team uses to monitor/run the business? If any of the following are applicable, please provide.
  - ▪ User engagement: 4.2M users, 11M page views
  - ▪ Total # of pieces of content: ~6,700 (and 8,400 Classfinder course pages)
  - ▪ Average time spent on platform: 1:42
  - ▪ Additional demographic data if available: Please let us know what you'd like to know, we can provide lots of aggregated data here.

GX1438

© 2025 DOAR

# Do The Math

| The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris |
|---|---|---|---|---|

## GX1438



**User engagement: 4.2M users, 11M page views**

| **11,000,000** |  | **4,200,000** |  | **2.619** |
|---|---|---|---|---|
| **page views** | | **users** | | **page views per user** |

GX1438; GX1.8

© 2025 DOAR

# Do The Math

| The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris |

## GX1.8



## GX1438

**User engagement: 4.2M users, 11M page views**

**4**
page views per user



**4,200,000**
users



**16,800,000**
page views

GX1438; GX1.8

© 2025 DOAR

# Couldn't Recall The Definition

The Contract    **LionTree**    GX3.1.4    Users    Leslie Wims Morris

## GX3011-A



**Grand Total to Date**    **5,424,449**

## Houston Cowan Testimony

5    Q.  Okay.  And that's referring to the website traffic,

6    correct?

7    A.  Mr. Baez, I do not recall the exact definition.

GX3011-A; Trial Tr. 288:5-7

31    © 2025 DOAR

| The Contract | **LionTree** | GX3.1.4 | Users | Leslie Wims Morris |

## Alex Sweeney Testimony

18          MR. BAEZ:  Now let's take the FAFSA in process

19   column -- actually, let's go all the way over to the left real

20   quick.

21   Q.  ==Do you see where it says:  All new users?==

22   A.  Yes.

23   Q.  ==You understand that, of course, to mean all new people who==

24   ==went to the website; right?==

25   A.  ==I don't know what it means.==

Trial Tr. 1499:18-25

The Contract | LionTree | **GX3.1.4** | Users | Leslie Wims Morris



**From:** Michael, Alex <AMichael@liontree.com>
**Sent:** Thursday, June 24, 2021 8:30:27 AM
**To:** Charlie Javice <charlie@withfrank.org>
**Cc:** Koskovolis, Luke <LKoskovolis@liontree.com>
**Subject:** Mason comments

Spoke with him this morning. Key takeaways:

- Keep feeding the data room. That's where they want to live and have as much info as possible there especially on user behavior. It gives so many of their team context. To that end, they want as much as they can get on: (keep feeding them)

GX3010

© 2025 DOAR

| The Contract | LionTree | **GX3.1.4** | Users | Leslie Wims Morris |

On Wed, Jun 23, 2021 at 6:33 PM Cowan, Houston <HCowan@liontree.com> wrote:

Hey Matt and all,

See attached for what we have, as well as in the first tab the requests we are trying to get at per Capital One.

We currently have historic users in aggregate by year, but need to break historic users out monthly by product to get the bulk of what they are asking (customers, retention, MAU historically by product).

Note that we did not upload user projections into the VDR as we assume those projections have changed with 5 months of the year as actuals already. Their last ask (first tab of excel attached) highlights that they're interested in projection forecasts of users by product so will need to update/split that out.

Let us know of questions for clarity you may have.

From: Charlie Javice <charlie@withfrank.org>
Sent: Wednesday, June 23, 2021 7:31 PM
To: Cowan, Houston <HCowan@liontree.com>
Cc: LT-ProjectFrontier@liontree.com; Matt Glazer <matt@withfrank.org>; Olivier Amar <olivier@withfrank.org>
Subject: Re: Cap One follow-up item

Hi Houston,

Given the product launch timeline of when we implemented the gateway for all additional products, are they just asking for the last 18months ish? Everything else before is FAFSA basically.

I believe the we have the monthly by product mix when applicable and we can pull monthly for that time if it's not in the we provided earlier (thought it was in the raw file before we decided to only show annual for prior years).

On forecasts happy to put that together tomorrow am for them.

