UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

                      :

UNITED STATES OF AMERICA     :

                      :

        - v. -        :   S1 23 Cr. 251 (AKH)

                      :

CHARLIE JAVICE and       :

OLIVIER AMAR,          :

                      :

        Defendants.    :

                      :

------------------------------------------------------x

# THE GOVERNMENT'S OPPOSITION
## TO THE DEFENDANTS' RULE 29 AND RULE 33 MOTIONS

PERRY CARBONE
Attorney for the United States, Acting under
Authority Conferred by 28 U.S.C. § 515

Rushmi Bhaskaran
Nicholas W. Chiuchiolo
Micah F. Fergenson
Georgia V. Kostopoulos
Assistant United States Attorneys

*- Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 2

    I. Procedural Background ................................................................................................ 2

    II. Factual Background .................................................................................................... 2

        A. Background ......................................................................................................... 2

        B. The Defendants Told Lies During Diligence ................................................... 4

        C. The Data Validation Exercise ........................................................................ 12

        D. The Acquisition ............................................................................................... 17

        E. The Defendants Purchased Data To Cover Up Their Fraud ........................... 17

        F. The Defendants Augmented the ASL List with Enformion Data ................... 26

        G. Post-Acquisition, the Defendants Continued Lying to JPMC About Their User Numbers .......................................................................................................... 29

        H. The Defendants Sent Purchased (and Other) Data to JPMC, Falsely Claiming It Was Frank's User Data ..................................................................................... 31

    III. The Trial ................................................................................................................. 40

        A. The Government's Case .................................................................................. 40

        B. The Defense Cases .......................................................................................... 41

APPLICABLE LAW ........................................................................................................... 42

    I. Rule 29 Motions ........................................................................................................ 42

    II. Sufficiency of the Evidence ..................................................................................... 43

    III. Rule 33 Motions ..................................................................................................... 44

ARGUMENT ...................................................................................................................... 45

    I. The Jury's Guilty Verdict Should Stand Because the Government's Evidence of Guilt Was More Than Sufficient Under Rule 29 .................................................................... 45

    II. The Defendants' Arguments for a New Trial Under Rule 33 Are Meritless ..................... 52

        A. The Jury Instructions Were Proper ................................................................ 52

        B. The Court Properly Denied Severance and The Defendants Are Not Entitled To A New Trial On This Basis .............................................................................. 78

        C. The Court's Evidentiary Rulings Were Reasonable and Within Its Discretion .............. 95

        D. The Defendants Are Not Entitled To a New Trial Because The Court Precluded Evidence Regarding JPMC's Civil Lawsuit Against the Defendants ................................. 108

        E. The Defendants Are Not Entitled To a New Trial Because the Court Restricted the Defendants' From Cross-Examining Witnesses on JPMC's Payment of Witness Legal Fees ............................................................................................................. 109

F. The Defendants Are Not Entitled To A New Trial On the Basis of Alleged *Brady* Violations ...................................................................................................................................... 110

G. The Government's Examinations Were Not Misleading ................................................ 111

H. Salve's Testimony Was Proper ..................................................................................... 114

CONCLUSION.................................................................................................................... 117

**PRELIMINARY STATEMENT**

The jury found, beyond a reasonable doubt, that Charlie Javice and Olivier Amar committed fraud when they sold Frank for $175 million based on lies.  The jurors heard from more than a dozen witnesses who detailed the defendants' brazen lies that were made in documents, in emails and spreadsheets, and during meetings; they read the defendants' private text messages in which they discussed their fraudulent scheme; and they saw the fake and purchased data they used to cover up their crimes.

In the face of this mountain of evidence, the defendants' motions try to take the case out of the jury's hands by distorting the trial record and the Court's legal rulings.  None of those efforts warrant overturning the jury's considered and careful evaluation of the evidence or holding a new trial.

*First*, the Government's evidence was more than sufficient to support the jury's guilty verdict as to both defendants.  Ignoring his heavy burden under Rule 29, and rather than assessing the actual trial record and drawing all inferences from it in the Government's favor, Amar distorts (and ignores) the trial record.  In truth, there was overwhelming evidence of each defendants' guilt, which supplies a more-than-sufficient basis under Rule 29 to conclude that a rational jury could— and, in fact, did—find each defendant guilty.  The defendants' motions for judgments of acquittal should be denied.

*Second*, the defendants cannot come close to establishing that they are entitled to a new trial under Rule 33.  There was no manifest justice in the jury's verdict, nor a credible concern that an innocent person was convicted.  The Court's jury instructions properly instructed the jury on the law of conspiracy, materiality, and conscious avoidance, and the Court was well within its discretion to decline to provide Javice's theory of the defense instruction.  The Court also properly

1

denied severance.  As the trial record made clear, the defendants did not have mutually antagonistic defenses, and they cannot point to a single instance where their right to a fair trial was compromised.  Finally, the Court's preclusion of certain evidence or lines of cross-examination do not warrant a new trial, for those decisions were proper and well within the Court's discretion.

There is, in short, no basis to overturn the jury's verdict of guilty on all counts as to each defendant.  The defendants' motions should be denied.

## BACKGROUND

### I.  Procedural Background

On July 12, 2023, a grand jury in this District issued a superseding indictment charging the defendants in four counts.  Count One charged the defendants with conspiring to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349.  Count Two charged the defendants with wire fraud, in violation of Title 18, United States Code, Section 1343. Count Three charged the defendants with bank fraud, in violation of Title 18, United States Code, Section 1344.  Count Four charged the defendants with securities fraud, in violation of and Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

On March 28, 2025, following a six-week trial, the jury returned guilty verdicts on all counts for each defendant.

### II.  Factual Background[1]

#### A.  Background

Javice founded TAPD, Inc., d/b/a "Frank," in or about 2017 and served as its CEO until its acquisition in September 2021.  Amar was Frank's Chief Growth Officer.

---

[1] The following facts were proven at trial.

2

Frank set out to offer college students and prospective college students a suite of products that assisted them in applying for student aid. Frank's flagship tool was designed to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA"). FAFSA is a federal government form, available free of charge, that students use to apply for financial aid for college or graduate school. Frank coined itself as the "TurboTax of FAFSA," claiming that customers could "apply for aid in under 7 minutes." Frank eventually offered other tools, including products that assisted with appealing student aid determinations, finding scholarships, and finding college classes for credit.

As of 2021, Frank had, at most, approximately 500,000 user accounts, the majority of which were related to the FAFSA tool. Tr. 454:1-5; 17-21; GX 802-60. In order to create a FAFSA account, an individual needed to provide his or her first name, last name, email address, and phone number. GX 214. Frank saved and maintained the data provided by its users, including the detailed information that users submitted as part of their FAFSA application, which included detailed information about demographics, student finances, and parent finances. GX 3.1.12. As of August 2021, approximately 142,000 FAFSA applications had been completed using Frank's FAFSA tool. GX APP.

In January 2021, Frank began the process of putting itself up for sale. Around the same time, Javice directed that Frank start referring to Frank's website visitors, *i.e.*, someone who merely clicked on Frank's website—for whom Frank collected no personally identifying information (or "PII")—as a Frank "user." While Frank only had several hundred thousand customers, *i.e.*, people who had created an account by providing their name, email, and address, Frank's website had more than 4 million visitors. Tr. 986. Thus, by referring to website visitors as "users," Frank was able to claim it had millions of users.

Frank was not a profitable company.  Tr. 111.  Frank's value to potential acquirers was in its ability to build continuing relationships with large numbers of young people and collect detailed information on its young userbase.  Tr. 153, 1393-94, 3007-3009.  Frank's target audience—college students and prospective students—was a demographic that traditional financial institutions had historically struggled to connect with.  Frank's purported track record of attracting large numbers of young students and vast data on those students made it an attractive target for acquisition by financial institutions. As such, the number of Frank users and the quality and quantity of data collected on Frank users were critical diligence items in the sale of Frank to potential buyers. *See, e.g.*, Tr. 151-52 ("The focus of the diligence meetings was very much around what these buyers could potentially do with the users if they acquired Frank.").

## B.  The Defendants Told Lies During Diligence

In early 2021, Frank retained an investment bank, LionTree LLC, to advise on a potential sale of the company.  Javice repeatedly told LionTree, falsely, that Frank had 4.25 million users and that a "user" was someone who had created a Frank account by providing their full name, email, and home address.  Tr. 142, 147, 211; GX 3034.

Based on information provided by Javice and Amar, LionTree prepared pitch materials to market Frank for sale.  *See* Tr. 114, 127-29, 197-203.  The pitch materials and presentations, which repeated the defendants' lies about the number of customers Frank had, emphasized Frank's proven track record of amassing millions of customers and vast data on those millions of customers.  For example, the pitch deck that LionTree prepared for Javice to use in presentations to potential buyers claimed that Frank was an "acquisition machine" that had built meaningful relationships with students "that would take a company hundreds of millions of dollars and many years to replicate."  GX 1.1.  As to the data that Frank purported to collect on its millions of

customers, the pitch materials claimed that Frank "know[s] more about [its] Students than any lender, college, or employer year over year."  GX 1.1.

### 1.  Capital One

 The first serious potential buyer was the bank Capital One.  Capital One was interested in exploring an acquisition of Frank for the opportunity to engage with a very large audience of young people and to sell banking products to them.  Tr. 2110-11, 2118-19, 2129.  Consistent with the lies Javice had told to LionTree, Javice also lied to Capital One, asserting that Frank had 4.25 million users and that a user was someone who had created a Frank account by providing their name, email, and address.  Tr. 2111, 2123, 2133, 2139, 2142, 2143, 2148.

During its diligence, Capital One representatives primarily met with Javice and Amar.  As the Frank employee most knowledgeable about users, Amar responded to Capital One's questions about users, along with Javice. Tr. 2183, 2285.

### a. The Defendants Created the 3.1.4 User Breakdown Spreadsheet

In response to a request for more detailed information about Frank's user base, Javice and Amar prepared a purported monthly breakdown of "user" signups across all Frank products since 2017, which became the data room document named "3.1.4 User Breakdown."  *See* GX CAP 3.1.4 (version uploaded to Capital One data room); GX 3.1.4 (version uploaded to JPMC data room); GX 521.  The defendants' account breakdown spreadsheet falsely showed that more than 4.265 million Frank users had started a FAFSA application, and that more than 2.1 million Frank users had completed a FAFSA application.  GX 3.1.4.  In truth, approximately 500,000 Frank users, at most, had created an account and thus could have started a FAFSA application, and less than 142,000 completed a FAFSA application.  *See* Tr. 1580 (as of August 2, 2021, approximately 142,000 Frank users had started filling out a FAFSA application, as shown in GX APP).

The creation of the fraudulent 3.1.4. spreadsheet by Javice and Amar on June 24, 2021, is reflected in Google Docs and email traffic. At first, the user breakdown spreadsheet was a Google Sheet shared by Javice with Amar and Jen Wong. *See* GX G516 (spreadsheet named "User_Breakdown"), G517 (metadata). On June 24, 2021, Javice shared a Google Sheet named "User_Breakdown" with Jen Wong, writing: "here is the tab. you can see the breakdown need in columns F through L. we are taking the sessions column for this." GX 1636; Tr. 1080. After receiving Javice's request, Wong filled out the spreadsheet using sessions data from Google Analytics. Tr. 1080-81 (describing the "Channel breakdown" tab of the original "User_Breakdown" spreadsheet); GX G516.

Thereafter on June 24, 2021, Javice copied the "User_Breakdown" spreadsheet filled out by Wong, and saved it as a new Google Sheet with the name "User_Breakdown_CJ." *See* GX G520 (Google Sheet); G521 (metadata). Javice then emailed this file, the contents of which were identical to the "Channel breakdown" tab of the spreadsheet shared with Wong and Amar, to LionTree. *See* GX 1509, 1509-A.

Subsequent additions to that spreadsheet included clear misrepresentations. Specifically, Javice made further edits to the Google Sheet, and saved a new version named "User_Breakdown_CJ_v2." *See* GX G521. Javice emailed this second version to LionTree as well. *See* GX 3010, 3010-A. The second version made several changes. *See* GX 3010-A. The name of the spreadsheet tab was changed to "Channel *& Product* breakdown," and Javice added several columns to the spreadsheet's body, related to "Product Mix Attribution" for Frank's purported 5.4 million "users." *Id.* (emphasis added). These new products columns had the following headings: "FAFSA In Process," "FAFSA Completion Rate," "Scholarships," "Classfinder," "Aid Appeal," and "Financial Education & College Costs." *Id.* According to the

spreadsheet, the total number of cumulative Frank users between March 2017 and June 2021 who had at least one "FAFSA In Process" was 4,265,085.  *Id.*

Approximately three hours after emailing this fraudulent spreadsheet to LionTree, Javice had a call with Amar.  GX 902.  Specifically, beginning at 1:56 p.m., Javice and Amar spoke on the phone for approximately five minutes.  GX 902.  Early in the call, at approximately 1:57 p.m., Javice shared the fraudulent Google Sheet she had emailed to LionTree (*i.e.*, "User_Breakdown_CJ_v2") with Amar.  *See* GX 1678 (automated email from Google to Amar showing Javice shared "User_Breakdown_CJ_v2" with Amar); GX G521 (metadata showing same).  While on the phone with Javice and within a minute of receiving this fraudulent file— which falsely represented that over 4 million Frank users had started a FAFSA application—Amar not only viewed the fraudulent file, but also edited it.  GX G521.

Approximately one minute after Javice and Amar's call ended, Javice renamed the Google Sheet to "User_Breakdown_CJ_v3."  GX G521.  Approximately one minute after renaming the file, Javice emailed a copy of the "User_Breakdown_CJ_v3" excel to LionTree.  *See* GX 3011, 3011-A.[2]  The third version emailed to LionTree contained the same fraudulent product columns as the second version—such as "FAFSA In Process" and "FAFSA Completion Rate"—and now included projected monthly user numbers (highlighted in yellow) for the remainder of 2021.  GX 3011-A.  In addition, the third version included "Notes" indicating that the spreadsheet generally used the term "user" to mean a Frank account.  *See id.* ("Notes" include: "Classfinder accounts created upon credit card entry. This is a different CACs to optimize learnings *and not Frank accounts*" and "2020 – *accounts* added across products" (emphases added)).[3]

---

[2] Amar was not on this email chain with LionTree.

[3] A few months later, in February 2022, Javice inadvertently shared the fraudulent version of the User Breakdown spreadsheet, including the "FAFSA In Process" and "FAFSA Completion Rate"

The numbers in this spreadsheet created by Javice and Amar were false. Frank never had millions of FAFSA starts or completions, nor did Frank otherwise have millions of accounts, as Javice and Amar both knew. *See, e.g.*, Tr. 1088-89. Frank had merely a few hundred thousand accounts. Javice and Amar, in the "FAFSA In Process" column, had thus inflated the number of Frank accounts by roughly a factor of ten.

In fact, the figures in the fraudulent 3.1.4 spreadsheet did not even accurately represent what Google Analytics calls "users," that is, *unique* website visitors. Rather, the figures in the 3.1.4 spreadsheet represented what Google Analytics calls "sessions," that is, *not* unique hits on the Frank website. *See* GX 414 (report from Google showing monthly Google Analytics sessions and users for the Frank website); Tr. 1087.

### b. The July 8 Presentation to Capital One

On July 7, 2021, Capital One requested, via LionTree, a meeting with Amar to discuss questions related to Frank's users, including "FAFSA starts and completions." GX 1691 (Capital One executive emailing LionTree that "following on" the in-person meeting yesterday, "we had some follow on questions and thought it would be best to address them directly with Olivier on a 30 mins call today, if possible" and listing the topics to be discussed). A LionTree employee, Luke Koskovolis, responded: "Some of these topics came up yesterday during the in-person sessions

---

columns, with Jen Wong, in addition to Amar. *See* Tr. 1089-1111 (Wong testimony on this subject); GX 802-71 (chat among Wong, Javice, and Amar). Wong questioned Javice and Amar about the source of the numbers. GX 802-71. Javice appeared to claim the FAFSA In Process column was website visitors. GX 802-71 (Javice claiming "process was on page"). Amar likewise appeared to claim that the FAFSA In Process represented Google Analytics visitors "plus everything that came to typform"—a survey software that Frank had previously used for the FAFSA application. GX 802-71; *see* Tr. 1108. In the chat with Wong, Amar never expressed surprise at the figures, or denied knowledge of this version of the spreadsheet and the FAFSA In Process and FAFSA Completion Rate columns. *See* GX 802-71. That was because, a few months earlier, Amar had worked with Javice to create the fraudulent user spreadsheet.

and the company was preparing some materials this afternoon to walk through in response. Probably best if we wrap those pages before setting a call.  Can we plan on sending those over to you tomorrow morning and then setting a call with Olivier . . .?"  GX 1691.

In an email chain regarding a draft PowerPoint presentation for Capital One, LionTree conveyed Capital One's request for a call with Amar to review the specified topics with the Frank team.  *See* GX 3037.  The email chain continued into the morning of July 8, with both Amar and Javice providing feedback and edits to the substance of the presentation for Capital One.  *See* GX 3039.  The PowerPoint reviewed and approved by Amar and Javice contained blatant falsehoods. For example, slide 10 of the final PowerPoint was called "Frank FAFSA Completions Breakdown" and claimed—accounting for only the first five months of 2018, 2019, 2020, and 2021—that Frank had a total of over 580,000 FAFSA completions.  GX 3039.  As noted in the slide, the source for the figures provided was the fraudulent 3.1.4 User Breakdown spreadsheet (which, as noted above, had been created by Javice and Amar together approximately two weeks earlier).  GX 3039.  In preparing the PowerPoint for the July 8 meeting, a LionTree employee even emailed directly to Javice and Amar a copy of the fraudulent 3.1.4 User Breakdown spreadsheet containing analysis by LionTree of Frank's user numbers in 2019 and 2020.  GX 3038, 3038-A.

The meeting between Amar and Capital One occurred virtually on July 8, 2021.  GX 3041; GX 2036 (attendance records from Zoom).  In advance of the meeting, LionTree, acting on behalf of Amar and Javice, emailed to Capital One the PowerPoint with the false information about, among other things, Frank's FAFSA completion numbers.  *See* GX 3040 (Houston Cowan sharing the final PowerPoint with Capital One employees, LionTree employees, and Amar and Javice). The only attendees from Frank at the July 8 Capital One meeting were Amar and Javice.  GX 3040; GX 2036.  Amar appeared via Zoom while Javice dialed in using a telephone.  GX 2036.

While the two trial witnesses, Houston Cowan and Mason Young, who were attendees at the July 8 meeting did not have a specific recollection of this particular meeting, *see* Tr. 385 (Cowan), Tr. 2241-42 (Young), the written record reflects what occurred. The PowerPoint presentation that Amar presented to Capital One during the July 8 meeting advanced and elaborated upon the defendants' earlier lies about millions of users completing FAFSA applications. GX 3040. In addition to the inflated number of FAFSA completions taken from the 3.1.4 User Breakdown spreadsheet, the PowerPoint also indicated that Frank possessed a phone number and email address for its "users"—in other words, that a "user" was someone who had signed up for a Frank account and thus provided their phone number and email address to Frank. GX 3040. Specifically, on slide 12 of the PowerPoint, titled "How Frank Engages Users," the PowerPoint claimed that user engagement "happens at the checklist level of the dashboards where Frank pushes notifications *via texts and emails* . . . ." GX 3040 (emphasis added). A "user" being someone who had provided phone number and email address to Frank—that is, a "user" being a Frank accountholder—was consistent with Javice and Amar's earlier misrepresentations in the fraudulent 3.1.4 spreadsheet, which had falsely indicated that the millions of Frank "users" listed in the spreadsheet were Frank accountholders.

Following the July 8 meeting, LionTree emailed follow up questions to Javice and Amar, including questions about FAFSA users. *See* GX 3042; *see also* GX 3043 (full email chain). For example, one question related to "the decay curve of the FAFSA users" and asked: "Is it possible to determine the number of FAFSAs that Frank users have filed? i.e. out of the 2.1mm of FAFSA users we have, how many FAFSAs have all those people filed combined?" GX 3042. Another follow up question asked about the "demographic difference between FAFSA in progress vs FAFSA complete"—indicating again that the topic of FAFSA starts and completions was

discussed at the meeting between Javice and Amar and Capital One. GX 3042; *see* GX 1691 (Capital One's initial request for meeting with Amar indicating that "FAFSA starts and completions" was a topic for Amar to address).

### 2. JP Morgan Chase (JPMC)

In the summer of 2021, JPMC also expressed significant interest in acquiring Frank. During that diligence process, Javice and Amar told the same lies to JPMC that they had previously told to Capital One. Among other things, JPMC received, early on, the defendants' fraudulent monthly breakdown of Frank's users, which had been prepared by the defendants in connection with Capital One's diligence. *See* GX 3.1.4; GX 1692 (in response to an urgent question on July 8, 2021 from JPMC regarding the number of Frank households, LionTree directed JPMC to the 3.1.4 User Breakdown spreadsheet in the data room); Tr. 211 (Cowan testifying that the JPMC diligence process was "[m]uch smoother" because they had "been through essentially a whole—the majority of the second-round process with another buyer [Capital One]"). JPMC ultimately acquired Frank for $175 million based on the defendants' lies about Frank's users.

JPMC's diligence process began in early July 2021. On July 2, 2021, Javice emailed updates to Leslie Wims Morris, JPMC's head of corporate development. The first update related to customer acquisition, and falsely claimed that Frank had generated 200,000 new customer accounts from a single marketing email and that five to seven million visitors came to the Frank website monthly. GX 1590. In reality, Frank had, in total since 2017, just a few hundred thousand customer accounts and approximately 4 million non-unique website sessions. Javice repeated these types of lies about Frank's accounts and website visitors throughout JPMC's diligence.

In at least one instance, Amar was present when Javice lied to JPMC about Frank's users. During a July 12, 2021 diligence session about Frank's users, with Amar present, Javice falsely

claimed that a Frank user was someone who had supplied their name, email, and address, and that Frank had 4.25 million such users. Tr. 2297; GX 2035 (Zoom record showing Amar's attendance at the second half of the July 12 diligence session). Javice repeated these lies to JPMC executives throughout JPMC's diligence outside of Amar's presence as well. Tr. 570, 1450; GXs 1140, 3.1.4.

Frank's customer base was the "main source of value" to JPMC and thus Frank's customer volume as well as the quantity and type of data that Frank collected from its customer base were critical to JPMC's evaluation of the value of a potential acquisition. Tr. 1393, 1395, 1407. Among other things, JPMC wanted to assess the degree of "personal and confidential" information provided by Frank's customers, which was relevant to the "established . . . level of trust" between Frank and its customers and its ability to do business with those customers in the future. Tr. 1395, 1431. The more engaged a Frank customer was, the more likely it was that that customer could be converted to a JPMC customer. Tr. 1391. Based on data provided by Frank during diligence, JPMC estimated it could convert a certain percentage of Frank customers to JPMC customers. GX 1591. Thus, the defendants' false statements about the number of customers had a vast impact on JPMC's valuation. Based on the defendants' lies, JPMC projected it could generate more than $500 million in revenue from selling banking products to Frank's customers. GX 1591. Had JPMC known the truth—that Frank only had a few hundred thousand users—the bank would not have acquired Frank. Tr. 635-36, 1398.

## C.  The Data Validation Exercise

Given the importance of Frank's customer base and its user data, JPMC asked to review Frank's customer list as part of diligence. Tr. 615-619. Javice initially refused, citing customer privacy concerns. Tr. 615. JPMC proposed alternative solutions and ultimately told Javice that the deal would not move forward unless JPMC was able to validate Frank's customer list. Tr. 621;

GX 1070, 1071. Specifically, on August 1, 2021, JPMC told Javice that the bank would not proceed with the acquisition unless a third party, Acxiom, reviewed Frank's customer list to confirm the number of customer accounts and the types of data Frank possessed for each of those customers. Tr. 621; GX 1070, 1071.

After receiving JPMC's data validation request on August 1, 2021, Javice forwarded the email to Amar. GX 1147 (Javice forwarding to Amar the email from Leslie Wims Morris, JPMC's Head of Corporate Development). At the same time, Javice sent Amar a message in their private WhatsApp chat: "Hey – have time to chat this am [/] Need to talk about a data pull and strategy [/] Ur gonna need to block off ur day. And good news on the offers." GX 801-2. That day, Amar and Javice called each other nineteen times. Over the course of the next several days, Javice and Amar used synthetic data to create a list of 4.25 million fake users in order to fraudulently pass the data validation exercise.

### 1. Patrick Vovor

Javice and Amar first asked one of Frank's engineers to create synthetic data. On August 1, 2021, the same day that JPMC made data validation a condition to the acquisition, Javice asked Frank's chief engineer, Patrick Vovor, if he could create a list of 4.25 million fake customers that had the same statistical attributes as Frank's actual customers. Tr. 1529; GX 1762. That day, Javice shared a Google Doc called "Data Request" with Amar and Vovor, which listed 4,265,085 FAFSA applications in progress and 2,100,184 FAFSA completions—consistent with the fraudulent user breakdown spreadsheet created by the defendants. GX G506; GX 1684. Javice also emailed Vovor and Amar a copy of the user data provided to JPMC during diligence, attaching a spreadsheet named "CJ_PV_FrontEnd_UserData" that included, among other things, a version of the fraudulent user breakdown spreadsheet created by the defendants. GX 1145.

