UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

Case No.: 1:23-cr-00251-AKH

CHARLIE JAVICE and OLIVIER AMAR,

Defendants.

**REPLY MEMORANDUM OF LAW IN SUPPORT OF CHARLIE JAVICE'S**
**MOTION FOR JUDGMENT OF ACQUITTAL AND A NEW TRIAL**

# TABLE OF CONTENTS

**Page**

I.    The government failed to show that Ms. Javice Received a Fair Trial.................................. 1

  A.    The government fails to grapple with the injustice of facing trial by two prosecutors. ..... 1

  B.    Omitting the agreed-upon "blind eye" materiality instruction was manifestly unjust........ 8

  C.    The government offers no meaningful response to the Court's erroneous decision to decline to give a theory of defense instruction. ...................................................................... 11

  D.    Justice requires a new trial because Ms. Javice was prevented from presenting a complete defense. .................................................................................................................................... 12

  E.    The Court erred in admitting Dr. Salve's testimony...................................................... 13

II.    a judgment of acquittal is required because the government failed to prove each element of every charge beyond a reasonable doubt. .................................................................................... 14

  A.    The Court should vacate all four convictions because no reasonable jury could have found Ms. Javice made material misrepresentations. ............................................................. 15

  B.    No rational jury could conclude that Capital One or JPMC were acting as "financial institutions" within the meaning of 18 U.S.C. § 1344. .......................................................... 20

  C.    The government failed to establish nearly every element of securities fraud for Capital One's declined Frank acquisition................................................................................................ 21

  D.    Securities fraud statute is an unconstitutional delegation of Congress's Article I power. 23

  E.    The government failed to satisfy its burden of proving each element of each charge beyond a reasonable doubt................................................................................................... 24

CONCLUSION................................................................................................................................ 25

CERTIFICATE OF SERVICE ....................................................................................................... 27

# TABLE OF AUTHORITIES

**Page**

Cases

*Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810) ........................................ 23

*G.F.F., et al. v. Trump*, No. 25-02886-AKH (S.D.N.Y. May 6, 2025) ............................ 23

*Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024) ................................................ 22

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892) .................................................... 24

*Shaw v. United States*, 580 U.S. 63 (2016) ................................................................... 20

*Thompson v. United States*, 604 U.S. __ (2025) .......................................................... 11

*UMB Bank, N.A. v. Benton*, No. 21-cv-00832 (BP), 2022 WL 16753765 (W.D. Mo. June 29, 2022), *aff'd sub nom. UMB Bank, N.A. v. Guerin*, 89 F.4th 1047 (8th Cir. 2024) .................. 21

*United Sates v. Koh*, 199 F.3d 632 (2d Cir. 1999) ......................................................... 20

*United States v Wedd*, 993 F3d 104 (2d Cir 2021) ......................................................... 9

*United States v. Amico*, 486 F.3d 764 (2d Cir 2007) .................................................... 18

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) .................................................. 8

*United States v. Barrett*, 102 F.4th 60 (2d Cir. 2024) .................................................. 15

*United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016) ........................................ 20, 21

*United States v. Budovsky*, No. 13CR00368 (DLC), 2016 WL 386133 (S.D.N.Y. Jan. 28, 2016) ...................................................................................................................... 14

*United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019) ............................................... 15

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989) .......................................... 3

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) .................................................. 18

United States v. Chierchio, No. 20-CR-306 (NGG), 2022 WL 523603 (E.D.N.Y. Feb. 22, 2022) ................................................................................................................... 5, 6

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) ............................................... 19

*United States v. Dennis*, 132 F.4th 214 (2d Cir. 2025) ................................................ 15

*United States v. DiCristina*, 726 F.3d 92 (2d Cir. 2013) .............................................. 22

*United States v. Dove*, 916 F.2d 41 (2d Cir. 1990) ................................................. 11, 12

*United States v. Eisen*, 974 F.2d 246, 256 (2d Cir. 1992) ............................................ 11

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) ............................................... 1

*United States v. Ferguson*, 49 F. Supp. 2d 321 (S.D.N.Y. 1999) .................................... 1

*United States v. Georgiton*, No. 23-6807, 2025 WL 1091253 (2d Cir. Apr. 8, 2025) ................ 8

*United States v. Gjurashaj*, 706 F.2d 395 (2d Cir. 1983) ............................................ 15

*United States v. Green*, 114 F.4th 163 (3d Cir. 2024) ............................................... 3, 8

*United States v. Hudson*, 11 U.S. 32 (1812) ................................................................ 23

*United States v. James*, 239 F.3d 120 (2d Cir. 2000) ................................................. 8, 9

*United States v. James*, No. 19-CR-0382(JS), 2023 WL 6675339 (E.D.N.Y. Oct. 12, 2023) ..... 15

*United States v. Kozeny*, 541 F.3d 166 (2d Cir. 2008) ................................................. 22

*United States v. Laljie*, 184 F.3d 180 (2d Cir. 1999) ................................................... 20

*United States v. Litvak ("Litvak I")*, 808 F.3d 160 (2d Cir. 2015) ............................. 17, 18

*United States v. Litvak ("Litvak II")*, 889 F.3d 56 (2d Cir. 2018) ............................... 16

*United States v. Masotto*, 73 F.3d 1233 (2d Cir. 1996) ............................................... 12

*United States v. Melendez*, No. 20-3875, 2022 WL 3640449 (2d Cir. Aug. 24, 2022) ............. 8

*United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994) ......................................... 15

United States v. Nordlicht, No. 16-CR-00640 (BMC), 2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018) ......................................................................................................................... 6, 7

*United States v. Pauling*, 924 F.3d 64 (2d Cir. 2019) .................................................. 19

*United States v. Prawl*, 168 F.3d 622 (2d Cir. 1999) ................................................. 9, 11

*United States v. Rommy*, 506 F.3d 108 (2d Cir. 2007) ............................................. 10, 11

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998)....................................................... 3
*United States v. Schulte*, 578 F. Supp. 3d 596 (S.D.N.Y. 2021)........................................ 15
*United States v. Serpoosh*, 919 F.2d 835 (2d Cir. 1990) ..................................................... 7
*United States v. Shkreli*, 260 F. Supp. 3d 247 (E.D.N.Y. 2017)............................... 3, 4, 5
*United States v. Stanley*, No. 3:23-cr-0027 (VAB), 2025 U.S. Dist. LEXIS 80884 (D. Conn. Apr. 29, 2025) ............................................................................................................................ 5
*United States v. Starr*, 816 F. 2d 94 (2d Cir. 1987) ........................................................... 16
*United States v. Tuzman*, 301 F. Supp. 3d 430 (S.D.N.Y. 2017)....................................... 5
*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015)........................................................... 20
*United States v. Wander*, 601 F.2d 1251 (3d Cir. 1979)..................................................... 10
*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016)........ 9, 16, 19
*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 6 L.Ed. 253 (1825) ............................................ 24
*Whalen v. United States*, 445 U.S. 684 (1980) ............................................................ 23
*Zafiro v. United States*, 506 U.S. 534 (1993)........................................................... 3, 5

