# EXHIBIT F

**quinn emanuel** trial lawyers | miami

2601 S. Bayshore Drive, Suite 1550, Miami, Florida 33133-5417 | TEL (305) 402-4880 FAX (305) 901-2975

WRITER'S DIRECT DIAL NO.
**(305) 402-3848**

WRITER'S EMAIL ADDRESS
**kirstennelson@quinnemanuel.com**

July 7, 2025

**VIA EMAIL**
Ashley Geiser
United States Probation Office
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007
Ashley_Geiser@nysp.uscourts.gov

Re:     *United States v. Charlie Javice and Olivier Amar*, 23 Cr. 251 (AKH)
        <u>Charlie Javice's Objections to Draft Presentence Report</u>

Dear Officer Geiser:

    We represent Charlie Javice in the above-referenced matter.  We have received the June 6, 2025 draft Presentence Report (the "Draft PSR") concerning Ms. Javice.  Pursuant to Federal Rule of Criminal Procedure 32(f) and the Court's June 18, 2025 order, ECF 404, we write to set forth our comments, corrections, clarifications, and objections to the Draft PSR.  For your convenience, we have noted the paragraph or page number of the Draft PSR to which each of our comments pertains.[1]

<u>**General Objections**</u>[2]

- In making any objection, Ms. Javice does not waive and expressly reserves all rights as to issues that have been preserved for appeal.  In particular, and without limitation, Ms.

---

[1]  We provide the paragraph and page references for your convenience, but each objection is made and incorporated with respect to all relevant references in the Draft PSR, regardless of whether we have specifically identified the corresponding paragraph or page.

[2]  Ms. Javice joins and incorporates by reference any objections made by Mr. Amar to his presentence report to the extent it contains the same or similar information and/or statements, and/or to the extent such objections would apply or otherwise be relevant to Ms. Javice.  Ms. Javice disputes, however, any characterization made by Mr. Amar to the extent it alleges that she intentionally made any misleading representations or committed any other improper conduct.

quinn emanuel urquhart & sullivan, llp

Ashley E. Geiser

> Javice's objections, comments, or corrections (or non-objections, comments, or corrections) to the Draft PSR's recitation of the allegations do not retract, undermine, or impact any arguments that may be raised on appeal as to, among other things, the sufficiency of the evidence or rulings as to any disputed evidence.

- Ms. Javice objects to any characterizations of the evidence that state or suggest that she intentionally made any material misrepresentations regarding or in relation to Frank or any of its metrics to JPMC and/or Capital One or otherwise, including to any third parties involved in the purchase or creation of synthetic data.

- Ms. Javice objects to the recitation of allegations, statements, and/or characterizations to the extent they describe conduct and/or evidence not presented during, or relevant to issues at, the trial, or to the extent the factual statements in the PSR contradict, mischaracterize, or otherwise fail accurately to reflect the evidence in the trial record.

- Ms. Javice objects to the Draft PSR's headers and sub-headers as unnecessary, misleading, and inaccurate, including as detailed below.

- Ms. Javice objects to the Draft PSR's inconsistent and undefined use of the phrases "users," "user accounts," "views" or "viewers," "sessions," and "clicks."  Ms. Javice requests that each reference to "users" in the PSR reflect that, pursuant to data reflected in and as defined by Google Analytics, Frank had approximately 4.25 million users as of August 2021.

- Ms. Javice objects to the use of the term "fake" rather than "synthetic" data as inaccurate and misleading.  *See* 03/12/2025 Trial Tr. 2046–47.  Other than when referring to direct quotes, the PSR should refer to the relevant data as "synthetic data."

- Ms. Javice reserves the right to supplement or amend her objections and corrections, including, but not limited to, in response to any changes to the Draft PSR.

## Part A:  The Offense

**General Objection**:  Ms. Javice objects to the omission of key information about JPMC's purchase of Frank.  She respectfully requests the following undisputed facts be added to the PSR.

- Beginning in July 2021 and prior to purchasing Frank, JPMC assembled a due diligence team of "nearly 350 people."  Trial Tr. 543:6-7.  In addition, JPMC and Frank each engaged sophisticated legal counsel to negotiate the terms of the sale and merger.  OA 1103-A; GX2026.

- JPMC and Frank's counsel negotiated an "Agreement and Plan of Merger," which set forth the terms of JPMC's acquisition of Frank.  GX2000.  The Agreement and Plan of Merger was signed on August 8, 2021.  In the Agreement, the parties agreed to the following:

Ashley E. Geiser

> Furthermore, the parties each hereby acknowledge that this Agreement, the
> Confidentiality Agreement and the Related Documents embody the
> justifiable expectations of sophisticated parties derived from arm's-length
> negotiations, and all parties to this Agreement, the Confidentiality
> Agreement and the Related Documents specifically acknowledge that no
> party has any special relationship with another party that would justify any
> expectation beyond that of an ordinary purchaser and an ordinary seller in
> an arm's-length transaction.
>
> GX2000.

- JPMC closed on the deal to purchase Frank on September 14, 2021.

**Paragraph 10**[3]:  This paragraph appears to contain a typographical error and should be revised accordingly:  A review of Pretrial Services' records indicate that the defendant has remained compliant with the conditions of ~~his~~ her release.

**Paragraphs 11, 18, 20, 32–33, 47, 49, 76, 78, 81–86, 87–88, 93–94, 103–04, 118**:  Ms. Javice objects to the use of the undefined term "investigation."  To the extent the Draft PSR intends to refer to JPMC's 2022 internal investigation ("JPMC Internal Investigation"), that investigation is irrelevant for sentencing purposes, as detailed below in more detail in Paragraphs 84–97, 103, 107, and 118.  To the extent "investigation" refers to information that was purportedly available to the government as part of its "investigation," but not made part of the trial record, such information is also irrelevant.

**Paragraphs 14**:  As stated above, Ms. Javice objects to the statement that "Frank had approximately 500,000 user accounts."  The term "user account" is undefined and confusing in light of the fact that, under Google Analytics' definition of "users," the Frank website had more than 4 million users. Ms. Javice also objects to the proposition that the actual number of user-sign ups is known. The sentence, and other similar uses of "user accounts" should be revised accordingly:  As of 2021, Frank had <u>at least</u> approximately 500,000 user ~~account~~ <u>sign ups</u>, the majority of which were related to the FAFSA tool.  *See* GX 3023; 02/21/2025 Trial Tr. 186.

