**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

              v.

CHARLIE JAVICE and OLIVIER AMAR,

              Defendants.

23-cr-251 (AKH)

**DEFENDANT CHARLIE JAVICE'S MOTION FOR BAIL PENDING APPEAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 3

I.    LEGAL STANDARD .................................................................................. 3

II.   MS. JAVICE IS NEITHER A FLIGHT RISK NOR A DANGER ................................. 3

III.  MS. JAVICE RAISES SUBSTANTIAL QUESTIONS AND A NEW
      TRIAL IS LIKELY IF SHE PREVAILS .............................................................. 5

      A. There Is A Substantial Question Whether The Lack Of A Severance
         Deprived Ms. Javice Of A Fair Trial ........................................................... 5

      B. There Is A Substantial Question Whether The Court's Evidentiary And
         Instructional Errors Require A New Trial .................................................... 10

         1.    The Website Evidence ................................................................... 10

         2.    The "Blind Eye" Instruction ........................................................... 13

         3.    The Salve Testimony ..................................................................... 16

CONCLUSION ................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Bullcoming v. New Mexico*,
   564 U.S. 647 (2011) ....................................................................................................17

*Commonwealth v. Gordon*,
   2025 WL 2655687 (Mass. Sept. 17, 2025) ................................................................17

*Smith v. Arizona*,
   602 U.S. 779 (2024) ............................................................................................16, 17

*State v. Hall-Haught*,
   569 P.3d 315 (Wash. 2025) ........................................................................................18

*United States v. Abuhamra*,
   389 F.3d 309 (2d Cir. 2004) ........................................................................................3

*United States v. Bankman-Fried*,
   22 Cr. 673 (S.D.N.Y.) ...............................................................................................13

*United States v. Blum*,
   62 F.3d 63 (2d Cir. 1995) ...........................................................................................12

*United States v. Cardascia*,
   951 F.2d 474 (2d Cir. 1991) .....................................................................................5, 9

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012) .........................................................................................11

*United States v. Dove*,
   916 F.2d 41 (2d Cir. 1990) .........................................................................................15

*United States v. Green*,
   114 F.4th 163 (3d Cir. 2024) ........................................................................................5

*United States v. Haynes*,
   16 F.3d 29 (2d Cir. 1994) .............................................................................................9

*United States v. James*,
   239 F.3d 120 (2d Cir. 2000) .......................................................................................14

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015) .......................................................................................12

*United States v. Onumonu*,
   967 F.2d 782 (2d Cir. 1992) .......................................................................................12

*United States v. Randell*,
   761 F.2d 122 (2d Cir. 1985) ...........................................................................1, 3, 18

*United States v. Rittweger*,
   524 F.3d 171 (2d Cir. 2008) .........................................................................................6

*United States v. Rommy,*
   506 F.3d 108 (2d Cir. 2007) ...................................................................................15

*United States v. Salameh,*
   152 F.3d 88 (2d Cir. 1998) ......................................................................................5

*United States v. Scully,*
   877 F.3d 464 (2d Cir. 2017) ...................................................................................12

*United States v. Serpoosh,*
   919 F.2d 835 (2d Cir. 1990) .............................................................................5, 8, 9

*United States v. Seward,*
   135 F.4th 161 (4th Cir. 2025) .................................................................................18

*United States v. Stewart,*
   907 F.3d 677 (2d Cir. 2018) ...................................................................................12

*United States v. Wander,*
   601 F.2d 1251 (3d Cir. 1979) .................................................................................14

*Zafiro v. United States,*
   506 U.S. 534 (1993) .................................................................................................5

**Statute**

18 U.S.C. § 3143 .........................................................................................................3

**Rule**

Fed. R. Crim. P. 30......................................................................................................14

We submit this motion for bail pending appeal on behalf of Charlie Javice, who is scheduled to be sentenced by this Court on September 29, 2025.  Ms. Javice intends to appeal her conviction and, to the extent the Court imposes a custodial sentence, asks that the Court permit her to remain on bail during the pendency of her appeal.

## INTRODUCTION

As a preliminary matter, the standard for bail pending appeal requires clear and convincing evidence that the defendant is not likely to flee or pose a danger to the community.  But there is no serious dispute that Ms. Javice is neither a flight risk nor a danger.  She has been on bail without incident since her April 3, 2023 arrest, has no close family or significant assets outside the United States, and has never engaged in any type of violence.

