P9T3JAVS                    Sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

               v.                        23 CR. 251 (AKH)

CHARLIE JAVICE

               Defendant.
------------------------------x

                                         New York, N.Y.
                                         September 29, 2025
                                         10:30 a.m.


Before:

               HON. ALVIN K. HELLERSTEIN,

                                         District Judge

                         APPEARANCES

AMANDA HOULE
     Attorney for the United States, Acting under
     Authority Conferred by 28 U.S.C. § 515
BY:  MICAH F. FERGENSON
     RUSHMI BHASKARAN
     NICHOLAS W. CHIUCHIOLO
     GEORGIA V. KOSTOPOULOS
     Assistant United States Attorneys

QUINN EMANUEL URQUHART & SULLIVAN LLP
     Attorneys for Defendant Javice
BY:  KIRSTEN NELSON
     ERICA PERDOMO
     CHRISTOPHER TAYBACK
     -and-
RONALD S. SULLIVAN
     -and-
JOSE A. BAEZ
     -and-
MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO PC
BY:  EOIN BEIRNE
     -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
         JULIAN S. BROD

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

THE DEPUTY CLERK:  U.S. v. Charlie Javice.  Counsel, please state your appearances for the record.

MR. FERGENSON:  Good morning, your Honor.  Micah Fergenson, Nicholas Chiuchiolo, and Georgia Kostopoulos for the government.  We're also joined by paralegal Alex Ross.

THE COURT:  Good morning.

MR. SULLIVAN:  Good morning, your Honor.  Ronald Sullivan and Jose Baez on behalf of Ms. Javice.

MS. SHAPIRO:  Alexandra Shapiro and Julian Brod also on behalf of Ms. Javice.

THE COURT:  Good morning.  And good morning, Ms. Javice.

THE DEFENDANT:  Good morning.

THE COURT:  It's my duty, Ms. Javice, to sentence you today.  And I begin by asking if you and your counsel have read the presentence investigative report?

THE DEFENDANT:  I have, your Honor.

THE COURT:  You have not?

THE DEFENDANT:  I have, your Honor.

THE COURT:  You have.  And your counsel has many objections and I'm going to deal with those first.

The first are a series of general objections, and they're not specific to particular paragraphs.  It is hard for me to deal with that.

MR. BEIRNE:  Good morning, your Honor.  Owen Beirne

also for Ms. Javice.  I'm going to handle the objections to the PSR.

Your Honor, we made a number of factual objections to the PSR which the probation department did accurately record in its addendum to the final PSR.  We don't think the Court needs to resolve any of those factual objections in order to perform its guidelines calculation, so we're satisfied --

THE COURT:  I need to find the facts as set out in the presentence investigative report, so I've got to do that first.

MR. BEIRNE:  Yes, your Honor.

THE COURT:  I can't put that off.  You want me to deal with these from your schedule of objections or do you want me to deal with it from what the probation officer has reported?

MR. BEIRNE:  Whatever your Honor's preference is.  I think we are all working from the final PSR, so perhaps in the way probation reports it.  I'm referring, your Honor, to the addendum that starts on page 48 of the final presentence report.

THE COURT:  It begins on page 46.

MR. BEIRNE:  Yes, your Honor.

THE COURT:  The first objection is to paragraph 11.

MR. BEIRNE:  Your Honor, this is, as you noted, part of a group of objections.

THE COURT:  I'm not dealing with groups, I'm dealing with specific paragraphs.  What's your objection to

paragraph 11?

MR. BEIRNE:  I think, like many of these factual objections, your Honor, we disagree with the characterization of the evidence presented at trial, we disagree that some of this evidence was as the jury found as part of its verdict.  So we have noted our objections in the presentence report.  And I think we'd probably be here for two weeks if we went through every single one of them.

THE COURT:  We can go through two weeks.  My job is to have an accurate presentence investigative report.  I have to take your objections one by one.  If you need someone else to present that, let that other person present it.  But we're going through them one by one.

MR. BEIRNE:  Okay, your Honor.  I'll rely heavily on Ms. Nelson to assist me to go through this.

I believe paragraph 11 is just a typographical error.  It should be "her" and not "his."

THE COURT:  There is no such adjective.

MR. BEIRNE:  I apologize.  It is now numbered paragraph 10.

THE COURT:  It says "she."

MR. BEIRNE:  Yes, your Honor.

THE COURT:  What's wrong with that?

MR. BEIRNE:  I believe farther down it says "A review of pretrial services record indicate the defendant has remained

compliant with the conditions of his release."  It should be her release.

THE COURT:  What paragraph are you reading from?

Could you take it please, if you are going to be the source of information.

MS. NELSON:  Good morning, your Honor.  Kirsten Nelson on behalf of Ms. Javice.

THE COURT:  Good morning, Ms. Nelson.  What's the first paragraph to which you take objection?

MS. NELSON:  Looking at the final PSR, your Honor, which is ECF No. 414, I'm looking at paragraph 10, which is on page 7 of the PDF.

THE COURT:  Yes.  This is the one that's revised August 4, 2025.

MS. NELSON:  That's correct, your Honor.

THE COURT:  I have paragraph 10.  What's the problem with paragraph 10?

MS. NELSON:  I'm looking at line 3 of paragraph 10, which begins with "remained compliant."

THE COURT:  Yes.

MS. NELSON:  It continues "with the conditions of his release."

THE COURT:  Thank you.  We'll change that to "her."

Next, paragraph 11.

MS. NELSON:  No objection, your Honor.

P9T3JAVS                      Sentence

THE COURT:  What's your next objection?

MS. NELSON:  I apologize, your Honor, U.S. probation worked with us very extensively in order to adopt our objections, so I am just checking my notes.

THE COURT:  Sorry?

MS. NELSON:  United States probation adopted many of our objections, so I'm just verifying.

Your Honor, we have an objection to paragraph 19.

THE COURT:  Yes.

MS. NELSON:  Here, too, it is just a correction to the record.  It says "Ms. Javice dialed in using a phone."  The testimony at trial did not establish how Ms. Javice joined the call.

THE COURT:  Why don't we say "And Javice joined the call."

MS. NELSON:  We agree, your Honor.

MR. FERGENSON:  Your Honor, it wasn't the testimony, it was the Zoom records itself showed she dialed in from her phone number.  So we think it's accurate as written.  It is not particularly material.

THE COURT:  And Javice joined the call, joined the Zoom call we have it.

MS. NELSON:  That works for the defense.

THE COURT:  What's next?  Try to make meaningful objections, please.

MS. NELSON:  Your Honor, I believe the rest of our objections are more disagreements with the characterizations by probation and not factual corrections.

May I have a moment to confer with Mr. Sullivan.

THE COURT:  Yes.

MS. NELSON:  Thank you.

(Pause)

MS. NELSON:  Thank you, your Honor.

We have one further clarification to paragraph 18. The last sentence of paragraph 18 says that "At least approximately 142,000 completed FAFSA applications."  We would respectfully request that that be modified to say after 2019, which was consistent with the testimony at trial.

THE COURT:  Mr. Fergenson?

MR. FERGENSON:  That's not correct, your Honor.  The 142,000 is actually I would say an overestimate how many actually completed.  And it includes the data prior to 2019 as well.

THE COURT:  So it says "and at least."

MR. FERGENSON:  I think I would say we could strike "at least" and just say approximately 142.

THE COURT:  I'll strike "at least."

MS. NELSON:  Thank you, your Honor.

THE COURT:  Your objection is overruled.

MS. NELSON:  Your Honor, that resolves Ms. Javice's

factual objections to the PSR.

THE COURT:  I find the facts as stated in the PSR correct except as modified.  Yes, sir.

MR. BEIRNE:  Would your Honor like to take up the objections in the PSR to the guidelines calculation?

THE COURT:  I'm about to do that.

I now turn to finding the appropriate guidelines. Again, there are numerous objections which I'll take up one by one.

I think both sides agree that the offense level is to be counted under Section 2B1.1 with a base level of 7.  Am I right?  No disagreement to that?

MR. BEIRNE:  That's correct, your Honor.

THE COURT:  The next upward adjustment is a calculation that the fraud was greater than $150 million and less than $250 million which would yield an upward adjustment of 26.

There is objection to that, Mr. Beirne?

MR. BEIRNE:  Yes, your Honor.

THE COURT:  Go ahead.

MR. BEIRNE:  Your Honor, as we pointed out in our opening brief and our reply papers, it is the government that has the burden of proving loss if it advocates for a loss enhancement.

THE COURT:  By a preponderance.

P9T3JAVS                        Sentence

MR. BEIRNE:  By a preponderance.  They have to prove both the amount, that there was a loss and the amount of loss.

THE COURT:  There is no question.

MR. BEIRNE:  Here, they have not done that.  They have taken a position based on a case which has no precedential value, that has not been followed by courts in this district that have done this analysis since that decision was issued, the government merely says because JPMorgan was fraudulently induced to enter into this transaction, that the fact that Frank had any value whatsoever has no bearing on the court's analysis, and that's not correct and that's not the law.

Frank was a real company.  It had real value, it had real users, perhaps not the amount that JPMorgan Chase thought it was getting, but it had precisely some of what JPMorgan thought it was getting.  That has value, that could have created revenue for JPMorgan, that the government has spent no time to fulfill its obligation to prove to your Honor what the net loss was to JPMorgan which is required.

So our position is, because the government has failed to do that, that this Court should follow what Judge Swain did in a recent case and what Judge Rakoff did in a recent case and refuse to apply this enhancement.

We're certainly not saying there was no loss here, your Honor, but what we're saying is the government has failed in its burden to demonstrate to your Honor what the loss was

P9T3JAVS                      Sentence

and so the enhancement cannot and should not apply.

THE COURT:  Mr. Fergenson?

MR. FERGENSON:  Thank you, your Honor.

The government has met its burden to show the loss amount in this case involving an acquisition for $175 million, that the loss was approximately $174 million.

THE COURT:  That's the price that was paid by JPMorgan Chase.

MR. FERGENSON:  Sticker price was 175 million, and if you do the arithmetic on all the costs.

THE COURT:  Plus additional consideration for salaries.

MR. FERGENSON:  Correct, your Honor.  The expenses total, when you do the precise math, about 174.

THE COURT:  The price of the deal was about $174 million.

MR. FERGENSON:  Correct.

THE COURT:  Which is more than 150 million and less than 250 million.

MR. FERGENSON:  Yes, your Honor.

Just to respond briefly on a few points.  One, we think there is an ample basis in the Second Circuit case law that the Court just need not consider any valuation of Frank here.  There is no credit that is required under the law in these circumstances.

P9T3JAVS                          Sentence

There is a line of cases from *Komar* and *Paul* and *Turk* followed by courts, district courts in the Second Circuit, such as *Shkreli* and *Bryson*, these are cases we cited in our submission.  This isn't like a public stock, that's not the appropriate comparison.  It was a company acquisition where the only valuable asset was fake.  And in those circumstances, the guidelines don't compel an impractical hypothetical counterfactual valuation exercise.  The loss was what they paid for this company.

Now, even if the Court were to find that under the law it should try to discern any value JPMorgan received from this transaction, it doesn't change the analysis, because JPMC received no value.  The transaction was valued -- or the company was valued at 100 percent goodwill and JPMorgan has written off the entire investment, a complete loss.

