

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 5, 2026

**BY ECF**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Streets
New York, New York 10007

    Re:    *United States v. Charlie Javice and Olivier Amar*, 23 Cr. 251 (AKH)

Dear Judge Hellerstein:

    The Government respectfully writes in opposition to defendant Charlie Javice's motion (Dkt. 463 ("Def. Mot.")), joined by defendant Olivier Amar (Dkt. 465), to vacate the jury's guilty verdict based on this Court's law clerks (the "Law Clerks") having accepted employment at Davis Polk & Wardwell LLP ("Davis Polk"), the law firm that represented non-party J.P. Morgan Chase ("JPMC") for part of this case's proceedings.

    As set forth below in greater detail, the defendants' motion lacks merit and should be denied. As a non-party, JPMC's role before the Court was largely in the role of a subpoenaed party and generally limited to a handful of discrete document production disputes. There is no evidence in the defendants' motion or in the record that the Law Clerks had any role in resolving those discrete production disputes, which regularly resulted in rulings adverse to JPMC and in favor of the defendants. Indeed, many of these disputes involving JPMC were resolved before the Law Clerks' clerkships even began. And while some of these disputes took place during the Law Clerks' tenure, the record makes clear that the Court personally resolved these document disputes and issued rulings from the bench following live argument from the parties, and without any record of conferral with the Law Clerks. Ultimately, the defendants' motion points to, at most, instances of the Law Clerks assisting the Court in ministerial matters during trial. That sort of ministerial assistance, however, does not create any appearance of partiality, particularly when viewed—as the law requires—reasonably and with knowledge of the lengthy record in this case of impartial and fair adjudication. Indeed, at sentencing, Javice herself personally thanked the Court for its "fairness" throughout these proceedings. (Sept. 29, 2025 Javice Sentencing Tr. 53). Any reasonable and informed observer would see that, throughout the case, the Court exercised its own judgment and acted fairly and impartially. Javice's Rule 33 motion thus comes nowhere close to meeting the standard for judicial disqualification, much less the high showing required to discard the jury's unanimous guilty verdict that was based on overwhelming evidence of the defendants'

fraud. The motion should be denied.

## I. Background

On July 12, 2023, a grand jury in this District issued a superseding indictment charging the defendants in four counts. Count One charged the defendants with conspiring to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349. Count Two charged the defendants with wire fraud, in violation of Title 18, United States Code, Section 1343. Count Three charged the defendants with bank fraud, in violation of Title 18, United States Code, Section 1344. Count Four charged the defendants with securities fraud, in violation of Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b 5. On March 28, 2025, following a trial, the jury returned guilty verdicts on all counts for each defendant.

The charges and the defendants' convictions arose from their scheme to falsely and dramatically inflate the number of customers of their company, TAPD, Inc. d/b/a Frank ("Frank"), in order to fraudulently induce victims to acquire Frank for $175 million. Specifically, the defendants repeatedly told potential buyers that Frank had over 4 million users when, in reality, the company had 500,000 users, at most. One of the buyers to whom the victims told such lies was JPMC, which ultimately paid $175 million to acquire Frank.

JPMC was not a party to the criminal case against the defendants. Nonetheless, JPMC was one of the victims of the charged conduct, and was therefore also a third party in possession of relevant records. JPMC was represented by Hogan Lovells until February 2024, when Davis Polk appeared as counsel for JPMC. (*See* Dkt. 88-91, 94). According to letters sent to the parties by Davis Polk following trial, the Law Clerks both began their judicial clerkships with this Court in September 2024. (Def. Mot., Ex. A). At the time, the Law Clerks had received and accepted offers of employment with Davis Polk. (Def. Mot., Ex. D). One Law Clerk's clerkship ended in August 2025, and the other Law Clerk's clerkship ended in October 2025. (Def. Mot., Ex. A).