GX3009

GOVERNMENT EXHIBIT 3009 51 23 Cr 251

CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA
CONFIDENTIAL

LTF-0013246
USAO_Rel_003378641

34

© 2025 DOAR

| The Contract | LionTree | **GX3.1.4** | Users | Leslie Wims Morris |

| Year | Month of the year | | | All New Users | FAFSA In Process |
|------|-------------------|---|---|---------------|------------------|
| **2017** | 3 | TRUE | 8,658 | 8,658 | 8,658 |
| | 4 | TRUE | 119,490 | 119,490 | 119,490 |
| | 5 | TRUE | 150,274 | 150,274 | 150,274 |
| | 6 | TRUE | 158,263 | 158,263 | 158,263 |
| | 7 | TRUE | 158,920 | 158,920 | 158,920 |
| | 8 | TRUE | 17,904 | 17,904 | 17,904 |
| | 9 | TRUE | 41,215 | 41,215 | 41,215 |
| | 10 | TRUE | 303,130 | 303,130 | 303,130 |
| | 11 | TRUE | 271,780 | 271,780 | 271,780 |
| | 12 | TRUE | 115,194 | 115,194 | 115,194 |
| **2018** | 1 | TRUE | 310,381 | 310,381 | 310,381 |
| | 2 | TRUE | 98,759 | 98,759 | 98,759 |

GX3012-A

| The Contract | LionTree | GX3.1.4 | Users | Leslie Wims Morris |



GX3011; GX3011-A

# Looking At Different Columns

| The Contract | LionTree | **GX3.1.4** | Users | Leslie Wims Morris |

**From:** Charlie Javice [charlie@withfrank.org]
**on behalf of** Charlie Javice <charlie@withfrank.org> [charlie@withfrank.org]
**Sent:** 6/24/2021 7:40:22 PM
**To:** Agarwal, Nikhil [nagarwal@liontree.com]
**CC:** Koskovolis, Luke [LKoskovolis@liontree.com]; Michael, Alex [AMichael@liontree.com]; Cowan, Houston [HCowan@liontree.com]
**Subject:** Re: Mason comments

in line below:

On Thu, Jun 24, 2021 at 3:18 PM Agarwal, Nikhil <nagarwal@liontree.com> wrote:

Charlie,

Thanks for sending this. Our team had a couple quick follow-up / clarifying questions below:

- For months 3, 5 and 6 in 2020, wondering why columns Q + S-W in the attached don't add up to column E (all new users)? --> it was pulled from the % product mix we provided, so it's off by a rounding error and you need to add column O on FAFSA there. I may be missing something here.
- Believe you had mentioned this on yesterday's call, but wanted to confirm again that the FAFSA count in column Q --> fafsa in progress is account validated
- If we were looking to calculate how many FAFAs have been completed can we just multiply column Q with R as we have done in column X of the attached? believe so



# Cowan Never Called Charlie

The Contract | LionTree | **GX3.1.4** | Users | Leslie Wims Morris

**From:** Charlie Javice [charlie@withfrank.org]
**on behalf of** Charlie Javice <charlie@withfrank.org> [charlie@withfrank.org]
**Sent:** 6/24/2021 7:40:22 PM
**To:** Agarwal, Nikhil [nagarwal@liontree.com]
**CC:** Koskovolis, Luke [LKoskovolis@liontree.com]; Michael, Alex [AMichael@liontree.com]; Cowan, Houston [HCowan@liontree.com]
**Subject:** Re: Mason comments

in line below!