The following day, Amar repeated the request for fake data to Vovor in greater detail.  In a three-way video call between Amar, Javice, and Vovor,[4] Amar asked Vovor "to take the FAFSA data [for Frank's real customers] and generate a bigger file of 4 million users that would have FAFSA data . . . ."—i.e., the data that a Frank customer would supply when using the FAFSA product.  Tr. 1661; GX 1066.  Amar showed Vovor a spreadsheet that listed the data fields for which they needed fake data for 4.265 million fake people.  GX G506.

Vovor asked Javice and Amar if their request to create this data was legal and expressed concern that Frank's general counsel was not present.  Tr. 1564, 1575.  Amar avoided the question, and Javice said that she did not want to end up in an orange jumpsuit, referring to prison clothes.  Tr. 1575-76.  Ultimately, Vovor told Javice and Amar that he would not do anything illegal, and he refused Javice and Amar's request to create fake data for JPMC's data validation request.  Tr. 1576.

### 2.  Dr. Adam Kapelner

Javice then turned to a friend from college, Dr. Adam Kapelner, an associate professor of mathematics at Queens College.  Javice explained that she was "in an urgent pinch."  GX 2801.  Javice asked Kapelner to do the same thing that Amar and Javice had asked Vovor to do:  create a list of 4.25 million users with synthetic data.  Unlike Vovor, who knew that Frank had nowhere close to 4.25 million customers, Kapelner did not work at Frank.  Javice led Kapelner to believe that Frank actually had 4.25 million customers and that synthetic data was needed to protect these purported customers' personally identifiable information.  GX 1752.

Javice and Amar prepared instructions on how much fake data to generate, so the data counts would match their previous lies to JPMC.  GX G72, G73.  On August 3, 2021, Amar created

---

[4] A video call invitation was circulated to Javice, Amar, and Vovor on August 1, 2021.  GX 1762.

and shared a Google Sheet with Javice, ultimately named "Records Needed," which listed the data

fields and total numbers that needed to be generated synthetically—including 4,265,085 accounts

and 2,100,184 completions—consistent with the user breakdown spreadsheet the defendants

created.  GX G72.  That same day, Javice had her first call with Kapelner, and then immediately

called Amar.  GX 902.  Thereafter, Amar shared the "Records Needed" spreadsheet with Javice

and the two had another phone call.  GX G73; GX 902.  Amar and Javice then texted via WhatsApp

about the "Records Needed" spreadsheet, with Amar explaining that certain fields were not

included because "we eliminated them from the report" to JPMC.  GX 801-7.  Javice then sent

Kapelner the documents for the project, including a version of the "Records Needed" spreadsheet.

*See* GX 603, 1077, 1752; Tr. 1916-17 (GX 603 sent to Kapelner by Javice via AWS).  Javice then

spoke on the phone with Kapelner.  After the call, Javice texted Amar: "I found my genius. He

says it will take him an hour." GX 801-10.

Kapelner worked around the clock creating the defendants' fake data, and on August 5,

2021, at Javice's direction, Kapelner submitted the final product—a list of 4.25 million fake people

with fake data—to Acxiom, the third party that JPMC had selected to validate Frank's user data.

Acxiom then confirmed to JPMC that Frank's customer list contained 4.265 million total

customers.  GX 1292A.  The Acxiom report listed the number of customer accounts that contained

specific data fields identified by JPMC (such as student birthday, student home address, and

student major interest).  GX 1292A. Consistent with the defendants' prior false statements to

JPMC (and other intended victims), the fake list of customers, as confirmed by Acxiom, falsely

indicated that Frank had 4.265 million customer accounts and that 100% of those customers had

signed up for an account by providing their first name, last name, email, and phone number. GX

1292A.  And, consistent with the instructions that Javice and Amar had prepared for Kapelner, the

15

list of fake customers and customer data also falsely represented that a high proportion of Frank's customers had provided detailed, personal information about themselves and their families, which, as noted above, was highly relevant to JPMC's decision to proceed with the acquisition. For example, the fake customer list indicated that approximately 80% of customers, or 3,434,247 users, had provided information about their cash assets.

In further support of the defendants' lies, Javice sent JPMC a purported "internal" analysis of Frank's customer list, which matched Acxiom's independent validation. Through that purported analysis, Javice falsely claimed, again, that Frank had 4.265 million "unique customer accounts" and that most of those accountholders had provided detailed PII. GX 1340.

**Data Variable Validation Request Details**

| How many UNIQUE customer accounts exist? | 4,265,085 | | |
|---|---|---|---|
| Of those records, what % include each data field below? | | | |

| Variable | % Captured | Comments | Count |
|---|---|---|---|
| STUDENT_FIRST_NAME | 100.00% | | 4,265,085 |
| STUDENT_LAST_NAME | 100.00% | | 4,265,085 |
| STUDENT_EMAIL | 100.00% | Provided as Unique ID | 4,265,085 |
| STUDENT_PHONE_NUM | 100.00% | | 4,265,085 |
| STUDENT_HOME_ADDR | 90.21% | Provided as Unique ID | 3,847,533 |
| STUDENT_BIRTHDAY | 90.21% | | 3,847,533 |
| STUDENT_MAJR_INTRST | 48.98% | Data limited due to application addition (added major field in 2019) | 2,088,875 |
| YEAR_OF_SCHOOL | 93.00% | | 3,966,529 |
| DEGREE_LEVEL | 93.00% | | 3,966,529 |
| CITY_OF_HIGH_SCHOOL | 82.99% | | 3,539,731 |
| STUDENT_IS_MARRIED | 81.33% | | 3,468,936 |
| HAS_CHILDREN | 81.33% | | 3,468,936 |
| MILITARY_STATUS | 81.33% | Data limited due to application logic | 3,468,936 |
| PARENT_NUM_CHILDREN_FIN_SUPP | 81.33% | Data limited due to application logic | 3,468,936 |
| STUDENT_COMPLETED_TAX_RETURN | 57.97% | Data limited due to application logic | 2,472,658 |
| STUDENT_EARNINGS_WORKING | 80.52% | Data limited due to application logic | 3,434,247 |
| STUDENT_CASH_ASSETS | 80.52% | | 3,434,247 |
| NET_WORTH_STUDENT_INVESTMENTS | 57.97% | Data limited due to application logic | 2,472,658 |
| IS_US_CITIZEN | 57.39% | | 2,447,931 |
| STUDENT_ADJUSTED_GROSS_INCOME | 80.52% | | 3,434,247 |
| NUMBER_OF_SCHOOLS_TO_SEND_FAFSA | 90.21% | | 3,847,533 |
| STUDENT_HOME_ADDR_APT | | Provided as Unique ID ** merged with top data field | |
| STUDENT_SPOUSE_EARNINGS_WORKING | | Data limited due to application logic ** household adjusted gross income w/ adjusted gross income | |

Javice sent text messages to multiple JPMC executives, claiming that her internal analysis resulted in an "exact match" to Acxiom's independent analysis of Frank's purported customer list, and reiterating the lie that Frank had 4.265 million unique customer accounts and that a high proportion of those accounts also had provided detailed PII. GX 803-7, 803-11.

16

### D. The Acquisition

On August 8, 2021, after confirming the existence of the purported 4.265 million customers, JPMC signed a merger agreement to acquire Frank for $175 million.  GX 2000.  In exchange for their equity, Javice received over $35 million in merger proceeds, and Amar received over $7 million in merger proceeds.  CJ 2171.  JPMC also entered into employment agreements with the defendants.  GX 2027, 2028.  JPMC also agreed to pay Javice a $20 million retention bonus over the course of three years, and to pay Amar a $3 million retention bonus over two years, both in addition to their salaries and incentive compensation.  The following month, the acquisition closed.

### E. The Defendants Purchased Data To Cover Up Their Fraud

Beginning on August 2, 2021, one day after JPMC made its data validation request, the defendants undertook an effort to acquire millions of records of student data in order to cover up their brazen fraud—*i.e.*, to acquire a "customer list" consisting of real people with real contact information that could be sent to JPMC when JPMC inevitably asked for the customer list to conduct cross-marketing.  While the defendants ultimately purchased data from ASL Marketing ("ASL"), the defendants contacted—and discussed contacting—several different data and marketing analytics companies, including Exact Data, Acxiom, mParticle, Narrative, LiveRamp, and TransUnion.  As reflected in their WhatsApp chats, the defendants appeared to be looking for a company that could provide additional PII for Frank's website visitors.  The defendants ultimately abandoned that effort and instead purchased millions of student records outright from ASL.

### 1.  The Defendants Discussed Data Companies in Search of A Company That Could Provide PII For Frank's Website Visitors

The defendants' one-on-one discussions regarding these data and marketing analytics companies appear to have begun on August 2, 2021, the day after receiving JPMC's data validation request.  These discussions took place via phone and WhatsApp.  After speaking on the phone twice, at approximately 8:38 a.m. on August 2, Javice texted Amar, using WhatsApp, a link to an article about Acxiom's data. GX 801-4 ("https://www.theverge.com/2013/6/26/4467300/marketing-data-giant-acxiom-opening-vault-to-public").  Minutes later, Javice texted Amar: "Lmk [let me know] when u get a hold of ASL." *Id.* During another phone call, at approximately 9:14 a.m. on August 2, Javice texted Amar a link to the website of a data company called Narrative.  *Id.* ("https://www.narrative.io/demo/providers"). At approximately 10:01 a.m., Amar texted Javice that he had "[r]eached out to ASL and mParticle," another marketing analytics company.  GX 801-5; *see also* GX 1206 (Amar email to mParticle, in which Amar asks mParticle whether mParticle or any mParticle partners can identify "users that have not completed registrations"—*i.e.*, website visitors who had not signed up for a Frank account); Tr. 1041-47 (Jen Wong testimony regarding this email chain).  At approximately 10:30 a.m. on August 2, Javice texted Amar that she had "[N]arrative at 1pm if u want to join," to which Amar responded, "Absolutely [/] Sent myself an invite."[5]  GX 801-5.  Javice and Amar then exchanged texts about ASL before texting during the 1:00 p.m. call with Narrative.  *Id.*

In particular, at approximately 1:05 p.m.—a few minutes into the defendants' 1:00 p.m. call with Narrative—Amar and Javice had the following exchange on WhatsApp:

**AMAR**:    the entire privacy policy would have to be appended

---

[5] This message indicates that Amar had access to Javice's calendar.

| | |
|---|---|
| **JAVICE**: | we are allowed to do cookies |
| **AMAR**: | this isn't that |
| | It's just like ASL |
| **JAVICE**: | ur not feeling it |
| **AMAR**: | I'm just feeling it's not what we need |
| | it won't complete the 4.7 |
| | it will fill out the 500K |

GX 801-5.  Amar's statement that Narrative's data augmentation services would not be able to "complete the 4.7" referred to acquiring PII for Frank's 4.7 million website visitors.  *See* GX 1145-A (spreadsheet containing a tab named "geo" with a Google Analytics report showing Frank had 4.7 million "users" or unique website visitors); Tr. 1558 (Amar showed Vovor this "geo" tab on August 2, 2021, when asking Vovor to create 4 million synthetic users with certain FAFSA data). As Jen Wong, Frank's former Director of Marketing, testified, Frank tracked website visitors using Google Analytics, which provided general anonymized demographic information about website visitors, but Frank collected no PII from people who only visited its website.  *See* Tr. 986, 1033-35, 1268.  And Frank could not augment its Google Analytics data about its website visitors, because Frank could not "add on more information to people we don't know anything about."  Tr 1033-35.

That was also true of the data augmentation services offered by companies like Narrative. *See* Tr. 1046-47 (Jennifer Wong testifying that companies like Narrative need "some PII" to start with in order to perform data augmentation), 947 (Tani Ochs testifying that, in her "experience over the last 20-some years, the three data companies [Ms. Ochs] worked for all require an input record that includes a name" and address in order to append data).  Thus, Amar's statement that

19

Narrative could "fill out the 500K" was a reference to Frank's approximately 500,000 accountholders, *see, e.g.*, GX 801-5 (Amar texting Javice that "520" thousand is "the number" of accounts "give or take"); Tr. 985 (Frank had approximately 500,000 accounts), for which Frank had PII and upon which Frank could perform data augmentation. That, however, was not what the defendants "need[ed]." GX 801-5.

## 2. Unable To Identify Their Website Visitors, The Defendants Instead Purchased Student Records

Because the defendants could not augment their way to the multi-million-customer list they had claimed to have, the defendants instead sought to purchase millions of student records outright from two data companies: Exact Data and ASL. Witnesses from both companies testified at trial, and Javice and Amar doctored the paperwork from each company.

### a. Exact Data

Exact Data employee Tani Ochs testified to her dealings with Javice and Amar regarding their potential purchase of millions of records of student data from Exact Data. *See, e.g.*, Tr. 982 ("They wanted to buy a list of individuals ages 18 to 27 with e-mail addresses and age and their level of education."), 959 ("[T]hey were looking for what we would call a list rental, where they're looking for a data set defined with email and postal information. They weren't specifically asking me for appending services. They were asking to purchase a list."), 969 (the rental terms "don't allow them to take the data and use it to enrich their own internally-owned data").

On August 2, 2021, Javice contacted Exact Data and ultimately spoke with Ms. Ochs about "pretty rapidly," Tr. 908-909, buying "a student marketing list" that "needed to contain email." Tr. 910; *see also* Tr. 972 ("e-mail was one of the main components or one of the most important components that they were in search of"). While Exact Data did not itself offer student-specific data, Ms. Ochs proposed to Javice that Exact Data could "pull an audience within a certain age

range and they would have a higher propensity for being a student." Tr. 911. Ms. Ochs emailed

Javice, who was using her personal Gmail account (rather than her Frank work email account),

proposals along those lines. GX 1646, 1647; Tr. 927-30. After sending a data sample, Ms. Ochs

also sent Javice a purchase order agreement for approximately 1.7 million data records. GX 1651

(purchase order showing a "Quantity" of 1,773,703); Tr. 931-34. In response to Ms. Ochs's email,

Javice added Amar to the email chain, stating in part: "Will have Olivier here provide the payment

info." GX 1651.

After receiving this email, Ms. Ochs had a phone call with Amar in which Amar "requested

that [Ms. Ochs] modify the invoice to remove the quantity" listed. Tr. 934. Amar did not provide

a reason for requesting that the approximately 1.7 million quantity figure be removed. *Id.* To

accommodate Amar's request, Ms. Ochs "had to reach out to [Exact Data's] accounting

department to manually create this invoice that would allow them to remove the rate and the

quantity." Tr. 936; *see* GX 1580 (email from Ms. Ochs to Amar sending modified invoice, with

quantity removed, as Amar requested).

This extraordinary request stood in contrast to Frank's own 2020 data purchase from Exact

Data, in which Amar signed Exact Data's typical purchase paperwork that included the quantity

of records being purchased. *See* GX 2025 (March 2020 purchase order signed by Amar, reflecting

a quantity of 21,570 records with a price of $2,912.60). That 2020 purchase was of "a list of

colleges and universities and . . . specifically . . . individuals with specific job titles"—that is, a

different type of data from the proposed August 2021 transaction, which sought data on young

people generally—and was for a much lower quantity and total cost. Tr. 941.

As reflected in their WhatsApp chat, Amar also checked with Javice about whether she

wanted to use her official business email for this transaction, or her Gmail account. *See* GX 801-

9 (August 3 WhatsApp messages in which Amar texted Javice: "which email do you want me to use for the invoicing? The original PO had your gmail"; "But I need to confirm the email"; "So again, move forward with your gmail or withfrank.org"). While Javice told Amar to use her withfrank.org email, *see* GX 801-9, Amar's concern over whether this "business" transaction should be made using Javice's business email reflected his knowledge that this was not a bona fide business transaction but an effort to cover up the defendants' fraud.

Ultimately, the defendants did not actually purchase the data from Exact Data, and instead purchased the records from ASL.

### b. ASL

Also on August 2, Amar contacted ASL regarding purchasing student data records, initially "looking for 10MM [million] records." GX 2302 (internal ASL email about outreach from Amar). That was the number of students that the defendants had represented to JPMC they expected to have by the end of 2021. *See, e.g.*, GX 801-27 (August 26, 2021 slack between Javice and Amar discussing a deck for JPMC in which Javice texts Amar in part: "They are expecting us to have 10M students this year (remember our metric)"). Amar discussed the purchase of ASL's data with ASL employees Denise Lyn and Steve Stolls, who was a Government witness at trial. Ultimately, Amar specifically requested that the total amount of student data records purchased equal 4.5 million—approximately the number of "FAFSA In Process" users that the defendants had falsely claimed that Frank possessed. *See* GX 3.1.4 (listing 4,265,085 purported FAFSA In Process users). Amar's request to ASL for exactly 4.5 million student records was made in writing to ASL. *See* GX 2310 (Amar: "I'd like the tots to be 4.5m"); Tr. 1305.

ASL first sent Amar a sample file of 100,000 records. *See* Tr. 1297-1301; GX ASL-S (sample file). ASL then sent the 4.5 million student records purchased by Amar in two data files, one of which included email addresses and one which did not. GX ASL-1; GX ASL-2. While all

4.5 million records from ASL contained name and address, only 2,460,489 also contained an email address.  *See* Tr. 1307, 1309.  The total purchase price was $105,000.  *See* Tr. 1310.

The ASL transaction was finalized over three days, and the defendants' communications make clear the defendants sought to purchase the ASL data urgently.  *See* Tr. 1294.  Indeed, Amar's initial outreach to ASL indicated that Amar wanted "to move very 'quickly' on this."  GX 2302.  In subsequent emails to Mr. Stolls, Amar stated that "we're rushed on this."  GX 2310; Tr. 1304.  And Javice sent numerous WhatsApp messages to Amar reflecting the urgency of obtaining the ASL data—for example:

- Javice on August 2: "Lmk when u get a hold of ASL".  GX 801-4.

- Javice on August 2: "Where are we with ASL?"  GX 801-6.

- Javice on August 3: "I need the data today [. . .] When can they get this to us". GX 801-9.

- Javice on August 3: "we get our sample yet :p".  GX 801-10.

- Javice on August 4: "We can't swipe a card after Saturday hopefully".  GX 801-12.

- Javice on August 4: "Lmk when u get the list ASAP [/] Need that thing". GX 801-13.

- Javice on August 4: "How's asl data going [/] I need it charged and wrapped tomorrow".  GX 801-15.

- Javice on August 5: "Can u call and email asl now [. . .] Need that thing ASAP and stress needs to charge card today".  GX 801-16.

- Javice on August 5: "Asl please [/] It's seriously urgent".  GX 801-17.

The ASL data purchase was urgent because the defendants sought to acquire and pay for the data prior to the signing of the merger agreement, which was imminent upon completion of the data validation project.  *See* GX 801-12 (Javice WhatsApp message to Amar: "We can't swipe a card after Saturday hopefully").  Consummating the transaction prior to the merger agreement

23

would afford the defendants a greater chance to conceal their data purchase, and thus allow them to send the purchased data to JPMC when JPMC requested Frank's customer list, as discussed further below.

To conceal this data purchase, the defendants doctored the ASL paperwork, as they had done with the Exact Data paperwork. *Compare* GX 2330 (invoice sent to Amar by ASL that lists quantities of 2,039,511 and 2,460,489 for the two ASL data files), 2328 (invoice sent back to ASL with the quantities deleted); *see also* Tr. 1310-11. Javice deleted the quantities from the ASL paperwork, signed the paperwork, and emailed it back to Amar, who then conveyed it to ASL. *See* GX 1086 (Aug. 5, 2021 email from Javice to Amar).

### 3. The Defendants Offered False and Pretextual Reasons For Their Data Purchase

As noted above, the defendants told Exact Data that they were seeking to purchase data for a marketing campaign. That was false. The defendants never intended to use this data for a bona fide marketing campaign.

Likewise, as with Exact Data, the defendants provided a pretextual reason for their purchase of the ASL list. The reason that Amar provided to ASL for the data purchase was that Frank wanted to "use [ASL's] data to augment their [Frank's] database" and Amar claimed that Frank would do that data appending "internally" within Frank. Tr. 1293-94; *see also* Tr. 1297; GX 2305; Tr. 1304 (Amar: "Again, this data is to augment our users."). This, too, was false. The defendants never used the ASL data to augment their database. Nor did the defendants use the ASL data, in some other way (or at all), for marketing, as explained below.

In addition to making false representations to Exact Data and ASL about the reason for their data purchase, the defendants even internally documented their pretextual justification for the early August 2021 data purchase. Specifically, while speaking on the phone, the defendants

exchanged emails in which they created a cover story for why they were seeking to purchase millions of records of student data immediately after receiving JPMC's data validation request. On August 2, 2021, the defendants had an 11-minute phone call between approximately 6:10 p.m. and 6:21 p.m. GX 902. During the phone call, at 6:14 p.m., Javice forwarded an Exact Data quote, which Javice had received from Ms. Ochs earlier that afternoon, to Amar. GX 1577. One minute after the defendants' 11-minute phone call ended, Amar replied to Javice: "Would love this for Marketing Automation to boost our lists to market scholarships and class finder. [/] Nice!" GX 1577. A few minutes later, at approximately 6:30 p.m., Javice responded: "I'm on it!! Let me get board and approval and will be awesome." GX 1577.

Despite this email exchange, and the purported reasons given to Exact Data and ASL, the defendants never intended to use purchased data for marketing—because doing so would have been completely ineffective, as Amar and Javice well knew. Indeed, the former Marketing Automation Manager of Frank, Jennifer Zeitler, as well as the former Marketing Director of Frank, Jennifer Wong, both testified about how purchased email lists are ineffective marketing tools. As Ms. Zeitler, a defense witness, testified, calling random marketing emails "spam":

Q. Is a cold e-mail a preferable marketing tool?

A. No.

Q. Why not?

A. Because they're not asking for the e-mail. So, if you send a lot of e-mails like that, popularly known as spam, then your sender score goes down and then less e-mails get out or to get to the intended people that actually want your e-mails.

Tr. 3083. Ms. Zeitler and Ms. Wong further testified that when Amar proposed using purchased data for an email campaign, Ms. Zeitler told Ms. Wong (Frank's former marketing director) that "it's bad email practice to put in an email list that we purchased, and I didn't want to do it." Tr.

3093; *see also* Tr. 1051-54 (Ms. Wong testifying about the incident).  Ms. Zeitler further testified

that while Amar had discussed a "data enhancement project" with her, he did not "ever actually

share that database with" her, even though she "had asked for it."  Tr. 3118.  Similarly, Ms. Wong

testified to the ineffectiveness of using purchased third-party data for marketing, and that Frank,

in fact, never used purchased third-party data for a marketing campaign.  *See* Tr. 1051-54.

     After finalizing the ASL transaction, Amar and Javice had the following text exchange on

August 5, 2021:

| | |
|---|---|
| **Amar**: | You'll have 4.5m users today. Just closed it |
| | 2.3 cents per user. 105k price |
| **Javice**: | perdfect |
| | love you |
| | :-) |

GX 801-18.  In his private WhatsApp chat with Javice, Amar intentionally used the term "users"

to describe the 4.5 million records of data purchased from ASL because he knew that the true

reason for the ASL purchase was to cover up the defendants' lies during diligence about the

number of Frank's "users."

## F.  The Defendants Augmented the ASL List with Enformion Data

     After the defendants obtained the ASL data, they augmented the ASL list with additional

data from another third-party data provider company named Enformion.  Javice used Kapelner as

an intermediary for this data augmentation.

     Dr. Kapelner testified regarding this data augmentation, or data appending, project (which

he also referred to as "Project 2").  Dr. Kapelner described the project as follows:

> So appending in this context, in Project 2, meant that I was given a data set of what
> I believed to be her [Javice's] student users that were missing certain attributes, for

> instance a phone number, date of birth, or e-mail, and I was instructed to append
> the phone number and/or e-mail and/or date of birth to the existing student user
> rows but not create any more student user rows.

Tr. 1959. On August 6, 2021—the day after Kapelner uploaded the synthetic data file to Acxiom

at Javice's direction, and the day after Amar purchased 4.5 million records from ASL containing

name, address, and (for some) email—Javice texted Kapelner: "Weird question. If I have names,

e-mails, physical address for contacts, can we augment the data with phone numbers from White

Pages database?" GX 2801; Tr. 1960. Javice told Kapelner the project could take a month. GX

2801; Tr. 1961.

Javice lied to Kapelner about the reason for the project, claiming that it was to fix a problem

with an earlier Frank database. Specifically, Javice texted Kapelner: "When we transitioned off

Qualtrics for our first two and a half years, the phone number was in a separate contact table and

didn't get transitioned over properly." GX 2801; Tr. 1961; *see also* GX 1751 (Javice email stating:

"Frank will provide a first name, last name, full address, and e-mails *for Frank students*" (emphasis

added)); GX 1576 (Javice email stating: "We are augmenting our contacts to be able to merge *our*

*old data* with new data" (emphasis added)); Tr. 1978 (Kapelner expected to receive "what [he]

believed to be her [Javice's] student users"), 1980 (same), Tr. 1987-88 (same), 2003 (same).

In reality, Javice provided Kapelner with the 4.5 million records from ASL and tasked him

with contacting data vendors to augment the ASL records. Javice provided Kapelner with two

files named "AS00703-2021 and AS00704-2021" which Javice claimed were "Frank's user

database for purposes of the Enformion project." Tr. 2000. These were the two files provided to

Amar and Javice by ASL, which in total contained 4.5 million student records. *See* Tr. 2000-2001;

GX ASL1; GX ASL2; GX S11 (stipulation providing: "ASL1 is a file named "AS00703-2021.csv"

containing a list of data compiled by ASL Marketing on or about August 5, 2021. ASL2 is a file

named "AS00704-2021.csv" containing a list of data compiled by ASL Marketing on or about August 5, 2021.").