Statutes
15 U.S.C. § 78j(b)............................................................................................................... 21, 23
15 U.S.C. 78c(10) ................................................................................................................... 22
18 U.S.C. § 1344.............................................................................................................. 20, 21

Rules
Fed. R. Crim. P. 14 ................................................................................................................... 3
Fed. R. Crim. P. 29 ................................................................................................................. 14
Fed. R. Crim. P. 33 .............................................................................................................. 1, 8
Fed. R. Evid. 401 .................................................................................................................... 12
Fed. R. Evid. 801 .................................................................................................................... 12

Regulations
17 C.F.R. § 240.10b-5............................................................................................................. 21

Other Authorities
23 Williston on Contracts §63.3 (4th ed. 2018)..................................................................... 16
Black's Law Dictionary (12th ed. 2024)................................................................................. 22
J. Locke, The Second Treatise of Civil Government and a Letter Concerning Toleration § 22 (1947) ....................................................................................................................................... 24
The Federalist No. 48............................................................................................................... 24
The Federalist No. 62............................................................................................................... 24
The Federalist No. 73............................................................................................................... 24
The Federalist No. 78............................................................................................................... 23
U.S. Const. Art. 1, Sec. 1 ....................................................................................................... 23
W. Blackstone, Commentaries on the Laws of England (1765)............................................. 24
William W. Story, *A Treatise on the Law of Sales of Personal Property* § 1 (1853)................. 22

The government's omnibus opposition imitates its prosecution—one that, despite its length, still falls short. The government invites the Court to conclude that Ms. Javice received a fair trial and that it proved every element of every charge beyond a reasonable doubt based on unsupported factual assertions and caselaw that undermines its position. The Court should decline the government's invitation. Justice demands a new trial or entry of a judgment of acquittal.

## I.    THE GOVERNMENT FAILED TO SHOW THAT MS. JAVICE RECEIVED A FAIR TRIAL.

### A.    The government fails to grapple with the injustice of facing trial by two prosecutors.

Faced with the indisputable evidence of a fundamentally unfair trial, the government distorts the law, the trial record, and the parties' positions at trial. Starting with its recitation of the legal standard for severance, the government's argument is self-defeating. In arguing that prejudicial joinder does not warrant a new trial, the government relies on *United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001). Opp. 80. Yet, in that case the Second Circuit upheld the *grant* of a Rule 33 motion and noted the district court's concerns that it had improperly denied the defendant's pretrial motion to sever his trial from that of his codefendant. *Id.* at 137; *United States v. Ferguson*, 49 F. Supp. 2d 321, 330 (S.D.N.Y. 1999) ("[E]ven my decision to refusing to sever Ferguson's trial from that of the core members of the Power Rules supports a new trial."). The Rule 33 motion was properly granted there and should be granted here, too.

The government's substantive arguments are also meritless. It claims that Ms. Javice and Mr. Amar's defenses were not truly antagonistic because Mr. Amar never "argued that Ms. Javice was guilty of a crime." Opp. 79. This is false. The purported misrepresentation of what constituted a Frank "user" and the corresponding 4.25 million user figure was the central allegation in the government's case. Ms. Javice's unwavering defense throughout trial was that neither she

nor Mr. Amar committed fraud.  By contrast, Mr. Amar repeatedly tried to pin the blame squarely on Ms. Javice, and Ms. Javice alone as to this alleged misrepresentation and others.

For example, Mr. Amar's counsel had the *very first witness* in the government's case establish that it was only Ms. Javice who defined a "user".  02/25/2025 Trial Tr. 318:23–25 (cross-examination of Houston Cowan) ("Q. To be clear, the only person you ever have a memory of providing you with a definition of what a Frank user was was Ms. Javice?" "A. That is correct.").  This antagonism continued throughout trial.  03/26/2025 Trial Tr. 3680:8–10 (Amar summation) ("And then Ms. Javice sends something else instead that was mislabeled, she sends this: CJ-Visitors Excel Spreadsheet."); *id.* at 3692:2–3 ("The only one who knows all of what is being done and why is Ms. Javice.").  Mr. Amar's post-trial briefing repeats this all-too-familiar damaging refrain.  *See* ECF 390 at 1 ("Time and again, counsel for Mr. Amar, and often the Court, had to clarify through objections or cross-examination that, to the extent anyone misrepresented Frank's user data, it was Ms. Javice, not Mr. Amar."); *id.* at 11 ("[T]he evidence at trial showed that Ms. Javice provided substantially inflated visitor data to Capital One and JPMC by taking Frank's impressions data (which was in the tens of millions) and mislabeling it as website visitors."); ECF 391 at 1 ("As Mr. Amar previewed, he sought to introduce evidence that was exculpatory as to him but inculpatory as to Ms. Javice.")

Further, Mr. Amar's counsel explicitly told the Court that their defense included arguing that Ms. Javice altered Frank's user metrics before providing them to JPMC.  *See, e.g.*, 02/27/2025 Trial Tr. 758:8–15 ("[O]ne of the things that we intend to show is that subsequent to this, the bank asks for age breakdown of Frank's users. Ms. Javice provides that information to LionTree, who provides it to JPMorgan, and the numbers are different from what Mr. Amar had pulled in giving to Ms. Javice."); *id.* at 776:2–7 ("And, to be clear, Mr. Sullivan is 100 percent right. We do intend

to prove, that time and again, Mr. Amar would provide accurate information to Ms. Javice, she would change those numbers, forward it on without including Mr. Amar in the correspondence. . . .").  Meaning, the jury could either believe Mr. Amar, that any misrepresentation was made by Ms. Javice alone and he was an unknowing pawn who she tried to cut out of the deal to avoid detection, or believe Ms. Javice that no fraud occurred.  This is more than "mere fingerpointing." *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989) (internal quotations omitted).  It is quintessential mutual antagonism.  *Cf. United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (affirming denial of severance when "at no time did Salameh argue or suggest that [his co-defendant] was involved in the bombing, or directly contradict [his co-defendant's] defense strategy").

Even if this were not the case, Rule 14 does not require mutual antagonism.  Rather, severance is appropriate where the prejudice is of such a magnitude so as to deny a fair trial.  *See* Fed. R. Crim. P. 14 (court may order separate trials where joinder appears to "prejudice" a defendant without specifying means of creating prejudice); *Zafiro v. United States*, 506 U.S. 534, 539 (1993) (severance appropriate "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"); *United States v. Shkreli*, 260 F. Supp. 3d 247, 256 (E.D.N.Y. 2017) (granting severance even though defenses were not mutually antagonistic because joinder presented a "serious risk" that Shkreli would not receive a constitutionally fair trial); *United States v. Green*, 114 F.4th 163, 177 (3d Cir. 2024) ("Mutually antagonistic defenses are only one means of demonstrating prejudicial joinder[.]" (citing *Zafiro*, 506 U.S. at 539)).  Indeed, joinder prejudiced Ms. Javice.