Ms. Javice also objects to the statement that as of August 2021, approximately 142,000 FAFSA applications were completed using Frank.  Because a portion of Frank's historic data was not migrated over when Frank switched to a new server, this amount underestimates the number of FAFSA applications.  02/26/2025 Trial Tr. 439.  The sentence should add the phrase "at least" before the word "approximately" to accurately reflect the record.

**Paragraph 15**:  In early 2021, Frank began to consider exploring various options related to its future growth.  The following sentence should be revised accordingly: In January 2021, Frank began ~~the process of putting itself up for sale~~ <u>to consider a strategic partnership or acquisition</u>.

---

[3]  Revisions to the Draft PSR are indicated by <u>underlined text</u> in the case of additions and ~~strikethrough text~~ in the case of deletions.

Ashley E. Geiser

Ms. Javice objects to the assertion that she "directed" anyone at Frank to start referring to Frank's website "visitors" as "users." There is no evidence showing Ms. Javice directed people to refer to Frank's metrics as anything in particular. The second sentence of paragraph 15 should be deleted.

Ms. Javice also objects to this paragraph's conflation of visitors and clicks. Per Google Analytics, Frank's website had more than 4 million users, a term synonymous with visitors. The following sentence should be revised accordingly: At this time, Frank had several ~~thousand~~ hundred thousand customers who had created an account by providing their name, email, and address while Frank's website had more than 4 million users according to Google Analytics. ~~clicks.~~ By referring to website visitors as "users," Frank was able to claim it had millions of users. This claim was consistent with the terminology used by Google Analytics.

**Paragraph 17**: Ms. Javice objects to the statement that Capital One was the "first serious potential buyer." Frank had other serious potential acquirers, like Red Ventures. The first sentence should be revised accordingly: ~~The first~~ An early serious potential buyer was Capital One Bank.

Ms. Javice also objects to the proposed definition of a user account; trial testimony established that someone creating a user sign up with the Frank website provided name, email, and a phone number. *See* Trial Tr. 2119–22. The sentence should be revised accordingly: JAVICE ~~mis~~represented to Capital One that Frank had 4.25 million users and that a user sign up was someone who had created an account by providing their ~~full~~ name, email, and phone number ~~address~~.

**Paragraph 18**: As stated above, Ms. Javice objects to the assertion that either she or Mr. Amar falsely misrepresented information about Frank's users. Trial testimony established that it was LionTree, not Ms. Javice or Mr. Amar, that added the calculation resulting in the 2.1 million number. *See* 02/26/2025 Trial Tr. at 305. The paragraph should be revised accordingly: The account breakdown spreadsheet prepared by JAVICE and AMAR ~~falsely~~ showed that more than 4.265 million Frank users had started a FAFSA application, and more than 2.1 million Frank users had completed a FAFSA application.

Ms Javice objects to the last sentence of this paragraph for the same reason as in Paragraph 14. The following sentence should be revised accordingly: The investigation revealed that at least 500,000 Frank users had started a FAFSA application, and at least approximately ~~only~~ 142,000 ~~competed~~ completed a FAFSA application.

**Paragraph 19**: Ms. Javice objects to the clause "JAVICE dialed in using a telephone" because there was no testimony at trial explaining how Ms. Javice joined the call. That clause should be deleted.

**Paragraph 20**: This paragraph appears to contain a typographical error. The first sentence may need to be revised accordingly: J.P. Morgan Chase (JPMC), a bank headquartered in New York, New York began diligence on a potential acquisition of Frank beginning in early July 2021.

This paragraph should also be revised to reflect that inaccuracies in the first update were later corrected.

Ashley E. Geiser

Ms. Javice also objects to the statement that Frank had "4.265 million non-unique website sessions." As stated above, Frank had 4.265 million users as defined by Google Analytics.

**Paragraph 21**: Ms. Javice objects to the statement that she defined a "user" as someone who provided a name, e-mail, and address. The government alleged and offered evidence to support the assertion that a "user sign up" was someone who provided name, email, and phone number. *See* Trial Tr. 633, 2297, 3511. The sentence should be revised accordingly: At trial the government presented evidence that during a July 12, 2021, diligence session about Frank's users, with AMAR present, JAVICE ~~falsely~~ claimed that a Frank user <u>sign up</u> was someone who had supplied their name, email, and <u>phone number</u> ~~address~~, and that Frank had 4.25 million such users.

**Paragraph 22**: Ms. Javice objects to this paragraph in its entirety. First, Ms. Javice objects to any assertion that JPMC's projected revenue was based solely on any representations about Frank's history metrics. JPMC's projection relied most heavily on marketing and selling to future students. *See* GX 1591 at slides 8, 32. JPMC's projection was also over a ten-year period. *Id.* This paragraph should be removed in its entirety, but, at a minimum, that information regarding JPMC's projection should be included.

**Paragraph 23**: Ms. Javice objects to this paragraph to the extent the Draft PSR omits that Ms. Javice also proposed alternative solutions as part of the diligence process.

Further, Ms. Javice objects because the Draft PSR inaccurately implies that Acxiom reviewed Frank's actual customer data, rather than counting data points Frank had stored on its customers. *See* 03/24/2025 Trial Tr. at 3168--69 (Toland testimony that Acxiom was directed only to "determine whether the fields" in the files Frank provided "were populated or blank.") The sentence should be revised as follows: JPMC proposed alternative solutions and on August 1, 2021, JPMC told JAVICE that the bank would not move forward with the acquisition unless a third party, Acxiom, reviewed <u>certain data points from</u> Frank's customer list to confirm whether the data points were populated or blank. ~~the number of customer accounts and the data Frank maintained on each of those customers~~.

**Paragraph 24:** Ms. Javice objects to this paragraph to the extent, as referenced generally above with respect to the characterization of "fake" users or data, and on the grounds that it misstates testimony about Ms. Javice's request.