Accordingly, the sole issue is whether her appeal will raise a "substantial question" likely to result in a new trial if decided in her favor.  A "substantial question" must only be "fairly debatable"—the Court need not conclude that it committed error.  *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985).  Ms. Javice's appeal will raise several substantial questions, and she is therefore entitled to bail under the statute.

First, although we recognize that the Court disagrees with our position on the merits, it is at least debatable whether the denial of Ms. Javice's severance motions deprived her of a fair trial.  In his *ex parte* pretrial proffer, co-defendant Olivier Amar told the Court his theory of defense was that Ms. Javice deceived him just as she deceived the banks.  Amar told the Court he planned to argue "that for the same reason the government is saying that they should convict her for having deceived [the banks] they should find that she deceived [Amar] as well."  In other words, Amar set out to prove his innocence by proving Ms. Javice's guilt.

This proffer alone should have resulted in severance. The trial showed why. With witness after witness, Amar elicited facts suggesting Ms. Javice's culpability, leading to seriatim objections from Ms. Javice's counsel. He even offered evidence of *his* personal theory of Ms. Javice's fraud—a theory the government considered "orthogonal" to its case and did not argue to the jury. Then, in summation, Amar's counsel trumpeted a nakedly prosecutorial narrative, arguing that Ms. Javice deliberately "siloed" him to prevent him from discovering her purported fraud after he called out a "huge mislabel."

The Court repeatedly recognized the danger inherent in forcing Ms. Javice to be tried alongside Amar, even taking the extraordinary step of granting Ms. Javice a "rebuttal" after Amar's summation. This was not enough. At a minimum, the denial of Ms. Javice's severance motions raises a substantial question about whether Ms. Javice received a fair trial.

Ms. Javice will also raise other substantial questions, including, among others: (1) the exclusion of admissible evidence showing that Frank's webpage was plastered with statements undercutting the government's theory of materiality; (2) the Court's refusal to give a crucial jury instruction on materiality after Ms. Javice had relied on that instruction in her summation; and (3) the overruling of Ms. Javice's Confrontation Clause objection to the testimony of a data scientist who served as a surrogate for plainly testimonial statements by his colleagues who actually performed the analysis.

The Court should grant bail pending appeal.

## ARGUMENT

## I.    LEGAL STANDARD

A court "shall order" bail pending appeal if it finds (1) by "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community," and (2) "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in … a new trial."  18 U.S.C. § 3143(b).  When a defendant satisfies that standard, bail is "mandatory."  *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

To be "substantial," a question need only be "one of more substance than would be necessary to a finding that it was not frivolous"—in other words, "a close question or one that very well could be decided the other way."  *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985).[1]  A question is also "substantial" where it is "novel" and "has not been decided by controlling precedent."  *Id.*  A question is "substantial" even if the Court does not believe that it made an error.  Rather, the Court must only decide that a question is "fairly debatable."  *Id.*  A defendant need not prove that he is likely to succeed on the substantial questions he raises; it is sufficient that if he does succeed, a new trial is likely.  *Id.* at 124-25.

## II.    MS. JAVICE IS NEITHER A FLIGHT RISK NOR A DANGER

As the Probation Department explained in finding Ms. Javice to be a good candidate for voluntary surrender, Ms. Javice "has kept all court appearances[,] has been in compliance with all terms and conditions of her pretrial release [and] is not viewed as a flight risk or danger to the community."  PSR, at 61.

---

[1] Unless otherwise noted, citations omit internal quotation marks, other citations, footnotes, and previous alterations in the original source.

Ms. Javice is plainly not a danger to the community.  She is 33 years old with no prior criminal history.  She was convicted in a highly publicized financial fraud case.  She is not working in the financial industry and there is zero risk of her re-offending.

Ms. Javice is also not a flight risk.  She has been a model supervisee and has fully complied with all bail conditions in the two-and-a-half years this case has been pending.  During that time, Ms. Javice has been free on a $2 million personal recognizance bond secured by her home and co-signed by her mother and father.  She has sought and maintained employment.  She lives in Miami with her partner, a U.S. citizen, with whom she plans to start a family.  She is close to both her parents as well as her brother and young niece, all of whom live in Miami.  She is relatively young.  Even the prospect of a significant sentence provides little incentive to embark on a life as a fugitive from justice.