THE COURT:  What happened when JPMorgan tried to contact the data that was furnished by Frank?

MR. FERGENSON:  That is exactly a good point, your Honor.  The fraud continued after the acquisition.

THE COURT:  At a certain point JPMorgan tried to contact the names that are furnished.

MR. FERGENSON:  That's right, your Honor.

THE COURT:  And the addresses that were furnished and found out that the bulk, if I remember correctly, came back nobody knows the address.

MR. FERGENSON:  Correct, your Honor.

THE COURT:  Address unknown.

MR. FERGENSON:  Correct, your Honor.  And that test, that test marketing campaign on 400,000 e-mails wasn't actually run on Frank's real data.  It was run on the augmented list, the data they bought.

THE COURT:  The synthetic and augmented data, so the list had very little value, if any.

All right.  I have the point.

MR. FERGENSON:  And I would say, your Honor.

THE COURT:  I have the point, thank you. Mr. Fergenson.

MR. FERGENSON:  Thank you, your Honor.

THE COURT:  I hold that the appropriate loss is $174 million.  Under *United States v. Komar*, 529 F.App'x 28, 29 (2d Cir. 2013), which actually should not be cited because it's Federal Appendix, but it affirmed the court below.

Do you want to say something, Mr. Baez?

MR. BAEZ:  Yes, Judge.  It requires us approaching on something.

THE COURT:  Sorry?

MR. BAEZ:  It requires us approaching on something private.  A private matter.  I apologize.

THE COURT:  You don't want me to finish?

MR. BAEZ:  Yes.  (Pages 13-14 Sealed)

(In open court)

THE COURT:  I was in the middle of ruling so let me start from the beginning of the ruling.

Pursuant to *United States v. Komar*, 529 F. App'x 28 at page 29 (2d Cir. 2013), affirming Judge Sullivan's sentence and judgment below at 11 CR 68, and *United States v. Turk*, 626 F.3d 743, 748 (2d Cir. 2010).  There is no mitigation unless actual property is returned.  And an investment of uncertain value is not worthy of credit.

Second point is that it's unclear that any value is obtained by JPMorgan Chase.  The value was in the customer list.  Customer list was made up of synthetic and augmented names and addresses.  So when Chase started to try to exploit what it took, what it obtained, found that an unpredictable large number was returned because the addresses were wrong.

The value of the asset was reduced to zero and there is no credit to be obtained.  So on both those grounds I overrule the objection, and I find that the upward adjustment is 26.

MR. BEIRNE:  If I may, we certainly respect the Court's ruling, but I feel obliged to just correct one aspect of the basis for the Court's ruling.  I don't think the government would dispute that JPMorgan Chase did receive some number of actual users of the type they believed they were getting, whether the number is 142,000, 293,000 or the 500,000

P9T3JAVS                        Sentence

that Mr. Chiuchiolo referred to in his closing, they did get exactly the type of information about those numbers of users. As you said, they were also given synthetic data, but they had those real users.  They elected eventually to shutter the company rather than to exploit those.

I respect the Court's ruling, but I believe the second basis the government would not dispute was an error.

THE COURT:  There may have been accuracy within the synthetic set of data that was produced, but there never was an accounting of just what was correct or what was not correct. And any value that should have been accepted by Chase did not exist.

There is no obligation on the part of a customer who is defrauded to mitigate what it receives.  This was a fraudulent inducement case.  Chase was fraudulently induced to purchase a business.  As such, there is no mitigation that is appropriate.  That's my holding.  So the 26 is the upward adjustment.

What's the next argument?  I think the government agrees that, maybe I'm wrong, Mr. Fergenson, sophisticated means, is that government feels it should be -- yes.

MR. FERGENSON:  Yes, your Honor.

THE COURT:  Is there an objection to sophisticated means?

MR. BEIRNE:  There is, your Honor, and we would be

prepared to rest on our papers for the argument.

THE COURT:  You can't rest on your papers.  You have to make the argument.

MR. BEIRNE:  We did not believe the evidence showed particularly sophisticated means.  Your Honor may think of the synthetic data as a basis to defraud JPMorgan here.  But as we argued, JPMorgan had a sophisticated team, and I am not blaming the victim in saying this.  And nor do I want to relitigate issues at trial because I don't think it would be very productive.  But, despite the use of synthetic data, we do not believe that the sophisticated means enhancement is called for here.

THE COURT:  I overrule the objection.  The sophisticated means had to do with the use of an expert, a professor of I think mathematics at Wharton who was a friend of Ms. Javice to create a set of 4,500,000, 4,250,000 synthetic users.  And then a purchase of an augmented list to fill in the data that was required in order to complete the deal with Chase.

These are sophisticated means and I hold that the upward adjustment of two is appropriate.

The next is an upward adjustment suggested by the probation department that since Ms. Javice and Mr. Amar received, since Ms. Javice received more than a million dollars of gross receipts from the fraud, there should be an upward

adjustment of two.  I think the government agrees that should not be appropriate, that there is too much duplication in the same conduct.

MR. FERGENSON:  No, your Honor, we are seeking that and we do not believe it is duplicative.

THE COURT:  I believe it is the same conduct.  Now, the adjustments sometimes will add culpability to what is the same conduct.  But here, the inducement was the reward.  The conduct is the same.  The culpability is not greater in my opinion.  And although there is good ground to argue that there should be an upward adjustment of two, I decline so to adjust.

The next is a concealment in the fraud adjustment under Section 3B1.3.  I think the government agrees that should not be applied.  Right, Mr. Fergenson?

MR. FERGENSON:  We agree, your Honor.

THE COURT:  The next is an upward adjustment proposed by probation under Section 3B1.1(c) for being an organizer or leader of fewer than five.

What's the government position on that?

MR. FERGENSON:  We believe it applies, your Honor.

THE COURT:  Mr. Beirne?

MR. BEIRNE:  Your Honor, we object and do not believe it applies.  The government repeatedly referred to Ms. Javice and Mr. Amar as co-conspirators and co-equals throughout the fraud.  Although Ms. Javice may have played a larger role as

P9T3JAVS                        Sentence

the face of the company, Mr. Amar was certainly participating in the crime alongside with her, alongside her, and she was not controlling his actions at any point.

At a few points during Mr. Chiuchiolo's closing argument he referred to the stars of the show, Javice and Amar. He said that Amar was working in parallel with Javice. I can give you the transcript cites.

Just because Ms. Javice had the title of CEO does not mean she was necessarily controlling her second in charge here. Much like the Court found in the Elizabeth Holmes case in California, where the Court declined to adopt this enhancement with her co-conspirator and co-defendant who simply occupied the title of second in charge, we don't think that the evidence at trial or the jury's verdict showed that Ms. Javice was controlling or directing the participation of Mr. Amar and we don't think this enhancement should apply.

There is also collateral consequences with this particular enhancement that deprive Ms. Javice as a first-time offender to a further reduction under 4C1.1, so we'd ask the Court to decline to adopt this enhancement.

MR. FERGENSON: May I respond, your Honor?

THE COURT: Yes, please.

MR. FERGENSON: Your Honor, the facts and as proven at trial, the record is clear that Ms. Javice was the leader of the fraud. She lied to every other third party involved, and

did so consistently, much more than Mr. Amar had. And she gave direction to Amar. We actually give some specific examples of that in our brief, particularly related to the purchase of ASL data. She was the CEO of the company and Mr. Amar reported to her ultimately. And that was the same thing with this fraud having to do with the company. It seems very clear, your Honor, that this enhancement applies.

THE COURT: The facts at trial show that it was Ms. Javice who organized the crime, tried to enlist people in her company, she enlisted Mr. Amar, others refused. She enlisted a professor, used other organizations, and she used her own organization. And therefore, a leadership role under 3B1.1(c) is appropriately applied.

*United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995); *United States v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004) and other cases. I overrule the objection and will apply the organizer and leader.

The next is an obstruction of justice claim, and I don't think that's being pursued by the government, is it?

MR. FERGENSON: We're not seeking that enhancement, your Honor. Correct.

THE COURT: Does the defendant claim a reduction for acceptance of responsibility?

MR. BEIRNE: We believe Ms. Javice has accepted responsibility as has been demonstrated to the Court in her

letters.  So we would like your Honor to consider applying that.

THE COURT:  She said she made a mistake, but she doesn't admit having committed a crime.  I don't think that's an acceptance of responsibility.  Therefore, she's not entitled to the two-level reduction.

So adding up what we have is 37.  Am I correct, Mr. Fergenson?

MR. FERGENSON:  Yes, your Honor.

THE COURT:  37.  Criminal history is zero.  Offense level of 37 yields a sentencing range of custodial punishment of 210 to 262 months.

Do I have it right, Mr. Fergenson?

MR. FERGENSON:  Yes, your Honor.

THE COURT:  Maintaining your objections, do I calculate correctly, Mr. Beirne?

MR. BEIRNE:  You have, your Honor.

THE COURT:  The guidelines are not mandatory, they're advisory.  And now comes the very act of discretion of determining the sentence.

Ms. Javice is 33 years old.  She has a history of good works.  Not committed a crime before.  There's extraordinary promise to her life.  A lot of blame can be assessed against JPMorgan Chase.  Not relevant, but nevertheless it is in the background.

So with that background, let me ask defendant counsel to speak.  Mr. Sullivan.

MR. SULLIVAN:  Thank you, your Honor.  We're going to ask the Court to enter a sentence that is below guidelines and we think that there's substantial support for a downward variance.

So Ms. Javice's conduct -- and the Court hit some of the high points that I hoped to address -- is certainly distinguishable from that in the sort of typical fraud case. In respect to motivation, it's different in respect to victims, it is different in respect to the actual harm.

So first I'll point out, I'll add to the Court's list that there is no evidence here of greed, lavish lifestyles, Ferraris, yachts, private jets, jet setting across the world. No evidence of victim devastation, children going to bed hungry, pension funds for firemen being completely wiped out. This is a different sort of fraud case in that respect.  It's different as well in there is no evidence of a syphoning off investor money and taking it for herself.

Now, in terms of the sort of actual harm to the victims, I'll let JPMorgan Chase speak for itself.  One of its primary witnesses, Leslie Wims Morris, senior JPMC executive, remarked, "Too funny re: $200 million -- where like aww that's nothing."  The remark reflects the bank's own contemporaneous understanding of the sum as being relatively immaterial to its

P9T3JAVS                          Sentence

overall operations, more than $4 trillion in total assets, etc.

I want to say a little bit about Frank itself, your Honor.  Different from other cases in federal courts like Elizabeth Holmes' case where the thing at issue did not work, Frank did good.  Frank worked.  It worked for fewer people than JPMorgan Chase expected and that your Honor ruled that they bargained for, but it worked.  It created measurable and lasting changes in the lives of real, every day, concrete people.  She helped people.  Unlike many fraud cases, Frank was not built in order to get money from people unlawfully.

Frank was built in order to make higher education accessible, to democratize higher education.  It did that and it did that well, which is why Ms. Javice and her company was so incredibly popular.  Thousands and thousands and thousands of people struggled to fill out that FAFSA form, including the person standing before you, your Honor.  That's a hard form to fill out and it took me hours and she found a way to make it simple.  To make it simple.  And help, in our estimation, well over 350,000 students.