The most significant litigation involving JPMC occurred before the Law Clerks commenced their clerkships in September 2024 and, to some extent, before Davis Polk even represented JPMC:

- In October 2023, the defendants moved to compel the Government to obtain records from JPMC on the basis that JPMC allegedly was part of the prosecution team. (Dkt. 58; *see also* Dkt. 60). On November 2, 2023, the Court substantially denied the motion to compel, finding that JPMC was not part of the prosecution team.[1] (Dkt. 61 (Order), 62 (Nov. 2, 2023 Tr.)). The defendants' motion and the Court's resolution of the motion occurred prior to Davis Polk's representation of JPMC in this matter and before the Law Clerks had commenced their clerkship.

---

[1] While the Court denied the motion in substantial part, the Government was directed to ask JPMC to search for records related to two additional document custodians. (Dkt. 61).

- On or about November 9, 2023, the defendants served Rule 17(c) subpoenas on JPMC, and on December 1, 2023, JPMC, through its then counsel, Hogan Lovells, moved to quash the subpoenas. (Dkts. 72-75). On January 17 and 18, 2024, the Court denied in part and granted in part JPMC's motion to quash, ordering JPMC to produce certain categories of documents and to prepare a privilege log. (*See* Dkt. 87 (Order)). JPMC's motion to quash and the Court's resolution of the motion occurred prior to Davis Polk's representation of JPMC in this matter and before the Law Clerks had commenced their clerkship.

- On August 6, 2024, the Court conducted a hearing in which the Court made individual rulings on JPMC's privilege log and ordered JPMC to complete additional productions of documents. (Dkt. 146 (Aug. 6, 2024 Tr.); *see also* Dkt. 143 (joint submission regarding privilege from the defendants and JPMC)). The evidentiary hearing and the Court's rulings occurred before the Law Clerks had commenced their clerkship.

- On September 6, 2024, the defendants moved for an order compelling JPMC to produce certain records over which JPMC had previously asserted privilege and to produce a revised privilege log. (Dkt. 152; *see also* Dkt. 158 (JPMC Opp'n)). After hearing argument on September 23, 2024 (*see* Dkt. 166 (Sept. 23, 2024 Tr.)), on September 24, 2024, the Court denied in part and granted in part defendants' motion to compel, ordering JPMC to re-review the approximately 5,000 documents on the privilege log that were responsive to Defendants' Rule 17 subpoenas, and produce all relevant, non-privileged documents, with certain exceptions. (Dkt. 163). The Court's ruling issued the same month the Law Clerks commenced their clerkship.

The litigation involving Davis Polk's representation of JPMC before this Court was limited during the period that the Law Clerks worked in the Court's chambers. Specifically, several document production disputes involving JPMC were resolved by the Court at the February 4, 2025 final pretrial conference. Prior to that conference, the defendants had filed two motions to compel—one directed to the Government, and one directed to JPMC. (Dkt. 232 (motion to compel the Government to obtain materials from JPMC); Dkt. 237 (motion to compel JPMC to produce certain records custodian certifications). JPMC filed an opposition to the motion to compel directed to JPMC.[2] (Dkt. 245). In addition, JPMC also filed its own motion prior to the conference: a motion to quash Rule 17(c) subpoenas issued by the defendants to JPMC, through which the defendants sought personnel records of certain current or former JPMC employees who

---

[2] The Government filed an opposition to the motion to compel that was directed to the Government (*i.e.*, Dkt. 232), which alleged that the Government was in a joint prosecution with JPMC—a rehashing of a motion the Court already denied in November 2023, as noted above. (Dkt. 247 (Gov't opposition to Dkt. 232)). The defendants' motion confuses these various filings. (Def. Mot. 12 (claiming incorrectly that Dkt. 245, filed by JPMC, was an opposition to Dkt. 232, when it was actually an opposition to Dkt. 237). JPMC did not file an opposition to the motion to compel directed to the Government that was based on a joint prosecution theory (*i.e.*, Dkt. 232). Rather, JPMC filed an opposition to a motion by Javice (*i.e.*, Dkt. 237) to compel JPMC to produce certain documents. (*See* Dkt. 245).

were potential witnesses at trial. (Dkt. 256). At the February 4, 2025 conference, the Court granted the defendants' motion to compel the production of document custodian certifications, and granted JPMC's motion to quash the Rule 17(c) subpoenas for employee personnel files. (Dkt. 260). However, the Court later revisited its ruling on the personnel files and ordered JPMC to produce the personnel files to the Court for *in camera* inspection. After reviewing the personnel files, "which were mainly full of praise," the Court concluded that there was no cross-examination material in the files. (Trial Tr. 1004).