On Thu, Jun 24, 2021 at 3:18 PM Agarwal, Nikhil <nagarwal@liontree.com> wrote:

Charlie,

Thanks for sending this. Our team had a couple quick follow-up / clarifying questions below:

- For months 3, 5 and 6 in 2020, wondering why columns Q + S-W in the attached don't add up to column E (all new users)? ---> it was pulled from the "a product mix we provided, so it's off by a rounding error and you need to add column O on FAFSA there. I may be missing something here.
- Believe you had mentioned this on yesterday's call, but wanted to confirm again that the FAFSA count in column Q --> fafsa in progress is account validated
- If we were looking to calculate how many FAFAs have been completed can we just multiply column Q with R as we have done in column X of the attached? believe so

FOIA Confidential Treatment Requested by JPMorgan Chase Bank, N.A. CONFIDENTIAL

EXHIBIT 3013
17-19 (a) 257

JPMC_00054044
USAO_Rel_000074792

## Houston Cowan Testimony

| | |
|---|---|
| 16 | Q. Did you, after seeing this email, ever email, call, or text |
| 17 | Ms. Javice and say, let's clear this up? |
| 18 | A. Not—I can't recall, Mr. Baez. |
| 19 | Q. And are you aware of whether anyone else on the team, any |
| 20 | of the other senior members on the team did so? |
| 21 | A. Mr. Baez, if I wasn't on the calls themselves, then I can't |
| 22 | recall if they did that or not. |

P2P5jav1                                          248

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA,
3
              v.                    23 Cr. 251 (AKH)
4
   CHARLIE JAVICE, OLIVIER AMAR

22            Attorney for Defendant Charlie Javice
23  QUINN EMANUEL URQUHART & SULLIVAN, LLP
              Attorneys for Defendant Charlie Javice
24  BY: CHRISTOPHER TAYBACK
       ERICA PERDOMO
25
       RICHARD M. DE MARIA

              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

GX3013; Trial Tr. 304:16-22

© 2025 DOAR

# The File Name Did Not Change But It Was Edited

| The Contract | LionTree | GX3.1.4 | Users | Leslie Wims Morris |





GX3011-A; GX3012-A

© 2025 DOAR

# FAFSA In Process = "On Page"

The Contract | LionTree | **GX3.1.4** | Users | Leslie Wims Morris

**JW**  **Jen Wong** <jen.wong@withfrank.org>                                2/11/2022, 10:12 PM

qq -

| | *Product Mix Attribution - 1st Capture Point with Frank* | |
|---|---|---|
| PPC | **FAFSA In Process** | FAFSA Completion Rate |
| 984 | 20,395 | 76.47% |
| $0 | 285,354 | 63.95% |
| $0 | 51,575 | 72.83% |
| $0 | 29,475 | 76.54% |
| $0 | 26,906 | 63.57% |
| $0 | 67,500 | 72.60% |
| $0 | 21,943 | 81.25% |
| 158 | 12,067 | 73.08% |
| 921 | 12,785 | 70.18% |
| 576 | 6,954 | 63.64% |
| 484 | 35,452 | 61.76% |
| 231 | 68,399 | 62.60% |
| 362 | 77,376 | 65.00% |
| 985 | | 72% |
| 084 | 160,849 | 75.00% |
| 526 | 164,685 | 75.00% |
| 291 | 293,915 | 75.00% |
| 147 | 837,000 | 75.00% |
| $0 | 595,000 | 75.00% |
| $0 | 248,000 | 75.00% |
| 166 | 4,265,085 | |
| 215 | 6,564,533 | |

*Image: image.png (20 KB)*

**JW**  **Jen Wong** <jen.wong@withfrank.org>                                2/11/2022, 10:12 PM

where are these numbers coming from? I dont see the same ones in mixpanel

**C**  **Charlie Javice** <charlie@tapd.us>                                2/11/2022, 10:12 PM

process was on page. not sure for completion no need to add

GX802-71

40

© 2025 DOAR

| The Contract | LionTree | **GX3.1.4** | Users | Leslie Wims Morris |



## Conversion to Student Account

Frank continuously optimizes and personalizes t...