Having been misled by Javice, Kapelner sought to have the ASL data[6] augmented by a data provider.  In an August 24, 2021 email with Kapelner discussing the data companies, Javice wrote: "I don't expect much from these cos, and I would just ask for a discount. They seriously all suck." GX 1761.  Kapelner and Javice ultimately used Enformion to augment the ASL data.   Tr. 2008-2010.  Enformion appended data where it could identify a match, but Enformion did not always have data to append.  *Id.*  In an effort to get more email matches in particular, Javice instructed Kapelner to have Enformion match on last name only, which would return hits for parents' or other family members' emails, and not just students' emails.  *See* Tr. 2013-16; GX 1761 (Javice: "My priority is to get emails for the remaining 2 million we don't have, even if it's for the parent email. Can we get them to run the last name and see what emails we can get back as a double pass?"); GX 2405 (instructing Enformion regarding same).  After expanding its email matching criteria, Enformion then emailed the augmented data set to Kapelner and Javice in seventeen separate files. *See* Tr. 2017-2026; GX 2821 – 2837 (17 emails transmitting the augmented data files from Enformion); GX ENF1 – ENF17 (17 augmented data files received from Enformion).

While Javice primarily interacted with Kapelner, Amar also discussed the data augmentation exercise with Javice.  As early as August 5, 2021—after finishing the data validation exercise with Kapelner, and immediately after Amar sent the signed purchase to ASL for the 4.5 million records purchase—Javice and Amar had the following exchange on WhatsApp:

> **Javice**:    Pls upload the Dropbox data [the ASL data]. I'm running around chasing paper. I'll address this data this weekend

---

[6] Kapelner had a unique ID added to the ASL data files—admitted into evidence as Government Exhibits ASL1_U and ASL2_U—in order to facilitate what he understood to be the purpose of the project: merging the new data into Frank's user database.  *See* Tr. 2003-2008; GX 1679.

> **Amar**:     It's in the dropbox
>              sorry, forgot to tell you
>
> **Javice**:   thx

GX 801-20.  The "data" that Javice was going to "address . . . th[at] weekend" was the ASL data, and the remaining task was data augmentation.  As noted above, Javice messaged Kapelner the very next day about the data augmentation project, and her question referenced the data fields that ASL had provided (*i.e.*, names, physical address, emails).  *See* GX 2801 (Javice texts with Kapelner); *see also* GX 801-21 (Javice and Amar discussing the augmented list on August 11, 2021).

As described further below, Amar and Javice also discussed the augmented ASL list extensively in January 2022, and shared copies of the actual augmented data files—with the files renamed as "Frank_1" through "Frank_17" files.

## G.  Post-Acquisition, the Defendants Continued Lying to JPMC About Their User Numbers

Following the acquisition, the defendants sent to JPMC what purported to be "Frank user data" but what was in fact data purchased from ASL.  In early January 2022, JPMC's marketing department ("JPMC Marketing") requested a copy of Frank's user data so that JPMC could run an email marketing campaign to Frank's users.  *See* GX 1726 (Jan. 6, 2022 email from JPMC Marketing to Amar requesting "the initial Frank user data transfer" and providing specifications for how the data should be transferred); GX 1017 (additional replies on same chain from Jan. 18, 2022); GX 1718 (full chain including reply of Feb. 4, 2022).

In connection with that request from JPMC Marketing, the defendants told lies about the number of Frank's users that were derivative of the defendants' lies during diligence.  Specifically, starting in January 2022, the defendants now claimed that Frank had 1 million "marketable" users.

*See, e.g.*, GX 1067 (Jan. 13, 2022 email from Javice to JPMC employees, including Amar, attaching a spreadsheet showing .99 million "Net Marketable Users"); GX 1693 (Jan. 18, 2022 email from Javice to JPMC employees, including Amar, showing the same number of purported net marketable users, and noting that "Olivier has already shared the net number last week with Kelly and Mark"). That was a lie in itself, as Frank never had more than a few hundred thousand users. That lie was also derived from the false premise—represented by the defendants in diligence to JPMC and to Capital One— that Frank had several million users total (*i.e.*, including users that were supposedly no longer "marketable"). *Compare* GX 1693 (claiming, in January 2022, that Frank had a total of 5.6 million users and subtracting several million of those as no longer "marketable" because they graduated) *with* GX 3.1.4 (spreadsheet from June 2021 claiming Frank had, in total, approximately 5.4 million users). In fact, these several million Frank users simply did not exist.

In addition to emailing about Frank's purported 1 million "marketable" users, the defendants also discussed this lie in their WhatsApp Chat. On January 13, 2022—shortly before Javice circulated to JPMC employees, including Amar, the "User_Breakdown_2021_Update" spreadsheet that purported to show Frank having approximately one million "marketable" users, *see* GX 1067—Amar asked Javice, "When can Kelley [Reichert, of the JPMC Marketing team] have the million user list?" The following day, on January 14, 2022, Javice texted Amar: "U can send mark and Kelly the waterfall today [/] Of counts." Javice was referencing two members of JPMC Marketing—Mark Goldstein and Kelly Reichert—who had not received the "User_Breakdown_2021_Update" (*i.e.*, the "waterfall . . . [o]f counts" of Frank's purported users) circulated the day prior. Amar responded: "I already told them yesterday it was around 1m." That is, Amar was stating that he had told JPMC Marketing that Frank had 1 million "marketable"

users—a direct lie told by Amar to JPMC, and one that aligns with the direct lies Javice, with Amar's knowledge, was telling to JPMC.

As noted, a few days later, on January 18, 2022, when Javice emailed the "User_Breakdown_2021_Update" to the JPMC Marketing's Ryan Macdonald, Javice stated that "Olivier has already shared the net number last week with Kelly and Mark." GX 1693.

### H.   The Defendants Sent Purchased (and Other) Data to JPMC, Falsely Claiming It Was Frank's User Data

In response to JPMC Marketing's request for Frank's user data, the defendants sent to JPMC Marketing (1) the purchased third-party data from ASL and Enformion, as well as (2) an edited copy of the synthetic data file prepared by Dr. Kapelner.

#### 1.   In the Initial File Transfer, the Defendants Passed off ASL Data as Frank User Data

The first "Frank user" file that the defendants caused to be sent to JPMC consisted of approximately 1 million records purchased from ASL. After the defendants continued their lies to JPMC about the number of Frank users—claiming that they no longer had millions of "marketable" Frank users but only approximately 1 million marketable Frank users—the defendants accordingly sent JPMC a data file with approximately 1 million records in it. Specifically, on January 21, 2022, Danish Mujeeb, a Frank Engineer, "uploaded the file that Charlie's team provided" to JPMC Marketing; the file was named "Frank_Marketing_List.csv." GX 1718; *see* GX 501 (the "Frank_Marketing_List.csv" data file). Despite being named "Frank_Marketing_List," and despite being sent in response to a request for "Frank's user data," GX 1718, this "Frank_Marketing_List" file did not contain a single piece of Frank user data. Instead, the "Frank_Marketing_List" file contained 1,048,575 rows of data—the maximum

number of rows allowed in Microsoft excel—from one of the ASL data files,[7] as shown in one of

the Government's summary charts:

| GX | COMPARED GX | RESULT |
|---|---|---|
| **GX 501**<br>**("Frank_Marketing_List.csv")**<br><br>1,048,575 rows of data with the following columns:<br>• Full Name, First Name, Last Name<br>• Address 2, Address 1, City, State, Zip<br>• Class Year<br>• Email<br>• uid | **GX ASL2_U**<br>**("List2_uid.csv")**<br><br>2,460,489 rows of data with the following columns:<br>• Full Name, First Name, Last Name<br>• Address 2, Address 1, City, State, Zip<br>• Zip4, DPBC, Check Digit, Carrier Route, Zip10, County<br>• Gender<br>• Class Year<br>• Email<br>• uid | GX 501 contains the first 1,048,575 rows of data from GX ASL2_U, with certain columns removed. |

GX 2708.

### a. The Defendants Intentionally Sent Purchased Data

Although the "Frank_Marketing_List" file was sent by a Frank engineer, the defendants

directed the transfer of this file. In their WhatsApp chat, in a recorded call with Patrick Vovor,

and in Slack messages, the defendants coordinated this fraudulent data transfer (and the subsequent

ones).

On January 13, 2022, Javice and Amar had the following WhatsApp text exchange:

**Amar**:         When can Kelley have the million user list?

**Javice**:       whenever it hits. we gotta go to s3 and kill it

**Amar**:         Do you want to ask PAtrick [Vovor] for it?

**Javice**:       we have the credentials ill forward when im off

GX 801-45. Javice's reference to "s3" meant the Amazon Web Services ("AWS") platform called

S3, which was a file storage and sharing platform. *See* Tr. 2776 ("S3 is a file server technology

---

[7] Government Exhibit ASL2_U is a version of the ASL data file that contained emails, which was supplemented with a unique ID column, and sent to Adam Kapelner. *See See* Tr. 2003-2008; GX 1679.

that is similar to on your iPhone you have cloud storage, or similar to One Drive Microsoft's solution, it is a way to store files in the public cloud.")

The next day, on January 14, 2022, Javice and Amar continued their discussion, via WhatsApp, about Vovor, the data in S3, and creating a list to share with JPMC Marketing:

| | | |
|---|---|---|
| **Amar**: | Did you sync with Patrick over the data needed? | |
| **Javice**: | Not yet<br>Just finished the sonali weekly | |
| **Amar**: | OKay, I'll let him know it's coming<br>I'm in with him now | |
| **Javice**: | It's in the s3 | |
| **Amar**: | Yes, but you need to give him the breakdown unless you're going to go to Adam [Kapelner] | |
| **Javice**: | Just tell him to start with frank files first for data requested | |
| **Amar**: | Frank files first? | |
| **Javice**: | No SSN<br>The fafsa ones | |
| **Amar**: | Submitted?<br>the 100K? | |
| **Javice**: | All<br>It's a subset | |

GX 801-46.  After these messages, Amar called Javice, for a call that lasted approximately 2 minutes and 49 seconds, and then Javice called Amar for a call that lasted approximately 56 seconds.  GX 902, 903, 925.

While Amar and Javice were speaking on the phone on January 14, 2022, Amar was, at the same time, in a video meeting with Patrick Vovor.  Vovor recorded his January 14, 2022 meeting with Amar—and, for a portion of it, Javice, was speaking with Amar on speaker phone and thus

is audible in Vovor's recording in the beginning. *See* GX 300 (recording) & 300-T (transcription and translation of French-language portion of recording). At the beginning of the recording, Amar and Javice spoke to one another, in English, about JPMC Marketing's request for Frank's user data and using the ASL list to satisfy that request.

> **AMAR:** This specific request was the dataset, they would parse it, including SSN to de-dupe – Yes, I was in that meeting, Charlie. I was in that meeting.
>
> **JAVICE:** [Indiscernible] when team request [Indiscernible].
>
> **AMAR:** Oh, when did you? I didn't see any e-mail for a team request.
>
> **JAVICE:** Yeah, you should. I saw one.
>
> **AMAR:** Ok, so you want the entire FAFSA dataset of everyone that up to physical address, correct? So first name, last name, email, physical address. Anything else?
>
> [00:00:32]
>
> **JAVICE:** Uh I'm looking through – I'll send it to you.
>
> **AMAR:** I don't remember this email.
>
> **JAVICE:** Like…
>
> **AMAR:** Alright. One of the candidates just graduated in December [Indiscernible] finance [Indiscernible].
>
> **JAVICE:** Like I know the SEO…[indiscernible] strategy, like you could have just said it wouldn't apply [indiscernible] when I produced more content…like this doesn't…
>
> [00:01:00]
>
> **AMAR:** No, no, but it's about more than that. Forget the deck, forget that deck. I'm speaking about specifically the list that we need to get…the list that we need to get Kelly and Mark today.
>
> **JAVICE:** No, no, not that, I'll get back to you, I was [indiscernible] the SEO strategy –

**AMAR:** Yeah yeah, I'll fill you in. No, it makes sense. Traci-Anne has a very specific mission and I get it now. I'll fill you in on it after. But it's, what she wants makes sense.

**JAVICE:** It was [indiscernible] who sent it?

**AMAR:** It could be. If it's get – if it's coming from anybody, it's Mark Goldstein.

[00:01:30]

**JAVICE:** Okay it was [indiscernible] first name, last name, email, phone number, address.

**AMAR:** Fine, I'll get Patrick to pull all the users that have those parameters, um, and put them into an S3 bucket, that, or, or put it into a flat file that we can send Chase. Ok bye.

**JAVICE:** That's perfect. Bye.

[00:02:00]

GX 300.  Amar was discussing with Javice the list that Frank needed to provide to JPMC Marketing.  Indeed, Amar tells Javice: "I'm speaking about specifically the list that we need to get…the list that we need to get Kelly [Reichert] and Mark [Goldstein] today."  Amar and Javice also discuss which data fields should be included in the list, and settle on "first name, last name, email, phone number, address."  Amar then states he will "get Patrick to pull all the users that have those parameters, um, and put them into an S3 bucket, that, or, or put it into a flat file that we can send Chase."

Amar then addressed Vovor, in French, about the task, and Javice continued with additional directions:

**JAVICE:** and...and step 2 is in the marketing growth S3 bucket what we have, it's literally the ASL list is what…it's that augmented by emails which is in the marketing thing which…[AMAR talks over JAVICE]

Javice and Amar then discussed how many records to use from the ASL list:

**AMAR:** Well, it's just that it creates – send – do me a favor, do an email for the S3 of exactly what you want, with the breakdown of the years, and to Patrick and myself, and we'll get it out. Like the breakdown yesterday right? Of X amount of 2017, X amount of 2018, X amount of 2019, 20.

**JAVICE:** [Indiscernible]

**AMAR:** Ok, so it doesn't matter. So, what's the number?

**JAVICE:** [Indiscernible] the total amount.

[00:03:00]

**AMAR:** How many do you want from the ASL list?

**JAVICE:** 300…Total amount is nine hundred nine…

**AMAR:** Ok, shoot me an email, shoot an email.

**JAVICE:** Send me the file –

**AMAR:** Don't set up the file – Just send an email to Patrick and myself and we'll get it out to you. Ok?

**JAVICE:** Uhh ok.

**AMAR**: Bye.

**JAVICE**: Bye.

GX 300.  In his initial response to Javice ("Like the breakdown yesterday"), Amar referenced Government Exhibit 1067, the email Javice sent on January 13 circulating Frank's "updated" user breakdown of .99 million purported marketable users.  When Amar asked how many users Javice wants "from the ASL list," Javice appears to answer 990,000—*i.e.*, .99 million, as in her email of the day prior.[8]

Amar then proceeded, speaking French, to give directions to Vovor.  *See* GX 300-T.  Amar drew a distinction between "the list of our users" and "the augmented list."  *Id.*  Amar also

---

[8] Similarly, later in the call, Amar references making a list with "990,000 and some users" in his exchange with Vovor.

told Vovor that he wanted Vovor to pull the "freshest" 990,000 users from the "augmented list" in S3. *Id.* Amar also explained to Vovor why he wanted the freshest users, demonstrating his knowledge of the JPMC Marketing campaign and this purchased list's use in that campaign: "Because, what's going to happen, Chase is going to send them direct mail and emails. So, the fresher they are, the greater the success rate they will have in reaching them. If we begin with 2017, it's going to be a disaster [laughs]." *Id.*

After Amar summarized his ask, Vovor explained that he had no involvement with the augmented or "enriched" list:

> **AMAR**: Alright, she is going to send you an email and that's the two lists I need. So the first list, our users. The second list, the enriched list. Ok? Together, that's going to make 990,000 and some users. Alright?
>
> **VOVOR:** Uh ok, the enriched list, I don't have it, I have never had it. So I don't know where it is.
>
> [00:07:00]
>
> **AMAR:** It is in the S3 bucket, you're the one who put it there, aren't you?
>
> **VOVOR**: No, no, no, I have never enriched anything. No, I gave our users, then Charlie, she took it, and she did what she wanted with it, with the data scientist.

*Id.*

Amar and Javice then discussed how Vovor was not involved with augmenting the ASL data, and Kapelner will instead have to do help prepare the file to be sent to JPMC Marketing:

| **Amar:** | Patrick [Vovor] says he never touched the ASL list |
| **Javice**: | i know\ |
| **Amar**: | Adam [Kapelner] will have to do the ASL list |
| **Javice**: | i didnt ask him to |
| **Amar**: | Patrick is pulling the FAFSA list today |
| **Javice**: | adam did the mapping. why asked him to pull FAFSA list |

|  | its first, last, email, physical address |
|---|---|
| **Amar**: | Yeah, he's pulling it<br>Can you reach out to Adam for the S3? |
| **Javice**: | if we have the FAFSA number ill ping him with it |
| **Amar**: | Okay |

GX 801-46.  In line with this discussion between the defendants, Amar asked Vovor just to pull the FAFSA users, and then later on January 14, 2022, Amar sent what Vovor pulled to Javice.  *See* GX 300-T, GX 801-46.

On January 18, 2022, JPMC Marketing followed up with Amar about the data transfer.  *See* GX 1017.  The same day, Amar replied: "Copying Charlie to this email as she'd got the data ready for transfer. I'll let you both take it from here."  GX 1017.  Javice replied: "This will not be coming from me and have our data person on it. He's currently combining everything to have ready for mailing campaigns."  GX 1017.

On January 20, 2022, Javice messaged Amar: "think list completed. Patrick needs to SFTP [secure file transfer protocol]."  GX 801-47.  On January 20 and 21, Javice and Amar further discussed the transfer of the file and the Frank engineers who were going to transfer it to JPMC Marketing on their behalf.  GX 801-47; GX 801-48.

Then, on January 21—the date when one million records of ASL data were passed off to JPMC Marketing as Frank user data—Javice and Amar exchanged the following messages:

| **Javice**: | 1048576 marketing list 1 and 139k from Patrick direct<br>The end |
|---|---|
| **Amar**: | Yup |

GX 801-48.  Javice was referencing the first two files sent to JPMC Marketing, which had 1,048,576 rows and approximately 139,000 rows.  *See* GX 1718; GX 2708.

After JPMC Marketing raised questions about the files that were sent, Mujeeb sent an internal email to Javice and Amar, along with other members of Frank's engineering team, asking questions about the source of the file with 1,048,576 rows. GX 1466 (Mujeeb referencing "**File-1** created by Marketing team – Over 1 million records" and stating "I am not sure about the source of the data"). Mujeeb did not know the source of the data, because the source was the ASL data purchased by the defendants in August 2021. While Javice and Amar knew that, neither of them responded to Mujeeb with that information. *See* GX 1466.

### 2. The Defendants Transferred Additional Fraudulent Data Files

The initial files sent to JPMC Marketing did not meet the specifications for what JPMC had requested. In particular, the data file sourced from ASL data did not contain date of birth, which JPMC had requested to ensure it was not marketing to minors. In addition, JPMC continued to ask questions about why Frank's user data was not matching what had been represented in due diligence. *See, e.g.*, Tr. 2571 (Ryan MacDonald testifying about how he "was specifically asking for the list, and during that discussion was questioning why it was so difficult to provide the list when a list had been provided previously to Acxiom during the data validation for due diligence."); GX 1722 (MacDonald asking questions about the data files sent by Frank initially in January 2022). Ultimately, Javice sent to JPMC an additional 29 data files. *See* GX 2706 (list of data files received by Keona Drakeford with Government Exhibit numbers and native file names). These data files consisted of the data purchased from ASL, the data purchased from ASL that had been augmented by Enformion data, an edited version of the synthetic data file that had been sent to Acxiom during diligence, and a small amount of Frank's real user data. GX 2708. In discussions with Drakeford, Javice falsely claimed that the 29 data files all related to Frank's users. Tr. 2665-66, 2668. Internally, Javice also shared these 29 data files with Amar on February 10, 2022, *see*

GX 802-59, 570, 571, 570-1 to 570-29; Tr. 2783, and a subset on January 14, 2022, *see* GX 801-

46, 572, GX 572-1 to GX 572-18; Tr. 2776, 2781-82, 2786-87.

## III.  The Trial

### A.  The Government's Case

The Government called 18 witnesses in its case-in-chief:

- Houston Cowan, a former LionTree employee who served as the analyst on the Frank deal, testified about the diligence process and the representations made to potential buyers about Frank's "users."

- Mason Young, who led the Capital One team that considered an acquisition of Frank, testified about the representations about Frank's users made by Javice and Amar during Capital One's diligence.

- Multiple current and former employees from JPMC who were involved in the Frank acquisition testified.  Leslie Wims Morris, the head of Corporate Development at JPMC at the time of the Frank deal, testified about the representations Javice made during diligence.   Sindu Subramaniam, a former member of the Corporate Development team at JPMC, testified primarily about a July 12, 2021 diligence session attended by Javice and Amar at which Javice falsely claimed that Frank had 4.25 million users, defined as someone who had provided Frank a first name, last name, email and phone number.  Alex Sweeney, another member of the Corporate Development team at JPMC, testified about his interactions with Javice in arranging for the August 2021 data validation exercise, in which Javice claimed to provide certain user data for Frank's supposed 4.25 million users to Acxiom for validation.   Sarah Youngwood, the former Chief Financial Officer of JPMC's Consumer Bank and a member of the deal review committee that approved the transaction, testified that validating the user data was important to her approving the deal.

- Other JPMC witnesses testified about the efforts to receive Frank's user data after the acquisition for an email marketing campaign.  Ryan Macdonald testified about JPMC's diligence as well as his efforts to obtain Frank's user data after the acquisition, including an in-person meeting with Javice and Amar where he requested the Frank user list that had been provided to Acxiom during the data validation exercise.  Keona Drakeford testified about the files she received from Frank and her discussion with Javice about those files.

- Michael Salve, a BRG consultant, testified as a summary witness, comparing the data files Drakeford had received with data files from ASL and Adam Kapelner, and showing that the files sent to JPMC after the acquisition consisted partly of purchased and synthetic data.

- Manny Pelarinos, a JPMC employee who gained access to Frank's internal database, introduced copies of the post-acquisition data files sent to JPMC, which Javice had shared with Amar.

- Two witnesses from data companies contacted by Javice and Amar testified: Steve Stolls from ASL, and Tani Ochs from Exact Data.

- Adam Kapelner, a data scientist and university professor, testified about his work for Frank at Javice's direction, including creating a synthetic data set, and augmenting a different data set.

- Several former Frank employees also testified. Frank's former Chief Product, Behram Panthaki, testified about the true number of accounts Frank had. Jennifer Wong, Frank's former Director of Marketing, similarly testified about the true number of Frank accounts, and explained how she was not involved in Javice and Amar's dealings with ASL, Exact Data, or Adam Kapelner. Patrick Vovor, Frank's former Director of Engineering, testified about how Javice and Amar asked him to create a fake data set of FAFSA users.

- A Google records custodian, Cory Gaddis, also testified, as well as an analyst in the U.S. Attorney's Office, Rachel Danko, who was called as a summary witness.

The Government also offered into evidence hundreds of exhibits, including emails, text messages, WhatsApp messages, a recorded phone call, Slack messages, pitch materials, diligence materials, Google Drive records, phone call records, Zoom records, and data sets.

## B. The Defense Cases

Javice called four witnesses:

- Marc Rowan, a former Board member of Frank;

- Jennifer Zeitler, a former member of Frank's growth team;

- Matt Toland, the Acxiom employee involved in the data validation exercise; and

- Anthony Santilli, a private investigator.

Amar called two witnesses—Jesse Candel (a paralegal) and Peter Manning (a cybersecurity investigator), neither of whom were involved in the Frank acquisition—to testify concerning documents.

APPLICABLE LAW

## I.  Rule 29 Motions

Federal Rule of Criminal Procedure 29 ("Rule 29") allows a district court, upon a defendant's motion, to set aside the verdict and enter a judgment of acquittal.  A court evaluating a Rule 29 motion must review the evidence presented at trial "in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999) (quotation marks omitted).[9]  "A judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quotation marks omitted).  The burden is on the defendant to make this showing, and the Second Circuit has repeatedly described that burden as "very heavy."  *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002); *see also United States v. Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010) (same).

A defendant's burden is even heavier in the case of a conspiracy conviction, where "deference to a jury's findings is especially important . . . because a conspiracy is by its very nature a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court."  *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)). A defendant may be guilty of conspiracy "even if he knows only one other member of the conspiracy, and a single act may be sufficient for an inference of involvement in a criminal enterprise . . . if the act is of a nature justifying an inference of knowledge

---

[9]    Unless otherwise indicated, all quotations omit internal quotation marks, citations, and previous alterations.

of the broader conspiracy." *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1112 (2d Cir. 1975)).

## II. Sufficiency of the Evidence

A defendant making an insufficiency claim bears a heavy burden. A jury verdict must be upheld on a Rule 29 challenge if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (quotation marks omitted). In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quotation marks and brackets omitted).

In considering the sufficiency of the evidence, the Court must view the evidence in the light most favorable to the Government. *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002). "[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Moreover, the Court must analyze the pieces of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999); *United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002) ("[W]e consider the evidence as a whole"). "These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105.