Sidestepping Ms. Javice's prejudice arguments, the government argues that Mr. Amar's protestations of Ms. Javice's guilt—made with each witness and in summation—did not create an "echo chamber" of the government's proof. Opp. 84. This is so, the government reasons, because it "strongly disputed [Mr.] Amar's characterization of *his* conduct." Opp. 84 (emphasis added). However, the government took no issue with Mr. Amar's characterizations of *Ms. Javice's* conduct or arguments that she was guilty. As to Ms. Javice, the government and Mr. Amar were "aligned." Opp. 84. The record is replete with examples of Mr. Amar's counsel imploring the jury to conclude that fraud was committed solely by Ms. Javice. ECF No. 389 ("Javice Mot.") at 12, 15. Likewise, some minor overlap between co-counsel's arguments unrelated to guilt does not negate Mr. Amar's repetition of the government's case. To the contrary, Mr. Amar's steady drumbeat of evidence and argument asserting Ms. Javice's guilt permeated the trial, depriving her of a fair trial.

The government's only defense to what it concedes is Judge Matsumoto's careful and correct interpretation of prejudicial joinder in *Shkreli* is that it is factually distinct. Not so. As the government acknowledges, the soon-to-be-severed co-defendant in *Shkreli* was open and honest with the court regarding its intention to "act as a second prosecutor against Shkreli, by arguing that Shkreli is guilty and that [the co-defendant] is, himself, just another victim of Shkreli's fraud." *Shkreli*, 260 F. Supp. 3d at 256. The same was true here. Mr. Amar's counsel was insistent before and throughout trial that it intended to inculpate Ms. Javice in order to exculpate Mr. Amar, and they followed through on this promise. *See supra* at 6; Javice Mot. 6–20. Other than to summarily assert, in direct contradiction to the countless instances where Mr. Amar's counsel proffered their antagonistic defense to the Court, that "[t]hat simply did not happen here," the government has no meaningful response. For the same reasons, the government's arguments that Ms. Javice suffered no prejudice from the joint trial fall short. *See* Opp. 86–89. As Judge Matsumoto recognized in

*Shkreli*, trying a co-defendant with another who will, along with the government, prosecute the defendant, "substantially prejudice[s]" a defendant by compromising the jury's ability to make a reliable judgment and by lowering the government's burden to prove guilt beyond a reasonable doubt. *Shkreli*, 260 F. Supp. 3d at 256–57. This is the exact prejudice about which the Supreme Court cautioned courts to be wary in *Zafiro*. 506 U.S. at 539, 544.

Next, the government attempts to minimize *Shkreli* as a legal outlier.[1] In so doing, however, it undermines its own arguments against severance. Opp. 84–85. First, the government relies exclusively on pretrial motions denying severance, in which the courts did not have a full trial record demonstrating manifest antagonism. Opp. 85 (collecting cases all denying severance pretrial). Unlike in those cases, this Court has an anthology of antagonism from the six-week trial. For example, in *United States v. Tuzman*, 301 F. Supp. 3d 430, 444 (S.D.N.Y. 2017), a case on which the government relies, the court denied a pretrial motion to sever, factually distinguishing *Shkreli*. The court reasoned severance was not warranted there because neither defendant planned to "introduce evidence and arguments" that one was a victim of the other. *Id.* Here, however, that is precisely what Mr. Amar's counsel did throughout trial. *See supra* 2; Javice Mot. 6–20.

Similarly, the government relies on *United States v. Chierchio*, in which the district court denied a pretrial motion to sever because the proffered defenses were not incompatible. No. 20-CR-306 (NGG), 2022 WL 523603 (E.D.N.Y. Feb. 22, 2022). However, the court's reasoning supports Ms. Javice's arguments and undermines those of the government. *Id.* at *5–6. The court

---

[1] The government incorrectly claims that there is not "a single case where a court has followed *Shkreli*." Opp. 85. This is incorrect. *See United States v. Stanley*, No. 3:23-cr-0027 (VAB), 2025 U.S. Dist. LEXIS 80884, at *15 (D. Conn. Apr. 29, 2025). Further, contrary to the government's characterizations, the district court cases cited in its motion did not decline to follow *Shkreli*. Instead, the district courts factually distinguished *Shkreli*, from those before it, in part, because the severance motions were filed pretrial.

explained that in other cases where severance was granted, the codefendants presented competing defenses. *Id.* at *6. One codefendant intended to argue that no fraud had occurred. *Id.* While the other would argue that a fraud had occurred but it was committed by someone else. *Id.* The court reasoned, this necessarily undermines the first codefendant's defense. *Id.* In these circumstances, severance is proper to focus the first codefendant's trial "on a single issue: whether or not the conduct charged was or was not fraudulent." *Id*. at *6. By contrast, the codefendants in *Chierchio* could "simply argue that one or the other was responsible. There [were] not two issues (the existence of fraud on one hand, and who committed it on the other) that could confuse the jury. There [was] only one: whodunit." *Id.* This is precisely what happened in Ms. Javice's trial. Javice Mot. 9–20. Contrary to the government's contentions, here, the jury was not simply left with a "whodunit." *Chierchio*, 2022 WL 523603, at *6. Rather, and as the court in *Chierchio* explained, Ms. Javice's defense was undercut because she argued the alleged conduct was not fraudulent. *Id.* By contrast, Mr. Amar's conceded that the conduct *was* fraudulent, and the only question was who committed the fraud. According to him, it was Ms. Javice. This was prejudicial and warranted severance.

The government's opposition also speaks volumes in its silence. For example, it fails to address *United States v. Nordlicht*, which is instructive here. No. 16-CR-00640 (BMC), 2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018) (granting severance). *Nordlicht* involved multiple defendants (Nordlicht primary among them) claiming that the frauds the government charged simply were not frauds, and one co-defendant (Shulse) claiming that they were, but that he was not involved in perpetuating them. *Id.* at *2. Defendant Shulse's proffered defense repeated many of the government's arguments against his codefendants. *Id.* For example, Shulse argued that he was something of a whistleblower, having reported his codefendants' purported wrongdoing. *Id.* The

trouble arose not just from the fact that Shulse claimed to be "at worst, merely an unknowing pawn in [the] alleged frauds [of his co-defendants]." *Id.* It was that Shulse had elected that defense *and* that his codefendants had elected an entirely different one (that there was no legally cognizable fraud). Severing Shulse from his co-defendants properly focused the question at trial on a single issue: whether or not the conduct charged was or was not fraudulent. That is what should have happened here.