**Paragraph 25**: Ms. Javice objects to this paragraph to the extent that it implies that Frank Employee-1's alleged "concern" was not addressed; on the contrary, Mr. Amar informed Frank Employee-1, in Ms. Javice's presence, that he could talk to Frank's general counsel if he wanted, undercutting any suggestion that either Ms. Javice or Mr. Amar were asking Frank Employee-1 to engage in anything illegal or nefarious. *See* Trial Tr. 1789–90. In particular, Mr. Amar's invitation directly undercuts that Ms. Javice's alleged comment about an orange jumpsuit indicates any intentional misconduct. The paragraph should be revised accordingly: Frank Employee-1 testified that he asked JAVICE and AMAR if their request for fake data was legal and expressed concern that Frank's general counsel was not present. AMAR <u>told Frank Employee-1 that he could talk to Frank's general counsel about it if he wanted</u> ~~avoided the question,~~ and JAVICE said that she did not want to end up in an orange jumpsuit.

Ashley E. Geiser

**Paragraoh 26**: Ms. Javice requests that the second half of the first sentence in this paragraph be revised to read "to synthesize ~~create~~ a list of 4.25 million users with data known about her users who had signed up and provided detailed information."

**Paragraph 27**: The first sentence of this paragraph misstates the trial record. Individual-1 testified that they "basically worked all night" not that they worked "round the clock."

**Paragraph 28**: As stated above, Ms. Javice objects to including the phrase "fake customers." Further, Ms. Javice requested only synthetic data, not "fake customers" from Individual-1. The paragraph should be revised accordingly: Consistent with the instructions that JAVICE and AMAR had prepared for Individual-1, the list of ~~fake customers and~~ synthetic data represented that a high proportion of Frank's customers had provided detailed personal information about themselves and their families. The ~~fake~~ customer list indicated that approximately 80% of customers, or 3,434,247 users, had provided information about their cash assets.

**Paragraph 29**: The last sentence incorrectly states that Ms. Javice texted multiple JPMC executives "exact match" when the actual wording varied. *See* GX 803-11 ("It's a match"); see also GX 803-7 ("Exact count match"). The sentence should be revised accordingly: JAVICE sent text messages to multiple JPMC executives, claiming that her internal analysis resulted in an "~~exact~~ match" to Acxiom's independent analysis of Frank's purported customer list.

**Paragraph 32**: Ms. Javice objects to including TransUnion in the list in the first sentence; this is unsupported by the evidence. The sentence should be revised accordingly: The investigation revealed JAVICE and AMAR discussed contacting several different data and marketing analytics companies, including Exact Data, Acxiom, mParticle, Narrative, LiveRamp~~, and TransUnion~~ via telephone and WhatsApp.

**Paragraph 34**: For the reasons stated above regarding the Google Analytics definition of "user," Ms. Javice objects to the use of the phrase "real customers." As the discussion between Ms. Javice and Mr. Amar makes clear, they sought to purchase student data on the open market to augment Frank's 4.7 million users, as defined by Google Analytics. The sentence should be revised accordingly: JAVICE and AMAR determined that Narrative was not a viable option as Narrative would only be able to perform data augmentation on Frank's approximately 500,000 user sign-ups ~~real customers, approximately 500, 000 users, who had provided their personal identifying information to Frank.~~

**Paragraph 47–48:** Ms. Javice objects to the inclusion of both paragraphs. The evidence presented at trial did not establish that Ms. Javice and Mr. Amar's reasons for purchasing the ASL were pretextual or that Ms. Javice and Mr. Amar did not want to use the data to augment their existing databases. The text messages quoted in the Draft PSR establish the exact opposite: that Mr. Amar and Ms. Javice intended for the purchased data to be used for marketing purposes, even if those plans may never have come to fruition.

**Paragraph 50**: Ms. Javice objects to this paragraph to the extent it implies that there was anything unlawful in purchasing data. Trial testimony established that not only was purchasing

Ashley E. Geiser

data lawful, it was common industry practice. *See* 03/05/2025 Trial Tr. 1328:14–20. The following should be added to this paragraph: Similarly, Frank Employee-3 testified to the ineffectiveness of using purchased third-party data and that Frank never used purchased third-party data for a marketing campaign. <u>Purchasing data from third-party sources, however, is common industry practice.</u>

**Paragraph 58**: Ms. Javice objects to this paragraph to the extent it implies that the referenced data was sent to JPMC in January 2022 because there is no support for this in the record.

**Paragraph 59–60**: Ms. Javice objects to statements that she falsely represented that Frank had 1 million "marketable users." Trial testimony established that every Frank website visitor counted as a "marketable user." *See* 03/20/2025 Trial Tr. 3061, 3065 (J. Zeitler testimony regarding installing cookies and retargeting); *see also* 03/10/2025 Trial Tr. 1719 (Vovor testimony describing how cookies are used for identification purposes within Google Analytics, among other things).

The phrase "no longer" should be removed. Stating that Ms. Javice and Mr. Amar represented that Frank "no longer" had millions of marketable users is misleading because Ms. Javice was only made aware of JPMC's qualifications for what constitutes a marketable user after the acquisition. Under JPMC's definition, "churned," or graduated students were not counted. GX1693; 03/17/2025 Trial Tr. 2401:23-2402:21. Nor were users from partnerships like Sallie Mae, who did not agree to have JPMC market to their users. 03/17/2025 Trial Tr. 2401:23-2402:21. This decreased the number of marketable users. *Id.*

**Paragraph 60**: The quotation in the last sentence should be revised to include brackets to reflect that referring to JPMC Employee-2 and JPMC Employee-1 are alterations to the original text. It should also be revised to reflect the actual name of the file Ms. Javice sent, which includes a "(1)" at the end of the filename. *See* GX 1693. The sentence should be revised accordingly: On January 18, 2022, JAVICE sent an email to a member of the JPMC marketing team, including AMAR, with the "User_Breakdown_2021_Update (1)" showing the same number of purported net marketable users, and noted that "Olivier [AMAR] has already shared the net number last week with [JPMC Employee-2] and [JPMC Employee-1]."

**Paragraph 61**: The Draft PSR incorrectly states that Ms. Javice texted Mr. Amar about sending Frank Employee-1 and -2 a waterfall of counts. The text message, GX801-46, refers to sending JPMC marketing personnel the waterfall, not Frank Employee-1 or -2. *See* GX 801-46 ("U can send mark and Kelly the waterfall today"). This paragraph should be corrected accordingly: On January 14, 2022, JAVICE texted AMAR: "U can send [~~Frank Employee-1 and Frank Employee-2~~ JPMC marketing personnel] the waterfall today [/] Of counts."