Ms. Javice attended all court appearances prior to trial and has returned to court for two appearances following the verdict.  The government itself has asserted that it could have sought to have Ms. Javice remanded without bail following her conviction but opted not to do so in view of Ms. Javice's record of compliance with her bail conditions.  04/01/2025 Tr. at 11.  This suggests that the government does not regard Ms. Javice as a flight risk.

Following the verdict, the Court imposed the additional condition of GPS monitoring.  *Id.* at 40.  This monitoring provides additional assurance that Ms. Javice will not flee.  Moreover, while the Court has noted Ms. Javice's French citizenship, the flight risk based on this factor is negligible.  Ms. Javice has surrendered her passports.  She is a U.S. citizen who has lived in the U.S. her entire life.  She holds French citizenship only by descent and has no significant ties to that country.  Her home, her partner, her parents, and her immediate family are all in this country.

### III.   MS. JAVICE RAISES SUBSTANTIAL QUESTIONS AND A NEW TRIAL IS LIKELY IF SHE PREVAILS

#### A.  There Is A Substantial Question Whether The Lack Of A Severance Deprived Ms. Javice Of A Fair Trial

Amar's defense strategy was built around a consistent narrative that bolstered the government's case against Ms. Javice:  he argued that Ms. Javice not only deceived the banks, she deceived Amar, and when Amar called out a batch of "mislabeled" data, Ms. Javice "siloed" him, assigning him discrete tasks but keeping him away from anything that would tip him off to her fraud.  There is, at a minimum, a substantial question whether the denial of Ms. Javice's severance motions deprived her of a fair trial.

Separate trials must be ordered where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro v. United States*, 506 U.S. 534, 539 (1993). A severance motion based on antagonistic defenses requires the defendant to show that "acceptance of one party's defense would tend to preclude the acquittal of [the] other."  *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998);  *United States v. Serpoosh*, 919 F.2d 835, 837-38 (2d Cir. 1990).  This does not mean that "mutually antagonistic" defenses must be "true mirror images of each other."  *United States v. Green*, 114 F.4th 163, 172 (3d Cir. 2024).  Nor does it mean that a defendant "is … required to show that a jury would be left with no other option *but* to convict him if a jury believes his co-defendant."  *Id.* at 173.  Rather, the question is whether the "core" of one defendant's case suggests the conviction of the other, *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991), and whether the defendant is so severely prejudiced that less drastic measures than severance do not suffice, *see Zafiro*, 506 U.S. at 538-39; *Salameh*, 152 F.3d at 116; *see also Green*, 114 F.4th at 1669 (reversing conviction and holding that "when

competing narratives call for a jury to convict one defendant in order to acquit another, we require separate juries to avoid substantial prejudice to any single defendant").

Amar told the Court *ex parte* before trial that his defense was that Ms. Javice "deceived [him] as well" and that he planned to "elicit[] evidence … and also argu[e] to the jury that for the same reason the government is saying that they should convict her for having deceived [the banks] they should find that she deceived [Amar] as well." ECF 382-1 at 27-28. This pre-trial proffer demonstrated strong enough ground for severance. And even if that had not been the case, the subsequent proceedings made the need for a severance even more compelling, and "the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear." *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) (Sotomayor, J.) (quoting *Schaffer v. United States*, 362 U.S. 511, 516 (1960)).

Amar used his cross-examinations to confirm that Ms. Javice made the misrepresentations that formed the core of the government's case, often echoing the prosecutor's points. This was also the theme of the first portion of Amar's summation. For example, he focused on testimony that a LionTree banker had "learned about the number of customers you thought Frank had within the first week or so of speaking to Ms. Javice" and had the 4.25 million users "number in mind even before [he] met with Mr. Amar." Tr.3665. Similarly, he highlighted testimony that the JPMC executive "quarterbacking" the deal understood that Frank had 4.25 million customer accounts "[b]ased on information that was conveyed to the firm by Ms. Javice." Tr.3665-66. Pointing to GX 3.1.4, which the government called the "fraud spreadsheet" and "the heart of this fraud scheme," Amar argued that Ms. Javice added "18 more columns" *after* Amar worked on it and that after the 18 fraudulent columns were added, "Mr. Amar never transmitted this document. *Ms. Javice did*." Tr.3678-79; *see also* Tr.3523 (government summation).

6

Counsel went on in this manner for page after page, telling the jury that he could "spend [his] entire two hours reading the transcript," and using slides in which Ms. Javice's name is bolded and underlined.  Tr.3665-72; *see also* ECF 383-5 at 14-20 (Amar summation slides).