Now, the societal benefits of first-generation students, first-gen students, that was whom she primarily targeted, is really difficult to measure.  The National College Attainment Network found that FAFSA completion "is one of the best predicters of whether a high school student will go on to college."

So what Ms. Javice did with her company, and this is the undisputed part that worked, the numbers that worked, what she did was help to move that needle, to democratize education, to make education more available for students who otherwise would not have a chance.  And we ask the Court to weigh that in its thinking.

In terms of Ms. Javice's background, characteristics, and unprecedented community support, that also warrants a downward departure.  Your Honor received more than 100 letters of support from childhood friends, from business partners, from rabbis, to former judges, who some of them had experienced incarceration.

As your Honor said before I stood up, Ms. Javice has a history of volunteerism, a history of supporting others.  Just as a high-level summary of some of the letters, she supported a mom and then her cousin through AA.  She protected her brother through her parents' divorce.  Her uncle in Paris leans on her and wants her to take care of his disabled son.

As your Honor saw in the letters, Charlie's mom, 60, unfortunately the same age as her grandmother and great-grandmother when she was also diagnosed with cancer, and Charlie has been a strong support system there and remains for her mother.  Her boyfriend's son is an above-the-knee amputee. Charlie helps with the care of him.

These are all things that are not in the headlines.

P9T3JAVS                          Sentence

As the letters suggest, your Honor, these are things that she does and has done out of the goodness of her heart.

She's helped friends with doctor appointments when battling cancer. She brought lunch to soldiers in uniform without drawing any attention to herself. She's paying for groceries for families she noticed were struggling. She's mentored countless students, many of whom might not otherwise have found a foothold in tech, people historically excluded from that field charlie Javice has helped. She's advocated so Hillel staff was not fired in December, the most expensive month of the year, and then rehired under the banner of logistics. She stepped in.

Her care and genuine affection for people and dedication to service started in early childhood. She helped care and support very close family members as a young person through addiction. She helped new people, new people into the country into the school communities feel welcomed. She started serving meals in high school. Turned that into a soup kitchen in high school. And she still, still does that, your Honor.

She brought her grandparents to school when another student denied the Holocaust. This is in her early childhood. In high school, the soup kitchen which I mentioned, she traveled and helped build orphanages, taught English, and worked in microfinance in Buenos Aires, again, to democratize these systems that are otherwise exclusionary to people of a

certain class, certain ethnicities.  Charlie Javice has been on the ground with that.

College, she always used her learning, your Honor, as a force for good.  She has been deeply involved in entrepreneurial enterprises that have social impact, that are social impact entities.  She became a leader of Penn Hillel.  She founded Pover Up, a novel idea where she taught people traditionally unused to managing resources to give them resources to help them start their own businesses and be able to care for themselves and their family.

You know, when Charlie founded Frank, and I'll get to in a minute what happened at Frank.  When Charlie founded Frank, your Honor, it was out of a sense of responsibility.  As your Honor learned through the pleadings, Charlie's grandmother always said that when she fled the war, the only thing she could take was her education.  And that set with Charlie.  She believed deeply that if people could get an education, then they would be able to make a meaningful impact in the country, community, world.  Based on that, she founded Frank.

And let me tell you what she did, some of the things that she did while at Frank, your Honor.  Charlie led by example.  She hired a young man, a front desk worker from WeWork because she saw something in him.  Someone who needed a job, Charlie stepped up.  She paid off another person's student loan when her dad was hospitalized.

These are not things that were in the newspaper, but these are things that your Honor has now learned.

She gave $5,000 to another person, an intern, so the family could replace their only car after a medical emergency. She didn't seek a humanitarian award. She did that in the context of Frank. She quietly covered rent for a brilliant young woman from the Bronx who basically raised herself. Charlie did that out of her own pocket. She helped a single teen mom get her daughter a full scholarship to a bilingual school, personally, guiding her through every step.

She gave time off to an employee going through surrogacy. Paid for a cross country trip, out of her own pocket -- these are the early days of Frank when it wasn't making much money -- but to travel across the country for the donor.

She never expected anything in return. She got a thank you note from time to time. But she was always there. She found a way to make people feel welcome, seen, understood. She created non-alcoholic happy hours for employees in recovery. Fought the time off for the grieving, etc. Your Honor, she has consistently since childhood done that.

Now, post sale, post sale, Charlie did not stop being involved in the community. She continued, your Honor, with her philanthropic ways, with her service, with her volunteer. Michael Eisenberg, he recalled asking her to mentor a group,

and I quote, he "recalled asking her to mentor a group of young women in a coding boot camp in the underserved town of Lod, Israel.  She immediately said yes.  Many of those women still credit their careers in tech to her encouragement, affectionately calling her the American girl who made them believe they could do it."

These are some of the things that she did.

Now, after the arrest, when Frank was no more, Charlie could have sort of gone inward, become solipsistic, not done anything.  But instead she helped her aunt with her special needs clinic.  She approved the website, the billing system, etc.  She helped parents find a way so that all of the children, each child had treatment.  She's been working with Ladies of Hope, with Dr. Topeka Sam, placing justice impacted women into jobs, training staff in advanced tools like AI for grant writing.  And even designing an entire Pilates program to give women in prison a path into wellness careers after release.  Her service has continued notwithstanding her personal circumstance.

As your Honor also knows, Charlie very much wants to and believes it is part of her destiny and responsibility to become a mother, has had challenges with fertility.  We mentioned that in various pleadings that are under seal.  I'll just note the physical and emotional issues associated therewith.

Now, Charlie is going to speak to you, your Honor. She does acknowledge her mistakes. She acknowledges points where there was a lapse of judgment. She speaks to it in her letter and she will address the Court herself.

She has endured a lot of, pain. Physical and emotional. Her reputation has been dismantled. She lost the business that she invested her blood, sweat, and tears in. Finances are drained and there have been irreversible consequences for Charlie and her family.

Let me speak to the personal circumstances and family responsibilities of Charlie. As your Honor knows from the letters, her mom lives next door. Charlie cooks for her, helps care for her, and is otherwise of assistance given the health concerns that her mom is experiencing.

Many relatives, as you know from the letters, your Honor, suffer from addiction or disability. And as you have seen in the letters, she has helped and continues to help with day-to-day support of these people and other non-family members as indicated in the letter.

The Court has more or less adopted the PSR's loss calculations. And notwithstanding that, a variance is still necessary to avoid unwarranted sentencing disparities.

Now, the guidelines -- the length of the guidelines are primarily based on loss amounts. This figure and these numbers are disconnected from how courts actually sentence

P9T3JAVS                          Sentence

comparable first time non-violent defendants in fraud cases.
Indeed, other sort of cases in the media like Elizabeth Holmes
got 12 years and did not have a real company.  The thing itself
as I mentioned didn't work.

Ms. Javice's sentence should be nowhere near that.
She had a real company, a real company that actually helped
people, your Honor.  All money that Ms. Javice received -- and
we will talk about this a little bit later.  But I'm sure your
Honor realizes that Ms. Javice by our calculations received
only about 20 million of the $175 million or $174 million -- my
mistake, your Honor, that your Honor found as a loss amount.
Just a fraction of that, that she personally received.  And
we'll say more about that at forfeiture and with respect to the
government's forfeiture and seizure letter.

The government argues that its recommendation is
consistent with or least a mean of where sentences fall, but
that, your Honor, does not give the Court a full picture.  If
the Court were to look at medians instead of means, the
sentences for comparable fraud cases are much, much, much less,
and we think that probation's 144-month recommendation would
put her well above the national median and would be far harsher
than many similar cases.

THE COURT:  What do you think is right?

MR. SULLIVAN:  Your Honor, we think somewhere in the
neighborhood of 18 months is an appropriate sentence for a

P9T3JAVS                        Sentence

first-time offender where other people got most of the money, where JPMorgan Chase, your Honor, has not made efforts to clawback that money from other investors, where one of their chief officers said that essentially the whole 174 is minimal. We think, your Honor, that that is more in line with what is fair for a young woman who has done, done good, has done good for most of her life. Horrible mistake, and but has done good for most of her life.

You know, I've mentioned the *Holmes* case, and just to be explicit, she was convicted at trial of one conspiracy count and three wire fraud counts. The tech itself never worked, and in fact, it endangered patients. Right. Loss amount about 120 million to investors, risk to public health, sentence 135 months.

THE COURT: She was sentenced to 135 months.

MR. SULLIVAN: 135 months. Much more egregious conduct. Public health risk. Dangerous medical consequences because the thing itself never worked.

The *Agarwal* case outcome, health, your Honor, five mail fraud, eight wire fraud, two bank fraud counts, government alleged $1 billion with a B fraudulently obtained, court reduced the loss to between 9 and 25 million. Sentence 3 years in a halfway house. Community confinement. Judge noted there that the guidelines overstated harm.

In the *Gina Champion-Cane* matter, it is a Ponzi

scheme.  *United States v. Champion-Cane*, pled guilty to securities fraud, conspiracy obstruction, ran a massive Ponzi scheme and tried to conceal evidence.  Raised over $350 million from 400 individual investors, enhancement for loss greater than $183 million, over 10 victims, sophisticated means, obstructions, 180 months.

*Bennett*, another Ponzi scheme, these are all in our writings.

THE COURT:  That's 15 years, isn't it?

MR. SULLIVAN:  Yes.  For this massive Ponzi scheme.

And again, your Honor, I've got to, Mr. Beirne started down this path.  JPMorgan Chase received hundreds of thousands of real names with the sort of PII that JPMorgan Chase asked for.  That's not in dispute.  How many hundreds of thousands may be in dispute, but they received hundreds of thousands of names, one, two, three, four, 500,000 names with PII.  This is not just some scheme --

THE COURT:  There were different numbers that were given to me during the trial.  Let's say there were 300,000 names that were good names.

MR. SULLIVAN:  Yes.

THE COURT:  What percentage of 4,250,000 is that?

MR. SULLIVAN:  Well, geez.  That's less than 10 percent.  I know enough math to say that.  So, but here's my point.  So less than 10 percent.

P9T3JAVS                              Sentence

THE COURT:  How do you engage in a marketing campaign where nine out of every 10 people are false?

MR. SULLIVAN:  I'm glad you asked me that, your Honor, because they did not use the Frank data.

THE COURT:  They couldn't use it.

MR. SULLIVAN:  No, they had it.  They could.  They had it.

THE COURT:  They couldn't use it because everything bounced.

MR. SULLIVAN:  No.

THE COURT:  No reliable marketing campaign when nine out of 10 names were fictitious.

MR. SULLIVAN:  I will represent to your Honor, if your Honor goes back to the transcript, they used a different list.

THE COURT:  We're not going to argue that.  But what was given to Chase was false.  She committed a fraud.

MR. SULLIVAN:  Yes.

THE COURT:  Committed a large fraud.

MR. SULLIVAN:  Yes.  But what was also given to Chase --

THE COURT:  The question is what's a just punishment.

MR. SULLIVAN:  What is a just punishment, and the just punishment should be less because this is different in kind and character than many of the other cases where the entire thing is a fraud.  To this day, JPMorgan Chase has the good names and

numbers and Social Security numbers and all of that.

THE COURT:  That argument is not going to give you any break.

MR. SULLIVAN:  I'm sorry, your Honor?

THE COURT:  That argument is not going to give you any break.