Following trial and the jury's guilty verdict, in the fall of 2025, the defendants were sentenced. On September 29, 2025, the Court sentenced Javice principally to 85 months' imprisonment, which was substantially below the bottom-end of the advisory sentencing Guidelines range and also below the sentence recommended by the Probation Office and the Government. It appears that one of the Law Clerks was still working in the Court's chambers at the time of Javice's sentencing. (Def. Mot. Ex. A). On November 5, 2025, the Court sentenced Amar principally to 68 months' imprisonment, again far below what the Guidelines advised. It appears that neither Law Clerk worked in the Court's chambers at the time of Amar's sentencing. (Def. Mot., Ex. A).

Javice has filed a notice of appeal. Javice moved, and the Court of Appeals agreed, to hold her appeal in abeyance pending resolution of the instant motion. Federal Rule of Criminal Procedure 37 provides that "[i]f a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Crim. P. 37(a). Here, the Court should deny the motion.

## II.     Applicable Law

Federal Rule of Criminal Procedure 33 ("Rule 33") allows a trial court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim P. 33(a). Because "motions for a new trial are disfavored in the Second Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), a court, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if it finds "a real concern that an innocent person may have been convicted," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "It is only when it appears that an injustice has been done that there is a need for a new trial." *Id.* The Second Circuit has "emphasized" that the remedy of a new trial should be granted "sparingly and in the most extraordinary circumstances." *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020). Further, "a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Id.* at 189.

Title 28 United States Code, Section 455(a) requires a federal judge to disqualify himself in any proceeding in which his impartiality might reasonably be questioned. *See* 28 U.S.C. § 455(a). Disqualification under "455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings."

*Liteky v. United States*, 510 U.S. 540, 557-58 (1994) (Kennedy, J., concurring). The test for disqualification under this section is whether there is an appearance of a wrongful or inappropriate bias or prejudice, not whether the judge actually harbored such a bias or prejudice against a party or his counsel. *See id*. at 548.

The test is an objective one. *See In re Drexel Burnham Lambert*, Inc., 861 F.2d 1307, 1313 (2d Cir. 1988). In determining whether there is an appearance of bias or impartiality, a judge must consider whether a reasonable person knowing and understanding all of the relevant facts and circumstances would harbor doubts as to the judge's impartiality. *See, e.g.*, *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987). An alleged disqualifying interest that is remote, contingent, or speculative is not sufficient to reasonably call into question the judge's impartiality. *See Drexel*, 861 F.2d at 1313. "It is vital to the integrity of the system of justice that a judge not recuse himself on unsupported, irrational or highly tenuous speculation, and he is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *McCann v. Communications Design Corp.*, 775 F. Supp. 1506, 1523 (D. Conn. 1991) (citing *Drexel*, 861 F.2d at 1312). Judges are presumed to be impartial. *See id*. Thus, a party moving for disqualification has a substantial burden to overcome that presumption. *See, e.g.*, *id*. at 1522. The movant must produce clear and convincing evidence that the court should be disqualified pursuant to Section 455. *See Cobell v. Norton*, 237 F. Supp. 2d 71, 79 (D.D.C. 2003).

Even where a violation of Section 445(a) may have occurred, vacatur of a conviction or a judgment does not automatically follow. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988). Instead, courts in the Second Circuit consider three factors "in determining how best to address a violation" of Section 445. *United States v. Amico*, 486 F.3d 764, 777 (2d Cir. 2007). These factors are: "(i) the risk of injustice to the parties in the particular case; (ii) the risk that the denial of relief will produce injustice in other cases, and (iii) the risk of undermining the public's confidence in the judicial process." *Id.* (citing *Liljeberg*, 486 U.S. at 864); *see ExxonMobil Oil Corp. v. TIG Ins. Co.*, 44 F.4th 163, 173 (2d Cir. 2022) (explaining "it is preferable for a court reviewing a potential violation of § 455(a) to explicitly discuss how the factors from *Liljeberg* apply"). "While not a traditional harmless-error analysis, this test looks to the relative harm to the parties, the public, and the judicial process." *Amico*, 486 F.3d at 777.