92%* → 76%* → 3

**Start Application**
- Arrive on Frank resource
- Start application
- Verified phone, email & address

**Academic Information**
- College list
- Degree
- Interest
- GPA (optional)

**Overall conversion from** App to Beyond Aid

Note: *Denotes conversion rate

CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA                    LTF-0000119

**Start Application**
- Arrive on Frank resource
- Start application
- Verified phone, email & address

GX1.1

© 2025 DOAR

The Contract    LionTree    GX3.1.4    **Users**    Leslie Wims Morris

## Marc Rowan Testimony

19  or externally for revenue purposes.  So, if they wanted, for

20  instance, if Frank wanted, for instance, to do business with a

21  for-profit college or a not-for-profit college, those

22  entities -- those colleges -- would want to know that Frank had

23  lots of users coming to their website who, in turn, could be

24  referred and potentially would take courses at either the

25  for-profit or not-for-profit colleges.  If they were doing

1  business with a financial services company, the more users who

2  came to their website who could be referred to that financial

3  services company would make them more and more valuable.  And

4  it was not just getting users to the website, it was getting

5  users to the website at a reasonable cost.

Trial Tr. 3006:19-3007:5

---

P3K5jav1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                    v.                    23 C

CHARLIE JAVICE, OLIVIER AMAR,

            Defendants.                   Jury
------------------------------x          New
                                         Marc
                                         10:1

Before:

            HON. ALVIN K. HELLERSTEIN,

                                         Dist

            APPEARANCES

MATTHEW PODOLSKY
        Acting United States Attorney for the
        Southern District of New York
BY:  MICAH F. FERGENSON
     RUSHMI BHASKARAN
     GEORGIA V. KOSTOPOULOS
     NICHOLAS W. CHIUCHIOLO
     Assistant United States Attorneys

BAEZ LAW FIRM
        Attorneys for Defendant Charlie Javice
BY:  JOSE A. BAEZ

RONALD SULLIVAN LAW PLLC
        Attorneys for Defendant Charlie Javice
BY:  RONALD S. SULLIVAN, JR.

RICHARD M. DE MARIA
        Attorney for Defendant Charlie Javice

QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Defendant Charlie Javice
BY:  CHRISTOPHER TAYBACK
     ERICA PERDOMO

            SOUTHERN DISTRICT REPORTERS,
                    (212) 805-0300

© 2025 DOAR

# "Account" Only Mentioned In Relation To CAC

| The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris |
|---|---|---|---|---|





GX1.1



The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris

## Mason Young Testimony

21   A.  So, the decision to provide the LOI was really motivated

22   out of the gate after my first meeting with Ms. Javice by the

23   fact that ==they had acquired so many users at a very efficient==

24   ==cost of acquisition.==  The decision to submit the LOI at this

Trial Tr. 2126:21-24

44

© 2025 DOAR

| The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris |



**$2,274,934**
**total marketing spend**

÷

**$4.45**
**cost per FAFSA account**
**(blended paid & organic)**

=

**511,221**
**FAFSA accounts**

GX1-1; GXCAP3.1.4

© 2025 DOAR

| The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris |





**$2,203,606**
**total marketing spend, 2017-2020**

÷

**$0.45**
**customer acquisition cost, 2017-2020**

=

**4,896,902.22**
**customers**

GXCAP3.1.4; GXCAP3.1.4b; Trial Tr. 2205:11-2208:9

© 2025 DOAR

The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris



## Jennifer Wong Testimony

16  Q.  There is another tool that you used called Semrush?

17  A.  Yes.

18  Q.  What is that?

19  A.  It is a research tool used by digital marketers to

20  understand how well a site is performing in search engines

21  compared to their competitors; you could also use it to

22  research your competitors; you could use it to research how

23  often a keyword was being searched for, and the types of

24  content people are looking for around those searches.

25  Q.  And is that a service that you used both at Frank and

1  elsewhere?

2  A.  Yes.  I use it for even prepping for job interviews.

3  Q.  And will that site let you know how much traffic a website

4  gets?

5  A.  It estimates out traffic.

Trial Tr. 1175:16-1176:5

© 2025 DOAR

The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris



## Jen Wong Testimony

2  Q.  Did you have access to Google Analytics while you were at

3      Chase after the acquisition?

4  A.  Yes.

5  Q.  Did others at Chase Bank have access to Google Analytics at

6      that time?