As is relevant here, the Second Circuit has repeatedly held that "a federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (quotation marks omitted). "Any lack of

corroboration of an accomplice's or co-conspirator's testimony goes merely to the weight of the evidence, not to its sufficiency, and a challenge to [t]he weight is a matter for argument to the jury, not a ground for reversal on appeal." *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) (quotation marks omitted). The credibility of a testifying witness is particularly within the province of the jury, not a reviewing court. *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." (quotation marks omitted)). For these reasons, the Second Circuit has emphasized that "the proper place for a challenge to a witness's credibility is 'in cross-examination and in subsequent argument to the jury.'" *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (quoting *United States v. Friedman*, 854 F.2d 535, 558 (2d Cir. 1988)). It is then for the jury to decide how those arguments bear on "the weight [it] should accord to the evidence." *United States v. Truman*, 688 F.3d 129, 140 (2d Cir. 2012).

## III.  Rule 33 Motions

Federal Rule of Criminal Procedure 33 ("Rule 33") allows a trial court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim P. 33(a). Because "motions for a new trial are disfavored in the Second Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), a court, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if it finds "a real concern that an innocent person may have been convicted," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "It is only when it appears that an injustice has been done that there is a need for a new trial." *Id.*

44

"[A] district court may not grant a Rule 33 motion based on the weight of evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be a 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020). Under this standard, the Second Circuit has "emphasized" that the remedy of a new trial should be granted "sparingly and in the most extraordinary circumstances." *Id*. A district court "must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless exceptional circumstances can be demonstrated." *Teman*, 465 F. Supp. 3d at 292. Exceptional circumstances are limited to situations where, "for example, the evidence was patently incredible or defied physical realities, where an evidentiary or instructional error compromised the reliability of the verdict, or where the government's case depends upon strained inferences drawn from uncorroborated testimony." *United States v. Landesman*, 187 F.4th 298, 331 (2d Cir. 2021) (citing *Archer*, 977 F.3d at 187).

Finally, "a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Archer*, 977 F.3d at 189.

## ARGUMENT

### I. The Jury's Guilty Verdict Should Stand Because the Government's Evidence of Guilt Was More Than Sufficient Under Rule 29

The Court should deny the defendants' motions under Rule 29, because the Government's evidence was more than sufficient to support the jury's guilty verdict. Recognizing as much, Javice makes only a summarily asserted Rule 29 motion, without any specific argument. *See* Dkt. 389 ("Javice Br.") 4-6. While Amar's Rule 29 motion, by contrast, proceeds at length, it does so only by distorting the trial record and the applicable law. *See* Dkt. 390 ("Amar R.29 Br."). Rather than analyzing the voluminous trial evidence of Amar's participation in a scheme and conspiracy wholistically and drawing all inferences in favor of the Government—as the law requires—Amar

selects portions of evidence for discussion seemingly at random and in insolation from all other evidence, [10] draws all inferences from the isolated evidence under discussion *against* the Government (and against plain common sense), and applies incorrect legal standards to his evaluation of the trial evidence.

Applying the proper standard of review to the actual trial record as a whole, there is no question that Amar's Rule 29 falls far short. The evidence of Amar's guilt is generally summarized within the Factual Background Section, *supra*, and included the following:

- Amar's job at Frank was, in significant part, to track and increase the number of user sign ups. *See* Factual Background Section II(B)(1), *supra*.

- On June 24, 2021, Amar worked with Javice to create a fraudulent user breakdown spreadsheet that falsely claimed Frank had 4,265,085 "FAFSA In Process" users and over 2 million FAFSA completions. *See* Background Section II(B)(1)(a), *supra*.

- On July 8, 2021, Amar presented a PowerPoint to Capital One that contained lies about Frank's FAFSA completions, consistent with the fraudulent user breakdown spreadsheet Amar and Javice had created on June 24. *See* Background Section II(B)(1)(b), *supra*.

- On July 12, 2021, Amar was present when Javice lied to JPMC during a diligence session, claiming that Frank had 4.25 million users who had created accounts—consistent with the fraudulent user breakdown spreadsheet Amar and Javice had

---

[10] As one prominent example, Amar organizes his discussion such that he addresses (1) what he deems evidence of Amar's involvement in misstatements *separately* from (2) what he deems evidence of Amar's fraudulent intent—apparently, yet inexplicably, drawing some distinction between these categories of evidence of Amar's guilt. *See* Amar R29 Br. at 18-28 (discussing what Amar deems evidence related to his misstatements, including the July 8, 2021 meeting with Capital One; the July 12, 2021 meeting with JPMC; the 3.1.4 Spreadsheet; and the "Records Needed" Spreadsheet); 31-43 (discussing what Amar deems evidence about intent including the data validation exercise, Vovor's testimony, and the purchase of ASL records). But Amar's knowledge of and involvement in misrepresentations is obviously probative of his intent, and what Amar classifies as "intent" evidence is obviously probative of Amar's knowledge of and involvement in misrepresentations. Simply put, these categories of evidence of Amar's guilt should be considered in combination, not in isolation, and together with all the other evidence of Amar's guilt. When that is done, there is no question that a rational jury could, and did, find that Amar had the requisite knowledge and fraudulent intent that makes him guilty.

created on June 24.  *See* Background Section II(B)(2), *supra*.

- In August 2021, Amar knew of the data validation request and assisted Javice's use of synthetic data.  *See* Background Section II(C), *supra*.

- On August 1, Javice forwarded to Amar the data validation request from JPMC and texted him to clear his day.  That day, Amar and Javice spoke on the phone 19 times.

- That same day, Javice shared a Google Doc called "Data Request" with Amar and Vovor, which listed 4,265,085 FAFSAs in progress and 2,100,184 FAFSA completions—consistent with the fraudulent user breakdown spreadsheet created by the defendants.

- That same day, Javice emailed Vovor and Amar a copy of the user data provided to JPMC during diligence, attaching a spreadsheet named "CJ_PV_FrontEnd_UserData" that included, among other things, a version of the fraudulent user breakdown spreadsheet created by the defendants.

- On August 2, in a video call with Javice and Vovor, Amar asked Vovor to create 4 million FAFSA "users" with synthetic data, and Vovor declined out of concern it could be illegal.

- On August 3, Amar created and shared a Google Sheet with Javice, ultimately named "Records Needed," which listed the data fields and total numbers that needed to be generated synthetically—including 4,265,085 accounts and 2,100,184 completions, consistent with the user breakdown spreadsheet the defendants created.

- That same day, Javice had her first call with Kapelner, and then immediately called Amar. Thereafter, Amar shared the "Records Needed" spreadsheet with Javice and the two had another call.  Amar and Javice then texted about the "Records Needed" spreadsheet, with Amar explaining that certain fields were not included because "we eliminated them from the report" to JPMC.

- Later that day, Javice sent Kapelner the documents for the project, including a version of the "Records Needed" spreadsheet.  Javice then spoke on the phone with Kapelner.  After the call, Javice texted Amar: "I found my genius. He says it will take him an hour."

- On August 5—prior to Amar receiving data from ASL, and thus not related to any purported data augmentation project—Javice told Amar she "Finished data at 2am . . . He did a fantastic job. Truly. We powered through together [/] Fun getting to work ur old stat professor :)"

- That same day, Amar approved the wire payment to Kapelner for his synthetic data work.

- Between August 1 and August 5, Amar and Javice were on the phone constantly, speaking 99 times in just those five days—a dramatic spike in the number of calls between the two of them.

- Also in early August 2021, Amar and Javice contacted Exact Data about purchasing millions of records for a purported marketing campaign. Amar requested a doctored invoice from Exact Data that removed the quantity of records from the invoice. *See* Background Section II(B)(E)(2)(a), *supra*.

- Again in early August 2021, Amar purchased 4.5 million student records from ASL, claiming the records were for data augmentation; in truth, these records were never used for data augmentation (or for marketing). As with Exact Data, Amar and Javice removed the quantity of records from the ASL paperwork. After the transaction closed on August 5, Amar texted Javice: "you'll have 4.5m users today." *See* Background Section II(B)(E)(2)(b), *supra*.

- Later that month, on August 26, 2021, Amar texted Javice, "I really wouldn't talk about the 5m anymore," referencing the Frank user numbers provided to JPMC during diligence. Javice responded later in the chat, "remember no one on that team [at JPMC] has seen the data room." GX 801-27.

- After the acquisition, in January 2022, Amar and Javice continued to lie to JPMC about Frank's users, claiming that their approximately 5 million Frank users had dwindled to approximately 1 million "marketable" users. *See* Background Section II(G), *supra*.

- In January and February 2022, Amar and Javice transferred purchased third-party data to JPMC in response to JPMC's request for Frank's user data. *See* Background Section II(H), *supra*.

- Amar had a significant motive to commit the fraud and to conceal it. Amar earned millions of dollars from the merger, and also received substantial compensation and retention packages for his employment at JPMC. *See* Background Section II(D), *supra*.

This voluminous, and devastating, evidence of Amar's guilt more than satisfies the Rule 29 standard.

Indeed, the testimony of Patrick Vovor alone was sufficient to establish Amar's guilt. It is well settled that "a federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *Florez*, 447 F.3d at 155 (quotation marks omitted).

And while Vovor was not an accomplice, that is only because he declined Amar and Javice's request that he join the conspiracy.

Amar's attempt to attack Vovor's credibility in his Rule 29 motion is unavailing. *See* Amar R.29 Br. 35-37, 44-45. Whether to credit Vovor's testimony is a question for the jury. *See, e.g.*, *O'Connor*, 650 F.3d at 855 ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony."). "[T]he proper place for a challenge to a witness's credibility is 'in cross-examination and in subsequent argument to the jury.'" *Roman*, 870 F.2d at 71. Amar made this argument about Vovor's credibility to the jury and the jury rejected it. Rule 29 does not countenance reversal because Amar had hoped the jury would decide differently.

Further, the purported inconsistencies in Vovor's testimony cited by Amar are not actually inconsistencies. Amar emphasizes that Javice first asked Vovor about the synthetic data request on August 1 without Amar present. *See* Amar R.29 Br. 35-37. Amar does not address how that fact is somehow inconsistent with anything Vovor said in his testimony, or with the other trial evidence.[11] Indeed, Vovor testified to that very fact—as well as testifying about how, the next day, Amar asked him to create the fake data. Vovor's testimony was corroborated by documentary evidence, moreover. *See* Background Section II(C)(1), *supra*. Accordingly, Vovor's testimony alone constitutes sufficient evidence of Amar's guilt to defeat Amar's Rule 29 motion.

---

[11] To the extent Amar's argument is based on the fact that Google metadata shows Vovor looked at certain files on August 1, rather than August 2, Vovor testified that the files at issue were shared, by the defendants, *on the screen* during the video call on August 2. Tr. 1852. That is, on August 2, Vovor saw the documents when they were put on the screen, not when he clicked into a Google Doc. Google Docs metadata is thus immaterial to what occurred during the video call on August 2.

Next, Amar devotes an entire section to the proposition that there was insufficient evidence that Amar made a misrepresentation in furtherance of the crimes charged. *See* Amar R29 Br. 18-28. That is factually untrue, as discussed below, but perhaps more fundamentally, it is a misguided analysis to undertake in a motion for acquittal of the charges in this case. Amar has been charged with joining a *conspiracy* and a *scheme*—not for, say, false statements in violation of 18 U.S.C. § 1001. There was ample evidence of Amar's guilt of those offenses even assuming he had not been the individual in the scheme or conspiracy making the direct misrepresentations. In any event, Amar misstates the facts: Amar told unambiguous, direct lies to Capital One before the acquisition, and to JPMC after the acquisition.[12]

With respect to Capital One, Amar indulges a technicality, repeatedly stating that there was no "*testimony*" (as opposed to evidence) about what Amar said on the July 8, 2021 video meeting with Capital One. Amar R.29 Br. 19-20 (emphasis added). Indeed there was evidence of Amar's lies to Capital One. The email and Zoom records clearly showed that Amar's presentation to Capital One contained a black-and-white lie about Frank's FAFSA completions. *See* Background Section II(B)(1)(b), *supra*. With respect to Amar's post-acquisition lies to JPMC, *see* Background Section II(G)-(H), *supra*, Amar appears to concede that he made misrepresentations and that they were criminal in nature, but appears to assert that this criminal conduct was not a crime charged in the Indictment. *See* Amar R.29 Br. 15, 26.n8, 29. Such arguments are nonsense. Amar lied to JPMC after the acquisition because—consistent with the overwhelming evidence recounted above, *and as expressly charged in the Indictment*—Amar had joined Javice in a conspiracy and scheme to defraud since June 2021 and, as charged in the Indictment, the fraud continued through

---

[12] This is not to mention other deceptive conduct Amar engaged in, such as asking Vovor to create 4 million fake FAFSA users, or requesting that Exact Data send him a doctored invoice with the quantity of records removed.

November 2022. Dkt. 27 (Superseding Indictment). Put differently, Amar's attempt to claim that the fraud was somehow complete and stopped at the acquisition is contradicted by the trial evidence and the Indictment itself.

Third, Amar emphasizes the "huge mislabel" incident in his brief, claiming it shows he lacked intent. *See* Amar R.29 Br. 2, 9-12, 43. Assuming that the facts were as Amar argues, the explanation for Amar calling the visitors slide a "huge mislabel" is that the third Frank executive who was not a member of the conspiracy, Matt Glazer (Frank's former General Counsel), was also on the call with Amar, Javice, and the LionTree team. Amar sent his "huge mislabel" message in an internal slack message to Javice and Glazer as a cover. Indeed, the next day at the July 8 presentation to Capital One, Glazer was excluded from the meeting while Amar was not. In his motion, Amar also points to Javice's attempt to exclude him from becoming a JPMC employee, claiming it shows a lack of a conspiracy. *See* Amar R.29 Br. 12-13. That is not a basis for acquittal as a matter of law. As the saying goes, there is no honor among thieves, and that Javice may have at one point sought to get rid of others she thought could lead to the exposure of the fraud is not proof that Javice and Amar never conspired or schemed to defraud. The evidence is overwhelmingly clear they did so.[13] In short, a rational jury could—and, in fact, did—find these arguments by Amar unpersuasive in view of the full record of Amar's guilt.

That same basic point holds for Amar's other arguments about why he lacked intent. *See, e.g.*, Amar R.29 Br. 32-35 (arguing Amar did not know about the data validation exercise despite receiving the JPMC email demanding it), 37-42 (arguing Amar's purchase from ASL of 4.5 million records that Amar and Javice later passed off to JPMC as Frank's user data was not part of a cover

---

[13] Amar's argument that the *Geaney* standard was not met is baseless, *see* Amar R.29 Br. 14, 27, as the Government proved the charged conspiracy *beyond a reasonable doubt*—more than satisfying the threshold finding for admission of a co-conspirator statement.

up).  These arguments lacked force before the jury that found Amar guilty of all counts, because they are inconsistent with the evidence (including, for example, evidence that Amar asked third party companies to doctor invoices) and with common sense.  Such specious arguments carry even less force when offered in support of an acquittal as a matter of law under Rule 29.

Accordingly, Amar's Rule 29 motion should be denied.

## II.  The Defendants' Arguments for a New Trial Under Rule 33 Are Meritless

### A.  The Jury Instructions Were Proper

The defendants are not entitled to a new trial based on the Court's jury instructions.  The Court's instructions were proper and legally sound, and the defendants cannot credibly claim that they suffered any manifest injustice as result.  Accordingly, the defendants' motion for a new trial on the basis of the Court's jury charge should be denied.

#### 1.  The Court's Decision to Omit the Defendants' Proposed Additions to the Materiality Instructions Did Not Prejudice the Defendants

Javice claims she is entitled to a new trial because the Court ultimately declined to provide a portion of the defendants' proposed instruction regarding materiality.  (*See* Trial Tr. 3459:16-21.)  This argument is without merit.

As an initial matter, Javice does not—and indeed, cannot—identify any error with the Court's decision to omit the proposed language from the final jury instructions.  At the charge conference, and as part of a lengthy instruction regarding materiality, both defendants requested that the Court incorporate several additional sentences from Judge Kaplan's instructions from *United States v. Bankman-Fried*, No. 22 Cr 673 (LAK), (S.D.N.Y. Nov. 2, 2023).   The Government objected to the additional language, which the Court paraphrased as follows:

> However, a victim cannot intentionally turn a blind eye to a misrepresentation.  If he does, you may consider . . . that in determining if the misrepresentation was material.

Tr. 3461:14-19.  During the charge conference, the Court initially agreed to adopt additional

language into the charge.  Ultimately, as part of the final materiality instruction, while the Court adopted other language provided by the parties, including elements of the instruction that had also been provided in *Bankman-Fried*, the Court declined to include that additional sentence, to which the Government had objected, noting, prior to the delivery of the final instruction, "I don't think this makes sense, and we cover it by conscious avoidance."  (Tr. 3762:18-19.)  Javice claims that the omission of these two sentences prejudiced her because she relied on that language in her summation, but points to no error in the Court's decision to remove them from the final instruction. The Court correctly instructed the jury on materiality, and apart from the omission of those two sentences, incorporated at length the defendants' suggested language throughout its materiality charge.

Nonetheless, Javice contends that the Court's jury charge violated Rule 30 of the Federal Rules of Criminal Procedure because it was different from the materiality instruction discussed at the charging conference.  That argument also fails.  Rule 30 permits parties to "request in writing" specific jury instructions, *see* Fed. R. Crim. P. 30(a), and requires the trial court to rule on those requests "before closing arguments," *id.* 30(b).  The rule is grounded in "basic concepts of fairness," allowing "counsel to conform their arguments to the law as it will thereafter be presented by the judge to the jury." *United States v. James,* 239 F.3d 120, 124 (2d Cir. 2000) (internal quotation marks omitted).  The rule can thus be violated by a trial judge "giving instructions that he did not inform counsel he would give, or by not giving instructions that he informed counsel he would."  *Id.*  Reversal on the basis of a Rule 30 violation is warranted, however, only "where the defendant can show that he was substantially misled in formulating his [closing] arguments or otherwise prejudiced." *Id.* (internal quotation marks omitted); *accord United States v. Prawl,* 168 F.3d 622, 629 (2d Cir. 1999); *United States v. Adeniji,* 31 F.3d 58, 64 (2d Cir. 1994).

Javice argues that she was prejudiced because she referenced the anticipated instruction on materiality, including her counsel's statements during summation that one "can't turn a blind eye to information and claim you were defrauded . . ."  (Tr. at 3631:25-26.)  But the Court explicitly warned the parties, both in its draft jury instruction and orally at the charge conference, "The charge itself is not the one that will be given the jury, even as amended." (*Id.* at 3426:4-9.)  As the Second Circuit has explicitly held, "when a defendant is on notice that the propriety of a particular jury instruction is subject to further consideration by the court, he cannot claim to have been substantially misled in framing his summation." *United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007); *see also United States v. Eisen,* 974 F.2d 246, 256–57 (2d Cir.1992) (holding that where defendant "was on notice that his requested charge was the subject of further consideration," he "could not have been substantially misled by the Court in formulating his summation argument").  The defendant's decision to "t[ake] a chance" by quoting from the anticipated instruction, despite the Court's warnings that the draft charge language was not final, is not a basis to demand a new trial or claim to have been misled.  *Rommy*, 506 F.3d at 125.  Nor can Javice point to any prejudice she suffered, given that the Court accurately instructed the jury on materiality.  While the Court did not verbatim use the phrase "blind eye" in its final instruction, it was not required to; the Court correctly instructed the jury on the law, and its instructions were consistent with Javice's summation.

## 2.  The Court Properly Declined to Provide Javice's Theory of the Defense Instruction

Nor did the Court err in declining to give Javice's proposed theory of defense instruction. A defendant is entitled to a jury charge that reflects any defense theory for which there is a foundation in the evidence.  *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999).  However, "defendants are not necessarily entitled to have the exact language of the charge they submitted to

the district court read to the jury.  Rather, a charge is sufficient if it adequately appraises the jury

of the crime and the defense." *United States v. Johnson,* 994 F.2d 980, 988 (2d Cir.1993) (internal

quotation marks and citations omitted).  "To prevail on a contention that the trial court erred in

refusing to give requested instructions, the defendant must establish that his own proposed

language accurately represented the law in every respect and that the charge actually given, viewed

as a whole, prejudiced him." *United States v. Funaro*, 222 F.R.D. 41, 46–47 (D. Conn. 2004)

(citing *United States v. Dove,* 916 F.2d 41, 45 (2d Cir.1990)).  In order to establish prejudice, the

defendant must demonstrate that the instruction as given either misled the jury as to the correct

legal standard, or did not adequately inform the jury of the law.  *United States v. Masotto,* 73 F.3d

1233, 1238 (2d Cir. 1996) (citing *Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir. 1994)).

The Court considered, and ultimately rejected, Javice's theory of the defense instruction.

As the Court observed, the majority of Javice's proposed instructions were already captured in the

Court's anticipated instructions, including its anticipated instruction on materiality. [14]  For

example, relying on the Supreme Court's recent decision in *Thompson v. United States*, 604 U.S.

___ (2025), Javice asked the Court to instruct the jury that "the terms 'misleading' and 'false' are

not interchangeable, and that misleading statements can be true."  *See* Exhbit A at 1 (Javice's

proposed theory of defense instructions); *see also* Dkts. 350, 364 (letter briefing on *Thompson*).

While the Court did not adopt Javice's precise language, after extensive colloquy about *Thompson*

during the charge conference as well as written briefing from both parties, *see, e.g.*, Tr. 3450-55,

3481-83, and over the Government's objection, the Court incorporated additional language from

---

[14] Javice attempts to argue that the Court's reference to language in the materiality instruction that
covered aspects of her proposed instruction was limited to the two sentences the Court ultimately
omitted from the materiality instruction, but as the Court's own statements make plain, the Court's
statements referenced the entirety of the materiality instruction—including other portions of the
instruction as provided.

*Thompson* in the proposed charge, including instructing the jury that a statement "has to be misleading *and has to be false* in order . . . to be actionable." (Tr. 3788:10-13.) As for Javice's remaining requests to charge the jury on steps JPMC should have taken as a reasonable investor, and whether JPMC received "what it bargained for," Ex. A at 1, while the Court incorporated some additional language in the instruction regarding the nature of the commercial transaction between JPMC and the defendants, the Court properly rejected those instructions, which impermissibly attempted to reduce criminal charges to a commercial dispute, and the relevant inquiry to what steps the victim had (or had not) taken to detect the defendants' fraud. In light of the above, Javice does not—and indeed, cannot—claim that the Court's decision not to provide Javice's proposed instruction misled the jury or failed to adequately inform the jury of the law.

### 3. The Court's Conscious Avoidance Instruction Was Proper

Amar argues that the Court's decision to deliver a conscious avoidance charge was manifestly unjust and warrants a new trial. That argument fails. There was ample factual predicate for the Court's decision to deliver the requested charge. Amar's arguments to the contrary boil down to little more than an effort to bootstrap in artificial requirements to the delivery of a conscious avoidance instruction. The Court's decision to provide a conscious avoidance instruction followed the law and was well-supported by the record.

A conscious avoidance instruction "may only be given if (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction, . . . and (2) the appropriate factual predicate for the charge exists, i.e., 'the evidence is such that a rational juror may reach [the] conclusion beyond a reasonable doubt . . . that [the defendant] was aware of a high probability [of the fact in dispute] and consciously avoided confirming that fact[.]'" *United States v. Ferrarini,* 219 F.3d 145, 154 (2d. Cir. 2000) (internal citations omitted). "The second prong of this test thus has two components—there must be evidence that the defendant (1) was aware of a high

56

probability of the disputed fact and (2) deliberately avoided confirming that fact." *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) (internal citations omitted). "Of course, the same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct." *Id.* at 480 (internal citations and quotations omitted). Moreover, the second prong may be established where "[a] defendant's involvement in the criminal offense may have been *so overwhelmingly suspicious* that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *Id.* (citations omitted) (emphasis in original).

Here, the first prerequisite is easily met. Amar, through his counsel, categorically denied knowledge of Javice's misrepresentations to JPMC, including highlighting throughout the trial his absence from key meetings and correspondence—with LionTree, JPMC, Capital One, and others—containing certain of Javice's misrepresentations. (*See, e.g.*, Tr. 80:3-9; 315:5-24; 319:3-5; 2236:10-16; 2256-2257; *see also* Tr. 3672:1-12 ("If you can't answer who this man lied to, that, in and of itself, should give you a significant reasonable doubt as to whether he is guilty of anything. He lied to no one in this case.")). Not only did Amar claim to be in the dark about Javice's misrepresentations, but he also argued that Javice at times took steps to commit parts of the fraud on her own by changing or altering materials Amar had provided to her in connection with due diligence. (*See, e.g.*, Tr. 3680:7-14.)

The second prerequisite is also easily met. To start, the Government's proof at trial included evidence of Amar's participation in meetings and presentations, and Amar's receipt of materials related to meetings and presentations, that contained key misrepresentations about the number of users Frank had and the kinds of data Frank had for each of those users. In those

57

meetings, Javice falsely claimed that Frank had millions of users; specifically defined a user as someone who had provided a first name, a last name, and date of birth, and an email address to Frank (that is, not merely a "website visitor"); and falsely claimed that millions of those users had completed a FAFSA application (and therefore provided Frank with valuable personal information about themselves).  At trial, Amar attempted to seek refuge behind the claim that he believed those statements to refer to users who had just visited the website—i.e., a user as defined by Google Analytics—and that his role was limited to providing metrics to Javice and others in connection with due diligence requests.  That claim is belied by the evidence showing Amar present when Javice defined the term user, as set forth above, to have a specific meaning distinct from website visitors, not to mention Amar's active involvement in working to back up that lie, e.g., the creation of 3.1.4 and procuring fake user data.  It was therefore appropriate for the jury to be instructed that any lack of actual knowledge on Amar's part "was due to a conscious effort to avoid confirming an otherwise obvious fact."  *Svoboda*, 347 F.3d at 480–81.