Much like Shulse, Mr. Amar also echoed many of the government's allegations against Ms. Javice. He too argued that he was a whistleblower of sorts, alerting Capital One to Ms. Javice's purported "huge mislabel." 02/20/2025 Trial Tr. 78:14–79:1 (arguing Mr. Amar reported to Capital One that Ms. Javice reported incorrect user metrics, and then Capital One declined to purchase Frank); 03/24/2025 Trial Tr. 3276:19–3277:2 (same). Going a step further than Shulse, Mr. Amar's counsel argued that Ms. Javice retaliated for exposing her purported fraud by attempting to cut Mr. Amar out of the JPMC deal. *See, e.g.*, 03/26/2025 Trial Tr. 3686:12–18 (arguing Ms. Javice attempted to cut Mr. Amar out of the deal because of his whistleblowing). Further, Mr. Amar argued that he was at most an unknowing pawn of Ms. Javice's fraud, intentionally siloed from key meetings and communications. ECF No. 381, Ex. C (slides 72–76, 77–81, 111–17). Because Mr. Amar elected this defense, and Ms. Javice's was that no fraud occurred, Ms. Javice's trial should have been severed to preserve her right to a fair trial. *Nordlicht*, 2018 WL 1796542, at *2–3.

Finally, contrary to the government's suggestion, Ms. Javice and Mr. Amar's dual convictions do not suggest that Ms. Javice's joint trial was fair. Opp. 79–80. The Second Circuit has reversed convictions for failure to sever in nearly identical circumstances. *See United States v. Serpoosh*, 919 F.2d 835, 837–38 (2d Cir. 1990) (reversing convictions for failure to sever where

one defendant's testimony "contradicted [his codefendant]'s story in all significant respects" and his summation argued that the codefendant was only using him as an unwitting "buffer" to facilitate a drug purchase); *Green*, 114 F.4th at 180 n.9 (reversing the district court's denial of severance, vacating the defendant's conviction, and remanding for new trial).[2]

### B. Omitting the agreed-upon "blind eye" materiality instruction was manifestly unjust.

The government does not dispute that the Court failed to give the "blind eye" instruction "that he informed counsel" prior to summations that he would give, *United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000), and that Ms. Javice's counsel explicitly relied on in summation, Javice Mot. 41. It does not dispute the accuracy of the "blind eye" instruction.[3] Nor does it address—let alone dispute—that omitting the "blind eye" instruction created a prejudicial asymmetry in the Court's materiality instructions that heavily favored the government and its victim negligence instruction. Javice Mot. 42–43. Instead, the government maintains that the Court's decision to omit the proposed language was correct, and that Ms. Javice was on notice that the "blind eye" instruction was subject to further consideration by the Court. Neither is availing.

The Court explained that it refused to give the agreed-upon "blind eye" instruction because it did not "make[s] sense and [was] cover[ed] by conscious avoidance." 03/27/2025 Trial Tr.

---

[2]  That *Green* involved a direct appeal of a court's severance denial, rather than a Rule 33 motion, is a distinction without a difference. Both are reviewed for an abuse of discretion, *see United States v. Georgiton*, No. 23-6807, 2025 WL 1091253, at *2 (2d Cir. Apr. 8, 2025) (summary order reviewing Rule 33 motion), *United States v. Melendez*, No. 20-3875, 2022 WL 3640449, at *7 (2d Cir. Aug. 24, 2022) (summary order reviewing severance denial), and both require a miscarriage of justice to justify relief, *see United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000) (Rule 33), *Melendez*, 2022 WL 3640449, at *7 (severance).

[3]  Although the government objected to its inclusion at the charging conference, it did not provide a basis for its objection. *See* 03/25/2025 Trial Tr. 3460:3. When given the opportunity to address the Court, the government only suggested replacing the word "misrepresentation" with the phrase "certain types of misrepresentations." *Id.* at 3461:9–11.

3762:18–19.  A comparison of the two instructions contradicts that conclusion.  Conscious avoidance is about the state of mind of defendants.  It "prevents defendants from avoiding criminal liability by deliberately shielding *themselves* from clear evidence of critical facts that are strongly suggested by the circumstances and that, if known, would render *them* guilty of a crime."  *United States v Wedd*, 993 F3d 104, 118 (2d Cir 2021) (emphasis added and internal citation omitted).  The "blind eye" instruction, however, had nothing to do with either defendant's awareness or knowledge.  Instead, it focused on the investors' state of mind and actions, because materiality "looks to the likely or *actual behavior* of the recipient of the alleged misrepresentation."  *Kousisis v. United States*, 605 U.S. __ (2025) (Thomas, J. concurring) (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016)) (emphasis added); Javice Mot. 41.  Although the government claims that the Court's instruction on materiality was otherwise "correct[]", Opp. 54, it fails to point to any other instruction that "conveyed the practical substance" of the blind-eye instruction.  *James*, 239 F.3d at 125.  Even assuming the materiality instruction as given was legally correct, this is insufficient.  Where a missing requested instruction is a correct statement of law, and represents "a theory of defense with basis in the record that would lead to acquittal," and "is not effectively presented elsewhere in the charge," it is reversible error to refuse the requested instruction.  *See United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999) (internal citation omitted).

Indeed, the Court's eleventh-hour turnabout—declining to give the "blind eye"instruction after Ms. Javice incorporated the instruction in her summation based on the Court's prior statement that the jury would receive the instruction—violated Rule 30 and principles of fundamental fairness.  Javice Mot. 41–42.  "It [is] the court's failure to advise counsel of its ruling prior to closing argument, *not the soundness of that ruling*, which violate[s] Rule 30 and prejudicially

affect[s] counsel's summation." *United States v. Wander*, 601 F.2d 1251, 1262–63 (3d Cir. 1979) (emphasis added and internal citation omitted). The omission violated Rule 30, prejudicing Ms. Javice. *Id.* at 1262 ("Whether the actual instruction reflects a better statement of the law is irrelevant.").

Contrary to the government's assertions, when Ms. Javice relied on the "blind eye" instruction in her summation, she was not on notice that the Court could later unilaterally strike it. The government's reliance on the Court's statement that "[t]he charge itself is not the one that will be given the jury, even as amended," 03/25/2025 Trial Tr. 3426:4–9, grossly mischaracterizes the Court's directions. Following that statement, the Court immediately clarified that the instructions it gave the jury would be only slightly modified to the extent the Court "repeat[ed]" or "extemporize[d]" and "ma[de] sure, the way a speaker can, that the jury [was] paying attention," *id.*, not that it would leave on the cutting room floor an entire instruction central to Ms. Javice's theory of defense. Indeed, where the Court intended to leave a proposed instruction subject to further review, it did so explicitly. *See* 03/25/2025 Trial Tr. 3445:23–25 (discussing another proposed charge and informing the parties it would "read the case and reread the statute, and act accordingly. I don't think you need to know that before argument, but if you want me to, I'll tell you."). During the charge conference, the only caveat the Court gave regarding the "blind eye" instruction was that the Court would "clean up the sentence. That's how it will go." *Id.* at 3461:18–19.