**Paragraphs 64-71**: Ms. Javice objects to the inclusion of any transcription, recitation, verbatim quoting, or paraphrasing or her alleged statements in the referenced audio recording. Unlike the English translation of the French conversation between Mr. Amar and Frank Employee-1, no transcript or writing of Ms. Javice's alleged statements was ever admitted at trial or presented to the jury. Notably, the government admitted that it "enhanced" a version of the audio recording allegedly to make Ms. Javice's voice more clearly heard. The government to date has not disclosed

Ashley E. Geiser

its enhancement method and/or whether any alterations were made to Ms. Javice's statements. To the extent that the Draft PSR's transcription is premised on the enhanced audio, Ms. Javice objects to any reliance or use of the undisclosed, unknown, and unreliable "enhanced" recording. *See* U.S.S.G. Chapter 6 at Introductory Commentary (emphasizing the importance of "[r]eliable fact-finding" to "procedural due process and to the accuracy and uniformity of sentencing").

Ms. Javice also objects to any transcription, recitation, verbatim quoting, or paraphrasing of her alleged statements in the referenced audio recording as inaccurate and unreliable. The poor quality of the audio recordings (either enhanced or original) makes reliably deciphering any of Ms. Javice's statements impossible. *See United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) (requiring that information considered at sentencing must have "sufficient indicia of reliability to support its probable accuracy" (quoting *United States v. Simmons*, 164 F.3d 76, 79 (2d Cir. 1998)). For the reasons stated above, both the enhanced and original audio recording lack adequate reliability, and any references therein should be stricken from the PSR.

Ms. Javice requests that, at a minimum, the court determine for itself what, if any, of Ms. Javice's statements are audible from the recording rather than relying on the PSR's interpretation.

**Paragraph 64**:  Frank Employee-1 secretly made an audio (not video) recording of his conversation with Mr. Amar, during which Ms. Javice is largely inaudible. For the reasons stated in the objections to Paragraphs 64–71, these allegations should be removed. At a minimum, the following sentence should be revised accordingly:  The video meeting was ~~surreptitiously~~ recorded by Frank Employee-1 and revealed that AMAR spoke with JAVICE on speaker phone for a portion of the call which is inaudible in the audio ~~video~~.

**Paragraph 70**:  Ms. Javice objects to the assertion that the typing sounds that can allegedly be heard on the recording were Mr. Amar messaging with Ms. Javice. This is unsupported by the record. Frank Employee-1 testified that he "believe[d]" it was Mr. Amar who was typing and that he didn't know who Mr. Amar was typing to. *See* 03/10/2025 Trial Tr. 1628:6–9 ("Q. Mr. Vovor, do you recall who was typing there? A. I believe Mr. Amar. Q. And do you know who he was typing to? A. No.").

**Paragraph 76**:  Ms. Javice objects to the last sentence of this paragraph, including her messages with Mr. Amar. The government tried, unsuccessfully, to get these messages admitted at trial. The Court correctly recognized that these messages were taken out of context and were irrelevant to the charged conduct. 03/18/2025 Trial Tr. 2622–24; 03/24/2025 Trial Tr. 3219, 3235–36. Ms. Javice's "ah we are fucked" message in particular has nothing to do with the preceding text message regarding spreadsheets but instead refers to, as reflected in the subsequent texts (not included in the Draft PSR), an individual with a thick accent that Ms. Javice and Mr. Amar had difficulty understanding. GX 801-51. The sentence and messages should be removed in their entirety. Ms. Javice also objects to the implication that the messages relate to sharing "30 data files with JPMC" because there is no evidence that Ms. Javice shared the files prior to the date of the messages.

Ms. Javice maintains that this paragraph should be deleted. But at a minimum, the subsequent texts should be included to provide additional context. The last sentence should, at a

Ashley E. Geiser

minimum, be revised accordingly:  On February 7, 2022, JAVICE and AMAR exchanged messages ~~about JAVICE having shared the approximately 30 data files with JPMC~~:

> JAVICE: gave him the shit show of all systems in spreadsheets
> AMAR: okay
> JAVICE: ah we are fucked
> <u>JAVICE: russian</u>
> <u>AMAR: That's quite the accent</u>
> <u>JAVICE: but his name is latin</u>

**Paragraph 83**:  Ms. Javice objects to this paragraph's statement comparing the Frank marketing campaign's metrics to JPMC's typical email campaigns. Ryan MacDonald, a JPMC witness recognized that Frank's email campaign could not be compared to a typical JPMC email campaign and that different results were expected for a cold email from Chase to Frank users than JPMC's typical email campaigns.  Trial Tr. 2431:13-16.  Mr. MacDonald also acknowledged that he simply received the summary but was not involved in analyzing the data.  Trial Tr. 2434:5-12.  Further trial testimony showed that JPMC's typical delivery rates were not based on cold emails to the student segment, thus it is inaccurate to compare Frank's performance to JPMC's typical open rates, which may not include cold emails outside of the student segment.  It is unclear what this typical data is based on, and its reliability was called into question by an experienced professional in email marketing and former Frank and JPMC employee, Jenny Zeitler.  Jenny Zeitler explained that a 99% open rate is not consistent with her experience in email marketing. Trial Tr. 3081:20-23.  Ms. Zeitler also explained that the rates might be low in this instance because it was a cold email from Chase to Frank customers, with no reference to Frank - a reason that is unrelated to fraud. Trial Tr. 3083:4-11.

**Paragraphs 84–102**:  Ms. Javice objects to any inclusion of allegations relating to alleged misrepresentations made during JPMC's Internal Investigation and within documents related to JPMC's civil lawsuit in the United States District Court for the District of Delaware ("JPMC Civil Case") (*see JPMC v. Javice et al*, 22 Civ. 1621 (MN) (D. Del.)).  JPMC Internal Investigation or JPMC Civil Case from being admitted at trial because there was "no relevance to this case." 03/17/2025 Trial Tr. at 2546; *see also* 03/11/2025 Trial Tr. at 1769.  Moreover, the cited evidence lacks a "sufficient indicia of reliability to support its probable accuracy."  *Martinez*, 413 F.3d at 242 (quoting *Simmons*, 164 F.3d at 79).   These allegations should be deleted from the PSR.