Amar then turned to the heart of his summation:  how *Ms. Javice* deceived *him*.  During Capital One's due diligence Amar had provided Ms. Javice with accurate data on website impressions but "then *Ms. Javice* sends something else instead that was *mislabeled*."  Tr.3680. Amar flagged this for Ms. Javice and Frank's general counsel, stating:  "We need to discuss this. That's a huge mislabel."  Tr.3683.  Amar forced this message into evidence over objection from both Ms. Javice *and* the government, which insisted that the mislabeled spreadsheet was "orthogonal" to its theory of the case.  Tr.3212.

Amar put the "huge mislabel" message front and center.  He told the jury that it was "probably the single most important piece of evidence in this case."  Tr.3679.  He argued that what Ms. Javice did was "wrong" and that whether Ms. Javice did this "by accident or not" was "not for me to decide, *that is for you to decide*."  Tr.3680.  But Amar ensured that the jury knew who was responsible:  "The only person that had anything to do with this document … was Charlie Javice…. Who had permissions on this document, which email address?  I am only seeing charlie@withfrank.org."  Tr.3681.

Amar next argued that Ms. Javice culpably resisted efforts by a senior LionTree banker to issue a correction based on Amar's spotting the "huge mislabel."  There was "a lot of pushback by Ms. Javice, *she did not want to do it*" because "[s]he was worried it would *blow up the deal*." Tr.3684.  And that, Amar argued, is exactly what happened:  Capital One walked away from the deal the day after the correction was issued.  Tr.3686.  "Is that a coincidence?  I don't think so." *Id.*

7

This brought Amar to his central point. Amar argued that after Capital One baulked "[e]verything changed" for him. *Id.* He was "almost completely cut out of [JPMC] due diligence from this point forward." *Id.* Why? Because "[t]hey lost Capital One and … Ms. Javice doesn't want him involved anymore with [JPMC], calling out mislabels." *Id.*; *see also* Tr.3714.

It would have been bad enough had Amar argued that Ms. Javice cut him out of diligence in a fit of pique. But his actual argument was much more damaging. Amar argued that Ms. Javice deliberately cut him out of JPMC due diligence *so that she could perpetrate her fraud in secret*. It was "*not an accident* that these things are kept separate by Ms. Javice"; it was a deliberate plot to ensure "[t]he left hand doesn't know what the right hand is doing." Tr.3690. This became a constant refrain: "If Mr. Amar is in on this fraud, why did [Ms. Javice] have Dr. Kapelner buy the Enformion information. Why wouldn't [Amar] do it? Because the left hand doesn't know what the right hand is doing and the only one that sees the full picture is Ms. Javice." Tr.3705. Again: "She is separating out the two of them because the left hand doesn't know what the right hand is doing." Tr.3713. And to drive the point home: "The only one who knows *all of what is being done and why is Ms. Javice*." Tr.3692.

Moreover, that both defendants were convicted does not mean Amar's antagonistic defense did not deprive Ms. Javice of a fair trial. In *Serpoosh*, the Second Circuit vacated the convictions of *both* co-defendants where Defendant A argued that Defendant B had framed him in a drug transaction and Defendant B argued that Defendant A had used him as an unwitting "buffer" between Defendant A and the drug buyers. 919 F.2d at 838-39. The court held that the defendants' "mutually exclusive explanations" and the "sparring between counsel" resulted in

"substantial prejudice" requiring reversal.  *Id.*[2]; *see also Cardascia*, 951 F.2d at 484 (holding that severance must be granted "when antagonism at the *essence* of the defenses prevails to such a degree … that the jury … infers that the conflict alone" indicates both defendants' guilt).

When it denied Ms. Javice's Rule 33 motion, this Court did not grapple with the particularized and prosecutorial nature of Amar's case against her.  The Court acknowledged that Amar offered "evidence against Ms. Javice" but found this evidence "limited, tending to show that Ms. Javice's role was greater than his."  ECF 415 at 10.  As explained above, Amar offered a comprehensive theory of how Ms. Javice deliberately distanced him as part of a plan to hide her fraudulent scheme from him and stop him reporting problems with her data.  Thus, the Second Circuit may well take a different view and find that the mutually antagonistic defenses here deprived Ms. Javice of a fair trial.  The Court also offered its view that "[t]he evidence at trial showed mutual guilt, not the innocence of either."  *Id.*  Respectfully, however, the Court's view that the defendants were both guilty as charged does not mean the failure to sever is not a substantial question requiring bail:  Ms. Javice was entitled to have a jury make that determination following a fair trial, and the denial of Ms. Javice's severance motions deprived her of that opportunity.