MR. SULLIVAN:  Okay.  My point is, all I'm trying to do is distinguish this case from many other cases where the entire enterprise is fraudulent for the purpose of enriching the fraudster.

This is different.  Ms. Javice has not gone out buying yachts and those sorts of things.  This is different in character, different in kind, different in degree.  This is why I'm focusing on this, your Honor.  I'm not trying to relitigate the facts, but just trying to suggest to your Honor it's different from a case where, let's say, investors are defrauded for the pecuniary gain of the defendant.  Different from a case where teachers and public servants are losing pensions because someone defrauded them.  This is different.

This is, whatever number your Honor is comfortable thinking about using in terms of the actual Frank, which JPMorgan Chase bought and owns and has all of the data, if that's the correct word, to this day.  Right.  It is a real thing that is out there.  Very, very different from the traditional sorts of fraud cases that we see.

Now, just some of the other factors briefly, your Honor. In terms of a custodial sentence and its necessity to adequately deter future harm. So, as your Honor well knows, one of the justifications for punishment is general deterrence. Another is individual deterrence.

On the general deterrence register, Ms. Javice has already been publicly disgraced and humiliated. The collateral consequences are severe. I hope your Honor would agree, given her background and the fact that Frank was an actual company that did good, that there is as close to zero possibility of Ms. Javice committing another crime after what she has gone through.

As courts have long recognized, collateral consequences of the nature that Ms. Javice has suffered serve as significant punishment. Put plainly, collateral consequences count in the general deterrence category.

So a lengthy period of incarceration is simply not necessary to afford adequate deterrence to criminal conduct as outlined in the statute.

Now, the government matches the probation office's recommendation of 12 years, which I passionately believe far exceeds whatever is fair in this case. The justification by the government is that the fraud was premeditated, it was sustained, it was sophisticated, and it caused staggering losses. They contend a shorter sentence would fail to deter

P9T3JAVS                        Sentence

Ms. Javice and others.  Now let's --

THE COURT:  We need a break now.

MR. SULLIVAN:  Yes, your Honor.

THE COURT:  We'll take 10 minutes.

(Recess)

THE COURT:  Be seated, everyone.

Go ahead, Mr. Sullivan.

MR. SULLIVAN:  Thank you, your Honor.  So essentially I was talking about the government's arguments.  And my point is that the government equates Charlie Javice's matter with other matters that simply are not analogous.

Here in this jurisdiction, Judge Ramos, the *Trevor Milton* case.  Another example of a case, hundreds of millions of dollars of loss.  The tech didn't work.  The tech did not work at all.  Four years.  Tech didn't work.  Ms. Javice's tech worked, the product worked.  Dispute about how many people signed up, the thing itself worked.

Our point, and then I'm going to sit down here, your Honor, is that Ms. Javice's case is not the prototypical type of fraud case.  This case was a 28 year old versus 300 investment bankers from the largest bank in the world that did due diligence in 22 business days.

Ms. Javice had a lapse of judgment.  She's going to stand up and talk to you about that.  But you also heard the testimony, your Honor, that part of the rush was what they

called a defensive play.  Right.  That they didn't want another bank to get this product.

THE COURT:  What consideration should be given to Chase's very poor due diligence?

MR. SULLIVAN:  I think your Honor said it best.  I'll adopt your Honor's phraseology.  It should be in the background of your considerations as a relevant factor in thinking about what is a fair and appropriate sentence.

THE COURT:  How far in the background?

MR. SULLIVAN:  Not too far.  It should be pretty close up, your Honor.

THE COURT:  You know, fraud remains a fraud whether you outsmart someone who is smart or someone who is a fool. Whether you outsmart someone who is almost indifferent or outsmart someone who is careful.

MR. SULLIVAN:  And the jury determined --

THE COURT:  It's still the conduct.

MR. SULLIVAN:  The jury determined that, your Honor. We're looking at punishment.  Different set of considerations. And we ask that be part of your Honor's background considerations as to the level of culpability with respect to punishment for Ms. Javice and whether the --

THE COURT:  Punishing her conduct and not JPMorgan's stupidity.

MR. SULLIVAN:  We would never ask you to punish

JPMorgan's stupidity, at least we're not going to ask you in this forum. However, your Honor, as a background consideration, we do submit that it is a relevant factor for your Honor to consider. As your Honor knows, the criminal law is all about intent, all about *mens rea*.

THE COURT: That has to do with Javice's *mens rea*.

MR. SULLIVAN: Sure. I'm not going to argue liability. The jury established liability.

THE COURT: They wanted to have the names of the students. No, you can't have them because they're protected by privacy. So she made up a phony set of names. That doesn't speak well of her *mens rea*.

MR. SULLIVAN: And she also gave them the real names, your Honor, and that piece can't be lost. That has to factor in. She gave them the real names by a conservative estimate of 300,000.

THE COURT: If you mix up a bad quarter with a whole bunch of pennies, you don't really get very much, do you.

MR. SULLIVAN: I think your Honor is putting those together. Those are on separate lists and the government won't deny this. Those were on separate lists when we talked about the marketing people.

THE COURT: In all of the things I've got to consider, I don't think having good names mixed with bad is going to help you.

MR. SULLIVAN:  Okay.  They weren't mixed.  I'll just leave it at that.  It was on a separate disk.  JPMorgan Chase still have all of the good names.

THE COURT:  Why don't you tell me about the annex to this very interesting letter I got from Jessica A. O'Brien listing the volunteer and service highlights of Charlie Hannah Javice.

Ladies of Hope Ministries.  Connects justice-impacted women with jobs and educational opportunities.  Designing a pilot program for fitness instructor training during and after incarceration.

Smile Trust.  Secured a food sponsor for monthly soup kitchen.  Serves meals monthly and recruits volunteers.

College application advisor.  Tutored students.  Volunteering with Brooklyn Youth Sports Clubs.

Israel coding boot camp.  Funded and mentored underprivileged Druze, Israeli Arab, and Hasidic women learning to code.  Pilot expanded to other students.

Soup kitchen founder while she was in high school.

Planet Finance Argentina.  Assisted women entrepreneurs in accessing interest-free microloans.

English teacher in Myanmar and Thailand.  Taught English to refugee youth.  Organized book drives in New York to support them.

Meals on Wheels volunteer.

Community Drives organizer.

That is a very powerful list of her personal characteristics. Along with her crime. I think I've got your point, Mr. Sullivan. Thank you very much.

MR. SULLIVAN: Thank you very much, your Honor. If I may, I'll just close with one thing. I opened by saying one significant difference in this case is that Ms. Javice did not plunder a company and live a life of excess buying ornamental trinkets and expensive gadgets.

When we're talking about *mens rea*, her heart and mind were in the right place in setting up Frank. She didn't go on some spending spree like a lot of people convicted of fraud. So much so, your Honor, that Ms. Javice will give back every dime to JPMorgan that she got from them. As I said, she didn't get the whole 175. She got 20 or so. She'll give it back. Because she didn't -- she wasn't in this to go and spend it. She doesn't have to go and liquidate yachts or anything. That's one thing that she is willing to do and wants to do, because she is remorseful for her lapse of judgment during that due diligence period in this process.

So, your Honor, we just ask that your Honor weigh all these many factors and the substantial work that Ms. Javice has done in order to come to a decision that is fair, that is just, and that takes into account what the purpose of punishment is for.

THE COURT:  Thank you, Mr. Sullivan.

Mr. Fergenson.

MR. BAEZ:  Judge, before Mr. Fergenson commences, starts his argument, I wanted to add factually for Mr. Sullivan that JPMorgan had the support --

THE COURT:  Do you want to take the podium?

MR. BAEZ:  Yes, sir.

I wanted to remind the Court or at least put it in its purview that JPMorgan had support agreements for the entire board and all of the investors that accounted for the rest of the 175 million from which --

THE COURT:  I missed that point.  JPMorgan had what?

MR. BAEZ:  They had them sign support agreements, basically acknowledging that in the event of fraud, that they would get the money back from the other folks who, as we know, Ms. Javice only got 20 million --

THE COURT:  That's a restitution issue.  You're talking about a restitution issue?

MR. BAEZ:  Yes, but I was just following up on the issue of loss.

THE COURT:  I'll get to restitution.

MR. BAEZ:  Yes, sir.

THE COURT:  Mr. Fergenson.

MR. FERGENSON:  Thank you.

This was an audacious and multifaceted criminal

P9T3JAVS                         Sentence

scheme.  It was built on sustained deceptive conduct.  And it was fueled by greed.  There is just no getting around that, your Honor.  The defense asserts it was only $20 million she got.  In fact, it was 29, but --

THE COURT:  I think a million dollars is a lot of money.

MR. FERGENSON:  It is life-changing money, no matter what.  And Ms. Javice had it dangling in front of her and she lied to get it.  And she continued to lie.

She lied before JPMorgan even surfaced.  She lied to her board, to her investment bankers, to other potential buyers including Capital One, but dozens of other companies.  They reached out to nearly 60 companies.  She lied to data companies, she lied to Adam Kapelner.

THE COURT:  It is one big package of lies, because -- well, go ahead.

MR. FERGENSON:  It is important I think, your Honor, not just the brazenness of the lie itself, which was brazen. But the breadth and the duration of the lies matter.  Because they reflect on her intent, they reflect on the need for deterrence.  She doctored --

THE COURT:  I think it's not the duration here.  Once the decision is made to monetize the business, a lie is created and embellished.  And that's what we have here and it's embellished through very clever means.  That's the culpability.

P9T3JAVS                          Sentence

MR. FERGENSON:  I think that is part of it.  But there was --

THE COURT:  It is greed.

MR. FERGENSON:  There is greed.  And then there is the obstructive conduct that comes to try and cover it up.

You know, JPMorgan, they didn't get a functioning business, they acquired a crime scene.  And its two top exclusives were intent on hiding that crime.  And they did so by lying further.

Almost two years after this scheme starts, Ms. Javice is still adamantly, absurdly lying to JPMC's internal investigators.  And then when it breaks out into civil litigation, she lies to a federal district court.  She files knowingly false claims against the victim of her fraud.  That is brazenness.  It goes beyond the greed.  This is doing anything to get away with it and thinking she might actually do so.  And she almost did.

And it doesn't just stop with the lies to a federal district court judge.  Because around the same time that this breaks out in civil litigation, Ms. Javice starts trying to hide the tens of millions of dollars she got.  She transfers this money through a series of trusts and LLCs to shield it. There is no other explanation.

And the notion that she's now going to give every penny back to JPMorgan, well, it's about as hollow as her

claims of acceptance of responsibility, your Honor.

She hasn't accepted responsibility for anything. She's denied. It. She's now just asserting, on the very eve her sentencing, that she accepts responsibility. But she doesn't actually do that.

THE COURT: Has the government been able to trace all the money?

MR. FERGENSON: Not all the money, your Honor. We traced what we could. We're not certain where I believe several million dollars now reside. And I believe the record is sufficient.

THE COURT: How much is missing?

MR. FERGENSON: I would need -- may I have one moment to confer with my colleagues, your Honor?

THE COURT: Yes.

MR. FERGENSON: Your Honor, I -- if we may, just so I don't get the math wrong, I might ask my colleagues to try and do that calculation while I continue the rest of my argument, if that's all right.