### III. Discussion

The Court should deny the defendants' motion. The motions are highly speculative, and, in light of the circumstances, even the defendants' speculation does not raise a concern regarding an appearance of impartiality. The specific (and limited) instances cited by the defendants that supposedly create appearance concerns would not cause a reasonable person to doubt the impartiality of the proceedings based on the Law Clerks' future employment with Davis Polk. In each instance relied upon by the defendants, the record reflects that the Court—not any law clerk—held and executed the decision-making authority, and in certain instances the Court was simply applying its prior rulings (issued *before* the Law Clerks began their clerkships). Moreover, the broader record reflects that the Court often ruled adversely to JPMC. Ultimately, the record does not create any appearance that the Court was biased or prejudiced and does not support the extraordinary relief sought by the defendants.

*First*, the defendants repeatedly point to a single exchange in the six-week trial that occurred during the testimony of Jen Wong, a former Frank employee who was not represented by Davis Polk.[3] (Def. Mot. 7, 10 (claiming "the clerks actively weighed in at trial on important questions, like the proper scope of witness examination")). The limited nature of this exchange in the context of a six-week trial, and the actual substance of the exchange, cannot within reason be said to create an appearance of bias. Specifically, at the close of the Government's direct examination, the following exchange occurred:

> Q. Ms. Wong, had you been involved in due diligence in the summer of 2021, to your knowledge, at least?
>
> A. No.
>
> THE COURT: She said no. You've asked those questions.
>
> Q. Ms. Wong, what involvement, if any, did you have in creating a synthetic data file in the summer of—
>
> THE COURT: You've asked those questions.
>
> MR. FERGENSON: I have not asked that one.
>
> THE COURT: Yes, you have.
>
> MR. FERGENSON: I'm sorry, Judge?
>
> THE COURT: Yes, you have.
>
> MR. FERGENSON: May I have a moment, your Honor.
>
> THE COURT: Yes.
>
> My law clerk agrees with you. You can ask the question.
>
> MR. FERGENSON: May I ask, Judge?
>
> THE COURT: Yes.

(Trial Tr. 1115-16). With respect to the first question quoted above, although there was no objection from defense counsel, the Court was correct that the Government had previously asked

---

[3] Not only was this particular witness *not* represented by Davis Polk—she admittedly disliked JPMC and was friends with the defendants. (*See* Trial Tr. 994 (her reaction to being fired by JPMC was, "I was pissed"); Trial Tr. 1268 ("Q. Is it fair to say you are no fan of JPMorgan? A. I am not a fan.")).

a series of questions relating to Wong's lack of involvement in due diligence. (*See* Trial Tr. 1077-78). However, the Government had not asked whether Wong had a role in creating a synthetic data file in the summer of 2021, or in purchasing data from third-party data companies. (*Compare* Trial Tr. 1077-78 *with* Trial Tr. 1116-17). Put differently, the transcript shows definitively that the law clerk was *correct* that the Government had not asked that question previously. Neither defendant objected to the Government's questions in the first instance, or to the Court's allowing them after initially stopping them *sua sponte*. Indeed, even in the instant motion, the defendants do not contend that the law clerk was incorrect or that the questions were improper.

No reasonable observer would question the impartiality of the proceedings based on the foregoing. The questions the Court ultimately allowed had not, in fact, been asked previously—and neither defendant even objected to the questions. Nor did either defendant ever dispute the testimony elicited from those questions—that Wong had no role in the synthetic data file or the data purchases. And given that those questions were more specific iterations of topics covered in the scope of direct examination, and in the scope of the cross examinations, these questions would have been asked on redirect examination had they not been allowed on direct, in any event. There is simply no conceivable way that a reasonable person would question the impartiality of the proceedings because a law clerk apparently made the ministerial correction noted above.