7  A.  Yes.

Trial Tr. 1284:2-7

© 2025 DOAR

| The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris |

## Jenny Zeitler Testimony

```
 6   Q.  Do you recall how many meetings, round figures, there were

 7       about this privacy policy?

 8   A.  Probably six or seven.

 9   Q.  And do you recall how many folks attended?

10   A.  Probably eight or nine.

11   Q.  Was it only people from Frank?

12   A.  No.  It was mostly Chase people.
```

Trial Tr. 3073:6-12

The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris



## Jenny Zeitler Testimony

9   A.  I worked with the Chase legal team, I don't remember their

10  names, Jeanette I think was one of them, to write the privacy

11  policy e-mail, and then I deployed it out of Braze.

12  Q.  And when you say deployed it out of Braze, does that mean

13  you sent, like, 400,000 e-mails?

14  A.  Yes.

Trial Tr. 3072:9-14

© 2025 DOAR

# Privacy Policy Emails In The Hundreds Of Thousands

The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris

## Jennifer Wong Testimony

1 A.  Every single one that we had an email address for, even if

2 they don't have an account.

3 Q.  And how many were sent out by JPMorgan Chase?

7 A.  I believe we sent out the privacy policy, but I don't

8 remember exactly how many emails we sent out.

9 Q.  Was it in the hundreds of thousands or millions?

10 A.  It was in the hundreds of thousands.

Trial Tr. 1188:1-10

© 2025 DOAR

| The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris |



## Ryan MacDonald Testimony

8  Q. Now, Mr. MacDonald, we're going to go through again what an

9  optout email is. If you could just describe briefly what an

10 optout email is.

11 A. It was—it is—a notice that is sent to the customer that

12 has seen a previous privacy statement, to let them know what

13 the new terms of the service are, and to opt out of those terms

14 if they so choose.

15 Q. And why was an optout email necessary as the first step of

16 the marketing campaign that you helped oversee?

17 A. Because prior to sending any other communication, we need

18 to know—we need the customer to understand what those new

19 terms of service are and—in order to proceed with any

20 communication.

21 Q. At that point, Mr. MacDonald—well, when did the optout

22 email get sent?

23 A. Again, to the best of my recollection, it was sometime

24 around September, October.

Trial Tr. 2382:8-24

© 2025 DOAR

# Braze Contract Renewal

The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris

## Jennifer Wong Testimony



4    A.  When we renew a contract with Braze, we have to work with

5    them to estimate out approximately how many emails we would

6    have to send or use, ultimately, over that course of the

7    contract as we negotiate our rates, so we need to know what

8    we've done in the past to be able to negotiate future rates.

9    Q.  And was the number no more than 500,000 a month?

12    A.  That I'm not sure in the contract, but I do know we used

13    historical numbers to negotiate new contract rates.

14         MR. TAYBACK:  And if I could show for this witness

15    only CJ 2156 at page 15.

16    Q.  Do you recognize this as the order form attached to the

17    contract?

18    A.  Yes.

19    Q.  And does it identify a number for the year, of emails that

20    would be sent?

21    A.  It has a start and end date, yes.

22    Q.  And the number of emails, does this refresh your

23    recollection as to the number of emails?

24    A.  Yes.

25    Q.  And what was the number?

1    A.  6 million.

2    Q.  For the year.

3    A.  For the year.

4    Q.  Which is about 500,000 a month.

5    A.  About.

Trial Tr. 1190:4-1191:5

© 2025 DOAR

# Grew Users To The Website Quickly

The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris



## Jennifer Wong Testimony

8  Q.  Now once you started at Chase, did you at some point, in

9  November of 2021, shortly after you started, did you give a

10  presentation to Chase employees——not legacy Frank employees but

11  Chase employees——regarding your SEO practices, your search

12  engine optimization practices?

13  A.  There was a presentation made.

14  Q.  And how did that come about?

18  A.  Chase marketing was very interested in how we approached

19  marketing or SEO within Frank and how we grew our number of

20  users to the website so quickly.

Trial Tr. 1183:8-20

© 2025 DOAR

| The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris |

## Behram Panthaki Testimony

5  Q.  During your time there you know that she did a number of

6  interviews?

7  A.  That is right.

8  Q.  Publications of various sorts targeting young people,

9  potential applicants?