Indeed, that evidence was only compounded by other red flags about the sale of Frank that the Government proved Amar ignored or avoided confirming in the days before the transaction closed.  On August 1, 2021, Amar learned that JPMC had asked to conduct a data validation exercise on Frank's user data.  *See* GX 1147.  At the same time, he also learned, as demonstrated through his text messages with Javice, that Javice was hiring a data scientist to assist with that request.  GX 801-10 (JAVICE: "I found my genius.  He says it will take him an hour.")  Over the next four days, and at Javice's request, Amar contacted several third-party data companies to purchase millions of customer records.  *See infra* at 21-26 (testimony by Exact Data and ASL). Following the acquisition, Amar received numerous requests for Frank's user data from JPMC in connection with the bank's marketing and integration efforts, but both he and Javice initially

declined to provide it, ultimately supplying JPMC with fake data – that is, a mix of purchased data and synthetic data created by a data scientist. To the extent Amar was asking the jury to credit his claims that these were legitimate actions in his role as a senior executive at Frank, that he was siloed from the true purpose of these requests, and that he had no reason to suspect that Javice was misleading JPMC in connection with these requests, these obvious "red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance." *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011).[15]

Amar also argues that the Court should not have provided a conscious avoidance instruction because the Government "did not pursue a theory of conscious avoidance against Mr. Amar, and the prosecution did not argue it at closing." Amar R.33 Br. 39. But one does not follow from the other. The Government is not required to choose between an "actual knowledge" and a "conscious avoidance" theory, precisely because "the same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct." *Svoboda,* 347 F.3d at 480. A conscious avoidance charge is "not inappropriate merely because the Government has primarily attempted to prove that the defendant had actual knowledge, while urging in the alternative that if the defendant lacked such knowledge it was only because he had studiously sought to avoid knowing what was plain[.]" *United States v. Kaplan*, 490 F.3d 110, 128, n.7 (2d Cir. 2007). Moreover, the Government attacked at length, particularly in its rebuttal, the defense's claim that Amar's absence from certain meetings or correspondence,

---

[15] Equally unavailing are Amar's claims that the Court somehow implied that conscious avoidance could be used "to establish the defendant's intent to use false information," Amar R. 33 Br. 40, or that the jury "likely did not appreciate how the theory applied to the conspiracy count," *id.* 41, 42 n.21. While Amar takes issue with the Court's decision to charge the jury on conscious avoidance, the Court's instruction accurately stated the law.

or his purported efforts to correct other data provided to the bidders, meant that he was unaware of the scheme.  Amar's argument seems to boil down, in essence, to the Government's decision not to recite the words "conscious avoidance" in its summation or rebuttal.  Simply put, the Government was not required to do so where the legal and factual predicate for the charge is satisfied, as it was here.

Finally, and to the extent a conscious avoidance charge was not warranted, any conceivable error did not prejudice Amar or otherwise constitute a manifest injustice given the "overwhelming evidence" that Amar possessed actual knowledge of the fraud, and that the jury was properly instructed on actual knowledge.  *See United States v. Adeniji*, 31 F.3d 58, 62 (2d Cir. 1994).   There was overwhelming evidence that Amar and Javice lied about the number of customer accounts Frank had, used a fake customer list to support that lie, and then used purchased customer data to backstop the lie and hide the fraud even after JPMC acquired Frank.  Amar himself presented the very misrepresentations that went to the heart of the fraud in a July 2021 meeting with Capital One, one of the two banks bidding on Frank; he participated at length in the creation of documents and spreadsheets that supported the fraud; and, as his own text messages with Javice make clear, he was aware that his efforts to purchase third-party customer data on the eve of closing the JPMC transaction was designed to support the scheme.  *See* GX 801-18 (AMAR: "You'll have 4.5 million users today.")  Based on all of this evidence, a rational jury could – and did – convict Amar on all counts.

### 4.  The Court's Jury Instructions Regarding Conspiracy Were Proper and The Defendants Are Not Entitled To a New Trial On This Basis

Amar argues that he was prejudiced by the Court erroneously instructing the jury on the law of conspiracy, which allowed Amar to be convicted for substantive crimes that were committed before he joined it. Amar R.33 Br. 2-14.  As discussed below, the Court's legal

instructions on conspiracy were proper. Moreover, in light of the overwhelming evidence that Amar joined the conspiracy in June 2021 and that Javice's and Amar's scheme continued until well after the acquisition, Amar's argument that he was held responsible for acts committed before a conspiracy existed is baseless. Accordingly, Amar cannot argue that a manifest injustice resulted from the Court's proper jury instructions, and there can be no concern that an innocent person was convicted. *Sanchez*, 969 F.2d at 1414.

### a. The Court Did Not Erroneously Instruct The Jury That Amar Could Be Liable For Javice's Substantive Crimes

Amar argues that he is entitled to a new trial because the Court erroneously instructed the jury that he could be liable for Javice's substantive crimes based on Javice's acts before he joined the conspiracy. Amar R.33 Br. 5-7. This argument is without merit because the Court properly instructed the jury on the differences between substantive and conspiratorial offenses, and Amar is not entitled to a new trial on this basis.

Amar first complains about the Court's instruction that a defendant "will still be held responsible for all that was done before he joined and all that was done during the conspiracy's existing while he or she was a member." Tr. 3784-85; Amar R.33 Br. 5. While Amar concedes that this is a correct statement of the law, he claims that the Court failed to instruct the jury that "this instruction applies only to conspiracy liability, and not liability or substantive offenses." Amar R.33 Br. 5-6. This argument misconstrues the record. The Court clearly explained to the jury the differences between substantive and conspiratorial offenses. The aforementioned instruction occurred during the Court's conspiracy charge. Prior to giving the challenged instruction, the Court instructed the jury that "a conspiracy to commit a certain crime is separate from the crime itself." Tr. 3780. Immediately before giving the challenged instruction, the Court summarized the elements of conspiracy, Tr. 3784, and instructed the jury that a "defendant need

61

not have joined the *conspiracy* at the outset. He or she may have joined it at any time in its progress and he or she will still be held responsible for all that was done before he joined and all that done during the *conspiracy's* existence while he or she was a member." Tr. 3785 (emphasis added). And after completing the instructions on conspiracy, the Court told the jury, "we have finished with the conspiracy. We are now going to talk about wire fraud." Tr. 3786. Accordingly, the challenged jury instruction was clearly identified as relating to conspiracy and the Court's instructions that a defendant could "be held responsible for all that was done before he joined" the conspiracy applied only to the conspiracy, charge, and not the substantive offenses.[16] Amar can claim no manifest injustice on this basis, and is not entitled to a new trial. *Archer*, 977 F.3d at 187.

*Second*, Amar complains about how the Court delivered an instruction—that he himself requested—regarding the evidence necessary to establish a defendant's membership in a conspiracy. Specifically, during the jury charge, the Court instructed the jury as follows:

> Once you are in a conspiracy, anything done by any member of the conspiracy counts against you. It is like agency in law. If you are in a conspiracy and somebody does something in furtherance of the conspiracy, all members of the conspiracy are held to account. *However, in considering if a particular person joined the conspiracy, you can only do so by evidence relevant to that particular person independent of what others may have said or done.* That is the point of this charge.

Tr. 3786.[17] Amar complains that the as-delivered charge conflated "two different legal principles: (i) liability for substantive crimes based on a co-conspirator's act; and (ii) the jury's right to consider a co-conspirator's hearsay statement against other members of the conspiracy." Amar R.33 Br. 7. This argument fails for at least two reasons.

---

[16] The Court also instructed the jury that a defendant can be liable for committing a substantive offense by actually committing the crime, aiding and abetted a crime, or willfully causing another to commit a crime. Tr. 3805-3806.

[17] The italicized language above was included at Amar's request.

First, this instruction was given during the Court's conspiracy charge, when, as described above, the Court made clear that conspiracy was a separate offense from the substantive offenses. Tr. 3780. As such, the instruction did not give the jury the misleading impression that Amar could be liable for Javice's substantive crimes that occurred before he joined the conspiracy.

Second, the instruction that Amar complains of was given as a result of Amar asking for the italicized language above. Prior to the jury charge, Amar proposed the following language: "You are reminded that a defendant's membership in the conspiracy must be established by independent evidence of that defendant's own acts or statements, and not solely by the acts or statements of others." Tr. 3437-38. The Government objected to this instruction. *See* Dkt. 367). Before charging the jury, Court indicated that he would include Amar's language on co-conspirator statements, but would reword it as follows:

> In considering whether a defendant knowingly and willfully participated in a conspiracy, be advised that a defendant's participation in a conspiracy must be established by independent evidence of his or her own acts or statements. However, in determining the factual issues before you, you may consider against the defendants any acts or statements made by any of the people that you find under the standards I've described to have been co-conspirators, even though such acts or statements were not made in their presence or were made without their knowledge.

Tr. 3761. Amar did not object to the proposed rewording of the instruction, which was substantively identical to the as-delivered charge. The Court only reordered the points from the preview it provided to the parties.[18] In addition, during the charge conference itself, the Court

---

[18] *Compare* Tr. 3786 (as-delivered charge) ("However, in considering if a particular person joined the conspiracy, you can only do so by evidence relevant to that particular person independent of what others may have said or done.") *with* Tr. 3761 (Court's proposed charge) ("In considering whether a defendant knowingly and willfully participated in a conspiracy, be advised that a defendant's participation in a conspiracy must be established by independent evidence of his or her own acts or statements."); *compare* Tr. 3786 (as-delivered charge) ("Once you are in a conspiracy, anything done by any member of the conspiracy counts against you. It is like agency

advised the parties that the Court does not read the jury instructions verbatim. Tr. 3426 ("The charge itself is not the one that will be given to the jury, even as amended. I find that it is important to repeat, extemporize, and make sure, the way a speaker can, that the jury is paying attention."). Amar cannot complain that he suffered a manifest injustice when the Court included the language in the charge at his request, and in any event, waived his ability to challenge this instruction. *United States v. Shea*, 20 Cr. 412 (AT), 2023 WL 4551635, at *3 (S.D.N.Y. Jul. 14, 2023) ("A party who proposed a jury instruction waives any objection to it.").

*Third*, Amar argues that "the Court erred in giving its conspiracy charges because they similarly stated that Mr. Amar could be convicted of conspiracy based on acts taken by Ms. Javice prior to the establishment of the conspiracy." Amar R.33 Br. 7-8. He argues that, because the conspiracy only involved two people, the Court's instruction permitted the jury to hold him "responsible for acts committed prior to the formation of the alleged conspiracy." *Id.* at 8. The Court's instruction did no such thing. Rather, the Court instructed the jury that, "the government must prove beyond a reasonable doubt that the defendant knew of the conspiracy and its unlawful purpose and the defendant joined to further its unlawful objectives and that it did so unlawfully, willfully, and knowingly." Tr. 3783. Therefore, the Court's instructions were clear that the jury must first find that Amar knowingly, willfully, and unlawfully joined a conspiracy. The Court also explained that, once the defendant joined the conspiracy, the defendant "will still be held responsible for all that was done before he joined." Tr. 3785. In the overall context of the Court's

---

in law. If you are in a conspiracy and somebody does something in furtherance of the conspiracy, all members of the conspiracy are held to account.) *with* Tr. 3761 (Court's proposed charge) ("However, in determining the factual issues before you, you may consider against the defendants any acts or statements made by any of the people that you find under the standards I've described to have been co-conspirators, even though such acts or statements were not made in their presence or were made without their knowledge.").

instruction, it was clear that "all that was done" referred to the conspiracy; if no such conspiracy existed, the Court's instruction did not permit the jury to convict a co-conspirator for substantive crimes that occurred before the formation of the conspiracy.

*Fourth*, Amar's complaints about the conspiracy instructions misstate the Government's theory of Amar's guilt and misapprehends the jury's finding of a scheme to defraud. The Government's evidence showed that Javice and Amar, beginning in June 2021, committed fraud together. Contrary to Amar's brief, Amar R.33 Br. 8-10, the Government's evidence of Amar's guilt was not limited to "the alleged concealment of the fraud in connection with the sale of Frank" as the Government introduced substantial evidence of Amar's involvement in the conspiracy beginning in June 2021. *See* Background Section II.B, *supra*. And even if Amar's involvement began only in August 2021—and it did not—that still makes him guilty of conspiracy and the substantive offenses with which he was charged. Indeed, the substantives offenses were alleged and were proven to continue until well after JPMC's acquisition of Frank.

Therefore, Amar cannot complain that he suffered a manifest injustice based on the Court's conspiracy charge, particularly in light of the overwhelming evidence of Amar's participation in the conspiracy beginning in June 2021. *See* Argument Section I, *supra*. Amar's motion for a new trial on this basis should be denied. *Sanchez*, 969 F.2d at 1414.

### b. The Court's Conspiracy Re-Charge Was Proper

Amar argues that he is entitled to a new charge because the Court erred in responding to the jury's question, "Are co-conspirators guilty of all crimes committed in the conspiracy?" Amar R.33 Br. 10-14. Amar is wrong. The Court correctly addressed this question by making clear: (1) that substantive and conspiratorial offenses are separate offenses; and (2) that for the crime of conspiracy, a co-conspirator is responsible for the criminal acts of his-coconspirator.

As a threshold matter, a trial judge "is in the best position to sense whether the jury is able to proceed properly with its deliberations, and he has considerable discretion in determining how to respond to communication indicating that the jury is experiencing confusion." *United States v. Parker*, 903 F.2d 91, 101 (2d Cir. 1990). After consultation with counsel, the trial judge can provide "supplemental instructions designed to remedy the confusion." *Id.* Moreover, the district court has "discretion to determine what language to use in instructing the jury as long as it adequately states the law." *United States v. Alkins*, 925 F.2d 541, 550 (2d Cir. 1991).

In response to the jury's question, "Are co-conspirators guilty of all crimes committed in the conspiracy?" and to the jury's request that the Court "read the first paragraph of the legal definition of a conspiracy again," Tr. 3883-84, the Court gave the following instruction: "The crime of conspiracy to violate a federal law is an independent offense, a crime separate and distinct from the actual violation of any specific federal laws even if the conspiracy is not successful." *Id.* Next, the Court responded to the jury's question as to whether co-conspirators are "guilty of all crimes committed in the conspiracy" by first rereading a portion of the charge that the Court had previously delivered in the initial charge:

> In considering whether a defendant knowingly and willfully participated in a conspiracy, be advised that a defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements. However, in determining the factual issues before you, you may consider against the defendants —co-conspirators—any acts or statements made by any of the people that you find under the standards I have already described, to have been co-conspirators, even though such acts or statements were not made in their presence or were made without their knowledge.

Tr. 3884-85. The Court then made clear that, in the context of a conspiracy charge, one co-conspirator is responsible for the acts and statements of another co-conspirator by instructing:

> You have to go back to the indictment which alleges two purposes, two objectives of the conspiracy. Only those crimes can be considered. And with respect to those crimes, if you found, by independent evidence that they're, both Amar and Javice

66

are members of a conspiracy, all their statements and acts are considered against --
all the statements and acts of one are considered against the other.

Tr. 3885.

Amar's argument that he was prejudiced by these correct legal instructions are without merit. Amar claims that the Court "responded to the jury's question about substantive liability with an instruction on the consideration of co-conspirator acts and statements as evidence." Amar R.33 Br. 11-12. But as discussed above, the Court made clear that substantive and conspiratorial offenses are separate, and the Court otherwise made clear throughout the trial that the jury must consider the defendant's guilt as to each count separately. Transcript of February 19, 2025 Voir Dire, at 390 ("Each defendant has to be judged separately. You go count by count, decide if, on that count, the government has proved guilt beyond a reasonable doubt as to a particular defendant, and then you vote accordingly."); Tr. 3768 ("We have two individuals on trial who are to be judged separately."); *id.* ("If the government proves its case beyond a reasonable doubt, then you may find a verdict of guilty. The government must do it count by count, requiring it to prove beyond a reasonable doubt every element of each of the crimes charged in each of the counts, and separately against each defendant."); *id.* at 3778 ("Although the two defendants are on trial together, you must consider each defendant's conduct individually on the evidence, relevant, and admitted against that defendant, and without regard to the guilt or innocence of the other and you must do this separately for each count against each defendant charged in that count."). Amar also complains of the "truncated" nature of the Court's instructions (Amar R.33 Br. 12), but neglects to account for the hours-long jury charge that explained, in detail, the elements of the substantive offense with which the defendants were charged.

Third, Amar complains that the "recharge did not clarify that criminal acts or statements committed by Ms. Javice before any agreement between the two could not be considered against

Mr. Amar." Amar R.33 Br.12. But once again, for the reasons explained above, the Court's jury instructions made clear that the evidence against each defendant needed to be considered separately and properly instructed the jury on the distinction between substantive and conspiratorial crimes.

### 5. The Court's Response to the Jury's Request for the Documents Related to the FAFSA Completions Graph Was Not Error

Amar makes several arguments related to the jury's request during deliberations for the "the graph + email that . . . showed FAFSA completion"—a reference to a particular slide in a presentation given to Capital One on July 8, 2021, in connection with a meeting that Capital One had requested to have with Amar specifically. *See* Amar R.33 Br. 14-23. None of Amar's arguments relating to the July 8 meeting and accompanying presentation has merit: Cowan's testimony on redirect examination was proper, the Court acted well within its discretion in denying Amar's request for re-cross examination, and there was no error in the Court's statements to the jury in response to their request during deliberations.

#### a. Relevant Background

As set forth in detail above, *see* Background Section II(B)(1(b), *supra*, on July 7, 2021, Capital One requested a meeting specifically with Amar regarding, among other things, FAFSA starts and completions. GX 1691; *see also* Tr. 2284 (Young testifying that Capital One requested Amar address these questions "[b]ecause in his role as head of growth at Frank, he was responsible for customer acquisition" and Capital One "want[ed] the most knowledgeable person who could provide us with accurate data during diligence"). In response, Amar helped prepare a PowerPoint presentation to send to Capital One. *See* GX 3037 (email chain between LionTree and Frank employees including Amar exchanging an early draft of the PowerPoint); GX 3039 (full email chain between LionTree and Frank employees showing Amar's review of the PowerPoint, and

attaching the final version of the PowerPoint which was thereafter sent to Capital One); GX 3040 (final version of PowerPoint as transmitted to Capital One and the other meeting attendees, including Amar).  On July 8, 2021, Amar appeared via Zoom at the meeting with Capital One, while Javice dialed in on her phone.

Significantly, the PowerPoint for Capital One—both its early draft and the final version sent to Capital One on July 8—contained clear lies about the number of Frank's FAFSA completions.  At trial, Amar did not dispute that he reviewed the PowerPoint.  Indeed, the centerpiece of Amar's defense was that, in reviewing an early version of the PowerPoint, Amar had caused one slide in that PowerPoint to be corrected, calling it a "huge mislabel."  In response, the Government pointed out during its case that, among other things, the "corrected" PowerPoint still contained lies.  *See* Tr. 414 (redirect of Cowan, eliciting that the graph falsely purporting to show nearly 600,000 FAFSA completions in a limited timeframe was "in the same deck that [Amar's counsel on cross examination] was speaking to you about that was corrected"), Tr. 2148-49 (direct examination of Young).

In closing arguments, the Government argued that Amar lied to Capital One in connection with the July 8 meeting and the accompanying PowerPoint.  Specifically, the Government stated the following about the July 8 meeting in its main summation:

> [L]et's talk about the [July 8] meeting because it puts Amar right on center stage. This is an e-mail, it is Government Exhibit 1691, it is an e-mail from Capital One to LionTree requesting a meeting with Amar. They wanted to speak to Amar directly and ask questions about user profiles including FAFSA starts and FAFSA completions, the numbers that are the heart of this fraud. So, the meeting gets scheduled for July 8 at 12:30, Amar accepts the calendar invite, and the Zoom records, which are here, Government Exhibit 2036, show that Amar in fact attended the meeting, the entire meeting. And of course he did. Capital One specifically asked to meet with him. And Javice, her phone number ends in 9314, she just dials in. Amar is the one who logs in. Amar is presenting.
>
> And what was discussed at this meeting? What lies were told? You don't have to guess. It is in writing. Look at the PowerPoint presentation from this meeting. This

is from slide 10 of Government Exhibit 3040. It is a PowerPoint presentation, again for Amar's July 8 meeting. The chart shows FAFSA completions in just the first five months, so not even half years, of 2018 through 2021. Just the first five months of each year which, by the way, that is the off-season. The high season for FAFSA is the second half of the year, the fall, when students are applying.

In just the first five months, Amar falsely claims that there were 500,000 FAFSA completions of those years. They didn't even have 500,000 FAFSA users let alone completed applications.

Tr. 3519-20.

The Government also addressed the July 8 meeting during its rebuttal summation, in response to arguments by Amar's counsel about the "huge mislabel" message on July 7, arguing in part as follows:

July 7 is not the end of the story. It continues to July 8 when they actually have the meeting with Capital One and it is a Zoom meeting. The Zoom records are in evidence, they're indisputable. Mr. Amar is on video. Ms. Javice dials in. Remember they asked specifically to talk to Mr. Amar? This is his presentation, he is on the whole time, he is the only person from Frank on video. And by the way, it is just Javice and Amar on this one, not the third person. He is cut out.

What happens on that call? You don't have to guess.

In the presentation deck --

Can we go to slide 1[0]?

THE COURT: What is the exhibit number?

MR. FERGENSON: This is Government Exhibit 3040, Judge.

Mr. Menchel pointed to a different slide from this presentation. This is the slide that has the clearest lies. And ladies and gentlemen, Mr. Amar is on an e-mail chain about the drafting of this presentation, his presentation that he is giving to Capital One. He is on an e-mail chain about creating this document and then he is on the e-mail chain where it is sent to Capital One and then he is on the call where they go through it. This slide is a lie. It is the main lie. It is the lie about how many people had started and completed FAFSAs. This shows nearly 600,000 people who had completed a FAFSA with Frank. It is right there. Mr. Amar is presenting this. In less than two years they have 600,000 FAFSA completions. That's totally false. It is not even close.

Tr. 3742-44.

During the second day of deliberations, the jury sent a note stating: "Can we see the graph and email that was created by OA [Olivier Amar] that was presented to Chase that showed FAFSA completion?"  Tr. 3867.

The parties and the Court then engaged in a colloquy regarding the appropriate response. *See* Tr. 3867-82.  From the outset, the Government and Amar agreed that the jury was asking for the graph on Slide 10 of the PowerPoint included in Government Exhibit 3040.  Tr. 3867-68.[19] Amar's counsel added: "I do want the record to reflect that while the government said this document was created by Mr. Olivier Amar, there is actually no evidence that is true."  Tr. 3868. Amar's counsel argued, formalistically, that the "deck was put together by LionTree," not Amar. Tr. 3871.  In response, the Government directed the Court to Government Exhibit 3039, "which is an e-mail chain directed toward Mr. Amar about the creation of that PowerPoint where he sends edits about it.  And, no doubt, LionTree, as we heard, is the intermediary here in sending the materials to both Capital One and [JPMC], but this is the internal e-mail chain where they [Amar, Javice, and LionTree] edit and finalize this presentation for the [July 8 meeting]."  Tr. 3874; *see also* Tr. 3875 ("[Government Exhibit] 3039 is the e-mail chain where they [Amar, Javice, and LionTree] finalize the PowerPoint that is on [Government Exhibit] 3040.").

The Court then proposed directing the jury to both Government Exhibits 3039 and 3040. Tr. 3875.  In response, counsel for Amar attempted to add further exhibits for the jury to consider, including an unrelated email chain from a week prior to July 8 that did not include Amar, *see* GX

---

[19] Slide 10 of the PowerPoint is page of the 12 of the .pdf file that is Government Exhibit 3040. *See* Tr. 3867 (referring to the slide as "page 12 of the PDF").

3027.[20]  Tr. 3876-78.  Javice's counsel then raised objections to providing exhibits beyond Government Exhibit 3040.  Tr. 3879.  Amar's counsel requested again that the Court instruct the jury that who created the PowerPoint was "a disputed fact."  Tr. 3881.  The Court responded that Government Exhibit 3040 "doesn't mention authorship. I can say that."  Tr. 3881.  Amar's counsel responded: "OK. I will take that."  Tr. 3881.

With the jury present, the Court answered the jury's question regarding the graph and email as follows:

> There is no such document and there is too many things putting it together. We have a graph and e-mail that shows FAFSA completions, Exhibit 3040. It does not show who created the document and it was to Capital One, not to Chase. If you want to see that document we will put it on the screens and then you can ask if you want anything else.

Tr. 3885.  The exhibit was then displayed on the screen for the jury.  Tr. 3886.  Thereafter, the Court said: "We can send 3040 to you, even though it doesn't answer your question, and then you can tell us what else you might want."  Tr. 3886.  The foreperson then stated: "We just have a question. For Exhibit 3040, is it the same presentation that was sent to JPM?"  Tr. 3886.  The Court responded: "I am not able to answer that."  Tr. 3886.  Government Exhibit 3040 was also sent back to the jury.  Tr. 3890.