The government's legal citations, like the record citations, do not support its argument either. For example, in *United States v. Rommy*, the district court "made no ruling" on a proposed instruction and informed the parties that it wanted "to think a little bit more about" the instruction. 506 F.3d 108, 125 (2d Cir. 2007). Neither the government nor defense then followed-up with the

court to ask it to decide the issue before summation.  *Id.*  Here, by contrast, the Court clearly conveyed that the "blind eye" instruction would, in sum and substance, be incorporated into its charge.  03/25/2025 Trial Tr. 3461:18–19.  *United States v. Eisen* is even further afield.  974 F.2d 246, 256 (2d Cir. 1992).  After hearing the government's objections to a proposed charge, the *Eisen* court made clear that it would "consider" the requested language.  *Id.*  Defense counsel proceeded to rely on the proposed charge in summation, even absent a final ruling.  *Id.*  Following summations, the court advised counsel that its "charge was not in accord with [counsel's] argument and offered [him] an opportunity to address the jury again."  *Id.* at 257.  By contrast, here, the Court had affirmatively stated it would give the "blind eye" instruction, Ms. Javice featured the instruction in her closing argument, and then the Court later changed course.  Further, the Court here did not give Ms. Javice's counsel the opportunity to readdress the jury either.  Even if it had, however, readdressing the jury would not eliminate the prejudicial asymmetry created by omitting an essential aspect of the Court's materiality instruction.  A new trial is required.

### C.    The government offers no meaningful response to the Court's erroneous decision to decline to give a theory of defense instruction.

The government concedes that Ms. Javice is entitled to a jury charge that "reflects *any* defense theory for which there is a foundation in the evidence."  Opp. 54 (citing *Prawl*, 168 F.3d at 626) (emphasis added).  It tries to distract from this well-settled principle by cherry-picking certain instructions that the Court did adopt, wrongly contending those instructions were sufficient.  *Id.* at 55–56 (citing *Thompson v. United States*, 604 U.S. __ (2025)).  But they were not.  That the Court adopted some of Ms. Javice's instructions does not change the fact that it improperly rejected others.  Nor does it remedy the resultant prejudice from giving instructions that "fail[ed] to balance the charge and compass the theory of the defense."  *United States v. Dove*, 916 F.2d 41, 47 (2d Cir. 1990).  Further, none of the other instructions cover the topics as those Ms. Javice requested.

Nor does the government identify any.  Opp. 55 (citing *United States v. Masotto*, 73 F.3d 1233, 1238 (2d Cir. 1996)).  Rather, Ms. Javice's requested instructions were supported by the factual record and binding precedent, ECF No. 374 (collecting cases), and were not otherwise covered by the Court's instructions.  Failure to give the requested instructions requires a new trial.  *Dove*, 916 F.2d at 47 (ordering a new trial where the district court failed to give a legally correct theory of defense instruction that was not otherwise covered by the instructions).

    **D.**    **Justice requires a new trial because Ms. Javice was prevented from presenting a complete defense**.

Tellingly, the government argues that the Court properly excluded evidence from Frank's website without citing a single rule of evidence.  Opp. 95–99.  At best, the government's arguments go to the weight of the evidence, not admissibility.  Fed. R. Evid. 401.  Similarly, the government's opposition ignores that the proffered website pages, on which Frank self-reported user metrics, are highly probative of Ms. Javice's defenses on the elements of materiality and intent.  Instead, it attempts to recast her arguments as inadmissible victim blaming.  Opp. 95–99.  However, the government's distortions and failure to engage with Ms. Javice's arguments underscore the prejudicial impact of excluding this evidence.  The excluded pages from Frank's website directly negate the government's materiality and intent theories, for which it has no response.

The same is true of the government's response regarding Mr. Macdonald's draft diligence slide.  Opp. 99–101 (discussing CJ 0239).  Despite Ms. Javice explicitly arguing that she was not offering the document for the truth of the matter asserted, Javice Mot. 29, the government mistakenly asserts that the proffered evidence is hearsay.  However, since Ms. Javice offered the slide to demonstrate her state of mind, and not for its truth, the government is simply incorrect. Fed. R. Evid. 801(c)(2) (defining hearsay as an out of court statement being offered for its *truth*).

Finally, any suggestion by the government that Ms. Javice was not constitutionally entitled to present evidence to defend against charged conduct during the post-acquisition period must be disregarded.  Opp. 101–102 (arguing Ms. Javice was not entitled to present a defense to the alleged "cover up" period, which extended post-acquisition).  Ms. Javice has a constitutional right to present a defense to the charged conduct—a point the government does not refute.  Nor can it. Javice Mot. 21–22.  The Court should have allowed the jury to hear this evidence and to consider the competing inferences—if any—flowing therefrom.  The Court, however, deprived Ms. Javice of that opportunity.  Justice demands a new trial.

**E.    The Court erred in admitting Dr. Salve's testimony.**

The government does not dispute the importance of Dr. Salve's testimony.  While the government claims that he did not convey out-of-court testimonial statements by unnamed analysts at BRG, its contentions are contradicted by Dr. Salve's own testimony.  Opp. 114–15.  He testified that both he "as well as [his] members" "prepared" and "inputted into the chart" Dr. Salve testified about in court.  03/18/2025 Trial Tr. 2756:24–25.  He also testified inconsistently about the extent of his purported personal knowledge, sometimes indicating he performed certain work himself, while at other times clarifying that "his" work involved the work of other analysts, raising a serious concern that Ms. Javice was deprived of her confrontation clause rights.  *Compare id.* at 2712:18–20 ("Q: Did you then compare these two data files? A. Yes, I did.") *with following immediately after id.* at 2712:21–24 ("Q. Can you explain how you did the comparison? A. Sure. So, *I used -- my team and I used* two different software packages[.]").  Dr. Salve was also unable to answer basic questions about the coding he may or may not have personally performed, depriving Ms. Javice of her right to meaningful cross-examination.  *See id.* at 2716:22–2717:1 ("Q. And did you

13

write code for Python to perform this analysis or someone on your team? A. Yes. Q. How many lines was that code, do you know? A. I don't recall how many lines exactly it was.").

This error was compounded by the fact that Dr. Salve's testimony was expert testimony, offered by the government without proper notice. Indeed, the government does not deny that it failed to disclose Dr. Salve as an expert witness or provide the information required by Rule 16 and the Court. While the government claims that defense counsel had ample notice about Dr. Salve's testimony, it was not until the night before he took the stand that the government first revealed that Dr. Salve relied on Python and SQL—sophisticated computer programming languages—to perform the analysis about which he would testify. *See United States v. Budovsky*, No. 13CR00368 (DLC), 2016 WL 386133, at *3 (S.D.N.Y. Jan. 28, 2016) (noting that the government informed defense counsel that it would "need to retain a forensic expert" to search discovery data stored on an SQL server and to "use "SQL queries . . . to manipulate and analyze" the data). Further, it was not until Dr. Salve was on the witness stand that defense counsel first learned about the existence of his team of analysts who allegedly performed much of the work supporting his opinions. Ms. Javice was denied her constitutionally guaranteed right to cross examine the unnamed, and undisclosed, BRG experts who conducted the analysis and Dr. Salve about his fees, which directly relate to credibility and bias. This was manifestly unjust.

## II.    A JUDGMENT OF ACQUITTAL IS REQUIRED BECAUSE THE GOVERNMENT FAILED TO PROVE EACH ELEMENT OF EVERY CHARGE BEYOND A REASONABLE DOUBT.