**Paragraph 86**:  Ms. Javice objects to the extent this paragraph implies that Investigator-1 only had conversations with Attorney-1.  The first sentence should be amended accordingly:  As part of the internal investigation, Investigator-1 and their colleagues had discussion with <u>JAVICE and</u> JAVICE's counsel (Attorney-1). ~~regarding JAVICE's use of personal texts for business matters among other things.~~

Ms. Javice also objects to this paragraph because it incorrectly implies that Ms. Javice was asked to conduct a comprehensive review of her personal phone to identify substantive business-purpose messages. Ms. Javice requests that the following be added:  In response to representations by JAVICE that she texted on her personal phone only about non-substantive work matters, Investigator-1 and their colleagues requested examples. <u>During an interview on July 21, 2022,</u>

Ashley E. Geiser

Investigator-1 acknowledged to JAVICE that "logistics" texts were not improper, but nevertheless JAVICE was asked to retrieve and provide some examples of such texts (a task to be done after the conclusion of the interview). Investigator-1 also requested that, if while conducting that search for "some examples," JAVICE happened to come across substantive business communications, she forward those as well. There was no express request for a full search of her personal phone to identify substantive business-purpose messages beyond that. Indeed, counsel for JAVICE expressly stated in the interview that, while JAVICE would agree to provide some examples, she was not agreeing to undertake any comprehensive review of her phone in search of any business-related texts, and Investigator-1 acknowledged the limited-scope of the request in this regard. On August 3, 2022, an investigative counsel at JPMC wrote to Attorney-1:

"Following up on our request for examples of logistics-based texts. As previously mentioned, we request (1) 2-3 examples of JPM related texts concerning logistics (meeting times, "I'm running a few minutes late", etc.) from Charlie's [JAVICE] personal phone, and (2) confirmation that during her review of her text messages, Charlie [JAVICE] did not find substantive business-related texts on her personal phone."

**Paragraph 88**: Ms. Javice objects to the statement that "The full WhatsApp Chat between JAVICE and AMAR between July 19, 2021, and April 3, 2023, was extracted from AMAR's cellphone during the criminal investigation. The full WhatsApp Chat revealed that JAVICE's representation to JPMC, as conveyed by Attorney-1 in August 2022, was false." Ms. Javice represented that, in the limited search she conducted to pull precisely what JPMC requested—logistics texts—she did not find substantive texts is not proven false by the fact some substantive texts did exist in her full set of messages. Indeed, Investigator-1 had previously expressly disavowed that his request required her to make a fulsome search of all her text messages.

Ms. Javice objects to the clause "including communications about the fraud on JPMC," in the third sentence. The clause incorrectly suggests that the subsequent examples of business-related communications in paragraphs 89 and 90 are also alleged fraud-related communications. The text messages referenced in paragraphs 89 and 90 are unrelated to any purported fraud on JPMC. The sentence should also be updated to reflect that the full WhatsApp Chat, rather than the portion of a WhatsApp Chat as defined in paragraph 88, is what is being referenced. The sentence should be revised accordingly: The full WhatsApp Chat contained a multitude of communications about Frank and JPMC business, including communications about the fraud on JPMC, in the months leading up to Attorney-1's August 2022 email.

**Paragraph 89**: Ms. Javice objects because this paragraph reflects only that Ms. Javice and Mr. Amar had "multiple substantive communications about work matters." It does not allege that these communications were on any unapproved channels and/or personal devices.

Ms. Javice also objects because neither communication is related to, references, or otherwise has anything to do with the alleged fraud on JPMC. The exchange in Paragraph 89 is, as is clear from its face, a discussion between two employees discussing whether and how much energy to personally devote to rebuilding the submitter tool in the wake of the Department of Education's new 2-factor authentication rules that had rendered the prior version of the submitter technically obsolete.

Ashley E. Geiser

**Paragraph 90:**  Ms. Javice objects to this paragraph in its entirety.  This conversation refers to JPMC's rule regarding business information on personal devices, not any alleged fraud or cover-up.  The court recognized that during trial when it precluded those messages from being presented.  03/18/2025 Trial Tr. 2624–28 (observing that the messages were "unexplained").  The Draft PSR incorrectly implies that the conversation between Ms. Javice and Mr. Amar evidences some plan to destroy evidence.  The dialogue only shows that Mr. Amar was reminding Ms. Javice to do *exactly* what Investigator-1—and JPMC—would have wanted her to do upon establishing a dedicated work phone:  transfer her Chase business email app from her personal cell phone and then install it on her dedicated business phone so that Ms. Javice would no longer be using her personal phone for JPMC emails.  The conversation is not a substantive business communication, but rather is an example of one responsible JPMC employee reminding another to observe good corporate data practices in line with JPMC's policies.

**Paragraph 91**:  Ms. Javice objects because, as explained above, she did not and was not representing that no substantive communications at all existed in her messages.  Investigator-1's request was limited in scope and Attorney-1 expressly made clear that no exhaustive search would be conducted to find any and all such texts.  Ms. Javice also objects to the assertion that any discussion with Mr. Amar regarding synthetic data was related to the charged conduct.  This reference has no basis in the record and as explained above, synthetic data use is lawful and common in the industry.

**Paragraph 92:**  Ms. Javice objects to referring to "the Frank Email Account" without defining this term.

**Paragraphs 93–95, 97:**  As discussed above, Ms. Javice objects to including any allegations regarding JPMC's Internal Investigation, including because the cited evidence lacks a sufficient indicia of reliability.  At a minimum, the PSR should make clear in the relevant paragraphs that the quoted sections are quotes from Investigator-1's rough notes, not direct quotes from a transcript or any recording of the interviews themselves.

**Paragraph 93**:  The quoted portions of Ms. Javice's interview memoranda with Investigator-1 inaccurately quotes "personally identifiable information" rather than "PII."  The interview quotation should be revised accordingly:

> JAVICE: August 2021. I think he was doing extra work for ACT (one of our testing companies) in terms of why would undo it I didn't want <u>PII</u> [personally identifiable information.]
> Question: How were the invoices simplified?
> JAVICE: I think college major, first and last name, phone numbers were removed from invoices. I asked to remove all things. I think it had to do with <u>PII</u> [personally identifiable information], I think, the reference to PII [personally identifiable information], not the actual <u>PII</u> [personally identifiable information.]