Ms. Javice was forced to go to trial against two prosecutors—two prosecutors who offered different theories of her guilt but who each zealously advocated against her.  Ms. Javice will argue on appeal that the result was a constitutionally unfair trial.  At a minimum, this

---

[2] To the extent that *Serpoosh* suggested that "severance is *required* … when the jury, in order to believe the core of testimony offered on behalf of one defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant," 919 F.2d at 838 (emphasis added), that statement was abrogated by *Zafiro*.  *See United States v. Haynes*, 16 F.3d 29 (2d Cir. 1994).  *Serpoosh*, however, also made clear that the result was based on "prejudice so severe as to amount to a denial of a constitutionally fair trial."  919 F.2d at 837.

presents a substantial question about which reasonable jurists might disagree, entitling Ms.

Javice to bail pending appeal.

**B. There Is A Substantial Question Whether The Court's Evidentiary And Instructional Errors Require A New Trial**

The Court hamstrung Ms. Javice's materiality defense by erroneously excluding critical

evidence undercutting the government's allegation that the number of FAFSA users was

material. The Court also declined to give a crucial jury instruction necessary to balance the

materiality instruction after inducing Ms. Javice to rely on the instruction in summation. The

Court also overruled Ms. Javice's Sixth Amendment objection to the testimony of a data scientist

who served as the surrogate for opinions developed by non-testifying witnesses. These issues

individually and cumulatively raise a substantial question about whether Ms. Javice received a

fair trial.

1. <u>The Website Evidence</u>

Ms. Javice argued that JPMC bought Frank for reasons having nothing to do with the

number of users who had signed up for accounts and turned a "blind eye" to any

misrepresentations regarding the number of accounts. As the Court put it, materiality was "one

of the really contested issues in this case," Tr.3788, and "[m]ateriality means they saw and didn't

care because it was not important to them," Tr.3148. Despite this, the Court excluded critical

evidence that supported Ms. Javice's defense: statements in the "FAQ" and "Newsroom" pages

on Frank's website boasting that Frank had helped no more than several hundred thousand

students, not the several million JPMC supposedly believed. ECF 345-1, 345-2, 388-1. Had

these concededly authentic webpages come in they would have provided ample reason for the

jury to doubt the government's case, both with respect to Ms. Javice's intent, and, most

significantly, with respect to materiality. Without them, Ms. Javice was limited to picking up

10

scraps from the well-drilled platoon of government witnesses, each of whom took the stand and insisted that Ms. Javice's alleged lies about the number of FAFSA accounts were *the* material information in the deal.

The Court excluded the webpages because Ms. Javice did not extract testimony from the testifying JPMC bankers that they reviewed the specific webpages in question. Tr.3150. In ruling on Ms. Javice's Rule 33 motion, for example, the Court explained that "[e]vidence of statistics posted on Frank's website as to students and families helped by Frank [was] not relevant to the misrepresentations made directly to the banks" where "there was no evidence that bank employees saw those specific statistics." ECF 415 at 11. This was error. "When faced with a question of conditional relevance [under Rule 104(b)], the district court should 'examine[] all the evidence in the case and decide[] whether the jury could reasonably find the conditional fact … by a preponderance of the evidence.'" *United States v. Coplan*, 703 F.3d 46, 81 (2d Cir. 2012) (quoting *Huddleston v. United States*, 485 U.S. 681, 690 (1988)). The question, in other words, was not whether the Court was satisfied that the bankers had *in fact* reviewed the webpages but whether there was sufficient evidence from which the jury *could* conclude that JPMC had reviewed the webpages.

There is only one answer to this question. JPMC was buying a *website* for $175 million. Its 350-person due diligence team scrutinized the deal for a month. The statements in question were not buried at the back of the website: they were on the "FAQ" page and the "Newsroom" page. The senior bankers testifying for the government acknowledged reviewing Frank's website. It is unthinkable that the due diligence team skipped over them. Indeed, we know that JPMC was focused on claims made on Frank's website because a legacy Frank employee testified outside the presence of the jury that she worked with JPMC's integration team

11

immediately after the acquisition going line by line through the website to validate claims. Tr.1274-78.  The Court excluded this testimony as well.  Tr.1284-85.