THE COURT: Yes, sure. But tell me more about how this was done. The mechanics of it.

MR. FERGENSON: Yes, Judge. She sets up I believe four different trusts, and several LLCs. Money flows through those entities. And ultimately, a very large portion of the proceeds, if I recall offhand, it was upwards of around

P9T3JAVS                      Sentence

$10 million or more, goes into an LLC that's actually owned and controlled by her boyfriend.  And in the PSR, she lists that LLC and the assets it has as a personal savings account.  That's not what it was, Judge.

That is just some of the evidence that this was driven by greed, and some of the obstructive conduct where she tried to get away with it.

THE COURT:  Well, it could be argued differently with regard to intent, but I take the point.  The money was diverted.

MR. FERGENSON:  And just a note on, look, I respect your Honor's eloquence --

THE COURT:  What happened, Chase gave a check of $174 million more or less.  So, what happened to the money?

MR. FERGENSON:  So the equity payout to Ms. Javice, like her merger proceeds, were approximately $28 million.

THE COURT:  28?

MR. FERGENSON:  Approximately, Judge, yes.  And this is laid out in more detail in our sentencing submission.  More precisely I'd say.  And then she also receives about I think roughly a million dollars in salary and benefits from JPMorgan.  So you get to 29 million and some change for the fraud proceeds she received.

I want to make one point about --

THE COURT:  What happened to the money then?

P9T3JAVS                        Sentence

MR. FERGENSON:  The merger proceeds are put into accounts at JPMorgan.  They're moved to accounts at Signature Bank, they're moved from Signature Bank to a Fidelity account, and then to a Wells Fargo account.

It is laid out in a tracing affidavit we submitted, your Honor.  But the money goes a lot of different places.  One of the places where we ultimately seized a large portion of it was in this BX5 LLC that's in the name of her boyfriend.  That was where I think we seized what was left in the account was around $8 million.

THE COURT:  There is an autistic child involved here, isn't there?

MR. FERGENSON:  I'm sorry, your Honor?

THE COURT:  There is an autistic child involved there, the boyfriend.

MR. FERGENSON:  That's what I understand from the papers, your Honor.

THE COURT:  I mean, just because the money's been split up in these different ways, probably motivated by taxes, it's just not necessarily hiding money.  I don't take that point.  And the money hasn't been spirited abroad, has it?  It is in the United States.

MR. FERGENSON:  What we've been able to trace we laid out in our forfeiture submission, your Honor.

But just to be clear, JPMorgan was out 300-some

million dollars.  This is a pittance compared to the losses she --

THE COURT:  They are out $174 million plus a lot different expenses.  And they have a lot to blame themselves for, too.

MR. FERGENSON:  But I would respectfully push back somewhat on that, at least in this context, Judge.  Certainly I think --

THE COURT:  Capital One Bank took care of itself very nicely and JPMorgan didn't.

MR. FERGENSON:  I would submit, your Honor, that at a sentencing hearing like this, the focus is not on JPMorgan. Ms. Javice was lying before they even entered.

THE COURT:  I agree with you.  I'm stepping ahead in terms of expenses.  Ms. Javice's culpability is measured by Ms. Javice and her intent, and that's why I was interested in exploring the split up of money.  But I don't think there is anything there.

Okay.  I think I have your point, Mr. Fergenson.

MR. FERGENSON:  And your Honor, we'll rest on our papers.  Thank you.

THE COURT:  Thank you.

Ms. Javice, you have the right to talk to me if you'd like to exercise that right.

MR. BAEZ:  Can we have a brief recess?

THE COURT:  Yes, you may.  10 minutes.  How long will Ms. Javice plan to be?

MR. BAEZ:  Five minutes.

THE COURT:  10-minute break.

(Recess)

THE COURT:  Mr. Fergenson, have you got the number?

MR. FERGENSON:  Your Honor, what we traced was about $21 million in value, so about a 8 million difference.

THE COURT:  Wait.  Yes.

Mr. Fergenson, before Ms. Javice begins her conversation, do you have the missing numbers?

MR. FERGENSON:  Yes, your Honor.  Our rough estimate of the value of what we traced is approximately $21 million. Which is about --

THE COURT:  You're missing seven.

MR. FERGENSON:  It is about from the 29.7 million money judgment, it is a difference of about 8.7 million.

THE COURT:  How come you couldn't find that?

MR. FERGENSON:  That's what we were able to trace in the records we had available, Judge.  I'm not certain on the exact difference.

THE COURT:  Mr. Baez.

MR. BAEZ:  I'm well aware of the difference.  That was the holdback that they never paid.

THE COURT:  Chase's holdback?

MR. BAEZ:  Correct.  That was the holdback.

THE COURT:  That explains it.

MR. BAEZ:  That's why it's missing, because they never gave it.

MR. FERGENSON:  I don't believe so.  Well, let me back up, Judge.

THE COURT:  I don't want to get stuck on that point, okay.  Thanks.

MR. FERGENSON:  Fair enough.

THE COURT:  I'm ready to hear you, Ms. Javice.  Do you mind taking the podium?

You're okay standing there if you want to, Mr. Baez.

THE DEFENDANT:  I am, thank you.

Your Honor, thank you for the opportunity to address your Honor directly.

THE COURT:  Brigitte, can you increase the volume to her?

THE DEPUTY CLERK:  Talk into the microphone.

THE DEFENDANT:  I feel nervous standing here with the gravity of what it means to plead myself before God and before you, your Honor.

I do not take this moment lightly.  At 28, I did something that runs against the grain of my upbringing and every lesson I once claimed to have learned.  I made choices that I will spend my entire life regretting.  I let down those

P9T3JAVS                          Sentence

who trusted me, and that truth is a shadow that will follow me for all of my days.

These errors, this complete collapse in character, are woven into who I am now.  Living with them daily is its own kind of sentence.

Not a day goes by that I do not replay my mistakes searching for meaning.  Not a day passes that I do not feel profound remorse.  Not one day goes by that I do not repent for what I did.

I'm asking now for forgiveness from all the people touched or tarnished by my actions.

To the shareholders of JPMorgan who invested in my vision to make higher education accessible and affordable, I ask for your forgiveness.

To the team at JPMorgan who spent tireless hours supporting Frank, I ask for your forgiveness.

To every Frank employee or investor whose name, career, or future was in some way stained by proximity to me, I ask for your forgiveness.

To every student and family who depended on Frank to make their dreams of attending college a reality, I ask for your forgiveness.

To my dad who sacrificed so much for me, whose good name I have cast into the shadow of my actions.  No father should ever have to experience the fear I saw in your eyes at

Case 1:23-cr-00251-AKH   Document 450   Filed 10/30/25   Page 49 of 84   51

P9T3JAVS                    Sentence

trial.  I feel the pain it has caused you to sit helplessly, unable to protect your child.  That look will forever be with me.  I know that if you could, you would trade places with me in a heartbeat.  I ask for your forgiveness.

To my mom, who has always been my North Star.  Your strength, your compassion, and your unconditional love in my lowest hours are the qualities I aspire to, if I could muster even half of your resilience and someday be half the mother that you are, it could only be a dream.  I hear you now reminding me through every setback, it's about progress, not perfection.  I am so sorry that I might never be able to pass along your legacy, and that is a heartbreak beyond words.  You deserve everything, mom.  I ask for your forgiveness.

And to my better half, it was I alone who derailed our future.  I made us put our life on hold during what should have been happier days and just our beginning, planning a wedding, dreaming of children, and building a life together.  While I hope those dreams still remain possible, the reality is that none of it is guaranteed.  Your unwavering grace and compassion in my darkest hours have set a standard I can only hope to one day reach.  The kindness you've shown, especially when regret and disappointment feel heavy, is a debt that I may never, ever be able to repay.  I love you, and I'm sorry.

I am deeply sorry, and I am asking with all my heart for forgiveness.  If it were within my power, I would never

(212) 805-0300

P9T3JAVS                        Sentence

make the same mistakes again.  Not for money, not for recognition, not for anything.

Yet even in regret, I hold on to hope that these wounds might one day be the starting point of a life rebuilt on honesty and love.

I cannot change my past, but I refuse to let it define my future.  At my core, I still believe I am a good person.  My parents taught me that charity is justice, and that giving back is a duty.  Frank was the culmination of those lessons.  Losing Frank and seeing the good it did overshadowed by my mistakes has been devastating.  I'm haunted that my failure has transformed something meaningful into something infamous.

Most of all, I miss being a source of pride for my family, a role model for my niece, and a friend others could count on.  The faith and support from my friends and family, those who believe in me and in second chances mean more to me than anything.  They are the reason I'm still standing here today.  Their unwavering support reminds me that brokenness is not the end and grace is always within reach.

If only I could go back and look that young girl in the mirror and tell her that the shortcut she's considering are paved with regret, that the cost of betraying her own values will echo through every relationship, every dream, and every quiet moment alone.  I would beg her to choose courage over comfort, truth over easy answers, because the pain of honest

struggle is nothing compared to the devastation of lost trust and lost self-respect.

Each morning I wake up determined to do better, to try and become worthy again of trust and forgiveness.  Each day I rise committed to doubling down on the acts of service that define my purpose.  I know there is only one way forward, to face the consequences head on with a remorse deeper than I knew possible.

I respectfully ask your Honor that you temper justice with mercy.  Whatever sentence is imposed, I will accept with dignity and humility.  I have learned my lesson.  And I promise every day going forward to be better and to do better.

Thank you, your Honor, and thank you to all the court staff for your time, your fairness, and for giving me this final opportunity to speak, to ask the people that I have disappointed for forgiveness, and to ask you for mercy.  Thank you.

THE COURT:  Thank you, Ms. Javice.  It's five minutes to 1.  Should we take our lunch break and continue at 2:15?  Let's do that.

(Recess)

(In open court)

MR. SULLIVAN:  Your Honor, very briefly before you get started.  During my presentation, you mentioned Dr. Topeka Sams --

P9T3JAVS                         Sentence

THE COURT:  Podium, please.

MR. SULLIVAN:  Yes.  Very brief indulgence.  During my presentation you mentioned Dr. Topeka Sams and the letter, the bullet point list of service.  She is in the audience and asked if it would be helpful, she's willing to speak and give the Court more color, more context about the service-related items.

THE COURT:  I don't think it will be necessary.  I've read her letter, I read all of the letters.  I understand the situation.

MR. SULLIVAN:  Understood.  She is in the audience.  I wanted to bring it to the Court's attention that she's here and willing, if it would aid the Court.

THE COURT:  Thank you.  Nice words in the letter.

All right.  Your words, Ms. Javice, were very moving. And your record of good deeds is compelling.  As Ms. Jones mentioned in the robing room to me, we don't remember a defendant who asked forgiveness for the right people, for the right reasons.

You also asked forgiveness from me.  I can't give forgiveness.  My job under the law is to sentence, and it's not a pleasant job, but I never get it right.  At least I never feel I get it right.  I try to feel that I'm sentencing people not because they're bad, but because they've done bad things. You are a good person.  You've done a bad thing, and I have to punish you.  I have to sentence you.

The judge is instructed by the criminal code as to the factors that go into a sentence.  Among those are the guidelines, but everyone recognizes that the guidelines for crimes of acquisition are not terribly useful.