*Second*, the defendants appear to repeatedly reference Davis Polk's appearance on behalf of JPMC during a portion of the February 4, 2025 final pretrial conference. (Def. Mot. 3, 5, 12). The defendants identify no indication in the record of the Law Clerks' involvement in the Court's rulings at the hearing—and the record reflects otherwise. Indeed, the record reflects that, in ruling on the defendants' motion to compel the Government to obtain records from JPMC, it relied on its *prior* decision rejecting the defendants' theory that JPMC was an arm of the prosecution. (*See* Dkt. 232, 247, 251). The Court noted, among other things, that it "had already reviewed" a motion for this relief previously—notably, *before* the Law Clerks clerkship began and *before* Davis Polk even appeared on behalf of JPMC—"and I held that [the defendants are] not entitled" to such relief. (Feb. 4, 2025 Tr. 19). While JPMC had not filed an opposition to this motion, in the course of extended colloquy with defense counsel, the Court asked JPMC's counsel whether JPMC objected to providing its interview notes to defense counsel. (Feb. 4, 2025 Tr. 20). Counsel for JPMC confirmed the objection on the basis of privilege. (Feb. 4, 2025 Tr. 20). The Court then ruled from the bench (without discussion with the Law Clerks), adhering to its prior denial of the same motion made previously by the defendants, before the Law Clerks had any involvement in the case, and stating as follows:

> I've ruled on this issue, and even though it may have been a year ago, my recollection is it's a little different, but what's the difference? I'm ruling consistently with the way I had in the past for the reasons I gave on the record at that time. I see no reason that the government should be compelled to ask for privileged material in this connection. Motion denied.

(Feb. 4, 2025 Tr. 20).

The other rulings at the conference further belie the defendants' claims. The Court ruled *against* JPMC with respect to the defendants' request for certain record custodian certifications

related to the use of text messaging.  (Feb 4, 2025 Tr. 9).  Later in the hearing, the Court addressed JPMC's motion to quash a Rule 17 subpoena for personnel records.  (Feb. 4, 2025 Tr. 40).  The Court heard argument from counsel for JPMC and from counsel for Amar.  (Feb. 4, 2025 Tr. 40-41).  The Court then reviewed each request in the Rule 17 subpoena, heard additional argument from defense counsel, and initially granted JPMC's motion to quash the requests for personnel records, but later revisited this ruling and ordered JPMC to produce the personnel files to the Court for *in camera* inspection.  (Feb. 4, 2025 Tr. 41-43; *see* Trial Tr. 1004).  There is no indication in the record that the Court consulted with either of the Law Clerks in connection with these rulings, and, in any event, given the substance of the Court's rulings, there is simply no suggestion of bias.

The defendants appear to focus on the defendants' motion to compel the Government to obtain records from JPMC on a joint prosecution theory.  (Def. Mot 12 (citing Dkt. 232)).  Specifically, the defendants claim—wrongly (*see* note 1, *supra*)—that JPMC filed an opposition to that motion (*see* Def. Mot. 12 (citing JPMC's filing at Dkt. 245, which, in fact, opposed a different motion), and assert that the Law Clerks "were working in chambers when this important motion, opposed by the firm they were committed to work for, was denied." (Def. Mot. 12).  First, the defendants are wrong: JPMC (via Davis Polk or otherwise) did not file an opposition to this motion.  Instead, JPMC filed an opposition to a different motion to compel, which was directed to JPMC, as already described above.  (*See* Dkt. 237 (motion to compel JPMC to produce certain records custodian certifications); Dkt. 238 (letter from JPMC requesting an opportunity to respond to Dkt. 237); Dkt. 245 (JPMC's opposition to Dkt. 237)).  Moreover, the motion that JPMC opposed was granted in favor of the defendants.  (Feb 4, 2025 Tr. 9).  As to the defense motion referenced by defendants in the instant motion, the Government, not JPMC, opposed it—in a lengthy brief that addressed the joint prosecution arguments, as the Government had in the first round of briefing on the issue.  (Dkt. 247 (Gov't opposition to joint prosecution motion)).  Second, and perhaps most significantly, the defendants' purportedly "important" joint prosecution motion, on top of being simply meritless, was merely a rehashing of a prior motion that the Court had already denied.  The Court denied the renewed motion from the bench, for the same reasons given at the earlier time—a time when Davis Polk had not appeared and the Law Clerks had not started their clerkships.  A reasonable observer would have no concerns about partiality on this record.