10  A.  That's correct.

11  Q.  In the course of those interviews, you would read them,

12  right, you would become aware of them and how the company is

13  being promoted, right?

14  A.  Yes.

15  Q.  And you recall that in those interviews she would routinely

16  say --

17       MS. BHASKARAN:  Objection.

18       MR. TAYBACK:  I haven't finished the question.

19       THE COURT:  Overruled.

20       So far it is without objection.

21  BY MR. TAYBACK:

22  Q.  When were you in those interviews, you knew that she would

23  routinely represent to the public that there were three to four

24  hundred thousand students who had been helped by Frank.

25       MS. BHASKARAN:  Objection.

1        THE COURT:  Overruled.

2  BY MR. TAYBACK:

3  Q.  Correct?

4  A.  That is correct.

5  Q.  You never thought that was an unreasonable estimate in your

6  time, correct?

7  A.  That is correct.

Trial Tr. 473:5-474:7

© 2025 DOAR

| The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris |

**CHASE**

STRICTLY PRIVATE AND CONFIDENTIAL

Project Finland

July 2021

CHASE

JPMC INTERNAL USE ONLY-CONFIDENTIAL

## Finland Management Team

**Charlie Javice**

**Founder and CEO**

In 2016, Charlie launched Frank to help students afford college without the burden of student debt. Over the course of two years, she estimates that Frank has helped more than 300,000 students receive $7 billion in financial aid. In 2017, she raised a total of $15.7 million, the largest venture funding round for a female founder that year, from investors such as Apollo Global Management, Aleph Venture Capital, and Reach Capital, that have since made investments in Frank as recent as March 2020. Charlie is a thought leader in fintech and education, authoring opeds for the New York Times and the Wall Street Journal.

GX1591

© 2025 DOAR

| The Contract | LionTree | GX3.1.4 | **Users** | Leslie Wims Morris |
|---|---|---|---|---|

## Government Opening

11          The defendants were executives at a small startup
12   called Frank.  Javice was the CEO and Amar was her right-hand
13   man.  Frank offered an online tool that helps students apply
14   for financial aid.  ==They had about 400,000 people who created==
15   ==an account and used this tool.==  These were the defendants'
16   users.  Frank didn't make much money and it never turned a

## Marc Rowan Testimony

19   Q.  Okay.  Now I think you testified on direct examination that
20   you understood that about 500,000 students had completed a
21   FAFSA with Frank?  Do I have that right?
22   A.  I believe I testified that was a number that was consistent
23   with my belief of the number of customers.
24   Q.  ==Were you aware that the number was actually less than==
25   ==150,000?==
1    A.  ==No.==
2    Q.  Were you aware that Capital One and JPMorgan were told that
3    2.1 million students had completed a FAFSA using Frank?
4    A.  No.
5    Q.  That number would not be consistent with your recollection,
6    correct?
7    A.  That's not my recollection.

Trial Tr. 36:11-16, 3039:19-3040:7

The Contract | LionTree | GX3.1.4 | Users | **Leslie Wims Morris**



## Leslie Wims Morris Testimony

> 5 | Q.  You were the person in charge of this deal; correct?
>
> 6 | A.  No.

> 3 | Q.  As the quarterback, as you described, of this deal, it is
>
> 4 | fair to say you have a dog in this fight?
>
> 5 | A.  No.

Trial Tr. 657:5-6; 658:3-5

© 2025 DOAR



## Leslie Wims Morris Testimony

22   A.   LionTree provided us bid guidance of 175 to 180 million to

23   be competitive and get in the process.

24   Q.   And they told you you needed—so essentially they told you

25   that there were other bidders, correct?

1   A.   Correct.

9   Q.   And are you aware that LionTree—that the other bidder was

10   only 125 million?

11   A.   No.

Trial Tr. 686:22-687:1, 687:9-11

The Contract | LionTree | GX3.1.4 | Users | **Leslie Wims Morris**



## Leslie Wims Morris Testimony

**Q.** Now, you didn't talk about the fact that Ms. Javice had

actually met with Jamie Dimon; correct?