### b.  Discussion

Amar's arguments—which, tellingly, do not cite a single case or any other legal authority—are meritless.  Amar argues that the Court's response to the jury's request was error.  As a predicate argument, Amar contends that the jury was misled by earlier events in the trial.  In particular, Amar contends that the jury had been misled by improper redirect examination of

---

[20] The Government objected to including Government Exhibit 3027, but not Government Exhibit 3037, which is an earlier email and attachment in the email chain that is Government Exhibit 3039. Tr. 3877.

Houston Cowan, that Amar's request for re-cross examination should have been granted, and that it was improper for the Government to argue in summation that Amar had made misrepresentations to Capital One in connection with the July 8 meeting and accompanying presentation. These arguments all lack merit.

*First*, the Government's redirect examination of Houston Cowan was not "improper." Amar R.33 Br. 14. During the cross examination of Cowan, Amar's counsel extensively questioned Cowan regarding the correction of impressions data being labeled as visitors data. *See* Tr. 367-391. A substantial portion of the cross-examination related to the preparation of the July 8 PowerPoint on July 7 and July 8, and how the final version of the PowerPoint did not include the mislabeled impressions data. *See* Tr. 380-391. In response, the Government elicited during its redirect examination that the final version of the PowerPoint, which was "corrected," still contained lies about FAFSA completions. Tr. 413-415. Notably, Amar's counsel did not object to this questioning. *Id.* Following redirect examination, Amar requested re-cross examination, claiming that there was "new" direct examination during the Government's redirect. Tr. 420. The Court denied the application, ruling that the redirect was "fair rebuttal to what you brought out on cross." Tr. 420.

Amar contends that the Government's redirect was improper because it misled the jury about what Cowan testified to during cross examination. In particular, Amar cites a portion of the redirect eliciting that Amar's counsel "asked [Cowan] a lot of questions about" the July 8 meeting. Amar R.33 Br. 17 (citing Tr. 413). Amar's convoluted argument misstates a simple record. The Government did not "suggest that [Cowan's] testimony" during cross examination about particular slides "concerned the entire final presentation that was provided to Capital One." Amar R. 33 Br. 17. The supposedly "improper" redirect question ("Mr. Menchel asked you a lot of questions

73

about this") was not even posed while showing the presentation; it was posed while showing a reply to the calendar invitation for that meeting (i.e., the first page of Government Exhibit 3040), not the invitation's attachment (i.e., the presentation, which starts at page 3 of Government Exhibit 3040). And as is evident from the immediately prior question, the "this" being referenced (that Mr. Menchel had questioned Cowan about) was "*the July 8 meeting*," as a general topic, not any particular slides from the presentation. Tr. 413 (emphasis added). Indeed, this line of direct examination began with the Government turning to the topic of the July 8 meeting and noting how Amar's counsel "asked several questions about this timeline leading up to *the July 8 meeting* with Capital One." Tr. 411-412 (emphasis added). There was nothing inaccurate, much less improper, in eliciting testimony that Amar's counsel had asked several questions related to the July 8 meeting. That was merely a way to arrive at the topic of the July 8 meeting and accompanying presentation. The substantive takeaway from this brief line of redirect examination was simply that the presentation that Amar had reviewed and supposedly corrected, in fact, still contained the falsehoods that were at the very heart of the charged fraud.

*Relatedly*, the Court did not err in denying Amar's request for re-cross examination. For one, the basis for Amar's request—that the Government "directed the witness to new sections in these exhibits that he did not ask about on direct examination," Tr. 420—was simply incorrect. *See* Tr. 201-202 (direct examination testimony about the slide at issue). Nor was there anything misleading *at all*. The testimony concerned written documents that were all already in evidence. Finally, as the Court properly held, showing that the supposedly "corrected" presentation still contained material falsehoods was certainly "fair rebuttal" to cross examination repeatedly suggesting that Amar had corrected the presentation. Tr. 420.

*Third*, there were ample grounds in evidence for the Government to have argued, and on

which the jury could have concluded, that Amar conveyed misrepresentations to Capital One in connection with the July 8 meeting and the associated PowerPoint. While neither Houston Cowan from LionTree nor Mason Young from Capital One had a specific recollection of what Amar did during the July 8 meeting, *see* Tr. 385 (Cowan), Tr. 2241-42 (Young), the documentary evidence established that:

1) Amar knew Capital One had specifically requested that he answer its follow up questions, including about "FAFSA starts *and completion*," and that the purpose of the PowerPoint was to assist in doing so. GX 3037 (emphasis added).

2) Amar had received, reviewed, and helped prepare the PowerPoint that contained lies about Frank's FAFSA completions. GX 3039.

3) Amar knew the final PowerPoint was transmitted to Capital One explicitly in connection with his Zoom meeting with Capital One. GX 3040.

4) Amar attended the July 8 Zoom meeting with Capital One. Amar was logged in via the Zoom application, whereas the only other Frank employee present, Javice, merely dialed in by phone, such that she would not be able to see which page of the PowerPoint was being shared on the screen during the video call.

The reasonable inference from the documents—indeed, the only persuasive inference—was that, during his July 8 meeting with Capital One, Amar presented the information in the PowerPoint to Capital One, and that information included blatant lies about Frank's FAFSA completions. LionTree had even told Capital One that the presentation would be "walk[ed] through" on the call with Amar. *See* GX 1691. Further establishing that Amar had presented the fraudulent FAFSA completion data during the July 8 meeting was the email sent by LionTree after the July 8 meeting recording the meeting "follow ups," which included follow up questions related to FAFSA completions. *See* GX 3042. Relatedly, the record provided ample basis to refer to the July 8 meeting and presentation, during argument, as being "Amar's." *See* Amar R.33 Br. 19 (claiming that this was misleading). After all, this meeting and the associated presentation arose because Capital One had requested to discuss these issues *specifically with Amar*.

*Finally*, there was no error in the Court's answer to the jury's request for the "graph and email" showing FAFSA completion.  As discussed above, the appropriate answer to the jury's request was the subject of extended colloquy among counsel and the Court, and the Court ultimately adopted the request from Javice that only Government Exhibit 3040 be given, *and* the request from Amar that the Court instruct the jury that Government Exhibit 3040 "does not show who created the document."  Tr. 3885.  Amar's complaint that the Court's answer improperly suggested there was evidence in the record that Amar created the document is baseless.  Such a suggestion is far from apparent from the Court's statement.  In fact, to the contrary, the Court instructed the jury that Government Exhibit 3040 "does not show who created the document."  Tr. 3885.[21]

Accordingly, Amar's arguments regarding the Capital One slides should be rejected.

---

[21] Even assuming there was such a suggestion, that suggestion would have been accurate.  There is indisputable documentary evidence that Amar reviewed and approved the presentation sent to Capital One.  *See* GX 3037, 3039, 3040.  While, as a formalistic matter, LionTree put together the slides in the presentation, Amar was responsible for the presentation's substance.  *See* Tr. 114 (Cowan testifying that his role as an analyst involved "a lot of formatting PowerPoint work" and "fancying . . . up" documents before they were shared with potential buyers); GX 2010 (LionTree's engagement letter specifying that LionTree will relying on the accuracy of the information provided by Frank); Tr. 127-20 (Cowan testifying that LionTree relies on the accuracy of what Frank tells them because LionTree lacks the relevant knowledge and access to company records); Tr. 196 (LionTree relies on the client "for truthful information and data").  Amar cannot escape that responsibility merely because LionTree, acting on his behalf, prepared the slides and emailed them to Capital One.  *See, e.g.*, Fed. R. Evid. 801(d) (an opposing party statement includes statements "the party manifested that it adopted," statements "made by a person whom the party authorized to make a statement on the subject," and statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed").

**6.  The Court Did Not Make Any Improper Comments Regarding the Timing of the Jury's Deliberations**

Amar misconstrues the record in arguing that the Court expressed a preference for "quick jury deliberations."  Amar R. 33 Br. at 23.  The Court did no such thing. To the contrary, the Court specifically instructed the jury that there were no time limits on its deliberations:

> No one can foretell how long deliberations should last. They should last until you reach a verdict. They should last until all of your conscientious convictions are finished and completed and the verdict sheet requires, the law requires that you be unanimous as to any verdict you reach, whether guilty or not guilty.

Tr. 3834.

Amar's argument rests on passing comments from the Court on Monday, March 24 (the beginning of the sixth week of trial), that the Court hoped it did not "have to ask you that next week, did you have a pleasant weekend," and the Court's comment during deliberation on March 28, 2025 that the Court would sit until 3 p.m. that day.  There was nothing problematic in the Court expressing hope that the trial would complete within the sixth week (as the Court told the venire during jury deliberations, *see* Transcript of February 18, 2025 Voir Dire), nor was there anything wrong with the Court reminding the jury about the length of time they would sit on Friday, March 28, the day the jury reached a verdict, because at no point did the Court place any time constraints on the jury's deliberations.  *See United States v. Green*, 523 F.3d 229, 234-35 (2d Cir. 1975) (rejecting motion for a new trial when the district just had told the jury earlier in the case that the case would conclude by a date certain, because "[a]t no time did the district judge instruct the jury that it must return a verdict by a certain time.  On the contrary, the court in court instructed the

jurors to decide the case solely on the evidence, to listen to the arguments of their fellow jurors, and to decide whether they could with good conscience agree.").[22]

Amar's citations to *Jenkins v. United States*, 380 U.S. 445 (1965) and *United States v. Diamond*, 430 2.d 668 (5ᵗʰ Cir. 1970), do not support his argument. In *Jenkins*, the district court instructed the jury, which had indicated that it was deadlocked, that "you have got to reach a decision in this case," after which the jury returned a guilty verdict; the Supreme Court held that the district court's directive to a deadlocked jury was coercive. *Id.* at 446. No such coercion occurred here. Instead, the Court merely expressed hope that the case would stick to the schedule the Court promised the venire at the start of the case, and reminded the jury that jury deliberations would end at 3 p.m. on March 28, 2025. Amar also misstates the holding in *Diamond*. In that case, the Fifth Circuit did not reverse because the court told that jury that the court hoped the jury would return a verdict promptly; instead, a new trial was ordered because the court's supplemental jury instructions did not reference the defendant's good faith defense. *Diamond*, 430 F.2d at 696-697.

## B. The Court Properly Denied Severance and The Defendants Are Not Entitled To A New Trial On This Basis

The defendants each had a fair trial, and considering the overwhelming evidence of the defendants' guilt, there is no concern that an innocent person was convicted. *United States v. Yannai*, 791 F.3d 266, 242 (2d Cir. 2015); *Sanchez*, 969 F.2d at 1413. The defendants' convictions were amply supported by competent evidence. *See United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The excluded evidence that was the defendants claimed was exculpatory was not,

---

[22] In his summation, Amar's counsel implored the jury to take their time with their deliberations. *See* Tr. 3732 ("I know you've been here a long time, but I'm going to urge you not to rush a verdict just to get out of here. This man's life is literally in your hands.").

in fact, exculpatory; it was simply inadmissible, whether at a joint trial or had the defendants been tried separately. Accordingly, there was no manifest injustice that resulted from their joint trial and neither defendant is entitled to a new—and severed—trial.

As a threshold matter, the defendants cannot meet the heavy burden of the Rule 33 standard because they fail to establish that their defenses were mutually antagonistic: each defendant strenuously argued their innocence. To be sure, Amar sought to distance himself from Javice and her representations to potential buyers—but he never conceded that a fraud occurred or argued that Javice was guilty of a crime. Furthermore, neither defendant can credibly argue that their trial rights were circumscribed. There was no evidence that was excluded that would have been admissible in a single-defendant trial. The Court, moreover, issued limiting instructions that each defendant's guilt or innocence was to be considered separately.

In the context of a Rule 33 motion, it is highly relevant to the Court's analysis that both Javice and Amar were convicted on all counts.[23] The jury's guilty verdict for both defendants on

---

[23]    Javice claims that it is "irrelevant" that Amar was ultimately convicted, citing *United States v. Green*, 114 F.4th 163 (3d Cir. 2024). *Green*, however, did not concern a Rule 33 motion and is inapposite. In that case, three defendants, Green, Murphy, and Wong, were indicted for kidnapping a victim and forcing the victim to commit a robbery. *Id.* at 169-170. After denying Green's severance motion, Green and Murphy were tried together and convicted. Wong's trial was severed due to issues with his counsel, and Wong was ultimately acquitted.

At Green and Murphy's trial, Green argued that no kidnapping occurred, while Murphy argued that there was a kidnapping, but he was coerced by Wong and Green to commit it. On appeal, the Third Circuit held that severance was appropriate on the basis of mutually antagonist defenses and prejudicial evidence that was admitted during the joint trial. *Id.* at 177-178. In a footnote, the Court observed that Wong was acquitted at a separate trial, which raised further concerns that Green's conviction resulted from improper joinder of Green and Wong's trial. However, the Third Circuit did not rely on this observation in deciding whether the district court abused its discretion in not granting severance, because it was limited to the information that was known or foreseeable to the district court at the time. *Id.* at 180 n.9. Here, however, the question before the Court is whether the defendants should be granted a new trial on the basis of Rule 33. The jury's guilty verdict as to both defendants is highly relevant to the Rule 33 analysis, both because it confirms the overwhelming evidence of guilt (and obviates any concern than an innocent

all counts confirms that there were no mutually antagonistic defendants: if there had been, one might expect a split verdict where one defendant was convicted but the other was not. That, of course, did not happen here. As a result, there is no credible concern that "letting a guilty verdict stand would be a manifest injustice," *Ferguson*, 246 F.3d at 134, or that "an innocent person may have been convicted," *Sanchez*, 969 F.2d at 1413.

### 1. Applicable Law

The Supreme Court has set a high bar for severance for properly joined defendants, such that a severance motion should be granted only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Accordingly, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993). "[A] defendant seeking severance under Rule 14 bears an extremely difficult burden of proving . . . that the prejudice would be so great as to deprive him of his right to a fair trial." *United States v. Barret*, 824 F. Supp. 2d 419, 433 (E.D.N.Y. 2011); *see also United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993) (denial of severance motion is improper only where defendant will incur "prejudice so severe that his conviction [would] constitute[] a miscarriage of justice"). A trial court's decision to sever or not sever a properly-joined trial is "virtually unreviewable." *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991).

The mere fact that two defendants advance defenses that are adversarial to one another "clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multi-

---

person was convicted) and shows that Javice's and Amar's defenses were not mutually antagonistic.

defendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses." *Cardascia*, 951 F.2d at 484-85 . Moreover, "[m]ere fingerpointing does not require severance." *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989). Rather, the term "mutually antagonistic" has been adopted to describe a narrow category of adversarial defenses where "accepting one defense requires that the jury must *of necessity* convict a second defendant." *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) (emphasis added); *see also Zafiro*, 506 U.S. at 542 (Stevens, J., concurring) (describing "mutually antagonistic" defenses as those as to which "acceptance of one . . . necessarily preclude[s] acceptance of the other and acquittal of the codefendant").

However, the Supreme Court has held that even "mutually antagonistic defenses are not prejudicial per se," and that severance is not required when defendants adopt antagonistic defenses "even if prejudice is shown." *Zafiro*, 506 U.S. at 538-39. Rather, when defendants adopt mutually antagonistic defenses, severance is appropriate only if defendants can demonstrate "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539; *see also United States v. Scott*, 637 F. App'x 10, 13 (2d Cir. 2015) (summary order) ("It is not enough to demonstrate that separate trials would have increased the chances of the appellant's acquittal . . . the defendant must instead show prejudice so severe that his conviction constituted a miscarriage of justice and amounted to a denial of a constitutionally fair trial."). "In those rare instances where a defendant establishes a 'high' risk of prejudice, however, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States v. Abakporo*, No. 12-CR-340 (SAS), 2013 WL 6188260, at *3 (S.D.N.Y. Nov. 25, 2013).

## 2.  The Defenses Were Not Mutually Antagonistic

Javice argues at length that Amar's jury addresses and witness examinations prejudiced her with Amar "gunning to prove Ms. Javice's guilt."  *See* Javice. Br. 10-16.  That is simply not so.  The actual record makes clear that the two defendants' defenses were not mutually antagonistic.  Both defendants claimed that they were innocent and Amar **_never_** conceded that a fraud occurred.  While Javice claims that Amar stated that he was "nothing more than a pawn in Ms. Javice's fraud" more than a dozen times through his opening (Javice Br. 10-11), not a single example cited by Javice supports this hyperbole.[24]  Nor did Amar's counsel concede fraud in examining any witness or during summation—rather, his counsel sought to distance himself from Javice's statements to potential buyers and convince the jury that Amar acted in good faith.  *See* Javice Br. 10-14 (citing examples from Amar's cross-examinations and summations where Amar distanced himself from Javice and argued he acted in good faith, but not once conceded that a fraud occurred).  At most, Amar's defense strategy amounted to "[m]ere fingerpointing" which is not sufficient for a severance.  *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989); *see also United States v. Serpoosh*, 919 F.2d 835, 837 (2d Cir. 1990) ("The mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance.").

---

[24] *See* Tr. 66 (claiming that Amar was innocent and that the case was "really about his boss" and the prosecution "[l]umped" them together as if they were one unit"); Tr. 67 (imploring the jury to keep evidence as to Javice separate from Amar and claiming that Amar never lied to any witness); Tr. 68 (Amar provided accurate data when asked); Tr. 69 (claiming that Amar was just an employee of Frank); Tr. 73 (claiming that he was siloed but Javice "ran point on everything" but adding "there's nothing wrong with that"); Tr. 74 (claiming that Amar "just did his job" "without full visibility"); Tr. 76-77 (claiming that Amar provided accurate data during diligence); Tr. 78 (claiming that Amar identified mislabeled data); Tr. 79 (Amar had "barely" any involvement in diligence after Capital One declined to buy Frank); Tr. 80 (claiming that Amar was not on many emails after July 14, 2021 and had nothing to do with Dr. Kapelner); Tr. 84 (asking the jury to consider each defendant separately).

To the extent there was any antagonism between the defenses, Amar's defenses were not mutually antagonistic because they did not require the jury to convict Javice "of necessity." *Yousef*, 327 F.3d 56, 151. Amar claimed that he always acted in good faith and was not involved in any misrepresentation made to a potential buyer. A jury could have credited these arguments yet still have concluded that Javice's statements were not misleading, not intentionally misleading, or immaterial. Indeed, Amar's efforts to distance himself from Javice, had they been accepted by the jury, would have tended to show that there was no meeting of the minds to support a conspiracy conviction. And in any event, Amar's defense plainly did not work: a jury rejected his argument and concluded that he and Javice conspired to commit fraud.

Indeed, far from conceding fraud, Amar's defense, in several important ways, echoed Javice's defense. Both defenses, for example, challenged whether there were material misrepresentations made to potential buyers by arguing that the term "user" could also reference a website visitor, and that Frank used the term "user" to describe website visitors. *Compare* Tr. 3604 (Javice summation) ("[W]hat does "users" really mean, people? That's it. You have to look at the context for which it's being described. And Marc Rowan told you, customers, website visitors, users, one and the same. It depends on the context.") *with* Tr. 3672 (Amar summation) ("I think Mr. Baez covered it . . . user, both in the context of Frank and in general, has many different meanings depending on the context[.]"). And both defendants argued that they engaged in a legitimate effort to purchase data from ASL and augment it, and that purchased data could be used for marketing efforts. *Compare* Tr. 3653-3654 (Javice summation) ("That's actually actions of innocence. This ASL list shows they're [*i.e.*, Javice and Amar] both innocent. They [*i.e.*, Javice and Amar] were trying to market and move this thing forward and get better.") *with* Tr. 3692

(Amar summation) ("In fact, JPMorgan used data augmentation and bought data from ASL to fill out their existing databases and augment them. It is a perfectly legitimate thing to do.").

Equally misplaced is Javice's argument that Amar's witness examinations and jury addresses served as an "echo chamber" of the Government's proof.  Javice Br. 14-15.  Hardly so. Throughout the trial, the Government strongly disputed Amar's characterization of his conduct. The Government argued at length that Javice and Amar told lies together and conspired together to commit fraud.  *See, e.g.*, Tr. 411 (Government redirect of Houston Cowan, with Cowan testifying as to Amar's role at Frank for user growth and his involvement in Capital One's diligence); Tr. 762 (Government redirect of Leslie Wims Morris, with Wims Morris testifying that JPMC retained Javice and Amar as key employees); Tr. 2283 (Government redirect of Mason Young, with Young testifying that Amar was responsible for customer acquisition and that Capital One wanted Amar, Frank's Head of Growth, to present on information regarding user growth during a diligence meeting on July 8, 2021); Tr. 2342 (Government redirect of Sindhu Subramaniam, where she testified that Amar presented information to JPMC just before Javice provided false information of Frank's user base).  Put simply, the Government and Amar were far from aligned.

Finally, Javice's continued reliance on Judge Matsumoto's decision in *United States v. Shkreli*, 260 F. Supp. 3d 247 (E.D.N.Y. Aug. 5, 2020), is misplaced.  Javice Br. 8, 10, 19-20. While Judge Matsumoto did sever the *Shkreli* trial even though they were no mutually antagonistic defenses, her reasons for doing so related to the "extraordinary and *unique*" facts of that case, which are inapposite to the record here. *Id.* at 257 (emphasis added); *see also id.* at 256 (again noting the court's "serious concerns . . . under the *unique* circumstances presented (emphasis added)).  In *Shkreli*, defendant Greebel's counsel represented—in a sworn affidavit and again in

84

open court—that he would argue at trial that "Shkreli is guilty" and that Greebel was "a victim of Shkreli's fraud." *Id.* at 256. That simply did not happen here. Indeed, the Government is not aware of a single case where a court has followed *Shkreli* since it was decided—an unsurprising result, in light of *Shkreli*'s unique facts. *See United States v. Tuzman*, 301 F. Supp. 3d 430, 444 (S.D.N.Y. 2017) (declining to follow *Shkreli* in case where defendants asserted antagonistic defenses); *United States v. Sezanayev*, No. 17 Cr. 262 (LGS), 2018 WL 2324077, at *6 (S.D.N.Y. May 22, 2018) (declining to follow *Shkreli* and noting that "is not a Second Circuit case and does not dictate the result here"); *United States v. Carton*, No. 17 Cr. 680 (CM), 2018 WL 3559172, at *4 (S.D.N.Y. Jul. 10, 2018) (declining to follow *Shkreli*, and noting the unique facts of that case, including that Greebel's counsel "swore under oath that he intended to argue that Shkreli was guilty as sin but Greeble [*sic*] was simply a victim of Shkreli's nondisclosure"); *United States v. Dupigny*, 18 Cr. 528 (JMF), 2019 WL 2327697, at *1 (S.D.N.Y. May 30, 2019) (declining to follow *Shkreli* when a defendant claimed a co-defendant's defense "may bolster the Government's case" against that defendant); *United States v. Hameedi*, No. 17 Cr. 137 (JGK) 2017 WL 5152991, at *6 n.2 (S.D.N.Y. Nov. 3, 2017) (declining to follow *Shkreli*, noting that the "unique facts of that case. . . provide[] little guidance for the disposition" of the severance motion under consideration); *United States v. Chierchio*, No. 20 Cr. 306 (NGG), 2022 WL 523603, at *6 (E.D.N.Y. Feb. 22, 2022) (declining to follow *Shkreli*); *United States v. Webb*, No. 15 Cr. 252 (PKC), 2020 WL 6393012, at *5 (E.D.N.Y. Nov. 11, 2020) (same); *United States v. Codner*, No. 18 Cr. 609 (RJD), 2022 WL 3139119, at *2 (E.D.N.Y. Aug. 5, 2022) (same); *United States v. DiScala*, No. 14 Cr. 399 (ENV), 2018 WL 1187394, at *23 (E.D.N.Y. Mar. 3, 2018) (same); *United States v. Mangano*, No. 16. Cr. 540 (JMA), 2018 WL 851860, at *9 (E.D.N.Y. Feb. 9, 2018) (same). As this Court has already held, *Shkreli* is far afield from this case. Tr. 771 ("Defendants have cited *United States*

*v. Shkreli*, but that case involved extraordinary and unique facts, different—much different—than the ones we have here.").

Therefore, because the defenses were not mutually antagonistic (and as discussed below, they suffered no prejudice as a result of their joint trial), the defendants cannot demonstrate that "it would be a manifest injustice to let the guilty verdict stand," *see United States v. Lin Guang*, 511 F.3d 110, 119 (2d Cir. 2007). Accordingly, the defendants cannot meet their heavy burden that they are entitled to a new trial.

### 3. The Defendants' Rights to A Fair Trial Were Not Compromised By Joinder

Even if there were mutually antagonistic defenses—and they were not—the defendants cannot meet the heavy burden to obtain a new trial because they cannot demonstrate that the rights to a fair trial were compromised through a joint trial that resulted in any manifest injustice. *Sanchez*, 969 F.2d at 1414

### a. Javice's Rights Were Not Compromised Prior to the Start of Trial

Javice claims that she was "caught flat-footed" because she "was forced to prepare for trial without the full knowledge of Mr Amar's antagonistic defense" has no merit. Javice Br. 9-10. That argument fails because Javice was indeed on notice of Amar's anticipated defense and cannot demonstrate any manifest injustice. Based on Amar's disclosures to her, Javice moved for severance one month before trial, arguing in her heavily-redacted brief that Amar intended to argue that Javice "concealed information and deceived him." Dkt. 185, at 7. That understanding conveyed in her pretrial severance motion is substantively no different than Amar's counsel *ex parte* colloquy with the Court on January 23, 2025, during which his counsel conveyed that they intended to elicit evidence that Javice misled Amar. Furthermore, Javice's complaint that Amar

did not have disclosure obligations vis-à-vis Javice is a red herring:  the Government and the defendants, throughout trial, exchanged exhibits prior to a witness's testimony.