The government's brusque attempt to dismiss Ms. Javice's Rule 29 arguments confounds its burden to prove every element of every charge beyond a reasonable doubt. Opp. 45. Because "the very nature of such motions is to question the sufficiency of the evidence to support a conviction," when a defendant's motion for acquittal lacks specificity, "it is incumbent upon the government to review its proof as to the facts required to establish *each element of each offense*

alleged." *United States v. James*, No. 19-CR-0382(JS), 2023 WL 6675339, at *2 (E.D.N.Y. Oct. 12, 2023) (emphasis added) (quoting *United States v. Gjurashaj*, 706 F.2d 395, 399 (2d Cir. 1983)); *United States v. Schulte*, 578 F. Supp. 3d 596, 611 (S.D.N.Y. 2021); *United States v. Dennis*, 132 F.4th 214, 227–28 (2d Cir. 2025); *accord United States v. Barrett*, 102 F.4th 60, 71 (2d Cir. 2024) ("[D]efendant need not specify the ground of [a Rule 29] motion in order to preserve a sufficiency claim for appeal."). However, the government failed to do so. As the government failed to prove each element of every charged offense beyond a reasonable doubt, Ms. Javice renews her general motion for judgment of acquittal on all four counts of the Superseding Indictment, and makes the following additional arguments.

## A.    The Court should vacate all four convictions because no reasonable jury could have found Ms. Javice made material misrepresentations.

To establish wire, bank, and securities fraud, the government had the burden to prove beyond a reasonable doubt that any alleged misrepresentation was material.[4] 03/27/2025 Trial Tr. 3789 (wire fraud); 3797–98 (bank fraud); 3801–02 (securities fraud); *see also United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) ("The wire and bank fraud statutes do not criminalize every deceitful act, however trivial."). "A material fact is one that would have been significant to a reasonable investor's investment decision." 03/27/2025 Trial Tr. 3789:4–13. A misrepresentation "is significant if there is a substantial likelihood that the misstated fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available to that investor." *Id.* "Materiality is an objective standard. It asks what the reasonable investor would have found significant in the total mix of information made

---

[4] Where the underlying object of an alleged conspiracy is found to be legally insufficient, the conspiracy count must be reversed. *See United States v. Mittelstaedt*, 31 F.3d 1208, 1218–20 (2d Cir. 1994). If the court determines judgment of acquittal is required for the federal fraud charges, it must also enter judgment of acquittal on the conspiracy conviction.

available to him." *Id.* The traditional materiality standard is "demanding" and "rigorous" in the contracting context. *Universal Health Servs.*, 579 U.S. at 192, 194; *Kousisis v. United States*, 605 U.S. __ (2025).

Not every misrepresentation can support a fraud conviction. Only misrepresentations that "go[] to the root of the parties' agreement" or "touch[] the fundamental purpose of the contract" suffice. *Kousisis v. United States*, 605 U.S. __ (2025) (Thomas, J., concurring) (quoting 23 Williston on Contracts §63.3, p. 483 (4th ed. 2018). Facts that are "collateral to [a] sale" are inadequate. *United States v. Starr*, 816 F. 2d 94, 98 (2d Cir. 1987). Material statements in this context are those about price, quality, or objectively essential aspects of the transaction. *See id.*

Here, the government alleged Ms. Javice misrepresented what information Frank had about its 4.25 million users. ECF No. 381-1, Ex. A at 9 (Gov't closing demonstratives). Government witnesses testified that Ms. Javice said that Frank had personally identifiable information ("PII") for each of its 4.25 million users. 02/26/2025 Trial Tr. 570:6–9. The 4.25 million metric was based on website traffic, howeve. ECF No. 381-1, 381-2, Ex. A at 9–120 (Gov't closing demonstratives). In JPMC and Capital One dealmakers' opinions, the number of users with PII was material to their decision to invest. 03/06/2025 Trial Tr. 1393:25–1394:25–3. However, their after-the-fact, subjective assessments are insufficient to sustain a conviction.

Where, as here, the government "relies heavily on the testimony of . . . purported victims" that the alleged misstatements were an important factor in their investment decisions, such "point[s] of view" must be "shown to be within the parameters of the thinking of reasonable investors in the particular market at issue." *United States v. Litvak ("Litvak II")*, 889 F.3d 56, 65 (2d Cir. 2018). Meaning there must be "a nexus between a particular [investor's] viewpoint and that of the mainstream thinking of investors in [the relevant] market." *Id.*; *see also United States*

*v. Litvak ("Litvak I")*, 808 F.3d 160, 184 (2d Cir. 2015) (holding the trial court erred in excluding defendant's proposed materiality expert where the government relied on the subjective view of "purported victims."). No such nexus exists here.

The government relied exclusively on the materiality opinions of alleged victims JPMC and Capital One. *See, e.g.*, Opp. 12 ("Frank's customer base was the 'main source of value' to JPMC and thus Frank's customer volume as well as the quantity and type of data that Frank collected from its customer base were critical to JPMC's evaluation of the value of a potential acquisition."). However, it failed to forge a link between JPMC and Capital One's subjective materiality opinions and the mainstream thinking of reasonable investors in the financial services market. For example, Leslie Wims-Morris, the then-head of corporate development at JPMC, testified that the number of Frank's "customers" for whom there was sufficient information for marketing purposes was material to JPMC. 02/27/2025 Trial Tr. 606:12–20. As a result of JPMC's specific intended use, Ms. Wims-Morris opined that Frank would be of "no value *to us*" if Frank's "customer" metrics did not capture PII, because JPMC's "strategy" centered on marketing to Frank's customers outside of the Frank platform. 02/27/2025 Trial Tr. 606:12–607:9; *see also, e.g.*, *id.* 583:12–14 (explaining that JPMC was "trying to understand the definition of a customer since that was core to how [JPMC] thought about the value of this business to [JPMC]"). Without any connection between this individual strategy and that of a reasonable investor, however, JPMC's subjective preference is insufficient to establish materiality.[5]

---

[5]   Indeed, in its oral Rule 29 proffer at the close of its case-in-chief, the government itself described the evidence supporting materiality as an alleged misrepresentation "by both defendants [that] ultimately went to the heart of these contemplated transactions as numerous witnesses testified that the metrics that they were falsely told by the defendants or were communicated to them by the defendants went to the core of *their desire* to acquire Frank." 03/25/2025 Trial Tr. 3417:5-10 (emphasis added).