**Paragraph 94:**  The second sentence should be revised to avoid giving the incorrect impression that Ms. Javice and Individual-1 discussed that "fake users" were supplied to Acxiom:

11

Ashley E. Geiser

The investigation revealed that JAVICE and Individual-1 discussed "fake users" and not a data augmentation issue, and <u>that</u> the "fake users" were supplied to Acxiom.

**Paragraph 96:**  Frank Employee-3 testified that, to her knowledge, no Frank partner had requested a data purchase related to data augmentation.  *See* 03/04/2025 Trial Tr. 1047–48.   The first sentence should be revised accordingly:  Frank Employee-3 testified <u>that, to her knowledge,</u> there was no request from ACT, or any other Frank partner, for a data purchase related to data augmentation.

**Paragraph 99**:  Ms. Javice objects to the phrase "such as casting JAVICE as a victim of 'retaliation' for raising privacy concerns".  This is not a factual statement.  Rather, it is an argumentative characterization about Ms. Javice's purported motive.

**Paragraph 100:**  Mr. Amar's response in the second sentence should be revised to reflect his complete response:  "Great. Still going through your filing."

**Paragraph 103**:  Ms. Javice objects to this paragraph in its entirety, other than the first sentence regarding her arrest.  Ms. Javice incorporates all prior objections, clarifications, and comments herein while also raising several specific objections.

Ms. Javice objects that she was a leader or organizer of any conspiracy, for the reasons stated *infra* at Paragraph 117.

Ms. Javice objects that she submitted a list of "false users" made from data purchased from third parties to JPMC to conceal any deception or fraud, for the reasons stated *supra*.  Ms. Javice also objects that this constitutes "sophisticated means," for the reasons stated *infra* at Paragraph 113.

Ms. Javice also objects to the Draft PSR's statement regarding JPMC's internal investigation and the JPMC Civil Case.  As described above in Paragraphs 84–104, Ms. Javice objects to the inclusion of these allegations in their entirety.  Ms. Javice also objects because the Draft PSR states that Ms. Javice attempted to obstruct or impede justice "subsequent" to her arrest. As reflected in Paragraphs 84–102, however, all statements were all made prior to her April 2023 arrest.[4]  Ms. Javice objects to the allegations regarding JPMC's Internal Investigation and Civil Case.  For the reasons stated *supra* at Paragraphs 84–102, these allegations irrelevant for the purposes of sentencing and that the cited evidence lacks sufficient indicia of reliability.  For the reasons stated *infra* at Paragraphs 107 and 118, Ms. Javice objects that she obstructed or impeded the investigation and/or prosecution of the instant offense.

---

[4]   Ms. Javice also objects because the Draft PSR oscillates between referring to Ms. Javice's conduct as obstructing or impeding justice and *attempting* to obstruct or impede justice.  Compare Paragraph 103 (simply that "JAVICE attempted to obstruct or impede") with Paragraph 118 ("The defendant willfully obstructed or impeded, or attempted to obstruct or impede.").

Ashley E. Geiser

Ms. Javice objects to the extent this paragraph asserts that Ms. Javice and Mr. Amar "submitted altered lists of the synthetic data" during the JPMC Internal Investigation as unsupported by the evidence.

Ms. Javice objects to the stated loss amount of "approximately $197,541,000, which accounts for the amount JPMC paid for the acquisition of Frank and losses related to marketing based on the misrepresented list of users provided by JAVICE and AMAR" for the reasons stated *infra* at Paragraph 112.

Ms. Javice also objects to the use of the term "false users." As stated above, the appropriate language is "synthetic data." The paragraph should be revised accordingly: JAVICE directed Individual-1 to compile a list of ~~false users~~ synthetic data that was knowingly submitted to JPMC by JAVICE and AMAR during due diligence to deceive JPMC in the acquisition of Frank in September 2021.

Finally, the second to last sentence appears to contain a typographical error. The sentence should be revised accordingly: JAVICE attempted to obstruct or impede the investigation and/or prosecution of the instant offense subsequent to ~~his~~ her arrest.

**Paragraphs 105–06, 181**: Ms. Javice objects to the amount of restitution allegedly owed to JPMC pursuant to the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A. As will be detailed further in her forthcoming sentencing memorandum, Ms. Javice objects to any restitution generally, and specifically to $299 million amount stated in the Draft PSR. *First*, Ms. Javice objects to classifying JPMC as a "victim" within the MVRA. *See* 18 U.S.C. § 3663A(a)(2)(defining "victim" as an entity that was "directly and proximately harmed as a result of" the offense of conviction); *see also United States v. Reifler*, 446 F.3d 65, 135 (2d Cir. 2006).

*Second*, Ms. Javice objects to the assertion that JPMC suffered $299 million in losses that may be compensated by an order of restitution authorized under the MVRA. Restitution may only be imposed for losses that were "directly and proximately" caused by the "specific conduct that is the basis of the offense of conviction." *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021) (cleaned up); *see also United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013) (noting that a court may not order restitution for "loss[es] caused by relevant conduct" under the Guidelines, as opposed to "the specific conduct that is the basis of the offense of conviction."). Further, any recovery is limited to "actual loss . . . not losses that are hypothetical or speculative." *United States v. Maynard*, 743 F.3d 374, 378 (2d Cir. 2014); *see also United States v. Tanner*, 942 F.3d 60, 67 (2d Cir. 2019) (reversing restitution award where court failed to adequately approximate losses with a "sound methodology"). The Draft PSR provides no support for its $299 million restitution amount, other than what appear to be high-level, boilerplate categorical claims put forth by JPMC and/or the government. This fails to meet the government's burden of proving that these figures represent actual losses that were directly and proximately caused by the specific conduct of conviction. *Goodrich*, 12 F.4th at 231. This includes, but is not limited to, any restitution amount that fails to take into consideration the underlying and continuing value that Frank (and its employees, via services or otherwise) had after being acquired by JPMC.