At an absolute minimum there was sufficient evidence for *the jury* to consider whether JPMC reviewed the "FAQ" and "Newsroom" pages with their modest claims about Frank FAFSA users.  The Court erroneously took this question away from the jury.

"Materiality was an issue central to [the defense] case and was hotly contested at trial." *United States v. Litvak*, 808 F.3d 160, 184 (2d Cir. 2015).  The government understood that materiality was the heart of the case and focused in on it in summation.  Tr.3527-32 ("Reason 3.  The defendants' lies were important to potential buyers.  They told lies that mattered…").  The excluded evidence "went to the core of the prosecution's case," *United States v. Blum*, 62 F.3d 63, 69 (2d Cir. 1995), and the Court's ruling "deprived [Ms. Javice] of a fair opportunity to present [her] case to the jury," *United States v. Onumonu*, 967 F.2d 782, 789 (2d Cir. 1992).  The Second Circuit has not hesitated to reverse convictions in which critical defense evidence— including evidence on materiality in fraud cases—was excluded.  *See, e.g.*, *Litvak*, 808 F.3d at 183-84 (vacating conviction where court limited defense ability to contest materiality and defendant was "left only with the 'victims' of his conduct as sources of potential testimony on this issue"); *United States v. Stewart*, 907 F.3d 677, 691 (2d Cir. 2018) (vacating conviction based on erroneous exclusion of single piece of evidence even where evidence on several elements was "overwhelming" where excluded evidence went to "the central point of contention"); *United States v. Scully*, 877 F.3d 464, 475-76 (2d Cir. 2017) (vacating conviction because court excluded evidence "necessary to rebut the government's [fraud] claim").  Accordingly, whether the proffered materiality evidence was erroneously excluded, it is at least a substantial question that, if resolved in Ms. Javice's favor, would likely result in a new trial.

2.    The "Blind Eye" Instruction

The Court compounded the error in excluding the website evidence by *sua sponte* reversing its decision to instruct the jury that it could consider in connection with materiality whether a victim turned a "blind eye to a misrepresentation" after Ms. Javice had expressly relied on that instruction in her summation. The Court's proposed instruction was: "[A] victim cannot intentionally turn a blind eye to a misrepresentation. If he does, you may … consider that in determining if the misrepresentation was material." Tr.3461. This was a legally correct instruction modelled after an instruction given by Judge Kaplan in *United States v. Bankman-Fried*, 22 Cr. 673 (S.D.N.Y.). Indeed, the only objection the government made to the instruction was a request for a minor re-wording that the Court rejected: "I think the only suggestion we would make is, instead of 'misrepresentation,' that it say 'certain types of misrepresentation.'" Tr.3461. The "blind eye" instruction would have come directly after and counterbalanced an instruction telling the jury that "it does not matter that the [bank] may have been gullible … because the fraud laws protect both the gullible and the sophisticated." Tr.3789.

Defense counsel focused heavily on materiality in his summation. And counsel specifically relied on the anticipated "blind eye" instruction, telling the jury that "Judge Hellerstein will give you some instruction" about how "[y]ou can't turn a blind eye to information and claim you were defrauded." Tr.3631-32. Yet after summations concluded, the Court determined that the instruction doesn't "make[] sense, and we cover it by conscious avoidance." Tr.3762.

There was no basis for this turnaround. The instruction *did* makes sense—that's why the Court adopted it without any substantive objection from the government. Nor was the topic covered by the conscious avoidance instruction. That instruction had nothing to do with

materiality.  Tr.3793-94.  Moreover, the conscious avoidance instruction is an instruction about the *defendants'* state of mind, not that of the *bankers*—the whole point of the "blind eye" instruction.

And most importantly, counsel was blindsided by the reversal, having relied on the Court's original plan to give the instruction, only to have the rug pulled out from him after his closing.  The rules are supposed to protect parties from such unforeseen modifications.  That mandate is express:  "The court must inform the parties *before closing arguments* how it intends to rule on the requested instructions."  Fed. R. Crim. P. 30(b) (emphasis added).  "This rule proceeds from basic concepts of fairness."  *United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000).  It "permits counsel to conform their arguments to the law as it will thereafter be presented by the judge," a "purpose … frustrated if the judge, after informing counsel of his proposed charge, then changes the charge after summations are completed."  *Id.*  "Whether the actual instruction reflects a better statement of the law is irrelevant [because] [i]t is the court's failure to advise counsel of its ruling prior to closing argument, not the soundness of that ruling, which violate[s] Rule 30."  *United States v. Wander*, 601 F.2d 1251, 1262 (3d Cir. 1979).  Rule 30 error requires reversal when the defendant shows "that he was substantially misled in formulating his arguments or otherwise prejudiced."  *James*, 239 F.3d at 125; *see, e.g.*, *Wander*, 601 F.2d at 1263 (ordering new trial where "material modification … in the instructions … after counsel have closed" was "prejudicial and violated Rule 30").