But I have to consider the nature and circumstances of the offense.  The circumstances of the offense show clever avarice, a search for money, whether money is needed, but also money in terms of recognition and power and achievement.  And the offense required a great deal of duplicity.

But I also have to consider the history and characteristics of the defendant.  Those bullet points to which Mr. Sullivan just referred is a useful summary of the way you've devoted your life, and it's highly commendable.

So here I have a serious offense, committed in a duplicitous way, by a good person who has shown herself with good deeds.  And how should the judge punish?

I have to reflect the seriousness of the offense.  The offense is a serious one.  Honesty in a market is required. Honesty in exchange is required.  It's biblical.  One of the many commandments in the Bible, the commandment of just weights and measures.  And yours was not a just weight and measure.

I have to afford adequate deterrence to criminal conduct.  I believe you, I don't think you would be committing any crimes and I think you will be devoting your life to service.  But others need to be deterred.  Others need to be

P9T3JAVS                        Sentence

aware that doing bad things results in a serious enough punishment that reflect that severity and to prevent and deter others from doing the same thing.  This is particularly true with what we call white collar crimes, where people need to know that they just can't get away with wrongful conduct, and they have to think about that before they engage in it.

There is no way to have a science of just the right punishment.  I look at the things I've done, and I try to measure the sentences I've given, and there is never a rationality that enables me to square them.  I try to do the best I can, but it's never good enough.  I try to look what others have done, and the same thing.

I think the government recommendation is too high.  I think Mr. Sullivan's suggestion is too low.  Taking everything into consideration, the closest I can come to just punishment is 85 months, and that is the sentence.  85 months of custody.  And it shall be served -- is there a recommendation?

MR. SULLIVAN:  Yes, your Honor, at Danbury.

THE COURT:  So recommended.  Proximity to family, and to promote visitation.

Following custody, the law provides of supervised release up to 3 years on Counts Two and Four, up to 5 years on Counts One and Three.  I think 3 years is the appropriate time for supervised release.  And I so order.

I think 3 years is the appropriate time for supervised

P9T3JAVS                          Sentence

release and I so order.

The conditions for supervised release are set out in the probation report.  The mandatory conditions, they are appearing on page 56.  You must not commit another federal, state, or local crime.  You must not unlawfully possess a controlled substance.  You must refrain from any unlawful use of a controlled substance.  The drug testing condition is suspended.  Ms. Javice does not pose a risk of substance abuse.  You must cooperate in the collection of DNA as directed by the probation officer.  And you must make restitution in the amounts and according to the percentages I will deal with in a few minutes.

There are 12 standard conditions.  I needn't read them out.  They are on pages 56 and 57 of the PSR.  All are applicable.

As special conditions, I do not order search as recommended in the first special condition on page 58.  The first half of the page is taken up by conditions of search.  I do not impose any of them.

The second special condition is that you must provide the probation with accesses to any requested financial information.  I impose that for the reasons given in the probation report.

Similarly, the condition of not incurring new credit charges or opening additional lines of credit without the

approval of the probation officer unless you're in compliance with the installment payment schedule we'll deal with in minutes.  I impose that.

And you'll be supervised by the district of your residence.

Let's now deal with forfeiture.  What does the government request on forfeiture?

MR. FERGENSON:  May I have a brief moment to confer with counsel, your Honor?  And just for the record, your Honor, I assume that the defendant waives the reading of the mandatory, the 12 mandatory conditions.

THE COURT:  Do you so waive, Mr. Sullivan?

MR. SULLIVAN:  Yes, your Honor.

(Counsel conferring)

MR. FERGENSON:  Thank you, your Honor.  We are close but not in agreement on a money judgment number with the defense.

We submitted a proposed forfeiture order and the number was about 29 million.  We would reduce that, your Honor, to the number of JPMC fraud proceeds in the seizure warrant affidavit we submitted, which was the docket 432 submission, and it's page 27 of 32 of that filing, Judge.  It's page 9 of the seizure warrant affidavit.

THE COURT:  I have the order, I don't have the affidavit handy.  I can get it handy if I need it.  Since

you're close to agreement on the order, let me just work with the order.

MR. FERGENSON:  Fair enough.  I think, your Honor, the change we would request is that the money judgment total be reduced, and I can give you the amount now, your Honor.  It's 22 million --

THE COURT:  Where should I look, page 4?

MR. FERGENSON:  Of the order?

THE COURT:  Yes.  It's 29,706,747.

MR. FERGENSON:  Correct.  So we would actually request that the Court lower it to $22,360,977.48.

THE COURT:  22,306,000.

MR. FERGENSON:  977.48.

THE COURT:  Is that an agreed number?

MR. FERGENSON:  That is close but not an agreement. We base that on the declaration from Special Agent Jeremy Rosenman in the seizure warrant affidavit, that that's the amount of JPMC fraud proceeds that was received into her account.

THE COURT:  Where is the disagreement?

MR. FERGENSON:  Where is the affidavit?

THE COURT:  "Disagreement."

MR. FERGENSON:  Oh, the disagreement.  I believe they're about a million dollars less is their read of it, your Honor.  But I'll let them address it.

MR. BEIRNE:  Thank you, your Honor.  Owen Beirne.

So we agree with the government that the amount should be reduced by the $7 million representing the holdback. Mr. Fergenson indicated that they've traced seizure warrants to reflect the proceeds of the sale being -- and please correct me if I'm wrong -- $22,360,977.  We have conflicting records on our side.  We come up with a number of $21,416,498, which we would concede represents, if not the entire amount of forfeiture to be ordered by your Honor, at least a significant part of it.

THE COURT:  Is there a rationale for the difference?

MR. BEIRNE:  Your Honor, we got the government's papers late Friday evening.  We, frankly, haven't had time to compare them to our other notes.

At this point, and just to reconcile the difference, we've worked through the break and with the government to try to figure it out.  We just aren't comfortable committing to these numbers.  Ms. Javice is going to emerge from prison and starting from absolute zero, so we want to make sure we have these numbers correct.

Similarly, the other component of the forfeiture number is salary received.  Our numbers don't tie with the government's numbers.

So what I would suggest, and what we would be willing to do, is if your Honor wants to order forfeiture today, we

P9T3JAVS                          Sentence

would concede an amount of -- and I can read you the specific number, $21,416,498.68, subject to recision by consent.

THE COURT:  Sorry.  Give it to me again.

MR. BEIRNE:  $21,416,498.68.

THE COURT:  So I can order forfeiture with the amount between the one you just gave and the one that the government gave, to be fixed in further proceedings within the next several days?

MR. BEIRNE:  I think that's right, your Honor.

THE COURT:  Mr. Fergenson?

MR. FERGENSON:  Forfeiture is different than restitution, your Honor, so I think you have to pick a forfeiture number to orally pronounce as part of the sentence today.

THE COURT:  What do you recommend?

MR. FERGENSON:  We have traced the bank records, this is a seizure warrant executed in April of 2023, your Honor. It's been with the defendants for a long time.  The analysis of the bank records shows that amount coming into Javice's accounts from JPMorgan.  That's the number, at least.

THE COURT:  Where is the record different, Mr. Beirne?

MR. BEIRNE:  Pardon me?

THE COURT:  Where is your record different?

MR. BEIRNE:  Our record consists of work product, your Honor.  And again, we just have not had enough time between

Friday evening and this morning to reconcile the two.  We'd just like an opportunity to do that, and I think we're talking about a Delta of a million dollars on top of what your Honor will order today.  $21 million of forfeiture.

THE COURT:  I'd like to finish today.

MR. BEIRNE:  I think we and the government are both going to suggest that you continue restitution for sort of similar reasons.  It is a huge restitution number for which we've not been provided sufficient substantiation for the figure amounts.  So, we are I believe jointly with the government going to request that you continue the restitution phase for some reasonable period of time.  I think your Honor has 90 days to complete that.

MR. FERGENSON:  Your Honor, we are prepared for your Honor -- we've proposed a restitution order.

THE COURT:  I'm prepared to go ahead.  I will accept the report of Jeremy Rosenman, document 432-2, and fix the amount at that given by Mr. Fergenson.  And if there is an error, you can move to correct.

Mr. Fergenson, would you look at page 4 of document 432-1, and in particular the subparagraphs.  Are there any changes to be made in those subparagraphs that follow?

MR. FERGENSON:  Related to the specific property, your Honor?

THE COURT:  Yes.

MR. FERGENSON:  Starting with the Fidelity account?

THE COURT:  Particularly the numbers, because you changed the total.

MR. FERGENSON:  These numbers don't change, your Honor.

THE COURT:  They don't change?

MR. FERGENSON:  Correct.

THE COURT:  In the order of forfeiture, I've changed the number $29,706,747.49 appearing twice on page 4 and once on page 6 to $22,360,977.48.

Today's September 29.  I've signed the order of forfeiture, Ms. Jones will file it.

We'll now get to restitution.  Yes, Mr. Beirne.

MR. BEIRNE:  I'm sorry, your Honor.  I was just waiting for a cue from you.

THE COURT:  I said we're finished with the order of forfeiture.  I've signed it.  I've given it to Ms. Jones to file.

MR. BEIRNE:  Understood.

THE COURT:  We are now up to restitution.

There are several components to this.  First is the acquisition cost of Frank by JPMorgan Chase, and that of funds withheld being paid out by JPMorgan Chase to Frank was $168,531,714.

In addition, JPMorgan Chase indemnified the legal fees

of Javice and Amar, without distinguishing between them, for a total of $114,911,501.  I'm applying a 75 percent allocation as between Javice and Amar, and so I propose to add to the acquisition cost $86,183,625.75.

These fees were advanced by JPMorgan Chase under indemnification agreements, they are directly related to defendant's criminal conduct, and they should be recoverable. And I would cite *United States v. Sullivan*, 118 F.4th 170, 233, n.443 (2d Cir. 2024).

Do you want to comment, Mr. Beirne?

MR. BEIRNE:  Yes, your Honor.  Perhaps odd for me to ask a question of the Court, but is the allocation between Ms. Javice and Mr. Amar of the legal fees, is that based on analysis of those legal fees or --

THE COURT:  No.  It is a rough approximation of a principal defendant and a less principal defendant.

MR. BEIRNE:  Well, it is unclear from what the government provided, which it obtained obviously from JPMorgan Chase, whether those fees were actually advanced or whether those represent the amounts that were billed and some lesser amount was actually paid of those.  There is ongoing litigation in Delaware where those fees are being vigorously contested. Obviously some law firms here know what they were paid. Others, I don't know what Mr. Baez has been paid in this case.

THE COURT:  How much was paid?

P9T3JAVS                       Sentence

MR. BEIRNE:  I don't know that, your Honor.  The government presumably could find that out from JPMorgan.

THE COURT:  Mr. Fergenson, do you know?

MR. FERGENSON:  Yes, your Honor.  JPMorgan itemized this in Exhibit A to our sentencing submission.  It is a June 6, 2025, letter from Davis Polk to the U.S. Attorney's Office that provides the breakdown of JPMorgan's costs, including the legal fees.

And your Honor, if it is helpful, I would offer that the restitution amount will be joint and several for both defendants, so I don't know if there is a reason to fashion a 75-25 break like that.  Because the total amount will be joint and several between the two of them.

THE COURT:  I can stand corrected in that way.  So, I should look at?