*Third*, the defendants cite the September 23, 2024 conference during which Davis Polk appeared for JPMC regarding ongoing disputes between JPMC and the defendants concerning privilege assertions by JPMC while responding to Rule 17 subpoenas from the defendants.  (Def. Mot. 5).  The September 23 hearing was a continuation of issues raised at a hearing the month prior, on August 6, 2024, as well as earlier hearings and briefings (*see generally* Dkt. 143), and the Law Clerks did not commence their clerkships until sometime in September 2024.  Moreover, the substance of the September 23 hearing was a lengthy discussion among the parties and the Court, without any apparent involvement by the Law Clerks, resulting in a procedure to resolve the outstanding privilege disputes from the August hearing, and resulted, at least in part, in adverse rulings for JPMC. (Dkt. 145 (Order)).  Nothing about the September 23, 2024 hearing evinced any kind of bias or partiality—indeed, the Court impartially and personally oversaw this case's proceedings in the same manner both before and after the change in Law Clerks in September 2024.

*Fourth*, the defendants claim that the Frank website provides a "concrete example" of why disqualification was warranted. (Def. Mot 15). The defendants' claim is baseless. Javice requested a mistrial and a missing evidence jury instruction, claiming that a trial witness contradicted representations by JPMC that it did not have a copy of Frank's website.[4] (*See* Dkt. 345 (Javice Motion), 357 at 4-5 (Gov't Opp'n). The court denied the defendants' request for a missing evidence instruction (and, by implication, the request for a mistrial).[5] There is no indication in the record that the Law Clerks had any substantive role in these issues or the Court's ruling. More importantly—and as the Court found—the motion turned on whether the evidence was in the possession of the Government (not JPMC). The denial of the missing evidence instruction was made orally by the Court from the bench at the charge conference:

> THE COURT: What is missing? The government gave you everything it had. If it doesn't have it, it doesn't have to give it to you.
>
> MR. TAYBACK: Your Honor, there was some testimony that a witness, at the very end of the case, said that in fact JPMorgan Chase did, indeed, still have the Frank website.

---

[4] In fact, the witness's testimony was far from clear. This witness, Manole Pelarinos, was not called to testify about Frank's public website, but rather simply to admit certain files recovered from Frank's internal data storage platform, which used Amazon Web Services, or AWS. The witness first testified that he did not have a copy of the website, nor did anyone else "to [his] knowledge." (Trial Tr. 2788). The witness then stated that JPMC preserved "the AWS account with all the relevant applications" and that "all the data and all the technology in place" at acquisition was preserved "to the best of [his] knowledge." (Trial Tr. 2788-89). The witness then said that the website was preserved but not publicly accessible, clarifying that "all of the applications behind the scenes are still there." It is unclear if the witness had any actual knowledge of the status of Frank's previously-public website or whether he was speaking to the AWS data storage platform that Frank used (from which he downloaded the files that were admitted into evidence during his direct examination). Indeed, the witness testified that he had no involvement in JPMC's acquisition of Frank, and "[v]ery minimal" involvement in JPMC's integration of Frank post-acquisition, consisting of "[a] couple of discussions." (Trial Tr. 2774). All this witness did was screenshot and download the files found at two hyperlinks in Frank's AWS platform.