**A.** Correct.

Trial Tr. 703:25-704:2

© 2025 DOAR

The Contract    LionTree    GX3.1.4    Users    **Leslie Wims Morris**



## Leslie Wims Morris Testimony

24    Q.    And on July 7, that's when Ms. Javice met with Mr. Dimon?

25    A.    Correct.

1    Q.    And July 7 is also the same day -- on that very same day -- is when you held the first long, all-day, management meeting with Ms. Javice?

3

4    A.    Correct.

5    Q.    And then you also had lunch with Mr. Dimon?

6    A.    Yes.

7    Q.    And then 22 business days later this deal is signed; correct?

8

9    A.    OK.

Trial Tr. 704:24-705:9

# Table Stakes

| The Contract | LionTree | GX3.1.4 | Users | **Leslie Wims Morris** |



CJ130

## To: Adam Seltzer, David Katz & 2 more...

3. Understand when analysis is necessary and when it impedes change.

While I am fanatical about detail and multi-year analysis, it's important to be cautious about its application. Assumptions are frequently involved, and small changes in a few variables can dramatically change an outcome.

Even net present value analysis fails to capture the true value of something after a certain period of time. For instance, people commonly look at the five-year net present value of a customer acquisition, which can mask the true compounding effect of keeping that client for 20 years. And we have often seen net present value analysis fail to capture ancillary benefits (like customer happiness) that can often be more important than the analysis itself.

Sometimes a new product or an investment should simply be considered table stakes

— meaning there's no need to do analysis at all. Think about banks adding the capability of opening new accounts digitally, for example, or maintaining a strong technology infrastructure and adopting new technologies, like cloud or artificial intelligence (AI). These could be life-or-death decisions for a company, so instead of focusing on net present value, the emphasis should be on getting the work done properly, efficiently and quickly.

Bureaucrats can torture people with analysis, stifling innovation, new products, testing and intuition.

In the last section, I go into further detail about how certain analyses fail to guide us to the right answer in public policy – particularly around complex issues like healthcare, job creation, mortgage markets and infrastructure.

© 2025 DOAR

The Contract | LionTree | GX3.1.4 | Users | Leslie Wims Morris



## Leslie Wims Morris Testimony

14  Q.  And students and lower market—and people from LMI, are

15  higher interest rates for their credit cards, right?

16  A.  No.

Trial Tr. 681:14-16

| The Contract | LionTree | GX3.1.4 | Users | **Leslie Wims Morris** |

## Leslie Wims Morris Testimony

```
 9   Q.  Okay.  And the two things that you actually negotiated for
10       was for the company, right?  You have to say yes.
11   A.  Yes.
12   Q.  Okay.  And Ms. Javice, correct?
13   A.  The company and the key employee.
14   Q.  Which included Ms. Javice and Mr. Amar.
15   A.  Correct.
```

Trial Tr. 700:9-15

© 2025 DOAR

# Was Not Aware That Charlie Javice Told Her About The Mistake

The Contract | LionTree | GX3.1.4 | Users | **Leslie Wims Morris**



## Leslie Wims Morris Testimony

21  Q.  And you are aware, ma'am, are you not, that the 35 million

22  website visitors came from this mistake?

23  A.  I'm not aware of where the 35 million website visitors came

24  from, and/or whether it was tied to a mistake.  I'm aware of

25  that which was conveyed to me by Ms. Javice.

Trial Tr. 665:21-25

© 2025 DOAR

# Lies About Defensive Play

| Defensive Play | Mason Young | Data | Fake Validation | ASL List |



## Leslie Wims Morris Testimony

**4   Q.   And you considered this a ==defensive play== when you purchased**

**5   this company, correct?**

**6   A.   ==No.==**

Trial Tr. 678:4-6

© 2025 DOAR

**Defensive Play** | Mason Young | Data | Fake Validation | ASL List



**From:** Katz, David [david.katz@jpmorgan.com]
**Sent:** 7/29/2021 10:08:18 PM

**Subject:** RE: Deal Review - Finland
**Attachments:** Project Finland_Final_DR_07.29.2021_6PM.pdf

Please find attached the deck for tomorrow's Deal Review at noon.