### b. A Joint Trial Did Not Reduce the Government's Burden To Prove Javice's Guilt Beyond a Reasonable Doubt

Javice's argument that she is entitled to a new trial because the joint trial "lessened the government's burden to prove" her guilt is baseless.  Javice Br. 18-19.  In support of this argument, Javice cites Justice Stevens's concurrence from *Zafiro* observing that, in cases involving mutually antagonistic defenses (and there are none here), joinder could reduce the government's burden in two scenarios.  In the first scenario, Justice Stevens observed that "joinder may introduce what is in effect a second prosecutor into a case, by turning each codefendant into the other's most forceful adversary." *Zafiro*, 506 U.S. at 544.  For the reasons set forth above (*see* Argument Section II.B.2, *supra*), Amar was not Javice's second prosecutor because Amar's defense—which the Government vigorously disputed and the jury rejected—was not mutually antagonistic. In the second scenario, Justice Stevens observed that "joinder may invite a jury confronted with two defendants, at least one of whom is almost certainly guilty, to convict the defendant who appears the more guilty of the two regardless of whether the prosecutor has proven guilt beyond a reasonable doubt as to that particular defendant." *Zafiro*, 506 U.S. at 544.  That concern is not present here, as the jury convicted both defendants on all counts.

In any event, the Court adequately addressed any prejudice resulting from Amar's antagonism.  The Court provided Javice with an opportunity to rebut Amar's closing statement and provided numerous limiting instructions to the jury.  The steps the Court took to minimize any antagonism directed at Javice, coupled with the overwhelming evidence of guilt as to both defendants, leaves no concern "that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1413.

### c. Amar Did Not Introduce A New Theory of Prosecution

Javice claims that she is entitled to a new trial because Amar invited the jury to convict her on "an entirely new theory prosecution." Javice Br. 17 (*citing* Tr. 3680). This simply did not happen and therefore is not a reason for a new trial.

In June 2021, Javice sent a spreadsheet—GX 3017A—that was labeled "visitors" data but was in fact "impressions" data. Far from imploring the jury to convict Javice of fraud on the basis of this document, Amar's counsel's told the jury that he was "not here to malign Ms. Javice" and that he did not "know whether this was done by accident or not." Tr. 3680. Instead, Amar argued that, because he later identified this graph as containing mislabeled data, he did not have a specific intent to defraud or conspire with Javice. *See* Tr. 3683 (arguing that Amar's correction is "completely inconsistent with somebody who is trying defraud someone and inconsistent that they're in cahoots"). In any event, the jury clearly rejected Amar's argument, so there can be no concern that a manifest injustice occurred. *Sanchez*, 969 F.2d at 1414.

### d. The Court's Preclusion of Certain Exhibits Was Proper And Does Not Warrant A New Trial

Amar argues that he is entitled to a new trial because he was repeatedly barred from introducing supposedly exculpatory evidence that was excluded because his trial was held jointly. Amar R.33 Br. 24-38. He is not. The Court properly excluded all of the exhibits that Amar now complains of because that evidence was inadmissible (and, in any event, not exculpatory)— whether in a joint trial or had Amar had been tried alone.[25] Accordingly, Amar cannot demonstrate, on the basis of properly excluded evidence, that there is any real concern that an

_____

[25] Amar incorporated by reference several letter motions he filed during the trial. The Government respectfully incorporates its responses to those letters in this opposition. *See* Dkt. 298 (Government's February 27, 2025 opposition to Dkt. 292); Tr. 3244-3246 (oral argument in response to Dkt. 349).

innocent person was convicted or that there would be a manifest injustice by allowing the guilty verdict to stand. *Sanchez*, 969 F.2d at 1414.

### (1) The Court Properly Excluded Amar's "Age Distribution Exhibits" (OA 204, 204-A, 200, 200-A, 238, 238-A)

Amar claims that the Court erroneously precluded him from offering evidence related to JPMC's diligence requests related to the demographics of FAFSA user data. Amar R.33 Br. 27-34 (referring to OA 204, 204-A, 200, 200-A, 238, 238-A, collectively, the "Age Distribution Exhibits."). Amar is not entitled to a new trial on this basis. The Court properly excluded these exhibits because they were irrelevant and because whatever probative value they had was outweighed by the risk of confusion to the jury and waste of time. Tr. 3316-18. These exhibits, moreover, would have been equally irrelevant and confusing if Amar had been tried alone.

The Age Distribution Exhibits concern certain documents regarding Javice's representations to JPMC regarding the age distribution of its FAFSA users. Amar claimed that he provided accurate age distribution data to Javice (alone), who later changed and misrepresented this data to JPMC. As the Government explained, Javice's statements to JPMC regarding Frank's age distribution were outside the charged fraud, and the evidence was irrelevant and confusing. Tr. 3312.[26] The Court agreed. Tr. 3316-17 (COURT: "I am bothered by issues of relevance, I am bothered by issues of completeness. I don't think these documents are self-understandable. . .

---

[26] On its face, the evidence was not exculpatory. Amar sent the age distribution spreadsheet to Javice—his coconspirator with whom he communicated by phone frequently. No one from JPMC was copied on his email. The version of the data that Javice sent to JPMC was altered—but the Government has not alleged that this document contained a material misrepresentation of fact. Even if it did contain a material misrepresentation, and accepting Amar's argument that he was not involved in making that misrepresentation, it is not a defense that Amar was not involved in one specific instance of misconduct. *United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021) (holding that a "defendant may not seek to establish his innocence . . .through proof of the absence of criminal acts on specific occasions."). Nor would this episode negate the overwhelming evidence that Javice and Amar were in the charged conspiracy. *See supra* Argument, Section I.

. And what it has to do with the issue of users which is the heart of this case and there is the subject of what is false and misleading we also don't know.  I am inclined to agree with the government and Javice that the potential for confusion and digression and prejudice outweighs any potential use of this document for relevance purposes, and therefore I exclude it.").  The Court's decision— that the documents were irrelevant and confusing—did not turn on the joint nature of the trial, and the Age Distribution Exhibits lack of relevance and potential for confusion would apply with equal force had Amar been tried alone.

Amar complains that the Court's exclusion of this evidence was prejudicial, but none of his arguments are availing.  First, Amar claims that the Court refused to sever the trial after hearing Amar's *ex parte* defense theory on January 23, 2025, but then "refused to consider this evidence during trial."  Amar R.33 Br. 30.  However, it is not surprising—and certainly not unfair—that the Court excluded the evidence after having the benefit of a more fulsome trial record.  Second, Amar complains that the Court deferred ruling on the Age Distribution Exhibits, which prevented Amar from eliciting relevant testimony concerning these exhibits.  Amar R. 33 Br. 30-31.  However, the Age Distribution Exhibits were lacking in foundation, on top of being irrelevant and confusing, each time that Amar sought to introduce them, whether through Sweeney or MacDonald.   Tr. 1515, 2529-2530.  Third, Amar argues that the Court was wrong to conclude, in its Rule 403 analysis, that the percipient witness testimony would be necessary to make the Age Distribution Exhibits understandable.  Amar. R.33 Br. 31-32.  The Court, however, was well within its discretion to conclude that additional percipient witness testimony was necessary to make the documents understandable to the jury, including testimony as to why the data was changed, whether or how the data was explained to JPMC, and whether those changes were material to

JPMC. Tr. 3318. That there was no such witness is a reflection of the extremely tangential nature of this evidence—precisely the kind of evidence Rule 403 is meant to preclude.

Finally, Amar complains that the Court's ruling with respect to the Age Distribution Exhibits were improperly applied to GX 802-51 and DX OA 90. Amar R.33 Br. 32. But these documents, too, were plainly inadmissible—whether in a joint trial or had Amar been tried alone. GX 802-51 is a June 25, 2021 Slack message from "Bot Message Google Drive" that appears to refer to certain documents shared between Javice, Amar and Wong; in addition to being confusing on its face, it has no discernible relevance to the defendants' misrepresentations regarding the number of users that Frank had. DX OA 90 is a similar Slack exchange which includes Matt Glazer; it too is confusing and lacking in any relevance to the charged crimes, and raised presence-of-counsel issues that the Court consistently and correctly precluded throughout trial. These documents were properly excluded.

Therefore, Amar cannot meet his heavy burden to establish that there was a manifest injustice—or a concern that an innocent person was convicted—because the Court excluded irrelevant and confusing documents that would be equally inadmissible had he been tried alone.

### e. GX 1547

Amar claims that he was prejudiced by the Court precluded GX 1547, an email exchange which Amar was not copied on, between LionTree personnel, Javice and Glazer regarding Capital One's diligence. Amar. R.33 Br. 34. The Court properly excluded this evidence as hearsay being offered for its truth (Tr. 378)—and had Amar been tried alone, GX 1547 would still constitute inadmissible hearsay. GX 1547 was also irrelevant because Amar's absence on certain

communications and his relative culpability are not a defense.[27]  *Dawkins*, 999 F.3d at 792.  That is because such "'good act' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—*i.e.*, if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit."  *Id.*

Therefore, Amar cannot meet his heavy burden to establish that there was a manifest injustice—or a concern that an innocent person was convicted—because the Court excluded GX 1547, a document that Amar could not have admitted had he been tried alone.

### f. GX 802-5

Amar claims that he was prejudiced by the Court's preclusion of GX 802-5, a June 24, 2021 slack exchange between Amar and Wong concerning a data pull from Google Analytics. Amar R.33 Br. 35-36.  Amar claims that this evidence was "critical state-of-mind" evidence showing his belief that a diligence request from Capital One concerned website visitors.  *Id.* However, the Court properly excluded GX 802-5 as hearsay under Rule 403 (Tr. 1232), and GX 802-5 would be equally inadmissible had Amar been tried alone.

Furthermore, GX 802-5 does not fall into a "state-of-mind" exception to the hearsay rule: Amar only asks Wong to provide Google Analytics data for sessions and users, but the exhibit says nothing about Amar's understanding "that the diligence request pertained to Frank's website users."  Amar R. 33 Br. 36.  To the contrary, the overwhelming evidence at trial established that, in the late June 2021 time period, Amar and Javice worked together to create GX 3.1.4, using

---

[27] Amar further claims that the Government left the jury with a misleading impression that Amar knew about the mislabeled data because he was copied on its initial transmission (GX 3017, 3017-A) but was not the source of the correction.  This argument fails.  First, the Government never made that argument to the jury.  Second, the Court admitted the "huge mislabel" Slack (802-22), and Amar relied on this document to argue that he did not have an intent to defraud.  *See* Tr. 3677, 3683 (Amar's summation).

Google Analytics data regarding website visitors to fraudulently state that Frank had 4.25 million users with accounts. *See supra*, Argument, Section I.

Therefore, Amar cannot meet his heavy burden to establish that there was a manifest injustice—or a concern that an innocent person was convicted—because the Court excluded GX 802-5, a document that Amar could not have admitted had he been tried alone. [28]

### g. GX 1250 and GX 1328

GX 1250 and GX 1328 are email exchanges between Javice and JPMC that Amar is not copied on, pertaining to the initial transfer of Frank user data to JPMC in early 2022. Amar claims that these exhibits tended to show that Amar had "little to no involvement" in the data transfer but were improperly precluded. Amar R.33 Br. 36-38; Tr. 2967 ("Mr. Buckley: As the Court noted, [GX 1250] is not intended to antagonize Ms. Javice. It is intended to show that Mr. Amar is not there."). However, the Court properly excluded these documents, and Amar cannot demonstrate that a manifest injustice resulted from their exclusion.

GX 1250, a January 19, 2022 communication on which Amar is not copied, concerns the transfer of Frank user data to JPMC. Amar first sought to admit the document under Rule 106;[29]

---

[28]    With respect to Amar's argument that the Government "impermissibly comment[ed] before the jury regarding its inability to examine Mr. Amar," the Government incorporates by reference its letter dated March 9, 2025 (Dkt. 320) and the Court's ruling on March 11, 2025 (Tr 1751) concluding that the Government's comment did not affect the right of Amar to remain silent.

[29]    Amar's Rule 106 argument was based on the Government's introduction of GX 1017, an separate email chain from January 18, 2022. Rule 106 did not, therefore, call for the admission of GX 1250. *See United States v. Thiam*, 934 F.3d 89, 96 (2d Cir. 2019) (holding that the "rule of completeness doctrine under Rule 106 of the Federal Rules of Evidence provides that an omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion. But it does not require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages.").

the Court initially sustained the Government's and Javice's objections because GX 1250 was not necessary to complete any other document that had been admitted; after further argument, the Court determined that it would allow its introduction. Tr. 2542, 2954-2958. Then, the Government argued that the introduction of GX 1250 opened the door to the introduction of GX 801-51, a WhatsApp exchange between Javice and Amar early February 2021 where Javice told Amar, "gave him the shit show of all systems in spreadsheets" and "ah we are fucked[.]" The Government argued that, if Amar was permitted to introduce a document to argue that he was not aware of the initial data transfer, the Government should be permitted to introduce GX 801-51 to show that he was so aware. Tr. 2960-2961. Upon further reflection, the Court held that, if Amar sought to introduce GX 1250, then the Government could introduce GX 801-51, and Amar never introduced GX 1250. The Court was well within its discretion to make that evidentiary ruling to avoid a misleading impression to the jury, and Amar cannot demonstrate any manifest justice on this basis.

Nor can there be any concern that an innocent person was found guilty, because GX 1250 is not exculpatory: Amar's absence on a set of communications does not negate his guilt, rendering GX 1250 irrelevant. *Dawkins*, 999 F.3d at 792. This analysis would be no different had Amar been tried alone.

With respect to GX 1328, a February 14, 2022 email from MacDonald to Javice, in which MacDonald asked Javice, "Do you have the older breakdown you did that footed to the 4 MM users (including inactive users)?", the Court properly excluded this document, which would be inadmissible in an Amar-only trial. Tr. 1328. The document is hearsay and not admissible to impeach MacDonald. Amar's absence from this communication, in addition, is not evidence that he was not involved in the charged crime. *Dawkins*, 999 F.3d at 792.

Therefore, Amar cannot meet his heavy burden to establish that there was a manifest injustice—or a concern that an innocent person was convicted—because the Court excluded GX 1250 and GX 1328, documents that Amar could not have admitted had he been tried alone.

## C. The Court's Evidentiary Rulings Were Reasonable and Within Its Discretion

The defendants argue that they are entitled to a new trial because the Court improperly precluded them from introducing evidence about, among other things, Frank's website and Matthew Glazer. The Court properly precluded this evidence. The testimony that the defendants sought to elicit, and the documents they sought to introduce, were irrelevant and otherwise inadmissible. The Court's evidentiary rulings were proper and in no way "compromised the reliability of the verdict." *United States v. Landesman*, 187 F.4th 298, 331 (2d Cir. 2021).

A district court "ha[s] broad discretion to decide evidentiary issues," *United States v. Atilla*, 966 F.3d 118, 131 (2d Cir. 2020). A defendant's right to present relevant evidence is not unlimited; rather it is subject to "reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308, 118 (1998). Central among these restrictions are rules of procedure and evidence "designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986). The power of courts to exclude evidence through the application of evidentiary rules that serve the interests of fairness and reliability is well-settled. *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").

## 1. The Court Properly Precluded Irrelevant and Misleading Evidence About Frank's Website

Javice first claims that the Court improperly precluded the admission of testimony and documents related to Frank's website. This evidence, purportedly the "cornerstone" of Javice's

defense, Javice Br. 23, would have shown, according to Javice, that Frank's website claimed that Frank had "300,000 FAFSA filers [and] [n]ot 4.25 million." Javice Br. 23-26. Javice claims that this evidence was relevant to Javice's state of mind and the materiality of the alleged false statements.

To the extent the Court precluded evidence concerning Frank's website, it did so properly. First, Javice inaccurately describes the evidence she sought to admit. Javice did not offer evidence —because there is none—that Frank's website claimed there were only "300,000 FAFSA filers." Rather, Javice sought to introduce ambiguous and cherry-picked statements from Frank's website about the number of families that Frank had helped secure student aid. *See, e.g.*, CJ-1897 ("Frank is an online tool that has helped 300,000 students maximize their financial aid for college"), CJ-2173 ("Frank has helped over 250,000 families"), CJ-2174 ("More than 350,000 prospective college students have used Frank to apply for financial aid and find the right school"). It is unclear what these numbers even refer to, and Javice proffered no evidence that they refer to the number of users Frank had or the number of Frank users who had filed a FAFSA application. Not everyone who created a Frank account completed a FAFSA application, and not everyone who completed a FAFSA application ultimately received student aid. In fact, the Government understands that Frank did not even track the number of FAFSA applications that were ultimately submitted or the percentage of Frank users who were awarded student aid. Thus, undated materials from Frank's website about the number of students who "maximized" student aid do not, as Javice suggests, make clear "that there were between 250,000 and 400,000 FAFSA users as opposed to the 4.25 million that JPMorgan alleges it was defrauded into thinking existed." Tr. 3145:16-18.

Marketing materials from Frank's website about the number of families who "maximized" student aid are similarly not probative of materiality or Javice's intent to deceive JPMC about a

completely different metric—Frank account signups, which was the subject of the defendants' fraudulent scheme.

Second, the Court properly found that Javice's proposed website exhibits were irrelevant because Javice could not establish that anyone from JPMC (or anyone else, for that matter) actually saw the specific statements at issue. Tr. 3144-3151. While the Court indicated that evidence that JPMC "saw and didn't care" about the real number of account signups would be relevant to materiality, Javice was unable to procure such evidence. Javice offered no evidence that the real numbers were posted to Frank's website. And while Javice questioned certain witnesses about whether they had seen Frank's website, *see, e.g.*, Tr. 693-694 (questioning about various products offered on Frank's website), Tr. 2335 (questioning about a demo of Frank's website), Tr. 2517 (questioning about historical versions of Frank's website), no witness indicated that they saw statements on Frank's website about the number of Frank users.

Third, the Court properly precluded questioning and argument about what information JPMC could have learned from Frank's website because that type of evidence would have improperly put at issue the thoroughness of JPMC's due diligence. It is not a defense to fraud charges that the victim was insufficiently vigilant. That is because "reliance is not an element of criminal fraud," and "the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent." *United States v. Weaver*, 860 F.3d 90, 95-96 (2d Cir. 2017). Javice repeatedly tried to introduce evidence—including website evidence—to suggest to the jury that JPMC and the other intended victims were "on notice" of Javice's false statements. Javice Br. 26. This type of evidence and argument is improper, and the Court properly precluded it.

Fourth, even if the Court erred in precluding evidence from Frank's website about the number of people Frank had helped obtain student aid, such error was harmless because the Court permitted Javice to introduce the same type of evidence in a different form. For example, Javice introduced an internal JPMC diligence record from July 2021 stating that "Frank has helped more than 300,000 students receive $7 billion in financial aid." GX-1591; Tr. 736-737. This is precisely the type of evidence that Javice sought to introduce from Frank's website. *Compare* GX-1591 *with* CJ-1897 ("Frank is an online tool that has helped 300,000 students maximize their financial aid for college."). Javice introduced this document, questioned a JPMC witness about it, and made arguments from it. The jury rejected those arguments. To the extent the Court erred in precluding Frank website evidence about the number of students that Frank helped obtain student aid—and there was no error—the error plainly no difference in the outcome of the trial.

Next, Javice argues that she should have been permitted to introduce evidence that JPMC "curated" the Frank website after the acquisition to remove references to Frank having hundreds of thousands of users (as opposed to 4.25 million users). Javice Br. 24. This argument is without merit. First, as noted above, Javice offered no evidence that Frank's website, at any time, listed Frank's user count. Second, Javice offered no evidence that anyone from JPMC was aware of the portions of the website at issue. Third, Javice offered no evidence that JPMC, as opposed to legacy Frank employees, maintained day-to-day control over the Frank website after the acquisition. And fourth, Javice's argument makes no sense because, as she acknowledges, even after the acquisition Frank's website "retained multiple articles referring to '300,000 students' or '250,000 families.'" Javice Br. 24.

Finally, Javice argues that the Court erred in declining to give a missing witness jury instruction concerning the Frank website. Javice Br. 23. In advance of trial, Javice asked the

Court to compel the Government to produce "copies of the Frank Website as it existed (1) during the period that [JPMC] was conducting due diligence . . . and (2) after JPMC acquired Frank." Dkt. 200.  The Government responded, accurately, and Javice does not, and cannot, contend otherwise, that "[t]he Government does not, and has never, possessed . . . copies of pages from Frank's website." Dkt. 212.  The Government referred the defense to a publicly available internet archival service, https://www.web.archive.org, that maintained prior versions of the Frank website.[30]

Because the Frank website was not, and had never been, in the Government's control (or possession, for that matter), the Court correctly declined to give a missing witness instruction.  *See United States v. Caccia*, 122 F.3d 136, 138 (2d Cir. 1997) (A missing witness instruction "permits the jury to draw an adverse inference against a party failing to call a witness when the witness's testimony would be material and the witness is peculiarly within the control of that party.").  What's more, the Frank website was equally available to the defense through the publicly available internet archive and, as explained above, the Government is unaware of any exculpatory and admissible evidence from the Frank website.

### 2.  The Court Correctly Excluded a Draft Internal JPMC Document that was Irrelevant to Materiality and Javice's Intent

Javice sought to introduce a draft slide that was part of a larger internal JPMC presentation about the proposed Frank acquisition.  Javice Br. 27-28; CJ-239.  The draft slide, which was

---

[30] In her motion, Javice suggests that JPMC failed to respond to a defense subpoena for a copy of the Frank website.  Javice Br. 23.  Not so.  On January 29, 2025, Javice issued a Rule 17 subpoena to JPMC that requested "true and accurate archived copies of the Frank website . . . including all sub-pages, as the website existed" on specific dates:  July 2021 and January 2023.  Unlike the publicly available internet archive, JPMC does not maintain historical versions of the Frank website.  Rather, JPMC only has a copy of the Frank website as it existed when it was taken offline, which Javice's subpoena did not request.

prepared by Ryan MacDonald and his marketing team, noted that there were 2.4 million new enrollees in U.S. colleges each year and that Frank "supports" approximately 300,000 new student FAFSA applications per year. Javice sought to introduce the draft slide to show that "there is no conceivable way that . . . [the] 300,000 new student applications per year . . . adds up to 4.2 million." Tr. 2503. The Court correctly held the draft slide to be inadmissible but permitted questioning about the content of the slide.

First, the draft slide is inadmissible hearsay. Javice tried multiple times, without success, to lay a foundation under Fed. R. Evidence 803(6) that the draft slide was the product of a regularly conducted business activity at JPMC. Tr. 2494-2496. Having failed to lay a proper foundation, the draft slide was inadmissible as a business record. Javice then used the document, at the Court's suggestion, to refresh the witness's recollection and to impeach the witness. The Court permitted this but correctly precluded the admission of the document itself.

Second, the draft slide is irrelevant. Javice's theory of relevance—the slide's contention that were "300,000 new student FAFSA applications per year" is inconsistent with JPMC's belief that there were 4.25 million total Frank users—makes no sense. MacDonald testified that he understood, based on the defendants' misrepresentations, that Frank had 4.25 million user accounts. Tr. 2372. Frank user accounts and submitted FAFSA applications are totally different metrics. Not every user filed a FAFSA application. Indeed, the defendants' fraudulent monthly breakdown of Frank users, GX-3.1.4, showed that less than 50% of people who started a FAFSA application completed the application. And, as explained above, there is no way to know how many of the completed FAFSA applications were actually submitted. Moreover, as MacDonald explained when questioned about the draft slide, the 300,000 new student applications were a subset of Frank's overall customer bases, which included returning students and adult learners.

Tr. 2509. In short, nothing on the draft slide "negated" the Government's evidence of materiality or Javice's fraudulent intent.

Third, the Court's ruling that the draft slide was inadmissible, which was the correct ruling, did not meaningfully prejudice Javice. The Court allowed Javice to question MacDonald about the content of the slide. Tr. 2508-2513. Ultimately, Javice was able to make the same arguments about the content of the slide that she could have made had the slide been admitted into evidence.

### 3. The Court Properly Limited Testimony About Events Occurring After JPMC's Acquisition of Frank

Throughout trial, Javice repeatedly tried to introduce irrelevant and misleading testimony and documents relating to events that occurred *after* the defendants fraudulently caused JPMC to pay $175 million for Frank. Javice claims that this evidence was relevant to her good faith because it shows that she disclosed to JPMC the truth—that "Frank's user data was based on website traffic—not FAFSA sign-ups with PII." Javice Br. 30. Even if Javice's description of her purported evidence were accurate—and it is not—the Court would have been correct in precluding it. Had Javice told JPMC the truth after she fraudulently caused the bank to acquire her company, she would be no less guilty of the charged crimes. If a fraudster sells a victim a Hyundai for $250,000, falsely claiming it is a Ferrari, he is no less guilty of fraud because he eventually tells the victim the truth. Accordingly, the Court acted well within its broad discretion in limiting the admission of evidence from the time period after the acquisition.[31]

---

[31] The Government introduced evidence of the defendants' post-acquisition coverup of their lies to JPMC. Javice does not claim that this type of evidence is relevant and admissible. Rather, she argues that she should have been permitted to introduce unrelated evidence of her post-acquisition conduct. As described, Javice proposed evidence did not actually negate her fraudulent intent and was plainly designed to confuse the jury. The Court was correct in precluding it.