Not only did the government fail to show the alleged victims' position was within the parameters of the thinking of reasonable investors, *Litvak I*, the only sophisticated investor who was not an employee of JPMC or Capital One to testify contradicted the companies' subjective opinion that user data is meaningless without PII.  Marc Rowan, the chief executive officer of Apollo Global Management, a global financial services company and investment firm, testified that Frank's value did not rise and fall on a static list of PII for past customers.  Rather, an objective investor would find value in, among other things, the number of users who visited Frank's website, with or without PII.  03/20/2025 Trial Tr. 3006:19–3007:5.  Mr. Rowan explained Frank's ability to drive website traffic was valuable because those website users could be "referred to [a] financial services company," to purchase other products, and "would make [Frank] more and more valuable" to an investor.  *Id.*; *cf.* 02/26/2025 Trial Tr. 570:23–571:1 (Ms. Wims-Morris testimony that the number of website visitors was "irrelevant to [JPMC]" because they "were focused on real customers").  Based on Mr. Rowan's experience in mergers and acquisitions and investing in companies ranging from the New York Law Journal to Yahoo and AOL, his understanding of the value of website visitors would be true in the financial services industry.  Even in the light most favorable to the government, the evidence of guilt is equivocal, at best.  *United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005).  For this reason alone, the verdict must be set aside as to all four counts.  *Id.*

The problems with the government's materiality evidence do not end there, however.  A victim's gullibility or negligence in failing to uncover a fraudulent scheme is no defense.  *See United States v. Amico*, 486 F.3d 764, 780 (2d Cir 2007).  However, "a finding that a victim intentionally turned a "blind eye" to certain types of representations when making decisions about the victim's money or property" is.  *United States v. Bankman-Fried*, No. 22-cr-00673, Trial Tr.

3156:8–11 (S.D.N.Y. 2023) (Kaplan, J.), ECF No. 384 (jury instructions); 03/24/2025 Trial Tr. 3148:6–7 (the Court confirming the same).  As Justice Thomas explained in *Kousisis v. United States*, "materiality looks to the effect on the likely or *actual behavior* of the recipient of the alleged misrepresentation."  *Kousisis v. United States*, 605 U.S. __ (2025) (Thomas, J. concurring) (quoting *Universal Health Servs.,* 579 U.S. at 193) (emphasis added).  Based on JPMC and Capital One's actual behavior, the only reasonable inference is that JPMC and Capital One were aware of—but *did not care*—about the number of past users for whom Frank had actually collected PII. For example, Frank's marketing materials disclosed that it had helped several hundreds of thousands of students, including by helping them file FAFSA applications—the primary source of PII Frank collected.  Not 4.25 million.  And JPMC knew this.  Its internal documents acknowledged that "Frank has helped more than 300,000 students receive 7 billion in financial aid."  02/27/2025 Trial Tr. 736:3–737:7 (Ms. Wims Morris discussing GX 1591); *see* GX 3006 (Capital One acknowledging the 400,000 number).   JPMC knew the truth about the quantity and quality of Frank's historic user data and did not care.  This is because it was not material.  The government "must do more than introduce evidence at least as consistent with innocence as with guilt."  *United States v. Pauling*, 924 F.3d 64, 656 (2d Cir. 2019) (quoting *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)).  Because it failed to do so, a judgment of acquittal is the appropriate remedy.

The Frank merger agreement further erodes any reasonable inference that the number of historic users with PII was material.  As the government has conceded in another case, an alleged misrepresentation goes to the "very essence of the bargain" when it was included in a warranty within a contract between the defendant the alleged victim.  Br. for the United States at 17–18, *Kousisis v. United States*, 605 U.S. __ (2025) (quotation marks omitted).  Not only has the

government conceded this point, but so too did its witnesses at trial.  For example, Mason Young explained that it is common, and a practice followed by Capital One, to rely on "representations and warranties and the definitive purchase agreement," to ensure that "information provided during diligence is accurate."  03/13/2025 Trial Tr. 2219:24–2220:6; *accord* 02/27/2025 Trial Tr. 641:5– 7 (Ms. Wims-Morris testimony noting it is "common" for parties in a putative acquisition to negotiate representations and warranties in a merger agreement).  Meaning, if something is important—material—a reasonable investor puts it in the contract.  Yet the agreement between JPMC and Frank contains no warranty or representation "covering the number or quality of Frank's customers or users."  03/27/2025 Trial Tr. 3790:16–18 (Court's jury charge).  Far from being supported by "substantial evidence," the government's materiality allegation is at best specious, and at worst, undermined by the trial record.  A judgment of acquittal is warranted. *United States v. Valle*, 807 F.3d 508, 522 (2d Cir. 2015).

**B.    No rational jury could conclude that Capital One or JPMC were acting  as "financial institutions" within the meaning of 18 U.S.C. § 1344.**

The purpose of Section 1344 "is to protect the federal government's interest as an insurer of financial institutions."  *United States v. Laljie*, 184 F.3d 180, 189 (2d Cir. 1999); *see also, e.g.*, *United Sates v. Koh*, 199 F.3d 632, 638 (2d Cir. 1999) ("Congress clearly intended to protect the 'financial integrity' of institutions in which it had a strong federal interest, including those that are 'federally created, controlled or insured.'") (citation omitted).  Section 1344, however, "should not be read to federaliz[e] frauds that are only tangentially related to the banking system," the statute's "core concern."  *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016) (quotation omitted).  Congress intended bank fraud prosecutions only where the alleged "scheme" involves "the core functions of our federal banking system," such as bank's depository or lending functions.  *Id.* at 125–26; *cf. Shaw v. United States*, 580 U.S. 63, 65–67 (2016) (acknowledging that illicit transfers

20

from one federally-insured account to another federally-insured account can constitute bank fraud).

A bank's decision to purchase a company in the commercial marketplace—as any other purchaser or investor might—is not a "core function of a bank" and lacks any connection with the federally insured banking system. *Cf. UMB Bank, N.A. v. Benton*, No. 21-cv-00832 (BP), 2022 WL 16753765, at *11 (W.D. Mo. June 29, 2022) (grating motion to dismiss) ("Here, while UMB is a bank, the alleged fraud had nothing to do with UMB's status *as a bank*—rather, the fraud concerned UMB's position *as a trustee*, a position that could have just as easily been occupied by a non-bank person or entity, and that has nothing to do with the banking system."), *aff'd sub nom. UMB Bank, N.A. v. Guerin*, 89 F.4th 1047 (8th Cir. 2024). Liability under Section 1344 cannot attach where the only involvement of the "victim[]" bank is its "engage[ment] in activities far afield of the core functions of our federal banking system." *Bouchard*, 828 F.3d at 125–26.

The government failed to introduce any evidence that JPMC or Capital One was acting pursuant to its core banking functions in deciding whether to acquire Frank. Rather, both JPMC and Capital One were operating as a business in the private merger and acquisitions market, no different from any non-banking entity that may have sought to acquire a company like Frank. This is not what the bank fraud statute is intended to protect. Judgment of acquittal on Count Three is required.

### C. The government failed to establish nearly every element of securities fraud for Capital One's declined Frank acquisition.

To establish securities fraud, the government must prove that the alleged fraud was committed "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The government's evidence fails from top to bottom for Capital One.

When interpreting a statute, the Court "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. DiCristina*, 726 F.3d 92, 96 (2d Cir. 2013) (quoting *United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008)).