Ashley E. Geiser

*Third*, Ms. Javice objects to the assertion that legal fees are compensable as restitution.  For one, none of the legal fees were directly or proximately caused by Ms. Javice's specific offense conduct, rather than an independent obligation to its employees and former employees, including Ms. Javice and Mr. Amar.  *See United States v. Sullivan*, 118 F.4th 170, 231–33 (2d Cir. 2024).  Ms. Javice and Mr. Amar's defense fees are also not compensable because they neither advanced the government's criminal investigation nor were necessary to JPMC's participation.  *See United States v. Rankin*, 2023 WL 7403638, at *7 (D. Conn. Nov. 9, 2023), *reconsideration denied sub nom. United States v. Sullivan*, 2023 WL 8723671 (D. Conn. Nov. 21, 2023), *and aff'd sub nom. United States v. Sullivan*, 118 F.4th 170 (2d Cir. 2024) (citing 18 U.S.C. § 3663A(b)(1)).

*Fourth*, Ms. Javice objects to the imposition of restitution because determining complicated issues of fact related to causation and loss amount as outlined above would complicate the sentencing process to a degree that the need to provide restitution is outweighed by any burden on the sentencing process.  *See* 18 U.S.C. § 3663A(c)(3).

*Fifth*, Ms. Javice objects because she has not received a "complete accounting of the losses" JPMC alleges it suffered.  *See* 18 U.S.C. § 3663A(d); *id.* § 3664(a); *see also* Fed. R. Crim. P. 32(c)(1)(B).

*Sixth*, Ms. Javice objects because imposition of the restitution as stated in the Draft PSR would violate Ms. Javice's Fifth and Sixth Amendment rights because it would not be based on facts found by the jury.  *See, e.g., Hester v. United States*, 586 U.S. 1104, 1107 (2019) (Gorsuch, J. and Sotomayor, J., dissenting from denial of cert.); *see also Apprendi v. New Jersey*, 530 U.S. 466 (2000).

**Paragraph 107**:  Ms. Javice objects for the reasons stated below, *infra* at Paragraph 118.

**Paragraph 108, 121**:  Ms. Javice objects the Draft PSR's penalty for exercising her right to trial.  *See United States v. Tavberidze*, 2025 WL 826917, at *2 (S.D.N.Y. Mar. 14, 2025) (Rakoff, J.) (holding that § 3E1.1(b) violates the Sixth Amendment right to trial); *see also United States v. DiMassa*, 117 F.4th 477, 490 (2d Cir.) (Parker, J., dissenting).

**Paragraph 112**:  As will be argued in further detail in her upcoming sentencing memorandum, Ms. Javice objects to any enhancement under § 2B1.1(b)(1)(N) related to the Draft PSR's stated loss amount.

*First*, the Draft PSR lacks a sufficient calculation, explanation, or methodology as to how it determined the $197,541,000 alleged loss amount.  Loss amount cannot be based on "pure speculation."  *United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993); *United States v. Williams*, 247 F.3d 353, 358 n.7 (2d Cir. 2001); *United States v. Cuti*, 2011 WL 3585988, at *3–4 (S.D.N.Y. July 29, 2011) (finding that determining loss amount was "difficult and speculative" where victim-purchaser relied on a variety of factors beyond the alleged fraudulent misrepresentations in making its investment decision).  Ms. Javice specifically objects to including in the calculation of any loss amount vague and unspecified references to "marketing."

*Second*, Ms. Javice objects because any purported losses were not "reasonably foreseeable pecuniary harm that resulted from the offense."  § 2B1.1(b).  This includes, but is not limited to,

Ashley E. Geiser

the fact that JPMC may be entitled to recoup any losses it allegedly suffered as a result of the purported fraud because of certain provisions that allow for recoupment in the event of fraud.

*Third*, Ms. Javice objects to the purported loss amount because it fails to account for Frank's underlying value, *see* § 2B1.1 Application Note 3(B)–(D), (E)(ix); *see also United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008); *United States v. Byors*, 586 F.3d 222 (2d Cir. 2009).

*Fourth*, Ms. Javice objects to the purpose loss amount because it fails to account for loss caused by events other than the offense conduct. These include, but are not limited to, the Department of Education's rollout of two-factor authentication as well as market conditions. *See United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) ("[T]he loss must be the result of the fraud." (cleaned up)).

**Paragraph 113**: As will be argued in further detail in her upcoming sentencing memorandum, Ms. Javice objects to a two-level enhancement under § 2B1.1(b)(10)(c) for allegedly using "sophisticated means." Ms. Javice objects to the Draft PSR's assertion that Ms. Javice submitted a list of "false users" made from data purchased from third-parties to JPMC to conceal any deception or fraud. In any event, the described conduct does not meet the definition of sophisticated means under § 2B1.1(b)(10)(c). *See* Application Note 9(B) (defining sophisticated means to be "especially complex or especially intricate offense conduct"); *see also United States v. Guldi*, ---F.4th---, 2025 WL 1774801, at *10–13 (2d Cir. June 2, 2025).

**Paragraph 114**: As will be argued in further detail in her upcoming sentencing memorandum, Ms. Javice objects to a two-level enhancement under § 2B1.1(b)(17)(A) for allegedly deriving more than $1,000,000 in gross receipts from a financial institution. The gross receipts provisions seeks to punish her for conduct (allegedly gaining $1,000,000 related to the sale of Frank) that is already accounted for in the Draft PSR's loss calculation. *See supra* Paragraph 112; *United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000).

**Paragraph 116**: Ms. Javice objects to a two-level enhancement under §3B1.3 for abuse of private trust or use of a special skill. In support of her objections, she incorporates her factual objections as stated *supra*.

*First*, the "abuse of trust enhancement applies *only* where the defendant has abused discretionary authority entrusted to [her] by the victim." *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996) (emphasis added); *United States v. Broderson*, 67 F.3d 452, 456 (2d Cir. 1995). The enhancement *does not apply* to "[a] purely arm's-length contractual relationship between the defendant and the victims." *United States v. Huggins*, 844 F.3d 118, 125 (2d Cir. 2016). That is precisely the case here. As discussed above, *supra* at pg. 2–3 this was an arms-length, commercial transaction, which renders this enhancement inapplicable as a matter of law. Further, in its agreement to purchase Frank, JPMC expressly agreed that "no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction." GX2000 (merger agreement). Meaning, Ms. Javice did not "occup[y] a position vis-à-vis [JPMC] that is in the nature of a fiduciary relationship," another requirement for application of this enhancement. *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996). To the contrary, JPMC had no expectations of Ms. Javice beyond that of an

Ashley E. Geiser

ordinary seller in an arm's-length transaction. According to the parties' own words, Ms. Javice did not hold a position of trust. Thus, this enhancement is inapplicable.