That is what occurred here.  Defense counsel was led to pitch a key part of his summation around an instruction that was promised and then denied.  Counsel quoted from the instruction and reasonably put his credibility on the line by telling the jury they would next hear it from the

lips of the judge.  The Court's *sua sponte* turnabout cost counsel credibility and deprived Ms. Javice of her one opportunity to put on her best defense.

In denying Ms. Javice's Rule 33 motion, the Court noted that "the defendants were put on notice that the charge delivered to the jury may deviate slightly from the charge discussed at the charging conference."  ECF 415 at 14.  But the Court's suggestion of possible minor deviations from the written charge did not put the defense on notice that there might be substantive revisions, let alone the excision of a key instruction specifically requested by the defense. Rather, the Court told the parties that it found it "important to repeat, extemporize, and make sure, the way a speaker can, that the jury is paying attention."  Tr.3426.  While a defendant "cannot claim to have been substantially misled in framing his summation" when he is "on notice that the propriety of *a particular jury instruction* is subject to further consideration," *United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007) (emphasis added), that is not what happened here.  Ms. Javice had *no warning* that the "blind eye" instruction might be excised from the final charge.

The refusal to give the "blind eye" instruction also unfairly skewed the charge on materiality in favor of the prosecution.  The Court adopted the government's proposed instruction on "investor gullibility," Tr.3789, but rejected the defense's legally sound "blind eye" instruction designed to give the jury the other half of the law.  This rendered the instructions prejudicially "unbalanced" and violated the well-established principle that "a criminal defendant is entitled to instructions relating to his theory of defense, for which there is some foundation in the proof, no matter how tenuous that defense may appear to the trial court."  *United States v. Dove*, 916 F.2d 41, 45-47 (2d Cir. 1990) (reversing because charge was insufficiently balanced and failed to convey defense theory).  There was a sound basis in the evidence for Ms. Javice's

theory that JPMC knew about the true FAFSA numbers and did not care because those numbers were not the reason it was buying FRANK.  The unbalanced instructions, however, led the jury only to the conclusion that this defense theory was irrelevant as a matter of law.  At a minimum, this raises a substantial question.

       3.    <u>The Salve Testimony</u>

The government's claim that Ms. Javice used purchased data to placate JPMC's demand for user data and coverup her alleged fraud was central to its case.  The government sought to prove this theory by calling a data scientist, Dr. Michael Salve, to testify to comparisons between various data sets comprising millions of lines of data.  Salve opined that data provided to JPMC matched data Ms. Javice purchased from third parties.  The government called this a "whopper of a lie" and relied heavily on Salve's keystone testimony and accompanying charts in its summation.  Tr.3578, 3580-3581; Gx.2708, Gx.2709.

There is, at a minimum, a substantial question as to whether Salve's testimony violated the Confrontation Clause, especially in light of *Smith v. Arizona*, 602 U.S. 779 (2024), and caselaw developing in its wake.  Salve did not perform the analysis underlying his opinion.  Rather, he served as the mouthpiece for work performed by two other data scientists working under his supervision.  Salve explained that "one of [his] team members use[d] a program called Microsoft SQL server that allows for the comparison between two different databases, looking at millions of rows and millions of values in those rows, to see if in fact they're exactly the same" and "another person on [his] team program[med] in a language called Python, and that person went through the spreadsheets and compared line by line, row by row, value by value, to see which ones were identical."  Tr.2741.  In this way, Salve had "two different team members validate [the comparison] through [two] different programs," while Salve "overs[aw] th[e]

programming work." *Id.* As a quality check, Salve then performed "a casual inspection to make sure that what was happening was consistent with our programming results." *Id.*

The Court explained posttrial that "Dr. Salve's testimony did not violate Ms. Javice's Confrontation Clause right because Dr. Salve personally reviewed and verified the work done by his assistants." ECF 415 at 12; *see also* Tr.2726, 3506 (rejecting Ms. Javice's Confrontation Clause arguments without analysis). But the testimony does not support this conclusion. Salve's oversight of the work performed by two other data scientists was cursory—a matter of reviewing the work *they* did and doing a quick manual quality check.