MR. FERGENSON:  If you look at page 1 of the June --

THE COURT:  Davis Polk is here.  So, let me get a representation from Davis Polk as to the amount actually paid.

Please identify yourself.

MS. WU:  Cindy Wu from Davis Polk.

THE COURT:  Loudly, please.

MS. WU:  Cindy Wu here from Davis Polk.

THE COURT:  Your name?

MS. WU:  Cindy Wu.

THE COURT:  Spell the last name.

MS. WU:  W-U.

THE COURT:  Yes.  What is the amount that was actually paid?

MS. WU:  JPMorgan rests on the papers in the victim impact statement.

THE COURT:  Is that the letter of June 6?

MS. WU:  That is.

THE COURT:  You advanced $114,911,501 in legal fees, and you broke them down into the fees for firms and consultants.  So I adopt that number.  $114,911,501.  And I accept the government's proposition that it be joint and several as between Javice and Amar.  Thank you.

MS. WU:  Thank you.

THE COURT:  Your objection is overruled, Mr. Beirne.

The next category is JPMorgan Chase's fees to its attorneys at Dechert, Price & Rhoads.

Is that its name now or Dechert?  To Dechert.  I don't know I need to know.

MR. FERGENSON:  I think that's right.

THE COURT:  The amount is $641,324.  I don't think this is appropriate for restitution.  This is part of a general program of acquisition of companies by JPMorgan Chase.  I don't know that it is directly resulting to the fraud, and I don't think it should be reflected in restitution.

MR. FERGENSON:  We would submit, your Honor, it is

part of the cost to the victim of the fraud that wouldn't have occurred if the truth were told to them.

THE COURT:  We would never know that.  There was a great deal of interest JPMorgan Chase had in Frank and in terms of the business at hand.  It was in competition with Wells Fargo and other banks for such companies.  I can't say all or a part of it would have been incurred.  I do not award it.

The next category is the salaries, taxes, and benefits paid to Javice in the amount of $1,171,524.  Seems to me I should give that.

MR. FERGENSON:  We agree, your Honor.

THE COURT:  Mr. Beirne?

MR. BEIRNE:  Your Honor, if I may have one moment.

Your Honor, this is the same issue we had when discussing forfeiture.  The June 6 letter of Davis Polk contains numbers that we have not been able to substantiate and we do not believe that Mr. Amar and Ms. Javice actually received these amounts.  It may be that they pulled these numbers from offer letters, but we've not been able to confirm that these were the actual amounts received, hence our reluctance to consent on the forfeiture number containing these amounts.

MR. BAEZ:  Judge, we would ask for a brief recess.

THE COURT:  Okay.

(Recess)

THE COURT:  Yes, Mr. Beirne.

MR. BEIRNE:  So I'm not sure exactly where we left off, your Honor.  I apologize.

THE COURT:  Finished salaries, taxes, and benefits ordering $1,171,524 as part of restitution.  We're now up to retention payments and additional salaries, taxes, and benefits.  And that amount is $2,886,339 and it should be added to restitution.

MR. BEIRNE:  Same issue, your Honor.  We have not gotten sufficient substantiation to be able to understand these numbers.  The government in general in proving this and in putting these numbers before your Honor has to provide some sound methodology --

THE COURT:  They are.  They are attached to the victim impact statement of June 6, 2025.

MR. BEIRNE:  Your Honor, this letter --

THE COURT:  And they're set out in detail in the exhibits that are attached to that.  Specifically, the retention payments are in Exhibits E and F.  That's sufficient substantiation.  So I order that.

The next item, post acquisition costs of 164,468, and I decline to order those.  They seem to be part of either overhead or JPMorgan Chase's normal activities.  It's very hard to break them down or understand they wouldn't be made, and so I don't think they belong to restitution and I decline to order

P9T3JAVS                        Sentence

it.

The next category is prejudgment interest.  It is discretionary whether I add that or not, and I decline to add that amount.

The amount requested is $11,962,922.  I decline to order that.

MR. BEIRNE:  If I might make a record before we move on.

THE COURT:  Yes, one minute.

The total of the amounts ordered for restitution is $287,501,078 jointly and severally with defendant Amar.

Yes, Mr. Beirne.

MR. BEIRNE:  Thank you, your Honor.  The government has an obligation to provide a sound methodology for the Court to base its restitution order on.  This June 6 letter, just taking the four corners of it, it makes computational errors of $11 million.  There is a subsequent letter dated the 26th which makes a $26,000 error.

So our position is this does not constitute a sound methodology on which the Court should base a restitution order. The government should be forced to call a witness, and we should be able to cross-examine them.  I understand your Honor wants to move ahead with this today.

So, secondly, the legal fees, your Honor cited the *Sullivan* case, again the citation 118 F.4th 170 (2d Cir. 2024).

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

We believe that case stands for a different position than the Court took.

THE COURT:  It is dictum in the case.  The court said, "We can easily imagine circumstances where an advance of defense fees is sufficiently related to a defendant's criminal conduct such that they might be recoverable as the loss of property caused by that conduct.  For example, we agree with the District Court that such fees might be available where the offense conduct involved a fraudulent inducement to pay legal defense fees."  And in citing a case, "They might also be available where a defendant obtained his position with the victim company, and thus coverage under its indemnification provisions due to the offense conduct.  We express no view on the proper resolution of such issues.  We note only that a hodding in this case does not dictate a result in those situations."

My reasoning is that the indemnification clause, I haven't examined it in this particular case, but generally, it applies to conduct where the defendant is not found to be guilty of the fraud which is being defended, and here, defendants are guilty of the fraud.  These expenses would not have been incurred but for the fraud.  That's my reasoning. I'm sorry to interrupt you.

MR. BEIRNE:  No, no, perfectly fine, your Honor.

The Mandatory Victim Restitution Act requires that the

P9T3JAVS                          Sentence

fees are only paid, and that there be but for approximate causation showed.  Here, Ms. Javice and Mr. Amar were entitled to indemnification of their fees based on the bylaws of JPMorgan Chase.  So they were going to be paid regardless of whether they were convicted.  And so we don't think that the *Sullivan* case stands for the proposition your Honor announced and that that proper causation has been shown.

Finally, your Honor, in footnote 1 of the June 6 letter from Davis Polk with the various categories eligible for restitution, there is an amount of $17,460,00 due to a third-party provider compensation, an insurer called Euclid Transactional LLC that the government again states -- or Davis Polk and the government has adopted the position that they're entitled to $17,460,000.  Again, I don't think causation has been shown.

THE COURT:  Which category is this?

MR. BEIRNE:  Well, it seems it's footnote 1, it doesn't put it into any particular category, it just adds it to the total amount of restitution that the victim is seeking.

MR. FERGENSON:  Your Honor, if I may clarify.

THE COURT:  Yes, go ahead.

MR. FERGENSON:  That amount is the amount that JPMorgan's insurer has paid JPMorgan of its loss.  It is not an additional loss amount.

THE COURT:  I understand that.

MR. FERGENSON:  So the restitution amount would stay the same.  They are a subrogee.

THE COURT:  I was about to say that.  The total is $312,885,320 which is the acquisition costs of Frank, net of a holdback, and the footnote shows the distribution between defendant and defendant's insurer.  The insurer is subrogated for the amount that's paid to JPMorgan Chase.  So I overrule that objection.

MR. BEIRNE:  Your Honor, if I might just have a moment to confer with my co-counsel.

Nothing further, your Honor.

I'm sorry, your Honor, to come back to the well.  Your Honor declined to impose prejudgment interest.

THE COURT:  Correct.

MR. BEIRNE:  May we ask that continue going forward, and that interest not continue to accrue on the restitution amount that your Honor is going to order?

THE COURT:  I'll take that up.

So the total amount of restitution is $287,501,078.

Now, what is the proposal of the defendant for paying that amount?  The amount is mandatory, and that amount is joint and several with Amar.

MR. BEIRNE:  Your Honor, we would ask that the restitution amount be subordinated to the forfeiture -- or I'm sorry, I have it backwards.  That the restitution be paid

first, it goes back to the victim, the forfeiture amount goes to the government.

THE COURT:  What you want, in other words, for me to order that the forfeiture be subordinate to the restitution.

MR. BEIRNE:  Exactly.

THE COURT:  That the government doesn't take the money, the money is paid to the victim.

Mr. Fergenson.

MR. FERGENSON:  Yes, your Honor.  The Second Circuit is quite clear that there is no authority for a District Court to order that under the statutory schemes.

THE COURT:  I agree, but there is also provision that the restitution be favored over forfeiture.  Because the money was taken from the victim, the money that has been forfeited has been taken from the victim.  It's only fair that the victim be repaid before the government takes the money.  It's not a fine, it's a forfeiture.

MR. FERGENSON:  That's true, your Honor.  But, again, maybe we're splitting hairs here in that --

THE COURT:  We're not splitting hairs.  There is money involved.

MR. FERGENSON:  I think the government certainly agrees that JPMC suffered significant losses.  It is just --

THE COURT:  Sorry?

MR. FERGENSON:  The government certainly agrees that

JPMC suffered significant losses and restitution is extremely important.

I think just the legal framework that Congress has established makes it the decision of the attorney general through the process known as remission to transfer forfeited funds to the victim.  And it's not something a Court can itself can order.

THE COURT:  Does Davis Polk want to be heard on the subject?  Ms. Wu?

MS. WU:  Could I have a moment to confer with my client?

THE COURT:  Yes.

(Pause)

THE COURT:  Let's go on to another point while we wait for Davis Polk to come back.

I'm not ordering a fine given the amount of restitution, which is far in excess of accessible funds by the defendant.  There is no ability to pay a fine.

There is a mandatory assessment of $400 under the Crime Control Act which is imposed.

The next provision is a question of remand or surrender.  What is the government's position?  Is there going to be an appeal taken, Mr. Sullivan?

MR. SULLIVAN:  Yes, your Honor, and we have an application for bail pending appeal as well.

P9T3JAVS                          Sentence

THE COURT:  What's the government's position?

MR. CHIUCHIOLO:  Your Honor, we have no objection to a three-month surrender date.

THE COURT:  Go up to the podium.

MR. CHIUCHIOLO:  Your Honor, the government has no objection to a three-month surrender date for Ms. Javice.  As far as bail pending appeal, the government opposes that, and would like time to respond to the motion that Ms. Javice made I think on Thursday evening.

THE COURT:  I'd like to hear it now.  You've had time.  What's the section?  Title 18.

MR. CHIUCHIOLO:  Your Honor, I think it's Title 18, Section 3143.

THE COURT:  I think the burden is on defendant.

MR. CHIUCHIOLO:  That's correct, your Honor.

THE COURT:  3143(b).  Mr. Sullivan, I'll hear you.

MR. SULLIVAN:  If it please the Court, Ms. Shapiro is handling that motion.

THE COURT:  Nice to see you again.

MS. SHAPIRO:  Nice to see you, Judge.

THE COURT:  Ms. Shapiro's father and I were very close friends during our law school time, more than 100 years ago.

MS. SHAPIRO:  Thank you, Judge.

THE COURT:  How is he?

MS. SHAPIRO:  Unfortunately, he passed away after a

long illness last summer.

THE COURT:  I'm sorry to hear that.  How is your mother?

MS. SHAPIRO:  She's doing well, thanks.

THE COURT:  Give her my regards.