Moreover, defense complaints about JPMC's preservation of the Frank website were particularly specious given that the publicly available Internet Archive had preserved copies of the Frank website over time, including around the time of the acquisition. (*See* Dkt. 212). These preserved copies of the Frank website were publicly available. Pages of the Frank website from the Internet Archive were entered into evidence via a stipulation among the parties. (*See* GX S10).

[5] On March 26, 2025, the Court addressed outstanding trial motions. The Court did not address Javice's motion for a mistrial based on the Frank website. The Court asked counsel for Javice if any motions were missed, and counsel stated none were. (*See* Trial Tr. 3507).

>THE COURT: They may have had it but it is what the government has. You also served a subpoena on JPMorgan Chase.
>
>MR. TAYBACK: We did, your Honor.
>
>THE COURT: I decline to do it.

(Trial Tr. 3486).

*Fifth*, the defense notes that, during Javice's sentencing hearing, JPMC was permitted to be heard as a victim and agreed with the Government's position that forfeiture should not be "subordinated" to restitution, as Javice had (at least initially) requested during the sentencing. (Sept. 29, 2025 Javice Sentencing Tr. 72-74, 82). While there is no indication in the record that the Law Clerks had any role in this issue, more importantly, there cannot be any possible finding of an appearance of bias because the Court never even ruled on Javice's application: Javice *withdrew her request*, prior to any court ruling on the issue, rendering the issue moot by her own accord. (Dkt. 439). This was not surprising given that clear Second Circuit precedent supported the Government's position and prohibited a district court from issuing such an order. (*See* Dkt. 440 (Gov't Ltr.)). Needless to say, no reasonable observer would doubt the impartiality of the proceedings on the basis that Javice made a request (which was clearly contrary to binding Second Circuit law) and soon thereafter voluntarily withdrew the request, before this Court made any ruling.

In short, the defendants' motion establishes only that one of the Law Clerks may have occasionally assisted the Court in ministerial matters during trial. *See Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1310-13 (10th Cir. 2015) (no appearance of partiality arose from law clerk's ministerial, in-court work); *United States v. Martinez,* 446 F.3d 878, 883 (8th Cir. 2006) (same). The letters from Davis Polk contain only the generalized statement that Davis Polk has been "informed that [the Law Clerks] participated in [this Court's] chambers' work on" this case, but do not offer anything specific about what that work entailed. (Def. Mot, Ex. A). It is also apparent and undisputed that one or both of the Law Clerks attended this case's proceedings once their clerkships began. The record of those proceedings, however, make clear that the Court's rulings were the result of Your Honor's personal decision-making and that the Court's rulings were not partial towards any one party and certainly not towards non-party JPMC. *See Marcus v. W2007 Grace Acquisition I, Inc.*, No. 15 Civ. 6242 (KBF), 2017 WL 6398619, at *1 (S.D.N.Y. Sept. 13, 2017), *aff'd sub nom. Marcus as Tr. of Grace Preferred Litig. Tr. v. Smith*, 755 F. App'x 47 (2d Cir. 2018) (no violation of Section 455(a) from law clerk employment with counsel for party where "[t]he docket of this case reflects significant personal involvement by the district court judge, including several hearings and extensive oral argument," and show the judge's "personal decision making"); *see also In re Allied-Signal Inc.*, 891 F.2d 967, 971 (1st Cir. 1989) ("Both bench and bar recognize . . . that judges, not law clerks, make the decisions. The statute itself speaks of 'justice[s], judge[s], or magistrate[s],' not clerks." (quoting 28 U.S.C. § 455(a))). At hearings and at nearly every day of the six-week trial, the Court heard argument, encouraging the parties not to limit their presentation directly to the Court on matters that had been briefed, asking questions, challenging the parties' positions, reviewing legal authorities and exhibits contemporaneously while on the bench, and at times appeared to reconsider its views or prior

rulings in real time based on the oral advocacy from the parties directly to the Court. (*See., e.g.*, May 29, 2025 Tr. 8-9 ("THE COURT: Mr. Sullivan, I've got all the time. . . . I'm not limiting you. You make your arguments. Don't worry if they're written as well.")).