## Defensive Play

☐ Defensive play to ensure another FI does not acquire Finland

GX1591

© 2025 DOAR

**Defensive Play** | Mason Young | Data | Fake Validation | ASL List



From: Wims Morris, Leslie [leslie.wimsmorris@chase.com]
Sent: 7/30/2021 3:26:59 PM
To: Lake, Marianne [marianne.lake@jpmorgan.com]; Roberts, Jennifer [jennifer.roberts@chase.com]; Macdonald, Ryan S [ryan.s.macdonald@jpmorgan.com]; Goodman, Steve W [steve.w.goodman@chase.com]; Seltzer, Adam B [adam.b.seltzer@chase.com]; Linden, Alexandra D [alexandra.d.linden@jpmorgan.com]; Sweeney, Alex [alex.sweeney@chase.com]; Carmody, Brian J [brian.j.carmody@chase.com]; Beer, Allison [allison.beer@chase.com]; Amin, Rohan M [rohan.m.amin@jpmchase.com]; Simcock, Stephen [stephen.simcock@jpmchase.com]; Burger, Corrine M [corrine.m.burger@chase.com]; Brucker, Mark D [mark.d.brucker@jpmorgan.com]; Youngwood, Sarah M [sarah.m.youngwood@jpmorgan.com]; Kane, Matthew [matthew.kane@chase.com]; Neilson, Peter J [peter.j.neilson@jpmchase.com]; Ramos, Andre R [andre.r.ramos@chase.com]; Griffin, Bradley W [bradley.w.griffin@jpmchase.com]; Williams, Natalie R [natalie.r.williams@jpmchase.com]; Norton, Cathy T [cathy.t.norton@jpmchase.com]; Schmitter, Todd [todd.schmitter@jpmchase.com]; Blair, Jordyn [jordyn.blair@jpmchase.com]; Ashworth, Michael [michael.ashworth@jpmorgan.com]; Bessey, Brian A [brian.a.bessey@jpmchase.com]; Piepszak, Jennifer A [jennifer.a.piepszak@jpmchase.com]; Katz, David [david.katz@jpmorgan.com]; Fuller, Elizabeth K [elizabeth.k.fuller@jpmorgan.com]; Matarese, Christian [christian.matarese@dechert.com]
Subject: Deal Review - Finland <Materials attached>
Attachments: Finland Q&A 7.29.21.pdf; Project Finland - All Key Insights and Risks - Master 7.29.21.pdf; Project Finland_Final_DR_07.29.2021_6PM.pdf; _.ics

When: Friday, July 30, 2021 12:00 PM-12:30 PM (UTC-05:00) Eastern Time (US & Canada).
Where: Zoom Meeting ID: 949 810 4665



==Defensive Play==

▪ Defensive play to ensure another FI does not acquire Finland

CJ942

# Final Deal Review: Competitive Advantage

| Defensive Play | Mason Young | Data | Fake Validation | ASL List |
|---|---|---|---|---|

## Strategic Rationale

▧ **Opportunities for Chase** include the ability to:

▧ Accelerate our customer acquisition by selling into an installed base (conversely, **if acquired by another Bank, JPMC will be at a competitive disadvantage**)

CJ942

© 2025 DOAR



**Defensive Play**   Mason Young   Data   Fake Validation   ASL List

Purchase price assumed to be 100% goodwill

Includes $175mm of goodwill (100% of purchase price)

Project Finland
July 2021

CHASE

CJ942

© 2025 DOAR

# $200mm – "That's Nothing!"

**Defensive Play** | Mason Young | Data | Fake Validation | ASL List



**From:** Wims Morris, Leslie [leslie.wimsmorris@chase.com]
**Sent:** 7/8/2021 9:23:53 PM
**To:** Katz, David [david.katz@jpmorgan.com]
**Subject:** RE: Finland - Met with Andre FYI

Useful context
Glad you talked to him
Also, glad people think we are not being aggressive enough!
Too funny re: $200mm - where like aww that's nothing!

CJ133

© 2025 DOAR