Putting that aside, Javice never told JPMC the truth—either before or after the acquisition—and her descriptions of the evidence she sought to introduce are entirely misleading. For example, several weeks after the acquisition was completed, Frank sent a privacy policy update to all of its users (only about 400,000 users, not 4.25 million). Javice Br. 29. To send this email, Javice claims that Frank had "turned over" the 400,000 email addresses to JPMC, and "JPMC did not ask any questions or investigate further." *Id.* That is not what happened. In reality, a legacy Frank employee, Jenny Zeitler, sent the privacy policy update email from Frank's systems, and Zeitler did not recall telling anyone from JPMC that the email was only being sent to 400,000 people and not 4.25 million. Tr. 1112, 3072-3073. This is a far cry from the full-throated disclosure that Javice describes. In any event, the Court permitted Javice to introduce evidence about the privacy policy update email. Tr. 1188, 3072-3073.

Javice also mischaracterizes a November 2021 document that she attempted to introduce. Javice claims that in November 2021, several months after the acquisition, in a presentation on Search Engine Optimization ("SEO") given by Jennifer Wong, JPMC was told that Frank "did not have PII for 4.25 million users." Javice Br. 30. Again, even if that were the case, the Court would have been well within its broad discretion in precluding such evidence. But the presentation bears no resemblance to Javice's misleading description, *see* CJ-380, or the reason she first attempted to introduce the document, Tr. 1184. And again, the Court allowed Javice to elicit limited testimony about the SEO presentation market data that was provided to those who attended. Tr. 1185-1186.

### 4. The Court Properly Precluded Amar from Introducing Improper and Misleading Testimony About the Presence of Counsel

During the trial, Amar repeatedly attempted to inject improper and misleading evidence about the presence of counsel at meetings and in communications. Amar's efforts were a transparent attempt to mislead and confuse the jury into believing lawyers had approved or blessed

the defendants' actions, without having to satisfy the stringent requirements of an advice of counsel defense. The Court properly stopped Amar from doing this.

### a. Evidence of Mr. Glazer's Activities Was Irrelevant and Misleading

Amar first claims that the Court improperly precluded evidence that Glazer was involved in diligence leading up to the sale of Frank. Amar R.33 Br. 43-46. Amar claims that Glazer's involvement is direct evidence of Amar's good faith. Amar's argument confirms that he intended to do precisely what the law forbids—mislead the jury into believing that a lawyer had somehow blessed Amar's otherwise unlawful conduct.

While Glazer had some role in the sale of Frank and the diligence leading up to the sale, Javice and Amar purposefully excluded Glazer from certain meetings and did not disclose to him key facts related to their fraud. Among other things, Amar did not disclose to Glazer the following:

- The defendants had defined a "user" in due diligence as one who had signed up for a Frank account by providing their name, email, and address.

- The defendants told potential buyers, including JPMC, that Frank had 4.265 million users.

- The defendants told potential buyers that more than 2 million Frank users had completed a FAFSA application.

- The defendants created synthetic data for 4.265 million fake people that they passed off as Frank's real users.

- The defendants purchased data on the open market for 4.5 million students to pass off as Frank's users.

These are critical facts that were, for obvious reasons, not vetted with Glazer. Without knowledge and an understanding of these facts and the contours of the defendants' scheme, Glazer's presence at diligence meetings or on diligence-related communications had little to no relevance. On the other hand, evidence of Glazer involvement had the potential to seriously mislead and confuse the jury.

Take, for example, the definition of a Frank "user." At the beginning of the sales process, Glazer was told that a "user" would be "defined . . . in diligence . . . as people who use [Frank's] website." GX-G543. The defendants did not later disclose to Mr. Glazer that they told JPMC in diligence meetings that a "user" was someone who had created an account and provided their "first name, last name, e-mail address, and a phone number." Tr. 2297. Allowing Amar to elicit testimony that Glazer "was involved in reviewing and signing off on representations during diligence," Amar R.33 Br. 45, would have seriously misled the jury into believing that Glazer had blessed the defendants' conduct when, in fact, Glazer had both incomplete and inaccurate information.

Courts in this District have consistently and repeatedly recognized this exact point. Absent a formal advice of counsel defense, and there was none here, evidence of a lawyer's involvement "can pose a substantial risk of misleading the jury." *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2024 WL 477043, at *3 (S.D.N.Y. Feb. 7, 2024); *United States v. Gillier*, 11 Cr. 409 (PAE) (S.D.N.Y.) (July 5, 2022 Hr'g Tr. at 15) ("Apart from permitting a defendant to benefit from an incomplete advice-of-counsel defense, a presence-of-counsel defense may also be highly misleading to the jury. That is because the mere presence of a counsel is not probative of anything. It does not establish what was said between client and counsel."). A "jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction." *SEC v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013). Such a misunderstanding would unfairly prejudice the Government because it would "give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense." *Id.*

In *SEC v. Stoker*, No. 11 Civ. 7388 (JSR) (S.D.N.Y. 2012), the district court took exception to defense counsel's effort to highlight, through questioning, that attorneys had reviewed certain offering materials that the SEC charged were materially misleading. Specifically, the court recognized that "absent evidence that counsel knew either the information that Mr. Stoker allegedly kept secret, from outsiders, or knew the information that the SEC claims were distorted misrepresentations, the role of counsel in any of this [was] *totally irrelevant*." *Stoker*, Dkt. No. 100, July 23, 2012 Trial Tr. at 895-96 (emphasis added). The court further recognized, despite the defendant's proffer of an alternative reason for the examination, that the defendant was effectively mounting a "disguised reliance argument," *id.* at 973, and that, even if the testimony were offered for some other purpose, questioning about the role of attorneys invited "all the danger of the jury misunderstanding the alleged purpose" of the testimony. *Id.* at 981; *see also United States v. Petit*, No. 19 Cr. 850 (JSR) (noting that defense counsel "has been quite good in avoiding" raising presence of counsel and accountant issues, but that if they raise it in summation "I will probably interrupt right then and there and say 'There is no defense of counsel here, there is no auditor advice defense.'").

Therefore, for the reasons set forth before, the Court properly precluded Amar from introducing inadmissible and misleading presence of counsel evidence, and he is not entitled to a new trial on this basis.[32]

---

[32] Amar claims that the Court misled him into believing that he would be able to put on a presence of counsel defense and that the Court's subsequent evidentiary rulings "severely prejudiced Mr. Amar's ability to mount a defense." Amar R.33 Br. 45. This is nonsense. At the final pretrial conference, the Court ruled on a single document concerning Mr. Glazer, GX-802-24. Feb. 4. 2025 Hr'g Tr. 64 ("THE COURT: If you want to use this colloquy, you can"). Notwithstanding the Court's ruling allowing Amar to introduce this document into evidence, for whatever reason Amar chose not to. Instead, Amar tried to admit other inadmissible records related to Glazer. In any event, the Court made clear that these pretrial rulings, among others, were "preliminary

### b. The Government Did Not Elicit "False Testimony" About Mr. Glazer.

Amar claims that the Government opened the door to evidence of Glazer's presence by eliciting "false testimony" about Glazer. Amar R.33 Mot. 46. Vovor testified that one of the reasons he felt uncomfortable about Javice and Amar's request for fake data was that Glazer was not involved. Amar R.33 Br. 46. Amar claims that the Government gave the false impression that "Mr. Vovor did not raise the conversation with Mr. Glazer because Mr. Glazer had left Frank in August 2021" when in fact Glazer remained employed through September 2021. Amar R.33 Br. 46-47.

The Government did not elicit misleading or "false testimony" and did not open the door to a presence of counsel defense. To the contrary, the Government elicited testimony from Vovor that the reason he did not report the conversation to Glazer was because he "didn't know what Ms. Javice and Mr. Amar had sent to Chase [or] what Chase asked them exactly for . . . ." Tr. 1612. In other words, Vovor testified, in response to questioning from the Government, that he did not report his conversation with the defendants to Glazer because he did not know whether the defendants had, in fact, done anything wrong. The Government did elicit "false testimony" or otherwise open the door to a presence of counsel defense.

### c. The Court Correctly Precluded Evidence of Amar's Purported Reliance on Legal Advice from Frank's Outside Counsel

Amar introduced an August 3, 2021 WhatsApp message between Javice and Amar about the purchase of student data on the open market. The message, which Javice sent to Amar, was: "On with Michael and Idan and they both said buy [the ASL data] and move quick." The Government understands that Michael referred to Michael Eisenberg, a Frank board member, and

---

rulings" that were subject to change "in the light of the context of the trial." Feb. 4. 2025 Hr'g Tr. 50.

Idan referred to Idan Nester, Frank's outside counsel at Sidley Austin LLP. Shareholder Representative Services LLC ("SRS"), an entity that holds the privilege that existed between Frank and Sidley prior to the JPMC acquisition, maintained that this communication was privileged. Notwithstanding, Amar sought to introduce the complete WhatsApp message. The Court allowed Amar to introduce the message, over the Government's objection, so long as the attorney's name was redacted.

Putting aside SRS's assertion of privilege, which the Court disagreed with, the Court correctly directed the redaction of the attorney's name. As the Government understands, and neither defendant has disputed, Nester's involvement in the purchase of data from ASL was limited to whether the purchase required board approval or not. Dkt. 321. Such legal advice had no relevance to any issue properly before the jury.

Second, Nester's involvement did not bear on Amar's state of mind, and evidence of Nester's involvement created a high risk of misleading the jury. Just like with Glazer, the defendants concealed key facts from Nester—for example, that they intended to pass off the ASL data as Frank user data or that the purchase of ASL data was related to the JPMC acquisition. The jury could have easily been confused into believing that Nester blessed Amar's ultimate use of the ASL data.

Third, the Government was blocked from obtaining complete information related to Nester's legal advice and the surrounding context of the WhatsApp message because of the attorney-client privilege. By seeking to use the ultimate legal advice, but effectively blocking the Government from all of the surrounding details, Javice and Amar tried to use the attorney-client privilege as both a sword and shield. *See United States v. Doe (In re Grand Jury Proceedings)*, 219 F.3d 175, 182 (2d Cir. 2000) ("[F]airness considerations arise when the party attempts to use

the privilege both as 'a shield and a sword.' In other words, a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."). This raised serious fairness concerns—that the Government would not be able to fully respond to the misleading message. For the same reasons, allowing Amar to admit an unredacted version of the WhatsApp message would have caused unnecessary delay. The Government would have needed to litigate the application of the crime-fraud exception to the attorney-client privilege, collect additional records concerning the legal advice, and call Nester as a rebuttal witness.

The Court correctly precluded evidence of Nester's very limited and irrelevant involvement in the defendants' purchase of the ASL data. No new trial is warranted on this basis.

### D. The Defendants Are Not Entitled To a New Trial Because The Court Precluded Evidence Regarding JPMC's Civil Lawsuit Against the Defendants

The defendants are not entitled to a new trial because the Court precluded them from presenting evidence concerning JPMC's civil lawsuit against Amar and Javice. The Court was well within its discretion to preclude this line of cross-examination under Rule 403.

*First*, the probative value of this line of cross-examination—particularly as to Vovor and MacDonald—was minimal, as these witnesses themselves did not file any lawsuit against the defendants, and there was nothing in the record or the Section 3500 material to suggest that they were aware of these lawsuits, had a financial interest in the outcome of these lawsuits, or were otherwise influenced by their outcome. The minimal probative value is further outweighed by the fact that the defendants had ample opportunities to impeach the Government's witnesses because of their current or former affiliation with JPMC: indeed, Javice's defense was that JPMC witnesses

108

were not telling the truth.[33]  *See* Tr.3619.  *Second*, as the Court ruled, introduction of the JPMC

civil lawsuit could result in a "digression and misleading material." Tr. 3345.  Indeed, had the

Court taken judicial notice of the lawsuit, the Government would have offered Javice's and Amar's

civil answers which contained demonstrably false statements.[34]  Furthermore, the introduction of

the civil lawsuit risked confusing the jury, particularly in light of Javice's counsel's comments that

the Government's case was a civil case, not a criminal case.[35]

The defendants, accordingly, were not denied their right to impeach JPMC witnesses and

cannot demonstrate a manifest injustice.  Accordingly, they are not entitled to a new trial on this

basis.

### E.  The Defendants Are Not Entitled To a New Trial Because the Court Restricted the Defendants' From Cross-Examining Witnesses on JPMC's Payment of Witness Legal Fees

The defendants are not entitled to a new trial because the Court precluded them from cross-

examining witnesses on JPMC's payment of legal fees.  Amar R.33 Br. 60-62; Javice Br. 43-45.

Defense counsel vigorously cross-examined Government witnesses throughout the trial and cannot

credibly argue that their rights under the Confrontation Clause have been curtailed because they

were not permitted to cross-examine Government witnesses as to who paid their legal fees.

---

[33]    In addition, Amar, in order to suggest that Vovor testified with bias against Amar, Amar elicited testimony from witnesses that Vovor and Amar frequently butted heads. Tr. 1074 (Wong), 3108 (Zeitler).

[34]    In fact, Amar sought to introduce evidence of JPMC's civil lawsuits at the eleventh hour of the trial, such that the Government had no opportunity to rebut allegations that JPMC witnesses were shading their testimony to assist JPMC's civil lawsuit.

[35]    Indeed, the Court had to issue a curative instruction to address Javice's improper comments that the case should be considered a civil dispute.  Tr. 3656 ("If this case walks like a civil case, quacks like a civil case, it's probably because that's what it was."); Tr. 3791 (instructing the jury that "[n]ow, those clauses [in the Merger Agreement] would be highly relevant if this were a civil case but this is not a civil case and so, it does not directly affect this case.").

Furthermore, as the Government stated in its prior opposition on this issue (Dkt. 285), cross-examination concerning JPMC's payment of legal fees was of minimal probative value: it is routine for employers, such as JPMC, to pay legal fees and/or provide counsel for its employees and former employees in matters arising from their employment.[36] What's more, evidence of JPMC's payment of government witness legal fees would be incomplete and misleading because JPMC is *also* paying the defendants' legal fees. Allowing the defendants to cross-examine Government witnesses on JPMC's payment of legal fees would, therefore, open the door for the Government to elicit how JPMC is paying the defendants' legal fees. Accordingly, the Court properly precluded defense counsel from cross-examining Government witnesses on JPMC's payment of legal fees. The defendants cannot demonstrate that a manifest injustice occurred because the Court precluded this line of cross-examination, especially where, as here, it would open the door to arguments that JPMC was paying the defendants' legal fees.

## F. The Defendants Are Not Entitled To A New Trial On the Basis of Alleged *Brady* Violations

For the reasons set forth in its prior opposition, the Court properly denied Amar's pretrial Brady motion. *See* Dkt. 247; Transcript of February 4, 2025 Pretrial Conference, at 19; Dkt. 61. The Court has twice held that JPMC has never been part of the Government's prosecution team (*see id.*), and JPMC's notes of its witness interviews have never been in the Government's possession. Amar's rank speculation that JPMC's notes of its own interviews might have differed from the witness's later testimony because such witnesses were "coached" by JPMC lawyers falls

---

[36] Javice recounts in her brief that one witness did not meet with the Government until that witness obtained counsel. Javice Br. 44-45. Putting aside Javice's mischaracterizations of that witness's Section 3500 material, it is hardly unusual that a witness, a former Frank employee, to chose to obtain counsel, and clarify who was paying for counsel, before sitting down for a voluntary interview with the Government.

far short of establishing a *Brady* violation. *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (a violation of the Government's *Brady* obligation deprives the defendant of a fair trial only when the defendants "show[s] that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice.").

### G.   The Government's Examinations Were Not Misleading

Amar cites a series of questions the Government asked witnesses, arguing that he is entitled to a new trial because, in his view, the Government intended to elicit misleading testimony. Amar's argument lacks any merit in the law and is wholly unsupported by the factual record. None of the questions (or the resulting testimony) was misleading, and in any event, Amar had the opportunity to address his view of the testimony in cross-examination and in argument to the jury. In fact, Amar made many of the same arguments he presents in his motion to the jury during his summation. The jury found his arguments to be unpersuasive, and so should the Court. But more fundamentally, nothing Amar identifies as "misleading" can give rise to a new trial under Rule 33. Amar cites to no legal authority standing for the proposition that a question that may elicit testimony, which the defense then views as misleading but is fully able to then subject that testimony to cross-examination, entitles a defendant to a new trial. Instead, Amar cites to two cases involving prosecutors who argued substantial facts not in evidence. Amar R.33 Br. 52. That is not what happened here, and those cases do not support any of Amar's arguments.

Amar first complains about a question asked during the Government's redirect examination of Steven Stolls, a witness from ASL Marketing.[37]  Amar contends that the Government sought

---

[37] The specific question was: "Other than 4.5 million, do you recall Mr. Amar requesting any other volume of student data?" Tr. 1363.  Mr. Stolls responded, "I don't.  I don't recall."  The Government asked this question on redirect because during his cross-examination of Mr. Stolls, Amar repeatedly tried to create the misimpression that Amar had requested "various different

"to create the misimpression" that Amar had only requested data for 4.5 million people when, in fact, there were notes from another employee at ASL—not Mr. Stolls—reflecting that Amar had initially inquired with that other person about buying data for 10 million students.  Amar R.33 Br. 52-53.  As an initial matter, the fact that Amar originally requested 10 million records is completely consistent with the Government's theory of the case.  The Government therefore had zero motivation to "create [a] misimpression" about it.  The Government argued that Amar had purchased student data from ASL in order to cover up his and Javice's lies about having data for millions of customers.  JPMC was told, falsely, that Frank was projected to have 10 million customers by the end of 2021.  GX 3.1.4.  Indeed, in an August 26, 2021, WhatsApp chat between Javice and Amar—just a couple of weeks after the ASL purchase—Javice reminded Amar that JPMC was "expecting us to have 10M students this year (remember our metric)."  GX 801-27. Amar's inquiry to ASL about records for 10 million students is devastating proof of his guilt.  In any event, the jury was clearly not misled because the Government later introduced into evidence the very same ASL notes at issue that reflect Amar's initial request for 10 million records.  GX

---

quantities of data to purchase," Tr. 1343, when in fact Amar had asked Mr. Stolls for 4.5 million records.  *See, e.g.*, Tr. 1343 ("Q.  "With regard to your discussions with Mr. Amar, you discussed various different quantities of data to purchase by Frank; right?"), Tr. 1343 ("Q.  Isn't it true that Mr. Amar asked about a quote for 7 million records at one point in your discussions?"), Tr. 1343 ("Q.  In the course of your discussions with Mr. Amar, didn't it eventually become the case that you were discussing the purchase of 3 million records?").  One way in which Amar did this was by showing the witness "count summaries," which summarized the total records ASL maintained in this database for certain categories, and suggested, through questioning, that Amar had made a request for the specific numbers reflected in those reports.  Tr. 1333-1334.  When the Government objected on rule of completeness grounds and asked that the cover email to one of the count summaries also be admitted into evidence so the jury could understand the context, counsel for Amar responded, "I don't see why the cover e-mail is necessary."  Tr. 1345.  Amar's own questioning risked confusing the witness and the record before the jury, and Amar's objection sought to leave the jury with incomplete information.  Amar's allegation that it was somehow the Government that intended to deceive the jury through its questioning of Mr. Stolls falls flat.

2303.  There can be no basis for a new trial where the jury actually got the very evidence that Amar (incorrectly) implies was withheld from them.

Amar next cites a question that the Government asked Houston Cowan about a correction to website visitor data that Frank made during diligence ("Now, Mr. Cowan, did there come a time when you learned that that data was not unique website visitors?").  Amar R.33 Br. 54; Tr. 193.  This question—to which there was no objection—was not misleading.  Amar claims that the question "implied that it was some external actor—and not Mr. Amar—who was responsible for making the correction."  Amar R.33 Br. 54.  But the question did not make any implication, misleading or not, about the source of the correction.  Most importantly, the witness was free to answer with any responsive information. And, as cross-examination demonstrated, the source of the correction was beyond the witness's knowledge.  Tr. 279 ("I don't recall who caught [the mistake], Mr. Baez, but it was corrected, yes.").  Regardless, the Court cured any conceivable issue by admitting, over the Government's objection, GX 802-22, a Slack chat in which Amar called out the mistake about website visitor data.  Once again, no error occurred.  The jury had access to the evidence Amar wanted to admit, and the jury still unanimously convicted Amar.

Finally, Amar complains that the Government misleadingly grouped the defendants together when questioning witnesses about fraudulent misrepresentations.  This argument has no merit.  The Government repeatedly, and on purpose, elicited testimony from witnesses that Amar was not involved in certain conduct.  For example:

Testimony of Leslie Wims Morris:

| Q: | Did you interact at all with Mr. Amar during diligence? |
|----|----------------------------------------------------------|
| A: | Only in that one session where he talked about growth. |
| Q: | And who did you primarily interact with at Frank? |
| A: | Ms. Javice |

Tr. 569.

Testimony of Alex Sweeney:

| Q: | Was Mr. Amar involved in any of those [validation project] discussions? |
|---|---|
| A: | No |

Tr. 1456.

The Government did not misleadingly group the defendants together. But regardless, Amar was free to cross-examine witnesses and make arguments to the jury about any disagreement he had with the Government's questions or with the content of the witnesses' testimony, which he did. In short, none of Amar's claims of "misleading" the jury are accurate, nor could they warrant the extraordinary relief he seeks.

### H. Salve's Testimony Was Proper

Javice's arguments in her Rule 33 motion regarding the testimony of Michael Salve—that his testimony violated the Confrontation Clause, and that he offered improperly disclosed expert testimony, *see* Javice Br. 34-39—are without merit.

*First*, Javice's Confrontation Clause argument is baseless. Dr. Salve testified, in short, that he verified the accuracy of two summary charts, and explained the two charts for the jury. The information in the summary charts came entirely from already-admitted Government Exhibits, and Dr. Salve's role was simply to compare the contents of certain data sets that were in evidence. *See* GX 2708, 2709; Tr. 2730, 2734-35. While Dr. Salve was assisted by others at BRG in certain aspects of his work comparing data files—namely, setting up computer programs to help compare the files line by line, rather than doing a strictly manual comparison, which would have taken an inordinate amount of time—Dr. Salve testified that he personally oversaw the work performed in the first instance by others on his team, personally reviewed that work, and personally validated that work. *See* Tr. 2717, 2741-42; *see also, e.g.*, Tr. 2743 ("*I* did it by using Excel as well as

114

Microsoft SQL and Python." (emphasis added)).  Because Dr. Salve's testimony was based on his personal knowledge and he did not convey any testimonial statements of out-of-court declarants, at all, his testimony does not raise any Confrontation Clause issue.

*Second*, Javice's argument that Dr. Salve was an improperly disclosed expert is likewise meritless.  As an initial matter, the Government had disclosed that it was calling a witness from Berkeley Research Group ("BRG") to do these comparisons in December 2024, approximately four months prior to Dr. Salve's testimony, and the defendants received the initial draft of the comparison summary chart approximately seven weeks prior to Dr. Salve's testimony.  *See* Tr. 2723.  At no point, until the day prior to Dr. Salve's testimony, did the defendants raise any expert witness issue.  *See id.*  Next, while the Court initially sided with Javice's counsel's arguments that Dr. Salve was offering expert testimony, upon actually hearing from Dr. Salve about the work he performed and the computer programs used to aid that work, the Court revised its ruling and correctly held as follows:

> The use by Dr. Salve of Python, UltraEdit, and Microsoft SQL are mechanical aids in the human ability to display, observe, and compare. What a witness would be able to do, under Federal Rule of Evidence 1006, summarizing large exhibits and putting them together in a coherent fashion for the jury to consider, is an appropriate point of admissibility. Essentially that's what this witness is doing. Whatever the means used by the witness to compare, the comparisons, according to Mr. Fergenson, were disclosed several months ago, giving defendants ample time to make their own comparisons, to the extent they wish, using whatever mechanical and automated tools they wished to do so. So it will be unfair to the prosecution to prevent this witness from coming on in the normal course, and I rule that he may do so . . . before the jury.

Tr. 2724-25.  The Court's ruling under Rule 1006 was correct.  Further, Javice does not contend that anything Dr. Salve testified to was, in fact, inaccurate or misleading, and thus has failed to identify any prejudice from Dr. Salve's testimony, which accurately summarized information contained in exhibits that were already admitted into evidence.

*Finally*, Javice complains, for the first time, that the Government did not produce a copy of its contract with BRG. Javice Br. 39. Yet Javice never requested that contract, nor otherwise raised this issue during trial. Even without that contract, moreover, Javice was free to question Dr. Salve regarding his fees. *See id.* (stating Javice "had a right" to such questioning). Javice instead strategically chose not to raise either this discovery request with the Government, or this line of inquiry with the witness on cross examination. That strategic choice was a reasonable one in light of the fact that the substance of Dr. Salve's testimony was not reasonably subject to attack as somehow biased. Dr. Salve was not offering disputed opinions; his testimony as a summary witness was limited to undisputed summaries of already-admitted data files.

**CONCLUSION**

For the foregoing reasons, the defendants' motions should be denied.

Dated: New York, New York
       May 16, 2025

                              Respectfully submitted,

                              PERRY CARBONE
                              Attorney for the United States, Acting under
                              Authority Conferred by 28 U.S.C. § 515


           By:      ___/s/_____
                    Rushmi Bhaskaran
                    Nicholas W. Chiuchiolo
                    Micah F. Fergenson
                    Georgia V. Kostopoulos
                    Assistant United States Attorneys
                    Telephone: (212) 637-2439 / -1247 / -2190 / -2212

117