No rational jury could conclude there was a sale or purchase of anything between Capital One and Frank. Sale means "[t]he transfer of property or title for a price." Sale, Black's Law Dictionary (12th ed. 2024); William W. Story, *A Treatise on the Law of Sales of Personal Property* § 1, at 1 (1853) ("A sale is a transfer of the absolute title to property for a certain agreed price."). A purchase is the "acquisition of an interest in real or personal property by sale, discount, negotiation, mortgage, pledge, lien, issue, reissue, gift, or any other voluntary transaction." Purchase, Black's Law Dictionary (12th ed. 2024). Because, there was no deal between Capital One and Frank, neither a sale nor a purchase occurred. 03/13/2025 Trial Transcript 2224:24–2225:1. For this reason alone, a judgment of acquittal should be entered.

Nor did the relationship between the parties involve a "security" as defined by 15 U.S.C. 78c(10). Rather, Capital One sent Frank a letter of intent, which Frank did not sign. GX 1032. Even if executed—which it was not—a letter of intent is not a security. 15 U.S.C. 78c(10). The remaining element fares no better. Since the government failed to demonstrate a sale or purchase of security, there cannot be a "nexus between the fraudulent conduct and the purchase or sale of securities."[6] 03/27/2025 Trial Tr. 3803:4–19. Thus, the government has failed to establish that

---

[6]    Ms. Javice maintains her objection to the Court's jury instructions for securities fraud, because the Court failed to interpret 17 C.F.R. § 240.10b-5 *de novo* as required by *Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024).

any alleged fraud was "in connection" with the sale or purchase of a security. For these reasons, the verdict as to Count Four must be set aside.

### D.    Securities fraud statute is an unconstitutional delegation of Congress's Article I power.

The Constitution guarantees that only the people's elected representatives may adopt new federal laws restricting liberty. U.S. Const. Art. 1, Sec. 1; *United States v. Hudson*, 11 U.S. 32, 34 (1812); *Whalen v. United States*, 445 U.S. 684, 689 (1980) ("[W]ithin our federal constitutional framework . . ., the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the Congress."). Yet prosecutions for securities fraud scramble that design. Title 15 of the United States Code, Section 78j, purports to give an unelected, appointed member of the executive branch the power to write his own criminal code governing the lives and conduct of millions of Americans. 15 U.S.C. § 78j(b) (prohibiting "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors"). This is an unconstitutional delegation of Congress's Article I power.

Each of the vested powers in the three branches of government has a distinct content. *See, e.g.*, *G.F.F., et al. v. Trump*, No. 25-02886-AKH, ECF No. 84 (S.D.N.Y. May 6, 2025) (explaining the same). For legislative power, the founders understood it to mean the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to "prescrib[e] the rules by which the duties and rights of every citizen are to be regulated," The Federalist No. 78, at 465 (Alexander Hamilton) (C. Rossiter ed. 1961), or the power to "prescribe general rules for the government of society," *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136, 3 L.Ed. 162 (1810); J. Locke, The Second Treatise of Civil Government and a Letter Concerning Toleration § 22, at

13 (1689) ("Locke, Second Treatise"); 1 William Blackstone, Commentaries on the Laws of England 44 (1765).

Accompanying that assignment of power to Congress is a bar on its further delegation for "powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43, 6 L.Ed. 253 (1825). This is so because the federal government's most dangerous power is that to enact laws restricting the people's liberty. The Federalist No. 48, at 309–312 (James Madison). An "excess of law-making" was, in the founders' words, one of "the diseases to which our governments are most liable." The Federalist No. 62, at 378 (James Madison); The Federalist No. 73, at 441–442 (Alexander Hamilton); Locke, Second Treatise § 143. Similarly, the framers understood that it would frustrate "the system of government ordained by the constitution" if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals. *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892). Congress "cannot transfer the power of making laws to any other hands; for it being but a delegated power from the people, they who have it cannot pass it over to others." Locke, Second Treatise § 141, at 71. However, that is precisely what Congress did here. "[W]hen the people have said [w]e will submit to rules, and be governed by laws made by [Congress], nobody else can say other men shall make laws for them." *Id.* Nor can the people be "bound by any laws but such as are enacted by those whom [the people] have chosen and authorised to make laws for them." *Id.* That is Congress, and Congress alone. Count Four must be vacated.

**E.    The government failed to satisfy its burden of proving each element of each charge beyond a reasonable doubt**.

The government has failed to establish every element of the four offenses charged in the Superseding Indictment. This includes, but is not limited to, establishing identity beyond a reasonable doubt; 03/27/2025 Trial Tr. 3769:20–3769:22; that Ms. Javice used or caused to be

used an interstate wire, *id.* at 3795:14–23; that she participated in a scheme to defraud, *id*. at 3792:9–12; that she conspired with Mr. Amar to commit bank or wire fraud, *id.* at 3779:7–12; and that the charged offenses occurred in the Southern District of New York, *id.* at 3807:7–18. Judgment of acquittal on all counts is warranted.

## **CONCLUSION**

For all of these reasons—and for the additional errors and constitutional violations raised throughout trial, which Ms. Javice fully preserves and incorporates by reference—the Court should enter a judgment of acquittal. At a minimum, it should vacate Ms. Javice's conviction and order a new trial to remedy the injustices that permeated the trial from start to finish.

Respectfully submitted,

Dated: May 27, 2025

**QUINN EMANUEL URQUHART**
**& SULLIVAN, LLP**

By: */s/ Kirsten R. Nelson*
Kirsten R. Nelson* (*pro hac vice*)
Erica Perdomo (*pro hac vice*)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 402-4880
ericaperdomo@quinnemanuel.com
kirstennelson@quinnemanuel.com

* Not admitted in Florida; Admitted in District of Columbia and Maryland

Christopher Tayback (*pro hac vice*)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
213-443-3000
christayback@quinnemanuel.com

Sara Clark (*pro hac vice*)
700 Louisiana Street, Suite 3900

**BAEZ LAW FIRM**

Jose Baez (*pro hac vice*)
1200 Brickell Avenue
Miami, FL 33131
Telephone: (305)-999-5100
jose@baezlawfirm.com

**RONALD SULLIVAN PLLC**

Ronald Sullivan (*pro hac vice*)
1300 I Street NW, Suite 400E
Washington, DC 20005
Telephone: (202) 313-8313
rsullivan@ronaldsullivanlaw.com

Houston, TX 77002
Telephone: (713) 221-7100
saraclark@quinnemanuel.com

**MINTZ, LEVIN, COHN, FERRIS,**
**GLOVSKY & POPEO, P.C.**

*Counsel for Defendant Charlie Javice*

David Siegal
Ellen Shapiro
919 Third Avenue
New York, NY 10022
Telephone: (212) 935-3000
dmsiegal@mintz.com
eshapiro@mintz.com

Eóin P. Beirne (*pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
epbeirne@mintz.com

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2025, I caused a copy of the foregoing document to be served via ECF on counsel of record.


By:                                                          */s/ Kirsten R. Nelson*
                                                                Kirsten R. Nelson