*Second*, since this enhancement is based on use of a special skill, it "may not be employed in addition to an adjustment under §3B1.1," which the PSR also applies. U.S.S.G. §3B1.3; *see* PSR ¶¶ 116-17 (applying an enhancement under §§3B1.3 and 3B1.1). It is also factually unsupported.

Ms. Javice will further elaborate on these arguments in her forthcoming sentencing submission.

**Paragraph 117**: Ms. Javice objects to the inclusion of a two-level role enhancement under §3B1.1(c), because it has not been shown by a preponderance of the evidence that she was an "organizer, leader, manager, or supervisor" of another "criminally responsible" participant in the criminal scheme. *See* U.S.S.G. § 3B1.1; *United States v. Beverly,* 5 F.3d 633, 642 (2d Cir.1993).

*Second*, Ms. Javice objects to application of enhancements for both "use of a special skill" under §3B1.3 and a role enhancement under §3B1.1 as impermissible double counting. *See supra* Paragraph 116.

Ms. Javice will further detail these arguments in her sentencing memorandum.

**Paragraph 118**: As will be argued in further detail in her upcoming sentencing memorandum, Ms. Javice objects to a two-level enhancement for obstruction of justice under § 3C1.1. Ms. Javice incorporates her objections to the allegations as stated *infra* at Paragraphs 84–102.

*First*, Ms. Javice objects because the allegations do not establish that she willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice of the criminal investigation. § 3C1.1.

*Second*, Ms. Javice objects because the allegations do not establish that her alleged conduct was purposefully calculated, and likely to thwart, the investigation or prosecution of the offense of conviction. *See* § 3C1.1 (Application Note 1 stating that "[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction).

*Third*, Ms. Javice objects because the allegations do not have the requisite nexus to a government-led investigation or case. *Cf. United States v. Zagari*, 111 F.3d 307, 328 (2d Cir. 1997), *United States v. Chivers*, 488 Fed. App'x 782, 787–88 (5th Cir. 2012).

*Fourth*, Ms. Javice objects because the alleged conduct is not obstructive, including, but not limited to, because any alleged falsehoods were not material. *See* § 3C1.1 (Application Note 2, stating that a defendant's "denial of guilt [] other than a denial under oath that constitutes perjury[] . . . is not a basis for application of this provision); (Application Notes 3, 4, and 5, which outline covered conduct and noting that "less serious forms of conduct" are not intended to be

Ashley E. Geiser

covered by this enhancement); *see also United States v. Cusack*, 66 F. Supp. 2d 493, 501–02 (S.D.N.Y. 1999), *aff'd*, 229 F.3d 344 (2d Cir. 2000); *United States v. Johns*, 27 F.3d 31, 34 (2d Cir. 1994).

**Paragraph 120**:  Ms. Javice objects to the omission of a two-level reduction for zero-point offenders pursuant to §4C1.1.

**Paragraphs 119, 122**:  For the reasons stated above, Ms. Javice objects to the Draft PSR's offense calculations.

## Part C:  Offender Characteristics

**Paragraph 132**:  This paragraph incorrectly states the ages of Ms. Javice's parents.  Mr. Javice is 68 years old, and Ms. Rosin will be 65 in August.

**Paragraph 133**:  Since conducting her interview with Probation, Ms. Javice's brother has changed jobs.  He is now self-employed and starting a holding company.  Ms. Javice requests that this paragraph be updated accordingly:  The defendant's brother, Elie Javice, is 32 years old and resides in Miami Beach, FL. He ~~is~~ was employed as the Chief Digital and Tech Officer at Firehouse Subs through Restaurant Brands International, <u>but is now currently self-employed</u>.

**Paragraph 134**:  Ms. Javice disputes describing her childhood as "quiet and tranquil" and maintains that she described it as "normal and loving."  The following clause should be revised accordingly:  She described their childhood as ~~"quiet and tranquil"~~ <u>"normal and loving."</u>

Ms. Javice also disputes that her mother was the primary disciplinarian; her father was. The following clause should be revised accordingly:  ~~Ms. Rosin~~ <u>Mr. Javice</u> was the primary disciplinarian

Ashley E. Geiser



**Paragraph 159:**  Ms. Javice earned a gross annual salary at Frank after raising outside funding; the following sentence should be revised accordingly:  She stated that she did not initially take a salary but earned a gross annual salary between $60,000 and $75,000 once Frank ~~was profitable~~ raised outside funding. This paragraph also omits Ms. Javice's bonus, and should be revised accordingly:  At the time that Frank was sold, Javice earned a gross annual salary of approximately $250,000 and a bonus of $100,000.

**Part D:  Sentencing Options**

**Paragraphs 169–70**: For the reasons stated above, Ms. Javice objects to the guidelines calculations as laid out in the Draft PSR.

**Paragraph 181**:  For the reasons stated above, Ms. Javice objects to the imposition of any restitution.

**Paragraphs 183–85**:  We reserve objection to any claim for forfeiture.  Ms. Javice would dispute any such claim.

**Paragraphs 188–89:**  Ms. Javice objects to the omission of the following basis for a downward departure: § 5K2.0(c); § 5K2.20; and Application Note 21(C) to § 2B1.1.  Further, Ms. Javicce requests that Paragraph 189 be amended to include an additional basis for a downward variance: the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct pursuant to 18 U.S.C. § 3553(a)(6).  Ms. Javice will detail these and further arguments in support of her requests for a downward departure or variance in her forthcoming sentencing memorandum.

Respectfully submitted,

/s/ *Kirsten R. Nelson*
Kirsten R. Nelson* (*pro hac vice*)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 402-4880
kirstennelson@quinnemanuel.com

* Not admitted in Florida. A member in good standing in
Maryland and the District of Columbia

Ashley E. Geiser