Moreover, even assuming Salve performed a close, technical review of his colleagues' work, the Supreme Court's decisions in *Bullcoming v. New Mexico*, 564 U.S. 647 (2011) and last year in *Smith* strongly suggest that such surrogate testimony is unconstitutional. In *Bullcoming*, the Court held that "[t]he accused's right is to be confronted with the analyst who made the certification" and that the accused must be able to "cross-examine that particular scientist." 564 U.S. at 652. And in *Smith* the testifying analyst "prepared for trial by reviewing [the non-testifying analyst's] report and notes" and then "offered an 'independent opinion'" based on those materials. 602 U.S. at 791. That is little different from what Salve did here: he reviewed his colleagues' work and then either parroted that opinion, having performed some brief quality checks, or offered an "independent opinion" based on their work. Either way, the Constitution requires more.

Several courts have recognized that *Smith* requires a re-evaluation of prior precedent in this area. In *Commonwealth v. Gordon*, for example, decided just a week ago, the Massachusetts Supreme Judicial Court held that *Smith* abrogated prior Massachusetts precedent and vacated a conviction where a laboratory supervisor who had "performed the technical and administrative

reviews of the original analyst's work" gave a supposedly "independent" opinion in place of the original analyst. 2025 WL 2655687, at **1, 10-17 (Mass. Sept. 17, 2025) (collecting cases addressing *Smith*). In *State v. Hall-Haught*, the Supreme Court of Washington held that *Smith* abrogated *its* prior precedent and vacated a conviction where a supervisor who had supervised and reviewed an analyst's work testified in the analyst's place. 569 P.3d 315, 321-22 (Wash. 2025). In *United States v. Seward*, the Fourth Circuit held that *Smith* abrogated *its* precedent and ruled that an "independent" opinion by an analyst who performed a quality review of the original analyst's work violated the Confrontation Clause. 135 F.4th 161, 167-69 (4th Cir. 2025).

The Second Circuit has not addressed the application of *Smith* to testimony by a supervisor. A question that is "novel" and "which has not been decided by controlling precedent" is necessarily "substantial." *Randell*, 761 F.2d at 125. Salve's opinion was crucial in bringing together the various strands of the prosecution's case. In light of *Smith* there is—at least—a substantial question as to whether the admission of his testimony was constitutional error and, if so, whether it was harmless beyond a reasonable doubt.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant bail pending appeal.

Dated: New York, New York
September 25, 2025

**SHAPIRO ARATO BACH LLP**

By: <u>/s/ Alexandra A.E. Shapiro</u>
Alexandra A.E. Shapiro
Julian S. Brod
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
(212) 257-4880
ashapiro@shapiroarato.com
jbrod@shapiroarato.com

**QUINN EMANUEL URQUHART**
**& SULLIVAN, LLP**

Christopher Tayback (*pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
christayback@quinnemanuel.com
Sara Clark (*pro hac vice*)
700 Louisiana Street, Suite 3900
Houston, TX 77002
(713) 221-7100
saraclark@quinnemanuel.com

Erica Perdomo (*pro hac vice*)
Kirsten R. Nelson* (*pro hac vice*)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
(305) 402-4880
ericaperdomo@quinnemanuel.com
kirstennelson@quinnemanuel.com
* Not admitted to the Florida Bar.
Admitted in Maryland and Washington, D.C.


**MINTZ, LEVIN, COHN, FERRIS,**
**GLOVSKY & POPEO, P.C.**

David Siegal
Ellen Shapiro
919 Third Avenue
New York, NY 10022
(212) 935-3000
dmsiegal@mintz.com
eshapiro@mintz.com

Eóin P. Beirne (*pro hac vice*)
One Financial Center
Boston, MA 02111
(617) 542-6000
epbeirne@mintz.com

**BAEZ LAW FIRM**

Jose Baez (*pro hac vice*)
1200 Brickell Avenue
Miami, FL 33131
(305)-999-5100
jose@baezlawfirm.com


**RONALD SULLIVAN PLLC**

Ronald Sullivan (*pro hac vice*)
1300 I Street NW, Suite 400E
Washington, DC 20005
(202) 313-8313
rsullivan@ronaldsullivanlaw.com

*Counsel for Defendant Charlie Javice*