MS. SHAPIRO:  I will, thank you, your Honor.

So your Honor, under the statute, as you've said, we have the burden, and as long as there is no flight risk or danger, which here there clearly --

THE COURT:  I'd like you to go into that, Ms. Shapiro.

MS. SHAPIRO:  I'm sorry?

THE COURT:  I'd like you to go into that.  Ms. Javice, is she a dual citizen of France and United States?

MS. SHAPIRO:  She is, but all her ties are in the United States.

THE COURT:  Is she a dual citizen with Israel?

MS. SHAPIRO:  No.  And I would just highlight for the Court that the probation office confirmed that she's neither a risk of flight nor a danger.  She's complied with all of her bail conditions throughout.  And there is really no issue, I don't think the government is taking the position, although they'll correct me if I'm wrong, that the probation office is wrong about this.

THE COURT:  Does she have any ties to France?

MS. SHAPIRO:  No, your Honor.  Her family is all in

P9T3JAVS                        Sentence

the United States.

THE COURT:  I did receive a letter from an uncle in France.

MS. SHAPIRO:  Your Honor, I don't think there is any indication that there is any risk of flight here.  Ms. Javice has no incentive to flee the United States.  Her every incentive is to stay here with her family.  She's still intends on trying to start a family, as your Honor --

THE COURT:  Mother and father are here.

MS. SHAPIRO:  They're here in the United States.

THE COURT:  She has a longterm companion who is here.

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  All her life is here.

MS. SHAPIRO:  Correct.

THE COURT:  She went to college here.

MS. SHAPIRO:  Yes.  And the government has her passport.

THE COURT:  What conditions would apply so that there is no delay in the appeal?

MS. SHAPIRO:  We intend to file the notice of appeal promptly after the judgment is issued, and we can expedite the appeal if the Court would grant bail pending appeal.

THE COURT:  If I were to grant appeal, would you agree to no requests for adjournments from the court of appeals?

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  I've written an opinion August 7, 2025, rejecting motions by defendants for a new trial and for judgment notwithstanding the verdict.

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  Just a minute.

MS. SHAPIRO:  Sorry.

THE COURT:  Notwithstanding my rejection, I think there are questions of law and fact which a reasonable person might regard as substantial, and which, if successful, would result in a reversal or an order for a new trial.

So those are my preliminary findings.

Mr. Fergenson or Mr. Chiuchiolo, would you like to be heard?

MR. CHIUCHIOLO:  Yes, your Honor.

Your Honor, I'll start with risk of non-appearance. The burden is on the defendant to prove by clear and convincing evidence that she is not a risk of non-appearance.  The defendant, as the Court has already noted, is a flight risk.  I think the Court talked about this --

THE COURT:  I didn't say she was a flight risk.  I inquired of Ms. Shapiro of what the incidents are, and I concluded from that that there was clear and convincing evidence, subject to hearing from you, that she was not a flight risk.

I think to elaborate on the point, her life is here.

If she were to go to France, there is no extradition requirement, but she would have to make an entirely new and different life, separated from all her contacts, all her friends, her parents, and never be able to come to the United States again.  I don't think she would want to do that.

MR. CHIUCHIOLO:  Your Honor, there is also 78 months of prison here in the United States.  She would not be serving that in France.  And as the Court knows, we do not have an extradition treaty with France.  If she were to go to France, the United States would have very limited ability to extradite here in order for her to serve that sentence.

THE COURT:  I am assuming if that were the case, that the extradition would be difficult and possibly impossible.  But I am convinced that she will not flee, that her life is here.

And that yes, I sentenced her to 85 months of imprisonment or 7 years, but they will go, they will pass.  She'll have as positive an experience as I think a person would have in imprisonment.  She will be able to help other people.  And she'll come out a different and perhaps better person from it, and she will have the rest of her life here.  If she goes to France, she'll never come back here.  I don't think she wants that.

MR. CHIUCHIOLO:  Noted, your Honor.

THE COURT:  Will you, Ms. Javice?  You have to say.

THE DEFENDANT:  I intend to stay here and serve my sentence with dignity, as I mentioned.

MR. CHIUCHIOLO:  Understood.  I'll move on from flight.

I will note for the record that probation did not determine she's not a flight risk.  Probation said she's a good candidate for the self-surrender which the government agrees with.  Moving on to the --

THE COURT:  I agree.

MR. CHIUCHIOLO:  The merits, your Honor.  As the Court knows, the Court is only supposed to grant bail pending appeal in exceptional circumstances when there truly is questions of law and fact that people can disagree about.  We're not sure what those are, your Honor.  They certainly have not been identified in the briefing as far as we can tell.

THE COURT:  Well, I'll tell you, I've commented on the legal and the factual questions.  But there is another and very personal issue, which I don't know that defendant wishes me to speak about publicly, but which is known to all of us.  And that is fraught with difficulty, and if there is an opportunity to succeed, I'd like to give it to her.  And the only way I can give it to her is through bail.  And that's a strong motivational factor for me to consider.

MR. CHIUCHIOLO:  I would just say that consideration, if I'm thinking of what you're thinking of, is outside of the

P9T3JAVS                          Sentence

statutory scheme of --

THE COURT:  It is clearly outside the statutory scheme.  But we are all human beings, and it would be wrong not to think of it.

MR. CHIUCHIOLO:  Your Honor, I guess we'll rest on there are no substantial issues.

THE COURT:  Bail is awarded on the same terms and conditions as have been applying to date.

Still waiting for Davis Polk.

I advise you, Ms. Javice, that you have a constitutional right to appeal.  If I can't afford a lawyer, the government will provide a lawyer free of charge.  If you wish to appeal, you should instruct your lawyers so they do so on a timely basis.

And Mr. Sullivan, Mr. Baez, if so instructed, I instruct you to file in a timely basis.

Are there underlying counts?

MR. FERGENSON:  There are, your Honor, and we move to dismiss the underlying counts.

THE COURT:  So ordered.

MR. FERGENSON:  I have one or two housekeeping matters, your Honor, while we wait.

THE COURT:  Yes, please.

MR. FERGENSON:  One is with respect to the special conditions of supervised release, related to Ms. Javice's

finances and the probation office, I assume your Honor imposed those because Ms. Javice has substantial financial obligations as part of her sentence with forfeiture and restitution, and so those special conditions are appropriate.

THE COURT:  You want me to go into those special conditions?

MR. FERGENSON:  No, I was making clear that the basis for imposing those --

THE COURT:  Yes, of course.  Absolutely.

Ms. Wu is ready I think.

MR. FERGENSON:  I'm sorry, your Honor.

MS. WU:  Thank you for your patience.  JPMorgan's position is consistent with that of the government, which is that forfeiture should come first before restitution.

THE COURT:  Say that again?

MS. WU:  Forfeiture should come first before restitution.

THE COURT:  Okay.  Mr. Beirne.

MR. BEIRNE:  That's very generous of the victim here. I would propose, your Honor, that I think you could with your discretion withdraw the forfeiture imposition, and we could pledge that amount as an initial restitution payment.  We think the bank is more deserved of getting back the money here than the government.  But of course we respect your Honor's decision.

THE COURT:  I'd like the issue to be briefed.

MR. BEIRNE:  Happy to, your Honor.

THE COURT:  So the decision with the forfeiture subordinate to restitution is held in abeyance pending briefing from both sides.

MR. BEIRNE:  Your Honor, I have --

THE COURT:  I'd just like to add a point here.  I have not studied the law.  I have ruled on the issue previously in other cases to the way that the government asked me to rule. However, I note that the money is forfeited because it is directly derived from a fraudulent attaining of funds.  And since a thief can never pass title to a custodian of funds, it would follow that the owner of the funds has a preexisting right paramount over the government's right.

But I say that out of logic and understanding of the common law.  The statute on forfeiture is silent on the point. But I would be pleased to read the law as it's given to me by the parties.

Each side has a week for simultaneous presentation, a week from today.

MR. BEIRNE:  Just a couple of brief things, your Honor.  I just to make sure I'm not doing any disservice to Ms. Shapiro.  I would just like to renew generally and under the MVRA the objection we made previously to the forfeiture and restitution amounts.  Your Honor asked two -- well, I guess we

asked one question.

THE COURT:  All your objections are carried forward.

MR. BEIRNE:  Thank you, your Honor.

Your Honor asked for a plan for Ms. Javice to make restitution when she's released.  We would propose 10 percent of her net earnings per month go towards restitution.

THE COURT:  Generally I provide 10 percent of gross receipts.

MR. BEIRNE:  So the difference being gross versus net.

THE COURT:  Net requires calculation, it induces argument, and is really hard to calculate what is net in the circumstance of receipts.

So, I'll apply 10 percent of gross receipts payable on the 30th day of the month, beginning at the end of custody.

MR. BEIRNE:  Thank you, your honor.

THE COURT:  Which funds are available under the restitution provisions of confinement.  I forget what they are. Would you remind me, Mr. Fergenson?

MR. FERGENSON:  Do you mean the BOP's Inmate Financial Responsibility Program which is subject to 18 U.S.C. Section 3664(n)?

THE COURT:  Yes.  They are imposed.

MR. BEIRNE:  Your Honor, said you were going to I believe take under advisement the question of whether or not interest would continue to accrue going forward.  Do you intend

to decide that today?

THE COURT:  The only provision I order is that as long as timely payments are made, there will be no interest.

MR. BEIRNE:  Thank you, your Honor.

And finally, is your Honor going to issue the final judgment today or after the briefing on the issue we just discussed about restitution versus forfeiture?

THE COURT:  Well, it's not going to be today since it's already after 4 o'clock.  Hopefully tomorrow or soon, with that issue open.

MR. BEIRNE:  Thank you, your Honor.

MR. FERGENSON:  One other housekeeping matter, your Honor.  The sentence of 85 months I assume is on each count to run concurrently?

THE COURT:  Yes, concurrently.  And it is to go into effect 60 days after finality.

Is that clear?

THE DEPUTY CLERK:  No.

THE COURT:  Finality is the determination by the Second Circuit Court of Appeals, plus the time to seek certiorari, plus 60 days after that.

So 60 days after judgment is final at the facility assigned by the Bureau of Prisons at 2 p.m. that day.

Is there anything else I missed?  I have to sign the order of restitution.

I changed the figure in the document that's been given to me 432-3, on page 1 and schedule A so it reads $287,501,078. Signed and dated it.  And I hand it to Ms. Jones for filing. And the issue of subordination is left open.

Is there anything else from the government?

MR. FERGENSON:  Your Honor, just for the Court's awareness on the proposed restitution order, for it to be consistent with the 10 percent monthly income, you'll just need to adjust underneath Section 2, the second paragraph, it currently reads "Monthly payments of no less than $500 or at least 20 percent of the defendant's gross income."  So you'll have to reduce that to 10.

THE COURT:  I changed it to 10 percent.  Thank you.

MR. FERGENSON:  Nothing further from the government.

MR. BAEZ:  Nothing from the defense.

THE COURT:  Ms. Javice, the road ahead for you is not easy, and it's easy to find all kinds of different excuses. You have an appeal open and I don't speak about the appeal. But the rest of your life is open, and I wish you continue all the good things you have done in your life, and make it a better life for you and for others whom you love and who love you, and whom you can help.

I wish you the best.  These proceedings are closed except for the open item.

(Adjourned)