Viewed in context and with knowledge of the full record, the defendants' allegations would not cause any reasonable person to have doubts about the Court's impartiality and fairness in this case. Notably, while JPMC appeared in some of this case's proceedings, represented at times by Davis Polk, neither was an actual party to the case, which was a federal criminal prosecution brought and tried by the United States. By the time either of the Law Clerks would have been in a position to work on this case, most of the disputes involving JPMC and Davis Polk before this Court had already concluded. Indeed, the only disputes Davis Polk litigated while the Law Clerks were clerking were the production disputes regarding custodian certifications and certain JPMC personnel files. The Court resolved these motions mostly in favor of the defendants against JPMC. More generally, there is nothing in these proceedings—either before, during, or after the Law Clerk's potential involvement—that could cause someone to reasonably question the Court's fairness or impartiality as it related to non-party JPMC. The Court presided over this criminal case from its beginning, in May 2023, through its conclusion, in November 2025—for nearly 2.5 years. There was no discernable difference in the Court's rulings when the Law Clerk's clerkship began (or after they left). In fact, as noted above, the limited litigation involving JPMC after September 2024 resulted in mostly adverse rulings for JPMC.[6] Moreover, the Court ultimately imposed sentences far below the Sentencing Guidelines Range[7] and, in fact, was critical of JPMC during the course of those proceedings.[8] While the Government noted its disagreement with the Court's criticism of JPMC, the fact that the Court expressed those views at all further underscores why no reasonable person, with full knowledge of the record, would believe that the Court was partial towards JPMC in these proceedings.

---

[6] The Court also regularly issued rulings adverse to the Government.

[7] Javice's sentencing proceeding, which occurred during one of the Law Clerk's clerkships, illustrates how any suggestion of bias is without merit. The Court imposed a sentence far below what the sentencing Guidelines recommended and what the Probation Office and the Government sought. Indeed, in a Delaware state court filing related to the reasonableness of Javice's legal fees, Javice's lawyers boasted that their work "in connection with Ms. Javice's sentencing was life-changing — resulting in a 7-year sentence, less than the 'life' suggested by the Sentencing Guidelines, and far below the 12-year sentence requested by the government." Jef Feeley, *Charlie Javice Accuses JPMorgan of 'Hypocrisy' on Legal Bills*, Bloomberg, Nov. 5, 2025, https://www.bloomberg.com/news/articles/2025-11-05/charlie-javice-accuses-jpmorgan-of-hypocrisy-on-legal-bills. It strains credulity for Javice to now suggest that one of the Law Clerk's potential involvement at sentencing created an aura of impartiality and unfairness. Javice's claim is without merit.

[8] For example, during Javice's sentencing, the Court commented about the purported failures during its due diligence of the Frank acquisition, discussing "JPMorgan's stupidity" and "very poor due diligence." (Sept. 29, 2025, Javice Sentencing Tr. 37-38).

In light of the foregoing, there is no reasonable finding of an appearance of partiality and no violation of 28 U.S.C. § 455(a). That suffices to deny the motion. Even assuming, *arguendo*, there were a violation of Section 455(a), for many of the same reasons identified above, the *Liljeberg* factors do not weigh in favor of vacating the jury's guilty verdict, and the Rule 33 standards weigh heavily against doing so. *See United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) ("It is only when it appears that an injustice has been done that there is a need for a new trial."). Far from an injustice, the jury found each defendant guilty as charged based on the overwhelming evidence of their fraud.

\* \* \*

The defendants do not point to anything in these proceedings that would cause a reasonable person to have legitimate concerns about the Court's impartiality and fairness based on the Law Clerks' employment with Davis Polk. There was thus no violation of Section 455(a). Nor can the defendants identify any injustice in their prosecution. Accordingly, the Court should deny the motion.

Respectfully submitted,

AMANDA HOULE
Attorney for the United States, Acting under Authority Conferred by 28 U.S.C. § 515

By:     /s/_____
Nicholas W. Chiuchiolo
Micah F. Fergenson
Georgia V. Kostopoulos
Assistant United States Attorneys
212-637-1247 / -2190 / -2212